## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

DOMINGO ARREGUIN GOMEZ, a Lawful
Permanent Resident of the U.S.,
     360 2nd Street
     Romeo, MI 48065

MIRNA S., a Lawful Permanent Resident of the U.S.,

and

VICENTA S., a U.S. Citizen,[1]

          Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

Serve:  Donald J. Trump
       President of the United States
       1600 Pennsylvania Avenue NW
       Washington, DC 20500

WILLIAM BARR, in his official capacity as Attorney
General of the United States,

Serve:  William Barr
       Attorney General of the United States
       950 Pennsylvania Avenue, NW
       Washington DC 20530

Case No. ___20-1419_____

**COMPLAINT**

---

[1] A motion for leave for Plaintiffs Mirna S. and Vicenta S. to proceed pseudonymously is forthcoming.

1

UNITED STATES DEPARTMENT OF STATE,

Serve:  Executive Office
        Office of the Legal Advisor
        Suite 5.600
        600 19th St. NW
        Washington, DC 20522

MICHAEL POMPEO, in his official capacity as United
States Secretary of State,

Serve:  Executive Office
        Office of the Legal Advisor
        Suite 5.600
        600 19th St. NW
        Washington, DC 20522

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY,

Serve:  Office of the General Counsel
        Department of Homeland Security
        Mail Stop 3650
        Washington, D.C. 20528

and

CHAD WOLF, in his official capacity as Acting
Secretary of the Department of Homeland Security,

Serve:  Office of the General Counsel
        Department of Homeland Security
        Mail Stop 3650
        Washington, D.C. 20528

                        Defendants.

## **COMPLAINT**

1.     After announcing his intent to "temporarily suspend immigration into the United

States" on Monday, April 20, 2020, President Trump signed a "Proclamation Suspending Entry

of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak" (the "Proclamation") on Wednesday, April 22, 2020.

2.      With limited exceptions, the Proclamation suspends the entry of foreign nationals as immigrants for a period of 60 days. The Proclamation went into effect the next day, April 23, 2020, at 11:59 pm Eastern Daylight Time, approximately 30 hours after it was signed.

3.      The Proclamation's restrictions are currently set to last for 60 days, but its effect on children currently eligible to enter as immigrants—children sponsored by family members who are either U.S. citizens or lawful permanent residents—is much more draconian, barring them from immigrating to the United States for decades, and perhaps forever.

4.      Those children's current eligibility turns on the fact that they are under 21: if they do not receive a visa before their 21st birthdays, that eligibility will be lost and they will be placed into immigration categories with multi-decade waiting periods.  During the 60 days the Proclamation is in effect, it requires these children to meet a new, undefined "national interest" standard in order to obtain their visas—notwithstanding the family unification principle that underlies our immigration laws. The individual plaintiffs (and the members of the class they seek to represent) are the sponsors of child visa applicants who likely will not receive visas because of the Proclamation's requirement and, as a result, will "age out" of their current visa eligibility and face delays and family separation for decades before they again are eligible to immigrate into the United States. The Proclamation's effect on these families is unfair, unlawful, and unconstitutional. This Court should issue temporary and permanent relief enjoining the application of the Proclamation to bar issuance of visas to these individuals.

5.      According to its preamble, the Proclamation was issued to address "the impact of foreign workers on the United States labor market" at a time when the country's "mitigation

strategies," adopted to "flatten the curve of infections and reduce the spread of SARS-CoV2, the virus that causes COVID-19," have "taken a toll on the United States economy, with national unemployment claims reaching historic levels."

6.     Excepted from the Proclamation's entry suspension are healthcare professionals and researchers pursuing COVID-19-related research, along with their spouses and children under 21; immigrants arriving on EB-5 investor visas; the spouses of United States citizens; children of United States citizens, defined as an unmarried son or daughter under the age of 21; foreign nationals whose entry would further important United States law enforcement objectives as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees and based on a recommendation of the Attorney General or his designee; members of the United States Armed Forces and their spouses and children under 21; individuals arriving on Special Immigrant Visas designated for certain Iraqi and Afghani workers, as well as their spouses and children; and any noncitizen whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees.

7.     Apart from these limited exceptions, the Proclamation applies to the parents of United States citizens; all employment- and family-based visas; all individuals selected for diversity visas; and all individuals seeking visas under the Violence Against Women Act or other visas reserved for certain victims and witnesses to crimes in the United States. Under the Proclamation's terms, a consular officer must determine whether, in the consular officer's discretion, an individual has established his or her eligibility for one of the Proclamation's exceptions. The Secretary of State is charged with implementing the Proclamation "as it applies to visas." At least one Plaintiff sponsoring a child for an immigrant visa has already been

informed by the consulate handling the child's visa application that if the child does not meet the Proclamation's "national interest" exception, she will be denied a visa.

8.      Although the Proclamation expires by its own terms after 60 days (*i.e.*, on June 22, 2020), it was implemented with such little notice—only 30 hours—that its suspension of the country's immigration system will have a devastating and lifelong impact on Plaintiffs, their children and grandchildren, and the members of the class Plaintiffs seek to represent.

9.      Plaintiffs are United States citizens and lawful permanent residents who have sponsored their noncitizen minor children or other derivative child relatives for immigrant visas. Two Plaintiffs, as parents, have sponsored their noncitizen minor children under the age of 21. The third Plaintiff has sponsored her noncitizen minor grandchild under the age of 21 as a derivative to his father.

10.      Before the Proclamation took effect, these minor children were eligible for entry on immigrant visas in certain "family preference" categories as long as their visa petitions were "current"—*i.e.*, when the consulate could immediately issue an immigrant visa to a sponsored child because the child had an approved visa petition and had submitted the necessary application to the consulate. Indeed, Congress designed the Immigration and Nationality Act ("INA") and its visa allocation system to prioritize and facilitate the reunification of parents and their minor children within the United States. Other family preference categories suffer from backlogs that cause sponsored individuals to wait for years, if not decades, before they have an opportunity to receive an immigrant visa.

11.      Plaintiffs' minor children and grandchild, however, will turn 21 before or very shortly after the Proclamation expires. When these children do so, they will "age out" of their current visa preference category unless, before their twenty-first birthday, they can secure an

emergency consular interview with their respective consulate and meet a new admissibility requirement— qualifying for one of the Proclamation's exceptions to its broad entry suspension. Such "aging out" has draconian consequences.

12.     For example, if Plaintiff Gomez's daughter ages out before she can receive her visa, she will be reassigned to a different visa preference category that has a far lower number of visas allocated per year, is subject to per-country caps on the number of visas granted annually, and in which her visa petition will no longer be "current." These factors may result in a processing backlog, for Plaintiff Gomez and his daughter, of almost 70 years.

13.     If Plaintiff Mirna S.'s daughter and Plaintiff Vincenta S.'s grandchild age out, their visa applications will be categorically denied. Plaintiff Mirna S. and Plaintiff Vincenta S. will be required to go through a new visa sponsorship process—again, in a visa preference category with a far lower number of allocated visas per year, and which is subject to per-country caps on the number of visas granted annually. By having to go through a new visa sponsorship, moreover, Plaintiff Mirna S.'s daughter and Plaintiff Vincenta S.'s grandchild will be waiting for multiple decades for another opportunity to apply for a visa.

14.     Similar consequences await other United States citizens and lawful permanent residents who have "current" approved visa petitions for children and derivative children relatives who will turn 21 while the Proclamation remains in effect: once these children age out of their existing visa preference category, where they have "current" petitions, they will lose the opportunity, possibly forever, to immigrate to the United States. To the extent any distant future opportunity exists, the processing backlogs in visa preference categories for adults mean that these children will face years, if not decades, of further delay before they are able to reunite in the United States with their family members. In the case of oversubscribed countries such as

Mexico, China, India, and the Philippines, the wait for individuals in an adult relative visa preference category can be decades—or, in effect, an entire lifetime.

15.     The consequences of turning 21 and "aging out" are so severe that, in recognition of the fact that many children age out due to large visa processing backlogs beyond the control of the children and their sponsoring parents or relatives, Congress passed the Child Status Protection Act ("CSPA") in August 2002. The CSPA aims to provide a modicum of relief for certain children faced with the consequences of aging out due to administrative delays in the immigration process.

16.     Given the severe consequences of aging out, and in addition to the protections provided by the CSPA, consulates prioritize "emergency" interviews for children who are about to turn 21 and potentially age out of their visa preference category.[2] Emergency interviews have remained available during the COVID-19 pandemic.[3] These emergency consular services enable children about to turn 21, who have not yet received their visa due to backlogs and bureaucratic

---

[2]     *See, e.g.*, U.S. Dep't of State, Apply for A U.S. Visa in the Philippines, Frequently Asked Questions, https://www.ustraveldocs.com/ph/ph-gen-faq.asp ("If visa numbers are available for you (or your visa case becomes current for processing) and your child is *aging out* (or turning 21), we are prepared to expedite the processing of the application."); Questions for NVC/AILA DOS Liaison Committee Meeting (Nov. 4, 2014), AILA InfoNet Doc. No. 14111420 (posted Dec. 13, 2014), at 11, *available at* https://travel.state.gov/content/dam/visas/AILA/AILA %20NVC%20November%202014.pdf (noting that National Visa Center provides expedited processing for age-out cases); USCIS Policy Memorandum, *Requests to Expedite Adjudication of Form I-601, Application for Waiver of Grounds of Inadmissibility, Filed by Individuals Outside the United States; Update to Adjudicators Field Manual (AFM) Chapter 41.7 & Appendix 41-5 (AFM Update AD12-09)* (June 6, 2012), available at https://www.uscis.gov/sites/default/files/ USCIS/Laws/Memoranda/2012/June%202012/Revised%20Expedited%20I-601%20PM.pdf ("Similarly, the applicant may request that the case be expedited to prevent a child not covered by the Child Status Protection Act from aging out before visa issuance.").

