**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DOMINGO ARREGUIN GOMEZ, a Lawful Permanent Resident of the U.S.; MIRNA S., a Lawful Permanent Resident of the U.S.; and VICENTA S., a U.S. Citizen,<br><br>            Plaintiffs,<br><br>      v.<br><br>DONALD J. TRUMP, President of the United States of America, et al.,<br>            Defendants. | Civil Action No. 1:20-cv-01419 |

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

Jesse M. Bless (D.D.C. Bar No. MA0020)
AMERICAN IMMIGRATION LAWYERS
  ASSOCIATION
1301 G Street NW, Ste. 300
Washington, DC 20005
(781) 704-3897
jbless@aila.org

Karen C. Tumlin (*pro hac vice*)
Esther H. Sung (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org

Stephen Manning (*pro hac vice*)
Nadia Dahab (*pro hac vice*)
Tess Hellgren (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
nadia@innovationlawlab.org
tess@innovationlawlab.org

Andrew J. Pincus (D.D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Cleland B. Welton II (*pro hac vice*)
MAYER BROWN MEXICO, S.C.
Goldsmith 53, Polanco
Ciudad de Mexico, 11560
Telephone: (502) 314-8253
cwelton@mayerbrown.com

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
JAC Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
labonihoq@gmail.com

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 2

I.   THE CASE IS JUSTICIABLE ................................................................ 2

    A.   Vicenta S. Has Standing To Sue .......................................................... 2

    B.   The Class's Claims Are Not Moot ....................................................... 5

II.  THE APA CLAIM IS LIKELY TO SUCCEED ON THE MERITS ............... 8

    A.   Defendants' Threshold Arguments Fail ................................................ 9

        1.   The Agency Defendants' Actions Are Subject To APA Review ............. 9

        2.   The Agency Defendants' Actions Are Final And Reviewable ............... 12

        3.   Consular Nonreviewability Does Not Apply ......................................... 16

    B.   Defendants Fail To Rebut Plaintiffs' Showing That The Agencies'
        Implementation And Enforcement Of The Proclamation Is Arbitrary,
        Capricious, And Not In Accordance With Law ................................... 17

III. VICENTA S. AND CLASS MEMBERS WILL SUFFER IRREPARABLE
    HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF ............................. 18

IV.  THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH
    HEAVILY IN FAVOR OF INJUNCTIVE RELIEF ..................................... 22

V.   CLASSWIDE INJUNCTIVE RELIEF IS APPROPRIATE ........................... 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milas*,
896 F.3d 1094 (9th Cir. 2018) ...................................................................................17

*Appalachian Power Co. v. E.P.A.*,
208 F.3d 1015 (D.C. Cir. 2000) .................................................................................13

*Baan Rao Thai Rest. v. Pompeo*,
2019 WL 3413415 (D.D.C. July 29, 2019) ...............................................................17

*Barrick Goldstrike Mines Inc. v. Browner*,
215 F.3d 45 (D.C. Cir. 2000) .....................................................................................12

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................................................10

* *Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .....................................................................................9

*Ciba-Geigy Corp. v. U.S.E.P.A.*,
801 F.2d 430 (D.C. Cir. 1986) ...................................................................................12

*Connecticut v. U.S. Dep't of the Interior*,
363 F. Supp. 3d 45 (D.D.C. 2019) .............................................................................12

*CropLife Am. v. E.P.A.*,
329 F.3d 876 (D.C. Cir. 2003) ...................................................................................13

*Dalton v. Specter*,
511 U.S. 462 (1994) ...................................................................................................11

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ...............................................................................................11

*Deposit Guar. Nat'l Bank v. Roper*,
445 U.S. 326 (1980) .....................................................................................................6

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
883 F.3d 895 (D.C. Cir. 2018) ...................................................................................10

* *Doe v. Trump*,
288 F. Supp. 3d 1045 (W.D. Wash. 2017) ...............................................10, 16, 18, 20

*E. Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020) ................................................................18

\* *Emami v. Nielsen,*
    365 F. Supp. 3d 1009 (N.D. Cal. 2019) ..........................................10, 16

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .............................................................................11

\* *Hawaii v. Trump,*
    878 F.3d 662 (9th Cir. 2017) .....................................................10, 12, 16

*Heard v. U.S. Soc. Sec. Admin.,*
    170 F. Supp. 3d 124 (D.D.C. 2016) ........................................................6

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) ................................................................19

\* *HIAS, Inc. v. Trump,*
    415 F. Supp. 3d 669 (D. Md. 2020) ..................................................10, 18

\* *Int'l Refugee Assistance Project v. Trump,*
    883 F.3d 233 (4th Cir. 2018) ................................................................20

\* *J.D. v. Azar,*
    925 F.3d 1291 (D.C. Cir. 2019) ..............................................................6

\* *Moghaddam v. Pompeo,*
    424 F. Supp. 3d 104 (D.D.C. 2020) ....................................................9, 10

\* *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ............................................................25

\* *Nguyen v. U.S. Dep't of Homeland Sec.,*
    2020 WL 2527210 (D.D.C. May 18, 2020) ...........................................4, 5

\* *Nine Iraqi Allies Under Serious Threat v. Kerry,*
    168 F. Supp.3d 268 (D.D.C. 2016) ........................................................16

\* *P.K. v. Tillerson,*
    302 F. Supp. 3d 1 (D.D.C. 2017) ..........................................................16

*Petties v. D.C.,*
    238 F. Supp. 2d 114 (D.D.C. 2002) ......................................................21

*Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.,*
    138 F. Supp. 3d 31 (D.D.C. 2015) ........................................................13

*Plunkett v. Castro*,
  67 F. Supp. 3d 1 (D.D.C. 2014) ........................................................................6

*Protect Our Cmties. Found. v. Chu*,
  2014 WL 1289444 (S.D. Cal. Mar. 27, 2014) ....................................................11

*Public Citizen v. U.S. Trade Representative*,
  5 F.3d 549 (D.C. Cir. 1993) .............................................................................12

*Ramirez v. U.S. I.C.E.*,
  338 F. Supp. 3d 1 (D.D.C. 2018) .....................................................................22

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) .......................................................................17

*Schaffer ex rel. Schaffer v. Weast*,
  546 U.S. 49 (2005) ...........................................................................................14

*Seminole Nation of Okla. v. Norton*,
  223 F. Supp. 2d 122 (D.D.C. 2002) .................................................................13

*Sierra Club v. Clinton*,
  689 F. Supp. 2d 1147 (D. Minn. 2010) ............................................................11

*Thomas v. Pompeo*,
  2020 WL 601788 (D.D.C. Feb. 7, 2020) ..........................................................10

*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2019) .......................................................................................6

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ..........................................................................2, 10, 18

*Tulare Cty. v. Bush*,
  306 F.3d 1138 (D.C. Cir. 2002) .......................................................................10

*Udugampola v. Jacobs*,
  795 F. Supp. 2d 96 (D.D.C. 2011) ...................................................................17

*Van Ravenswaay v. Napolitano*,
  613 F. Supp. 2d 1 (D.D.C. 2009) .....................................................................17

*\* Vulupala v. Barr*,
  2020 WL 601887 (D.D.C. Feb. 7, 2020) ..........................................................16

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ..........................................................................................12

\* *Wilson v. Gordon*,
  822 F.3d 934 (6th Cir. 2016) .................................................................6, 7, 8

