**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DOMINGO ARREGUIN GOMEZ, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, President of the United
States of America, et al.,

Defendants.

Civil Action No. 1:20-cv-01419

<u>**MEMORANDUM IN SUPPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**</u>

Jesse M. Bless (D.D.C. Bar No. MA0020)
AMERICAN IMMIGRATION LAWYERS
   ASSOCIATION
1301 G Street NW, Ste. 300
Washington, DC 20005
(781) 704-3897
jbless@aila.org

Karen C. Tumlin (*pro hac vice*)
Esther H. Sung (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org

Stephen Manning (*pro hac vice*)
Nadia Dahab (*pro hac vice*)
Tess Hellgren (*pro hac vice*)
Jordan Cunnings (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
nadia@innovationlawlab.org
tess@innovationlawlab.org
jordan@innovationlawlab.org

Andrew J. Pincus (D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Cleland B. Welton II (*pro hac vice*)
MAYER BROWN MEXICO, S.C.
Goldsmith 53, Polanco
Ciudad de Mexico, 11560
Telephone: (502) 314-8253
cwelton@mayerbrown.com

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
Justice Action Center Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
laboni@hoqlaw.com

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    Statutory and Regulatory Background ................................................. 3

    B.    The Proclamations ........................................................................... 9

    C.    Agency Implementation.................................................................... 11

    D.    The Plaintiffs ................................................................................... 12

LEGAL STANDARD.......................................................................................... 18

ARGUMENT ..................................................................................................... 19

I.      PLAINTIFFS' CLAIMS ARE JUSTICIABLE ......................................... 19

    A.    Plaintiffs Have Standing To Sue ...................................................... 19

    B.    Consular Nonreviewability Does Not Apply ..................................... 21

II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................ 22

    A.    The June Proclamation Is Ultra Vires Because It Does Not Satisfy The Statutory Prerequisites For Entry Suspension..................................... 22

    B.    Assuming That The June Proclamation Satisfies The Statutory Prerequisites, It Violates The Separation Of Powers ........................... 29

    C.    If The President's Authority Is Not Cabined, Sections 1182(f) And 1185(a) Are Unconstitutional Delegations Of Legislative Authority ................ 32

    D.    The State Department's Implementation Violates The APA.............................. 33

III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF..................................................................... 38

    A.    Family Separation Plaintiffs ............................................................. 39

    B.    Diversity Visa Plaintiffs.................................................................... 40

    C.    Nonimmigrant Visa Plaintiffs .......................................................... 41

IV.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF INJUNCTIVE RELIEF ................................ 43

V.     SCOPE OF RELIEF ............................................................................. 44

CONCLUSION.................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ........................................................................19

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986) ......................................................................30

*Almaqrami v. Pompeo*,
    933 F. 3d 774 (D.C. Cir. 2019) .......................................................................45

*Animal Legal Def. Fund, Inc. v. Perdue*,
    872 F.3d 602 (D.C. Cir. 2017) ........................................................................37

*Aracely R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) ................................................................43

*Baker Elec. Coop. v. Chaske*,
    28 F.3d 1466 (8th Cir. 1994) .....................................................................41, 42

*Barrick Goldstrike Mines Inc. v. Browner*,
    215 F.3d 45 (D.C. Cir. 2000) ..........................................................................34

*Baystate Franklin Med. Ctr. v. Azar*,
    950 F.3d 84 (D.C. Cir. 2020) ....................................................................35, 37

*Beacon Assocs. v. Apprio, Inc.*,
    308 F. Supp. 3d 277 (D.D.C. 2018) ................................................................41

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................34

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ........................................................................................23

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................................44

*Casa de Maryland v. DHS*,
    924 F.3d 684 (4th Cir. 2019) .....................................................................35, 37

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................................34

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Cigar Ass'n of Am. v. FDA*,
    436 F. Supp. 3d 70 (D.D.C. 2020) ........................................................36

\* *Clinton v. City of New York*,
    524 U.S. 417 (1998) ....................................................................30, 32

*CropLife Am. v. E.P.A.*,
    329 F.3d 876 (D.C. Cir. 2003) ..........................................................34

\* *DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ................................................................35, 36

*Doe 2 v. Mattis*,
    344 F. Supp. 3d 16 (D.D.C. 2018) ..................................................44, 45

\* *Doe v. Trump*,
    418 F. Supp. 3d 573 (D. Or. 2019) ........................2, 30, 32, 33, 42

\* *Doe v. Trump*,
    957 F.3d 1050 (2020) ......................................1, 2, 22, 24, 30

*E. Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) ..........................................................33

*Emami v. Nielsen*,
    365 F. Supp. 3d 1009 (N.D. Cal. 2019) ..............................................22

\* *Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ................................................................35, 36

\* *Encuentro Del Canto Popular v. Christopher*,
    930 F. Supp. 1360 (N.D. Cal. 1996) ....................................................35

\* *Everglades Harvesting & Hauling, Inc. v. Scalia*,
    427 F. Supp. 3d 101 (D.D.C. 2019) ......................................20, 41, 42

*Galvan v. Press*,
    347 U.S. 522 (1954) ......................................................................29

*Gresham v. Azar*,
    950 F.3d 93 (D.C. Cir. 2020) ............................................................37

*Gulf Coast Mar. Supply, Inc. v. United States*,
    218 F. Supp. 3d 92 (D.D.C. 2016) ....................................................44

# TABLE OF AUTHORITIES
(continued)

Page(s)

\* *Gundy v. United States*,
139 S. Ct. 2116 (2019) ................................................................................32, 33

*Hawaii v. Trump*,
878 F.3d 662 (9th Cir. 2017) ................................................................34

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ................................................................40

*Jacinto-Castanon de Nolasco v. USCIS*,
319 F. Supp. 3d 491 (D.D.C. 2018) ......................................................39

*Jackson v. Dist. of Columbia*,
692 F. Supp. 2d 5 (D.D.C. 2010) ..........................................................38

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................44

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ................................................................39

*M.G.U. v. Nielsen*,
325 F. Supp. 3d 111 (D.D.C. 2018) ......................................................39

*Make the Rd. New York v. McAleenan*,
405 F. Supp. 3d 1 (D.D.C. 2019) ..........................................................39

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ......................................................19, 21

*Mohamed v. Pompeo*,
2019 WL 4734927 (E.D. Cal. Sept. 27, 2019) ..................................20, 40

*N.Y. Republican State Comm. v. SEC*,
927 F.3d 499 (D.C. Cir. 2019) ..............................................................20

\* *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ......................................................44, 45

*Nguyen v. U.S. Dep't of Homeland Security*,
2020 WL 2527210 (D.D.C. May 18, 2020) ......................................19, 21

*Open Cmtys. All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) ......................................................44

# TABLE OF AUTHORITIES
(continued)

Page(s)

\* *P.K. v. Tillerson*,
302 F. Supp. 3d 1 (D.D.C. 2017) .........................................................................21, 40, 41, 45

*Pickett v. Hous. Auth. of Cook Cty.*,
114 F. Supp. 3d 663 (N.D. Ill. 2015) .........................................................................................43

*RadLax Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ...................................................................................................................29

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
836 F.3d 57 (D.C. Cir. 2016) ......................................................................................................29

*Sanchez v. McAleenan*,
2020 WL 607032 (D. Md. Feb. 7, 2020) ....................................................................................39

*Scialabba v. Cuellar de Osorio*,
573 U.S. 41 (2014) ........................................................................................................................4

*Temple Univ. v. White*,
941 F.2d 201 (3d Cir. 1991) ........................................................................................................23

*Tenrec, Inc. v. USCIS*,
2016 WL 5346095 (D. Or. Sept. 22, 2016) ................................................................................20

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
437 F.3d 75 (D.C. Cir. 2006) ......................................................................................................38

\* *Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ..................................................................1, 3, 19, 22, 24, 30, 32, 35

\* *United States v. Bikundi*,
926 F.3d 761 (D.C. Cir. 2019) ....................................................................................................23

*United States v. Rice*,
746 F.3d 1074 (D.C. Cir. 2014) ..................................................................................................23

*United States v. Sanders*,
485 F.3d 654 (D.C. Cir. 2007) ....................................................................................................23

*Vulupala v. Barr*,
438 F. Supp. 3d 93 (D.D.C. 2020) ..............................................................................................22

*Whitman v. Am. Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001) ....................................................................................................................34

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008)..................................................................................19, 43

*Wisc. Gas Co. v. FERC*,
　758 F.2d 669 (D.C. Cir. 1985)..........................................................38, 41

\* *Youngstown Sheet & Tube Co. v. Sawyer*,
　343 U.S. 579 (1952).....................................................................................30

\* *Zedner v. United States*,
　547 U.S. 489 (2006).....................................................................................23

**Statutes, Rules and Regulations**

8 C.F.R. § 214.1.................................................................................................6, 7

8 C.F.R. § 214.2...............................................................................6, 7, 8, 9, 25

20 C.F.R. § 655.0 *et seq.*...............................................................................7, 8

22 C.F.R. § 40.6......................................................................................................5

22 C.F.R. § 42.33....................................................................................................5

22 C.F.R. § 42.51....................................................................................................4

22 C.F.R. § 42.52....................................................................................................4

22 C.F.R. § 42.73....................................................................................................5

22 C.F.R. § 62.1......................................................................................................8

22 C.F.R. § 62.3......................................................................................................8

22 C.F.R. § 62.4......................................................................................................8

22 C.F.R. § 62.5-13................................................................................................8

22 C.F.R. § 62.15....................................................................................................8

22 C.F.R. § 62.22(b)(1)(ii)...............................................................................8, 31

22 C.F.R. § 62.32(n)(3)(ii)...............................................................................8, 31

5 U.S.C. § 704......................................................................................................34

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

5 U.S.C. § 705 .................................................................................................33

5 U.S.C. § 706 .................................................................................................35

8 U.S.C. § 1101 ..........................................................................5, 6, 7, 8, 9, 25, 31

8 U.S.C. § 1151 ...............................................................................................5

8 U.S.C. § 1153 ............................................................................................4, 5

8 U.S.C. § 1154 ............................................................................................4, 6

8 U.S.C. § 1182 ...........................1, 2, 6, 7, 9, 22, 23, 24, 29, 30, 31, 32, 34, 35

8 U.S.C. § 1184 ...................................................................................6, 7, 9, 31

8 U.S.C. § 1185 ................................................................................9, 29, 32, 34, 35

8 U.S.C. § 1201 .........................................................................................5, 35

22 U.S.C. § 2451 ..............................................................................................8

22 U.S.C. § 2452 ..............................................................................................8

29 U.S.C. § 1391 ............................................................................................45

Act of Oct. 1, 1997, Pub. L. No. 105-48 (1997) ..............................................8

Eisenhower Exchange Fellowship Program, Pub. L. No. 101-454 § 8, 104 Stat.
     1063 (1990) ..............................................................................................8

Fed. R. Civ. P. 23(b)(2) ....................................................................................44

Fed. R. Civ. P. 50(a)(1) ....................................................................................22

Pub. L. No. 103-415, 108 Stat. 4302 § 1(v) (1994) ..........................................8

Pub. L. No. 104-72 (1995) ................................................................................8

**Legislative History**

87 Cong. Rec. 5051 (1941) ..............................................................................22

136 Cong. Rec. H-8629-02 (1990) ............................................................3, 5, 37

# TABLE OF AUTHORITIES
(continued)

Page(s)

144 Cong. Rec. 8572 (Sept. 24, 1998) ..................................................................7

144 Cong. Rec. S-10877-01 ...............................................................................28

H.R. Rep. No. 82-1355 (1952) .............................................................................3

H.R. Rep. No. 99-682 (1986) ...............................................................................7

H.R. Rep. No. 101-723 (1990) ....................................................................4, 5, 37

S. Rep. No. 105-186 (1998) .................................................................................7

**Other Authorities**

Alex Nowrasteh, *Don't Ban H-1B Workers:  They Are Worth Their Weight in
    Innovation*, Cato at Liberty (May 14, 2020, 12:08 PM) ...........................6

Buttonwood, *Keep on Trucking*, The Economist (Feb. 11, 2012) ..............................27

Dara Lind, *What "chain migration" really means— and why Donald Trump hates
    it so much*, Vox (updated Jan. 30, 2018, 12:48 PM) ..................................4

*Economics A-Z Terms Beginning with L*, The Economist ...........................................26

Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*,
    Fed. Reserve Bank of S.F. Econ. Letter (Aug. 30, 2010) .........................27

Jacqueline Varas, Am. Action Forum, *How Immigration Helps U.S. Workers and
    the Economy* (Mar. 20, 2017) ..............................................................27

Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force*
    (Aug. 25, 2015) ...............................................................................27

Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook
    on Immigration and Economic Growth* 70 (3d ed., Sept. 2017)....................27

Nat'l Acad. of Scis., Eng'g., and Med., *The Economic and Fiscal Consequences
    of Immigration* (The National Academies Press 2017)...............................26

Paul Krugman, *Lumps of Labor*, N.Y. Times (Oct. 7, 2003)......................................26

Ruth Wasem, *Temporary Professional, Managerial, and Skilled Foreign
    Workers: Policy and Trends*, Cong. Research Serv. Report No. R43735
    (Jan. 13, 2016).................................................................................9

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Tatiana Sanchez, *Exclusive: Yemeni girl, 10, stuck abroad as family waits anxiously in San Francisco*, S.F. Chron. (July 30, 2020), ......................................................15

U.S. Chamber of Commerce, *Immigration Myths and Facts* (Apr. 14, 2016) .............................27

USCIS, *Characteristics of H-1B Specialty Occupation Workers* (Mar. 5, 2020).........................6

*U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, RIN 1615-AC18 (to be published in the Federal Register Aug. 3, 2020) ....................................................26

U.S. Dep't of State, Bureau of Consular Affairs, *National Interest Exceptions to Presidential Proclamations (10014 & 10052) Suspending the Entry of Immigrants and Nonimmigrants Presenting a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak* .............................................................................12

U.S. Dep't of State, Bureau of Educ. and Cultural Affairs, *J-1 Visa Exchange Visitor Fact Sheet*..........................................................................8

U.S. Dep't of State, *Phased Resumption of Routine Visa Services* (updated July 14, 2020) ........................................................................21

## INTRODUCTION

Unable in multiple attempts to pass harsh immigration restrictions through Congress, even while his party held both Houses, President Trump has sought to achieve the same ends through the back door—exploiting an ongoing public-health and economic catastrophe to rewrite the Immigration and Nationality Act (INA) by virtually eliminating—for an indefinite period extending at least through the end of the year—not only permanent immigration of foreign nationals, but also much of the INA's carefully calibrated system for temporary admission of nonimmigrant workers.  The President has neither statutory nor constitutional authority to take these actions, and therefore his Proclamations are invalid.  Those Proclamations are causing irreparable and unjustifiable harm to Plaintiffs and class members.  The Court should enjoin them.

