**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DOMINGO ARREGUIN GOMEZ, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, President of the United States of America, et al.,

Defendants.

Civil Action No. 1:20-cv-01419

**DECLARATION OF LAURA RODNITZKY**

I, Laura Rodnitzky, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Chief People Officer of 3Q Digital, a fully integrated digital marketing agency headquartered in Chicago, with employees located in San Francisco, Chicago, Denver, Austin, San Diego, Raleigh, Charlottesville, Dublin, and Singapore. 3Q Digital is a Delaware corporation established in 2008, with its executive headquarters located at 25 East Washington Street, Suite 420, Chicago, Illinois 60602.

2. I began my career with 3Q Digital in 2009. After spending several years on the digital marketing production side of the company, where I actively serviced our client accounts and led a large team of production and reporting associates, I transitioned to the operational side of the business. After 2 years running company-wide change management projects and the overall business operations, I then transitioned onto the human resources team, and ultimately became the Chief People Officer in 2018. As Chief People Officer, I lead the teams responsible for talent acquisition, talent development, human resources, benefits, people analytics, DEI (diversity, equity, and inclusion), and employee engagement, and culture.

3. 3Q Digital is the largest independent digital marketing agency in the United States. In 2019, we had over $15 million in Gross Income. Our customer base includes leading brands such as Square, TurboTax, Mailchimp, TheRealReal, and Wine.com, and we partner with leading technology companies including Facebook, Twitter, Pinterest, LinkedIn, Google, Microsoft, and Apple Computers. For many of our customers, we manage their global digital marketing campaigns. 3Q Digital spends over a billion dollars on behalf of its clients and their marketing strategies every year.

4. 3Q is a worldwide industry leader and our clients expect quality service. Our best-in-class search, paid social media, and display techniques are combined with select technology partners and our in-house mobile, landing page optimization, design, and analytics teams for top-to-bottom campaign optimization. Over the course of many years, 3Q Digital has developed proprietary practices that, upon public distribution, have since become the industry standard. Our Alpha Beta campaign structure and Lin-Rodnitzky Ratio are considered best practices for measuring account health. Our proprietary single-objective social techniques have helped clients reach and convert high-performing new audiences. We offer our clients a unique Strategic Growth Assessment™, developed and executed by our Strategy Team, with recognition that the most significant opportunity for transcendent client growth integrates best-in-class channel management with wider-scope marketing levers.

5. We currently have 330 employees in the United States, consisting of U.S. Citizens and foreign nationals. More than 95% of our U.S. staff are U.S. citizens or Legal Permanent Residents. In addition to our operations in the United States, 3Q Digital has a global

presence. Our two international offices and six international employees serve our international clients.

6. The success of 3Q Digital thus far has been primarily due to the diligent efforts and dedication of our knowledgeable management and support staff, whose expertise has made 3Q Digital into a profitable company. We seek to hire the very best in the field, so that when our clients come to us with questions and problems that need to be solved, they know they are getting serious value for their money that they cannot get elsewhere. Our reputation—for being an industry leader, for being able to make our clients leaders in their own industries, and for being able to deliver integrated marketing strategies that allow our clients to grow their own businesses—is everything in a competitive marketplace. Hiring the best person possible for any opening we have allows us to anticipate and stay ahead of industry trends so that we can better serve our clients and position them for success. In a service industry, our people are our most valuable asset.

7. Because of the success we have built thanks to our employees, we have been able to truly support our employees and our clients during the economic downturn caused by the COVID-19 pandemic. Many of our competitor agencies suffered massive layoffs during these trying economic times. We furloughed approximately 3% of our staff in the spring, but have already been able to bring many of them back to full-time work, and we have not down-sized or laid off any U.S. workers due to COVID challenges. We also continue to give back to the communities where we have a presence. In fact, 3Q employees donated over $7,000 to national and local organizations during COVID and the recent turbulent movements facing our nation. We continue to provide services at a discounted rate for

companies impacted by COVID and provide pro bono services to non-profits around the country.

