# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOMINGO ARREGUIN GOMEZ, et al. ) <br> ) <br> Plaintiffs ) <br> ) <br> v. ) <br> ) <br> DONALD J. TRUMP, et al. ) <br> ) <br> Defendants ) <br> ) <br> _____) | Civil Action No. 1:20-cv-01419 |

### BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Charles H. Kuck
Kuck Baxter Immigration, LLC
365 Northridge Rd, Suite 300
Atlanta, GA 30350
(404) 816-8611
ckuck@immigration.net

Gregory H. Siskind
Johnna J. Main Bailey*
Siskind Susser, PC
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com
jmainbailey@visalaw.com

*Pro hac vice admission pending

TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………3

Interest of Amici Curiae ................................................................................................... 5

Argument ........................................................................................................................5

1. Presidential Proclamations violate United States obligations under the World Trade Organization General Agreement on Trade in Services……………........................6

A. The United States is a Member of the WTO......................................................6

B. The United States is a Signatory to the WTO's General Agreement on Trade in Services Which Requires the U.S. to Admit L-1 Nonimmigrants..........................7

C. The Presidential Proclamation of June 22, 2020 Will Cause the U.S. to be in Violation of the GATS......................................................................................9

D. The WTO Provides a Dispute Resolution Venue……………..………….....…10

E. The Threat of Retaliation……………………………………………………...11

Conclusion ..................................................................................................................12

TABLE OF AUTHORITIES

**Treaties:**

General Agreement on Trade in Services (GATS), text of the GATS can be found at https://www.wto.org/english/docs_e/legal_e/26-gats_01_e.htm....................................................7

    Article I(2)(a)-(d)………………………………………….……………………………7

    Article XIX………………………………………………..……………………..……..7

    Article XXI………………………………………………...……………….…..……….7

**Other Sources:**

DS503: United States — Measures Concerning Non-Immigrant Visas. Available at https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds503_e.htm...........................................10

National Foundation for American Policy: NFAP Policy Brief, "Legal Analysis: Fee Increase on H-1B Visas Likely Violates U.S. Commitments Under GATS," analysis by Stephen Claeys (January 2011). Available at http://www.nfap.com/pdf/0111H1BFeeIncreaseandGATS_NFAPPolicyBrief.pdf........................9

"Number of U.S. workers employed by foreign-owned companies is on the rise" by Kristen Bialik (December 14, 2017). Available at https://www.pewresearch.org/fact-tank/2017/12/14/number-of-u-s-workers-employed-by-foreign-owned-companies-is-on-the-rise/........................................................................................................................................9

Schedule of U.S. commitments under the GATS. Available at https://www.citizen.org/documents/GATS98.pdf, pages 31 through 36………………...………..8

"The United States and the World Trade Organization" USTR Archives (December 2011). Available at https://ustr.gov/about-us/policy-offices/press-office/blog/2011/december/united-states-and-world-trade-organization ................................................................………………..7

Visas Issued by Fiscal Year, available at https://infogram.com/figure-1-l-1-visas-issued-by-fiscal-year-1hke60rjro0165r ........................11

World Trade Organization member country profile for the United States. Available at https://bit.ly/3fnKRDg....................................................................................................6

"World Trade Organization, Understanding the WTO: Settling Disputes – A unique contribution".  Available at https://www.wto.org/english/thewto_e/whatis_e/tif_e/disp1_e.htm.............................................6

INTEREST OF *AMICUS CURIAE*

Gregory Siskind, a graduate of Vanderbilt University and the University of Chicago Law School, has practiced immigration law since 1990. He is the author of six books including the J-1 Visa Guidebook, a treatise published annually by Lexis-Nexis since 1997. He has served for the past ten years on the Board of Governors of the American Immigration Lawyers Association and was awarded AILA's Advocacy Award in 2020. He writes this brief in his individual capacity as an expert on immigration law.

Charles Kuck earned his J.D. degree, cum laude, from Arizona State University Law School in 1989. He is admitted to practice law in Washington, D.C., Georgia, and Arizona. He has taught immigration law as a professor for over 20 years at Emory Law School and the University of Georgia Law School. He is the author of numerous law review articles and op-eds on various U.S. immigration law subjects, and has spoken at hundreds of legal, industry business, and civic organization on immigration. He has testified before Congress on numerous occasions on immigration and is frequently quoted by the press due to his immigration expertise. Charles Kuck is a former National President of the American Immigration Lawyers Association.