[3]     *See, e.g.*, Status of U.S. Consular Operations in Mexico in Light of COVID-19 (Apr. 13, 2020), https://mx.usembassy.gov/status-of-u-s-consular-operations-in-mexico-in-light-of-covid-19/ (accessed May 27, 2020) ("Immigrant visa emergency appointment requests will be considered only when the applicant will age out of his or her case, or in case of emergencies.").

processing delays, to appear for their visa interview and complete the remaining steps in the visa application and vetting process on an expedited basis.

17.     Normally, sponsoring parents and grandparents and their legal representatives, if any, take scrupulous care to seek emergency consular processing well in advance of their children's or derivative grandchildren's 21st birthdays. Plaintiff Gomez, for example, sought an emergency interview for his daughter two months before her 21st birthday and before the Proclamation was announced. Likewise, Plaintiff Mirna S.'s attorney made multiple requests for expedited visa processing for her daughter's visa application, including *five* follow-up requests from United States Senator Kirsten Gillibrand over the course of two and a half months. Plaintiff Vicenta S.'s attorney also made multiple requests for expedited visa processing before her grandson's 21st birthday and had to involve United States Representative Cindy Axne. But the Proclamation was issued with so little warning that it was virtually impossible for any visa petitioner with a sponsored child or derivative child relative to seek emergency consular services before it took effect. For United States citizens and lawful permanent residents sponsoring children and derivative child relatives who will turn 21 during the Proclamation's effective period, the Proclamation will result in a lifetime of family separation.

18.     Notwithstanding the harsh consequences for sponsored children and grandchildren about to turn 21, and notwithstanding that Congress intended to protect such minor children and prioritize their reunification with family in the United States, the Proclamation makes no exception and provides no waiver for any sponsored children or other derivative child relative who will turn 21 within the Proclamation's effective period. Even after being alerted to the harm posed to such children, the Department of State has stated only that children who will age out during the Proclamation's effective period may seek an emergency interview and attempt

to meet one of the Proclamation's enumerated exceptions—which, for age-out children, will likely be the "national interest" exception.[4] Nevertheless, there is no public guidance about how the "national interest" exception is to be interpreted—either to assist visa applicants in preparing for their interview or to guide consular officials in making a "national interest" determination.

19.     Thus, instead of having the opportunity to live with their sponsored family members in the United States, Plaintiffs and other similarly situated parents and grandparents will likely lose the chance, and the laborious efforts previously undertaken, to sponsor their loved ones for immigrant visas. They will lose the benefits that Congress intended to provide under the INA to prioritize the family reunification of parents and minor children.

20.     Plaintiffs challenge the Proclamation under this Court's inherent authority to review executive actions that exceed statutory grants of authority, the Administrative Procedure Act, 5 U.S.C. § 706(2), and the Due Process Clause of the Fifth Amendment. Plaintiffs respectfully request that the Court issue appropriate declaratory relief and enjoin the Proclamation as to Plaintiffs and similarly situated United States citizen and lawful permanent resident parents and relatives who are sponsoring children and derivative children relatives who, due to the Proclamation, will age out of their visa preference categories during the Proclamation's effective period.

## JURISDICTION AND VENUE

---

[4]     *See* Decl. of Brianne Marwaha, ECF 137-2, *Doe v. Trump*, No. 3:19-cv-01743  (D. Or. 2020); *see also* U.S. Dep't of State—Bureau of Consular Affairs (Apr. 23, 2020), https://travel.state.gov/content/travel/en/News/visas-news/Proclamation-Suspending-Entry-of-Immigrants-Who-Present-Risk-to-the-US-labor-market.html (last visited May 27, 2020).

21. Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over Plaintiffs' claims under the U.S. Constitution and federal statutes. The Court has additional remedial authority under 28 U.S.C. §§ 2201–02.

22. Venue is proper under 28 U.S.C. § 1391(e) because (a) this is a civil action in which Defendants are the President and federal officers and agencies of the United States, (b) a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia, and (c) Defendants are headquartered in this district. There is no real property involved in this action.

## PARTIES

23. Plaintiff Domingo Arreguin Gomez is a United States lawful permanent resident of Mexican origin who resides in Romeo, Michigan. He sponsored his wife for an immigrant visa, and his wife's daughter—Plaintiff Gomez's stepdaughter—is a "follow-to-join" beneficiary of his wife's visa application. Plaintiff Gomez's stepdaughter will turn 21 on June 15, 2020.

24. Plaintiff Mirna S. is a United States lawful permanent resident of Mexican origin who resides in the Bronx, New York. She was the victim of severe domestic violence, and before obtaining lawful permanent resident status she obtained a U nonimmigrant visa when she assisted law enforcement with investigating and pursuing prosecution of her abuser. She has an approved "SU-3" immigrant visa petition for her daughter, who will turn 21 on June 23, 2020.

25. Plaintiff Vicenta S. is a United States citizen of Salvadoran origin who resides in Council Bluffs, Iowa. She has an approved visa petition for her son, and her grandson is a follow-to-join derivative beneficiary on her son's visa application. Vicenta S.'s grandson will turn 21 on June 30, 2020.

26.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Presidential Proclamation challenged in this lawsuit.

27.     Defendant William Barr is the Attorney General of the United States and has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103. He is sued in his official capacity.

28.     Defendant Department of State ("DOS") is a cabinet-level department of the United States federal government. DOS is responsible for the issuance of immigrant visas abroad. The Proclamation assigns DOS a variety of responsibilities regarding its implementation and enforcement.

29.     Defendant Michael Pompeo is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Proclamation by all DOS staff. He is sued in his official capacity.

30.     Defendant Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. The Proclamation assigns DOS a variety of responsibilities regarding its implementation and enforcement.

31.     Defendant Chad Wolf is the Acting Secretary of Homeland Security and has responsibility for overseeing enforcement and implementation of the Proclamation by all Department of Homeland Security staff. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

## STATUTORY BACKGROUND

32.     Bedrock principles within the Immigration and Nationality Act of 1952 ("INA") and subsequent amendments have focused on four key goals: reunifying families, promoting the

availability of foreign-born talent for business purposes, protecting vulnerable persons through humanitarian relief, and supporting the immigration of diverse persons from across the globe. Accordingly, Congress has allowed for the issuance of an unlimited number of immigrant visas to "immediate relatives" of U.S. citizens, which includes their spouses, parents, and unmarried children under 21 years of age. 8 U.S.C. § 1151(b)(2)(A)(i); *see also id.* § 1101(b)(1) (defining "child" for immigrant visa purposes). It has also created a comprehensive immigrant visa system that allows "worldwide immigration" based on an allocation of "preference" visas: "family-based visas"; "employment-based visas"; "humanitarian" visas, such as "U" visas, for the victims and witnesses of certain crimes who assist law enforcement; and "diversity-based" visas. 8 U.S.C. §§ 1101(a)(15), 1101(a)(27)(U), 1151(a), 1152, 1153, 1184(p)(7), 1255(m)(3).

33.     Under this system, 8 U.S.C. § 1151(a) sets forth four different categories of individuals who may be issued immigrant visas and the individual numeric annual limitations for each category; § 1151(b) sets forth specific categories of individuals not subject to the numerical limitation; and § 1152 sets a cap on the maximum number of immigrant visas that can be issued to the nationals of any given country each year.

34.     Under 8 U.S.C. § 1151, the worldwide level for annual family-based preference immigrants is a *minimum* of 226,000; the worldwide level for annual employment-based preference immigrants is at least 140,000; and a maximum of fifty-five thousand visas each year are available through a diversity visa lottery, open to countries with historically low rates of immigration to the United States. The INA also makes a maximum of 10,000 nonimmigrant "U" visas available annually for victims of crimes such as domestic violence, sexual assault, and trafficking, who may eventually adjust status and become lawful permanent residents; there is no

12

annual cap, however, on non-immigrant U visa holders and eligible derivatives who may adjust status and obtain a green card based on their non-immigrant status. 8 U.S.C. § 1184(p)(2)(A).

35.     Under 8 U.S.C. § 1152, the per-country limit for preference immigrants is set at 7 percent of the total annual family-sponsored and employment-based preference limits. This limit means that no single country can receive more than 7 percent of the total green cards issued in a year (unless they would otherwise go unused).

36.     Within the INA's visa allocation system, qualifying family members or employers are allowed to "sponsor" a noncitizen (the "beneficiary") and any "derivatives"—*i.e.*, the noncitizen beneficiary's spouse and unmarried minor children under the age of 21—for an immigrant visa. To do so, a family member or employer must file either a Form I-130, Petition for Alien Relative, or Form I-140, Petition for Alien Worker, with U.S. Citizenship and Immigration Services ("USCIS") on behalf of the "beneficiary." This form establishes the necessary family or employer-employee relationship to qualify for an immigrant visa.

37.     If and when U.S. Citizenship and Immigration Services ("USCIS") approves the immigrant visa petition, so long as visas are available, the beneficiary of the approved petition (also known as the "principal" visa applicant) may apply for a visa for him or herself and his or her derivatives. Beneficiaries and their derivatives who are abroad must apply with the U.S. Department of State via the National Visa Center ("NVC"), which coordinates the immigrant visa process with the respective consulates abroad. A visa interview at the consulate is the final step in the visa application process and enables a consular officer, in his or her discretion, to approve and issue a visa that will allow the visa petition beneficiary and any derivatives to travel to the United States and gain admission as a lawful permanent resident.

38.     Demand for immigrant visas regularly exceeds supply. *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 48 (2014). "As a consequence, the principal beneficiary of an approved petition is placed in a queue with others in her category (F1, F2A, or what have you) in order of 'priority date'—that is, the date a petition was filed with USCIS." *Id.* (citing 8 U.S.C. § 1153(e)(1); 8 C.F.R. § 204.1(b); 22 C.F.R. § 42.53(a) (2013)). Section 1153(e) thus provides that family-sponsored and employment-based preference visas "shall" be issued to eligible immigrants in the order in which a petition on behalf of each has been filed—that is, according to the "priority date" of the underlying visa petition.