**Statutes and Rule**

5 U.S.C. § 551 ..............................................................................................12, 14

5 U.S.C. § 701 ....................................................................................................11

5 U.S.C. § 702 ....................................................................................................11

5 U.S.C. § 705 ....................................................................................................24

5 U.S.C. § 706 ....................................................................................................25

8 U.S.C. § 1182 ..................................................................................................15

8 U.S.C. § 1227 ..................................................................................................23

Fed. R. Civ. P. 23(b)(2) ......................................................................................24

**Other Authorities**

Buttonwood, *Keep on Trucking*, The Economist (Feb. 11, 2012) ....................23

David Bier, Cato Inst., *Five Myths About DACA* (Sept. 7, 2017) ....................23

*Economics A-Z Terms Beginning with L*, The Economist ...............................22

*The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve
  Bank of S.F. Econ. Letter (Aug. 30, 2010) ...................................................23

Gov't of El Salvador, Exec. Decree No. 31 (June 14, 2020) ..............................3

Gretchen Frazee, *4 Myths About How Immigrants Affect the U.S. Economy, U.S.
  Economy*, PBS NewsHour (Nov. 2, 2018) ....................................................23

Jacqueline Varas, Am. Action Forum, *How Immigration Helps U.S. Workers and
  the Economy* (Mar. 20, 2017) ........................................................................23

Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force*
  (Aug. 25, 2015) ..............................................................................................23

Maria E. Enchautegui, *Immigrant and Native Workers Compete for Different
  Low-Skilled Jobs*, The Urban Institute: Urban Wire (Oct. 13, 2015) ..........23

Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook
  on Immigration and Economic Growth* 70 (3d ed., Sept. 2017) ..................23

Newberg on Class Actions § 2:15 (5th ed. 2015) ............................................................7

Paul Krugman, *Lumps of Labor*, N.Y. Times (Oct. 7, 2003).........................................22

U.S. Chamber of Commerce, *Immigration Myths and Facts*
   (Apr. 14, 2016)............................................................................................................23

U.S. Department of State, *Proclamation Suspending Entry of Immigrants Who
   Present Risk to the U.S. Labor Market During the Economic Recovery
   Following the COVID-19 Outbreak* (Apr. 23, 2020)................................................13

## INTRODUCTION

Defendants' opposition to the TRO motion is a reflection of their litigation strategy, which is to avoid at all costs judicial review of an agency action that is so obviously arbitrary and capricious that Defendants' brief does not even try to argue otherwise.  In pursuit of that goal, Defendants have mooted out two of the three named Plaintiffs in the two weeks since Plaintiffs filed the instant motions for injunctive relief and class certification.  And they are now seeking to remove Vicenta S. (the third plaintiff) from the equation, by insisting that she has no standing unless her son (the father of W.Z.A., the minor-child beneficiary at risk of aging out) travels on minimal notice from Iowa to El Salvador to attend a just-scheduled, in-person consular interview in a country that has no operating international airport and which has only just exited quarantine.  But these extraordinary barriers have been overcome through extraordinary effort—the father has made arrangements to fly to Tegucigalpa, Honduras, and to drive six hours from there to San Salvador to complete the visa process before W.Z.A. turns 21 and ages out.  The only remaining barrier between W.Z.A. and a visa now is Defendants' enforcement of the Proclamation.  Vicenta S. has standing to sue for an order enjoining such enforcement.

So does the proposed class.  Even if Vicenta S. lacks standing, the class claims can proceed through co-Plaintiffs Mr. Gomez and Mirna S.  While Defendants have strategically mooted these Plaintiffs' individual claims by granting visas to their children, it is clear that they had standing at the commencement of the lawsuit.  Well-established exceptions to the mootness doctrine permit such Plaintiffs to continue representing the class even though their own claims are moot.  Any other rule would allow Defendants to enforce their irrational and unlawful policy in perpetuity, by mooting named plaintiffs' claims while arbitrarily continuing to allow other individuals' children to age out.  Article III's case-or-controversy requirement does not support such a result.

With justiciability resolved, Defendants' other efforts to stop the Court from proceeding to

the merits of the TRO are all unsuccessful.  Defendants' arguments either misunderstand or mischaracterize Plaintiffs' APA challenge—which attacks the agency Defendants' irrational determination to apply the Proclamation's immigration suspension to age-outs, rather than adhering to their longstanding policy of protecting such vulnerable individuals from the enormous harm of losing their current visa eligibility.  Defendants offer no procedural or substantive defense of that choice, so it must be set aside under the APA.  And the irreparable harm of family separation that Vicenta S. and similarly situated U.S. citizens and permanent residents will suffer without a TRO far outweighs any speculative harm to the public interest.  The only "injury" that Defendants can assert is a readily debunked claim that immigrants take Americans' jobs.  In fact, it is well known that immigration helps to *grow* the economy, not to mention that immigrants make many contributions to society at large.  Defendants' specious claim of public harm cannot justify their infliction of permanent damage on a few unlucky individuals.

Defendants' actions are arbitrary, capricious, unlawful, and massively harmful.  The Court should enjoin them as to the entire class, and ultimately should set them aside under the APA.

## ARGUMENT

## I.     THE CASE IS JUSTICIABLE

### A.     Vicenta S. Has Standing To Sue

Defendants do not dispute that "a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact," *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018), such that harm to Vicenta S.'s interest in being united with W.Z.A. satisfies the first standing requirement.  *See* TRO Mot. 21.  Defendants instead contest the causation and redressability elements of standing.  TRO Opp. 17-23.  Their arguments fail.

*First*, Defendants argue (TRO Opp. 18-19) that causation is not established because the COVID-19 pandemic (not the agencies' enforcement of the Proclamation) was the cause of

W.Z.A.'s inability to secure the required medical examination and subsequent visa interview. But Defendants' argument has been overtaken by events. For one thing, El Salvador has relaxed its quarantine such that medical examinations and visa interviews may go forward.[1]  And, on the afternoon of June 11 (before Defendants filed their TRO opposition on June 12), the State Department tentatively scheduled W.Z.A. and his father (W.Z.) for a medical examination on June 17, and for a consular interview on June 22.  *See* Second Blackford Decl. ¶ 17.  That event goes unmentioned either in Defendants' brief or in Consul General Bent's supporting declaration, but combined with the relaxation of the quarantine, it substantially changes the landscape.

Specifically, before Plaintiffs filed this lawsuit and the instant motions, the Department of State had ignored Vicenta S.'s repeated efforts (through her attorney and her Congresswoman) to schedule the consular interview and attendant medical examination, leaving her with no knowledge of the reasons for W.Z.A.'s inability to complete those steps in the visa process.  *See* Vicenta S. Decl. ¶ 20; First Blackford Decl. ¶¶ 6, 9.  In those circumstances, all that Vicenta S. could do was to infer, reasonably, that the agencies' implementation of the Proclamation (as described by, for example, the Division Chief of the Office of Field Operations of the Bureau of Consular Affairs' Visa Office), was the reason why W.Z.A.'s examination and interview had not been rescheduled, even though consulates were nominally still conducting "emergency" interviews.  *See* First Marwaha Decl. (Dkt. 21-5) ¶ 4; TRO Mot. 21-22.