The statute invoked as authority for the Proclamations, 8 U.S.C. § 1182(f), requires that the President "*find[ ]*" that entry into the country by certain foreign nationals would be "detrimental to the interests of the United States."   As the Ninth Circuit concluded in refusing to stay a preliminary injunction barring enforcement of an indistinguishable proclamation in *Doe v. Trump*, 957 F.3d 1050, 1066-67 (2020), this *findings* requirement is not satisfied by mere assertion or guesswork unsupported by evidence or rational analysis: the Executive Branch must investigate the issues before it, and *find* in good faith that the entry of specific classes of individuals would be detrimental to the national interest.  That is how the President saved the proclamation at issue in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018)—conducting a worldwide multiagency review and issuing detailed reasons for finding that nationals of particular nations should be barred from entry.

But the Proclamations at issue in *this* case do not indicate any such analysis and contain neither detailed findings nor support for such findings.  They gesture to the economic downturn, but supply no support for their central premise that admitted foreign nationals take Americans' jobs.  Nor could the President have found such support, for the overwhelming weight of the

evidence contradicts his supposition.  Immigration *creates* jobs and *grows* the economy, improving job prospects and working conditions for U.S. workers.  Moreover, the Proclamations bar entry by persons holding visas that, by their own terms, do not permit the visa holder to take a job available to someone already in the United States.  The Proclamations do not withstand the slightest scrutiny, and are invalid under the plain language of the very statute purporting to authorize them.

Even if the Proclamations satisfied § 1182(f)'s findings requirement, they are invalid because they violate constitutional restrictions on the President's authority.  The Proclamations erase large portions of the INA based on economic concerns that Congress fully accounted for when it wrote the law.  As the Ninth Circuit has concluded, such action violates separation-of-powers principles: the President cannot rewrite the INA.  *Doe*, 957 F.3d at 1064-65.  And to the extent that § 1182(f) purports to authorize such executive revision, the statute violates the nondelegation doctrine: Congress cannot abdicate its legislative power in favor of the President.  The district court so ruled in *Doe v. Trump*, 418 F. Supp. 3d 573 (D. Or. 2019), in an opinion that the Ninth Circuit found "thoughtful" and "forceful" even as the court found it unnecessary to decide the issue's merits, 967 F.3d at 1067.  Identical considerations compel the same result here.

The State Department has also violated the Administrative Procedure Act (APA) in its implementation of the Proclamations.  By their own terms, § 1182(f) and the Proclamations address only *entry* into the United States.  They do not say anything about suspending the *issuance of visas*—a separate and distinct event that occurs at a U.S. Embassy or Consulate *before* the visa recipient seeks to enter the county.  Yet the State Department has implemented the Proclamations' *entry* suspension by refusing to take the antecedent step of issuing visas.  That refusal is hugely consequential.  Winners of the annual diversity visa lottery lose their visa eligibility if their visas do not issue by September 30, but the visas are valid for six months—so even if the Proclamations' *entry* suspension remains in place through its scheduled termination on December 31, 2020, a

-2-

diversity visa issued now would allow the recipient to immigrate in the new year.  And even for individuals in different circumstances, receiving a visa now (rather than after the Proclamations expire) will allow immediate entry into the country once entry is again permitted—saving precious time and ameliorating processing backlogs that already delay the availability of visas for years or decades.  There is no evidence that the State Department accounted for these and other important considerations when it banned visa *issuance*.  The State Department's action is thus arbitrary and capricious, and it should be set aside under the APA.

Defendants' unlawful actions are inflicting grave and irreparable consequences on Plaintiffs and class members:  Families are being kept apart, diversity-visa winners are facing the prospect of losing a once-in-a-lifetime opportunity to immigrate to the United States, and businesses are losing out on workers who are vital to their success and even their survival.  These serious injuries are not counterbalanced by any legitimate governmental interest.  Plaintiffs respectfully submit that immediate injunctive relief is warranted and indeed necessary.

## BACKGROUND

### A.      Statutory and Regulatory Background

Broadly speaking, a foreign national wishing to enter the United States must first obtain a visa from the State Department.  He or she generally may then use the visa to lawfully enter the country at a port of entry operated by DHS.  *See generally Hawaii*, 138 S. Ct. at 2414-15 (explaining the "basic distinction" between visa issuance and entry "that runs throughout the INA").  The relevant parts of the visa system are described below.

***Family-Based Immigrant Visas.***  One of Congress's goals in enacting the INA was to ensure "preservation of the family unit."  H.R. Rep. No. 82-1355 (1952).  Indeed, Congress has recognized that "family reunification" is "the cornerstone of U.S. immigration policy," and serves the "national interest."  136 Cong. Rec. H8629-02 (1990).  Congress has thus authorized a U.S.

-3-

citizen or lawful permanent resident (LPR) to "sponsor" a foreign-national relative (the "beneficiary") for an immigrant visa.  Congress considered the impact of such immigration on the labor market, relying on the Nation's top economists' affirmation that increased immigration benefits the U.S. economy.  *See* H.R. Rep. No. 101-723, pt. 1 (1990), as reprinted in 1990 U.S.C.C.A.N. 6710.  Although immigration opponents, including the President,[1] have sought to scale back the family-based visa program, Congress has rejected that proposal at every turn.  *See* First Amended Complaint ("FAC") ¶ 82.

To seek a visa for a qualifying family member, the sponsor files a petition with U.S. Citizenship and Immigration Services ("USCIS").[2] Provided that the petition is complete and satisfies the eligibility criteria, USCIS will approve it.  8 U.S.C. § 1154(b).  But because demand for visas outstrips the congressionally allocated supply, backlogs have developed in many visa categories, for many countries.  *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 48 (2014).  Most approved visa applicants must wait in a queue, determined by the applicant's country of origin and his or her relationship with the visa sponsor.  *See* 8 U.S.C. § 1153(e); 22 C.F.R. §§ 42.51(a), 42.52(a)-(c); 9 FAM 504.1-2(c)-(d).  When the applicant reaches the front of the queue, he or she completes the visa application, provides supporting evidence, pays the requisite fees, and attends an in-person interview with a consular officer, who issues the visa upon finding that the beneficiary

---

[1] *See, e.g.*, Dara Lind, *What "chain migration" really means— and why Donald Trump hates it so much*, Vox (updated Jan. 30, 2018,), https://tinyurl.com/yaz8t5ls (describing the President's opposition to so-called "chain migration," *i.e.*, immigration "based on family ties");   Donald J. Trump (@realDonaldTrump), Twitter (Feb. 10, 2018, 6:34 PM), https://tinyurl.com/y6hm856g ("My Administration has identified three major priorities for creating a safe, modern and lawful immigration system: fully securing the border, ending chain migration, and canceling the visa lottery.") (Ex. 1 hereto); *id.* (June 15, 2018, 1:08 PM), https://tinyurl.com/y8vk99qc ("Any Immigration Bill MUST … end … Chain, and go to Merit Based Immigration.") (Ex. 2 hereto).

[2] The petition may include certain "derivative" relatives of the principal beneficiary.  *See* 8 U.S.C. §§ 1153(d), 1154(a).

is eligible and merits the visa. 8 U.S.C. § 1201; 22 C.F.R. § 42.73; 9 FAM 504.1-2(d), 504.1-3. The immigrant may then be "lawfully admitted for permanent residence."  8 U.S.C. § 1101(a)(20).

*Diversity Immigrant Visas.* Congress has determined that it is important "to promote diversity in [the] immigration system," H.R. Rep. No. 101-723, pt. 1 (1990), and that "[i]t is in the interest of the United States to be a beacon to people from all over the world." 136 Cong. Rec. H-8629-02 (1990).  To accomplish that goal, Congress in 1990 amended the INA to provide 55,000 "diversity" immigrant visas each year to randomly selected individuals from countries with historically low levels of immigration into the United States. *See* 8 U.S.C. § 1151(e); *id.* § 1153(c)(1)(A). Many immigration opponents oppose this program, and the President has repeatedly pressed to eliminate it.[3]  Congress, however, has refused to do so. *See* FAC ¶ 82.

To be eligible for a diversity visa, a foreign national must be a citizen of a country with historically low immigration to the United States, and must have either a high school diploma or two years of qualifying work experience. *See* 8 U.S.C. § 1153(c)(1)-(2); 9 FAM 502.6-3.  Eligible applicants enter a random lottery held once each fiscal year.  8 U.S.C. § 1153(c); 22 C.F.R. § 42.33. Far more than 55,000 entries are received every year; there were some 14.7 million qualified entries in the FY 2018 lottery.  *See* FAC ¶ 57.  Lottery winners complete an application process similar to that for family-based visa beneficiaries, which includes a visa interview and a nonrefundable fee. *See* 8 U.S.C. §§ 1153(c)(1), 1153(e)(2); 22 C.F.R. § 40.6; 9 FAM 502.6-4.[4]

Once a diversity visa issues, it is normally valid for six months.  8 U.S.C. § 1201(c).

---

[3]  *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Nov. 2, 2017, 2:33 PM), https://tinyurl.com/yctzjvsu (Ex. 3 hereto) ("I am calling on Congress to TERMINATE the diversity visa lottery program"); *id.* (Feb. 8, 2018, 6:26 PM), https://tinyurl.com/y3to998u (Ex. 4 hereto) ("Time to end the visa lottery."); *id.* (June 15, 2018, 1:08 PM), https://tinyurl.com/y8vk99qc (Ex. 2 hereto) ("Any Immigration Bill MUST … end [the] Visa Lottery").

[4] A lottery winner's spouse and unmarried minor children may immigrate as derivatives. 8 U.S.C. §§ 1151(e), 1153(d).

However, the visa must issue by the end of the federal government's fiscal year (September 30) for the year in which the applicant has won the lottery. 8 U.S.C. § 1154(a)(1)(I)(ii)(II). Failure to obtain the visa by that date results in permanent loss of the opportunity to immigrate based on that year's lottery. *Id.* There is no provision for extension of or exception to this deadline.

**H-1B Nonimmigrant Visas.** Congress has also established several categories of nonimmigrant visas, which authorize individuals to enter the country on a *temporary* basis for work, study, and residence. The INA sets out detailed requirements for admission of such foreign nationals, and the statutes are supplemented by exhaustive regulations. *See generally* 8 U.S.C. § 1184; 8 C.F.R. §§ 214.1, 214.2. Four categories of nonimmigrant visas are at issue in this case.

First, the H-1B category enables U.S. employers to hire qualified foreign professionals in "specialty occupation[s]" requiring "theoretical and practical application of a body of highly specialized knowledge" and a "bachelor's or higher degree." 8 U.S.C. § 1184(i)(1); *see id.* § 1101(a)(15)(H)(i)(b). H-1B visa holders commonly fill occupations in "STEM" (science, technology, engineering, and math) and computer-related fields, but other fields are also eligible.[5]

Responding to the concerns of organized labor, Congress has generally limited the number of new H-1B visas to 85,000 per year, with 20,000 of those available only to individuals with an advanced degree from a U.S. higher education institution. 8 U.S.C. §§ 1184(g)(1)(A), 1184(g)(5)(C). Congress also introduced a labor condition application (LCA) process to prevent employers from using foreign workers to undercut domestic wages and working conditions. *See* 8 U.S.C. § 1182(n)(1)(A)-(D). Congress added "additional requirements" in 1998, with the stated goal of "ensur[ing] that [employers] are recruiting American workers and not replacing them with

---

[5] *See* Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020, 12:08 PM), https://tinyurl.com/y5kbzp2v; USCIS, *Characteristics of H-1B Specialty Occupation Workers* (Mar. 5, 2020), https://tinyurl.com/yxrvs5mv.

foreign workers." 144 Cong. Rec., at 8572, 8577-78 (Sept. 24, 1998); *see* S. Rep. No. 105-186, at 19, 21 (1998) (similar); 20 C.F.R. §§ 655.731, 655.732, 655.733, 655.736. An employer whose workforce already comprises a large percentage of H-1B workers must also certify that it has tried and failed to fill the position with a domestic worker, and that the H-1B worker does not displace a U.S. worker. 8 U.S.C. §§ 1182(n)(1)(E), (n)(1)(G), (n)(3)(A); *see* 20 C.F.R. § 655.736.