8. Recruiting and retaining the best talent includes employing international workers on H-1B visas when necessary. 3Q Digital has had great success with employing international workers on H-1B visas. We sponsor two to three H-1B employees every year and currently employ four such workers in our offices in the United States, all in positions that we simply could not fill with U.S. talent.

9. As a data-driven company, the scientific and analytic background that many of our H-1B employees have is highly valuable and not easily found in many applicants, which empowers our company to continue to evolve. We strive to stay abreast of market trends, such as the movement towards decision sciences and analytics. The H-1B program has allowed us to strengthen our competitiveness by hiring workers with specialized skillsets, including deep analytics analysis.

10. We have also found that an international workforce leads to more creativity and productivity in the workplace, thanks to the diversity of perspectives and experience. This not only helps us to build a rich and more fulfilling workplace culture for all employees, but helps us develop successful global strategies for clients who are trying to reach a global customer base. Our ability to bring broad and diverse perspectives to the table is increasingly demanded by both current and potential clients, whose diversity-and-inclusion initiatives require that the vendors they hire have a diverse employee base, so as to better develop successful global strategies.

11. Our H-1B employees have made invaluable contributions to 3Q's success, enhancing our reputation for global excellence, expanding our service offerings, and boosting our overall

revenues by using their unique and specialized skill sets to develop new and creative solutions for our clients. Our H-1B employees are critical to our expansion plans, both domestically and worldwide. Improving the quality of our client services, enhancing our data analytics, and leading on diversity-and-inclusion initiatives for our clients—and thus staying ahead of market trends and giving our clients a competitive edge in their own industries—would not be possible if we could not hire H-1B workers.

12. Our employees best serve our needs when they are able to be present in our U.S. offices or onsite with our clients. Barring that, at the very least, our employees best serve our needs when they are in the same or similar time zone as their team members and client. These requirements exist because the innovations that our employees create are best attained through the collaborative environment we have at 3Q. It is extremely challenging, if not impossible, recreate through online interaction the creativity and productivity that our employees generate through collaborative, in-person innovation—whether at 3Q's offices or on-site with clients. It is thus critical that we be able to bring the best and the brightest people we can hire to the United States through the H-1B visa program. Working remotely is not a viable, long-term solution.

13. On or about March 30, 2018, 3Q Digital filed an H-1B nonimmigrant visa petition with U.S. Citizenship and Immigration Services (USCIS) on behalf of Mr. Balaji Bhat. We wish to hire Mr. Bhat as a Search Engine Marketing Account Manager in our San Francisco office. As a Search Engine Marketing Account Manager, Mr. Bhat will be responsible for the design and execution of paid search strategy, managing projects for client accounts, and acting as the primary paid search point of contact for assigned clients by answering client emails and leading weekly calls. He will drive paid search strategy for top-tier

clients; create roadmaps, plan strategic initiatives, and optimize efforts to hit client goals and targets; set and hit client targets for both volume and return on investment; identify and execute tasks that will have the most significant impact on hitting targets; quantify and prioritize initiatives and opportunities accordingly; monitor campaigns to ensure an account is pacing well relative to budgets and targets; and implement testing initiatives in key areas such as ad creatives, landing-page messaging, landing-page layout, audience segmentation, placements, networks, and third-party tools. Mr. Bhat's work is essential to meeting our largest client's needs and is essential to retaining their business.

14. At the time of filing the H-1B petition, Mr. Bhat was already employed at 3Q Digital as a Search Engine Marketing Account Manager pursuant to F-1 OPT (optional practical training) status. He sought a change of status to H-1B nonimmigrant status in conjunction with our petition. Prior to joining 3Q Digital, Mr. Bhat earned a bachelor's degree in Economics and a Certificate in New Media and Humanities from the University of Massachusetts in Amherst, Massachusetts.