Johnna Main Bailey practices immigration law at Siskind Susser. She writes this brief in her individual capacity. Siskind, Kuck, and Main Bailey are not counsel to either party of the suit, nor have they received payment for the preparation of or submission of this brief. Siskind, Kuck, and Main Bailey submit this brief in order to address a legal issue not discussed in the Complaint.

ARGUMENT

**1. Presidential Proclamations violate United States' obligations under the World Trade Organization General Agreement on Trade in Services.**

    **A. The United States is a Member of the WTO**

The World Trade Organization ("WTO") is an international organization charged, in part, with resolving disagreements involving trade issues between its member countries. The United States has been a Member of the WTO since January 1, 1995.[1]

As a member of the WTO, the United States may challenge the behavior of other member nations that the United States believes have violated their commitments to the WTO. [2] Likewise, the United States may be challenged by other member nations who believe the United States has violated its commitments to the WTO. *Id*.

The Office of the United States Trade Representative described the critical importance of the WTO to the United States:

> *"The United States is an original member of the WTO and a steadfast supporter of the rules-based multilateral trading system that it governs. Working through the WTO, the United States is able to protect and advance the economic interests of American businesses and workers while opening foreign markets. These actions protect and create jobs and support economic growth here at home. The United States is also a world leader in securing the reduction of trade barriers to expand global economic opportunity, to*

---

[1] See World Trade Organization member country profile for the United States. https://bit.ly/3fnKRDg.
[2] See "World Trade Organization, Understanding the WTO: Settling Disputes – A unique contribution", available at https://www.wto.org/english/thewto_e/whatis_e/tif_e/disp1_e.htm.

BRIEF OF AMICUS CURIAE

6

*raise standards of living, and to reduce poverty. The WTO agreements also provide a foundation for U.S. bilateral and regional agreements…"*[3]

**B. The United States is a Signatory to the WTO's General Agreement on Trade in Services Which Requires the U.S. to Admit L-1 Nonimmigrants.**

The General Agreement on Trade in Services[4] went into effect on January 1, 1995 simultaneously with the creation of the WTO and governs trade in services between signing countries. The GATS is binding on the United States as well as the rest of the WTO's member countries.

The GATS governs various types of services. Article 1 lists two such services that are relevant to U.S. immigration law: Mode 3 (the supply of a service by a service supplier of a WTO Member) and Mode 4 (the supply of a service by a service supplier of one Member, through the presence of natural persons of a Member).[5]

Signatories to the GATS made specific commitments regarding the terms, limitations, and conditions on market access and the conditions and qualifications on national treatment.[6] A schedule for each signatory country, including the United States, is attached to the GATS laying out that country's obligations. The GATS has a process whereby member nations may seek to revise their commitment schedule.[7]

---

[3] See "The United States and the World Trade Organization" USTR Archives (December 2011). https://ustr.gov/about-us/policy-offices/press-office/blog/2011/december/united-states-and-world-trade-organization.
[4] The text of the GATS can be found at https://www.wto.org/english/docs_e/legal_e/26-gats_01_e.htm.
[5] General Agreement on Trade in Services, Article I(2)(a)-(d).
[6] GATS, Article XIX.
[7] GATS, Article XXI.

The United States Schedule of Commitments under the General Agreement on Trade in Services[8] contains the following language with respect to L-1 intracompany transfer visas:

| Modes of supply: | 1) Cross-border supply   2) Consumption abroad   3) Commercial presence   4) Presence of natural persons | | |
|---|---|---|---|
| Sector or subsector | Limitations on market access | Limitations on national treatment | Additional commitments |
| | <u>Intra-corporate Transferees</u> - managers, executives and specialists, as defined below, who are employees of firms that provide services within the United States through a branch, subsidiary, or affiliate established in the United States and who have been in the prior employ of their firm outside the United States for a period of not less than one year immediately preceding the date of their application for admission and who are one of the following:<br><br>a) Managers - persons within an organization who primarily direct the organization, or a department or sub-division of the organization, supervise and control the work of other supervisory, professional or managerial employees, have the authority to hire and fire or recommend hiring, firing, or other personnel actions (such as promotion or leave authorization), and exercise discretionary authority over day-to-day operations. Does not include first-line supervisors, unless the employees supervised are professionals, nor does it include employees who primarily perform tasks necessary for the provision of the service. | | |
| | b) Executives - persons within the organization who primarily direct the management of the organization, establish the goals and policies of the organization, exercise wide latitude in decision-making, and receive only general supervision or direction from higher-level executives, the board of directors, or stockholders of the business. Executives would not directly perform tasks related to the actual provision of a service or services of the organization.<br><br>c) Specialists - persons within an organization who possess knowledge at an advanced level of continued expertise and who possess proprietary knowledge of the organization's services, research equipment, techniques, or management. (Specialists may include, but are not limited to, members of licenced professions.)<br><br>Entry for persons named in this section is limited to a three-year period that may be extended for up to two additional years for a total term not to exceed five years. | | |

---

[8] The Schedule of U.S. commitments under the GATS can be found at https://www.citizen.org/documents/GATS98.pdf on pages 31 through 36.

| | Personnel Engaged in Establishment - A person who has been employed in the immediately preceding year by an entity described in Section II, receiving remuneration from that source, who occupies a managerial or executive position with that entity and is entering the territory of the United States for the purpose of establishing an entity described in Section II that will support employment of persons named in paragraphs a), b), and c) therein. The subject persons shall present proof of acquisition of physical premises for the entity that shall commence its business operations within one year of the date of entry of that person. | | |
|---|---|---|---|

In short, the GATS requires the United States to admit L-1A and L-1B nonimmigrants, the intracompany transfer category that allows foreign-owned companies as well as U.S.-based multinational corporations to bring in key executives, managers and specialized employees.

**C. The Presidential Proclamation of June 22, 2020 Will Cause the U.S. to be in Violation of the GATS.**

On June 22, 2020, President Trump signed a proclamation (the "June Proclamation") that eliminates for the rest of 2020 – and potentially indefinitely – the entry of a variety of immigrant and nonimmigrant visas. Among them are individuals seeking entry on L-1 visas. The denial of visas to individuals otherwise qualifying for L-1 visas is a clear violation of the GATS. The GATS calls for the admission of L-1A and L-1B nonimmigrants and the June Proclamation contains an outright bar on the issuance of any visas in the category.[9]

The potential impact on international commerce could be severe. Nearly seven million Americans work for foreign-owned companies in the U.S. and this accounts for 5.5% of all U.S. private sector employment.[10]

---

[9] The National Foundation for American Policy has analyzed the impact of prior immigration changes on GATS compliance and its findings are instructive. They can be found at http://www.nfap.com/pdf/0111H1BFeeIncreaseandGATS_NFAPPolicyBrief.pdf and http://www.nfap.com/pdf/GATSLegalAnalysis_NFAPPolicyStudy_June2010.pdf

[10] "Number of U.S. workers employed by foreign-owned companies is on the rise" by Kristen Bialik (December 14, 2017). https://www.pewresearch.org/fact-tank/2017/12/14/number-of-u-s-workers-employed-by-foreign-owned-companies-is-on-the-rise/.

BRIEF OF AMICUS CURIAE

9

There is no doubt that a high percentage of these companies would have considered locating elsewhere if they believed they would not be able to send overseas representatives of the company to be able to oversee their U.S. operations. The GATS is supposed to prevent this result and thousands of companies have relied on it for more than a quarter century.

### D. The WTO Provides a Dispute Resolution Venue

The brazen violation of the GATS by the Trump Administration is not likely to go unchallenged by other WTO members. Indeed, the U.S. has been challenged for much lesser violations.[11] The process through which a WTO member nation disputes the behavior of another member nation is largely focused on discussions ("consultations") between the countries involved.[12]

When consultations alone do not lead to a resolution of a dispute between member nations, the WTO dispute resolution process also allows for decision-making by a panel of member nations. The process involves various stages in a typical WTO dispute settlement case.