39.     The queues for each preference category are critical because a family member or prospective employee abroad cannot apply for lawful permanent residence until a visa is immediately available, or when the visa petition's priority date becomes "current." The Department of State issues a monthly Visa Bulletin organized according to country of origin and visa preference category.[5] If there are sufficient visas available for applicants from a specific country and of a specific preference category, then the Visa Bulletin lists that combination as "current," and all applicants matching that combination may file an application and receive the visa regardless of their priority date. Similarly, the Visa Bulletin will provide final action dates for oversubscribed categories that allow those with priority dates on or before the provided date to finalize their visa applications and pursue their immigrant visas.

40.     The processing backlogs for family-based preference visas have remained very large, and a sponsored visa beneficiary can wait for years before their priority date becomes "current," depending on which preference category they fall within. "After a sponsoring petition

---

[5]     *See, e.g.*, U.S. Dep't State, Visa Bulletin for November 2019, Travel.State.Gov (May 27, 2020), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2020/visa-bulletin-for-november-2019.html.

is approved, but before a visa application can be filed, a family-sponsored immigrant may stand in line for years—or even decades—just waiting for an immigrant visa to become available." *Cuellar de Osorio*, 573 U.S. at 50.

*Family-based preference visas*

41.    Among family-based immigrants, Congress has prioritized the admission of "immediate relatives"—*i.e.*, the parents, spouses, and minor unmarried children of United States citizens, because Congress did not place a numeric cap on the issuance of immigrant visas for immediate relatives. 8 U.S.C. § 1151(b). This means that there is no "queue" for such family members, and their petition's "priority date" is of no consequence to when their visa may issue.

42.    By contrast to an "immediate relative," other family members are placed in preference categories that are tiered according to the family member's relationship with the petitioning family member. 8 U.S.C. §§ 1153(a)(1)-(4); *see Cuellar de Osorio*, 573 U.S. at 46–48. The family-based immigration preference classes set by Congress, along with the applicable visa allocations, are:

| Preference | | Number of Visas Allocated | Eligible Individuals |
|---|---|---|---|
| First ("F1") | | 23,400, plus any numbers not required for the fourth preference | Unmarried Sons and Daughters (21 years old or older) of U.S. Citizens |
| Second | ("F2A") | 114,200 for the "F2" preference category collectively, plus the number (if any) by which the worldwide family preference level exceeds 226,000, plus any unused first preference numbers | Spouses and Children of Permanent Residents (77% of the overall second preference limitation, of which 75% are exempt from the per-country limit) |
| | ("F2B") | | Unmarried Sons and Daughters (21 years old or older) of Permanent Residents (23% of the overall second preference limitation) |

| Third ("F3") | 23,400, plus any numbers not required by first and second preferences | Married Sons and Daughters of U.S. Citizens |
| Fourth ("F4") | 65,000, plus any numbers not required by first three preferences | Brothers and Sisters of Adult U.S. Citizens |

*See* 8 U.S.C. §§ 1151(b)(2)(A), 1153(a). Derivative spouses and unmarried minor children are

entitled to the same preference category as the beneficiary, or the "principal." 8 U.S.C.

§ 1153(d); 9 FAM 502.2-3(C)(a).[6] This means, for example, that the derivative minor child of an

F3 beneficiary may receive a visa if he or she still qualifies as a derivative when a visa becomes

available for his or her parent, the F3 principal. *Id.*

43.     Within the family-based preference immigrant visa allocation set out in the INA,

Congress has prioritized the reunification of parents with minor children by allocating

significantly more immigrant visas to minor children (defined by statute as children under the

age of 21, *see* 8 U.S.C. § 1101(b)(1)), than to children over the age of 21, thereby conferring a

greater benefit on minor children of citizens and immigrants. *See* 8 U.S.C. §§ 1101(b)(1)

(defining "child" for immigrant visa purposes); 1153(a)(2) (setting visa allocation levels for

minor and adult children of lawful permanent residents); T. Alexander Aleinkoff et al.,

*Immigration and Citizenship: Process and Policy* 276 (West, 8th ed. 2016). Minor children of

United States citizens qualify as "immediate relatives" and therefore are not subject to the

numeric visa limitations. Minor children of United States lawful permanent residents qualify for

the "F2A" family preference visa category, to which Congress has granted the most generous

allocation of immigrant visas across all family preference categories (approximately 88,000 per

year). The F2A family preference category is also not subject to any per-country caps.

---

[6]      "FAM" refers to the State Department's Foreign Affairs Manual, which is available at
https://fam.state.gov/.

44.     By contrast, all other familial relationships that qualify for a family preference visa have significantly lower annual allocations of immigrant visas and are subject to the 7 percent per-country limits of 8 U.S.C. § 1152, which can cause significant processing backlogs, especially for oversubscribed countries. Mexico, for instance, is an oversubscribed country. A Mexican national who files a petition today in the F2B family preference category can expect that it will not become "current" until the end of 2087.

*Employment-based preference visas*

45.     Every fiscal year (October 1– September 30), approximately 140,000 employment-based immigrant visas are made available to qualified applicants under the provisions of U.S. immigration law. Employment-based immigrant visas are divided into five preference categories which, like the family-based preference categories, have varying allocations of visas.

46.     To be considered for an immigrant visa under an employment-based category, the applicant's prospective employer generally must file with USCIS an Immigrant Petition for Alien Worker, Form I-140 for the appropriate employment-based preference category. Like the two-step family-based process for an immigrant visa, USCIS must first approve the I-140 petition that establishes the necessary employer-employee relationship. A "principal" applicant with an approved I-140 visa petition must then wait for his or her priority date to become "current," at which point he or she may submit the necessary paperwork and fees and eventually appear at the consulate for a consular interview.

47.     Spouses and unmarried children under 21 may apply for immigrant visas with the principal sponsored individual as provided under 8 U.S.C. § 1153(d). However, certain employment-based preference categories are vastly oversubscribed, which means that individuals

in these preference categories have a waiting period of several years before their priority date will become "current." Accordingly, many putative derivative children remain susceptible to turning 21 and losing the opportunity to receive an immigrant visa with his or her parent. If a derivative child turns 21 before his or her parent's employment-based immigrant visa is granted, the child will lose the ability to immigrate with his or her parent. For parent and child to reunite in the United States, either the child would need to seek his or her own visa independently, or the parent must sponsor the child for an immigrant visa in the "F2B" family-based preference category, for the adult children of lawful permanent residents.

*U Visas – for Victims of Criminal Activity*

48.     Congress created the "U" visa with the passage of the Victims of Trafficking and Violence Protection Act ("VTVPA") (including the Battered Immigrant Women's Protection Act) in October 2000. The law is intended to strengthen the ability of law enforcement agencies to investigate and prosecute cases of domestic violence, sexual assault, trafficking of aliens and other crimes, while also protecting victims of crimes who have suffered substantial mental or physical abuse due to the crime and are willing to help law enforcement authorities in the investigation or prosecution of the criminal activity. 8 U.S.C. §§ 1101(a)(15)(U), 1184(p); 8 C.F.R. § 214.14(c)(1).

49.     A "U" visa recipient is a survivor of certain crimes who has suffered mental or physical abuse and is helpful to law enforcement or government officials in the investigation or prosecution of such criminal activity. 8 U.S.C. § 1101(a)(15)(U). The individual initially

qualifies for a nonimmigrant visa, of which a maximum of 10,000 are available to "principal" noncitizen victims each fiscal year. *Id.* § 1184(p)(2)(A). [7]

50.     "U" nonimmigrant visa status enables those principals to remain in the United States legally and to sponsor, also for nonimmigrant visas, certain derivative family members, including spouses and children, and under certain circumstances, parents and siblings. *See id.* § 1184(p)(2)(B); 8 C.F.R. § 214.14(c)(5)(i), (d), & (f)(6). There is no cap on the number of visas that may be granted to "U derivatives," who may therefore apply immediately to enter the United States and reunite with the U-visa principal on nonimmigrant visas. 8 U.S.C. § 1184(o). The VTVPA, moreover, provides "age-out" protection for a U-visa principal's derivative children: if a derivative child turns 21 while the U-visa principal's nonimmigrant visa petition is pending, that child will receive age-out protection and maintain his or her status as a derivative, under-21 child, for as long as the petition remains pending and the derivative child remains unmarried. *Id.* § 1184(p)(7); 9 FAM 402.6.6(I)(3).

51.     The INA also allows U nonimmigrants to adjust status to that of a lawful permanent resident (*i.e.*, to get a Green Card, *see id.* § 1255(m)) in the United States if they meet certain eligibility requirements. Qualifying derivative family members who are already in the United States may also adjust status with the U-visa sponsor.

52.     After adjusting status and becoming a lawful permanent resident, a U-visa recipient may sponsor for an immigrant visa any qualifying derivative minor family members who remain outside of the United States by filing a Form I-929 petition on their behalf. *See*

---

[7]     If an eligible U-visa petitioner is not granted U-visa status solely because of the 10,000-visa cap, the petitioner is placed on a waiting list and must wait until new U visas are available at the beginning of the next fiscal year. *See* 8 C.F.R. § 214.14(c)(5)(i)(a) and (B); 7 C.F.R. § 214.14 (f)(6)(i) and (ii).

9 FAM 402.6-6(K)(a). If approved, the I-929 petition enables the derivative beneficiary to apply for a visa and eventually appear at the consulate to interview for an "SU" visa. There is no limit to the number of SU visas that may be granted, so the petition's priority date is of no consequence and there is no wait time associated with the processing of these visa applications (in contrast to oversubscribed family-based and employment-based preference categories). If approved and granted a visa, a "U" derivative will be allowed to "follow to join" the U principal in the United States immediately. *Id.* 402.6-6(K)(b).