Now, however, there is no need for inference.  W.Z.A. and W.Z. have been scheduled for the examinations and interviews, and plan to attend them.  *See* Second Blackford Decl. ¶¶ 17, 24-27.  Because flights to San Salvador are unavailable, W.Z. has scheduled travel on June 23, 2020

[1] *See* Gov't of El Salvador, Exec. Decree No. 31, Art. 9(A)(2), 9(A)(5), 9(B)(25) (June 14, 2020) (medical services and private transportation may recommence on June 14; diplomatic entities may reopen on June 16), https://covid19.gob.sv/decreto-ejecutivo-no-31/; Bent Decl. (Dkt. 30-5) ¶ 9.

(the first date available) to Tegucigalpa, Honduras, from which he will drive to San Salvador. *Id.* ¶¶ 25-26. Although that date is after the currently scheduled medical examinations and interview, W.Z.'s counsel is confident that he will be able to reschedule the examinations and the interview given W.Z.'s travel schedule and the emergency situation. *Id.* ¶ 27. As noted, the relaxation of El Salvador's quarantine has lifted, so both W.Z. and W.Z.A. will be allowed to travel freely to attend their medical examinations and visa interviews. W.Z. and W.Z.A. have fully completed the required visa paperwork, and have provided all the information necessary for their visas to issue (the State Department would not have scheduled their interviews otherwise). *Id.* ¶¶ 5-6. And neither W.Z. nor W.Z.A. is ineligible for a visa on any ground of which their immigration counsel is aware. *Id.* ¶¶ 3-4, 7. Taking these facts together, it is "almost certain" that the Department of State will treat W.Z. and W.Z.A. favorably and grant their visas (*id.* ¶ 7), consistent with its treatment of M.T.S. and Alondra. Both visas are thus likely to issue—unless the State Department enforces the Proclamation so as to prevent the consulate from granting one to W.Z.A.[2]

These facts establish that the agencies' enforcement of the Proclamation is the barrier to W.Z.A.'s visa, such that Vicenta S.'s imminent "injuries are attributable to the Proclamation [and] its implementation and enforcement." *Nguyen v. U.S. Dep't of Homeland Sec.*, 2020 WL 2527210, at *5 (D.D.C. May 18, 2020). And M.T.S.'s experience confirms the point: She was told directly at her consular interview that the Proclamation was the sole reason she was not granted a visa at the time. M.T.S. Decl. (Dkt. 21-11) ¶ 21. It was only after the filing of this lawsuit and the present motions that Defendants determined to invoke the Proclamation's "national interest" exception, allowing her visa to issue so that they could avoid litigating her mother's claims on the merits.

---

[2] W.Z.A.'s father's visa application and eligibility are not affected by the Proclamation, because he was not "outside the United States on the effective date" thereof. Proclamation § 2(a)(i).

The State Department's enforcement of the Proclamation had been the cause of M.T.S.'s inability to obtain her visa. The same is now true of W.Z.A.

*Second*, Defendants are also incorrect in contending that a TRO would not redress Vicenta S.'s injury. They first suggest (TRO Opp. 21) that El Salvador's quarantine would prevent W.Z. and W.Z.A. from obtaining their visas, but the quarantine has been lifted. Defendants also suggest (*id.* at 21-22) that W.Z. and/or W.Z.A. may not be found eligible for visas, but their immigration counsel has attested that they are "almost certain" to be found eligible because their applications are complete and no grounds of ineligibility exist. Second Blackford Decl. ¶ 7.[3] And Defendants speculate (TRO Opp. 22-23) that W.Z. might not be willing or able to travel to El Salvador, but the record shows otherwise. Second Blackford Decl. ¶¶ 24-27. So, again, the only thing standing between W.Z.A. and his visa is the agencies' enforcement of the Proclamation. Prompt relief would remove that last hurdle, redressing Vicenta S.'s injury. Vicenta S. has established a "substantial likelihood" that she has standing to sue. *See Nguyen*, 2020 WL 2527210, at *3.

### B.    The Class's Claims Are Not Moot

Even if Vicenta S. lacks standing, the case may still proceed as a class action, and the Court may still grant a class-wide TRO. Both Mr. Gomez and Mirna S. clearly had standing at the time the complaint and the TRO motion were filed: Each of them faced injury in the form of family separation; the agencies' enforcement of the Proclamation caused that injury by preventing their children from being granted visas; and a favorable decision would have redressed their injuries by removing the Proclamation as a barrier to the visas' issuance. *See* TRO Mot. 21-23.[4] It is true that

---

[3]   Defendants assert (TRO Opp. 22) that the TRO motion lacked support for the contention that no basis exists (other than the Proclamation) to refuse W.Z.A.'s visa, but they disregard Vicenta S.'s attorney's averment to that effect. *See* First Blackford Decl. ¶ 10, cited in TRO Mot. 18.

[4]   The fact that Alondra and M.T.S. have been granted visas since the TRO motion was filed proves the causation and redressability points: No visas issued while the agencies were enforcing

those individual claims are now moot because Alondra and M.T.S. have been granted visas, but two exceptions to the mootness doctrine apply to preserve the class's claims.

*First*, the class asserts "inherently transitory" claims: by their nature, each class member's claims expire when his or her minor-child beneficiary turns 21. *See J.D. v. Azar*, 925 F.3d 1291, 1308-12 (D.C. Cir. 2019); Class Cert. Reply 3-5. Individual claims will continue to expire as time goes on, and it is "by no means certain" that a named plaintiff could bring a claim that would remain live until the Court finally adjudicates the motion for class certification. *See J.D.*, 925 F.3d at 1310. However, "some class members will retain a live claim throughout the proceedings," *id.*, because class members will continue to face the threat of aging out for as long as the agencies' policies remain in effect. The "inherently transitory" exception's requirements are thus met, and the Court may adjudicate the case on behalf of the class. *See id.*; Class Cert. Reply 5.

*Second*, the class claims also remain justiciable because a defendant cannot moot a class action by strategically "pick[ing] off named plaintiffs … before the class is certified." *E.g.*, *Wilson v. Gordon*, 822 F.3d 934, 947 (6th Cir. 2016) (citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980)).[5] This exception applies where a defendant voluntarily moots the named plaintiffs' claims by (for example) "creat[ing] a new, ad hoc process to address Plaintiffs' claims,"

---

the Proclamation against Alondra and M.T.S., but once they were granted exceptions such that the immigration suspension no longer applied to them, the visas were granted forthwith.

Defendants suggest (TRO Opp. 19) that the State Department's own internal error was the real reason Alondra's visa did not issue sooner. But the fact of the matter is that the State Department caught its mistake, at which point Alondra still faced the agencies' enforcement of the Proclamation as the barrier to her visa. And in any event, Defendants do not deny that Mirna S. had standing when the complaint was filed. Only "one plaintiff must have standing" for a case to proceed. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2019); TRO Mot. 21.

[5] While the D.C. Circuit has not considered the "picking off" exception, many other circuits have recognized it. *See Wilson*, 822 F.3d at 948-49 (collecting cases). This Court has acknowledged the doctrine as well. *See Heard v. U.S. Soc. Sec. Admin.*, 170 F. Supp. 3d 124, 134-35 (D.D.C. 2016) (recognizing exception but declining to apply it on the facts at hand); *Plunkett v. Castro*, 67 F. Supp. 3d 1, 12 n.6 (D.D.C. 2014) (doctrine provided a "compelling" basis for justiciability).