After the Department of Labor ("DOL") approves an LCA, the employer may file a petition with USCIS to classify the foreign worker as an H-1B nonimmigrant. 8 U.S.C. § 1184(c)(1); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1). Once USCIS approves the petition, the worker may apply for an H-1B visa at a U.S. embassy or consulate, which will grant the visa provided the application is complete and the worker is not inadmissible. 9 FAM 402.10.[6]

***H-2B Nonimmigrant Visas.*** An H-2B petition allows an employer to hire foreign nationals "to perform temporary service or labor" in non-specialized, non-agricultural sectors "if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *see* 8 C.F.R. §214.2(h)(6); H.R. Rep. No. 99-682, pt. 1 (1986). H-2B visas are available only where "the petitioner's need for the … employee(s) is temporary," generally lasting "one year or less." 8 C.F.R. § 214.2(h)(6)(ii)(A)-(B). The number of such visas is capped at 66,000 per year. 8 U.S.C. § 1184(g)(1)(B).[7] To hire an H-2B worker, an employer must certify to DOL that it has attempted to recruit U.S. workers for the position, that no U.S. workers are available, and that the temporary employment of an H-2B worker will not adversely affect the wage rates or working conditions of similarly employed U.S. workers. *See* 8 C.F.R.

---

[6] The spouse and minor children of an H-1B worker may obtain derivative H-4 visas. 8 U.S.C. § 1101(a)(15)(H); 8 C.F.R. § 214.1(a)(2). H-4 visa holders are not generally authorized to work, though an H-4 spouse may sometimes obtain work authorization. *See* 8 C.F.R. § 214.2(h)(9)(iv).

[7] Half of the total annual visas (33,000) are awarded in each half of the fiscal year (October 1st through March 31st, and April 1st through September 30th). 8 C.F.R. § 214.2(h)(8)(i)(C).

§§ 214.2(h)(6)(iii)(A)-(D), (6)(iv)(A); 20 C.F.R. § 655.0 *et seq.*  If DOL approves the certification, the employer files a petition with USCIS.  *Id*. at 214.2(h)(6)(iii)(E).  If granted, the worker obtains the visa from the embassy or consulate, and then enters the country.  9 FAM 402.10-11.

*J Nonimmigrant Visas.* Congress created the J-1 visa program to "increase international cooperation for educational and cultural advancement," and to develop "friendly, sympathetic, and peaceful relations between the United States and other countries of the world."  *See* 8 U.S.C. §§ 1101(a)(15)(J), 22 U.S.C. §§ 2451, *et. seq.*; 22 C.F.R. § 62.1 (J visas "assist the Department of State in furthering the foreign policy objectives of the United States").   Regulations establish 15 categories of exchange program eligibility, including trainees, teachers, au pairs, and summer work and travel for foreign students.  22 C.F.R. §§ 62.1, 62.4. The visa must be sponsored by one of 1,500 designated entities, which include government agencies, academic institutions, businesses, and non-profits.  *Id.* §§ 62.3, 62.5-13, 62.15.[8]

Participants in the summer work-travel, trainee, and intern programs may not displace U.S. workers. *See* 22 C.F.R. §§ 62.32(n)(3)(ii), 62.22(b)(1)(ii); 62.22(f)(2)(v).  Positions in the summer work-travel program also must be truly seasonal or temporary.  *Id.* § 62.32(b), (g)(4)(i), (n)(3).  As for the au pair program, Congress considered and rejected claims that it adversely impacted U.S. labor markets,[9] and permanently authorized the program in October 1997.   Act of Oct. 1, 1997, Pub. L. No. 105-48 (1997); *see* 8 U.S.C. § 1101(a)(15)(J); 22 U.S.C. § 2452.  With limited exceptions, a J visa holder is ineligible to receive another nonimmigrant visa, or to become an

---

[8] *See* U.S. Dep't of State, Bureau of Educ. and Cultural Affairs, J-1 Visa Exchange Visitor Fact Sheet, https://tinyurl.com/y6bvt9o2.

[9] Eisenhower Exchange Fellowship Program, Pub. L. No. 101-454 § 8, 104 Stat. 1063 (1990); *see also* Pub. L. No. 103-415, 108 Stat. 4302 § 1(v) (1994); Pub. L. No. 104-72 (1995).

LPR, until he or she has returned to his or her home country for two years.  8 U.S.C. § 1182(e).[10]

*L Nonimmigrant Visas.*  Congress established the L visa in 1970 to allow multinational corporations to sponsor visas for temporary intracompany transfers to the United States of foreign managers and executives (L-1A visas) or employees with certain "specialized knowledge" about the petitioning company (L-1B visas).  8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. §§ 214.2(l)(2)(ii)(B)-(D).  Congress found that the L-1 visa is "essential to retaining and expanding international businesses in the United States."[11]  To qualify for an L-1A or L-1B visa, the foreign national must have worked in a managerial, executive, or specialized-knowledge capacity for at least one out of three years within a qualifying organization abroad.  *See* 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(l)(1).  An L visa recipient thus necessarily has unique knowledge of the petitioner's business that cannot be readily found in the U.S. labor market.[12]

## B.    The Proclamations

President Trump announced and executed the April Proclamation on April 22, 2020.  FAC Ex. A.  Citing authority purportedly granted by 8 U.S.C. §§ 1182(f) and 1185(a), the April Proclamation suspended entry of aliens as immigrants (including family-based and diversity immigrants) for 60 days, beginning April 23.  The President sought to justify the April Proclamation based on a purported "excess labor supply" resulting from the supposed "impact of

---

[10] A J-1 visitor's spouse and minor children may obtain J-2 visas to accompany the principal visa recipient.  8 U.S.C. § 1101(a)(15)(J).  J-2 spouses are not automatically entitled to work in the United States but may seek employment authorization.  8 C.F.R. § 214.2(j)(1)(v)(B).

[11] Ruth Wasem, *Temporary Professional, Managerial, and Skilled Foreign Workers: Policy and Trends*, Cong. Research Serv. Report No. R43735 (Jan. 13, 2016), https://tinyurl.com/yxu9mxsn.

[12] The spouses and minor children of L-1 sponsored employees may accompany those employees to the United States on L-2 derivative visas.  *See* 8 U.S.C. § 1101(a)(15)(L).  To avoid discouraging critical L-1 employees from relocating to this country, the statute permits L-2 spouses (but not children) to work in the United States.  *Id.* § 1184(c)(2)(E).

foreign workers on the United States labor market, particularly in an environment of high domestic unemployment and depressed demand for labor." *Id.* at 23441.  The April Proclamation provided no evidence of this alleged "impact," nor any analysis showing that the immigration suspension would ameliorate the asserted problem.  The April Proclamation was set to expire on June 22, 2020, but it provided that it could "be continued as necessary," without explanation.  *Id.* § 4.

President Trump signed the June Proclamation on June 22, 2020.  FAC Ex. C.  The June Proclamation extends the April Proclamation's immigration suspension until December 31, 2020, and again states that the suspension may "be continued as necessary," without explaining what this means.  *Id.* § 1(a).  The June Proclamation seeks to justify the extension on grounds that there are no "sufficient alternative means to protect unemployed Americans from the threat of competition for scarce jobs from new lawful permanent residents."  *Id.* at 38623. The President again provided no evidence or analytical basis for the assertion that immigrants take U.S. jobs.

The June Proclamation also expanded the entry suspension to cover H-1B, H-2B, L, and J nonimmigrants, until at least December 31, 2020.  *Id.* §§ 2, 6.  The President again asserted authority to continue the suspension "as necessary," without saying what this means.  *Id.* § 6.[13]

The June Proclamation asserts that admitting covered nonimmigrants "poses a risk of displacing and disadvantaging United States workers during the current recovery." *Id.* at 38623. It states that during the pandemic, "more than 17 million United States jobs were lost in industries in which employers are seeking to fill worker positions tied to H-2B nonimmigrant visas," and that "[d]uring this same period, more than 20 million United States workers lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions." *Id.* at 38623-24. But it cites no evidence that H-1B, H-2B, or L visa recipients would actually compete

---

[13] The President amended the June Proclamation in Proclamation No. 10054, 85 Fed. Reg. 40085 (June 29, 2020) (FAC Ex. D), but the amendment is not material to this motion.

with U.S. workers for any of the *jobs* in which the visa recipients would be employed.  With respect to J visas, the June Proclamation asserts that "the May unemployment rate for young Americans, who compete with certain J nonimmigrant visa applicants, has been particularly high."  *Id.* at 38624.  But it does not mention that many J visa holders are prohibited from working in jobs that displace U.S. workers, and it cites no evidence that American youths actually compete with J visa recipients for temporary jobs as trainees, teachers, or au pairs.  More broadly, the Proclamations take no account of the overwhelming consensus that foreign nationals entering the country do not take U.S. workers' jobs, but actually contribute to the economy—including by *creating* job opportunities.  *See generally* Peri Decl.; Sparber Decl.; Hunt Decl.; Nowrasteh Decl.; *infra* p. 4.

Each Proclamation directs the Secretary of State to "implement this proclamation as it applies to visas pursuant to such procedures as [he], in consultation with the Secretary of Homeland Security, may establish in [his] discretion." FAC Ex. A, § 3; FAC Ex. C, § 4.

### C.      Agency Implementation

Although the Proclamations do not purport to suspend the issuance of visas (the INA does not grant the President such power), the State Department has exercised its implementation authority by refusing to issue visas in the covered categories.  *See* FAC ¶¶ 110-113.  The State Department has made clear, for example, that "[w]hile the proclamation is in place, the issuance of diversity visas is not permitted" (FAC Ex. H), and that "[t]he September 30, 2020, deadline for DV-2020 has not been extended" (FAC Ex. I), even after a visa hopeful pointed out that "[t]he Proclamation only suspends entry, it does not mention suspending the Interview and Visa Issuance process" (FAC Ex. N). The State Department has taken the same position with respect to nonimmigrant visas: "We will not be issuing H-1B, H-2B, L, or certain J visas … through December 31, 2020, unless an exception applies."  FAC Ex. O.

On July 22, 2020 (after plaintiffs filed the FAC), the State Department published new

guidance making clear that the State Department has implemented the Proclamations by adopting

a policy of refusing to issue visas unless an applicant is determined to qualify for an exception:

> Travelers who believe their travel falls into one of these ['national interest' exception] categories or is otherwise in the national interest may request a visa application appointment at the closest Embassy or Consulate and *a decision will be made at the time of interview as to whether the traveler has established that they are eligible for a visa pursuant to an exception.*[14]

The substance of the emphasized clause is that, according to the State Department, an applicant is

not "eligible for a visa" unless he or she "establishe[s]" that "an exception" applies.  The guidance

indicates that exceptions will be granted to visa "[a]pplicants who are subject to aging out of their

current immigrant visa classification before [the entry suspension] expires or within two weeks

thereafter."  *See generally* ECF 1.  But the guidance provides no similar exception for 2020

Diversity Visa Lottery winners, despite the similarity of their situation to that of potential age-outs

(in that they will lose their current visa eligibility unless their visas issue by a date certain).  To the

contrary, the guidance reaffirms that "[a]pplicants for immigrant visas…, including Diversity Visa

2020 (DV-2020) applicants, who have not been issued an immigrant visa as of April 23 are subject

to the proclamation's restrictions unless they can establish that they are eligible for an exception."[15]

### D.     The Plaintiffs

Each of the Plaintiffs (with the exceptions of ASSE, EurAuPair, and CIR) is either the

sponsor of a visa beneficiary or a winner of the 2020 Diversity Visa Lottery.  Each of the visa

---

[14] U.S. Dep't of State, Bureau of Consular Affairs, *National Interest Exceptions to Presidential Proclamations (10014 & 10052) Suspending the Entry of Immigrants and Nonimmigrants Presenting a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak* (updated July 30, 2020), https://tinyurl.com/y36oqdw8.  A true and correct copy is attached hereto as Exhibit 5.  This guidance appears to supersede previous guidance that the State Department had issued on July 16.  *See* FAC ¶¶ 116-18.

[15] The July 22 guidance also describes the agencies' interpretation of the June Proclamation's "national interest" exception for nonimmigrant visa applicants.  None of the covered categories appears to cover any of the individuals seeking admission here.

beneficiaries and lottery winners is covered by the Proclamations' entry suspensions, and to Plaintiffs' knowledge none is eligible for an exception.  Indeed, the State Department has cited the Proclamations to reject Plaintiffs' requests for interviews at which eligibility for an exception could be established.  All of the moving Plaintiffs are suffering irreparable harm as a result of the Proclamations.  Their stories are summarized below, and are set out in detail in their declarations.

*Family-Based Immigrant Visa Plaintiffs*. The following Plaintiffs submitted visa petitions on behalf of family members.  USCIS has approved each petition, and a visa is immediately available to each beneficiary.  None of these Plaintiffs is aware of any ground of inadmissibility or other reason that a visa would be denied to any beneficiary.  But for the Proclamations, the visas would likely be granted, and the beneficiaries would be allowed to promptly immigrate.

**Nazif Alam** petitioned for his wife to immigrate from Bangladesh.  Alam Decl. ¶¶ 3-7.  The Proclamations deprive him of his wife's companionship.  *Id.* ¶¶ 9-16.