15. We sponsored Mr. Bhat for an H-1B visa because he has been working on a significant client account for the past three years and, through his creativity and skill set, he has built up the client relationship in a way that no one else would be able to replicate easily. As one of the longest-standing 3Q team members on this client's account, He has developed intimate knowledge of the client, their marketing needs, the history of prior strategies and what has been successful and what has not. He combines this knowledge with his own creative talent to develop the strategy of how to spend the client's marketing budget and translate that into success. However, this client requires on-site service because 3Q Digital's marketing strategies are integrated into the client's business. The client further

demands that 3Q Digital staff its account with employees who are available to work in the same time zone. Staffing their account in this manner has been necessary to help them become, and will be necessary to allow them to remain, a leader in their industry.

16. Because of the irreplaceable contributions Mr. Bhat brings to this significant client account and ultimately to our bottom line, 3Q Digital has gone to extraordinary lengths to retain Mr. Bhat as an H-1B employee. On June 22, 2018, USCIS issued a Request for Evidence requesting additional evidence that the role of Search Engine Marketing Account Manager is a specialty occupation requiring a minimum of a bachelor's degree in a specific field. On September 13, 2018, we responded to the Request for Evidence. On November 27, 2018, USCIS denied our H-1B petition.

17. Mr. Bhat's OPT work authorization expired on September 30, 2018, and he was forced to depart the United States after his work authorization document expired. His departure represented a significant setback for us because of our client's demand for on-site service and same-time-zone availability. Ever since he departed the United States in 2018, Mr. Bhat has continued to work for 3Q Digital and this significant client account from abroad, first as a contractor and then as an employee through our Singapore entity. He has maintained U.S. working hours in order to do so, which has been extraordinarily difficult for both Mr. Bhat and his colleagues in the United States. Singapore is literally on the other side of the world—and therefore in an opposite time zone—which putts the United States' working hours and Singapore's working hours at opposite times of day. Since 2018, Mr. Bhat has been waking up at 10-11 pm his time from Sunday until Thursday to meet the same-time-zone requirement. He has been unable to lead a normal life in Singapore,

keeping as he does opposite hours from everyone around him. Keeping these hours is not sustainable for him.

18. Mr. Bhat's skills and experience are so valuable to 3Q Digital that in March 2019, we filed a lawsuit against USCIS pursuant to the Administrative Procedures Act in the U.S. District Court for the District of Columbia. We filed for summary judgment on June 28, 2019. On March 6, 2020, the Court found that USCIS abused its discretion in denying our H-1B petition. On June 15, 2020, after we followed up with the U.S. Attorney's Office regarding the decision, USCIS approved our H-1B petition on behalf of Mr. Bhat as valid from June 15, 2020 until September 6, 2021.

19. It took more than three months from the date of summary judgment being granted to USCIS approval of our H-1B petition—and that only occurred upon our prodding the U.S. Attorney's Office. Mr. Bhat immediately began compiling all the necessary paperwork, and within a week of receiving approval, on June 24, 2020, filed a DS-160 Nonimmigrant Visa Form and simultaneously began the process to request an emergency H-1B visa interview, as all U.S consulates at the time were closed for routine visa appointments due to the worldwide coronavirus pandemic.

20. On June 22, 2020, before Mr. Bhat was able to obtain an H-1B nonimmigrant visa appointment, President Donald J. Trump issued an executive order suspending the issuance of several categories of nonimmigrant visas beginning on June 24, 2020. Because the suspension included H-1B visas, Mr. Bhat remains in Singapore to this day, awaiting the opportunity to apply for an H-1B visa stamp and enter the United States to continue working for 3Q Digital.

21. To date, 3Q has spent over $36,000 to procure an H-1B visa for Mr. Bhat. We will not be able to recognize any return on that investment until he can return to the United States.