---

[11] For example, in March 2016, India filed a dispute with the WTO against the United States. DS503: United States — Measures Concerning Non-Immigrant Visas, available at https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds503_e.htm. India's request alleged that the United States violated its obligations under GATS by imposing increased fees on certain applicants for L-1 and H-1B categories of non-immigrant visas. The complaint also alleged that the United States had, in violation of its specific numerical commitment to allow up to 65,000 H1-B visas each year for "Fashion Models and Specialty Occupations," entered into trade agreements with Singapore and Chile and each of those trade agreements effectively reduced the number of H1-B visas that the United States committed to granting on an annual basis under GATS. It is worth noting that El Salvador joined India in challenging the propriety of United States actions within the context of GATS. India's dispute against the United States, filed in 2016 and not yet settled (according to information available on the WTO's website), is an example of the type of challenges that the United States may face if the Presidential Proclamations are allowed to stand.

[12] https://www.wto.org/english/tratop_e/dispu_e/disp_settlement_cbt_e/c6s2p1_e.htm.

The panel stage[13] involves the issuances of a report recommending a solution to the dispute. The solution will be implemented or an agreed upon amount of compensation will be paid, with input from the parties.

If the solution is not implemented and compensation is not agreed upon, the prevailing party in the WTO dispute resolution process may seek permission from the WTO to retaliate against the losing party. Retaliation comes in the form of trade sanctions against the offending party.

**E. The Threat of Retaliation**

The June Proclamation impacts tens of thousands of workers from countries around the world[14] and it is very possible a large number of countries will seek redress for the U.S. violation of the treaty. Should the dispute result in impacted countries retaliating against the U.S. per the WTO's dispute resolution process, the consequences for Americans working abroad and U.S. companies operating around the world could be severe.

The State Department estimates that there are nine million American citizens living abroad.[15] And there are thousands of U.S. companies operating overseas that could find their owners in the U.S. are no longer able to manage their overseas operations. In short, the June Proclamation could put millions of U.S. workers' jobs overseas at risk and cost American companies an incalculable fortune.

---

[13] https://www.wto.org/english/tratop_e/dispu_e/disp_settlement_cbt_e/c6s3p1_e.htm
[14] In recent years, more than 75,000 L-1s are typically issued by U.S. consulates. https://infogram.com/figure-1-l-1-visas-issued-by-fiscal-year-1hke60rjro0165r.
[15] https://web.archive.org/web/20180313184411if_/https://travel.state.gov/content/dam/travel/CA_By_the_Numbers.pdf.

BRIEF OF AMICUS CURIAE

## CONCLUSION

The Plaintiffs have provided plenty of reasons why the June Proclamation is disastrous and illegal. They did not, however, delve into the issue of U.S. international agreement obligations. It is not necessary for the court to consider the issue of whether the Plaintiffs have the legal right to sue based on the GATS. It is enough that the court merely consider the economic impact of retaliation by GATS signatories.  The Trump Administration is citing helping U.S. workers as the sole basis for the June Proclamation. However, the Proclamation clearly runs counter to our obligations under the GATS and it is quite foreseeable that we will eventually find U.S. workers overseas being terminated and deported and U.S. companies forced to close their operations or run them at great risk with no oversight from American executives and managers.

Respectfully submitted,

By:  KUCK BAXTER IMMIGRATION LLC,

/s/ *Charles H. Kuck*
Charles H. Kuck, Esq.
365 Northridge Road, Suite 300
Atlanta, GA 30350
Phone: (404) 816-8611
Fax: (404) 816-8615

By:      /s/  *Greg Siskind*
Gregory H. Siskind
Johnna J. Main Bailey*
Siskind Susser, PC
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com
jmainbailey@visalaw.com

*Pro hac vice admission pending

## CERTIFICATE OF FILING AND SERVICE

I, Charles Kuck, hereby certify that on August 7, 2020, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

Respectfully submitted,

KUCK BAXTER IMMIGRATION LLC,

/s/ *Charles H. Kuck*
Charles H. Kuck, Esq.
365 Northridge Road, Suite 300
Atlanta, GA 30350
Phone: (404) 816-8611
Fax: (404) 816-8615