53.     Although "age out" protection exists for the children of U-visa applicants seeking *nonimmigrant* visas during the pendency of an application, there is no equivalent "age out" protection for the child of a U visa applicant who is the beneficiary of a I-929 follow-to-join petition for an "SU-3" immigrant visa. To avoid aging out, "SU-3 beneficiaries must have his/her visa issued – and must enter the U.S. – prior to his/her 21st birthday." *Id.* 402.6-6(K)(d). Accordingly, the Department of State's Foreign Affairs Manual instructs the consular officer to "process SU-3 cases as quickly as possible when they are close to aging out." *Id.*

54.     If an SU-3 derivative child ages out, however, the consular officer "must refuse the case under 8 U.S.C. § 1182(a)(5)(A) and add appropriate case notes." *Id.* 402.6-6(K)(e).[8]  If the parent and aged-out child wish to reunite in the United States, either the child must seek his or her own visa independently, or the parent must sponsor the child for an "F2B" family-based preference visa for the adult child of a lawful permanent resident.

## CHILD STATUS PROTECTION ACT

---

[8]     8 U.S.C. § 1182(a)(5) contains no age limitation, but imposes restrictions on the admission of "[a]ny alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor."

55.     As set out above, significant immigration benefits depend on whether the sponsored beneficiary (or the sponsored beneficiary's derivative) is a minor child. If the minor child ages out before he or she has a visa granted, the minor child loses his or her "child" status under immigration law and the accompanying benefits of that "child" status, including significantly more generous annual visa allocations and exemption from per-country caps, which Congress has built into the INA specifically to facilitate the reunification in the United States of parents and their minor children.

56.     In 2002, Congress specifically recognized that backlogs in visa application processing could result in children "aging out" when they turn 21, which has the consequences of putting them "at the end of [a] long waiting list for a visa." H.R. Rep. 107-45, at 2 (2001). It therefore enacted the Child Status Protection Act ("CSPA") as an attempt to address the problem in which "growing immigration backlogs in the immigration visa category caused the visa to be unavailable before the child reached his 21st birthday." 147 Cong. Rec. S3275-01 (daily ed. Apr. 2, 2001).

57.     For United States citizens seeking to sponsor their minor children for "immediate relative" immigrant visas, the CSPA eliminates entirely the danger of aging out. As long as a citizen parent sponsors his or her child for an immigrant visa while the child is under 21, that child will never be considered to "age out" for immigration purposes and can seek and receive a visa as a United States citizen's immediate family member. 8 U.S.C. §§ 1151(f)(1), (f)(4).

58.     For United States lawful permanent residents sponsoring their minor children, as well as for all other immigrant visa applicants with derivative minor children, the CSPA provides a method for calculating and thereby adjusting the minor child's age for immigration purposes: the child's "CSPA age" is the child's biological age on the date an immigrant visa becomes

available (*i.e.*, when the priority date for the child's petition becomes "current"), reduced by the

period of time the child's visa petition was pending before it was approved by USCIS. Under this

formula, some, but not all, children nearing their twenty-first birthday are able to maintain their

status as a "child" for immigration purposes even after their twenty-first birthday, so long as the

child applies for a visa within one year of his or her priority date becoming "current." For those

children of lawful permanent residents who age out even after taking into account the protections

under the CSPA, turning 21 means converting from the F2A preference category, for minor

children, to the F-2B preference category, for adults. For other children derivatives, aging out

means losing their beneficiary status entirely and having to file a new visa petition, most likely in

the F-2B category, sponsored by their now-lawful permanent resident parents..

59.     There are significant backlogs for individuals seeking F-2B visas. For example, if

a Mexican national files a new F-2B petition for an adult son or daughter today, that petition will

not become "current" and the son or daughter will not have an opportunity to seek and receive a

visa for nearly 7 decades.

## COVID-19'S IMPACTS ON VISA PROCESSING

60.     SARS-CoV-2 is a highly transmissible respiratory virus that has resulted in the

rapid spread of the infectious COVID-19 disease. On March 11, 2020, the World Health

Organization declared COVID-19 a "global pandemic." As of May 27, 2020, there are over 5.6

million confirmed cases throughout the world, and over 350,000 people have died from the

disease. Over 100,000 people have died in the United States alone.

61.     There is no vaccine against the SARS-CoV-2 virus, nor is there any known

medication to prevent or treat COVID-19 once an individual is infected and develops symptoms.

The only known effective measure to reduce the risk of injury or death from COVID-19 is to

prevent the spread of infection by "social distancing"—avoiding crowded spaces and keeping at least six feet between yourself and others—and by repeatedly disinfecting hard, commonly touched surfaces.

62.     On March 19, 2020, California was the first state to order residents to stay at home as much as possible until further notice; the same measure was later implemented in at least 42 other states and the District of Columbia, as well as by numerous localities.[9] As a result, most businesses have shut down or severely curtailed operations as part of the effort to try and limit the spread of the virus.[10]

63.     Likewise, on March 20, 2020, the Department of State temporarily suspended routine visa services at all Embassies and Consulates in response to significant worldwide challenges related to the COVID-19 pandemic. Embassies and consulates canceled all routine immigrant and nonimmigrant visa appointments, but as resources allowed, embassies and consulates continued to provide emergency and mission critical visa services.[11]

64.     After weeks of enforcing "stay-at-home" orders, governors have now begun reopening parts of their state economies, weighing the health costs of loosening restrictions with the economic toll of keeping those restrictions in place. As of May 28, 2020, stay-at-home restrictions had caused over 40 million Americans to lose their jobs and file for unemployment

---

[9]     Alicia Lee, *These states have implemented stay-at-home orders. Here's what that means for you*, CNN (Apr. 7, 2020), https://www.cnn.com/2020/03/23/us/coronavirus-which-states-stay-at-home-order-trnd/index.html.

[10]    Heather Long & Andrew Van Dam, *U.S. unemployment rate soars to 14.7 percent, the worst since the Depression era*, WASH. POST (May 8, 2020), https://www.washingtonpost.com/business/2020/05/08/april-2020-jobs-report/.

[11]    U.S. Dep't of State—Bureau of Consular Affairs, Suspension of Routine Visa Services (Mar. 20, 2020), https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html (last visited May 27, 2020).

benefits, yielding an unemployment rate that may reach 20 percent in May.[12] In Texas, however, the governor acknowledged that his decision to allow businesses to reopen starting on May 1, 2020, would likely lead to more infections and an "increase in spread."[13]

65.     Countries such as Hong Kong, Singapore, and Taiwan have already experienced a second wave of coronavirus infections, and experts foresee several cycles of a "suppress and lift" policy through the next year or more—cycles during which restrictions are applied and relaxed, applied again and relaxed again, in ways that can keep the pandemic under control at a more acceptable economic and social cost.[14]

### PRESIDENTIAL PROCLAMATION 10014

66.     Late on Monday night, April 20, 2020, President Trump tweeted that "[i]n light of the attack from the Invisible Enemy, as well as the need to protect the jobs of our GREAT American Citizens, I will be signing an Executive Order to temporarily suspend immigration into the United States!"[15]

---

[12]     Anneken Tappe, *1 in 4 American workers have filed for unemployment benefits during the pandemic*, CNN (May 28, 2020), https://www.cnn.com/2020/05/28/economy/unemployment-benefits-coronavirus/index.html.

[13]     *The governor of Texas told lawmakers he expected the virus to spread as businesses reopened,* N.Y. TIMES: THE CORONAVIRUS OUTBREAK (May 5, 2020), https://www.nytimes.com/2020/05/05/us/coronavirus-live-news.html.

[14]     Jen Kirby, *What we can learn from the "second wave" of coronavirus cases in Asia*, VOX (Apr. 17, 2020)*, https://www.vox.com/2020/4/17/21213787/coronavirus-asia-waves-hong-kong-singapore-taiwan. See also* Peter Beaumont, *Will there be a second wave of coronavirus?,* THE GUARDIAN (Apr. 20, 2020), https://www.theguardian.com/world/2020/apr/20/will-there-be-second-wave-of-coronavirus-.

[15]     Betsy Klein, Priscilla Alvarez & Kevin Liptak, *Trump claims he will temporarily suspend immigration into the US due to coronavirus fears*, CNN (Apr. 21, 2020), https://www.cnn.com/2020/04/20/politics/donald-trump-immigration-halt-coronavirus/index.html.

67.     The President announced in a press briefing the next day, April 21, 2020, that he would be "issuing a temporary suspension of immigration into the United States." Although White House officials said that the President could sign something as early as that same day, contemporaneous news articles reported that "it wasn't clear that administration officials had worked through the legal and practical implications of completely shutting down the country's immigration system."[16] The President confirmed in his April 21 press briefing that government attorneys were drafting the proclamation that day.

68.     The President ultimately signed the "Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak" on the evening of Wednesday, April 22, 2020. A copy of the Proclamation is available at https://www.whitehouse.gov/presidential-actions/proclamation-suspending-entry-immigrants-present-risk-u-s-labor-market-economic-recovery-following-covid-19-outbreak/ and is attached to this Complaint as Exhibit A.