*id.* at 951, rather than through ordinary conduct of a "standard operating procedure," *id.* at 950 (quoting Newberg on Class Actions § 2:15 (5th ed. 2015))—as where a defendant "expedite[s] processing for … plaintiffs named in a suit while continuing to allow long delays with respect to … other applicants," *id.* at 951.  In such circumstances, "refusal to consider a class-wide remedy merely because individual class members no longer need relief would mean that no remedy could ever be provided for continuing abuses."  *Id.* at 950-51 (alteration incorporated).

The "picking off" doctrine applies here, because Defendants have strategically acted through non-standard procedures to expedite the processing of Alondra's and M.T.S.'s claims, ultimately mooting them out of the case.  Plaintiffs filed their TRO motion on June 2, 2020, with a request that the Court render a decision in time to allow Alondra to complete her visa process before aging out on June 15.  TRO Mot. 1.  During the telephonic status conferences held on June 3 and 4, counsel for Defendants represented that Alondra would be protected from aging out by the Child Status Protection Act (CSPA), and that M.T.S. would be granted a "national interest" exception to the Proclamation.  Then at the June 5 teleconference, by which time it had become clear that Alondra was *not* protected by the CSPA, counsel represented not only that Alondra had been offered an emergency interview on June 9, but that the State Department had advised counsel that she too would be granted a "national interest" exception—even though she had not yet appeared for her interview or even completed her visa application.

All of this was highly irregular.  The "national interest" exception was never discussed at M.T.S.'s eight-minute visa interview (held May 29), and at the interview's conclusion the consular officer advised M.T.S. that he could not issue her a visa because of the Proclamation.  M.T.S. Decl. ¶¶ 18-21.  The State Department nevertheless granted her a "national interest" exception and then a visa on June 9 (*see* First Dus Decl. (Dkt. 30-3) ¶¶ 4-6), without any explanation or further

substantive communication.  In Alondra's case, the State Department apparently decided to grant her a "national interest" exception *before she even completed her visa application*.  This apparent prejudgment was confirmed at her interview:  the consular officer asked no questions relating to the "national interest" exception and did not even review the materials that Alondra had brought with her to support her claim, but nevertheless granted the exception and issued a visa on the same day as the interview.  *See* Flores Decl.¶¶ 9-10; Second Dus Decl. (Dkt. 30-4) ¶ 11.

Defendants have never explained why Alondra and M.T.S. were granted "national interest" exceptions.  But the reason is clear:  The fact that Defendants moved heaven and earth to grant exceptions and visas to M.T.S. and Alondra, thereby mooting their claims, gives rise to a plain inference of strategic behavior in pursuit of litigation advantage.[6]  Mooting those claims both allowed Defendants to extend their briefing deadline and eliminated two Plaintiffs who plainly had standing—leaving only Vicenta S., whose standing Defendants believed they could credibly challenge.  By granting such extraordinary relief to the named Plaintiffs through an obviously "ad hoc process," "while continuing to allow long delays with respect to … other applicants," Defendants have brought this case squarely within the "picking off" exception.  *Wilson*, 822 F.3d at 950-51.  The case is not moot.  The Court should remedy Defendants' "continuing abuses." *Id.*

## II.   THE APA CLAIM IS LIKELY TO SUCCEED ON THE MERITS

Defendants have no real answers to Plaintiffs' showing that the APA claim is likely to succeed on multiple grounds.  Defendants' challenges to the Court's authority to hear the case are incorrect for reasons set forth in the TRO motion, which go largely unaddressed in the opposition brief.  And Defendants entirely disregard the merits, leaving undefended what must have been a

---

[6] The point is underscored by Defendants' characterization (TRO Opp. 40) of Vicenta S. as "the only plaintiff left with a case that has not been mooted out"—using the casual patois of litigators rather than pretending that Alondra's and M.T.S.'s "national interest" exceptions were granted for any reason other than gaining an advantage in this lawsuit.

fatally compromised agency process.  The agencies' action is highly likely to be set aside.

**A.      Defendants' Threshold Arguments Fail**

Defendants are wrong to assert (TRO Opp. 23-30) that the agencies' action is not reviewable.  Plaintiffs anticipated these contentions and explained why they are wrong (TRO Mot. 32-36), but Defendants tellingly do not engage Plaintiffs' arguments.

**1.      The Agency Defendants' Actions Are Subject To APA Review**

Plaintiffs agree (TRO Mot. 32-33) with Defendants (TRO Opp. 23-24) that Presidential action is not *directly* reviewable under the APA.  But that is irrelevant, because the APA cause of action asserted in the TRO motion is not directed at the President.  It is directed at the *agency* Defendants' arbitrary and capricious policy *implementing* the Proclamation as to age-outs.  *That* conduct is properly subject to challenge under the APA even if the President's own action is not.[7]

While Defendants suggest otherwise, the law is clear that when an agency takes action to implement an unreviewable presidential decision, the agency's action is itself reviewable under the APA.  As the D.C. Circuit has explained, the fact that an agency's action is "based on the President's [Proclamation] hardly seems to insulate [it] from judicial review under the APA." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  The APA instead permits "officer suits against executive branch officials charged with carrying out the instructions contained in [a] Proclamation," including specifically in the immigration area.  *E.g.*, *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 120 (D.D.C. 2020) (collecting cases and permitting APA challenge to agency implementation of Presidential Proclamation).  Thus, where executive agencies "have consummated their implementation of the Proclamation, from which legal

---

[7] Defendants are off the mark in arguing (TRO Opp. 30-33) that *the Proclamation* "is a valid exercise" of authority under the INA.  The TRO motion raises an APA claim against the agencies' implementation of the Proclamation, not an INA claim against the Proclamation itself.

consequences will flow, their actions are final and therefore reviewable under the APA." *Hawaii v. Trump*, 878 F.3d 662, 681 (9th Cir. 2017) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)), *rev'd on other grounds*, 138 S. Ct. 2392 (2018).  Defendants do not acknowledge this authority, let alone show why it is either wrong or inapplicable here.  And many other decisions have permitted APA review of agency actions implementing the President's immigration directives. *See, e.g.*, *Thomas v. Pompeo*, 2020 WL 601788, at *5 (D.D.C. Feb. 7, 2020) (permitting APA challenge to agency action implementing "Muslim ban" Proclamation); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1019-21 (N.D. Cal. 2019) (similar); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1070 (W.D. Wash. 2017) (similar); *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 682-84 & n.18 (D. Md. 2020) (granting preliminary injunction against agency implementation of executive order based on APA claim).  Defendants do not address these authorities, either.

Defendants cite two cases from this District outside the immigration sphere (Opp. 26-27), but the D.C. Circuit has declined to endorse the analysis in those decisions—which are at odds with *Reich* and the weight of authority in the immigration context.  *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 904 (D.C. Cir. 2018) (affirming on alternative ground that bridge permitting decision was "committed to agency discretion by law"); *Tulare Cty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) (affirming on alternative ground that plaintiff had failed to allege facts supporting APA claim).  Indeed, the D.C. Circuit indicated in *Tulare* that if the plaintiff had alleged the agency's "acts with sufficient specificity," it could have "overcome th[e] bar" on APA review of presidential action "by challenging the non-presidential actions of the Forest Service."  306 F.3d at 1143; *see Moghaddam*, 424 F. Supp. 3d at 120 (noting that *Tulare* plaintiff could have obtained APA review if it "had alleged with sufficient specificity" the pertinent facts).  And other courts have rejected the reasoning reflected in the district-court decisions in *Detroit International* and

*Tulare.  See, e.g.*, *Protect Our Cmtys. Found. v. Chu*, 2014 WL 1289444, at *6 (S.D. Cal. Mar. 27, 2014); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1157 n.3 (D. Minn. 2010).