**Carmen Ligia Pimentel** petitioned for her husband to immigrate from the Dominican Republic.  Pimentel Decl. ¶¶ 5-9.  Ms. Pimentel is pregnant with the family's first child, who is due to be born around the time of this filing.  *Id.* ¶ 2.  The Proclamations deprive Ms. Pimentel of her husband's companionship and support in caring for their child.  *Id.* ¶¶ 10-21.

**Juan Carlos Rosario Lebron** petitioned for his two minor daughters to immigrate from the Dominican Republic. Lebron Decl. ¶¶ 3-6.  Mr. Lebron's daughters live with his mother, who has become unable to adequately care for them.  *Id.* ¶¶ 3, 18.  The Proclamations deprive Mr. Lebron of his daughters' companionship and the opportunity to care for them.  *Id.* ¶¶ 7-25.

**Daniel Chibundu Nwankwo** petitioned for his father to immigrate from Nigeria.  Nwankwo Decl. ¶ 4.  The Proclamations deprive Mr. Nwankwo of his father's companionship, care, and guidance during his formative years.  *Id.* ¶¶ 6-11.

**Claudio Alejandro Sarniguet Jiménez** petitioned for his son to immigrate from Chile.

Jiménez Decl. ¶¶ 4-6.   The Proclamations deprive Mr. Jiménez of companionship and the opportunity to care for and guide his son in his formative years. *Id.* ¶¶ 9-18.

**Angela Sinon** petitioned for her son to immigrate from the Philippines.   Sinon Decl. ¶¶ 7-14.   Ms. Sinon is elderly, and has no one else to care for her in the United States. *Id.* ¶ 18. The Proclamations deprive Ms. Sinon of her son's companionship and support.  *Id.* ¶¶ 15-23.

**Loida Phelps** petitioned for her daughter and three granddaughters to immigrate from the Philippines. Phelps Decl. ¶¶ 3-7.   The Proclamations deprive Ms. Phelps of her family's companionship and support as she advances in age and manages health conditions including osteoporosis, arthritis, migraines, and a breast tumor.  *Id.* ¶¶ 8-10.

**Nancy Abarca** petitioned for her brother, his wife, and their minor daughter Maria Andrea to immigrate from the Philippines.   Abarca Decl. ¶¶ 2-4.  Maria Andrea will turn 21 years old and age out of her current visa eligibility (*see generally* ECF 1) on November 26, 2020.  Abarca Decl. ¶ 3.  Although the June Proclamation calls for a "national interest" exception to be granted to alien *children* who would age out of visa eligibility (FAC Ex. C § 4(a)(i)), that provision does not help Maria Andrea:  As a derivative beneficiary, she cannot obtain her visa until one is granted to her father, and the Proclamations do not protect adult beneficiaries in this situation.   Thus, if the family's visas are not granted in time for them to enter the country by November 26, Maria Andrea will be unable to immigrate with her parents, and (due to visa backlogs) would face at least another decade before she could immigrate.  *See* Abarca Decl. ¶¶ 3, 6.  Due to her age and health conditions including asthma, arthritis, and diabetes, Ms. Abarca is unable to travel to the Philippines to visit her family.  *Id.* ¶ 10.  The June Proclamation deprives Ms. Abarca of her family's companionship and support, and the harm will be particularly severe if Maria Andrea ages out.  *Id.* ¶¶ 4-11.

**Mohamed Saleh** petitioned for his son Abu Bakr Saleh and his family to immigrate from Yemen.  *See* Saleh Decl. ¶ 4.  Although Abu Bakr and other members of his family received their

visas in February 2020, Abu Bakr's 10-year-old daughter R.S. did not receive hers. *Id.* ¶¶ 4-5. Abu Bakr and his family traveled to the United States without R.S. to avoid expiration of their own visas, leaving R.S. with friends in Egypt (where the family had traveled to complete the visa process). *Id.* ¶¶ 6-9.[16]  R.S. has since been unable to obtain her visa due to the Proclamations. *Id.* ¶ 10. The Proclamations have thus stranded Mr. Saleh's granddaughter in Egypt, depriving Mr. Saleh and his family of her companionship and the ability to care for her. *Id.* ¶¶ 10-15.

***Diversity Visa Plaintiffs.***  Six of the Plaintiffs were selected in the FY 2020 Diversity Visa Lottery: **Fatma Bushati**, seeking to immigrate from Albania with her husband and their minor child; **Jodi Lynn Karpes**, seeking to immigrate from South Africa; **Shyam Sundar Koirala**, seeking to immigrate from Nepal with his wife; **Aja Tamamu Mariama Kinteh**, seeking to immigrate from Gambia with her husband and three minor children; **Iwundu épouse Kouadio Ijeoma Golden**, seeking to immigrate from Cote D'Ivoire with her husband and two minor children; and **Aya Nakamura**, seeking to immigrate from Japan.

As their declarations explain, these Plaintiffs are all immediately eligible for visas, and before the June Proclamation each of them either had a consular interview scheduled or had been told that he or she was "ready for scheduling."  They had made concrete plans to complete their immigration processes, in some cases by selling property or forgoing investments.  But their interviews have all been cancelled, or never scheduled at all.  Each of these Plaintiffs has requested an emergency interview to invoke an exception, but the embassies and consulates have denied the requests due to the Proclamations.  None of these Plaintiffs is aware of any ground of inadmissibility or other reason that his or her visa would be denied.  But for the Proclamations,

---

[16] *See also* Tatiana Sanchez, *Exclusive: Yemeni girl, 10, stuck abroad as family waits anxiously in San Francisco*, S.F. Chron. (July 30, 2020), https://tinyurl.com/y3497yow (Ex. 6 hereto).

they would all likely be granted visas and be allowed to immigrate.  But as explained above, these visas must issue before the end of the fiscal year on September 30, 2020.

***Nonimmigrant Visa Plaintiffs.***   The following Plaintiffs sponsor individuals for nonimmigrant visas; sponsor nonimmigrant visa programs; or represent nonimmigrant workers.

**3Q Digital** is the nation's largest independent digital marketing agency.  Rodnitzky Decl. ¶ 3.  It sponsors H-1B nonimmigrant employees for critical positions that it has trouble filling with domestic workers.  *Id.* ¶¶ 8-9.  One of those petitions sought an H-1B visa for Balaji Bhat, a Search Engine Account Manager whom 3Q Digital wants to bring to the United States from Singapore. *Id.* ¶¶ 13-19.  Prior to the June Proclamation, USCIS approved the H-1B petition.  *Id.* ¶ 18.  3Q Digital sought an interview for Mr. Bhat, but he has not been able to secure an appointment due to the June Proclamation.  *Id.*  ¶¶  19-20. 3 Q Digital is not aware of any ground of inadmissibility or other reason that Mr. Bhat's visa would be denied.  *Id.* ¶ 23. The June Proclamation impairs 3Q Digital's growth by making it impossible to bring Mr. Bhat and other talented foreign nationals to its U.S. offices.  *Id.* ¶¶ 22, 25, 26.

**ASSE International** partners with the State Department to administer exchange programs for individuals on J-1 nonimmigrant visas.  Gustafson Decl. ¶¶ 2-4.  The June Proclamation halts the exchange programs that are ASSE's mission.  *Id.* ¶¶ 6-15.  The entry and visa suspensions would force cancellation of more than 3,000 participants' summer work and travel programs.  *Id.* ¶ 15.  Those cancellations necessitated issuing more than $1 million in refunds to ASSE's foreign partners, which in turn has forced ASSE to terminate or furlough multiple employees.  *Id.* ¶¶ 16 17. If the June Proclamation is not enjoined, there is a significant likelihood that ASSE will run out of money and be forced to close entirely by early 2021.  *Id.* ¶¶ 18-21.

**EurAuPair International** is a 501(c)(3) nonprofit that partners with the State Department to manage and administer an exchange visitor program for au pairs—young adults from abroad

who come to the U.S. on J-1 nonimmigrant visas to live with American families and look after their children.  Gustafson Decl. ¶¶ 22-23.  The June Proclamation has halted EurAuPair's program, and will cause it to lose more than $3.75 million in revenue by the end of the year.  *Id.* ¶ 29.  Without an injunction, EurAuPair will be forced to close entirely by early 2021.  *Id.* ¶¶ 29, 33.

**PowerTrunk** provides mobile radio systems to mass transit corporations and airports.  *See* Martin Decl. ¶ 3.  Over the past ten years, it has sponsored foreign national workers from abroad on L and H-1B nonimmigrant visas.  *Id.* ¶ 7.  PowerTrunk recently sought to renew an L-1B visa on behalf of its employee Victor Manuel Hernandez, a Spanish national who is the only PowerTrunk employee with certain specialized skills that are necessary to deploy PowerTrunk's product.  *Id.* ¶¶ 8-10.  After the U.S. Embassy in Spain advised that Mr. Hernandez's L-1B visa renewal was ready, Mr. Hernandez traveled to Spain in early March, leaving his wife in the United States.  *Id.* ¶17.  When the process was delayed because of the COVID-19 pandemic, PowerTrunk sought an emergency visa so that Mr. Hernandez could return to the United States to provide essential services for New Jersey Transit.  *Id.* ¶¶ 9-10.  But based on the June Proclamation, the U.S. Embassy in Spain has refused to issue Mr. Hernandez's visa.  *Id.* ¶¶ 10-19.  PowerTrunk is not aware of any ground of inadmissibility or other reason that Mr. Hernandez's visa would be denied.  *Id.* ¶ 19.  The June Proclamation irreparably harms PowerTrunk because without Mr. Hernandez, it cannot complete the work it was contracted to do.  *Id.* ¶¶ 17-18.  This is devastating to PowerTrunk's business, reputation, and continued economic growth, and may force PowerTrunk to lay off other employees in the United States.  *Id.* ¶¶ 18.

**SEIU Healthcare (CIR)** is the largest medical housestaff union in the country, representing approximately 17,000 physicians in the U.S., including foreign doctors on H-1B and J-1 nonimmigrant visas.  DeRosa Decl. ¶¶ 3-8. The June Proclamation stops many physicians seeking H-1B and J-1 visas from traveling to the United States to start their residency programs.

*Id.* ¶ 15.  This has forced CIR to divert significant resources from its core mission to address the June Proclamation's fallout for affected physicians and their sponsoring hospitals, and has deprived CIR of dues and fees from prospective members—impeding CIR's ability to serve its members.  *Id.* ¶¶ 6-7, 9-21.

**Shipco Transport Inc.** is one of the world's leading non-vessel operating common carriers.  Jepson Decl. ¶ 1.  It sponsors L-1 nonimmigrant visas to bring workers from its sister companies around the world to support its U.S. operations.  *Id.* ¶ 14.  Shipco recently sponsored Brian Nielsen, the chief financial officer at its Denmark office, whom it wants to employ in the United States as the Finance Director for its Americas Region.  *Id.* ¶ 16-17.  Though USCIS approved Shipco's L-1 application for Mr. Nielsen on June 30, 2020, the Embassy will not issue him the visa due to the June Proclamation.  *Id.* ¶¶ 19-20.  Shipco is not aware of any basis barring Mr. Nielsen's admission to the United States.  *Id.* ¶ 20.  The June Proclamation prevents Shipco from bringing knowledgeable and experienced employees like Mr. Nielsen to the United States, hamstringing Shipco's economic growth.  *Id.* ¶¶ 21-28.

**Superior Scape** is a landscaping company.  Newman Decl. ¶ 3.  It sponsors H-2B seasonal workers to support its business demands because it is difficult to recruit experienced local workers to engage in the physically demanding work required for its projects.  *Id.* ¶¶ 4-6, 15, 20.  The June Proclamation is depriving Superior Scape of laborers who are essential to the viability of its business (*id.* ¶¶ 10, 16)—damaging the company's reputation with customers, causing it to delay or forgo contractual obligations, and forcing it to lay off U.S. workers.  *Id.* ¶¶ 13-14.  Without H-2B workers, the company will be forced to consider shutting down business by year's end.  *Id.*

## LEGAL STANDARD

In deciding a motion for a preliminary injunction, the Court should consider four factors: (1) the movant's likelihood of success on the merits; (2) irreparable harm to the movant; (3) the

balance of equities; and (4) the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

20 (2008); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

**ARGUMENT**

## I.   PLAINTIFFS' CLAIMS ARE JUSTICIABLE

### A.   Plaintiffs Have Standing To Sue

"To establish standing, a party must demonstrate: (1) an injury in fact that is concrete and

particularized as well as actual or imminent; (2) a causal connection between the injury and the

challenged conduct; and (3) a likelihood, as opposed to mere speculation, that the injury will be

redressed by a favorable decision."  *Nguyen v. U.S. Dep't of Homeland Security*, 2020 WL

2527210, *3 (D.D.C. May 18, 2020) (citation and internal quotation marks omitted); *see* ECF 41,

at 13.  While "the court need only find one plaintiff who has standing," *Mendoza v. Perez*, 754

F.3d 1002, 1010 (D.C. Cir. 2014), each Plaintiff has standing here.

*Injury.*  Each Plaintiff has identified a "concrete" and "particularized" injury that is not

only "imminent" but *actual* and *ongoing*.  Indeed, they are of extended and indefinite duration:

The Proclamations are set to remain in force for at least five more months (on top of the time that

has already elapsed), and there is little reason to think that the President will deem the entry

suspensions no longer to be "necessary" at the end of the year.

*First*, the Proclamations are *currently* causing the family-based visa Plaintiffs to be

separated from their relatives.  *See supra* pp. 13-15.  An "interest in being united with [one's]

relatives" is sufficient "to form the basis of an Article III injury."  *Hawaii*, 138 S. Ct. at 2416.