22. It is not possible to overstate the value that Mr. Bhat brings to 3Q, our client service, our teams' productivity and creativity, and our competitive advantage. It is for this reason that we have continued our efforts to bring Mr. Bhat back to the United States to work with our employees and clients here. Our inability to do so thus far has affected 3Q's business plans in the following ways:

    a. As noted above, Mr. Bhat is staffed on one of 3Q's largest and most important client accounts, and his work contributes to the large growth that this client is experiencing. This staffing decision reflects the significant value-add Mr. Bhat brings to 3Q's work for this important client, as well as the value the client has placed on Mr. Bhat's contributions—thanks in large part to the unique client relationship Mr. Bhat has developed. But while Mr. Bhat remains in Singapore, 3Q is unable to obtain the collaboration and synergies we otherwise would be able to recognize if he was in the same country and time zone as the client and the rest of the team members. Such in-person collaboration and innovation cannot be recreated through remote work. Our inability to staff our best team on our top accounts undermines the service we are able to provide and, ultimately, our reputation as a leader in the industry.

    b. Because Mr. Bhat is unable to work the same hours as the rest of the team, he is unable to pursue team management opportunities within the team, to the detriment of 3Q. In our industry, it is unheard of for someone to have as much tenure and experience as Mr. Bhat, but not yet be able to transition into a people-management

role, to teach, mentor, and grow other employees. But Mr. Bhat has not been able to move into such a position and share his knowledge and experience with other people at 3Q, because such mentorship is only truly effective with in-person client and colleague interactions. Because Mr. Bhat cannot be here in the United States, 3Q cannot promote him to a people-manager role, and we are thereby losing the ability to capitalize on his skills and experience, both from a people development standpoint, as well as a higher billable rate to the client, and enhanced revenue for 3Q, should Mr. Bhat advance to such a people management role. We will not be able to truly recognize the value that he can bring to our company until he is able to return to the United States.

c. Additionally, our U.S.-based team members are sometimes required to work non-standard hours to be able to sufficiently overlap with Mr. Bhat, causing a burden on those individuals that could lead to potential burn-out if it needed to happen for a sustained period of time. Starting work prior to 8 am or scheduling calls well past 5 pm local time is not uncommon for our U.S.-based team.

d. If Mr. Bhat cannot return to the United States before his H-1B status expires in September 2021, looking for a U.S.-worker replacement for the value that Mr. Bhat brings to the client and 3Q teams would be challenging, to say the least. Because of the skill set Mr. Bhat brings to 3Q, combined with three years of building client relationships and developing detailed knowledge of our client's account, it would be onerous and costly to find someone to adequately step into his shoes. And even then, any replacement would not have the same client relationship and trust that Mr. Bhat has developed.

e. Because Mr. Bhat is overseas, our ability to enroll him in training and development activities are diminished. This minimizes our ability to invest in the talent we see in Mr. Bhat, to the detriment of 3Q Digital.

f. Due to the significant time zone differences, Mr. Bhat is only able to overlap with our client and his team members four days per week, and not for the entire workday. Additionally, to have sufficient overlap, Mr. Bhat is working midnight hours, local time. In fact, 3Q Digital ends up expending additional resources in order to make up for the time zone difference, resources that could be more effectively and efficiently deployed elsewhere if Mr. Bhat were in the United States.

g. As Mr. Bhat is the search engine marketing specialist on the large client account to which he is assigned, 3Q Digital misses out on strategic collaboration that would occur through organic brainstorming. 3Q Digital also misses out on discussions that would otherwise occur through inter-office interactions, which is critical for success.

h. In short, as long as Mr. Bhat is unable to come to the United States, 3Q's productivity and innovation will be harmed in ways that can never be recouped if our reputation suffers harm as a result.

i. Due to his non-resident status in Singapore, 3Q has been forced to pursue immigration authorization for Mr. Bhat from the Singapore government, which causes additional administrative and financial burdens that we would not incur if he were back in the United States. In particular, Mr. Bhat's Employment Pass for Singapore will expire in October 2020, and 3Q Digital is currently going through the necessary administrative steps to ensure that he is able to continue working in

Singapore, since it is still unclear when he will be able to return to the United States. But for the Presidential Proclamation, we would not have to incur these expenses and additional administrative obligation. And once these expenses are incurred, they will be unrecoverable.