---

[16]     Nick Miroff, Josh Dawsey & Teo Armus, *Trump administration working out details of suspending immigration during coronavirus crisis, plans to close off the United States to a new extreme*, WASH. POST (Apr 21, 2020)*,* https://www.washingtonpost.com/immigration/coronavirus-trump- immigration/2020/04/21/a2a465aa-837a-11ea-9728-c74380d9d410 _story.html. *See also id* ("[T]he president appears to have again publicly declared a U.S. policy that was not yet ready for implementation, leaving his aides rushing to deliver on his pronouncement."); Nick Miroff, Maria Sacchetti & Tracy Jan, *Trump to suspend immigration to U.S. for 60 days, citing coronavirus crisis and jobs shortage, but will allow some workers*, WASH. POST (Apr. 21, 2020)*,* https://www.washingtonpost.com/immigration/coronavirus-trump-suspend-immigration/2020/04/21/464e2440-838d-11ea-ae26-989cfce1c7c7_story.html ("Other aides said privately that the president had once more announced a sweeping policy that was not yet ready for implementation, and his administration was trying to piece together an executive order for him to sign that would catch up to his whim").

69.     The Proclamation went into effect on April 23, 2020, at 11:59 Eastern Daylight Time, approximately 30 hours after the President signed it.

70.     The Proclamation suspends the entry of all immigrants for 60 days, with certain exceptions. These exceptions include:

(i)     Any lawful permanent resident of the United States (Proclamation § 2(b)(i));

(ii)    Any immigrant seeking entry "as a physician, nurse, or other healthcare professional; to perform medical research or other research intended to combat the spread of COVID-19; or to perform work essential to combating, recovering from, or otherwise alleviating the effects of the COVID-19 outbreak, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees," as well as that immigrant's spouse and unmarried children under 21 (*id.* § 2(b)(ii));

(iii)   Any immigrants seeking entry through the EB-5 Immigrant Investor Program (*id.* § 2(b)(iii));

(iv)    Any spouse of a United States citizen (*id.* § 2(b)(iv));

(v)     Any child of a United States citizen who is under 21, as well as prospective adoptee children (*id.* § 2(b)(v));

(vi)    Any immigrant "whose entry would further important United States law enforcement objectives, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees, based on a recommendation of the Attorney General or his designee" (*id.* § 2(b)(vi));

26

(vii)     Any member of the United States Armed Forces, as well as any spouse and children of that individual (*id.* § 2(b)(vii));

(viii)     Certain Iraqis and Afghans seeking entry under a Special Immigrant Visa, "subject to such conditions as the Secretary of State may impose," as well as any spouse and children of such individuals (*id.* § 2(b)(viii)); and

(ix)     Any immigrant "whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees" (*id.* §2(b)(ix)).

71.    Apart from these exceptions, the Proclamation applies to all noncitizens who:

(i)     Are outside the United States on the Proclamation's effective date (*id.* § 2(a)(i));

(ii)     Do not have an immigrant visa that is valid on the Proclamation's effective date (*id.* § 2(a)(ii)); and

(iii)     Do not have an official travel document other than a visa, such as a transportation letter, an appropriate boarding foil, or an advance parole document, that is valid on the Proclamation's effective date, or is issued on any later date permitting the individual to travel to the United States and seek entry or admission (*id.* § 2(a)(iii)).

72.    The Proclamation states that a consular officer "shall determine, in his or her discretion," whether an immigrant qualifies for one of the enumerated exceptions. It also commands the Secretary of State to "implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland

Security, may establish in the Secretary of State's discretion." It commands the Secretary of Homeland Security to "implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish in the Secretary of Homeland Security's discretion."

73.     The Proclamation does not include any exception or waiver for children or other derivative child relatives sponsored for immigrant visas who will turn 21 during its 60-day effective period, have current priority dates within their respective preference categories, and will lose their visa eligibility within those current visa preference categories if they turn 21 and age out.

74.     The Proclamation ostensibly is meant to address "the impact of foreign workers on the United States labor market, particularly in an environment of high domestic unemployment and depressed demand for labor." The Proclamation states that "excess labor supply" is "particularly harmful to workers at the margin between employment and unemployment"—a harm that, according to the Proclamation, will "disproportionately" be borne by "historically disadvantaged groups, including African Americans and other minorities, those without a college degree, and the disabled." It further asserts that lawful permanent residents have "immediate eligibility to compete for almost any job, in any sector of the economy," and that "[e]xisting immigrant visa processing protections" are therefore inadequate either "to protect already disadvantaged and unemployed Americans from the threat of competition for scarce jobs from new lawful permanent residents," or to support "recovery from the COVID-19 outbreak."

75.     The Proclamation also states that it is necessary "to conserve critical State Department resources so that consular officers may continue to provide services to United States citizens abroad," and that "introducing additional permanent residents" will "pu[t] strain on the

finite limits of our healthcare system at a time when we need to prioritize Americans and the existing immigrant population."

76. Although the Proclamation expires by its own terms 60 days after its effective date (*i.e.*, on June 22, 2020), it "may be continued as necessary." The Proclamation commands the Secretary of Homeland Security, "in consultation with the Secretary of State and the Secretary of Labor," to "recommend" whether the President "should continue or modify this Proclamation." The Proclamation, however, provides no guidance for determining under what circumstances the Proclamation would no longer be "necessary."

77. Other than the Proclamation itself, the only information the Administration has made publicly available about the Proclamation is found on a page on the State Department's website.[17] Apart from summarizing the scope of and exceptions to the Proclamation, and providing a link to Proclamation's full text on the White House website, the page states that the Proclamation "is not retroactive," and that while "[r]outine visas [sic] services have been suspended at U.S. posts worldwide," "as resources allow, embassies and consulates will continue to provide emergency and mission critical visa services for applicants who may be eligible for an exception under this presidential proclamation." However, the webpage provides no guidance as to how an immigrant may demonstrate eligibility for one of the enumerated exceptions, particularly the exceptions that must be determined by a Cabinet Secretary or the Attorney General, or by a designee.

### HARMS OF AGING OUT, EXACERBATED BY THE PROCLAMATION

---

[17] U.S. Dep't of State, Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak, (Apr. 23, 2020), https://travel.state.gov/content/travel/en/News/visas-news/Proclamation-Suspending-Entry-of-Immigrants-Who-Present-Risk-to-the-US-labor-market.html (last visited on May 27, 2020). A copy is attached hereto as Exhibit B.

78.     As noted above, the INA contains certain structural advantages that prioritize the family unity of parents with their minor children, including more generous visa allocations for minor children that are not subject to the per-country caps of 8 U.S.C. § 1152, which can create significant processing backlogs and queues. Parents already in the United States who are sponsoring minor children are thus able to reunite with them far more quickly than with other familial relations. Parents who are outside the United States and seeking to immigrate are allowed to bring their children with them as derivatives and maintain their family's unity.

79.     The benefits of these structural advantages, however, disappear once a minor child turns 21. If the child has not received an immigrant visa by then, the now-adult child is considered to have "aged out" of his or her visa preference category.

80.     For lawful permanent residents who have sponsored minor children for "F2A" family preference visas, aging out means that their now-adult child will automatically "convert" to the "F2B" family preference category for the adult children of lawful permanent residents. Although the sponsored aged-out child of a lawful permanent resident will retain his or her "priority date" and his or her visa petition will remain pending, aging out means that the now-adult child will be effectively reassigned from a preference category (F2A) with virtually no queue, and with far more available visas, to a preference category (F2B) with a decades-long queue, for which far fewer visas are issued annually, subject to annual per-country limits. All these factors contribute to waiting periods that are years, sometimes decades, long. Prospective immigrants from oversubscribed countries such as China, Mexico, India, and the Philippines can wait for decades.

81.     The consequences are even more severe for any other family-, employment-, "U," or diversity-based visa applicant seeking to immigrate with, or to bring a child to the United

States as, a derivative. If a derivative child ages out before his or her principal parent receives a visa in these preference categories, the child has no recourse: the child's visa petition does not automatically convert to another preference category, and the child loses his or her priority date and the opportunity to come to the United States to reunite with his or her parent. An aged-out derivative child must therefore find a new, independent basis to immigrate, or the parent must file a new, family-based petition for the child—most likely in the F2B family preference category, for the adult children of lawful permanent residents. In either event, the time spent waiting for the principal parent's visa is entirely lost, and a new visa petition would place the now-adult child at the end of the queue in any immigrant visa preference category for which the child qualifies. Processing backlogs for adult visa preference categories are so long that the parent would, in all likelihood, not be able to reunite with his or her child for a decade or more, and possibly for his or her entire lifetime.

82.    Although the Proclamation expires by its own terms in 60 days, its suspension of the nation's immigrant visa system amplifies the risk of aging out for sponsored minor children who will turn 21 during its effective period by effectively imposing a new, possibly insurmountable admissibility requirement—*i.e.*, qualifying for one of the Proclamation's limited exceptions—that the child must meet before he or she turns 21. As the U.S. consulate in Ciudad Juarez has already advised Plaintiff Mirna S., the only likely exception available to minor, soon-to-age-out children under the Proclamation is the "national interest" exception. Defendants, however, have provided no guidance on how a visa applicant may apply for such an exception, nor have they provided any guidance on what a visa applicant must show to qualify for such an exception.

83.     This absence of guidance is particularly consequential given the speed with which the Proclamation was announced, was signed, became effective, and was implemented. The cumulative effect of the lack of guidance, on top of the lack of advance notice of the Proclamation's scope and effect, is that children at risk of aging out—and thus at risk of losing their opportunity to immigrate to the United States to be with their families, in some instances for the rest of their lives—must appear for an emergency consular interview to seek a "national interest" exception to the Proclamation without knowing how to do so, without knowing whether they even qualify, and without having any meaningful opportunity to develop, acquire, or document the traits, skills, experience, references, or other qualifications that would allow them to establish eligibility for that exception.

84.     Moreover, although many sponsoring United States citizens and lawful permanent residents schedule emergency visa processing for children at risk of aging out well before those children's 21st birthdays, the speed with which the Proclamation was signed and implemented all but guaranteed that such prophylactic actions would not be able to secure a timely visa for a soon-to-age-out child before the Proclamation went into effect because of the Proclamation's imposition of a new admissibility requirement for that child.