Defendants assert (TRO Opp. 26) that "[i]t would be 'absurd' to suggest that the President himself must personally carry out an action in order for the APA's limitation on judicial review to apply"—but the only support for that claim is *ipse dixit* in the district-court decision in *Tulare*, which the D.C. Circuit conspicuously did not adopt.  And Defendants' contention is contrary to both the APA's text and Supreme Court precedent.  Under the APA, "[a] person suffering legal wrong because of an agency action … is entitled to judicial review thereof," 5 U.S.C. § 702, and with irrelevant exceptions an "agency" is "each authority of the Government of the United States," *id.* § 701(b)(1).  The Supreme Court has held that the President himself is not such an "agency," based on "the unique constitutional position of the President" himself (in contradistinction to executive agencies).  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  But every other Defendant here is an "authority of the Government of the United States," from which it follows that their "action[s]" are subject to the APA's "basic presumption of judicial review."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (citation omitted).  Congress provided no exception to that presumption for cases in which an agency acts at the President's behest—and for good reason, as such an exception would swallow the rule.  Contrary to Defendants' suggestion (TRO Opp. 26), there is no relevant "APA[] limitation on judicial review."[8]

_____

[8] *Franklin* also exposes as false Defendants' claim (TRO Opp. 26) that "*all* presidential orders are necessarily implemented through Executive branch agencies."  In that case, APA review was unavailable because the action having legal consequences was undertaken *by the President himself*. *See* 505 U.S. at 797 ("the action that creates an entitlement … is the President's statement to Congress, not the Secretary [of Commerce's] report to the President"); *accord Dalton v. Specter*, 511 U.S. 462, 469 (1994) (no APA review of action "taken by the President, when he submit[ted] his certification of approval to Congress").  Thus, contrary to Defendants' suggestion, there *do* exist statutes and circumstances calling for direct action by the President.  In those contexts, the President's own actions are not APA-reviewable because the President is not an "agency."  But

### 2.      The Agency Defendants' Actions Are Final And Reviewable

Defendants are wrong in asserting (TRO Opp. 28) that judicial review is unavailable because "Plaintiffs identify no agency action."  The APA's definition of "agency action," 5 U.S.C. § 551(13), is expansive, and "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001).  Here, the TRO motion plainly states the precise action at issue (at 34):  "Defendants have decided to implement the Proclamation as a prohibition on immigration that extends even to individuals who qualify now for visas but who will age out before the Proclamation expires," and to require such age-outs to individually satisfy an exception to the Proclamation in order to enter the country.  That is a reversal of longstanding agency policy with respect to age-outs, to whom Defendants previously afforded preferential treatment and granted visas on an emergency basis (and unencumbered by any obligation to prove an "exception")—precisely to avoid the serious harms that come with aging out of visa eligibility.  Defendants' change in policy constitutes reviewable agency action within the APA's "flexible and pragmatic" meaning.  *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000); *see Hawaii*, 878 F.3d at 681 (agency implementation of Presidential immigration Proclamation was reviewable final agency action); TRO Mot. 33.

While Defendants have not published any formal rule overturning their prior visa-issuance policy with respect to age-outs (*see* TRO Opp. 28-29), that is neither determinative nor especially relevant.  As Plaintiffs explained (TRO Mot. 33), informal action may be final and reviewable. *See, e.g.*, *Ciba-Geigy Corp. v. E.P.A.*, 801 F.2d 430, 437-38 & n.9 (D.C. Cir. 1986); *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 58-59 (D.D.C. 2019).  Even a press release may constitute final agency action where it "effects a dramatic change in the agency's established …

---

where an agency has final responsibility for the action in question, the APA calls for judicial review.  *See Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993).

regime." *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883-84 (D.C. Cir. 2003).  And an agency cannot "immuniz[e] its lawmaking from judicial review" by declining to issue "official publications." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020 (D.C. Cir. 2000).  If an unofficial directive "reflect[s] a settled agency position" that is "for all practical purposes 'binding,'" it is a reviewable agency action.  *Id.* at 1021-23; *see, e.g.*, *Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 41 (D.D.C. 2015) (informal agency pronouncements may be binding and reviewable); *Seminole Nation of Okla. v. Norton*, 223 F. Supp. 2d 122, 141 (D.D.C. 2002) ("agency action encompasses an agency's interpretation of the law").

Here, the public evidence to date makes plain that although the agencies have published no formal guidance, they have "effect[ed] a dramatic change in the agenc[ies'] established … regime," *CropLife*, 329 F.3d at 884, and have put in place a new and different "settled agency position" that is "for all practical purposes 'binding'" and determinative of the rights of individual intending immigrants like W.Z.A., *Appalachian Power*, 208 F.3d at 2021:

- The State Department has announced that only "applicants who may be eligible for an exception under this presidential proclamation" are now eligible for visas.[9]

- The Division Chief of the Office of Field Operations of the Bureau of Consular Affairs' Visa Office has attested that consulates are conducting visa interviews only where an applicant "may qualify for an exception under the Presidential Proclamation" (First Marwaha Decl. (Dkt. 21-5) ¶ 4), and that each applicant must establish "on a case by case basis" that he or she "qualif[ies] for a national interest exception" to the

---

[9] U.S. Department of State, *Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak* (last updated Apr. 23, 2020), https://travel.state.gov/content/travel/en/News/visas-news/Proclamation-Suspending-Entry-of-Immigrants-Who-Present-Risk-to-the-US-labor-market.html.

Proclamation in order to receive a visa (Second Marwaha Decl. (Dkt. 30-2) ¶ 5).

- By Defendants' own account, the agencies applied the Proclamation to both M.T.S. and Alondra, who were granted visas only because the State Department decided that each qualified individually for a "national interest" exception. *See* TRO Opp. 11, 12; First Dus Decl. (Dkt. 30-3)  ¶¶ 4-6; Second Dus Decl. (Dkt. 30-4)  ¶ 11.

In the end, Defendants do not deny that the agencies have adopted a general policy to implement the Proclamation by refusing visas to potential age-outs like W.Z.A.  Far from it; they claim (wrongly) that it is of vital national importance to apply the Proclamation's visa prohibition to age-outs across the board. *See generally* TRO Opp. 37-39.  The agencies have acted in this case by setting a policy for their implementation of the Proclamation.[10]

Contrary to Defendants' mischaracterization (TRO Opp. 28), Plaintiffs are not merely challenging the State Department's "posting of notice regarding the Proclamation."  The notice is one of *several* pieces of evidence (including the Marwaha Declarations and Plaintiffs' own experiences) demonstrating that the agencies have established a new policy to enforce the Proclamation as a bar to age-outs' entry into the country—a point which Defendants cannot dispute.  This is not akin to a mere "budget request," nor is it "purely informational in nature" (*contra id.* at 28-29).  It is a determination regarding how the agencies will exercise their authority granted vis-à-vis age-outs.  That is "agency action," 5 U.S.C. § 551(13), because it constitutes a "rule"—*viz.*, "an agency statement of general or particular applicability and future effect," which is "designed to implement, interpret, or prescribe law or policy," *id.* § 551(4).  The agencies'

---

[10] To the extent Defendants argue that Plaintiffs identify no "agency action" because they cannot (yet) point to a formal pronouncement, the onus is on Defendants to produce the administrative record and the relevant communications. *See, e.g.*, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 60 (2005) ("The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.").

decision has general applicability to and future effect on age-outs, and it implements the policy set forth in the Proclamation.