*Second*, the Proclamations are *currently* causing the diversity visa Plaintiffs injury in fact,

by preventing adjudication of their visa applications and their entry into the country.  *See* Bushati

Decl. ¶ 21; Golden Decl. ¶¶ 9-11; Karpes Decl. ¶ 12; Kinteh Decl. ¶¶ 4-7; Koirala Decl. ¶¶ 6-8;

Nakamura Decl. ¶¶ 13-19.  Their visa applications are complete, and would likely be granted but

-19-

for Defendants' actions.  Their inability to immigrate is a cognizable injury in fact.  And that injury is particularly concrete, particularized, and imminent in view of the fact that if Defendants' policy remains in force, the diversity visa Plaintiffs will lose their visa eligibility after September 30.  *See, e.g.*, *Mohamed v. Pompeo*, 2019 WL 4734927, at *2 (E.D. Cal. Sept. 27, 2019) (finding standing and granting TRO to diversity-visa applicants challenging delay in adjudication of application).

*Third*, the June Proclamation is *currently* causing the nonimmigrant visa Plaintiffs injury in fact.  *See supra* pp. 16-18.  The employer and sponsor Plaintiffs are being deprived of foreign workers who are necessary to their respective businesses.  They are losing sales, failing to meet contractual obligations, and suffering reputational harm.  Some have already been forced to lay off workers, and others may be forced to cease operations if the nonimmigrant visa programs are not restarted.  Such injuries establish standing.  *See, e.g.*, *Tenrec, Inc. v. USCIS*, 2016 WL 5346095, *10 (D. Or. Sept. 22, 2016) (employer's inability to hire H-1B workers was sufficient injury to support standing); *see also Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101 (D.D.C. 2019) (granting employer's motion for preliminary injunction against H-2A program).

For its part, CIR has standing because the June Proclamation is preventing potential union members (*i.e.*, critical healthcare workers) from entering the country and working in its member hospitals.  *See supra* pp. 17-18.  This has deprived the union of dues and fees, and has caused CIR to divert resources to handle the unexpected burden placed on staff and its current members who have been forced to make up for the lack of the expected doctors.  This is sufficient to establish standing.  *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 503-04 (D.C. Cir. 2019) (organization had standing to challenge rule making it more difficult to solicit contributions).[17]

---

[17]  Plaintiffs' injuries-in-fact are not dispelled by the Court's order denying the motion for a TRO (ECF 41).  Whereas the Court ruled that the prior plaintiffs lacked standing because their visa beneficiaries were under consideration for exceptions to the April Proclamation, and were ultimately granted visas (*see id.* at 13-17), none of the individuals at issue in this motion appears

*Traceability*.  But for the Proclamations, the State Department would adjudicate (and likely grant) the visa applications at issue, enabling the applicants to enter the country.  The applications are complete, and none of the applicants appears inadmissible.  That the Proclamations are causing these injuries is established by Defendants' public statements (*see supra* pp. 11-12), as well as their consistent statements to the moving plaintiffs (*see, e.g.*, Bushati Decl. ¶ 21; Alam Decl. ¶ 18; Nakamura Decl. ¶¶ 16-19; Martin Decl. ¶ 14; Karpes Decl. ¶ 12; Jiménez Decl. ¶¶ 11-12.).

*Redressability*.  Plaintiffs' injuries would be redressed by a timely and favorable decision in this case.  Whereas the plaintiffs in *Nguyen* failed to establish redressability because they had not shown that they could obtain an interview (and because some of them had not completed their applications), *see* 2020 WL 2527210 at *6, all of the individuals here have had their applications approved and are ready to complete the process.  Nor is any of the Plaintiffs aware of any reason (other than the Proclamations) why a visa would fail to issue once an interview takes place.[18]

### B.     Consular Nonreviewability Does Not Apply

Defendants may argue that the doctrine of consular nonreviewability bars Plaintiffs' claims.  Any such argument fails because that doctrine "does not apply where the government has not made a *final* visa decision."  *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 11 (D.D.C. 2017) (emphasis

---

to be covered by any exception to the Proclamations' entry suspensions.  And similarly, the prior plaintiffs' mootness and ripeness problems (*see id.* at 17-19) are not present here:  None of the individuals here has been granted an interview, let alone a visa.

[18] In any event, Plaintiffs are seeking a procedural remedy (removing the Proclamations as a bar to *processing* the applicants' visas), and therefore are not required to prove that the agency would actually grant the ultimate substantive relief of issuing their visas.  *See, e.g.*, *Mendoza*, 754 F.3d at 1010 ("Plaintiffs [asserting a procedural violation] need not demonstrate that but for the procedural violation the agency action would have been different.").

 Defendants may argue that the pandemic would prevent visa processing, but the Bureau of Consular Affairs has advised that "U.S. Embassies and Consulates are beginning a phased resumption of routine visa services."  U.S. Dep't of State, *Phased Resumption of Routine Visa Services* (updated July 14, 2020), https://tinyurl.com/yb9yabw6 (last visited July 31, 2020).

added) (collecting cases).  The doctrine prevents courts from reviewing "the merits of a 'decision to issue or withhold'" a visa, but it does not apply before a given application has been decided.  *See Vulupala v. Barr*, 438 F. Supp. 3d 93, 98, (D.D.C. 2020) (citation omitted).  Thus, the doctrine does not bar pre-decision challenges such as this one.  *See, e.g.*, *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1019 (N.D. Cal. 2019) (claims challenging § 1182(f) proclamation "do not require review of an individual consular officer's decision" and are reviewable).  No final visa decision has been rendered here, and so consular nonreviewability is inapplicable.

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.     The June Proclamation Is Ultra Vires Because It Does Not Satisfy The Statutory Prerequisites For Entry Suspension

**1.**  Although § 1182(f) "grants the President broad discretion to suspend the entry of aliens into the United States," *Hawaii*, 138 S. Ct. at 2408, "the substantive scope of this power is not limitless." *Doe*, 957 F.3d at 1066.  The statute imposes a "prerequisite," *Hawaii*, 138 S. Ct. at 2408, directing that the President can invoke his entry-suspension power only if he "*finds*" that entry of covered aliens "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f) (emphasis added).

The word "finds" is significant, denoting a requirement to supply a rational justification. A jury, for example, cannot lawfully "find" something in the absence of "a legally sufficient evidentiary basis" to do so.  Fed. R. Civ. P. 50(a)(1).  Congress understood this meaning when it drafted § 1182(f)'s predecessor—choosing the word "find" (to replace the inadequate "deem") *precisely* to require the President to "base his [decision] on some fact," not on mere "opinion" or "guesses."  87 Cong. Rec. 5051 (1941) (statements of Rep. Jonkman and Rep. Jenkins) (Ex. 7 hereto).  Congress could have used different language (like "deem") if it had meant to allow the President to act by fiat and without a rational decision.  It rejected just such a proposal.

Courts in other contexts recognize that the plain meaning of the word "find" requires some rational investigation, holding that a statutory findings requirement obligates the officer in question to show that he or she "'seriously weighed the benefits'" of his or her action against any countervailing interests: "mere reference to 'some rough justice basis' is insufficient." *United States v. Bikundi*, 926 F.3d 761, 776-77 (D.C. Cir. 2019) (quoting *United States v. Rice*, 746 F.3d 1074, 1078 (D.C. Cir. 2014), and *United States v. Sanders*, 485 F.3d 654, 659 (D.C. Cir. 2007)).[19] And as the Supreme Court has recognized, such a requirement is often necessary to counterbalance an otherwise broad grant of discretion:  If Congress decides that it cannot "rigidly structure[]" a grant of authority without unduly constraining its exercise, it may (as here) impose a findings requirement so as "to counteract substantive openendedness with procedural strictness." *Zedner v. United States*, 547 U.S. 489, 508-09 (2006).  Therefore, even if the "substantive balancing" is left to the delegee's discretion, a statutory findings requirement like the one in § 1182(f) necessitates at least a rational consideration of the issues.  *Bikundi*, 926 F.3d at 776-77.

The Ninth Circuit recently recognized this principle's application to § 1182(f) in *Doe*, which concerned a proclamation suspending entry of individuals who lacked health insurance.  In refusing to grant a stay pending appeal of the district court's preliminary injunction, the court of appeals contrasted the barebones proclamation there at issue with the robust one that was before the Supreme Court in *Hawaii*.  *See* 957 F.3d at 1066-67.  In *Hawaii*, the challenged proclamation was based on a "worldwide review" undertaken by DHS, the State Department, and "several intelligence agencies," who "collected and evaluated data regarding all foreign governments" before recommending that the President suspend entry of aliens from specific countries that (as

---

[19] *See, e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (findings requirement obligated agency to "articulate a[] rational connection between the facts found and the choice made"); *Temple Univ. v. White*, 941 F.2d 201, 209 (3d Cir. 1991) (findings requirement not met where delegee "gather[ed] no information" and "did no empirical analysis" of the issue).

the agencies found) provided inadequate information to permit vetting of their citizens.  138 S. Ct. at 2404-05.  The President then crafted "country-specific restrictions" tailored to national-security goals and founded on "agency evaluations[] and recommendations."  *Id.* at 2408-09.  Moreover, the proclamation in *Hawaii* arose "in the context of international affairs and national security," where the President wields inherent power and "is not required to conclusively link all of the pieces in the puzzle."  *Id.* at 2409 (citation, brackets, and internal quotation marks omitted).

The proclamation in *Doe* was different from the one in *Hawaii*.  *Doe* arose in the context of "domestic economic matters," where "national security and foreign affairs justifications … disappear," such that the President's "power is more circumscribed." 957 F.3d at 1067.  And in that context, the court ruled, § 1182(f)'s findings requirement is unlikely to be satisfied by a Proclamation that is "issued with virtually no factual findings, minimal reasoning, and an extremely limited window for public comment."  *Id.*

**2.**  This case is like *Doe*, and unlike *Hawaii*.

*First*, with respect to immigrants, the Proclamations suspend entry based on the premises that (i) "the United States faces a potentially protracted economic recovery with persistently high unemployment if labor supply outpaces labor demand," (ii) LPRs are "eligib[le] to compete for almost any job, in any sector of the economy," and (iii) Americans face a "threat of competition for scarce jobs from new [LPRs]."  *See* FAC Ex. A at 23441.[20]  These assertions are insufficient to satisfy the statutory "find[ings]" requirement, because they leave open a massive inferential gap.

_____

[20] The June Proclamation added nothing on this score, and in fact *subtracted* from the April Proclamation's already-sparse reasoning:  Whereas the April Proclamation suggested that immigrants "strain ... our healthcare system" and that the entry suspension was necessary to "conserve critical State Department resources" during the pandemic, the June Proclamation did not purport to renew those putative "findings."  Those justifications are in any event unsupported by any evidence.  Immigrants do not impose any meaningful "strain" on the healthcare system. *See generally* Ku Decl.  And the consulates are beginning to reopen for normal operation (*see supra* note 18), so any concern about conserving resources during the pandemic now rings hollow.

While the President's premises (i) and (ii) are accurate, they do not establish premise (iii), that immigrants "compet[e] for scarce jobs" in the sense that when an immigrant accepts employment he or she takes an opportunity away from a U.S. worker.  Nor does anything else in the Proclamations support that assertion.  And without that proposition, the entry suspension's justification falls apart.  The Proclamations thus rest not on the statutorily required "find[ing]," but on the President's unfounded *assertion* regarding the effects of immigrants on the labor market.

*Second*, with respect to *non*immigrants, the June Proclamation similarly lacks the requisite findings.  While the President cites statistics allegedly showing that U.S. workers have recently lost jobs in "industries" in which employers are seeking H-1B, H-2B, and L workers, an *industry* is not the same thing as a *job*.  The June Proclamation does not even purport to find that nonimmigrant workers would take actual *jobs* that would otherwise go to U.S. workers.  Nor could it have done so.  "[T]otal employment *increased* by about 185,000 in the top 20 H-1B occupations" between January and May 2020, and "[u]nemployment in H-1B occupations generally has been falling since April"—meaning that the June Proclamation irrationally excludes workers in occupations where unemployment is *low*, rather than in the high-unemployment areas that the entry suspension is supposedly meant to target.  Nowrasteh Decl. ¶ 13.  The June Proclamation is likewise irrational with respect to H-2B workers: regardless of the *industries* in which such individuals are employed, the program's requirements mean that "[u]nemployed Americans already *rejected* 100 percent of the *jobs* for which [such] workers are hired"—so such workers cannot possibly displace U.S. workers.  *Id.* ¶ 14 (emphases added).  And L visas are available only to individuals with company-specific experience and specialized knowledge that U.S. workers are unlikely to possess.  *See* 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. § 214.2(l)(1).

With respect to J visas, the June Proclamation asserts that the "unemployment rate for young Americans, who compete with certain J nonimmigrant visa applicants, has been particularly

high"—but that does not establish that excluding J-visa applicants will open up a bounty of new positions for U.S. workers.  In fact, many J visas are *unavailable* if the recipients would displace U.S. workers.  *See supra* pp. 8-9.  And the Proclamations suspend entry for au pairs and teachers just as the demand for child care and education services is about to rise.  *See* Nowrasteh Decl. ¶ 17.