23. I am unaware of any reason, aside from the June 22 Proclamation, that would prohibit Mr. Bhat from receiving his visa to the United States.

24. In addition, because of the Presidential Proclamation, Mr. Bhat is unable to be with his family in San Francisco, CA and is having to manage the physical and mental toll that comes from the strain of working irregular hours in Singapore to have at least some overlap with the team and clients. The indeterminate amount of time that Mr. Bhat is left in limbo waiting to hear if/when he will be able to come back to the United States further exacerbates the impact of this order.

25. Apart from depriving us specifically of Mr. Bhat's invaluable contributions to the company, the Presidential Proclamation prevents us from hiring H-1B employees generally. Without H-1B employees, we will have great difficulty maintaining our quality of service and competitive edge. The best employee for a position is not always a U.S. worker, but the Presidential Proclamation limits the candidates we may consider. This harms our ability to remain nimble during a turbulent economic environment, find the best talent, and further harms our diversity and inclusion efforts as a company. Although we are not an H-1B dependent firm, we will hire them when they are the best candidate for an opening. And sometimes, H-1B applicants have been the only acceptable candidate for an opening. For example, we had a job opening for well over a year that was ultimately filled with an H-1B candidate. In an extremely competitive marketplace, the talent we recruit and

retain is how we maintain our industry leadership and our stellar reputation with our clients. We anticipate, for example, movement in our industry in the next six months towards stronger data analytics and also diversity-and-inclusion efforts that support more effective global marketing strategies. We need to be able to remain ahead of these trends by hiring the H-1B professionals who bring these skills and diversity of perspectives to the table. 3Q has specific diversity-and-inclusion metrics to meet by December 2020, and the Proclamation hamstrings our efforts to hire and retain the talent that allows us to be a first-mover on industry developments and meet these internal goals. This is particularly harmful to us at a time when we need every competitive advantage to maintain our success as the largest independently owned digital marketing agency. Without being able to hire employees who require H-1B sponsorship, we will miss out on their talent that enables to give our clients what they demand. This lost opportunity and inability to hire the best candidates will harm our reputation and thus our market share in the industry.

26. The President's ban deprives companies like ours from temporarily employing talented foreign nationals in the manner Congress provided in the immigration laws and regulations. It is difficult for me to understand why the President believes our sponsorship of foreign nationals for H-1B petitions would somehow take away from the United States' economic recovery. Our preference is to hire U.S. workers, but when we are unable to fill key roles that are critical to our own and our clients' success with U.S. workers, we expand our search and often find talented foreign nationals who are fantastic fits for 3Q Digital and who boost our productivity and innovation for our clients—and therefore for the U.S. economy. Just as these foreign nationals contribute to our successes, our inability to recruit and hire these critical workers detracts from our successes and our overall performance.

27. 3Q Digital is willing to serve as a class representative on behalf of those who are similarly situated.

28. I know that if the class is certified we will be representing more than our company in this case and would represent the similar interests of a large number of employers with approved nonimmigrant visa petitions that will be subject to the President's Proclamation, and thus cannot have the visas issued to their sponsored employees without meeting new requirements enforced and implemented by the Department of State and other government agencies. I have spoken with the lawyers who represent me about what being a class representative means. I am willing and able to help similarly situated employers because we are all suffering due to the unfair restrictions on the entry of nonimmigrant workers imposed by this Administration.

29. I understand that a class representative has claims that are typical of members of the class. By typical, I understand that our claims against Defendants are like the claims of other U.S. employers in the class because 3Q Digital and each of them has, or will receive the same unlawful treatment pursuant to the Proclamation and its implementation at consulates.

30. On behalf of 3Q Digital, I know of no conflict which would prevent it from being a representative of other U.S. employers in the same situation. I have the authority to state on behalf of 3Q Digital that it is willing to accept this role.

Executed this 23th day of July 2020 at Chicago, IL.

DocuSigned by:
Laura Rodnitzky
AC9B842F45594AC...

Laura Rodnitzky, Chief People Officer
3Q Digital