85.     Despite being aware of the draconian consequences that a minor child faces if he or she has the misfortune to turn 21 during the Proclamation's effective period, cannot establish eligibility for an exception, and is forced to age out solely because of the Proclamation's temporary entry suspension, Defendants have taken no steps to address or alleviate these consequences.

86.     Indeed, shortly after the Proclamation went into effect, the plaintiffs in *Doe v. Trump*, No. 3:19-cv-01743 (D. Or. Oct. 30, 2019), sought a temporary restraining order from the

U.S. District Court for the District of Oregon under the All Writs Act, asking the court to restrain the implementation and enforcement of the Proclamation specifically as to children who would age out during the Proclamation's effective period. The plaintiffs in *Doe* asked to enjoin the Proclamation only to the extent that its entry suspension would prevent such children from accessing emergency consular processing services that enable them to receive their visas on an expedited basis and therefore avoid aging out of their visa preference category.

87.     During attempts to meet and confer on the motion[18], the government defendants in that case represented that emergency consular processing services would continue to be available but that Presidential Proclamation 10014 would apply to age-out children who request emergency interviews. According to the government defendants, children at imminent risk of aging out would be required to show, to the satisfaction of a consular officer during their emergency interview, that they fall within the scope of the Presidential Proclamation 10014's "national interest" exception or another one of the limited exceptions. At the time of the telephonic conferral, the government defendants had not instructed or explained to consular officers or the public how consular officers are to make a determination that an individual satisfies the requirements of the "national interest" exception, or under what circumstances such a showing would be possible.

88.     At oral argument on the TRO motion, counsel for the government represented that children at risk of aging out would still be able to request emergency consular processing, notwithstanding the reduction in consular services due to the pandemic—but "[d]uring the [consular] interview, of course, the applicant would have to establish eligibility for an exception

---

[18]     Some of the undersigned counsel in this case are also counsel for the plaintiffs in *Doe v. Trump*.

under the Proclamation."[19] Although the government's counsel acknowledged the severe consequences of aging out, counsel nevertheless affirmed that a "categorical exception" for children at risk of aging out during the Proclamation's effective period was not available because "the consular officers, just like any other kind of visa eligibility factor, are going to make that decision during the interview on a case-by-case basis," and "[t]he national interest exception is definitely available to people who are going to age out."[20]

89.    Approximately three weeks after the government represented in *Doe* that a "categorical exception" was simply unavailable to provide relief for the finite number of children who would turn 21 and age out during the Proclamation's effective period if they could not establish eligibility for an exception, Acting DHS Secretary Chad Wolf issued a "National Interest Exemption" on May 22, 2020, categorically excepting foreign professional athletes and "their essential staff and dependents" from Presidential Proclamations Nos. 9984, 9992, 9993, and 9996, which—due to COVID-19 concerns—suspended the entry of aliens who had been physically present in certain countries within 14 days before seeking entry to the United States.[21]

---

[19]    A declaration by a State Department employee, filed in support of the government's opposition to the temporary restraining order requests, also confirmed that a consular post "may continue to schedule interviews, as resources allow, for mission critical and emergency cases where a post determines the applicant may qualify for an exception under the Presidential Proclamation." Decl. of Brianne Marwaha, ECF 137-2, ¶ 4, *Doe v. Trump*, No. 3:19-cv-01743 (D. Or. 2020).

[20]    The district court ultimately denied the emergency TRO motion on procedural grounds, without reaching the merits.  Specifically, the court found an insufficient connection between the Proclamation and the underlying claims in *Doe v. Trump*, such that the Proclamation at issue here would not so "interfere with the Court's jurisdiction" in that case as to render an injunction under the All Writs Act appropriate.

[21]    U.S. Dep't of Homeland Sec., NATIONAL INTEREST EXEMPTION FROM PRESIDENTIAL PROCLAMATIONS 9984, 9992, 9993, AND 9996 REGARDING NOVEL CORONAVIRUS FOR CERTAIN PROFESSIONAL ATHLETES AND THEIR ESSENTIAL STAFF AND DEPENDENTS (May 22, 2020), https://www.dhs.gov/sites/default/files/publications/20_0522_national-interest-exemption.pdf; *see also* U.S. Dep't of Homeland Sec., Acting Secretary Wolf Signs Exemption Allowing Entry

90.     Like the Proclamation that Plaintiffs are challenging here, Proclamations Nos.

9984, 9992, 9993, and 9996 are entry suspensions issued under 8 U.S.C. § 1182(f), and include

"an exception for 'any alien whose entry would be in the national interest, as determined by the

Secretary of State, the Secretary of Homeland Security, or their designees.'" *Id.* Pursuant to this

language, Acting Secretary Wolf found that "[p]rofessional sporting events provide powerful

first- and second-order benefits to the national economy" and "also provide intangible benefits to

the national interest, including civic pride and national unity." As a result, Acting Secretary

Wolf determined that "it is in the national interest to except from Proclamations 9984, 9992,

9993, and 996, aliens who compete in professional sporting events organized by certain

professional sporting groups, including their professional staff, team and league leadership,

spouses, and dependents." *Id.*[22]

91.     To date, Plaintiffs are unaware of any public guidance that Defendants have

issued, either to prospective immigrants or to consular officers, on how a consular officer should

process the visa application of a child at risk of aging out; on how and whether a consular officer

consider if that child meets the "national interest" exception, or any other exception, to the

Proclamation; or on how a prospective immigrant may demonstrate his or her eligibility for, or

otherwise seek, any of the Proclamation's exceptions. Apart from the foreign professional

athletes identified in the exemption signed by Acting Secretary Wolf on May 22, 2020, Plaintiffs

are unaware of any announcement, from either the Secretary of State or the Acting Secretary of

---

of Certain Foreign Professional Athletes into the US (May 22, 2020), https://www.dhs.gov/news
/2020/05/22/acting-secretary-wolf-signs-exemption-allowing-entry-certain-foreign-professional.

[22]     Professional athletes typically enter the country on P1A *nonimmigrant* visas, and so are
not typically affected by the Proclamation's restriction on the entry of aliens as immigrants.

Homeland Security, establishing that the entry of a class of individuals is categorically in the national interest and therefore excepted from entry suspensions issued under 8 U.S.C. § 1182(f).

92.     Notwithstanding Congress's express intent that the family unity of minor children and their parents be a priority under the INA's visa allocation system, and that minor children deserve relief from the draconian consequences of aging out, as expressed through the CSPA, Defendants have given every indication that the Proclamation can and will be enforced against minor children who will turn 21 during the Proclamation's effective period, and that such children must establish eligibility under one of the Proclamation's exceptions to receive a visa and avoid aging out. The Proclamation's enforcement against Plaintiff Gomez and his daughter, Plaintiff Mirna S. and her daughter, and Plaintiff Vincenta S. and her grandson, will cause Plaintiffs and their loved ones substantial, concrete, and particularized injury. If these children cannot establish before a consular officer that they meet one of the Proclamation's exceptions, they will be denied a visa and will age out of their current visa preference category. As a result, the Proclamation will permanently separate close family members and inflict irreparable harm.

93.     **Plaintiff Domingo Arreguin Gomez** is a United States lawful permanent resident who sponsored his wife for an immigrant visa shortly after they were married in 2016. His wife received her immigrant visa in January 2020, and her daughter Alondra—Plaintiff Gomez's stepdaughter, who currently lives in Mexico—is an F2A "follow-to-join" beneficiary on her visa application.

94.     Alondra is 20 years old and will turn 21 on June 15, 2020. Plaintiff Gomez's wife contacted the United States consulate in Ciudad Juarez on April 16, 2020, to schedule an emergency visa interview for Alondra. The family hoped that she would be able to appear for her interview and be granted her follow-to-join immigrant visa on an expedited basis. Unfortunately,

the consulate refused to schedule an interview at that time because Alondra's Mexican passport had expired.

95.     The family took immediate steps to renew Alondra's passport, but it was difficult because, by that time, the Mexican government had begun limiting certain operations due to the COVID-19 pandemic. The Mexican government canceled Alondra's initial passport appointment on April 28, 2020, because of COVID-19 concerns.

96.     After the family learned about the Presidential Proclamation in late April from Plaintiff Gomez's immigration attorney, and realized that the Proclamation's 60-day effective period would include Alondra's twenty-first birthday, the family and their immigration attorney redoubled their efforts to renew Alondra's passport on an emergency basis so that she could seek an emergency visa interview from the Ciudad Juarez consulate.

97.     Alondra was finally able to renew her Mexican passport on May 13, 2020. On that same day, she called the consulate to try and schedule an emergency consular interview, but she was told to wait five business days for a response. After receiving no further contact from the consulate after five business days, Alondra called again, multiple times, in the next few days. On May 22, 2020, the consulate told Alondra to file paperwork and pay the immigrant visa fee online, but the Department of State's Consular Electronic Application Center (CEAC) has blocked her online access to her application. She and her stepfather's attorney have contacted the National Visa Center and the U.S. consulate in Mexico on an almost-daily basis since that time, but have received no response.

98.     When Alondra is able to complete her application and schedule an emergency visa interview, she will still be subject to the Proclamation, and will thus be unable to obtain a visa unless she is able to satisfy one of the Proclamation's exceptions.  Apart from the

Proclamation, Plaintiff Gomez and his attorney are unaware of any reason why Alondra would be refused a visa.  If she does not receive a visa before June 15, 2020, she will age out of eligibility for an F2A visa.

99.     Alondra and her parents have a very close relationship, and she depends on them for support.  Alondra is a single mother, and she and her four-year-old son, who is a U.S. citizen, rely on Alondra's parents for childcare.  Alondra speaks to Plaintiff Gomez and his wife daily, and they are anxious for her to come live with them in the United States.  Currently, Alondra is very busy working and attending school, and it is difficult for her to work, go to school, and provide care for her son.  Before her mother, Plaintiff Gomez's wife, left Mexico, her mother was the primary caretaker for Alondra's son while Alondra was working or in class.  Since Alondra's family moved to the United States, and Alondra was forced to stay in Mexico, it has been very difficult for her, as a single mother, to find adequate childcare.