Defendants assert (TRO Opp. 29) that "the Proclamation would have gone into effect even if the Department of State had never provided any notice of it," but that again misses the point. The Proclamation is not self-executing, but grants authority and responsibility for its implementation to the agency Defendants (Proclamation § 3). The Proclamation would *not* have had ill effects on W.Z.A. and other age-outs if the agencies had exercised the authority conferred on them differently. And as Plaintiffs explained (*see* TRO Mot. 10-11, 24) the decision to apply the Proclamation as a bar to the immigration of age-outs was a genuine policy choice not compelled by the Proclamation: Instead of adopting their chosen policy, the agencies could have (for example) invoked the Proclamation's "national interest" exception to announce that otherwise-eligible age-outs would continue to be granted visas before losing their eligibility, and without any new individualized showing. Defendant Wolf took such a step to protect professional athletes from prior immigration suspensions that were (like the Proclamation) issued under 8 U.S.C. § 1182(f) (*see* Manning Decl. (Dkt. 21-8), Ex. E, at 1), and Defendants identify nothing in the INA or the Proclamation that would have precluded a similar choice here. Defendants assert (TRO Opp. 28 n.5) that "the Proclamation recognizes no ... categorical exclusion" for "all age outs," but it is equally true that nothing in the Proclamation foreclosed the agencies from implementing the President's broad directive in a manner consistent with their prior policy. There was a genuine policy choice to be made here, and the agencies' election constitutes agency action.

Defendants' attempt to deny that the agencies' action is "final" (TRO Opp. 29-30) is belied by the record, which shows that the agencies have finally decided to apply the Proclamation in a way that protects age-outs. Defendants do not advance any argument to support their assertion

(*id.* at 29) that their policy choice "does not mark the consummation of an agency's decision-making process." And their assertion (*id.*) that "[t]he legal consequences that Plaintiffs challenge in this case flow from the Proclamation, not action by the State Department" is inaccurate:  The consequences flow from the agencies' decision to require children to make individual "national interest" showings, rather than to effectuate the Proclamation in a manner consistent with prior policy.  That decision is final and reviewable agency action.

### 3.    Consular Nonreviewability Does Not Apply

Defendants are wrong in suggesting (TRO Opp. 24-26) that consular nonreviewability precludes review.  Plaintiffs are not "challeng[ing] [a] consular officer['s] visa determination[]" (*contra id.* at 24)—no such determination has been made as to W.Z.A.  And as Plaintiffs and this Court have explained, "the doctrine of consular non-reviewability does not apply where the government has not made a final visa decision."  *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 11 (D.D.C. 2017); *see Vulupala v. Barr*, 2020 WL 601887, at *5 (D.D.C. Feb. 7, 2020); *Nine Iraqi Allies Under Serious Threat v. Kerry*, 168 F. Supp. 3d 268, 291-92 (D.D.C. 2016).  The doctrine does not prevent courts from deciding legal questions just because they may bear on a consular visa determination that has not yet occurred.  *Vulupala*, 2020 WL 601887, at *5.  Nor does the doctrine preclude review of an agency's policy implementing a presidential immigration proclamation.  *See Hawaii*, 878 F.3d at 680-82 (consular nonreviewability did not bar challenge to agency implementation of presidential proclamation); *Emami*, 365 F. Supp. 3d at 1019 (claims challenging agency implementation of presidential proclamation "do not require review of an individual consular officer's decision" and are reviewable); *Doe*, 288 F. Supp. 3d at 1068-69 (similar).

Defendants, again, do not acknowledge or distinguish these authorities.  The cases on which Defendants rely involved direct challenges to final visa denials, and so do not speak to this

pre-denial challenge to the agencies' general policy.[11]  Consular nonreviewability is inapplicable.

### B.   Defendants Fail To Rebut Plaintiffs' Showing That The Agencies' Implementation And Enforcement Of The Proclamation Is Arbitrary, Capricious, And Not In Accordance With Law

Plaintiffs explained at length (TRO Mot. 24-32) that the agencies' implementation of the Proclamation vis-à-vis age-outs violates the APA for a variety of reasons.  There is no evidence that the agencies even *considered* the question of age-outs before reversing their preexisting policy and deciding for the first time not to issue visas without case-by-case proof that an exception to the Proclamation applies.  Having not considered the issue, the agencies have not articulated any reasons for the policy change as it applies to children who are aging out.  Nor have they shown that they accounted for the facts that underlay the prior policy, namely the severe harms that aging out inflicts on young people and their families—harms that the agencies have long sought to redress by giving preferential treatment to age-outs.  At the same time, the agencies have not attempted to account for the significant reliance interests of people like Vicenta S. and W.Z.A., who worked and waited for years to obtain visas under the old system—only to see the agencies' policy changed with so little warning that it was impossible for them to complete the visa process before the new policy took effect.  The agencies also have not attempted to reconcile their new policy with the State Department's Foreign Affairs Manual, which directs consulates facing crises to "[m]ake provisions for age-out cases" without imposing any "national interest" requirement. *See* 7 FAM 1812.4-2.b(4).  And in requiring age-outs to satisfy that requirement without providing any explanation of what it means or how it may be met, the agencies have established a rule that

---

[11] *See Allen v. Milas*, 896 F.3d 1094, 1096-97 (9th Cir. 2018); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1155 (D.C. Cir. 1999); *Baan Rao Thai Rest. v. Pompeo*, 2019 WL 3413415, at *1 (D.D.C. July 29, 2019); *Udugampola v. Jacobs*, 795 F. Supp. 2d 96, 98 (D.D.C. 2011); *Van Ravenswaay v. Napolitano*, 613 F. Supp. 2d 1, 3 (D.D.C. 2009).

is so vague as to be contrary to the Constitution.[12]

Any one of these faults would be enough to require setting the agencies' policy reversal aside, for the reasons detailed in the TRO motion and the cases cited therein.  And yet Defendants do not even meaningfully attempt to defend the merits of the APA claim.  For example, they do not contend that they undertook the required consideration of the issues, or that they have any non-arbitrary, non-capricious reason for suddenly requiring age-outs to satisfy a "national interest" exception to obtain an immigrant visa before losing their eligibility.  Nor do they try to articulate a comprehensible standard under which "national interest" exceptions are evaluated.  The probable conclusion to be drawn from the agencies' failure to defend their actions is that the agency process here was inadequate on at least one of the grounds advanced in the TRO motion, such that Defendants' implementation of the Proclamation is likely to be set aside under the APA.  Immediate injunctive relief is therefore warranted.  *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) (affirming preliminary injunction based on APA challenge to implementation of immigration proclamation); *HIAS*, 415 F. Supp. 3d at 682-84 (granting APA preliminary injunction based on litany of procedural failures); *Doe*, 288 F. Supp. 3d at 1086 (granting preliminary injunction based on APA challenge to implementation of executive order).[13]

## III.   VICENTA S. AND CLASS MEMBERS WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF

Defendants do not deny that the harm to Vicenta S. and her family from W.Z.A.'s loss of

---

[12]  For all the record shows, the "national interest" exception's chief and wholly arbitrary use appears to be as an escape hatch allowing Defendants to moot out individual plaintiffs, so that they can delay or avoid litigating the merits of their policy.  *See supra*, pp. 7-8.