**3.**  Nor could any rational assessment of the evidence have led the President to conclude that immigrants or nonimmigrant workers diminish the economic prospects of American workers. To the contrary, the Proclamation *undermines* its own stated goals.  From the horse's mouth:

> DHS knows that immigrants make significant contributions to the U.S. economy…. DHS agrees that immigrants are an important source of labor in the United States and contribute to the economy. …  DHS agrees that immigrants are crucial for agriculture, construction, healthcare, hospitality, almost all industries, immigrants are a source of future U.S. labor growth, many immigrants are successful entrepreneurs, and that welcoming new citizens helps the U.S. economy.

*U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, RIN 1615-AC18, at 42 (to be published in the Federal Register Aug. 3, 2020), https://tinyurl.com/yyjphew4.[21]

Economists from across the policy and political spectrum have discredited the "fallacy" that "there is a fixed amount of work to be done,"[22] and the evidence overwhelmingly shows that immigration restrictions *reduce* economic growth while failing to increase the employment of U.S. workers.[23]  Conversely, immigration contributes to economic growth, and thus to the jobs and

---

[21] The employer Plaintiffs' declarations bear out that the Proclamations threaten their businesses, and thus U.S. workers' job opportunities. *See, e.g.*, Martin Decl. ¶¶ 17-18 (Powertrunk); Newman Decl. ¶¶ 13-16 (Superior Scape); Gustafson Decl. ¶¶ 18-20 (ASSE), ¶¶ 31-33 (Euraupair).

[22] *Economics A-Z Terms Beginning with L*, The Economist, https://goo.gl/BvRwKU; *see* Paul Krugman, *Lumps of Labor*, N.Y. Times (Oct. 7, 2003), https://goo.gl/GyYTG5; Nat'l Acad. of Scis., Eng'g., and Med., *The Economic and Fiscal Consequences of Immigration* 5-6 (The National Academies Press 2017), https://doi.org/10.17226/23550..

[23] *See, e.g.*, Sparber Decl. ¶ 5 ("[R]estrictions on foreign workers, especially high-skilled professionals such as those who enter the United States on H-1B and L-1 visas, will reduce long-term economic growth while failing to increase the employment of Americans"); Hunt Decl. ¶ 6

wages of U.S. workers.[24]  Whereas the Proclamations are predicated on the notion that when an immigrant accepts a job in the United States he or she necessarily takes a job from a U.S. worker, the truth is the reverse:  Immigration has a "one-for-one" impact on total employment, "without 'crowding out' any native-born workers"—meaning that a new job is created for every job an immigrant fills.  Peri Decl. ¶ 9; *see* Nowrasteh Decl. ¶ 28.[25]  One reason is that "all immigrants and foreign-born workers create jobs because they participate in the economy as consumers of goods and services."  Nowrasteh Decl. ¶ 27."[26]  Another is that "one high-skilled job generates a 'local multiplier,' attracting other jobs rather than displacing them."  Sparber Decl. ¶ 12.

Moreover, because the Proclamations ban entry of high-skilled workers who boost innovation and productivity, the "benefits of [those individuals'] innovation, entrepreneurship, and human capital will go to other countries and other economies."  Sparber Decl. ¶¶ 5, 15.  The

---

("the Proclamation's immigration restrictions will almost certainly harm the country's economic recovery"); *id.* ¶ 8 ("*immigration increases economic growth while having no negative impact on native employment and little or no impact on average native wages*").

[24] *See, e.g.*, Hunt Decl. ¶ 11 ("the contribution of immigrants to human and physical capital formation, entrepreneurship, and innovation play an important role in economic growth"); Peri Decl. ¶ 10 (total immigration in the United States from 1990 to 2007 was associated with a 6.6% to 9.9% increase in real income per worker); *id.* ¶ 12 (local growth in immigrant population correlates to increased wages across labor markets); Sparber Decl. ¶ 11 (1% rise in foreign-born STEM workers increased real wages of college-educated natives by 7 to 8% and those of non-college educated natives by 3 to 4%).

[25] *See also, e.g.*, Jacqueline Varas, Am. Action Forum, *How Immigration Helps U.S. Workers and the Economy* (Mar. 20, 2017), https://goo.gl/ovHQEh; U.S. Chamber of Commerce, *Immigration Myths and Facts* (Apr. 14, 2016), https://tinyurl.com/yay4xjm9; Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook on Immigration and Economic Growth* 70, 118 (3d ed., Sept. 2017), https://tinyurl.com/y4ykokn9.

[26] *See also, e.g.*, Buttonwood, *Keep on Trucking*, The Economist (Feb. 11, 2012), https://goo.gl/x8vqaL; Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015), https://goo.gl/8p3SP8 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of S.F. Econ. Letter (Aug. 30, 2010), https://goo.gl/jK17fc.

Proclamations are thus doubly "counterproductive to [the] stated goal of protecting United States workers and the post-COVID economic recovery." Nowrasteh Decl. ¶ 8.[27]

In short, "[t]he notion that inflows of immigrants threaten domestic jobs is contrary to the results of a very large body of established and accepted economic research."  Peri Decl. ¶ 7; *see* Sparber Decl. ¶ 5 ("This view is flatly contradicted by well-established economic research."); Nowrasteh Decl. ¶ 5 ("economically baseless and counterproductive"); Hunt Decl. ¶ 7 ("thoroughly debunked by decades of established, peer-reviewed economic research").  It is also contrary to Congress's judgment in designing the INA to facilitate the entry of foreign-born workers to the United States, based on its recognition that doing so "is crucial to maintaining American economic competitiveness and to protect American jobs."  144 Cong. Rec. S-10877-01.

All of this remains true even in a recession, because (among other reasons) "foreign-born workers are more likely to make earnings-sensitive decisions to move towards areas where there is job creation"—meaning that they help to efficiently allocate labor, adding workers to the supply in growing areas while not increasing unemployment in depressed ones.  Peri Decl. ¶ 15.  Indeed, a policy of reducing the foreign-born work force has already been tried—by President Hoover, during the Great Depression, and it failed.  Sparber Decl. ¶ 14; *see* Nowrasteh Decl. ¶¶ 19.[28]

The point here is not simply that the President is wrong.  The point is that the Proclamations do not rest on anything like a national-interest "find[ing]" under the ordinary meaning of that term.

---

[27] *See* Peri Declaration, ¶ 20 ("By severely restricting immigration…, particularly the immigration of high-skilled workers, the Proclamations will only serve to penalize the economic recovery.").

[28] Even accepting *arguendo* the false premise that foreigners take jobs from U.S. workers, the Proclamations fail the findings requirement in other ways.  In particular, the entry suspension excludes from the country many individuals (like Mr. Saleh's ten-year-old granddaughter and Mr. Lebron's two minor daughters) who will not be competing for jobs in the foreseeable future.  Saleh Decl. ¶ 14; Lebron Decl. ¶ 22.  It also excludes individuals (like Mr. Alam's wife and Mr. Jiménez's son) who plan to pursue higher education rather than employment.  Alam Decl. ¶ 12; Jiménez Decl. ¶ 14.

As DHS's recent rule announcement shows (*supra* p. 26), the evidence conclusively establishes that the Proclamations' premise is false, and that the Proclamations will exacerbate the problems they purport to address. But the Proclamations give no indication that the President considered the evidence, or that he based the Proclamations on any countervailing agency analysis. The Proclamations' mere *assertion* does not constitute the *finding* that § 1182(f) requires. And because the statutory prerequisite is thus unsatisfied, the Proclamations are invalid and unlawful.[29]

### B.     Assuming That The June Proclamation Satisfies The Statutory Prerequisites, It Violates The Separation Of Powers

The Proclamation is independently invalid because it depends on an interpretation of §§ 1182(f) and 1185(a) that violates foundational separation-of-powers principles.[30]

"Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. … [T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Galvan v. Press*, 347 U.S. 522, 531 (1954). Once Congress has exercised this authority, the separation of powers dictates that its legislative judgment is not subject to the President's second-guessing. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its

---

[29] Defendants may seek to defend the Proclamations under § 1185(a)(1), which grants the President authority to "prescribe" "reasonable rules, regulations, and orders" regarding entry. Any such attempt to end-run § 1182(f)'s findings requirement fails as a matter of law. For one thing, § 1185(a)(1) does not authorize *suspension* of entry at all; that power is conferred only in § 1182(f), and the latter statute's specific requirements must govern the former's more general rulemaking authority. *See, e.g.*, *RadLax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). And in any event, the Proclamations would not satisfy the statutory requirement to be "reasonable," for all the reasons set forth in text.

[30] Avoiding these constitutional concerns is a powerful reason that the Court should resolve any statutory ambiguity in favor of foreclosing the President's action. *See, e.g.*, *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 68 (D.C. Cir. 2016) ("the canon of constitutional avoidance directs that we not construe the statute in a manner that renders it vulnerable to constitutional challenge").

lowest ebb," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring), and "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

Under these principles, "[t]he President may not … exercise his discretion granted under § 1182(f) to 'override' a provision of the INA," meaning that a § 1182(f) proclamation is invalid if it "overrides, contravenes, or is otherwise incompatible with any provision of the INA." *Doe*, 418 F. Supp. 3d at 594 (quoting *Hawaii*, 138 S. Ct. at 2411).  Thus, while the § 1182(f) "proclamation power … provides a safeguard against the danger posed by any particular case or class of cases that *is not covered* by one of the categories in [§] 1182(a)," *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (Ginsburg, J.) (emphasis added), the statute does *not* authorize the President to impose limits on entry where "Congress has already spoken … on the issue" forming the basis for the President's action.  *Doe*, 418 F. Supp. 3d at 597.

In *Doe*, for example, the President's proclamation requiring immigrants to show proof of health insurance violated the separation of powers because it fell within "the purview of" the statutory scheme through which Congress sought to ensure that immigrants would not burden taxpayers.  *Id.* at 595.  The proclamation was invalid as "stand[ing] in direct contravention to a statute passed by Congress after Congress's 'exhaustively considered,' and 'deliberate and deliberative process.'"  *Id.* at 597 (citations omitted); *see Doe*, 957 F.3d at 1064 (proclamation "eviscerate[d] the statutory scheme" and was likely invalid under separation of powers).

The Proclamations are invalid for substantially the reasons set forth in *Doe*.  "Congress has already spoken in § 1182[] on the issue of limiting … admissibility based on the potential" effects on the labor market.  *See* 418 F. Supp. 3d at 597.  Specifically, Congress has carefully prescribed the requirements for entry of "[a]ny alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor": they are inadmissible unless the DOL certifies that "there

-30-

are not sufficient workers who are able, willing, qualified … and available at the time of application … to perform such skilled or unskilled labor," and that "the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1182(a)(5); *see also id.* § 1182(p).  In the specific case of H-1B visas, Congress has gone even further by articulating the LCA scheme in minute detail—five subsections and dozens of multi-sentence subparagraphs.  *See id.* § 1182(n).  Another complex section of the statute details the labor attestation requirements for admission of "[n]onimmigrant professionals."  *See id.* § 1182(t).  Yet another ameliorates labor-market concerns relating to J visas by generally prohibiting their holders from seeking an immigrant or nonimmigrant visa, or permanent residence, without first residing abroad for two years after departing the United States.  *See id.* § 1182(e).[31]  And in the case of L visas, Congress limited the program to individuals in roles that are "managerial, executive, or involve[] specialized knowledge"—high-level jobs that create other employment opportunities in the United States.  *See id.* §§ 1101(a)(15)(L), 1184(c)(2).

Congress has thus carefully considered and decided whether, how, and to what extent labor-market impacts should be part of the admissions calculus.  It has imposed labor-protective conditions where it found them appropriate, and has declined to impose such conditions where (as in the cases of family-based and diversity visas) it did not view them as warranted.  What is more, Congress has recently (and repeatedly) refused the President's entreaties to eliminate the diversity visa lottery and to slash the family-based visa program.  *See* FAC ¶ 82; *supra* p. 4.  Congress also could have provided for additional protections in the event of a labor-market downturn, or it could have included emergency entry restrictions when it passed legislation in response to COVID-19 earlier this year.  Congress has chosen not to do any of that.

---

[31] Moreover, many J visas require the sponsor to certify that the foreign exchange participant will not displace U.S. workers. *See* 22 C.F.R. §§ 62.32(n)(3)(ii), 62.22(b)(1)(ii); 62.22(f)(2)(v).

The Proclamations throw all of these congressional judgments out the window, "in direct contravention to a statute passed by Congress after Congress's 'exhaustively considered,' and 'deliberate and deliberative process.'"  *Doe*, 418 F. Supp. 3d at 597 (citations omitted).  The Proclamations are thus invalid:  "The President simply does not have the constitutional authority to amend a statute."  *Id.* (citing *Clinton*, 524 U.S. at 438).

### C.      If The President's Authority Is Not Cabined, Sections 1182(f) And 1185(a) Are Unconstitutional Delegations Of Legislative Authority

If § 1182(f) were construed to permit the President to issue entry-suspension proclamations based on judicially unreviewable "find[ings]" that do not meet minimum standards of rationality, and which fall within a sphere in which Congress has already acted, then the statute itself would exceed the limits on Congress's authority to delegate legislative power to the Executive Branch.  *See Doe*, 418 F. Supp. 3d at 589-93.  Under the nondelegation doctrine, Congress "may not transfer to another branch powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (citation omitted).  While Congress may enlist the aid of the other Branches, it must provide "an intelligible principle to guide the delegee's use of discretion." *Id.*

This issue did not arise in *Hawaii*, because that case concerned not domestic matters but "a preventive measure … in the context of international affairs and national security," 138 S. Ct. at 2409—a setting in which "the President has his own inherent powers under Article II," *Doe*, 418 F. Supp. 3d at 592, and in which nondelegation concerns are accordingly diminished:  The President has inherent authority to assess the national interest in the national-security realm, and so in that context may not require Congressional guidance.