100.    It is also difficult for Plaintiff Gomez and his wife to have some family members in the United States but others, including Alondra and their grandson, in Mexico.  Plaintiff Gomez and his wife are able to visit Mexico occasionally, but it is difficult to go back and forth very often.  It is important to Plaintiff Gomez and his family that Alondra be able to apply for and receive a visa soon, so that they can reunite with, and provide support for, Alondra and her son. Their family is devastated that they cannot be together.

101.    **Plaintiff Mirna S.** is a United States lawful permanent resident who received a U nonimmigrant visa in 2013 because she was the victim of severe domestic violence and cooperated with law enforcement to investigate and pursue the prosecution of her former partner who physically and sexually abused her for four years.

102.     When Mirna S. applied for her U nonimmigrant visa, she filed derivative applications for the three children she had been forced to leave behind in Mexico when she came to the United States to earn money to support her family. Despite her best attempts, however, she was unable to locate the father of her older child or the father of her two younger children to obtain their consent for the children to be issued passports, or to give them notice so she could gain legal custody of the children. She was only able to sponsor her oldest daughter for a "U" derivative visa once that daughter was old enough to no longer to require parental consent for a passport.

103.     After remaining in the United States continuously for three years and satisfying all other requirements, Mirna S. was able to adjust status and receive a Green Card in September 2018. Shortly thereafter, she filed an I-929 petition to sponsor her younger daughter for an SU-3 immigrant visa.

104.     The I-929 petition for Mirna's daughter, M.T.S., was approved on June 27, 2019, and Mirna S. worked to prepare and submit the visa application for M.T.S., along with all the required supporting documentation, in the next few months. She completed the submission of all documents necessary to approve the SU-3 visa by November 13, 2019, at which time she alerted the NVC that M.T.S. would turn 21 on June 23, 2020. Mirna S.'s immigration attorney received a letter on December 13, 2019, stating that M.T.S. was ready to be scheduled for a consular interview.

105.     Notwithstanding this December 2019 letter, the consulate ultimately did not contact M.T.S. to schedule an interview *until nearly five months later*, on May 13, 2020—and this was only after Mirna S.'s attorney contacted the National Visa Center multiple times; submitted an Expedite Request to the NVC; reminded the NVC of Section 402.6-6(K) of the

State Department's Foreign Affairs Manual, which requires the State Department to process SU-3 visa cases as quickly as possible when the applicant is close to aging out; and ultimately resorted to asking United States Senator Kirsten Gillibrand to inquire, also multiple times, with the State Department about the status of M.T.S.'s visa application. In total, Senator Gillibrand's office contacted the State Department about M.T.S.'s visa application and scheduling an emergency consular interview *at least five separate times over two and a half months*, on February 26, March 6, April 17, May 1, and May 11.

106.    Finally, on May 13, 2020, Mirna S. received a call from the consulate, informing her that she had been scheduled for an emergency visa appointment on June 5, ten days before her 21st birthday.

107.    In an e-mail to Senator Gillibrand's office, which Senator Gillibrand's office subsequently forwarded to Mirna S.'s attorney, the consulate provided details about M.T.S.'s emergency visa interview. The consulate's e-mail included the following statement: "Please note that approval of this visa classification is currently suspended under Presidential Proclamation 10014 Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market, in effect as of April 23, 2020. Visa approval for this case will require a national interest exception. There is no guarantee that this exception will be granted, even if the visa is otherwise issuable at the time of interview."

108.    On May 14, at the Consulate's suggestion and with assistance from Senator Gillibrand's office, Mirna S.'s attorney rescheduled M.T.S.'s emergency appointment to May 29, 2020.

109.    Mirna S.'s attorney is not aware of any reason why the consulate would refuse issuing M.T.S. a visa apart from the Proclamation. The fact that USCIS approved Mirna S.'s I-

929 visa petition for M.T.S. represents that she prima facie qualifies for a visa, and Mirna S.'s attorney is not aware of any grounds of inadmissibility that might prevent her from receiving a visa.

110.    Nevertheless, Mirna S. understands that the consulate may not find that M.T.S. qualifies for a "national interest" exception and deny M.T.S. a visa, which would mean that M.T.S. would age out and no longer qualify for an SU-3 visa once she turns 21. If this happens, Mirna S. is aware that she may not reunite with M.T.S. for many years, and possibly not ever before Mirna S. herself dies, because of the limited number of visas available and the extreme backlogs for the "F2B" family preference category for the adult children of lawful permanent residents.

111.    The possibility that M.T.S. might age out and not receive her visa now is devastating to Mirna S. She and her children were all victims of domestic violence in Mexico at the hands of M.T.S.'s stepfather, the father of Mirna S.'s older daughter, who was both physically and verbally abusive to Mirna S. and the two girls; sexually abused Mirna S.'s older daughter when M.T.S. was only four years old; and harassed both girls for years. M.T.S. often feels her stepfather is watching and following her; she will only feel safe when she is able to leave Mexico and reunite with Mirna S. in the United States.

112.    After her family has suffered so much abuse and hardship, it pains Mirna S. that she and her daughters—all survivors of domestic violence—may not be able to reunite and heal together as a family. It is also painful for Mirna S. that she may be separated from M.T.S. as she grows up and builds an independent life for herself. Although the family communicates by phone and WhatsApp as often as possible, phone and video conversations are not the same for Mirna S. as being able to hold M.T.S. and know that she is safe in the United States.

113.     Plaintiff Vicenta S. is a United States citizen who sponsored her son for an immigrant visa almost sixteen years ago, on July 15, 2004. Her petition was approved on February 10, 2006 and includes her son's wife and children—Vicenta S.'s daughter-in-law and grandchildren—as derivative beneficiaries on that approved visa petition. After the petition was approved, they had to wait for years for a visa to become available in the third preference family-based visa category. The family was finally able to submit immigrant visa applications and all the necessary supporting documentation for Vicenta S.'s son, wife, and children on March 10, 2020. Vicenta S.'s attorney alerted the National Visa Center and the United States Embassy in El Salvador that Vicenta S.'s grandson, W.Z.A., is 20 years old and will turn 21 on June 30, 2020. Shortly after the family submitted their visa applications, the consulate contacted them sometime in March to schedule the family for their consular interview on April 30, 2020.

114.     On April 1, 2020, however, the family received an email notifying them that their interview was cancelled because of the COVID-19 pandemic. Vicenta S,'s office called and e-mailed both the NVC and the U.S. Embassy in San Salvador multiple times between April 1 and April 20 to try and get an interview for the family back on the calendar, but the consulate never responded.

115.     Finally, on April 20, with W.Z.A. due to age out in just over two months, Vicenta S.'s attorney reached out to her United States congressperson, Representative Cindy Axne. Representative Axne's office said it would look into Vicenta S.'s case the very next day, April 21. The Proclamation was issued on April 22, and then went into effect on April 23.

116.     Vicenta S.'s attorney has since repeatedly followed up on an interview for W.Z.A. before his 21st birthday. If the family is able to schedule his visa interview before his 21st birthday and while the Proclamation is in effect, he will be subject to the Proclamation's entry

suspension and be required to show he qualifies for one of the Proclamation's exceptions. Vicenta S. fears that if her grandson is not able to receive his visa and come to the United States now, she may never be reunited with him before she dies, given her age and health and how long her grandson would have to wait for another opportunity to apply for a visa.

117.    Being separated indefinitely from W.Z.A. would be devastating for Vicenta and her son. She sees her son suffering from the separation from W.Z.A., and she herself suffers; she is all too aware that the time she has left to spend with her grandson is running out. Although the family speaks with W.Z.A. on the phone as often as possible, it is not the same as being together. It pains Vicenta S., in the last years of her life, not to be with her grandson, and to see her son suffering because he cannot be with W.Z.A. as he grows up.

## CLASS ALLEGATIONS

118.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), on behalf of themselves and all other persons for whom Defendants' implementation of the Proclamation interferes with their reunification with sponsored children and sponsored derivative child relatives. The individual plaintiffs seek certification of a class consisting of:

> All individual immigrant sponsors with approved immigrant visa petitions for a
> child, including for derivative child relatives in applicable preference categories,
> with a "current" priority date while the Proclamation is in effect; and whose
> sponsored child or sponsored derivative child relative is subject to the
> Proclamation and will, as a result of the Proclamation, age out of his or her
> current visa preference category by turning 21 years old while the Proclamation
> remains in effect.

119.     Plaintiffs seek to represent the above-described class for all claims.

120.     This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

121.     The Plaintiff Class is so numerous that joinder is impracticable, satisfying Rule 23(a)(1).  For example, according to the Department of State's Annual Report of Immigrant Visa Applicants in the Family- and Employment Based Preference Categories as of November 1, 2019, the number of individuals who are waiting in line to receive a visa in the F2A preference category alone was 182,156. Many of those who are waiting in line are children at imminent risk of aging out. Moreover, a class action is the only appropriate procedural avenue for the protections of the class members' rights.

122.     The claims of the Plaintiff Class members share common issues of law and fact and will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2). Such common questions of law and fact include, but are not limited to:

   a.   Whether the Proclamation and Defendants' actions taken to implement the Proclamation exceed the statutory authority under the Immigration and Nationality Act;

   b.   Whether the Proclamation and Defendants' actions taken to implement it violate Plaintiffs' right to procedural due process under the Due Process Clause of the Fifth Amendment;

   c.   Whether, in issuing and implementing the Proclamation, Defendants relied on factors Congress did not intend for them to consider;

   d.   Whether, in issuing and implementing the Proclamation, Defendants failed to consider important aspects of the problem they sought to address;

e.   Whether, in issuing and implementing the Proclamation, Defendants explained its decision in a manner contrary to the evidence before them;

f.   Whether Defendants quantified or considered harms that would result from the Proclamation and its implementation; and

g.   Whether class members have suffered harm as a result of the Proclamation and Defendants' actions taken to implement it.