[13]  Defendants assert (TRO Opp. 32) that *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), "precludes Plaintiffs' challenge," but that decision did not address an arbitrary-and-capricious claim against agency action; the Court decided "whether the President had authority under the [INA] to issue the Proclamation, and whether the [Proclamation] violates the Establishment Clause."  *Id.* at 2403.

his visa eligibility is imminent (it will happen on June 30 absent timely relief or an arbitrarily awarded "national interest" exception), or that it will be irreparable.  *See* TRO Mot. 37-38. Defendants instead principally argue (TRO Opp. 35-37) that factors other than the Proclamation will cause that imminent and irreparable injury.  But for reasons set forth above (*supra* Point I.A) they are incorrect.  As their attorney attests, W.Z. and W.Z.A. would both be "almost certain" to be granted immigrant visas in the absence of Defendants' enforcement of the Proclamation against W.Z.A.  Second Blackford Decl. ¶ 7.  They are prima facie eligible, having submitted all necessary documentation and information, and they are aware of no ground of ineligibility that would prevent their visas from issuing.  *Id.* ¶¶ 3-7.  And W.Z. is going to extraordinary lengths to travel to El Salvador (whose quarantine has lifted) in order to attend his medical examination and visa interview, so that his primary visa may issue and open the door for his son.  *See id.* ¶¶ 24-27.  On these facts, any suggestion that W.Z. and W.Z.A. will be unable to complete their respective visa processes is speculative at best.  Again, the only evident impediment to W.Z.A. receiving his visa and immigrating to the United States is the agencies' enforcement of the Proclamation.  It is that policy that threatens to cause Vicenta S.'s irreparable harm.

Defendants speculate, without taking a position (TRO Opp. 37), that the harm "that results from W.Z.A. aging [out] ***might*** not be so great or imminent to constitute irreparable harm" (emphasis added).  But they fail to acknowledge Vicenta S.'s attestation to the harms that further delay in being reunited with W.Z.A. would cause her and her family.  *See* Vicenta S. Decl. ¶¶ 12, 13, 21; TRO Mot. 39-40; *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (court may consider "indirect hardship to … friends and family members" to grant injunctive relief).

Defendants note (TRO Opp. 37) that W.Z.A. could still "pursue an F2B visa" after aging out of his current visa eligibility.  But they do not dispute (*see id.*) either that pursing this alternative

relief would likely cost W.Z.A. and Vicenta S. at least another five years, or that such a wait would be both "[p]rolonged and indefinite."  *See Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated on other grounds*, 138 S. Ct. 2710 (2018); *Doe*, 288 F.3d at 1082 (government action that "will prolong the separation of [Plaintiffs and] their family members … is an irreparable harm"); TRO Mot. 38.  The five-year estimated wait is plainly "prolonged," and neither Vicenta S. nor W.Z.A. nor their family would ever be able to recoup the lost time.[14] Defendants also assert (TRO Opp. 37) that it is "speculative" for Plaintiffs to suggest that Vicenta S.—an elderly and infirm grandmother—might pass away before W.Z.A. again becomes eligible for a visa.  But that risk at minimum heightens the severity of the harms that she and her family would endure.  And this is ultimately a side issue, because it is clear both that "prolonged" separation constitutes irreparable harm and that the separation threatened here would be prolonged. Defendants' oblique attempt to minimize this irreparable harm should be rejected.

Defendants also suggest in a footnote (TRO Opp. 35 n.6) that Vicenta S.'s irreparable harm is "speculative" because W.Z.A.'s age-out day (June 30) falls after the Proclamation's current expiration date (June 22).  But W.Z.A.'s visa interview is scheduled for June 22.  The Proclamation and the agencies' implementation policies will remain in effect on that date absent injunctive relief. Absent a "national interest exception" or a TRO, the consulate would be unable to issue a visa on the day of the interview, as happened with Alondra (Second Dus Decl. (Dkt. 30-4) ¶ 11), in which case it would likely take multiple days for the visa to issue—it took eleven days in M.T.S.'s case (*see* First Dus Decl. (Dkt. 30-3) ¶¶ 4-6).  Any such delay would likely be fatal to W.Z.A.'s ability to obtain the visa *and* enter the United States by June 29 (the last day before he ages out).  A TRO

---

[14] Defendants suggest (TRO Opp. 37) that it is "speculative" to observe (TRO Mot. 38) that the five-year estimate is not a "guaranteed maximum," but that just proves that the wait is indefinite.

is necessary *now*, because the agencies' action is *currently* burdening W.Z.A. in his pursuit of a visa, and because any further delay would risk stymying his efforts permanently.

  In any event, Defendants acknowledge that the Proclamation may be "extended" (TRO Opp. 35 n.6), and they do not deny that such an extension is likely to be announced in short order. Indeed, the State Department was required to issue its recommendation to the President regarding whether the Proclamation should be renewed by June 12, 2020.  Proclamation § 6.  As W.Z.A.'s last day of "child" status is just a week after the Proclamation is now set to expire, it is a certainty that such an extension would affect him.  Thus, if the Court concludes that W.Z.A.'s claim is not yet ripe, even though he is currently subject to the Proclamation's restrictions, it should hold the motion and issue the TRO once the extension has been announced.

  Finally, even if the Court were to conclude that Vicenta S. has in some way fallen short of establishing irreparable harm resulting from W.Z.A.'s inability to obtain a visa, it still should grant relief to the class.  If outside factors conspire to prevent W.Z.A. from completing his own visa process, it still can hardly be doubted that many members of the proposed class are in situations like those that Alondra and M.T.S. faced when the instant motions were filed on June 2:  Ready and able to complete their visa processes and to enter the United States, but prevented from doing so solely by the Proclamation and the agencies' enforcement thereof.  In the absence of classwide relief, those individuals and their families will suffer irreparable injuries that are materially identical to those set forth in the Plaintiffs' declarations here:  Separation from family, inability to be with their children and grandchildren as they grow up, and the like.  *See, e.g.*, *Petties v. D.C.*, 238 F. Supp. 2d 114, 122 (D.D.C. 2002) (granting classwide injunctive relief; declarations of individual named plaintiffs provided "strong evidence" of irreparable injury to all class members). A classwide TRO is necessary to prevent those injuries.

## IV.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF INJUNCTIVE RELIEF

In comparison to the severe, prolonged, and even permanent harms that Vicenta S., W.Z.A., and other similarly situated families face should the agencies' enforcement of the Proclamation lead to aging out and loss of visa eligibility, Defendants can point to no genuine harm to the public interest from the narrow and limited injunction that Plaintiffs are seeking.  Defendants assert (TRO Opp. 38) that "[c]ontinued immigration at the normal rate during this critical time of economic recovery would threaten the ability of … American workers to secure employment," and warn of the supposed harms of "allowing immigration to continue unabated."  But the requested TRO would not restore immigration to an "unabated" "normal rate."  It would only allow W.Z.A. and a few dozen 20-year-olds—all of whom are admissible, visa-eligible, and in possession of current priority dates—to enter the country before their visa eligibility expires through no fault of their own.  While there are enough of those people to warrant class certification,[15] it is plain that there are nowhere near so many that allowing them to immigrate could meaningfully damage the labor market in a country the size of the United States.  Defendants complain about a supposed lack of evidence to support that obvious point (*id.*), but supply none of their own.