But the President has no such inherent power in the realm of "*domestic* policymaking"— particularly as to economic matters falling squarely within Congress's legislative authority.  *See id.*  In this area, Congress is required to provide an "intelligible principle" in order to effect a valid

delegation. *Gundy*, 139 S. Ct. at 2123.  But if § 1182(f) is construed to confer on the President authority to override congressional judgments based on putative "find[ings]" concerning domestic economic matters, and to insulate those "find[ings]" from judicial review even if they do not rationally support the President's action, then the statute violates the nondelegation doctrine. Under such a construction, § 1182(f) "provides no guidance whatsoever for the exercise of discretion by the President," and supplies "no 'intelligible principle' … as to what it means to be 'detrimental,' what the [relevant] 'interests' of the United States are, what degree of finding is required, or what degree of detriment is required." *Doe*, 418 F. Supp. 3d at 590.  This would be "the type of unrestrained delegation of legislative power that the Supreme Court has invalidated." *Id.* (collecting cases).  "In this wholly domestic context, the delegation by Congress [would be] without any intelligible principle and [would] thus fail[] under the nondelegation doctrine"— rendering the Proclamation itself a legal nullity.  *Id.* at 592."[32]

D.     **The State Department's Implementation Violates The APA**

Plaintiffs are also likely to succeed in showing that the State Department has violated the APA in implementing the Proclamations.  Injunctive relief is therefore appropriate.  *See* 5 U.S.C. § 705 ("the reviewing court … may issue all necessary and appropriate process … to preserve status or rights pending conclusion of the review proceedings"); *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) (affirming preliminary injunction based in part on APA challenge to agency implementation of presidential proclamation).

**1.**  At the threshold, the State Department has undertaken "final agency action" subject to APA review.  *See* 5 U.S.C. § 704.  The definition of that term "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531

---

[32] Identical analysis would apply to § 1182(a), which provides no "intelligible principle" to guide the President in determining what rules or restrictions are "reasonable."

U.S. 457, 478 (2001), and even informal action may rise to the level of being final and reviewable:
The APA's "flexible and pragmatic" language is satisfied by a "guideline or guidance," *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000), or a press release, *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883-84 (D.C. Cir. 2003).  All that is needed is conduct demonstrating that an agency has reached "the consummation of the … decisionmaking process" and has "determined" visa applicants' "rights" by establishing a policy "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 178 (1997) (citations and internal quotation marks omitted); *see Hawaii v. Trump*, 878 F.3d 662, 681 (9th Cir. 2017) (agency implementation of § 1182(f)) proclamation was reviewable under APA).  This standard is amply met here.

As summarized above (pp. 11-12; *see* FAC ¶¶ 110-112), and as detailed in Plaintiffs' declarations,[33] the State Department has made clear in both public and private that it has decided to implement the Proclamations by refusing to issue visas.  This is the "consummation of the … decisionmaking process," for there is no suggestion that the State Department is still considering whether this is its policy.  *See Bennett*, 520 U.S. at 156.  And this policy "determine[s]" the "rights" of plaintiffs and other class members, by resolving (in the negative) the question whether applicants may obtain their visas while the entry suspensions are in effect.  *Id.*[34]

**2.**  The Court "shall … hold unlawful and set aside agency action" that is "arbitrary,

---

[33] *See. e.g*., Bushati Decl. ¶ 21; Alam Decl. ¶ 18; Nakamura Decl. ¶¶ 16-19; Martin Decl. ¶ 14; Karpes Decl. ¶ 12; Jiménez Decl. ¶¶ 11-12.

[34] Defendants may argue that there has been no agency action because the President is not subject to the APA.  But the mere fact that agency action is "based on the President's [Proclamation] hardly seems to insulate [it] from judicial review under the APA."  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  And here, the action in question is not the President's *entry* suspensions (*see* FAC Ex. A §1; FAC Ex. C §2; 8 U.S.C. §§ 1182(f), 1185(a)(1) (authorizing suspension of and restrictions on *entry*)), but the State Department's discrete policy to refuse *visa issuance. See Hawaii*, 138 S. Ct. at 2414 (discussing "the basic distinction between admissibility [*i.e.*, entry-eligibility] determinations and visa issuance that runs through the INA").

capricious, an abuse of discretion, or otherwise not in accordance with law," or that is "in excess of statutory … authority." 5 U.S.C. § 706(2)(A), (C). The State Department's implementation of the Proclamations with respect to visas is unlawful and should be set aside on multiple grounds.

*First*, the State Department's action is "not in accordance with law" and "in excess of statutory authority" because it usurps consular officers' sole and express statutory authority to issue visas. The INA provides that "a consular officer may issue" visas to individuals who have "made proper application therefor," 8 U.S.C. § 1201(a)(1), and it expressly *deprives* the Secretary of State of "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas," *id.* § 1104(a). Thus, the State Department has no authority to "interfere[e] with the decision of a consular official to grant or refuse a visa," including by imposing requirements or restrictions outside of formal regulations issued under the INA. *Encuentro Del Canto Popular v. Christopher*, 930 F. Supp. 1360, 1369 (N.D. Cal. 1996). Moreover, the INA does not authorize suspension of visa issuance, *see* 8 U.S.C. §§ 1182(f), 1185(a)(1) (authorizing suspension of and restrictions only on *entry*), and the Proclamations do not suspend visa issuance (*see* FAC Ex. A §1; FAC Ex. C §2 (both suspending *entry*)). The State Department had no authority to suspend visa issuance. Its attempt to do so should be set aside.

*Second*, Defendants' actions are "arbitrary" and "capricious," 5 U.S.C. § 706(2)(A), because the State Department has not justified its new blanket no-visa policy. Adopting such a new policy requires an agency to provide adequate reasons. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Casa de Maryland v. DHS*, 924 F.3d 684, 703 (4th Cir. 2019); *see Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020) (same principle). The agency must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 136

-35-

S. Ct. 2117, 2126 (2016); *see Regents*, 140 S. Ct. at 1913.  "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."  *Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 84 (D.D.C. 2020).

Here, the State Department has failed to provide the requisite justification for its refusal to issue visas.  Indeed, it has "said almost nothing" about the issue, *see Encino Motorcars*, 1366 S. Ct. at 2127, with public statements limited to a few tweets and some guidance posted to the internet.  None of those statements even attempts to justify the no-visa policy, even in response to a direct question on the issue.  *See supra* note p. 11; FAC Ex. N.  Most glaringly, the State Department does not appear to have given meaningful consideration to the exceptionally harsh result of failing to issue visas to diversity visa lottery winners.  Even assuming *arguendo* that the Proclamations' suspensions of *entry* are valid exercises of presidential authority, a diversity visa issued today would be valid for six months—meaning that it would allow entry after the Proclamations are set to expire at the end of the year.  There is no indication that the State Department considered the fact that by refusing to issue diversity visas, it is imposing tremendous harms on potential immigrants *that extend beyond the Proclamations' end-date*.  That is "an important aspect of the problem," *Regents*, 140 S. Ct. at 1913, and the State Department's evident failure to give the issue due consideration renders its action unlawful.

The State Department also does not appear to have given due consideration to the interests of qualified applicants (and their sponsors and family members) in other visa categories.  Again assuming that the *entry* suspensions are valid, issuing visas to qualified applicants would move those individuals one significant step closer to entering the country.  When the Proclamations ultimately are lifted, the State Department is sure to see a flood of visa applicants—leading to significant delays in visa issuance even after the entry suspension has expired.  Even if Plaintiffs and class members are unable to enter the country now, having visas in hand would allow them to

avoid those delays—or even to pursue immediate admission from DHS under an exception to the entry suspension.  At the same time, issuing visas now would benefit other applicants and conserve consular resources by reducing processing delays in a future time of high demand.  Again, there is no evidence that the State Department has taken these interests and considerations into account.

*Third*, the no-visa policy is also arbitrary and capricious for the related reason that it "fail[s] to account for … matter[s] of importance under the statute." *Gresham v. Azar*, 950 F.3d 93, 102 (D.C. Cir. 2020) (finding such a failure to be "[a] critical issue" and setting aside agency's action). For example, Congress has made clear that it is "importan[t] under the [INA]," *id.*, "to promote diversity in [the] immigration system."  H.R. Rep. No. 101-723, pt. 1 (1990).  Another critical goal—indeed, "the cornerstone of U.S. immigration policy"—is "family reunification." 136 Cong. Rec. H-8629-02 (1990).  And Congress has also determined that it is important to admit the various categories of nonimmigrants, based on their contributions to the economy and to goals like cultural exchange.  *See supra* p. 8.  There is no public evidence that the State Department considered these issues in adopting its no-visa policy.

*Fourth*, Defendants also have not "articulate[d] a satisfactory explanation for [their] action" because there is no evident "rational connection between the facts found and the choices made."  *Baystate*, 950 F.3d at 89; *Casa de Maryland*, 924 F.3d at 703-04.  For one thing, as set forth above (Point II.A), in the expert declarations, and in DHS's recent rule announcement, the Proclamations themselves are irrational and contrary to all evidence.  Any policy based on the Proclamations is itself *ipso facto* irrational and unlawful.  *See Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking.").

But the no-visa policy is irrational even accepting *arguendo* the President's baseless beliefs about the labor market:  The Proclamations extend only through the end of the year, yet the State

Department's no-visa policy will severely injure Plaintiffs and class members long after the entry suspensions and their purported justifications have expired. Indeed, winners of the diversity visa lottery will lose the opportunity to immigrate *forever*. Others seeking to enter the country will face substantial and unnecessary delays—and their applications will contribute to backlogs that affect many other prospective immigrants, workers, and employers who are not themselves directly subject to the Proclamations. No rational decision-making process could have led to a policy that imposes such harms, which extend beyond the Proclamations' end date. Such an action "lacks any coherence" and therefore "cannot withstand judicial review." *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006).

For all these reasons, the State Department's no-visa policy is arbitrary, capricious, and unlawful. It should be enjoined, and ultimately set aside under the APA.

## III.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF

In addition to being unlawful, application of the Proclamations to Plaintiffs and other class members will cause irreparable harm in the absence of an immediate injunction. Irreparable harm is "an imminent injury that is both great and likely, and for which legal remedies are inadequate." *Jackson v. Dist. of Columbia*, 692 F. Supp. 2d 5, 7 (D.D.C. 2010) (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). These requirements are amply satisfied here. Plaintiffs are suffering irreparable harms that are not only imminent but *current* and *ongoing*. Those harms are not remediable at law. And in some cases, failure to issue a prompt injunction would lead to harms so great and irreparable (permanent loss of loss of visa eligibility; going out of business) that they would likely moot this case and foreclose any prospect of even *equitable* relief at a later date.

### A.      Family Separation Plaintiffs

Separation from one's family constitutes irreparable harm, because no legal remedy can compensate for the loss of the opportunity to live with and care for one's close family members.[35] The record demonstrates that the plaintiffs who sponsored visas for their family members are being irreparably harmed by the Proclamations:

- Mr. Alam, an essential worker in New York City, has already been separated from his wife for 2 years; he was devastated to learn that due to the Proclamations, their separation is now indefinite.  Alam Decl. ¶¶ 13-16.

- Ms. Pimentel is nine months pregnant, and is devastated that her husband will miss not only the birth of their first child but also at least the first six months of his life. *See* Pimentel Decl. ¶¶ 1-2, 12-13.

- Mr. Lebron has been separated from his minor daughters for seven years.  Lebron Decl. ¶ 25.  His mother is currently caring for them, but due to failing health, she is no longer able to meet this responsibility.  *Id.* ¶ 3.  Mr. Lebron is heartbroken that, when he was on the cusp of being reunited with his daughters, that opportunity was taken from him indefinitely by the Proclamation.  *Id.* ¶ 7.

- Mr. Nwankwo has been living apart from his father for four years; the Proclamations have crushed his hopes of enjoying his father's guidance and companionship.  Nwankwo Decl. ¶¶ 7-8.

- Mr. Jiménez has been separated from his young adult son for almost a year; they have only been able to communicate around once a week.  Jiménez Decl. ¶¶ 14-15. Mr. Jiménez is devastated that his son's dreams of attending college in the United States have fallen to pieces.  *Id.* ¶ 14.

- Ms. Sinon's son has been stranded in the Philippines after traveling to Manila for his consular interview.  Sinon Decl. ¶ 8.  Ms. Sinon is elderly and relies on her son for caretaking, and now she has no idea when she may be reunited with him again. *Id.* ¶¶ 12, 16-18.

- Ms. Phelps's "lifelong ambition" has been to resettle in the United States with her entire family, but after waiting 11 years for her daughter and grandchildren to

---

[35] *See*, *e.g.*, *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 62 (D.D.C. 2019), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121-23 (D.D.C. 2018); *Jacinto-Castanon de Nolasco v. USCIS*, 319 F. Supp. 3d 491, 502-03 (D.D.C. 2018); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011); *Sanchez v. McAleenan*, 2020 WL 607032, at *7 (D. Md. Feb. 7, 2020).

receive their visas, Ms. Phelps's hard work and planning has been overturned by the Proclamations, and she is too advanced in age to travel to visit them.  Phelps Decl. ¶¶ 1, 3, 5, 10.