123.   The claims of the named Plaintiffs are typical of the claims of the members of the Plaintiff Class, satisfying Rule 23(a)(3). Like other members of the class, Plaintiffs have been harmed, among other things, by Defendants' failure to abide by statutory limitations on their actions, thereby leading to arbitrary, capricious, and unlawful action that fails to account for important aspects of the supposed problems the Proclamation seeks to address. Plaintiffs have further been harmed by Defendants' failure adequately to explain their decision to issue and implement the Proclamation, to account for the reliance interests at stake, or to explain why children who will turn 21 will alleviate the flawed economic rationale for suspension of their entry. Each of these actions, independently and collectively, have caused harm to Plaintiffs and the Plaintiff class.

124.   The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4). The named Plaintiffs have no interest that is now or may become antagonistic to the interests of the Plaintiff Class. The attorneys representing the named Plaintiffs include experienced civil rights and immigration attorneys who are considered able practitioners in federal constitutional litigation. These attorneys should be appointed as class counsel.

125. The members of the proposed class are readily ascertainable through Defendants' records.

126. Counsel for Plaintiffs do not anticipate any conflicts of interest between the named Plaintiffs and the other class members, nor does Counsel anticipate any reason that the other class members would dispute the adequacy of Counsel's representation.

127. Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

128. Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore by properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Administrative Procedure Act, 5 U.S.C. § 706(2)

### (On Behalf of All Plaintiffs, Including the Class)

129. The foregoing allegations are repeated and incorporated as though fully set forth herein.

130. Under the Administrative Procedure Act ("APA"), courts must "hold unlawful and set aside" agency action that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

46

131.    Defendants' implementation of the Proclamation, including through informing visa applicants of the Proclamation and its operation, will result in a direct impact on the rights of qualified prospective immigrants and constitute final agency action(s) within the meaning of the Administrative Procedure Act. *See Bennett v. Spear*, 520 U.S. 154 (1997).

132.    Defendants' actions violate the APA in at least the following respects:

(i)      Defendants failed to reasonably justify their departure from settled practice for the allocation of immigrant visas on a per annum basis.

(ii)     Defendants failed to address conflicts with other laws and legislative intent, including but not limited to the specific scheme Congress mandated in the INA through provisions within 8 U.S.C. §§ 1152, 1153(a)-(b), 1184(p)(7); and numerous regulations duly promulgated under these and other laws.

(iii)    Defendants implemented the Proclamation in a manner that is not "consistent with applicable law" for a number of reasons, including that their actions will effectively override the protections and priorities that Congress has specifically extended to minor children to maintain their family unity with their parents, without notice, in a manner that is vague, arbitrary, and unsupported by the evidence.

(iv)     Defendants did not quantify or consider the harms that will result from their implementation of the Proclamation.

(v)      Defendants' implementation of the Proclamation's "national interest" exception, without guidance regarding the exception's meaning and application, is impermissibly vague, arbitrary, and capricious.

(vi)      Defendants have acted in excess of any statutory grant of authority under 8 U.S.C. § 1182(f) where Congress did not and could not constitutionally delegate unfettered discretion to the President to indefinitely rewrite the immigration laws, allow for suspensions that are unconstitutional and/or unsupported by adequate findings, or impose suspensions that effectively eliminate the protections and priorities that Congress has specifically included in the INA to allow minor children to maintain their family unity with their parents;

133.   Defendants' actions implementing the Proclamation are based on legal error; fail to consider all relevant factors; and lack a rational explanation and are therefore arbitrary and capricious and an abuse of discretion, in violation of the APA, 5 U.S.C. § 706(2)(A).

134.   Defendants' actions implementing the Proclamation are contrary to constitutional rights and deprive Plaintiffs of due process, thereby violating the Due Process Clause of the Fifth Amendment to the United States Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

135.   Defendants' actions implementing the Proclamation are ultra vires and in excess of any authority granted by the Proclamation, regulation, or statute, and not otherwise in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(C).

136.   Defendants' actions are without good cause.

137.   Defendants' violation of the APA causes ongoing harm to Plaintiffs.

138.   Plaintiffs have no adequate alternative to review under the APA.

## SECOND CAUSE OF ACTION

## Ultra Vires

**(On behalf of All Plaintiffs, Including the Class)**

139.     The foregoing allegations are repeated and incorporated as though fully set forth

herein.

140.     The Proclamation is unlawful, unconstitutionally vague and therefore ultra vires

for the reasons provided in Claim 1. *See, e.g.*, *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006);

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172, 1175 (D.C. Cir. 2003).

141.     The Constitution, Article III, § 1, provides that the "judicial Power of the United

States" is vested exclusively in this Court and the lower federal courts. A core component of that

judicial power is "'the duty of interpreting [the laws] and applying them in cases properly

brought before the courts.'" *Patchak v. Zinke*, 138 S. Ct. 897, 904 (2018) (plurality) (quoting

*Massachusetts v. Mellon*, 262 U. S. 447, 488 (1923)).

142.     As Chief Justice Marshall put it, "[i]t is emphatically the province and duty of the

judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *see

also Wayman v. Southard*, 23 U.S. 1, 22 (1825) ("[T]he legislature makes, the executive

executes, and the judiciary construes the law"); The Federalist No. 78, at 467 (Alexander

Hamilton) (Clinton Rossiter ed., 1961).

143.     Courts "ordinarily presume that Congress intends the executive to obey its

statutory commands and, accordingly, that it expects the courts to grant relief when an executive

agency violates such a command." *Bowen v. Michigan Academy of Family Physicians*, 476 U.S.

667, 681 (1986); *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187-88 (1993) (same);

*Stark v. Wickard*, 321 U.S. 288, 310 (1944) (courts retain "the responsibility of determining the

limits of statutory grants of authority . . . [this] is a judicial function entrusted to the courts by

Congress by the statutes establishing courts and marking their jurisdiction.").

144.    The President's attempt to suspend the entry of certain immigrants, including children and derivative children relatives who are sponsored by United States citizens and lawful permanent residents and who will turn 21 during the Proclamation's effective period, without notice and in contravention of the benefits and priorities Congress has extended to such minor children, exceeds the scope of Congress's permissible delegated power to the President under 8 U.S.C. §§ 1182(f) and 1185(a).

145.    The President's attempt to indefinitely ban certain immigrants including children and derivative children relatives who are sponsored by United States citizens and lawful permanent residents and who will turn 21 during the Proclamation's effective period, without notice and in contravention of the benefits and priorities Congress has extended to such minor children, violates constitutional separation of powers principles because it usurps Congress's authority and its expressed intent to allow for the entry of individual immigrants to further the goals of family reunification.

146.    Accordingly, the Court should set aside the President's Proclamation as *ultra vires* because it eliminates, for Plaintiffs with children and derivative children relative beneficiaries of immigrant visas who will turn 21 within or soon after the Proclamation's 60-day effective period, the preference and priority Congress specifically included in the INA to preserve the family unity of parents and their minor children, without adequate notice.

### THIRD CAUSE OF ACTION

### Due Process

### (On behalf of All Plaintiffs, Including the Class)

147.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

148.    The Due Process Clause of the Fifth Amendment states that no person will "be deprived of life, liberty, or property, without due process of law."

149.    United States lawful permanent residents have constitutionally protected liberty interests in family reunification with their children.

150.    Individuals must be given due process prior to any deprivation of these liberty interests.

151.    Congress has created statutory rights relating to the petitioning for and issuance of visas and other immigration benefits.

152.    Federal agencies have created regulatory rights related to the petitioning for and issuance of visas and other immigration benefits.

153.    Individuals must be given due process prior to the deprivation of these statutory and regulatory rights.

154.    The Proclamation, and Defendants' implementation thereof, unconstitutionally deny Plaintiffs their constitutional, statutory, and regulatory rights by preventing consideration of their visa petitions and thereby foreclosing their reunification with their children without *any* legal process whatsoever—let alone the process that they are due under the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any part of the Proclamation so as to deny or refuse consideration of Plaintiffs' and other class members' visa petitions on behalf of their children;

B.      A declaration pursuant to 28 U.S.C. § 2201 that the Proclamation is unlawful and invalid as to Plaintiffs and their children, and as to the proposed class;

C.      An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

D.      Such other relief as this Court deems equitable, just, and proper.

Dated: May 28, 2020

Jesse M. Bless (D.D.C. Bar No. MA0020)
American Immigration Lawyers Association
1301 G Street NW, Ste. 300
Washington, D.C. 20005
(781) 704-3897
jbless@aila.org

Karen C. Tumlin (*pro hac vice* forthcoming)
Esther H. Sung (*pro hac vice* forthcoming)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org

Laboni A. Hoq (*pro hac vice* forthcoming)
LAW OFFICE OF LABONI A. HOQ
JAC Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
labonihoq@gmail.com

Stephen Manning (*pro hac vice* forthcoming)
Nadia Dahab (*pro hac vice* forthcoming)
Tess Hellgren (*pro hac vice* forthcoming)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
nadia@innovationlawlab.org
tess@innovationlawlab.org

Respectfully Submitted,

By: */s/ Andrew J. Pincus*

Andrew J. Pincus (D.D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Matthew D. Ingber (*pro hac vice* forthcoming)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Cleland B. Welton II (*pro hac vice* forthcoming)
MAYER BROWN MEXICO, S.C.
Goldsmith 53, Polanco
Ciudad de Mexico, 11560
Telephone: (502) 314-8253
cwelton@mayerbrown.com