More galling is Defendants' evidence-free assertion (*id.*) that "[e]very single immigrant is another potential worker taking the job of a member of the American public."  That claim is false and outrageous.  Economists from across the policy and political spectrum have discredited the "fallacy" that "there is a fixed amount of work to be done."[16]  It is not the case that an increase in

---

[15] *See, e.g.*, *Ramirez v. U.S. I.C.E.*, 338 F. Supp. 3d 1, 44 (D.D.C. 2018) ("a class of at least forty members is sufficiently large to meet [the numerosity] requirement" for class certification); Class Cert. Mot. (Dkt. 20) 16-19.

[16] *Economics A-Z Terms Beginning with L*, The Economist, https://goo.gl/BvRwKU; *see also* Paul Krugman, *Lumps of Labor*, N.Y. Times (Oct. 7, 2003), https://goo.gl/GyYTG5.

the number of workers reduces the number of available jobs.  The indisputable reality is the reverse: "When people work for a living, they earn money. They spend that money on goods and services that are produced by other people."[17] That greater demand for goods and services in turn creates more jobs.  Studies consistently show that increased immigration levels into the U.S. have had largely *positive* impacts on the employment levels and incomes of U.S.-born workers,[18] and that immigrants complement, rather than compete with, U.S.-born workers in the workforce.[19]  The Court should disregard Defendants' baseless claim to the contrary.  And without that fabricated contention, Defendants' public-interest argument has no support at all.

Finally, Defendants concede (TRO Opp. 38) that their made-up injuries to the public interest are only temporary, as they could only possibly persist "during this critical time of economic recovery" in the wake of COVID-19—which will not last forever.[20]  But the irreparable

---

[17] Buttonwood, *Keep on Trucking*, The Economist (Feb. 11, 2012), https://goo.gl/x8vqaL; *see* David Bier, Cato Inst., *Five Myths About DACA* (Sept. 7, 2017), https://tinyurl.com/ydy2qx3q ("From 1970 to 2017, the U.S. labor force doubled. Rather than ending up with a 50 percent unemployment rate, U.S. employment doubled."); Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015), https://goo.gl/8p3SP8 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of S.F. Econ. Letter (Aug. 30, 2010), https://goo.gl/jK17fc.

[18] *See, e.g.*, Jacqueline Varas, Am. Action Forum, *How Immigration Helps U.S. Workers and the Economy* (Mar. 20, 2017), https://goo.gl/ovHQEh; U.S. Chamber of Commerce, *Immigration Myths and Facts* (Apr. 14, 2016), https://tinyurl.com/yay4xjm9.

[19] *See, e.g.*, Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook on Immigration and Economic Growth* 70, 118 (3d ed., Sept. 2017), https://tinyurl.com/y4ykokn9; Gretchen Frazee, *4 Myths About How Immigrants Affect the U.S. Economy,* PBS NewsHour (Nov. 2, 2018), https://tinyurl.com/yxlwzkth; Maria E. Enchautegui, *Immigrant and Native Workers Compete for Different Low-Skilled Jobs*, The Urban Institute: Urban Wire (Oct. 13, 2015), https://tinyurl.com/ycayp6ky; U.S. Chamber of Commerce, *supra* note 18.

[20] Defendants assert (TRO Opp. 38) that lawful permanent resident status cannot readily be revoked, but they omit to mention that "any alien," even one on a green card, is subject to deportation on a variety of grounds—including the commission of various crimes and becoming a "public charge" within five years of entry.  *See* 8 U.S.C. § 1227.

harm to Vicenta S. and W.Z.A.—and to others like them—from being indefinitely separated from their family members *will* last forever.  There is no way for Vicenta S. to recover the five years or more that she would spend separated from her grandson if Defendants get their way.  Nor is there any way for W.Z.A. to recover the five years or more that he would spend separated not only from his grandmother but also from his parents.  And other members of the proposed class would suffer even greater permanent harms as a result of the decades-long visa queues they would face after aging out of their present eligibility.  Even assuming *arguendo* the dubious proposition that a temporary immigration suspension is warranted by the rise in unemployment, it is impossible to conclude that this *temporary* economic concern justifies the uniquely severe and *permanent* harms that Defendants wish to impose on the limited group of individuals facing the age-out problem.

Visa-eligible relatives of U.S. citizens and permanent residents should not lose the opportunity to immigrate simply because of the happenstance of turning 21 during a pandemic.  No law or public interest favors that irrational and unjust result.  A TRO is warranted.

## V.     CLASSWIDE INJUNCTIVE RELIEF IS APPROPRIATE

Finally, Defendants argue (TRO Opp. 39-41) that the Court should not grant relief beyond Vicenta S. and W.Z.A.  But while Defendants note the complaint's inclusion of class claims (*id.* at 41), they ignore the fact that with the Court's permission, Plaintiffs have moved for class certification on the same schedule as this TRO motion.  As Defendants have "acted … on grounds that apply generally to the class," classwide injunctive relief will plainly be lawful and justified upon class certification. *See* Fed. R. Civ. P. 23(b)(2).

Classwide relief is particularly appropriate in this APA case.  The APA expressly authorizes the Court to "issue all necessary and appropriate process … to preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705, and instructs the Court to "hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law," *id.* § 706(2). As Defendants concede (TRO Opp. 40-41), the latter provision means that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (affirming nationwide injunction against enforcement of APA-violating regulation). Defendants' suggestion that the Court adopt a "narrower reading" of the statute's remedial provision is foreclosed by controlling Circuit precedent.

Defendants also suggest (TRO Opp. 40-41) that a different rule should apply in the preliminary-injunction context than in the final judgment context. But Defendants have abdicated any defense of the agencies' action under the APA (*see supra* Point II.B), so once the Court gets past Defendants' erroneous threshold legal arguments (*see supra* Point II.A), nothing of substance will stand in the way of the ultimate conclusion that the agency action is arbitrary, capricious, and unlawful, and thus subject to nationwide vacatur under *National Mining Association* and § 706(2). In this context, restricting the grant of preliminary relief to Vicenta S. and W.Z.A. would be unjust. While the case works its way through the litigation process, as-yet-unidentified class members will age out as they reach their 21st birthdays, suffering irreparable harm as the result of an agency action whose APA "merits" Defendants are unable to defend with a straight face. While a TRO protecting W.Z.A. from aging out is the minimum relief appropriate at this stage, Defendants should not be allowed to continue enforcing their irrational and unjustifiable policy against *any* child faced with aging out.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court immediately issue a TRO preventing Defendants from implementing or enforcing the Proclamation against Plaintiffs' sponsored family members and other similarly situated visa applicants.

-25-

June 16, 2020

Jesse M. Bless (D.D.C. Bar No. MA0020)
AMERICAN IMMIGRATION LAWYERS
   ASSOCIATION
1301 G Street NW, Ste. 300
Washington, D.C. 20005
(781) 704-3897
jbless@aila.org

Karen C. Tumlin (*pro hac vice*)
Esther H. Sung (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org

Stephen Manning (*pro hac vice*)
Nadia Dahab (*pro hac vice*)
Tess Hellgren (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
nadia@innovationlawlab.org
tess@innovationlawlab.org

Respectfully submitted,

/s/ Andrew J. Pincus
Andrew J. Pincus (D.D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Cleland B. Welton II (*pro hac vice*)
MAYER BROWN MEXICO, S.C.
Goldsmith 53, Polanco
Ciudad de Mexico, 11560
Telephone: (502) 314-8253
cwelton@mayerbrown.com

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
JAC Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
labonihoq@gmail.com