- Ms. Abarca has been waiting more than 25 years for her brother and his family to join her in the United States; now her brother's visa number is finally current, but he cannot immigrate due to the Proclamations, and Ms. Abarca cannot travel to see him because of her declining health.  Abarca Decl. ¶¶ 2, 10.  And Ms. Abarca's niece is at risk of aging out if her family's visas do not issue soon.  *See id.* ¶¶ 3-6.

- Mr. Saleh's 10-year-old granddaughter is stranded in Egypt, living with neighbors away from her parents and siblings.  Saleh Decl. ¶¶ 1, 9-10.  She cries on every telephone call with her family, and it breaks Mr. Saleh's heart to hear his granddaughter's distress and to know how frightened she is.  *Id.* ¶¶ 10-11.

These harms are compounded by the irreparable injuries that Plaintiffs' families are experiencing.  *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (courts may consider "indirect hardship to [immigrants'] friends and family members").  The beneficiary family members themselves have suffered irreparable injury by being denied the opportunity to reunite with their families.  And other family members have experienced grave hardship—such as Mr. Saleh's son and daughter-in-law, who separated from their ten-year-old daughter (Saleh Decl. ¶¶ 9-11).

### B.     Diversity Visa Plaintiffs

The diversity visa Plaintiffs are being irreparably harmed by the present denial of the opportunity to immigrate, and that harm will be exponentially worsened if they do not receive their diversity visas by September 30, 2020.  As discussed (*supra* at 2), lottery winners must receive their visas by that date, or they will forever lose access to that diversity visa.  Because the chances of ever winning the lottery again are miniscule (*see* FAC ¶¶ 56-57; *supra* at 3), an unlawful refusal to issue a visa to an otherwise qualified lottery winner before the deadline plainly causes great "irreparable harm," for which there is no "adequate alternative remedy." *P.K.*, 302 F. Supp. 3d at 9-10; *see Mohamed v. Pompeo*, 2019 WL 4734927, at *2 (E.D. Cal. Sept. 27, 2019) (similar).

The diversity visa Plaintiffs here have complied with all the requirements for obtaining diversity visas, and know of no reason, other than the Proclamation, why their visas would not issue.[36]  They have, moreover, taken significant affirmative steps to prepare to immigrate to the United States—selling assets, forgoing investment opportunities at home, and planning new lives for themselves and their children.[37]  They are emotionally devastated at having lost their lone opportunity to immigrate to the United States.[38]  The loss of their opportunity to immigrate based on diversity visas that they should have received *this* year is plainly a "certain," "great," and "imminen[t]" injury.  *Wisc. Gas Co.*, 758 F.2d at 674; *see P.K.*, 302 F. Supp. 3d at 9-10.

### C.    Nonimmigrant Visa Plaintiffs

The June Proclamation will irreparably harm the remaining Plaintiffs, because without nonimmigrant workers, these Plaintiffs will suffer financial and reputational harm for which no legal remedy is available.[39]  The harms experienced by Plaintiffs here more than justify relief:

- ASSE can no longer operate its exchange programs, which rely on individuals with J-1 nonimmigrant visas being able to enter the United States.  Gustafson Decl. ¶ 2. ASSE has been forced to refund more than $1 million because of cancelled exchange visits (money it cannot recover from the government), has terminated five

---

[36] *See* Bushati Decl. ¶ 20; Golden Decl. ¶ 12; Karpes Decl. ¶ 14; Kinteh Decl. ¶ 9; Koirala Decl. ¶ 9; Nakamura Decl. ¶ 14.

[37] *See, e.g.*, Golden Decl. ¶ 9; Kinteh Decl. ¶ 5; Koirala Decl. ¶ 5; Nakamura Decl. ¶ 9.

[38] *See* Bushati Decl. ¶¶ 22-24; Golden Decl. ¶ 11; Karpes Decl. ¶ 14; Kinteh Decl. ¶ 8; Koirala Decl. ¶ 6; Nakamura Decl. ¶¶ 14, 21-22.

[39] Financial injury constitutes irreparable harm to support an injunction "where the loss threatens the very existence of the movant's business," or where it "will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable."  *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 115 (D.D.C. 2019); *see also Baker Elec. Coop. v. Chaske*, 28 F.3d 1466, 1472-73 (8th Cir. 1994) (lost productivity constituted irreparable harm where plaintiff could not recover damages).

Reputational harm will support an injunction when it will result in the loss of future business opportunities, as where the challenged action will cause the plaintiff to breach its contractual obligations and dissuade business partners from renewing the relationship.  *See Everglades*, 427 F. Supp. 3d at 116; *Beacon Assocs. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018).

employees, and may need to reduce its staff even more. *Id.* ¶¶ 16-20. ASSE will run out of money in early 2021; its very existence as an organization is threatened by the Proclamations. *Id.* ¶¶ 20-21.

- EurAuPair similarly can no longer operate its au pair program. *Id.* ¶ 2. It has had to refund $434,500 to would-be host families, no longer generates any income, and will cease to exist in 2021 if the Proclamation is not enjoined. *Id.* ¶¶ 32-33.

- Superior Scape will lose money this year and preclusion of visas for H-2B workers due to the Proclamation will threaten the company's solvency and ability to continue operations. Newman Decl. ¶ 10. It is a small, family-run business that cannot sustain such losses. *Id.* The viability of Superior Scape's reputation and business at large depends on the end of the June Proclamation. *Id.* ¶¶ 10-16, 20-21; *see Everglades*, 427 F. Supp. 3d at 115-16 (company's limited resources was factor favoring granting preliminary injunction).

- PowerTrunk is irreparably harmed by its inability to bring knowledgeable and talented employees to the United States. Martin Decl. ¶¶ 7, 17-18. It will lose productivity as a result, and even more significantly will be unable to satisfy its contractual obligations if the Proclamation is not enjoined. *Id.*; *see Everglades*, 427 F. Supp. 3d at 116 (inability to satisfy contractual obligations factor in favor of finding irreparable reputational harm); *Baker*, 28 F.3d at 1472-73.

- The same is true of Shipco, which will be irreparably harmed if it is unable to bring its executive to this country to oversee its U.S. operations. Jepsen Decl. ¶¶ 12-13, 21-28; *see Baker Elec.*, 28 F.3d at 1472-73.

- 3Q Digital will be irreparably harmed if it cannot bring knowledgeable and talented employees like Mr. Bhat to the United States. Rodnitzky Decl. ¶¶ 8, 12. Mr. Bhat is so valuable to 3Q Digital that it has already spent more than $36,000 to procure an H-1B visa for him. Those funds are not recoverable if Mr. Bhat is unable to enter the country. Even more significantly, 3Q Digital's inability to bring Mr. Bhat to the United States will irreparably depress the company's growth and productivity. *Id.* ¶¶ 21-22. *See Baker Elec.*, 28 F.3d at 1472-73.

- CIR has lost revenue because resident physicians who would otherwise join CIR have been unable to enter the country—depriving it of dues and fees that it cannot recover from Defendants, and impairing CIR's ability to provide services to its members. DeRosa Decl. ¶¶ 17-18. CIR has also been forced to divert significant resources away from its core mission in order to help its members who have been harmed by the Proclamations. *Id.* ¶¶ 11-13. These injuries are ongoing and irreparable. *See Doe*, 418 F. Supp. 3d at 599 (diversion of resources from core mission "qualif[y] as sufficient irreparable harm").

The injuries that these entities will suffer are already ongoing and irreparable, and they will only worsen with the passage of time. Injunctive relief is necessary to forestall them.

## IV.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF INJUNCTIVE RELIEF

Finally, Plaintiffs have established that "the balance of equities tips in [their] favor and that an injunction is in the public interest." *See Winter*, 555 U.S. at 20.  Because the government is the opposing party here, these factors merge. *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018).  The Court should weigh the "competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.  While Plaintiffs and class members face real and irreparable injuries without relief (*see supra* Point III), there is no real harm or public interest weighing against an injunction.

***First***, as set forth above (at p. 43), overwhelming evidence shows that the public interest that the Proclamations purport to serve—protecting the interests of U.S. workers—is not actually furthered by leaving them in place.  In fact, the Proclamations undermine that goal, by artificially preventing immigrants and foreign workers from fueling growth in consumption, innovation, and productivity.[40]  The Court should disregard any claim to the contrary.

***Second***, the public has no other interest in keeping the affected individuals out of the country.  All of their visa petitions have already been approved.  "[T]he public interest is seriously disserved by … family[] separation." *Pickett v. Hous. Auth. of Cook Cty.*, 114 F. Supp. 3d 663, 673 (N.D. Ill. 2015).  And Congress has found that immigrant diversity and admission of foreign workers are in the nation's interest. *See supra* pp. 5, 6-9.  There is no basis to contest those judgments.

***Third***, Defendants cannot claim a cognizable interest in the abstract idea of enforcing the

---

[40] In addition to the evidence cited above, in May 2020 a coalition of 324 employers and trade, industry, and higher education associations submitted to the President a letter detailing why the exclusion of highly-skilled nonimmigrants would be detrimental to the economy. *See* Corley Decl.

Proclamations.  "There is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice," *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). Conversely, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," *League of Women Voters*, 838 F.3d at 12 (citation and internal quotation marks omitted), including the APA, *Gulf Coast Mar. Supply, Inc. v. United States*, 218 F. Supp. 3d 92, 101 (D.D.C. 2016), *aff'd*, 867 F.3d 123 (D.C. Cir. 2017).

In short, any insubstantial, speculative, and temporary impact of immigration on the labor market is vastly outweighed by the specific and *permanent* harms that Plaintiffs and other class members will suffer absent an injunction.  The Court should grant relief.

## V.      SCOPE OF RELIEF

***Classwide Injunctive Relief Is Appropriate.***  Plaintiffs have moved concurrently for class certification, and Defendants have "acted … on grounds that apply generally to the class." *See* Fed. R. Civ. P. 23(b)(2).  Upon class certification, classwide injunctive relief is plainly authorized by Rule 23.  Moreover, the D.C. Circuit has "upheld the use of systemwide injunctions when the circumstances warrant them," *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 23 (D.D.C. 2018) (citing *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998)), and the Supreme Court has explained that the "scope of injunctive relief is dictated by the extent of the violation established," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Here, the relevant "circumstances" are that the President has issued Proclamations that adversely affect hundreds of thousands of individuals around the globe.  And the "violation[s] established" are equally sweeping: The Proclamations are invalid *in toto*, because they do not satisfy the lone statutory prerequisite for their issuance, and they are an affront to the separation of powers.  The same is true of the State

Department's unlawful no-visa policy.[41]  Neither the violations nor their effects are limited to this District or to these Plaintiffs, and there is no basis to allow Defendants to continue visiting harms on other individuals simply because they have not yet sued.  "Given the systemwide impact of [the Proclamations], a systemwide remedy is … appropriate." *Doe 2*, 344 F. Supp. 3d at 26.[42]

    ***Alternative Relief For Diversity Visa Plaintiffs.***  If the Court does not enjoin the Proclamations, it should order the State Department to reserve unused diversity visa numbers for fiscal year 2020, so that visas may be granted upon a determination that the Proclamations are unlawful.  *See P.K.*, 302 F. Supp. 3d at 8-10 (granting such relief).  Plaintiffs submit, however, that enjoining the Proclamations themselves is the better course.  The D.C. Circuit has not held that the district court had authority to grant the relief in *P.K.*[43]  If this Court grants only this alternative relief, and if the court of appeals eventually rules on the merits that such relief is impermissible, then the diversity visa Plaintiffs would be left with nothing.  Enjoining the Proclamations themselves is the only sure way to avoid that outcome.[44]

## CONCLUSION

    The Court should enter issue a preliminary injunction preventing Defendants from implementing or enforcing the Proclamations against Plaintiffs and the proposed classes.

---

[41] A classwide injunction is particularly appropriate as to the APA claim, given that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Nat'l Mining Ass'n*, 145 F.3d at 1409 (affirming nationwide injunction against unlawful regulation).

[42] Moreover, all of the Defendants will be amenable to suits filed in this District by future plaintiffs.  *See* 29 U.S.C. § 1391(e); FAC ¶ 13.  A classwide injunction would serve judicial economy by avoiding the necessity of filing additional piggyback cases in this Court.

[43] *Almaqrami v. Pompeo*, 933 F. 3d 774 (D.C. Cir. 2019), held only that a claim for such relief was "not so 'completely devoid of merit as not to involve a federal controversy.'" *Id.* at 782.

[44] Such alternative relief was necessary in *P.K.* because the district court did not issue its decision until the day before the annual diversity-visa deadline, leaving no time for visa processing.  The exigency in this case, while real and substantial, is not so extreme.

July 31, 2020

Jesse M. Bless (D.D.C. Bar No. MA0020)
AMERICAN IMMIGRATION LAWYERS
  ASSOCIATION
1301 G Street NW, Ste. 300
Washington, D.C. 20005
(781) 704-3897
jbless@aila.org

Karen C. Tumlin (*pro hac vice*)
Esther H. Sung (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org

Stephen Manning (*pro hac vice*)
Nadia Dahab (*pro hac vice*)
Tess Hellgren (*pro hac vice*)
Jordan Cunnings (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
nadia@innovationlawlab.org
tess@innovationlawlab.org
jordan@innovationlawlab.org

Respectfully submitted,

/s/ Andrew J. Pincus
Andrew J. Pincus (D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Cleland B. Welton II (*pro hac vice*)
MAYER BROWN MEXICO, S.C.
Goldsmith 53, Polanco
Ciudad de Mexico 11560
Telephone: (502) 314-8253
cwelton@mayerbrown.com

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
Justice Action Center Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
laboni@hoqlaw.com