## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOMINGO ARREGUIN GOMEZ, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Civil Action No. 1:20-cv-01419

## SECOND AMENDED COMPLAINT

1.      On June 22, 2020, President Trump signed a proclamation (the "June Proclamation") that, with the stroke of a pen, eliminates for the rest of the year—and for an indefinite period going forward—a vast portion of the country's immigration system.  The White House itself estimates that the President's action will block approximately 525,000 work-authorized individuals from coming to the United States by the end of the year.  Experts estimate, based on data from prior years, that the Proclamation will prevent approximately 20,000 employers from bringing needed workers into the United States.

2.      The Proclamation is part of a series of measures intended to achieve the goal of substantially shutting down congressionally authorized immigration to the United States.  In addition to the ban of immigrants and the ban of nonimmigrants effectuated by the Proclamation, the Administration has significantly reduced refugee and asylee admissions to the United States, taken multiple steps to remove international students from the United States, indefinitely closed U.S. consulates around the world and announced the furlough of approximately 80% of the employees of USCIS.

3.      Through the latest Proclamation, the President has indefinitely separated families, thrown the business plans of U.S. companies into chaos, eliminated visa categories that allow hundreds of thousands of foreign nationals to live and work in the United States, and rejected decades of Congressional judgments on the terms and conditions upon which individuals may come to this country.

4.      The Proclamation extended and expanded an earlier April 22, 2020 ban on the entry of immigrants (the "April Proclamation," and together with the June Proclamation, "the Proclamations").  The President seeks to justify this action by pointing to the "extraordinary economic disruptions caused by the COVID-19 outbreak" and by professing a need to "protect unemployed Americans from the threat of competition for scarce jobs from new lawful permanent residents" and foreign-born workers.  Based on the assertion that the nation's immigration system "lack[s] sufficient alternative means" to address this problem, the June Proclamation effectively eliminates most of the family- and employment-based immigrant visa categories, the diversity visa program, and the H-1B, H-2B, J, and L nonimmigrant visa programs.  The June Proclamation will remain in effect for the rest of the year and enables the President to continue these entry bans thereafter as long as he deems them "necessary."

5.      The June Proclamation's entry bans, however, rest on a fatal, flawed assumption: that there is a fixed number of jobs in this country for which competition is a zero-sum game, such that the admission of immigrants and foreign-born workers necessarily "poses a risk of displacing and disadvantaging United States workers during the current recovery."  But Congress has already rejected that premise, and so has the overwhelming weight of economic research.  There is no evidence showing that immigrants and foreign-born workers "displace" U.S. workers, while there is overwhelming evidence that immigrants and foreign-born workers create additional jobs in the

United States by consuming goods and services, innovating, and contributing to human and physical capital formation, all of which are essential to long-term and sustained economic growth.

6. The June Proclamation's entry restrictions are irrational, undermining its asserted goals of protecting U.S. workers and aiding the country's economic recovery during and after the COVID-19 pandemic. The ban affects foreign-born workers, innovators, entrepreneurs, and consumers upon whom the economy relies on for stability and continued growth, and hamstrings U.S. companies around the country from effectively managing their labor needs. For example, it prevents frontline physicians who would be represented by Plaintiff SEIU Healthcare (CIR) from entering the country in the midst of a pandemic. It also prevents Plaintiff PowerTrunk, Inc.—a communications technology innovator that sells novel and exclusive technology to entities such as New Jersey Transit and Los Angeles International Airport—from bringing to the United States its most qualified and knowledgeable employee.

7. The June Proclamation's entry suspensions also ban thousands of individuals who are not authorized (or who do not intend) to work in the United States, and who therefore cannot contribute to the purported labor-market problem that the Proclamation is supposedly meant to address. Banning entry of such individuals only prevents them from contributing their purchasing power to the U.S. economy. Instead of protecting the U.S. labor force, the June Proclamation *endangers* the country's economy—to the ultimate detriment of U.S. workers.

8. Even apart from harming the economy and reducing U.S. companies' global competitiveness, the June Proclamation inflicts an intolerable human cost by separating thousands of families, in defiance of one of the bedrock principles of our country's immigration system— family unification. For many families who were on the cusp of reuniting, the June Proclamation prolongs their separation, preventing husbands and wives, parents and children, and grandparents

and grandchildren from starting their lives together in the United States.  For example, Plaintiff Nazif Alam has been separated from his wife for two years already—and if she is not admitted into the country soon, she will lose her opportunity to pursue a Master's degree at Cornell University.  Plaintiff Carmen Ligia Pimentel was expected to give birth to her first child today, even as her husband has been stranded in the Dominican Republic.

9.      The effects on winners of the 2020 Diversity Visa Lottery program are even more extreme.  By virtue of winning the lottery, these individuals secured a statutorily guaranteed, once-in-a-lifetime opportunity to immigrate to the United States.  But in order for these individuals to realize that congressionally created opportunity, their visas must issue by a statutorily mandated deadline of September 30, 2020 (the end of the 2020 fiscal year).  Because the June Proclamation extends beyond that deadline, and because Defendants have implemented the Proclamations to forbid not only *entry* but also the antecedent step of *issuing a visa*, the result is to unilaterally and permanently revoke diversity lottery winners' visa eligibility.  And that in turn will mean that highly qualified visa applicants from around the world—from Gambia and Cote D'Ivoire, Albania and Tajikistan, Nepal and Japan—may **never** have the opportunity either to pursue their American dreams or to promote Congress's goal of increasing the diversity of this country's immigrant populations.

10.      All of this is unlawful.  Congress has already considered and rejected the immigration cuts the President seeks to implement unilaterally through the June Proclamation.  Over the course of seven decades, Congress consistently has maintained and expanded the U.S. immigration system, even in the face of severe economic contractions, striking a considered balance between protecting domestic jobs and encouraging immigration to reunify families, promote diversity, and give domestic employers the necessary tools to manage their workforces

and weather economic downturns.  The June Proclamation seeks to unilaterally rewrite the federal immigration laws, imposing new and harsh restrictions that Congress has refused to adopt.  In so doing, the June Proclamation contravenes multiple provisions of the Immigration and Nationality Act (INA), exceeds the scope of the President's statutory authority, and violates the separation-of-powers and due-process principles enshrined in the U.S. Constitution.

11.     Plaintiffs challenge the June Proclamation and Defendants' implementation of it, under this Court's inherent authority to review executive actions that exceed the President's authority, the Administrative Procedure Act, and the Due Process Clause of the Fifth Amendment. Plaintiffs respectfully request that the Court issue appropriate declaratory relief, and that it preliminarily and permanently enjoin the June Proclamation and Defendants' implementation thereof, in their entirety.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over Plaintiffs' claims under the U.S. Constitution and federal statutes.  The Court has additional remedial authority under 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper under 28 U.S.C. § 1391(e) because (a) this is a civil action in which Defendants are the President and federal officers and agencies of the United States, (b) a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia, and (c) Defendants are headquartered in this district.

14.     Plaintiffs have standing to sue.  Defendants' actions are causing and will continue to cause Plaintiffs imminent, concrete, and irreparable injuries-in-fact, as detailed herein, by preventing the individual Plaintiffs and the beneficiaries of the sponsoring Plaintiffs from obtaining visas and entering the country, despite the fact that these individuals would be granted

those benefits if not for the June Proclamation. Defendants' actions are depriving the employer Plaintiffs of the critical services and expertise provided by the foreign nationals who are unable to obtain visas because of the June Proclamation. And Defendants' actions are depriving the institutional Plaintiffs of the funding they would have received from the entry of foreign nationals who are unable to obtain visas because of the June Proclamation. The requested relief will redress these injuries-in-fact by allowing these individuals to obtain the immigration benefits for which they are otherwise eligible.

## **PARTIES**

15.    Plaintiff Nazif Alam is a U.S. lawful permanent resident residing in New York, New York. He has sponsored his wife, a citizen of Bangladesh, for an immigrant visa in the family-based, second preference category for spouses of lawful permanent residents. Mr. Alam and his wife are unable to complete the immigrant visa process because of the June Proclamation. Mr. Alam is classified as an essential worker, and his work and well-being have been adversely affected by his inability to bring his wife to join him in the United States.

16.    Plaintiff Carmen Ligia Pimentel is a U.S. lawful permanent resident residing in Houston, Texas. She has sponsored her husband, a citizen of the Dominican Republic, for an immigrant visa in the family-based, second preference category for spouses of lawful permanent residents. Ms. Pimentel's baby was expected to be born on or about August 12, 2020. Ms. Pimentel and her husband are unable to complete the immigrant visa process because of the June Proclamation. Ms. Pimentel has been adversely affected by her inability to bring her husband to

join her in the United States to support her through her pregnancy and to join her for the birth of their child.

17.     Plaintiff Juan Carlos Rosario Lebron is a U.S. lawful permanent resident residing in Lawrence, Massachusetts.  He has sponsored his unmarried minor children, aged 12 and 17, who are both citizens of the Dominican Republic, for an immigrant visa in the family-based, second preference category for children of lawful permanent residents.  Mr. Lebron and his children are unable to complete the immigrant visa process because of the June Proclamation.  Mr. Lebron has been adversely affected by his inability to bring his children to join him in the United States.

18.     Plaintiff Daniel Chibundu Nwankwo is a U.S. citizen residing in Houston, Texas.  He has sponsored his father, a citizen of Nigeria, for an immigrant visa as an immediate relative.  Mr. Nwankwo and his father are unable to complete the immigrant visa process because of the June Proclamation.  Mr. Nwankwo has been adversely affected by his inability to bring his father to join him in the United States.

19.     Plaintiff Claudio Alejandro Sarniguet Jiménez is a U.S. lawful permanent resident residing in Hoover Alabama. He has sponsored his unmarried minor son, a citizen of Chile, for an immigrant visa in the family-based, second preference category for the children of lawful permanent residents.  Mr. Sarniguet Jimenez and his son are unable to complete the immigrant visa process because of the June Proclamation.  Mr. Sarniguet Jimenez has been adversely affected by his inability to bring his son to join him in the United States.

20.     Plaintiff Angela Sinon is a U.S. citizen residing in White Plains, New York.  She has sponsored her unmarried adult son, a citizen of the Philippines, for an immigrant visa in the family-based, second preference category for the adult sons and daughters of lawful permanent

residents.  Ms. Sinon is elderly and a single parent, who relies on her adult son for all of her basic

life activities.  Ms. Sinon and her adult son are unable to complete the immigrant visa process

because of the June Proclamation.  Ms. Sinon has been adversely affected by her inability to bring

her adult son to join her in the United States.

21.     Plaintiff Loida Phelps is a citizen of the United States residing in Glen Burnie,

Maryland.  She has sponsored her daughter, a citizen of the Philippines, for lawful permanent

residence in the family-based, second preference category for the unmarried sons and daughters of

U.S. citizens.  Ms. Phelps's petition on behalf of her daughter also includes her daughter's three

children.  Ms. Phelps and her daughter are unable to complete the immigrant visa process because

of the June Proclamation, and the daughter's oldest child—Ms. Phelps's grandchild—could "age

out" during the validity of the Proclamation.  Ms. Phelps has been adversely affected by her

inability to bring her daughter and grandchildren to join her in the United States.

22.     Plaintiff Nancy Abarca is a citizen of the United States residing in Maryland

Heights, Missouri.  She has sponsored her brother, a citizen of the Philippines, for lawful

permanent residence in the family-based, fourth preference category for the brothers and sisters of

adult U.S. citizens.  Ms. Abarca's brother is married to a citizen of the Philippines, and the couple

has two children, born in 1996 and 1999.  The family is unable to complete the immigrant visa

process because of the June Proclamation, and its younger child could "age out" during the validity

of the Proclamation.  Ms. Abarca has been adversely affected by her inability to bring her brother

and his family to join her in the United States.

23.     Plaintiff Mohamed Saleh  is a citizen of the United States residing in San Francisco,

California.  He has sponsored his son, a citizen of Yemen, for lawful permanent residence in the

family-based, third preference category for the married sons and daughters of U.S. citizens.  Mr.

Saleh's petition on behalf of his son also included his son's spouse and children.  Mr. Saleh's son was unable to complete the immigrant visa process for his 10-year-old child—Mr. Saleh's grandchild—because of the June Proclamation.  Mr. Saleh has been adversely affected by his inability to bring his grandchild to join him in the United States.

24.     Plaintiff Fatma Bushati is an applicant for an immigrant visa and a citizen of Albania residing in Shkodra, Albania.  Ms. Bushati submitted an immigrant visa application based on her selection in the FY 2020 Diversity Visa lottery, but is unable complete the immigrant visa process because of the June Proclamation.  Ms. Bushati has been adversely affected by the delay in her application to immigrate to the United States.

25.     Plaintiff Jodi Lynn Karpes is an applicant for an immigrant visa and a citizen of South Africa residing in Johannesburg, South Africa.  Ms. Karpes submitted an immigrant visa application based on her selection in the FY 2020 Diversity Visa lottery, but is unable to complete the immigrant visa application process because of the June Proclamation.  Ms. Karpes has been adversely affected by the delay in her application to immigrate to the United States.

26.     Plaintiff Shyam Sundar Koirala is an applicant for an immigrant visa and a citizen of Nepal residing in Kathmandu, Nepal.  Mr. Koirala submitted an immigrant visa application based on his selection in the FY 2020 Diversity Visa lottery, but is unable to complete the immigrant visa application process because of the June Proclamation.  Mr. Koirala has been adversely affected by the delay in his application to immigrate to the United States.

27.     Plaintiff Aja Tamamu Mariama Kinteh is an applicant for an immigrant visa and a citizen of Gambia residing in Banjul, Gambia.  Ms. Kinteh submitted an immigrant visa application based on her selection in the FY 2020 Diversity Visa lottery, but is unable to complete the

immigrant visa application process because of the June Proclamation.  Ms. Kinteh has been adversely affected by the delay in her application to immigrate to the United States.

28.     Plaintiff Iwundu épouse Kouadio Ijeoma Golden is an applicant for an immigrant visa and a citizen of Cote D'Ivoire residing in Abidjan, Cote D'Ivoire.  Ms. Iwundu submitted an immigrant visa application based on her selection in the FY 2020 Diversity Visa lottery, but is unable to complete the immigrant visa application process because of the June Proclamation.  Ms. Iwundu has been adversely affected by the delay in her application to immigrate to the United States.

29.     Plaintiff Aya Nakamura is an applicant for an immigrant visa and a citizen of Japan residing in Tokyo, Japan.  Ms. Nakamura submitted an immigrant visa application based on her selection in the FY 2020 Diversity Visa lottery, but is unable to complete the immigrant visa application process because of the June Proclamation.  Ms. Nakamura has been adversely affected by the delay in her application to immigrate to the United States.

30.     Plaintiff 3Q Digital is a digital marketing agency headquartered in Chicago, Illinois, with other offices in San Francisco, Denver, Austin, San Diego, Raleigh, and Charlottesville.  3Q Digital has 330 employees in the United States, consisting of U.S. citizens, permanent residents, and foreign nationals.  3Q Digital has petitioned for H-1B visa status to employ a citizen of India in the United States in a specialty occupation position.  The petition was approved by U.S. Citizenship and Immigration Services (USCIS), but the candidate is unable to secure the required H-1B visa and travel to the United States because of the June Proclamation.  3Q Digital has been adversely affected by the inability of the candidate to begin work in the United States.

31.     Plaintiff ASSE International, Inc. is a California public benefit organization and 501(c)(3) nonprofit.  ASSE is engaged in a private-public partnership with the Department of State

to manage and administer exchange visitor programs that use the J-1 nonimmigrant visa category. Because the June Proclamation forbids the entry of individuals on J-1 visas – the type of visa used by participants in ASSE's exchange programs—and because the Department of State has decided to implement the June Proclamation by no longer issuing J-1 visas, the June Proclamation has stopped ASSE from continuing to operate its programs and ASSE has been forced to provide refunds totaling more than a million dollars to host companies that would have employed its interns or trainees. ASSE is currently receiving no income because of the June Proclamation, has been forced to terminate 5 of its 33 full-time employees, and has placed an additional 3 employees on furlough effective August 1, 2020. Because of the June Proclamation, ASSE has been adversely affected by its inability to conduct its exchange program.

32.     Plaintiff EurAuPair International, Inc. is a California public benefit organization and 501(c)(3) nonprofit. EurAuPair is engaged in a private-public partnership with the Department of State to manage and administer an exchange visitor program that uses the J-1 nonimmigrant visa category. EurAuPair runs an exchange visitor program for au pairs, who come to the United States on J-1 nonimmigrant visas. The J-1 au pair program allows qualified parents or guardians, who are U.S. citizens or legal permanent residents and who have a child for the au pair to look after, the opportunity to host an au pair in their home. Because of the June Proclamation, EurAuPair cannot conduct is exchange visitor program for au pairs. It is currently receiving no income, has been forced to terminate 3 of its 11 full-time employees, and has placed another two employees on furlough effective August 1, 2020. EurAuPair has been adversely affected by its inability to conduct its program due to the June Proclamation.

33.     Plaintiff SEIU Healthcare (CIR) is a labor organization headquartered in Long Island City, New York. CIR is the largest housestaff union in the country, representing

approximately 17,000 physicians in California, Florida, Massachusetts, New Jersey, New Mexico, New York, and Washington, D.C.  Its members regularly include interns and residents working in hospitals in H-1B nonimmigrant visa status as specialty occupational professionals.  Its members also regularly include interns and residents working in hospitals in J-1 nonimmigrant visa status.  CIR's members and future members normally travel to the United States in June and July. CIR's future members have been unable to travel to the United States because of the June Proclamation.  CIR has been adversely affected by the inability of its future members to enter the United States, and CIR's current members have been adversely affected by the increased hours they have to work to make up for the loss of physicians who should have arrived on H-1B and J-1 visas.

34.     Plaintiff PowerTrunk, Inc. is a commercial radio equipment company headquartered in Jersey City, New Jersey.  PowerTrunk supplies radio equipment used by transit systems nationwide, including the New Jersey Transit Corporation, NY Metropolitan Transit Authority, Los Angeles International Airport, and John F. Kennedy International Airport.  PowerTrunk has eleven employees, who include U.S. citizens, lawful permanent residents, and foreign nationals.  PowerTrunk petitioned for L-1B visa status to employ a citizen of Spain in the United States in a specialty occupation position.  The petition was approved by USCIS, but the candidate is unable to secure the required L-1 visa and travel to the United States because of the June Proclamation.  PowerTrunk has been adversely affected by the inability of the candidate to begin work in the United States.

35.     Plaintiff Shipco Transport Inc. (Shipco) is headquartered in Chatham, New Jersey.  Shipco is one of the world's leading neutral Non-Vessel Operating Carriers (NVOCC).  Shipco has 21 branch offices and 425 employees in the United States, consisting of

US citizens, lawful permanent residents, and visa holders.  Shipco has petitioned for L-1A status to employ a citizen of Denmark in the United States in a managerial position.  The petition was approved by USCIS, but the candidate is unable to secure the required L-1 visa and travel to the United States because of the June Proclamation.  Shipco has been adversely affected by the inability of the candidate to begin work in the United States.

36.    Plaintiff Superior Scape, Inc. (Superior) is headquartered in Shelby Township, Michigan.  Superior is a landscape contractor.  Superior has a year-round staff of 14 employees, as well as 50-55 seasonal workers during peak periods.  Its workforce consists of U.S. citizens, lawful permanent residents, and visa holders.  Superior submitted applications for labor certification to the U.S. Department of Labor for a pool of H-2B seasonal, non-agricultural workers.  The applications were certified, but Superior has been unable to proceed with H-2B sponsorship for these workers because of the June Proclamation.  Superior has been adversely affected by the inability of the H-2B workers to begin work in the United States.

37.    Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.   In that capacity, he issued the Presidential Proclamation challenged in this lawsuit.

38.    Defendant William Barr is the Attorney General of the United States and has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.  He is sued in his official capacity.

39.    Defendant Department of State (DOS) is a cabinet-level department of the U.S. federal government. DOS is responsible for the issuance of immigrant visas abroad.  The Proclamations assign DOS a variety of responsibilities regarding their implementation and enforcement.

40.     Defendant Michael Pompeo is the Secretary of State and has responsibility for overseeing enforcement and implementation of the Proclamations by all DOS staff.  He is sued in his official capacity.

41.     Defendant Department of Homeland Security (DHS) is a cabinet-level department of the U.S. federal government.  The Proclamations assign DHS a variety of responsibilities regarding their implementation and enforcement.

42.     Defendant Chad Wolf is the Acting Secretary of Homeland Security and has responsibility for overseeing enforcement and implementation of the Proclamations by all Department of Homeland Security staff.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

## STATUTORY BACKGROUND

43.     The INA was enacted in 1952 and has since been amended several times.  The 1965 amendment created the version of the INA that endures today.  That amendment established "a new system of selection designed to be fair, rational, humane, and in the national interest," S. Rep. No. 89-748 (1965), as reprinted in 1965 U.S.C.C.A.N. 3328, 3332, which Congress "approached with foresight and caution."  H.R. Rep. No. 82-1365 (1952), as reprinted in 1952 U.S.C.C.A.N. 1653, 1678.  This new system was the product of "painstaking study, as well as careful weighing of equities, human rights, and continuous consideration of the social, economic, and security

interests of the people of the United States." H.R. Rep. No. 82-1365 (1952), as reprinted in 1952 U.S.C.C.A.N. 1653, 1678.[1]

44.   The comprehensive system that Congress created in the INA expresses and reflects Congress's intent that foreign nationals who meet certain qualifications may come to the United States to further four principal goals: promoting family reunification, admitting immigrants with skills that are useful to the U.S. economy, protecting foreigners in need of humanitarian relief, and increasing diversity. *Doe v. Trump*, 418 F. Supp. 3d 573, 580 (D. Or. 2019); *see also Elkins v. Moreno*, 435 U.S. 647, 664 (1978); H.R. Rep. No. 101-723, pt. 1 (1990), as reprinted in 1990 U.S.C.C.A.N. 6710 (summarizing statutory history).

45.   To serve those goals, Congress has prioritized admission of family members to support its goal of "preservation of the family unit," H.R. Rep. No. 82-1365 (1952), as reprinted in 1952 U.S.C.C.A.N. 1653, 1680,[2] established an annual "diversity visa" lottery program for the express purpose of "maintain[ing] an ongoing diverse flow of immigrants," 136 Cong Rec. H-8629-02 1990,[3] created the J exchange visa "to promote a better understanding of the United States

---

[1] Pub. L. 89-236, 79 Stat. 911 (amending 8 U.S.C. ch. 12, Sections 1101, 1151-57, 1181-82, 1201, 1254-55, 1259, 1322, 1351).

[2] *See, e.g.*, Child Citizenship Act of 2000, Pub. L. No. 106-395, 114 Stat. 1631 (2000) (H.R. 2883) (amending INA to confer U.S. citizenship automatically and retroactively to certain foreign-born children adopted by U.S. citizens); Legal Immigration Family Equity (LIFE) Act of 2000, Title IX of Pub. L. No. 106-553, § 1103, 114 Stat. 2762 (2000); Immigration & Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 3359 (1965) (granting 74 percent of all immigrant visas to family reunification categories); *see also Young v. Reno*, 114 F.3d 879, 886 (9th Cir. 1997) (noting that "Congress's general purpose in enacting [8 U.S.C. § 1153(a)(4) on sibling immigration] was to keep families intact . . . ."); *see also* Philip E. Wolgin, "Family Reunification is the Bedrock of U.S. Immigration Policy," Center for American Progress (Feb. 12, 2018), https://www.americanprogress.org/issues/immigration/news/2018/02/12/446402/family-reunification-bedrock-u-s-immigration-policy/.

[3] *See also, e.g.*, Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000) (VTVPA, precursor to TVPRA); Illegal Immigration Reform and Immigrant

in other countries, and to increase mutual understanding between the people of the United States and the people of other countries," H.R. Rep. No. 87-271, at 21 (1961),[4] and put in place the L visa to allow multi-national employers to bring managers, executives, and employees with specialized knowledge to the United States on a temporary basis, 8 U.S.C. § 1101(a)(15)(L); *see also id.* § 1184(c)(2)(F).

46.     The INA also authorizes the issuance each year of tens of thousands of temporary H nonimmigrant visas for workers in a wide range of occupations and industries, as well as for those workers' families.  Such visas are subject to strict numerical visa caps, specific visa-eligibility criteria, and strong enforcement mechanisms to "facilitat[e] the migration of professional, managerial, and skilled foreign workers without adversely affecting U.S. workers and U.S. students entering the labor market."[5]  Among other things, Congress has prescribed a comprehensive set of inadmissibility provisions designed to protect American workers.  *See, e.g.*, 8 U.S.C. § 1182(a)(5) (foreign nationals seeking to "perform[] skilled or unskilled labor" are inadmissible unless the Secretary of Labor certifies that "there are not sufficient [U.S.] workers"

---

Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) (IIRIRA); 8 U.S.C. § 1153(c).

[4] *See, e.g.*, 22 U.S.C. §§ 2451-2464 (establishing various educational and cultural exchange programs).

[5] Ruth Ellen Wasem, "Temporary Professional, Managerial, and Skilled Foreign Workers: Policy and Trends," Congressional Research Service, at 1 (Jan. 13, 2016), https://fas.org/sgp/crs/homesec/R43735.pdf.

to perform the same job, and that their admission "will not adversely affect the wages and working conditions of workers in the United States similarly employed").

### *Immigrant Visas*

47.     The INA's immigrant visa provisions reflect Congress's intent to permit "worldwide level of immigration," 8 U.S.C. § 1151(a), based on, among other things, an allocation of family-based immigrant visas "made available to individuals who have family members in the United States" and diversity-based immigrant visas "to promote diversity in our current immigration system."   H.R. Rep. No. 101-723, pt. I (1990) as reprinted in 1990 U.S.C.C.A.N. 6710, 6715, 6728.

### *Immediate Relatives of U.S. Citizens*

48.     Recognizing that it is "antifamily to allow . . . long separations" of family members, 136 Cong. Rec. H-8629-02 (1990), the INA makes available visas for "immediate relatives"—the parents, spouses, and unmarried minor children of U.S. citizens.  8 U.S.C. § 1151(b).

49.     Affirming that "family reunification" is "the cornerstone of U.S. immigration policy" and serves the "national interest," Congress has prioritized the admission of these "immediate relatives" by excepting the visas available to them from any numerical limits.  *Id*.  As a practical matter, this means that immigrant visas are always immediately available to qualified immediate relatives.  *See* 8 U.S.C. § 1151.

### *Family-based Preference Visas*

50.     Apart from visas for immediate relatives, family-based immigrant visas are available in four delineated "preference" categories based on the familial relationship between the sponsor and the beneficiary.  *See* 8 U.S.C. § 1153(a).  Derivative spouses and unmarried minor

children are entitled to the same preference category as the "principal" beneficiary.  8 U.S.C. § 1153(d); 9 FAM 502.2-3(C)(a).[6]

51.     Congress has allocated an annual minimum of 226,000 family-based preference visas, and an annual maximum of 480,000 such visas.  8 U.S.C. § 1151(c)(1)(B)(ii).  In addition, each foreign country is limited to 7 percent of the total number of family-based preference visas made available in any given year, unless there are visas available that would otherwise go unused. 8 U.S.C. § 1152. The actual number of family-based visas issued in a particular preference category varies from year to year and depends in part on how many visas are granted in other preference categories.  *See* 8 U.S.C. §§ 1151, 1153.

52.     Family-based visas are distributed to eligible applicants through a complex system of queues; thus, an intending immigrant must wait in line for a visa to become available before he or she may apply to receive it.  Because the demand for visas regularly exceeds supply, persons eligible for visas in the preference categories must often wait years, or even decades, for the opportunity to immigrate to the United States.  *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 48 (2014).

53.     Congress expressly considered the impact of family-based immigration on the labor market when it created the modern-day family preference visa system.  At the time that Congress drafted and enacted the Immigration Act of 1990, it relied on the nation's top economists to conclude that increased family-based immigration, and therefore overall levels of immigration, benefits the U.S. economy. *See* H.R. Rep. No. 101-723, pt. 1 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6710, 6717.

---

[6] "FAM" refers to the State Department's Foreign Affairs Manual, which is available at https://fam.state.gov/.

*Diversity visas*

54.     Section 131 of the Immigration Act of 1990 (Public Law 101-649) amended the INA 203 to provide for a new class of immigrants known as "diversity immigrants" to "enhance and promote" the diversity of immigration to the United States.  H.R. Rep. No. 101-723, pt. 1, at 48 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 6710, 6728.

55.     Through the INA, Congress has made up to 55,000 diversity visas available each year.  8 U.S.C. § 1151(e).  To be eligible for a diversity visa, an applicant must be a citizen of a country with low levels of immigration to the United States, as determined by the Attorney General,[7] and must have either a high school diploma or two years of qualifying work experience. 8 U.S.C. § 1153(c)(1)–(2).

56.     Applicants enter a random and always over-subscribed visa lottery, which is held once each fiscal year.  8 U.S.C. § 1153(c); 22 C.F.R. § 42.33.  For fiscal year 2018, approximately 14.7 million people entered the lottery with the hopes of winning one of the 55,000 available visa slots.[8]  Thus, any individual entrant had about a 0.37 percent chance at winning the lottery.  In other words, an individual entering the lottery every year may expect to win once every 267 years.

57.     Assuming that a lottery winner submits the requisite documentation and is found admissible to the United States, he or she must be granted a visa.  *See* 8 U.S.C. §§ 1153(c)(1), 1153(e)(2); 22 C.F.R. § 40.6.  In the interests of preserving family unity, a lottery winner's spouse

---

[7] For example, forty percent of diversity visas have traditionally gone to African countries, which are underrepresented in other immigrant categories.  *See* American Immigration Council, "The Diversity Immigrant Visa Program: An Overview," (Nov. 2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/the_diversity_immigran t_visa_program_an_overview.pdf.

[8] *See* U.S. Dep't of State, Diversity Visa Program, DV 2016-2018: Number of Entries Received During Each Online Registration Period by Country of Chargeability, https://travel.state.gov/content/dam/visas/DiversityVisa/DVStatistics/DV%20AES%20statistics %20by%20FSC%202016-2018.pdf.

and unmarried minor children may also immigrate through the program as derivatives.  8 U.S.C. §§ 1151(e), 1153(d).  Once the visa issues, it is normally valid for a maximum of six months. 8 U.S.C. § 1201(c).

58.    By statute, a diversity lottery winner must receive his or her visa by the end of the federal government's fiscal year (September 30) for the year in which he or she has won the lottery. 8 U.S.C. § 1154(a)(1)(I)(ii)(II).  Failure to obtain the visa by that date results in permanent loss of the opportunity to immigrate based on that year's lottery.  *Id.*  There is no provision for extension of this deadline.  Although a person who misses the deadline may enter subsequent lotteries, the chance of winning again is miniscule.

### *Nonimmigrant Visas*

59.    In addition to permanent immigrant visas, Congress has created temporary nonimmigrant visas for the purpose of meeting "the demands of American business in the international marketplace."  H.R. Rep. No. 101-723, pt. 1 (1990), as reprinted in 1990 U.S.C.C.A.N. 6710.  These visa categories, which include the H, J, and L categories described below, enable U.S. employers to sponsor foreign nationals to come and work in the United States on a temporary basis.  8 U.S.C. §§ 1101(a)(15)(H), (J), (L).  In creating and expanding these temporary nonimmigrant visa categories, Congress has recognized the "principle that labor markets have demonstrated time and time again: additional people entering the labor force, whether native-born students out of school, immigrants, or nonimmigrants, expand job

opportunities and create other jobs through innovation, entrepreneurship, and money spent on consumer items like food, clothing, and housing."  S. Rep. No. 106-260, at 12 (2000).

*H Visas*

60.     Congress established the H visa category to allow the entry of three different categories of temporary workers:  (1) workers "of distinguished merit and ability" who are "coming temporarily to the United States to perform temporary services of an exceptional nature requiring such merit and ability"; (2) workers who are "coming temporarily to the United States to perform other temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country; and (3) workers who are "coming temporarily to the United States as an industrial trainee."  Pub. L. No. 82-414, 66 Stat. 163 (1952), Immigration and Nationality Act of 1952.

*H-1B Visas*

61.     The H-1B visa category allows U.S. employers to hire skilled foreign professionals in "specialty occupation[s]" requiring "theoretical and practical application of a body of highly specialized knowledge" and a "bachelor's or higher degree in the specific specialty (or its equivalent)."  8 U.S.C. § 1184(i)(1); *see id.* 8 U.S.C. § 1101(a)(15)(H)(i)(b).  H-1B positions for workers in specialty occupations primarily fall within occupations in the "STEM" (science, technology, engineering, and math) and computer-related fields.[9]

62.     For an H-1B visa to issue, a sponsoring employer must commit to pay the prospective visa recipient a minimum salary of $60,000, and must attest, in a Labor Condition

---

[9] Alex Nowrasteh, "Don't Ban H-1B Workers:  They Are Worth Their Weight in Innovation," Cato at Liberty (May 14, 2020), https://www.cato.org/blog/dont-ban-h-1b-workers-they-are-worth-their-weight-patents; *see also* Characteristics of H-1B Specialty Occupation Workers, USCIS (Mar. 5, 2020), https://www.uscis.gov/sites/default/files/reports-studies/Characteristics_of_Specialty_Occupation_Workers_H-1B_Fiscal_Year_2019.pdf.

Application (LCA), that the employer will pay the employee the "prevailing wage" for his or her occupation; will provide working conditions that would not affect the working conditions of other similarly employed workers; and has provided notice of the LCA to its currently employed workers so that they may file a complaint if the employment of the H-1B worker adversely affects their own wages or working conditions.  *See* 20 C.F.R. §§ 655.731, 655.732, 655.733, 655.736.

63.     In addition, any "H-1B dependent employer"—an employer for whom H-1B skilled workers constitute a specified minimum percentage of its workforce, depending on the size of the business—must also affirm in its LCA that hiring an H-1B worker would not displace any U.S. workers and that it has taken good-faith steps to recruit U.S. workers for the job for which it seeks the H-1B worker.  20 C.F.R. § 655.739; *see* 8 U.S.C. § 1182(n).

64.     The maximum number of H-1B visas (cap and cap-exempt) that may be issued is currently 85,000 per year.  8 U.S.C. §§ 1184(g)(1)(a), 1184(g)(5)(C).

65.     The spouses and minor children of H-1B sponsored employees may accompany those employees to the United States as derivatives on H-4 visas.  8 C.F.R. § 214.2(h)(9)(iv); Pub. L. No. 91-225, 84 Stat. 116 (1970).  The status of H-4 derivatives depends on the continued employment of the H-1B employee.  8 C.F.R. § 214.2(h)(9)(iv).

66.     Most H-4 derivative visa holders are not legally authorized to work in the United States.  Only H-4 spouses (not H-4 children) may obtain such authorization, and they may do so only by applying for an Employment Authorization Document (EAD), which is generally available only if the H-1B visa holder has an approved I-140 petition to obtain a permanent immigrant visa. 8 C.F.R. § 214.2(h)(9)(iv).

*H-2B Visas*

67.     H-2B visas allow U.S. employers to hire foreign nationals "to perform temporary service or labor" in non-agricultural sectors "if unemployed persons capable of performing such service or labor cannot be found in this country."  8 U.S.C. § 1101(a)(15)(H)(ii)(b).[10]  In creating the H-2B visa category for temporary non-agricultural workers in 1990, Congress stressed that "[t]he essential feature of the H-2[B] program" is "the requirement that efforts be made to find domestic workers before admitting workers from abroad" and that "the importation of foreign workers will not be allowed if it would adversely effect [*sic*] the wages and working conditions of domestic workers similarly employed."  H.R. Rep. No. 99-682, pt. 1. (1986), as reprinted in 1986 U.S.C.C.A.N. 5649, 5684.

68.     To sponsor and hire an H-2B temporary worker, an employer must receive an approved labor certification from the Department of Labor, confirming that no U.S. workers are available and that the employment of an H-2B worker will not adversely affect the wage rate and working conditions of similarly employed U.S. workers.  *See* 8 C.F.R. §§ 214.2(h)(6)(iii)(A)-(D), (6)(iv)(A).  The employer must also establish that the need for an H-2B employee is temporary—in other words, that the need is "for a limited period of time" that "will end in the near, definable future."  *Id.* § 214.2(h)(6)(ii)(B).

69.     The Immigration Act of 1990 imposed an annual cap of 66,000 H-2B visas that remains in place today.  8 U.S.C. § 1184(g)(1)(B).

---

[10] Agricultural workers fall under the H-2A nonimmigrant visa category.  *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b).  The June Proclamation's entry suspension does not apply to such workers.  *See generally* June Proclamation § 2.

70.     Although the spouses and minor children of H-2B sponsored employees may accompany those employees to the United States as derivatives on H-4 visas, it is rare for H-2B workers to bring family on H-4 visas.[11]

*J Visas*

71.     Congress created the J visa category in 1961 in the Mutual Educational and Cultural Exchange Act (Fulbright-Hays Act) "to enable the Government of the United States to promote a better understanding of the United States in other countries, and to increase mutual understanding between the people of the United States and the people of other countries." H.R. Rep. No. 87-721, at 21 (1961). *See also* Pub. L. 87-256, 75 Stat. 527 (1961).

72.     The INA makes J-1 visas available to a variety of individuals, including students, scholars, trainees, teachers, professors, research assistants, specialists, and leaders in fields of specialized knowledge or skill, to pursue temporary work in the United States. *See* 8 U.S.C. § 1101(a)(15)(J). Implementing regulations have created J-1 visa programs for, among others, trainees and interns, 22 C.F.R. § 62.22; teachers, *id.* § 62.24; camp counselors, *id.* § 62.30; au pairs, *id.* § 62.31; and summer students in work/travel programs, *id.* § 22.62.32.

73.     The summer work/travel program has a cap of 109,000 visas per year. Employers who seek to hire summer students in this program, as well as employers seeking to hire interns and trainees, must certify that in doing so they "will not displace U.S. workers at worksites where they will place program participants." *Id.* § 62.32(n)(3); *see also id.* § 62.22(f)(2). Employers who hire summer students in work/travel programs also must confirm that they "have not experienced layoffs in the past 120 days and do not have workers on lockout or strike." *Id.* § 62.32(n)(3).

---

[11] David J. Bier, "The Facts About H-4 Visas for Spouses of H-1B Workers," Cato at Liberty (June 16, 2020), https://www.cato.org/blog/facts-about-h-4-visas-spouses-h-1b-workers

74.     The spouses and minor children of J-1 sponsored employees may accompany those employees to the United States as derivatives on J-2 visas.  8 U.S.C. § 1101(a)(15)(J).  J-2 spouses are not automatically entitled to work in the United States but may seek employment authorization. 8 C.F.R. § 214.2(j)(1)(v)(B).

*L Visas*

75.     Congress established the L visa category in 1970 to allow multinational corporations to transfer executives, managers, or employees with "specialized knowledge" to an office here in the United States on a temporary basis.  8 U.S.C. § 1101(a)(15)(L).

76.     To qualify for an L visa, an employee must have been employed abroad by the sponsoring employer for at least one year.  *Id*.  L-1A visas are available to managers and executives.  *Id.*  L-1B visas are available to workers with specialized knowledge, either of the company's product and its application in international markets, or of the company's processes and procedures.  8 U.S.C. § 1184(c)(2)(B).  L visas are approved in the first instance for a maximum of three years.  8 C.F.R. § 214.2(l)(11).  An employer may renew an L-1A visa for a manager or executive for up to 7 years, and an L-1B visa for a worker with specialized knowledge for up to 5 years.

77.     The spouses and minor children of L-1 sponsored employees may accompany those employees to the United States as derivatives on L-2 visas, which Congress created at the same time as L-1 visas.  *See* 8 U.S.C. § 1101(a)(15)(L).  To avoid discouraging critical L-1 employees from relocating to this country, the statute categorically permits spouses on L-2 visas to work in the United States.  8 U.S.C. § 1184(c)(2)(E).  L-2 children, however, are not eligible for such work authorization.

78.     Congress has not imposed numerical limits on L-1 visas and has allowed multinational companies to bring into the United States as many of their foreign employees as necessary, so long as the employees meet the visa's requirements.

79.     According to the Congressional Research Service, the L-1 visa is "essential to retaining and expanding international businesses in the United States."[12]  When investigating whether L-1 visa holders have displaced U.S. workers, the Office of the Inspector General of DHS found that claims of job displacement "do not seem to represent a significant trend."[13]

80.     U.S. companies rely on H-1B, H-2B and L-1 employees. For example, entire projects are dependent upon the ability of U.S. employers to transfer L-1B employees to bring knowledge of the foreign company's operations to the U.S.  Companies transfer L-1A executives and managers as an integral part of their plans for starting or expanding operations in the United States.  H-1B employers pay substantial fees to the government and to attorneys and go through a lengthy, multi-tier process to assure themselves of the availability of H-1B workers who are needed for specific projects.

81.     Congress has in recent years repeatedly refused to enact legislation that would have limited legal immigration and visa issuance.  Specifically, the proposed Reforming American Immigration for a Strong Economy (RAISE) Act was introduced in February 2017 (S. 354) and was later reintroduced in August 2017 (S.B. 1720) and in 2019 (H.R. 2278).  The proposed legislation would have (among other things) eliminated all family sponsorship beyond spouses and minor children of U.S. citizens and lawful permanent residents; reduced the visa allocation for

---

[12] *See supra* note 5.

[13] U.S. Dep't of Homeland Sec., Office of the Inspector General, Review of Vulnerabilities and Potential Abuses of the L-1 Visa Program, https://www.oig.dhs.gov/assets/Mgmt/OIG_06-22_Jan06.pdf (last visited on July 17, 2020).

family-based visas by more than 60 percent; eliminated the diversity lottery; and moved to "merit-based" point immigration system.  The legislation failed every time it was introduced.

## THE APRIL PROCLAMATION

82.     On April 20, 2020, President Trump tweeted that "[i]n light of the attack from the Invisible Enemy, as well as the need to protect the jobs of our GREAT American Citizens, I will be signing an Executive Order to temporarily suspend immigration into the United States!"[14]

83.     Two days later, on April 22, 2020, President Trump announced and executed Presidential Proclamation 10014, 85 Fed. Reg. 23441 (the "April Proclamation"), which broadly suspended the entry of aliens as immigrants into the United States for 60 days, with limited exceptions.  The April Proclamation is attached to this Amended Complaint as Exhibit A.

84.     The April Proclamation took effect at 11:59 Eastern Daylight Time on April 23, 2020, approximately 30 hours after the President signed it.

85.     The April Proclamation was not issued in response to any national-security or foreign-relations consideration; it was ostensibly a response to the COVID-19 crisis and the pandemic's effects on the U.S. labor market.  But it does not reflect any agency fact-finding; nor does it cite research or analysis of any kind.  As justification for restricting immigration, the April Proclamation cited a so-called "excess labor supply" resulting from the purported "impact of foreign workers on the United States labor market, particularly in an environment of high domestic unemployment and depressed demand for labor."

---

[14]   Donald J. Trump (@realDonaldTrump), TWITTER (Apr. 20, 2020, 10:06 PM), https://twitter.com/realDonaldTrump/status/1252418369170501639, attached as Exhibit B; *see* Betsy Klein, Priscilla Alvarez & Kevin Liptak, *Trump claims he will temporarily suspend immigration into the US due to coronavirus fears*, CNN (Apr. 21, 2020), https://www.cnn.com/2020/04/20/politics/donald-trump-immigraiton-halt-coronavirus/index.html.

86.     Specifically, the April Proclamation noted that lawful permanent residents (*i.e.*, aliens who have entered the country on immigrant visas) have "immediate eligibility to compete for almost any job, in any sector of the economy," and asserted without explanation that "[e]xisting immigrant visa processing protections" are inadequate either "to protect already disadvantaged and unemployed Americans from the threat of competition for scarce jobs from new lawful permanent residents," or to support "recovery from the COVID-19 outbreak."

87.     The April Proclamation broadly suspends the entry of intending immigrants if, as of the Proclamation's effective date of April 23, 2020, the intending immigrants:

     (a)     were outside the United States (April Proclamation § 2(a)(i));

     (b)     did not have a valid immigrant visa (*id.* § 2(a)(ii)); and

     (c)     did not have a valid official travel document other than a visa (*id.* § 2(a)(iii)).[15]

88.     The April Proclamation provides for nine limited exceptions to its otherwise broad suspension of immigration, including (as relevant to this case) a vague exception for immigrants "whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees." *Id.* § 2(b)(ix).

89.     The April Proclamation states that a consular officer "shall determine, in his or her discretion," whether an immigrant qualifies for one of the enumerated exceptions. It also directs the Secretary of State to "implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish in the Secretary of State's discretion," and directs the Secretary of Homeland Security to

---

[15] The prospective immigrants in this case are not covered by § 2(a)(iii), as they seek entry pursuant to various classes of visas.

"implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish in the Secretary of Homeland Security's discretion."

90.     The April Proclamation was set to expire by its own terms 60 days after its effective date (*i.e.*, on June 22, 2020), but it provided that it could "be continued as necessary."  The April Proclamation did not specify the circumstances under which it would, in the President's view, no longer be "necessary."

**THE JUNE PROCLAMATION**

91.     On June 22, 2020, President Trump signed Presidential Proclamation 10052, 85 Fed. Reg. 38263 (the "June Proclamation"), which extends the April Proclamation's entry suspension of individuals seeking immigrant visas and adds sweeping new restrictions on the entry into the United States of individuals seeking certain nonimmigrant visas.  A copy of the June Proclamation is attached to this Amended Complaint as Exhibit C.

92.     With respect to immigrant visas, the June Proclamation amends the April Proclamation's broad entry suspension by extending it until at least December 31, 2020.  June Proclamation § 1(a).  As with the April Proclamation, the June Proclamation provides that the immigrant visa entry suspension may "be continued as necessary" but does not specify the conditions under which the conditions requiring the suspension will no longer be considered "necessary."

93.     The June Proclamation seeks to justify the continuation of the immigration suspension on grounds that "the considerations present in [the April Proclamation] remain," and that the President lacks "sufficient alternative means to protect unemployed Americans from the

30

threat of competition for scarce jobs from new lawful permanent residents."  As with the April Proclamation, the President provided no analytical basis for these assertions.

94.     With respect to nonimmigrant visas, the June Proclamation states that the "Secretary of Labor and the Secretary of Homeland Security reviewed nonimmigrant programs" and concluded that "the present admission of workers within several nonimmigrant visa categories also poses a risk of displacing and disadvantaging United States workers during the current recovery."

95.     The June Proclamation states that "between February and April of 2020, more than 17 million United States jobs were lost in industries in which employers are seeking to fill worker positions tied to H-2B nonimmigrant visas," and that "[d]uring this same period, more than 20 million United States workers lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions."  The June Proclamation also states that "the May unemployment rate for young Americans, who compete with certain J nonimmigrant visa applicants, has been particularly high—29.9 percent for 16-19 year olds, and 23.2 percent for the 20-24 year old group."

96.     Without analysis or further factual support, the June Proclamation states that "[t]he entry of additional workers through the H-1B, H-2B, J, and L nonimmigrant visa programs . . . presents a significant threat to employment opportunities for Americans affected by the extraordinary economic disruptions caused by the COVID-19 outbreak."

97.     The June Proclamation broadly suspends entry into the country of "any alien seeking entry pursuant to any of the following nonimmigrant visas":

(a)     "an H-1B or H-2B visa, and any alien accompanying or following to join such alien [*i.e.*, spouses and children seeking to enter pursuant to H-4 visas]" (June Proclamation § 2(a));

(b)     "a J visa to the extent the alien is participating in an intern, trainee, teacher, camp counselor, au pair, or summer work travel program, and any alien accompanying or following to join such alien" (*id*. § 2(b)); and,

(c)     "an L visa, and any alien accompanying or following to join such alien" (*id*. § 2(c)).

98.     The June Proclamation's entry suspension became effective at 12:01 Eastern Daylight Time on June 24, 2020, just over one day after the President announced it.  *Id.* § 7.

99.     The entry suspension set forth in the June Proclamation is set to expire on December 31, 2020, but "may be continued as necessary."  *Id*. § 6.  The June Proclamation does not specify the conditions under which its entry suspension will, in the President's view, no longer be "necessary."

100.    As amended, the nonimmigrant entry suspension applies to any intending nonimmigrant visa applicant who, as of the June Proclamation's effective date (June 24, 2020):

(a)     was outside the United States (*id.* § 3(a)(i));

(b)     "d[id] not have a nonimmigrant visa, of any of the classifications specified in section 2 of this proclamation and to which the alien is seeking entry"[16]; and

---

[16] This language is provided in Proclamation No. 10054, 85 Fed. Reg. 40085, which the President signed on June 29, 2020, and which amends § 3(a)(ii) of the June Proclamation.  The amending Proclamation is available at https://www.whitehouse.gov/presidential-actions/proclamation-amendment-proclamation-10052/ and is attached to this Amended Complaint as Exhibit D.

(c)      did not have an official travel document other than a visa (*id*. § 3(a)(iii)).[17]

101.    The June Proclamation's nonimmigrant entry suspension provides for four exceptions, including (as relevant to this case), "any alien whose entry would be in the national interest as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees." *Id*. § 3(b)(iv).

102.    Like the April Proclamation, the June Proclamation states that a consular officer "shall determine, in his or her discretion," whether an individual qualifies for one of the enumerated exceptions.  *Id.* § 4(a).  It again directs the Secretary of State to "implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish in the Secretary of State's discretion," and conversely directs the Secretary of Homeland Security to "implement this proclamation as it applies to the entry of aliens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish in the Secretary of Homeland Security's discretion."  *Id.*

103.    The June Proclamation directs the Secretary of State, Secretary of Labor, and the Secretary of Homeland Security to "establish standards" to "define categories of aliens covered by section 3(b)(iv)," the "national interest" exception.  *Id.* § 4(a)(i).  The June Proclamation states that the exception includes those who "are critical to the defense, law enforcement, diplomacy, or national security of the United States; are involved with the provision of medical care to individuals who have contracted COVID-19 and are currently hospitalized; are involved with the provision of medical research at United States facilities to help the United States combat COVID-

---

[17] Again, the prospective immigrants in this case are seeking visas and so are not covered by § 3(a)(iii).

19; or are necessary to facilitate the immediate and continued economic recovery of the United States." *Id.* To date, the Secretaries have not publicly announced any "standards" governing the "national interest" exception, including whether these enumerate grounds are the exclusive bases on which to obtain a national interest exception.

104.    Seemingly in response to this litigation, the June Proclamation specifically provides that "[t]he Secretary of State and the Secretary of Homeland Security shall exercise the authority under section 3(b)(iv) of this proclamation and section 2(b)([ix[18]]) of Proclamation 10014 to exempt noncitizen children who would as a result of the suspension in section 2 of this proclamation or the suspension in section 1 of Proclamation 10014 age out of eligibility for a visa." *Id.*

105.    The June Proclamation directs that noncitizens covered by § 3(b)(iv)'s "national interest" exception "shall be identified by the Secretary of State, the Secretary of Homeland Security, or their respective designees, in his or her sole discretion." *Id.* § 4(a)(ii).

## AGENCY IMPLEMENTATION OF THE PROCLAMATIONS

106.    The State Department posted to its website an announcement concerning the April Proclamation on or about April 23, 2020. *See* ECF 21, at 9 & n.8. That announcement has since been updated to reflect the June Proclamation's extension of the existing restrictions on

---

[18] As the Court observed in its order of June 23, 2020, "[t]he reference . . . to . . . 'section 2(b)(iv) of Proclamation 10014' appears to be a scrivener's error," as it appears to be meant to reference the April Proclamation's "national interest" exception, which "is found in section 2(b)(ix)" of that Proclamation (not section 2(b)(iv)). ECF No. 41, at 4 n.2.

immigration.[19]  The announcement summarizes the April Proclamation's scope and exceptions, and directs the reader to the text of the April Proclamation for further information.

107.    DOS posted to its website a similar announcement summarizing the June Proclamation's scope and exceptions, and directing the reader to the text of the June Proclamation for further information, on or about June 23, 2020.[20]

108.    Although DOS suspended routine visa services on or about March 20, 2020 in response to the COVID-19 pandemic,[21] the Bureau of Consular Affairs has advised that "U.S. Embassies and Consulates are beginning a phased resumption of routine visa services."[22]

109.    The Bureau of Consular Affairs has also published, through a series of tweets, a brief FAQ regarding the State Department's implementation of the June Proclamation.  The FAQ largely repeats the language contained in the June Proclamation but adds, in response to the question whether the June Proclamation will "impact Diversity Visa applicants," that "the suspension does apply to DV applicants" and that "[t]he Proclamation will expire on December 31

---

[19] U.S. Dep't of State, Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak, https://travel.state.gov/content/travel/en/News/visas-news/Proclamation-Suspending-Entry-of-Immigrants-Who-Present-Risk-to-the-US-labor-market.html (last visited on July 17, 2020).  A copy is attached as Exhibit E.

[20] U.S. Dep't of State, Proclamation Suspending Entry of Immigrants and Nonimmigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak,   https://travel.state.gov/content/travel/en/News/visas-news/proclamation-suspending-entry-of-immigrants-and-nonimmigrants-who-present-risk-to-the-US-labor-market-during-the-economic-recovery-following-the-COVID-19-outbreak.html (last visited on July 17, 2020).  A copy is attached as Exhibit F.

[21] See U.S. Dep't of State, Suspension of Routine Visa Services, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html (last visited on July 17, 2020).

[22] See U.S. Dep't of State, Phased Resumption of Routine Visa Services (July 14, 2020), https://travel.state.gov/content/travel/en/News/visas-news/phased-resumption-routine-visa-services.html (last visited on July 17, 2020).

unless extended"—*i.e.*, after the September 30, 2020 deadline for Diversity Visas to issue for the current fiscal year.[23]

110.    The Bureau of Consular Affairs Twitter account has also responded to a number of individual queries regarding the Proclamations' effect. For example:

(a)    In response to the question "[w]hat's going to happen to" Diversity Visa 2020 winners who have not yet had an interview, the Bureau responded that "the Proclamation suspends the issuance of several categories of immigrant visas, including Diversity Visas.  While the proclamation is in place, the issuance of diversity visas is not permitted."[24]

(b)    Responding to a follow-up question, the Bureau reiterated, "We will not be issuing diversity visas while the proclamation remains in effect. The proclamation will expire on December 31, 2020, unless continued.  The September 30, 2020, deadline for DV-2020 has not been extended."[25]

(c)    In response to a question whether 2020 Diversity Visa applicants "can . . . do the interview" despite the June Proclamation, the Bureau responded that "DV-2020 applicants who have not been issued an immigrant visa as of April 23, 2020, are subject to the proclamation's restrictions unless eligible

---

[23] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 23, 2020, 7:49 PM), https://twitter.com/TravelGov/status/1275576629947822080, attached as Exhibit G.

[24] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 24, 2020, 7:02 PM), https://twitter.com/TravelGov/status/1275927372269846529, attached as Exhibit H.

[25] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 29, 2020, 8:24 AM), https://twitter.com/TravelGov/status/1277578676574568448, attached as Exhibit I; *see also* U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 29, 2020, 9:00 AM), https://twitter.com/TravelGov/status/1277587840428367874, attached as Exhibit J (similar).

for an exception.  The September 30, 2020, deadline for obtaining a visa has not been extended."[26]

(d)　　In response to the question whether a Diversity Visa 2020 lottery winner who is "waiting for [an] interview" is "affected by [the] proclamation of President Trump," the Bureau stated, "Applicants for immigrant visas covered by the proclamation, including DV-2020 applicants, who have not been issued an immigrant visa as of April 23, 2020, are subject to the proclamation's restrictions unless eligible for an exception,"[27] and that "[t]he September 30, 2020, deadline for DV-2020 applicants to obtain their visa has not been extended."[28]

(e)　　The Bureau gave the same answer to the observation that even if Diversity Visa holders "are suspended from entering till after the proclamation ends," "[t]he Proclamation only suspends entry, it does not mention suspending the Interview and Visa Issuance process."[29]

(f)　　With respect to nonimmigrant visas, in response to the following question:

> I'm on H1 and inside US.  My wife and kid have H4 approval notices but no valid visa stamps on passports, that means their August appointment is useless and they can't get visa stamps and can't get in although they don't have SSN and can't work here?

---

[26] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (July 6, 2020 10:29 PM), https://twitter.com/TravelGov/status/1280146948054487041, attached as Exhibit K;

[27] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 26, 2020, 10:20 AM),  https://twitter.com/TravelGov/status/1276520628577882112, attached as Exhibit L.  The tweet to which the Bureau was responding appears to have been deleted.

[28] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 26, 2020, 12:00 AM), https://twitter.com/TravelGov/status/1276545941819056128, attached as Exhibit M.

[29] *See* U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 30, 2020, 12:29 pm), https://twitter.com/TravelGov/status/1278002698487554052, attached as Exhibit N.

The Bureau responded,

> We will not be issuing H-1B, H-2B, L, or certain J visas, and their derivatives through December 31, 2020, unless an exception applies.[30]

(g)     In response to a question regarding where to "read a National Interest waiver procedure," the Bureau stated, "per the Proclamation please contact [the Department of Homeland Security] for information on a national interest waiver."[31]   Neither Proclamation directs DHS alone to issue such information, and to Plaintiffs' knowledge DHS has not done so.

111.    A search of the Bureau's Twitter feed shows that it has continued to reiterate these positions.[32]

112.    Plaintiffs' individual experiences bear out that the State Department has implemented the Proclamations by refusing to issue visas.  *See infra* ¶¶ 138-291.

113.    On or about June 22, 2020, DHS posted to its website an announcement concerning the June Proclamation.[33]   The announcement summarizes the June Proclamation's scope and

---

[30] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 30, 2020, 8:15 AM), https://twitter.com/TravelGov/status/1277938802259042304, attached as Exhibit O.  The tweet to which the Bureau was responding appears to have been deleted.  *See also* U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), TWITTER (June 29, 2020, 8:22 AM), https://twitter.com/TravelGov/status/1277578175741153281, attached as Exhibit P (similar in response to question whether an "H4 will be allowed to get [a] visa stamp if [the principal] H1 [visa holder is already] in US…?").

[31] U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), Tweet to Albert Alam, TWITTER (June 30, 2020, 12:56 PM), https://twitter.com/TravelGov/status/1278009405460676609, attached as Exhibit Q.  The Bureau misidentified the Department of Homeland security's Twitter account as "@DHS"; the correct account is @DHSgov.

[32] *See generally* https://twitter.com/search?q=proclamation%20(from%3Atravelgov)&f=live.

[33] U.S. Dep't of Homeland Sec., Trump Administration, DHS Prioritizes American Citizens for American Jobs, https://www.dhs.gov/news/2020/06/22/trump-administration-dhs-prioritizes-american-citizens-american-jobs (last visited on July 17, 2020).  A copy is attached as Exhibit R.

exceptions and directs the reader to the full text of the June Proclamation.  It states that DHS "will begin implementing" the June Proclamation but does not specify how it will be implemented.

114.    DHS's announcement further states that it "is also directed to use all available tools to transition to a merit-based immigration system, ending often-exploited avenues for fraud and abuse."   Neither the April Proclamation nor the June Proclamation, however, contains any provision concerning a "merit-based immigration system," and DHS's announcement provides no other citation for this asserted "direct[ive]."

115.    On July 16, 2020, DOS posted to its website an announcement regarding its implementation of the June Proclamation.[34]   It states, apparently under the authority of the Proclamations' "national interest" exceptions, that "limited exceptions may be provided" to:

- applicants who are subject to aging out of their current immigrant visa classification before the relevant Proclamations expire or within two weeks thereafter;

- certain H and J visa applicants who are traveling to work in support of a critical U.S. foreign policy objective (such as COVID-19 response) and/or traveling at the request of the U.S. government; and

- spouses and children of certain visa class holders, such as H, J, and L visa holders who are already excepted from, or not subject to, the June Proclamation.

---

[34] U.S. Dep't of State, Bureau of Consular Affairs, Exceptions to Presidential Proclamations (10014 & 10052) Suspending the Entry of Immigrants and Nonimmigrants Presenting a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak, https://travel.state.gov/content/travel/en/News/visas-news/exceptions-to-p-p-10014-10052-suspending-entry-of-immigrants-non-immigrants-presenting-risk-to-us-labor-market-during-economic-recovery.html (last visited July 17, 2020).  A copy is attached hereto as Exhibit S.

116.    DOS's announcement further states that it "will continue to issue H, L, and J  visas to otherwise qualified derivative applicants who are otherwise currently excepted or where the principal applicant is currently in the United States."

117.    The announcement further affirms that "[a]pplicants for immigrant visas covered by the proclamation, including Diversity Visa 2020 (DV-2020) applicants, who have not been issued an immigrant visa as of April 23 are subject to the proclamation's restrictions unless eligible for an exception."

118.    On August 12, 2020, the State Department published new guidance regarding the "national interest" exceptions to the Proclamations.[35]  Plaintiffs are analyzing what effects (if any) this new guidance may have on their claims.

## THE JUNE PROCLAMATION CONFLICTS WITH CONGRESSIONAL POLICY AND THE PROCLAMATION'S OWN STATED GOALS

119.    Although the June Proclamation purports to be supported by economic and labor market justifications, those justifications are contradicted by all established economic research. Indeed, they appear to have been created out of whole cloth and without any consideration of the issues.

120.    The June Proclamation rests on a fundamentally flawed premise: that its restrictions on the entry of immigrants and nonimmigrants into the United States are necessary to protect the U.S. labor force during a time of economic contraction, because foreign-born workers "pose[] a

---

[35] U.S. Dep't of State, National Interest Exceptions to Presidential Proclamations (10014 & 10052) Suspending the Entry of Immigrants and Nonimmigrants Presenting a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak (Aug. 12, 2020), https://travel.state.gov/content/travel/en/News/visas-news/exceptions-to-p-p-10014-10052-suspending-entry-of-immigrants-non-immigrants-presenting-risk-to-us-labor-market-during-economic-recovery.html

risk of displacing and disadvantaging United States workers"—especially during a time of high unemployment.

121.    This premise is contrary to decades of economic research.  Indeed, numerous economists of all political stripes have thoroughly discredited the "fallacy" that "there is a fixed amount of work to be done."[36]  In 2017, the National Academies of Sciences, Engineering and Medicine published a 642-page "Consensus Study Report" authored by a panel of nearly 40 economists from across the policy and political spectrum—including "immigration sceptics." The Report concluded that inflows of foreign-born workers have no significant effect on the overall employment levels of U.S. workers.[37]

122.    Congress has likewise rejected that "there is a fixed number of jobs for which competition is a zero-sum game," such that immigrants and foreign-born workers "presen[t] a significant threat to employment opportunities for Americans."  S. Rep. No. 106-260, at 12 (2000). Instead, Congress has found that "labor markets have demonstrated time and time again [that] additional people entering the labor force, whether native-born students out of school, immigrants, or non-immigrants, expand opportunities and create other jobs through innovation, entrepreneurship, and money spent on consumer items like food, clothing, and housing."  *Id.*

123.    Congress has therefore found, and economic studies consistently show, that *increased* immigration levels into the U.S. have had *positive* impacts on the employment levels

---

[36] *Economics A-Z Terms Beginning with L*, The Economist, https://goo.gl/BvRwKU; *see also* Paul Krugman, *Lumps of Labor*, N.Y. Times (Oct. 7, 2003), https://goo.gl/GyYTG5.

[37] THE NAT'L ACAD. OF SCIS., ENG'G., AND MED., THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION (The National Academies Press 2017), https://www.nap.edu/read/23550/chapter/1.

and incomes of U.S.-born workers.[38]  This is because foreign-born workers innovate more, creating jobs and increasing the productivity of U.S. workers;[39] they complement, rather than compete with, U.S.-born workers in the workforce;[40] and they participate in the economy as consumers, stimulating demand.[41]

124.    Perhaps for this reason, Congress has three times in the past four years refused invitations to curtail legal immigration.  *See supra* ¶ 81.

125.    The June Proclamation's sweeping ban on both immigrant and nonimmigrant entry, which the Department of State has decided to implement by refusing to issue visas in any of the covered categories, is therefore directly and irrationally contrary both to decades of Congressional judgment and to the June Proclamation's own stated economic goals.  By dramatically limiting the number of foreign nationals entering the U.S. economy at a time when consumer demand is already

---

[38] *See, e.g.*, Jacqueline Varas, Am. Action Forum, *How Immigration Helps U.S. Workers and the Economy* (Mar. 20, 2017), https://goo.gl/ovHQEh; U.S. Chamber of Commerce, *Immigration Myths and Facts* (Apr. 14, 2016), https://tinyurl.com/yay4xjm9.

[39] Giovani Peri & Chad Sparber, Global Migration Center, *Presidential Executive Actions Halting High Skilled Immigration Hurt the US Economy.* https://globalmigration.ucdavis.edu/presidential-executive-actions-halting-high-skilled-immigration-hurt-us-economy.

[40] *See, e.g.*, Matthew Denhart, George W. Bush Institute, *America's Advantage: A Handbook on Immigration and Economic Growth* 70, 118 (3d ed., Sept. 2017), https://tinyurl.com/y4ykokn9; Gretchen Frazee, *4 Myths About How Immigrants Affect the U.S. Economy*, PBS NewsHour (Nov. 2, 2018), https://tinyurl.com/yxlwzkth; Maria E. Enchautegui, *Immigrant and Native Workers Compete for Different Low-Skilled Jobs*, The Urban Institute: Urban Wire (Oct. 13, 2015), https://tinyurl.com/ycayp6ky; U.S. Chamber of Commerce, *supra* note 38.

[41] Kenneth Megan, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015), https://goo.gl/8p3SP8 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of S.F. Econ. Letter (Aug. 30, 2010), https://goo.gl/jK17fcl; Buttonwood, *Keep on Trucking*, The Economist (Feb. 11, 2012), https://goo.gl/x8vqaL ("When people work for a living, they earn money. They spend that money on goods and services that are produced by other people.").

low, the June Proclamation hinders recovery of both the economy and the labor market.  "Far from helping American workers, barring immigrants is likely to make the economy less productive."[42]

126.    Many of the particular immigration restrictions effected by the June Proclamation are irrational for additional reasons.

127.    First, the June Proclamation, as implemented, suspends visa issuance and entry for thousands of individuals who cannot or will not seek employment in the United States, and therefore do not contribute to the alleged problem of job competition that the June Proclamation purports to address.  These restricted individuals include children; elderly, retired, or disabled parents; students; and individuals who are legally not permitted to work, such as H-4 spouses and children.

128.    Second, the June Proclamation, as implemented, suspends visa issuance and entry for thousands of workers for whom a precondition of visa approval is that such workers will not take a job away from a U.S. worker—and therefore cannot "pose an unusual threat to the employment of American workers."  In particular, the INA requires the U.S. Department of Labor to certify that no U.S. workers are available before employers may hire H-2B workers.  8 U.S.C. § 1101(a)(15)(H)(ii)(b); *see* 8 C.F.R. § 214.2(h)(6)(iii).  The same is true for employers seeking to hire workers through the J-1 summer work/travel program or trainee/intern program—they must certify that hiring such workers will not "displace" any U.S. workers.  22 C.F.R. §§ 62.22(f)(2), 62.32(n)(3).  These certification requirements ensure that it is legally and practically impossible for the H-2B visa program to be responsible for the "more than 17 million United States jobs [that] were lost in industries in which employers are seeking to fill worker positions tied to H-2B

---

[42] Ilya Somin, *The Danger of America's Coronavirus Immigration Bans*, THE ATLANTIC (June 28, 2020), https://www.theatlantic.com/ideas/archive/2020/06/danger-americas-coronavirus-immigration -bans /613537/.

nonimmigrant visas"; for the J exchange program to be responsible for the "particularly high" unemployment rates for "young Americans, who compete with certain J nonimmigrant visa applicants"; or for workers on H-2B or J-1 visas to "present[] a significant threat to employment opportunities for Americans," as the June Proclamation incorrectly claims.

129.    Third, the June Proclamation, as implemented, suspends visa issuance and entry for thousands of H-1B and L-1 workers who play critical roles in job preservation and creation, and whose entry would therefore alleviate the effects of "the extraordinary economic disruptions caused by the COVID-19 outbreak."

130.    Many H-1B visas, for example, are provided to IT professionals, who have helped to transition much of the U.S. workforce to working from home during the COVID-19 crisis and who are needed to maintain the technology that allows the work-from-home economy to continue.[43]

131.    H-1B visa holders are also disproportionately likely to patent new technologies. Restricting their entry therefore not only denies U.S. companies the opportunities for growth and job creation that would have otherwise resulted from those new technologies,[44] but also "risk[s] reducing growth and productivity" as companies "off-shore" jobs to countries where they are able to hire skilled foreign workers.[45]   Indeed, recent academic research by the Wharton School of

---

[43] Alex Nowrasteh, *President Trump's Cancellation of Many Work Visas Will Hurt the American Economy*, Cato at Liberty (June 22, 2020), https://www.cato.org/blog/president-trumps-cancellation-many-work-visas-will-hurt-american-economy.

[44] *Id.*

[45] Letter from 324 employers and trade, industry, and higher education associations and groups across the American economy focused on the high-skilled workforce to President Donald J. Trump, Secretary of State Michael Pompeo, Secretary of Labor Eugene Scalia, and Acting Secretary of Homeland Security Chad Wolf (May 21, 2020), https://competeamerica.org/wp-content/uploads/sites/26/2020/05/324-Signatory-Business-Letter-to-President-and-Secretaries-Nonimmigrant-Visa-Facts-5-21-2020.pdf.

Business confirms that restrictions on high-skilled immigration causes firms to send jobs elsewhere by "open[ing] new foreign affiliates abroad" and increasing employment "at existing foreign affiliates."[46]

132.    H-1B visa holders are also hired for particular specialty occupations, and the majority of those specialty occupations are currently experiencing economic stability and success as opposed to the high unemployment currently experienced in other parts of the U.S. economy. Although the June Proclamation states that "more than 20 million United States workers lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions," that assertion ignores that U.S. employers seeking to hire H-1B workers cannot hire any worker from an entire *industry*, but instead must hire someone seeking to work in a specific type of *job*. Data on the top H-1B *jobs*—not *industries*—shows that between January 2020 and May 2020, total employment *increased* by about 185,000 in the top 20 H-1B occupations, which account for 85 percent of all H-1B requests.[47] In fact, DHS data shows that 66 percent of all H-1B workers work in computer-related occupations, in which the unemployment rate through April 2020—at the height of stay-at-home-orders in the United States—was 2.8 percent.[48] For this

---

[46] Britta Glennon, How Do Restrictions on *High-Skilled Immigration Affect Offshoring? Evidence from the H-1B Program*, SSRN (2020) https://papers.ssrn.com/sol3/papers.cfm?abstract_ id=3547655; *see also* S. Rep. No. 106-260, at 19 (2000). ("In 1998, Thomas Friedman of the *New York Times* wrote, 'If U.S. companies are told to put up "No Vacancy" signs, they are inevitably going to move more knowledge operations overseas, and that will spur more innovation, wealth creation, and jobs over there.'")

[47] David J. Bier, "The Facts About H-4 Visas for Spouses of H-1B Workers", Cato at Liberty (July 7, 2020), https://www.cato.org/blog/trumps-h-1b-ban-based-misreading-economic-statistics.

[48] *Supra* note 46.

reason, too, the ban on H-1B entry/visa issuance is contrary to the economic data: there are plenty of jobs in the highly skilled occupations most commonly held by H-1B visa holders.[49]

133.   The June Proclamation is similarly irrational with respect to L visas.  These workers must demonstrate significant institutional knowledge, expertise, or experience *specific to the sponsoring company*. Such workers are not fungible, and do not compete with unemployed U.S. workers for open positions.

134.   Moreover, L-visa holders are crucial for job creation in the United States because they provide critical on-the-ground leadership for multinational employers seeking to invest in their U.S. affiliates.  According to the Congressional Research Service, the L-1 visa category is "essential to retaining and expanding international businesses in the United States," not least because it allows multinational corporations to bring key employees, including top executives, to the United States on a temporary basis to oversee investments and set up new operations here.  In creating the L visa, Congress found that "[s]uch intracompany transfers have contributed immeasurably to the growth of American enterprise throughout the world and to the international trade of the United States."  H.R. Rep. 91-851, at 2755 (1970).

135.   In short, the June Proclamation's effects are directly and irrationally contrary to its asserted purposes and cursory findings.  Rather than protecting the U.S. labor force, as it claims to do, the June Proclamation endangers the U.S. economy by cutting off the supply of foreign-born workers, innovators, and consumers that the economy relies on for stability and continued growth.  At the same time, the Proclamation prohibits individuals with no intention of working in the U.S.

---

[49] In addition, H-1B-dependent employers must certify that the position for which the foreign worker is being recruited cannot be filled by a United States worker. *See supra* ¶47; 22 C.F.R. § 655.738.

from contributing their purchasing power to the U.S. economy, to the ultimate detriment of U.S. workers.

## THE PROCLAMATIONS AND DEFENDANTS' IMPLEMENTATION HARM PLAINTIFFS

136.    The Proclamations have effectively shut down a significant portion of the U.S. immigration system. The CATO Institute estimates that at least 164,000 immigrants and 381,000 nonimmigrant workers and their derivatives have been and will be banned through the June Proclamation's effective date, which will also affect approximately 20,000 U.S. employers seeking to bring workers in on nonimmigrant visas.[50]   The White House estimates that the June Proclamation will affect at least 525,000 people.

137.    The Proclamations and their implementation therefore cause Plaintiffs and all other similarly situated entities and individuals substantial, concrete, particularized, and irreparable injury.

### Family-Based Immigrant Visa Plaintiffs

138.    Plaintiff **Nazif Alam** is a Lawful Permanent Resident originally from Bangladesh. On March 29, 2019, he filed a petition to sponsor his wife, a prospective student at Cornell University who currently resides in Bangladesh, for an F2A immigrant visa.  USCIS approved the

---

[50] *See* David J. Bier, "Trump's Migration Ban Could Affect Up to 545,500 if Consulates Reopen— Fewer than 18,000 Otherwise," Cato at Liberty (July 7, 2020), https://www.cato.org/blog/trumps-migration-ban-could-affect-545500-consulates-reopen-fewer-18000-otherwise; David J. Bier, "About 20,000 U.S. Employers Are Affected by Trump's Travel Bans This Year," Cato at Liberty (July 16, 2020), https://www.cato.org/blog/about-20000-us-employers-are-affected-trumps-travel-bans-year.  The Migration Policy Institute has issued similar estimates.  *See* Migration Policy Inst. (@MigrationPolicy) TWITTER (Jun. 22, 2020, 5:42 PM) https://twitter.com/MigrationPolicy/status/1275167186794024962; *see also* Sruthi Darbhamulla, *Trump's COVID-19 visa bans may alter the face of American immigration beyond the pandemic,* THE CHICAGO REPORTER (July 8, 2020), https://www.chicagoreporter.com/trumps-covid-19-visa-bans-may-alter-the-face-of-american-immigration-beyond-the-pandemic/  (providing similar estimates from the American Immigration Council).

visa petition on February 14, 2020, and Mr. Alam submitted all necessary documentation in support of the visa on April 8, 2020.  The only remaining step was for Mr. Alam's wife to attend a consular interview.

139.    Mr. Alam has been waiting to be reunited with his wife for two years.  They are two young adults who are on the cusp of beginning their American dream together.  The last several months of their separation have been particularly trying, as Mr. Alam is an essential employee in the food distribution industry in New York City.  He works for the firm Harold Levinson Associates LLC, where he is responsible for ensuring that the grocery shelves of the convenience stores for which he is responsible are stocked with much-needed supplies.  During the COVID-19 pandemic, many people have been allowed to work from home to avoid exposure to the virus, but Mr. Alam has not had that luxury.  He comes home every day with the anxiety of having been exposed to one of the most lethal viruses in modern history.  Not having his wife's support, comfort, and companionship during these difficult times has left him even more stressed and burned out.

140.    Mr. Alam's wife will be fully supported financially when she arrives in the United States.  Not only will she be supported by her husband's steady job; she also has been accepted to a Master's program at Cornell University for fall 2020.  It is a rare opportunity for any person, and more so for a woman from a developing country, to be accepted into an esteemed institute like Cornell University.  This came at a steep cost:  dedication, effort, and many sleepless nights in order to get good scores in standardized tests and to write exceptional essays.  Mr. Alam and his wife stand to lose the initial monetary deposit that was made to Cornell to secure his wife's admission.  Her inability to attend Cornell would also result in severely restricting her earning potential and her ability to contribute to the economy of this country when she is here and ready

to enter the job market, thereby severely harming their effort in pursuing the American dream.  Mr. Alam has the necessary resources to support his wife for the eighteen months of her educational program when she will be a full-time student and not working.

141.    In late April 2020, when Mr. Alam learned about the Presidential Proclamation, he was devastated, because he knew it would prolong his separation from his wife, but he hoped that it would only last for 60 days.  When he learned in late June that the entry bar affecting his wife would extend at least another six months, if not indefinitely, he was beside himself.  It is emotionally wearing on Mr. Alam to be separated from his wife.

142.    On July 11 and 12, 2020, Mr. Alam contacted the National Visa Center and the U.S. Consulate in Dhaka Bangladesh to inquire about the visa process for his wife.  The Consulate only told Mr. Alam that "that they were awaiting approval from the Consulate in Bangladesh to approve the case being forwarded."

143.    Plaintiff **Carmen Ligia Pimentel** is a lawful permanent resident originally from the Dominican Republic.  She sponsored her husband Luis Beltre Rondon, who currently resides in the Dominican Republic, for an F2A immigrant visas.  Ms. Pimentel was expected to give birth to the couple's first child on or about August 12, 2020.

144.    Ms. Pimentel filed her husband's visa petition with USCIS on or around January 18, 2018, which was approved on or around September 27, 2019.  On March 16, 2020, the National Visa Center confirmed that the application was documentarily qualified, and Ms. Pimentel's husband was eligible for a visa interview.

145.    Ms. Pimentel has been separated from her husband for about two and a half years. Because the couple anticipated that he would receive his visa in short order, they made the decision to try to get pregnant and start a family sooner than later.  They are both in the workforce, and

once their baby is born, they had planned for one of them to stay home with the baby while the other worked, to avoid the cost of childcare. However, when Ms. Pimentel received the happy news in February 2020 that she was several months pregnant, and her husband had still not been scheduled for a visa interview, she requested expedited processing to secure the interview as soon as possible. The request was approved on or about March 20, 2020, but because of the COVID-19 pandemic, they did not hear anything further for about a month. In late April 2020, the Consulate contacted Ms. Pimentel's husband to inquire further about his request for an expedited interview and confirmed that his circumstances warranted expedition. However, they further informed him that they could not schedule his interview because of the Presidential Proclamation banning immigration for 60 days.

146.    Through her attorney, Ms. Pimentel contacted her congressional representative to ask how to invoke the "national interest" exception so that her husband would not have to miss the birth of their first child. She held out hope that the Proclamation would not be extended beyond the initial 60-day period so her husband could join her thereafter.

147.    In late June 2020, when Ms. Pimentel learned the President had extended the Proclamation through the end of the year, and perhaps indefinitely, she was devastated. Her separation from her husband has been extremely hard on her, particularly because he has not been there to provide her emotional support as she navigated her first pregnancy. Although she speaks to her husband on a daily basis, this is no substitute for the comfort and companionship his physical presence could provide. She is also heartbroken about the prospect of not having her husband there with her for the birth of their child, the most beautiful moment of their lives. But even worse is the prospect that her husband will also be separated from his child and be unable to help her care for him here in the United States, potentially indefinitely. Ms. Pimentel cannot easily travel to the

Dominican Republic to reunite with her husband once her child is born, particularly in light of the risk of becoming exposed to the COVID-19 virus.

148.     On July 10, 2020, Ms. Pimentel's attorney contacted the office of her Congressional representative, Sylvia R. Garcia, to seek an exception to the entry suspension for her husband.  On July 13, 2020, the U.S. Embassy in the Dominican Republic responded: "Thank you for your inquiry … According to our records Ms. Pimentel petitioned for her husband Luis Beltre Rondon … as such, the visa application falls under the recent Presidential Proclamation …, and we cannot process this visa until the expiration of the Proclamation."

149.     Plaintiff **Juan Carlos Rosario Lebron** is a Lawful Permanent Resident originally from the Dominican Republic.  On April 25, 2018, he filed applications to sponsor his two minor daughters (ages 12 and 17) for F2A immigrant visas.  On February 26, 2020 the National Visa Center notified him that his applications were complete and that his daughters were eligible for visa interviews.

150.     Mr. Lebron has been living apart from his two minor daughters for 7 years, and for over two years since his petition was approved.  Although Mr. Lebron was eligible to sponsor his daughters earlier, when he became a lawful permanent resident in 2013, he was in an abusive relationship and wanted to wait before bringing his daughters to live with him.  In the meantime, his mother has been their primary caretaker, while he provided for them financially.  However, his mother is now advanced in age and is no longer healthy enough to adequately care for his daughters.  Mr. Lebron also cannot return to the Dominican Republic for any significant length of time to care for his daughters without jeopardizing his career and financial stability, his Lawful Permanent Resident status, and his eligibility to become a U.S. citizen.

151.    In late April 2020, Mr. Lebron learned about the April Proclamation that banned immigration for 60 days, which prompted him to try to seek expedited emergency interviews in light of his mother's precarious health situation.  However, he has to date received no response to this request.

152.    Upon learning that the Proclamation entry suspension was being extended to the end of the year, and possibly indefinitely, Mr. Lebron has become distraught.  After waiting for his daughters' visa applications to become current for more than two years, he now faces the prospect that they will continue to be separated for at least another six months, and possibly indefinitely. This has caused him great fear and anxiety, particularly because of his mother's precarious health situation.  His mother could take a turn for the worse at any time, leaving his minor daughters to fend for themselves in a country where they have no other support structure.

153.    On July 14, 2020, Mr. Lebron contacted the National Visa Center to seek an emergency interview for his daughters, in order to invoke an exception to the June Proclamation. Congresswoman Lori Trahan also made a request for an emergency interview on Mr. Lebron's behalf on July 17, 2020.  As of the filing of this Amended Complaint, he has not received a response to his request.

154.    Plaintiff **Daniel Chibundu Nwankwo** is a U.S. citizen who was born in Nigeria. On March 18, 2018, he filed a petition to sponsor his father Sylva Nwankwo, who resides in Nigeria, for an immigrant visa.  The petition was approved on February 18, 2020.  After submitting all necessary paperwork, Mr. Nwankwo has been waiting for his father to be scheduled for a visa at the Consulate in Nigeria.

155.    Mr. Nwankwo has been separated from his father for over two and half years since he sponsored his immigrant visa.  The separation has been very difficult and has resulted in less

and less personal interaction with his father as time goes by.  He misses his father's love, care, guidance and discipline, which is essential to his balanced development.  Mr. Nwankwo is an undergraduate student in electrical engineering and looks to his father as his role model and mentor.  His father is a well-established engineer with a current license from the State of California.

156.    When Mr. Nwankwo learned in late April 2020 about the Presidential Proclamation's initial 60-day ban on immigration, and then in late June about the extension of the ban for another six months, if not longer, he and his family were heartbroken.  This protracted and possibly indefinite separation has made Mr. Nwankwo feel disappointed and troubled.  He had to go through many difficult life events without his father's support but was holding out hope that he only had to wait for his companionship a short time longer.  But when he learned about the prolonged and potentially indefinite separation imposed by the June Proclamation, his hopes were crushed by the uncertainty of how much longer it would take to reunite with his father.

157.    Plaintiff **Claudio Alejandro Sarniguet Jiménez** is a Lawful Permanent Resident originally from Chile.  On December 20, 2017, shortly after he became a Lawful Permanent Resident, Mr. Jimenez sponsored his now 19-year old son, Claudio, for an F2A immigrant visa. The application took two years to process but was finally approved on August 22, 2019.

158.    At that time, Claudio was temporarily living with his father in the United States. On August 23, 2019, Mr. Jimenez sent Claudio to Chile to carry out consular visa processing there. He anticipated that he would be separated from Claudio for only a few months, and diligently worked to submit all documents in support of his application to ensure that they would be reunited soon.  By January 22, 2020, Claudio was documentarily qualified for a visa interview.  The interview was originally scheduled for March 20, 2020, in Santiago, Chile, but was rescheduled to March 30, and then was indefinitely postponed because of the COVID-19 pandemic.

159.    Mr. Jimenez has now been separated from his son for almost a full year during one of the most critical periods in his son's life.  Claudio was planning on starting college at Auburn University or Troy University in Oklahoma in the fall of 2020.  Both schools expressed interest in offering Claudio a full scholarship.  He had expressed an interest in studying nuclear engineering so that one day he could enlist in the U.S. Navy and, after that, go to work for NASA.  Mr. Jimenez is very proud of his son and is eager to see him pursue higher education and advance his career in the near future.

160.    When the Presidential Proclamation was announced in late April, Mr. Jimenez held out hope that it would expire after 60 days, as it initially stated, so that his son's plans to start college in the fall would not be disrupted.  When the Proclamation entry suspension was extended for at least the next six months and possibly indefinitely, Mr. Jimenez was emotionally devastated. What was supposed to be a brief separation from his son has turned out to be an extended, if not indefinite family nightmare.  Not only was Mr. Jimenez's dream to see his son begin higher education in the United States destroyed, it also meant Mr. Jimenez would have to suffer prolonged and potentially indefinite separation from his son, with whom he had expected to reunite months ago.  He is only able to communicate with his son by phone once a week because of issues with the telephone signal, which has been difficult to bear.  Mr. Jimenez has spent thousands of dollars on legal counsel and government fees in connection with his son's immigration processing to hasten being reunited with him, which now appears to have been for naught.  He also has had to spend additional money providing for his son's living expenses in Chile, and he must pay for any medical expenses out-of-pocket as his son has no health insurance there.

161.    Mr. Jimenez has requested an emergency interview for his son, in order to invoke an exception to the June Proclamation.  As of the filing of this Amended Complaint, he has not received a response to his request.

162.    Plaintiff **Angela Sinon** is a U.S. citizen originally from the Philippines and worked for the United Nations in New York for 25 years before retiring in 2013.  On January 5, 2009, she filed a petition to sponsor her unmarried adult son Emmanuel Sinon for an F2B immigrant visa. The petition was approved on September 24, 2009, and her son was finally scheduled for an interview at the U.S. Embassy in Manila on March 10, 2020.

163.    Ms. Sinon's son was living with her in the United States, but when his interview was scheduled, he returned to the Philippines for the interview.  However, the interview was canceled because Mr. Sinon had to wait eight weeks for the results of a medical test.  Mr. Sinon's test ultimately came back negative, so he was again ready for the interview.  But the Consulate has not rescheduled Mr. Sinon's interview.

164.    Though Ms. Sinon has been separated from her son for only a few months, she has suffered greatly, and this suffering has only become more severe with each day he is away from her.  Ms. Sinon is an elderly, unmarried woman, and she relies on her son for all of her basic life activities.  Both of her parents have passed away, and her son is the only family she has left.  Ms. Sinon's son assists her with all of her daily activities, including buying groceries, taking her to her medical appointments, doing household chores, and paying her bills.  Because of all of the day-to-day assistance her son provides, Ms. Sinon has suffered significantly these last few months that her son has been in the Philippines awaiting his visa.  She has also suffered financially because of the separation from her son.  She has had to pay for his apartment and living expenses in the Philippines while he awaits visa processing there, which she can ill afford on her retiree income.

165.    Her son has a Bachelor's degree, and Ms. Sinon was expecting her son to help support her financially once he obtained his immigrant visa and was able to find employment.  He has been volunteering for the American Red Cross since 2013, and before that for the Department of Veterans Affairs from 2000 to 2013, always looking to give back to his adopted country.

166.    When Ms. Sinon learned in late April that the April Proclamation would ban immigration for 60 days, and then in late June that it would be extended to the end of the year, if not longer, she was heartbroken and devastated.  She has been waiting for her son's visa to become current for 10 years.  The prospect of having to wait to reunite with him for at least another six months, if not indefinitely, is more than she can bear.

167.    On July 13, 2020 Ms. Sinon contacted the U.S. Consulate in Manilla to seek an emergency interview for her son, in order to invoke an exception to the June Proclamation. As of the filing of this Amended Complaint, she has not received a response to her request.

168.    Plaintiff **Loida Phelps** is a U.S. citizen originally from the Philippines.  On March 18, 2009, she filed a petition to sponsor her unmarried adult daughter Maria Lourdes Aligam Dolom for an F2B immigrant visa, together with her three granddaughters Marylour Angela Dolom Reano, Sebastian Dolom Lozano, and Marylour Angela Dolom Lozano, all of whom currently reside in the Philippines.  The petition was approved on April 22, 2010.  Because her oldest granddaughter was close to aging out of her visa preference category, she was initially approved to expedite their visa interview, and she scheduled medical appointments for July 14, 2020 in Manila.

169.    Ms. Phelps has been separated from her daughter and granddaughters for the last 20 years, and began the process of reuniting with them 11 years ago.  She successfully petitioned to bring her other two daughters to the United States in 2003. They are now married, have children

and live ten minutes away from Ms. Phelps.  It has been her life-long dream to have all of her children and grandchildren together with her in the United States.

170.    Ms. Phelps was set to achieve her family reunification dream when in late April, and then again in late June, the Proclamation forced her to defer it further, possibly indefinitely. However, the consequences of this delay are dire.  Ms. Phelps is in her 60s and has a number of health issues, including osteoporosis, arthritis, migraines and a benign breast tumor that her doctor is monitoring.  She longs to have the comfort of her whole family around her, and worries that her declining health will rob her of the ability to enjoy their company if their arrival continues to be delayed.  Though Ms. Phelps has tried to visit her daughter and granddaughters in the Philippines regularly, each trip is a bit harder than the last, and she is not sure how much longer she will be able make these long journeys.

171.    Her daughter and granddaughters will not only be able to support her as she advances in age, but they will also contribute to American society.  Her eldest granddaughter is a senior in college studying medical technology in the Philippines, and has plans to enter a masters' program in this field when she comes to the U.S.

172.    Complicating matters is the fact that Ms. Phelps' granddaughter Marylour Angela Dolom Reano may be entitled to an exemption under the Proclamation because she may age out while the Proclamation is in effect on October 26, 2020, under the rules of the Child Status Protection Act.  However, this is cold comfort for the family, as her granddaughter, a derivative applicant, cannot immigrate unless her mother Maria Lourdes first receives a her visa.

173.    Ms. Phelps's attorney has repeatedly attempted to contact the Embassy through the U.S. Travel Docs system, to seek an exception to the Proclamation, but to date has had no response.

174.    Plaintiff **Nancy Abarca** is a U.S. citizen originally from the Philippines.   On February 9, 1995, she submitted a petition to sponsor her brother Renato Gawat, together with his wife Christina Tesaluna Gawat, and their minor daughter Maria Andrea Tesaluna Gawat, who currently reside in the Philippines.  The petition was approved on December 13, 1999, they have submitted all of the necessary paperwork.  Their case is now "current" according to the July 2020 Visa Bulletin, and they are awaiting a visa interview.

175.    Ms. Abarca has been waiting 25 years to reunite with her brother and his family in the United States.  While she knew the wait would be long under the sibling fourth preference category, the time has taken its toll on her health in ways that she did not expect.  She suffers from asthma, arthritis and diabetes.  Because of the heightened risks of the COVID-19 pandemic, she can no longer carry out full time work as a registered nurse. She worries that a flare up of any of her health conditions could greatly diminish the quality of her time with her brother if and when he eventually makes it here.  Ms. Abarca is no longer able to make the 10,000 mile journey to see her brother and his family in the Philippines.

176.    When Ms. Abarca learned in late April that her plans to reunite with her brother and his family would be further delayed because of the Proclamation, she was disappointed, but was prepared to wait the specified additional two months.  However, when she learned that the Proclamation would be extended to the end of the year, if not indefinitely, she was devastated.  She has longed to see her brother and his family settled in the U.S. near her.  She has also longed to see her niece, the next generation of her family, carry on their legacy here.  Her niece is studying architecture in the Philippines, and had hoped to complete her studies in the U.S., and go on to become a self-supporting professional who will contribute to American society.

177.   Complicating matters is the fact that Ms. Abarca's niece may be entitled to an exemption under the Proclamation because she may age out while the Proclamation is in effect. Her niece's birthday is November 26, 2020.  However, this is cold comfort for the family, as her niece, derivative applicant, cannot immigrate unless Renato first receives his visa.

178.   On July 12, 2020, Ms. Abarca's lawyer contacted the U.S. Embassy in Manila seeking an emergency interview for her brother and his family, in order to invoke an exception to the Proclamation.  As of the filing of this Complaint, they have not received a response to this request.

179.   Plaintiff **Mohamed Saleh** is a U.S. citizen originally from Yemen.  Mr. Saleh became a citizen in 2000, and shortly thereafter petitioned for his immediate family to immigrate to the United States, including his wife, two daughters and two sons.  His son Abu Bakr's petition was not approved until 2016, and in the intervening years Abu Bakr got married in Yemen, and had four children there, including a daughter R.S. (now ten years old), all of whom he added to the petition.

180.   Although Abu Bakr received his visa in 2016, Mr. Saleh asked the U.S. Embassy to hold off issuing visas to Abu Bakr's wife and four children at that time, so that Abu Bakr could spend some time working and saving money to support them.  A few years later, in October 2019, Abu Bakr contacted the U.S. Embassy in Egypt to continue processing visas for his wife and children.

181.   The Embassy scheduled the interviews for Abu Bakr's family in February 2020. Abu Bakr's family traveled from Yemen to the Egypt to attend the interview.  At the interview, the officer granted the family a waiver from Presidential Proclamation 9645 (the "Muslim Ban"), because they had nobody to support them in Yemen.  The day after the interview, the Embassy

called the family and asked them some further questions about R.S., which were similar to the questions they had asked at the interview—mainly relating to information they had provided on their DS 260 form.  The family answered the questions the same day.  Within a few days, the whole family, except for R.S., received their visas.  The Embassy official assured them that R.S. would be issued a visa soon as well.

182.    However, when weeks passed and R.S. had still not received her visa, Abu Bakr contacted the Embassy several times between March and June 2020 to inquire when the visa would be ready.  He explained that the rest of the family's visas were about to expire, and that they needed R.S.'s visa so they could travel as a family back to the U.S.  The Embassy told Abu Bakr that they could not issue the visa because it was in administrative processing.

183.    In late April, Mr. Saleh contacted the office of their local Congressional representative Nancy Pelosi, who contacted the Embassy on their behalf.  The Embassy informed Pelosi's office that the visa could not be issued because of the Proclamation.  Mr. Saleh also contacted an attorney who contacted the Embassy on their behalf to seek an exception to the Proclamation for R.S.  However, the Embassy simply relayed that they could not issue the visa.

184.    In late June, because their visas would soon expire, the rest of Abu Bakr's family was forced to travel to the U.S. or risk losing their visas, which they had waited four years to obtain. They asked the Embassy to extend their visas, so that they could wait for R.S.'s visa to be issued, but they were told that there was no guarantee that the visas would be reissued once they expired.  Though it was heartbreaking to do, they had no choice but to leave R.S. with acquaintances in Egypt, who agreed to look after her for a while.

185.    Since R.S. was separated from her family, the whole family has been inconsolable. They each speak to R.S. almost every day, each taking turns to check on her.  She is a young girl

and feels sad and alone in a foreign country, living with people she barely knows.  She cries on each phone call, in turn leaving Mr. Saleh and his family miserable knowing there is little they can do to console her from so far away, let alone take care of and protect her.

186.    The harm Mr. Saleh's family is suffering because of their separation from R.S. is profound.  While Abu Bakr's wife plans to return to Egypt to be with her young daughter while they wait out the saga of securing her visa, she cannot do so until she gets her green card.  Abu Bakr also is unable to travel to be with R.S. because he is the family's sole breadwinner and cannot take leave from his job.  Having R.S. in Egypt is taking a toll on the family's finances as well, as Abu Bakr has to support both his family in the U.S. and R.S. in Egypt.  R.S. would normally have been starting school in a few months, but she will be missing school if she continues to live in limbo in Egypt much longer.  Mr. Saleh has not seen his granddaughter R.S. since she was a baby, and was looking forward to being reunited with her, and finally having his whole family together after so many years.  Now he wonders if that will ever happen during his lifetime, leaving him heartbroken.[51]

**Diversity Visa Lottery Winners**

187.    Plaintiff **Fatma Bushati** is a citizen and resident of Albania.  Ms. Bushati has a Master's degree in Business Administration and works as a human resources professional for Albania's healthcare system.  She applied for the FY 2020 Diversity Visa Lottery in 2019 on behalf of herself and her immediate family, including her husband Eldis Bushati and her daughter Alia Bushati, age 3.  On May 11, 2019, she received notice that she had been selected to participate in

---

[51] R.S. received her visa from the U.S. Embassy in Egypt on or about August 11, 2020.  She boarded a flight from Egypt to the United States on August 12, 2020, and is expected to arrive in San Francisco and be reunited with her family on August 13, 2020.  Mr. Saleh will voluntarily dismiss his claims if and when R.S. has fully completed her immigration process and rejoined her family.

the 2020 Diversity Visa Program, bringing her family one step closer to realizing their lifelong dream of immigrating to the United States. On March 12, 2020, she received notification from the Department of State that she was "ready to be scheduled for an interview when [her] case number becomes current." However, because of the Proclamations, Ms. Bushati has never been scheduled for her visa interview.

188.    Ms. Bushati has entered the Diversity Visa Lottery every single year since she turned 18 years old because she has long admired the United States, its justice system and freedoms, and its opportunities for upward mobility. All of these things are sorely absent in her native Albania, an economically and politically unstable country. Although she understood her chances of obtaining a diversity visa were slim, throughout her adult life she took intentional steps to ensure she could be successful in the United States, including learning English and obtaining relevant skills and education to succeed in the U.S. job market.

189.    Ms. Bushati has specialized skills in the healthcare industry and would be able to contribute much-needed human capital to help combat the COVID-19 pandemic at a time when the U.S. healthcare system is under considerable strain. She works as a human-resources professional for the Office of the Operations of Health Care Services for the entire northern region of Albania. In this role, she is responsible for fulfilling the personnel needs of more than 80 healthcare facilities, including support staff, doctors, and nurses. During the COVID-19 crisis, she has been working day and night to ensure the healthcare facilities have the personnel they need. She is highly employable and plans to seek a health care administration job in the United States. Ms. Bushati's husband has a Bachelor's degree in finance but works as a plumber because of the limited career opportunities in his field in Albania.

190.    Ms. Bushati has family in the United States, including her husband's aunt, who has submitted an affidavit of support on their behalf, and she has already expended financial resources in anticipation of the Bushati family's arrival.  Her aunt recently purchased a new condo, in which she has placed furniture and home goods so the Bushati family can live comfortably while they get their bearings and find gainful employment in the United States.

191.    But the Bushati family's hopes and plans to realize the American dream were upended when, in April 2020, Ms. Bushati learned of the Presidential Proclamation suspending immigration to the United States for 60 days, and she later learned that the suspension would be extended through at least the end of the year, if not indefinitely.  Upon hearing the news, Ms. Bushati and her family have been suffering from mental anguish and anxiety, as the immigration ban will forever change their lives for the worse.

192.    The June Proclamation will forever destroy Ms. Bushati's dream of immigrating to the United States if she is unable to receive her diversity visa before the end of the federal fiscal year.  She never imagined that, after spending the past 13 months diligently fulfilling all of the conditions and requirements of the visa, the rug would be pulled out from under her just months before her American dream was to be realized.  She had plans to be self-sufficient in the United States, and is now sorely disappointed by the injustice of the June Proclamation's arbitrary and irrational denial of her ability to immigrate.

193.    The U.S. Consulate in Tirana, Albania, has stated that diversity visa applicants will not be scheduled for an emergency visa interview prior to September 30, 2020.  Nonetheless, on July 12, 2020, Ms. Bushati contacted the U.S. Consulate to request an emergency interview, in order to seek an exception to the June Proclamation.  The Consulate replied on July 13, stating: "the Presidential Proclamation 10014 suspended the issuance of several categories of immigrant

visas, including diversity visas.  This proclamation was recently extended until December 31, 2020.  Applicants for immigrant visas covered by the proclamation, including Diversity Visa 2020 (DV-2020) applicants, who have not been issued an immigrant visa as of April 23, 2020, are subject to the proclamation's restrictions.  The September 30, 2020, deadline to obtain an immigrant visa for DV-2020 has not been extended."

194.    Plaintiff **Jodi Lynn Karpes** is a citizen of South Africa, where she currently resides.  Ms. Karpes is an accomplished public relations specialist who runs her own business. She applied for and was selected as a winner for the FY2020 Diversity Visa Lottery.  Thereafter, she applied for a visa number, which is current, meaning a visa is available if she is able to schedule her interview.  However, as of the filing of this Amended Complaint, she has not yet had an interview.

195.    Ms. Karpes did have an interview scheduled, but in May 2020, she received notification from the U.S. Embassy in South Africa that her interview had been cancelled.  On July 13, 2020, Ms. Karpes requested an emergency immigrant interview.  The Consulate declined her request and stated that "[a]ll routine visa processing has been suspended until 30 December 2020 due to the Presidential Proclamation for coronavirus.  There are exceptions for IR1/IR2s, CR1/2s visas.  We are not conducting any visa interviews at the moment and awaiting guidance on how to process and scheduled visa interviews."

196.    Ms. Karpes is a highly educated business professional who has degrees and certificates from educational institutions around the world.  She has a Bachelor's degree in business from the University of South Africa, a teaching diploma from Trinity College of London, and a diploma in digital marketing from Digital Marketing Institute—Vega School of Brand

Advertising.  She also spent a semester at Scottsdale Community College in Arizona, where she fell in love with America and began to dream about immigrating here.

197.    In 2007, Ms. Karpes established her own business in South Africa, GreenQueen Communications, where she works as a public relations specialist.

198.    Ms. Karpes entered the Diversity Visa Lottery to overcome the limited professional opportunities she has in South Africa and other societal challenges associated with the country's depressed economy.  Although she has developed important skills and achieved business success in South Africa, her opportunities for professional and business growth are limited there.  The country's unemployment rate remains above 20 percent, crime is high, and there is rampant inequality in income and educational opportunities.  This has not been an ideal environment in which to advance herself professionally, let alone grow her business.

199.    In April 2020, she learned about the April Proclamation banning immigration to the United States for 60 days. On June 22, 2020, she learned that the President had extended the immigrant ban for the rest of the year, if not indefinitely, which would likely end her chance to immigrate.  The news was devastating for her, as she had already made plans to move her life to the United States and expand her business there.  She had plans to move to Tulsa, Oklahoma to live with a friend and develop a business plan that would result in the creation of more American jobs.

200.    Plaintiff **Shyam Sundar Koirala** is a citizen of Nepal, where he currently resides with his wife.  Mr. Koirala is a microbiologist by training, and works at an India-based pharmaceutical company.  Mr. Koirala has entered the diversity lottery each year for the last ten years so that he could come to the United States and build a new life for his family here.  On May 7, 2019, Mr. Koirala's dream came true: he received notification from the U.S. State Department's

Diversity visa website that he had been selected to participate in the 2020 Diversity Visa Program, bringing him one step closer to realizing his goal of improving his family's standard of living.  On December 16, 2019, he received notification from the Department of State that he had "submitted all required documentation to the Kentucky Consular Center and [was] ready to be scheduled for an interview when [his] case number becomes current."

201.    Mr. Koirala grew up with modest means—both of his parents are farmers—but he strived to improve his lot in life through education and hard work.  He has a Bachelor of Science degree in microbiology.  For the last seven years he has been working at the India-based pharmaceutical company RPG Life Sciences, where he is a territory business manager.  His wife Bhumika is also a professional, working for the past eight years as a banking assistant at a bank in Nepal.  While they have become established in their careers, they have few paths to further upward mobility given that Nepal continues to be an underdeveloped country with a struggling economy.

202.    Once Mr. Koirala was selected, he began to make concrete plans to start a new life in the United States, including by saving money and foregoing investment opportunities in Nepal.  His plan was to continue his career in the pharmaceutical industry in the United States.  His wife also planned to continue her career in the banking and finance industry.

203.    However, Mr. Koirala's hopes and plans were put on hold in late April 2020, when his family learned about the Presidential Proclamation's 60-day ban on immigration.  Their dreams were later shattered in late June 2020, when they learned that the President had extended the ban through the end of the year, if not indefinitely.  Since they are required under the diversity visa program to secure visas by September 30, 2020, they understood their opportunity to immigrate to the U.S. was likely gone.

204.     On July 14, 2020, as a last-ditch attempt to resurrect their dream to come to America, Mr. Koirala contacted the U.S. Embassy to request an emergency interview to seek an exception to the June Proclamation.  He received a form response that failed to address his request for an emergency interview.  The U.S. Embassy stated, "Please be informed that as of March 17, 2020, the United States Embassy in Kathmandu is canceling routine Diversity visas and nonimmigrant visa appointments.  From March 23, 2020, the U.S. Embassy is canceling all routine immigrant visa appointments. We will resume routine visa services as soon as possible but are unable to provide a specific date at this time."

205.     Plaintiff **Aja Tamamu Mariama Kinteh** is a citizen of Gambia where she currently resides.  Ms. Kinteh has a degree in economics and works as a statistician.  On October 4, 2018, she applied for a diversity visa for herself and her immediate family, including her husband Cherno Aboubacarr Jagne, her 6-year-old stepson Modou Lamin Jagne, her 3-year-old daughter Neima Aisha Jagne, and her 1-year-old daughter Fatimah Dagga Jagne.  On May 7, 2019, she received notification from the U.S. Department of State that she had been selected to participate in the 2020 Diversity Visa Program.  On February 19, 2020, after receiving notification from the U.S. Department of State that she had submitted all necessary documentation, she was scheduled for a visa interview on April 21, 2020 at the U.S. Embassy in neighboring Senegal.  The U.S. Embassy later postponed her interview to August 6, 2020.

206.     Ms. Kinteh entered the Diversity Visa Lottery to seek better professional and educational opportunities for herself and her children.  Ms. Kinteh works as a statistician at The Gambia Bureau of Statistics.  Her educational training in economic theory has taught her about the intricate relationship between human resource development and economic growth.  Though she enjoys her work in The Gambia, she knows that the country's position on the lower rungs of the

global economic ladder make it difficult to put her human resources to the best use there.  She feels that the U.S., with its vast opportunities, is the only place she can truly achieve her dreams.  She has instilled her hopes and dreams for bigger and better opportunities in her young children, who are especially excited about the prospect of coming to America.  Her daughter Neima Aisha wants to study medicine and become a doctor when she grows up.  Ms. Kinteh's husband works for himself and runs a software and web design company.  He too is looking to use his skills to expand his business in the United States, and ideally create jobs there.

207.     In late April 2020, Ms. Kinteh learned about the April Proclamation suspending immigration to the U.S., and later learned of the news in late June that the entry suspension was being extended through at least the end of the year.  Since hearing about the June Proclamation and its potential to permanently end their plan to immigrate to the United States, her whole family has become heartbroken and sorely disappointed.  They had already been making firm plans to move to Seattle, Washington to live near her uncle.  He runs an adult care facility in Everett, Washington and offered Ms. Kinteh and her husband jobs there until they are able to gain their own professional footing.  He also provided affidavits of support to bolster their immigration petitions, and has committed to provide them room and board in the U.S. until they could support themselves.  Knowing that their earnings would not be enough to foot their travel bills, Ms. Kinteh and her family have sold property to secure the necessary resources.   The news of the Proclamations was particularly painful for her children, who had started dreams of meeting Santa Claus and receiving a gift from him during the Christmas season, building a snowman, and visiting Disneyland.

208.     On July 12, 2020, Ms. Kinteh contacted the U.S. Embassy in Dakar to inquire about the status of her August 6, 2020 interview.  Having received no response, on July 13, 2020, she

requested an emergency interview, hoping to seek an exception to the June Proclamation.  That same day, the U.S. Embassy in Dakar responded, asking her to "explain [her] matter of urgency," and "[w]hat exception to the Presidential Proclamation [she] believe[s] [she] fall[s] under."  Ms. Kinteh immediately responded, explaining that the deadline to obtain a Diversity visa was fast approaching on September 30, 2020 and seeking guidance on what else the U.S. requires her to present to meet an exception to the June Proclamation.  As of the filing of the Complaint, Ms. Kinteh has not received any response to this request

209.    Plaintiff **Iwundu épouse Kouadio Ijeoma Golden** is a citizen of Cote D'Ivoire, where she currently resides.  Ms. Iwundu is a chemist by training but currently works in the hospitality industry.  She applied for a Diversity visa on November 2, 2018 on behalf of herself and her immediate family, including her husband Kouadio Kouassi Constant, their 3-year-old daughter Kouadio Moaye Deborah Roxanne Chidinma, and their 9-month-old daughter Kouadio Akachi Kenora Rébecca.  She was selected to participate in the 2020 Diversity Visa Program on January 7, 2020, bringing them one step closer to realizing their dream of improving their standard of living in the U.S.  On January 9, 2020, Ms. Iwundu was notified by the Department of State that she had "submitted all required documentation to the Kentucky Consular Center and [was] ready to be scheduled for an interview when your case number becomes current."  She was scheduled for a visa interview on April 28, 2020 but it was canceled on April 7, 2020, and it has not been rescheduled.

210.    Ms. Iwundu applied for the Diversity Visa Lottery because of the limited economic opportunities available to them in the tiny nation of Cote D'Ivoire.  Though Ms. Iwundu and her family have built a decent life for themselves, their education and professional skills have not been put to the best use, and they are eager to take advantage of the far greater opportunities available

to both them and their children in the U.S.  While Ms. Iwundu is a chemist by training, she is currently working as a receptionist at the five-star Radisson Blue Hotel in Abidjan.  Her husband is self-employed and runs his own real estate business, and also runs a digital printing business. He plans to continue his current business ventures in the United States, and potentially create jobs in this country.

211.    In late April 2020, Ms. Iwundu learned about the April Proclamation suspending entry to the United States of potential immigrants like herself with pending visa applications, and in late June she learned the entry suspension was being extended through at least the end of the year.  The news of the June Proclamation, and its impact on her and her family's plan to immigrate to the United States, felt like a grave injustice to Ms. Iwundu.  She has a particularly low visa preference number, meaning that her chances of receiving a diversity visa were good, and therefore had begun making concrete plans to move to the U.S.  She and her husband had been planning to invest in a restaurant in Cote D'Ivoire but put those plans aside in order to preserve their resources to have a nest egg with which to start their new lives in the U.S.  She was particularly devastated to have lost the opportunity to pursue higher education in the United States, and to expand her children's educational opportunities as well.

212.    On July 13, 2020, Ms. Iwundu contacted the U.S. Embassy to request an emergency interview in order to seek an exception to the June Proclamation.  On July 14, 2020, she received a form response, stating in pertinent part: "As of March 17, 2020, the United States Embassy in Abidjan has cancelled all routine nonimmigrant and immigrant visa appointments, as well as DNA testing.  We will resume routine visa services as soon as possible, but are unable to provide a specific date at this time . . . .  For immigrant visas, including Diversity Visas, you will be contacted once your visa appointment is able to be re-scheduled."  Ms. Iwundu received a further, more

definititive response from the Embassy the next day:  "It will not be possible to schedule your DV interview before September 30, 2020 due to the restrictions in the Presidential Proclamation on Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak. On June 22, the President extended these restrictions through December 30, 2020.  At this time, applicants for the Diversity Visa do not meet the criteria provided for a national interest exception.  We understand your request and desire for an interview, but unfortunately will not be able to facilitate this under the current immigration laws."

213.    Plaintiff **Aya Nakamura** is a citizen of Japan, where she currently resides.  She was a student in the United States for several years, and has degrees in business and applied science.  She applied for a diversity visa in 2019, and learned that she had won the lottery on May 7, 2019, while she was living in the United States on F-1 student visa status in New York, New York.  On June 19, 2020 after submitting all the necessary paperwork, she was notified that her visa interview was "ready for scheduling."

214.    At that time, she had completed her degrees and was on a post completion Optical Practical Training period authorized by the F-1 student visa.  But rather than complete this training period, she decided to return to Japan on January 1, 2020, to complete visa consular processing there, so that she could return to the United States with a green card.

215.    Winning the Diversity Visa Lottery was a dream come true for Ms. Nakamura, who had spent significant time in the United States completing her studies and could not imagine ever leaving permanently.  She had applied for the Diversity Visa Lottery four times while she was in the United States on F-1 student visa status before she won the lottery in 2019.  She had also invested significant resources into obtaining degrees in the United States, to best position herself

to succeed professionally if she were able to make this her permanent home.  She has plans to become a Certified Public Accountant and work as a CPA.  She also has dreams of opening her own accounting firm and creating jobs in the United States.

216.    Her dreams were upended, however, when in late April 2020, she learned of the Presidential Proclamation suspending immigration to the U.S. for 60 days.  Her dreams were further devastated when she learned in late June 2020 that the suspension would last until at least the end of the year and possibly indefinitely.  Ms. Nakamura has now spent so much time in the United States that she fears she will no longer fit back into Japanese society if she is forced to stay there.  The devastation of being denied the diversity visa will forever change her life.

217.    The website for the U.S. Embassy and Consulates in Japan indicates that they will "process a limited number of visa applications on an emergency basis," providing a list that "represents the types of visas that are eligible to request an emergency appointment." That list does not include diversity visa applicants.[52]

218.    On July 13, 2020, Ms. Nakamura's immigration attorney contacted the U.S. Consulate in Tokyo on her behalf to request an emergency interview.  The Consulate responded that "[a]ll diversity (DV) immigrant visa appointments have been cancelled at this time."  On July 16, 2020, Mr. Dunn again contacted the U.S. Consulate in Tokyo to request an emergency interview, specifically to seek an exception to the proclamation.  As of today's date, Mr. Dunn has not received a response to this request.

---

[52] *See* Qualifications for Emergency Appointment Request, U.S. Embassy and Consulates in Japan, https://jp.usembassy.gov/visas/emergencyappo/ (last visited on July 17, 2020).

**Nonimmigrant Visa Sponsors (H-1B, H-2B, J and L)**

219.     Plaintiff **3Q Digital** is a digital marketing agency that is incorporated in Delaware and headquartered in Illinois, with multiple offices in the United States and abroad.  In 2019, its gross income was over $15 million.

220.     3Q Digital has 330 employees in the United States.  More than 95% of its staff are U.S. citizens and legal permanent residents.

221.     3Q Digital is the largest independent digital marketing agency.  According to its Chief People Officer, Laura Rodnitzky, its success is due to the diligent efforts and dedication of its knowledgeable staff.

222.     3Q Digital has been so successful, it was not forced to downsize during the economic downturn caused by COVID-19.  While it initially furloughed approximately 3% of its staff, it has already brought many of those furloughed workers back for full-time work and did not lay off a single U.S. worker.

223.     3Q Digital prefers to hire American workers, but sometimes it has been unable to find them to fill key roles that are critical to 3Q Digital's success and that of its clients.  In those instances, 3Q Digital has found success hiring foreign nationals.

224.     Over the course of several years, 3Q Digital has petitioned to sponsor approximately ten H-1B nonimmigrant, temporary workers to perform specialized work at its U.S. offices.

225.     One of those petitions was for Balaji Bhat, whom 3Q Digital sought to continue  to employ as a Search Engine Account Manager, which is a specialty occupation.  At the time – March 30, 2018 – Bhat was already working for 3Q Digital in that role; he was in the United States in F-1 OPT status and sought to change status to H-1B.

226.    Bhat has a Bachelor's degree in Economics and a Certificate in New Media and Humanities from the University of Massachusetts in Amherst, Massachusetts.

227.    On November 27, 2018, USCIS denied 3Q Digital's H-1B petition on behalf of Bhat.  Bhat was forced to leave the United States.

228.    Bhat has continued to work for 3Q Digital from its Singapore affiliate as a Search Engine Marketing Account Manager.  The time difference between Singapore and the United States has harmed his ability to collaborate with other 3Q team members.  He is only able to work overlapping hours with his U.S. clients and team members on 4 days a week and, even then, not for the entire work day.  He is separated from his family in San Francisco, California.  3Q Digital is also unable to invest in Bhat's talent by providing him with training and development activities, and Bhat is unable to pursue management opportunities within his team.  3Q Digital fears that due to these difficulties, he may seek employment elsewhere, to 3Q Digital's detriment.

229.    In March 2019, 3Q Digital filed a lawsuit pursuant to the Administrative Procedure Act in the U.S. District Court for the District of Columbia, challenging the USCIS denial of its H-1B petition for Bhat.  On March 6, 2020, the district court held that USCIS abused its discretion when it denied 3Q Digital's petition.  On June 15, 2020, USCIS approved the H-1B petition for Bhat.

230.    Upon receiving the USCIS approval, Bhat immediately began compiling all the necessary paperwork.  He filed the DS-160 Nonimmigrant Visa Form on June 24, 2020, and requested an emergency H-1B visa interview, because all U.S. consulates were closed for routine visa appointments at the time.

231.     However, on June 22, 2020, President Trump issued the June Proclamation, barring the entry of H-1B visa holders.  Because of the Proclamation, Bhat has been unable to obtain a visa to enter the United States.

232.     The inability to bring Bhat and other foreign nationals to work in its U.S. offices harms 3Q Digital and its ability to meet its clients' needs.  The inability to bring talented foreign nationals to work in its U.S. offices hampers 3Q Digital's continued economic growth and impedes its ability to create more jobs for U.S. workers.

233.     Plaintiff **ASSE International, Inc.** is a California public benefit organization and 501(c)(3) nonprofit.

234.     ASSE is engaged in a private-public partnership with DOS to manage and administer exchange visitor programs for J-1 nonimmigrants.

235.     ASSE runs three J-1 exchange programs that have been harmed by the June Proclamation.  The first of those exchange programs is part of DOS's Summer Work Travel Program, which is open for current university students at foreign universities coming to the United States to work in a seasonal job for their summer break.  The second affected exchange program is part of DOS's Intern Program, which offers on-the-job training opportunities of up to 12 months to individuals who are current full-time students at foreign universities, or have completed a foreign university degree within the last year.  The third of affected exchange program is part of DOS's Trainee Program, which allows up to 18 months of on-the-job training for individuals who completed their degree more than a year ago and also have one year of employment experience; this program is also an option for individuals without a degree but in possession of five years of related employment.  For all three programs, DOS's regulations require orientation, cultural, and community events to be integrated into the J-1 participant's stay.

236.   So far in 2020, only 98 summer work and travel participants, 80 interns, and 49 trainees have been able to enter the United States through ASSE.  In comparison, 3,287 summer work and travel participants, 229 interns, and 174 trainees were able to enter the United States through ASSE in 2019.

237.   Because the June Proclamation forbids the entry of individuals on J-1 visas—the type of visa used by participants in ASSE's exchange programs—and because DOS has decided to implement the June Proclamation by no longer issuing J-1 visas, the June Proclamation has stopped ASSE from continuing to operate its exchange programs.

238.   In 2020, ASSE has had to provide refunds of $123,238 to host companies that would have employed its interns or trainees, and has had to pay $1,012,843 in cancellation refunds to its foreign partners in the summer work and travel program.  ASSE has had to pay these refunds because individuals were not able to come to the United States on J-1 visas as originally planned.

239.   ASSE is currently receiving no income because of the June Proclamation.

240.   ASSE has been forced to terminate five of its 33 full-time employees.  It has placed another three employees on furlough, with the furlough to begin on August 1, 2020.  If the routine entry of J-1 visa holders does not resume for the rest of 2020, ASSE will need to furlough or terminate at least eight additional employees.

241.   Absent the June Proclamation, ASSE would not have had to furlough or terminate multiple employees, and would not have had to pay over a million dollars in refunds.  ASSE anticipates that if the June Proclamation's entry restrictions do not end, ASSE will run out of money by early 2021.

242.     Plaintiff **EurAuPair International, Inc.** is a California public benefit organization and 501(c)(3) nonprofit.  EurAuPair is engaged in a private-public partnership with DOS to manage and administer an exchange visitor program that uses the J-1 nonimmigrant visa category.

243.     EurAuPair runs an exchange visitor program for au pairs, who come to the United States on J-1 nonimmigrant visas.  The J-1 au pair program allows qualified parents or guardians, who are U.S. citizens or legal permanent residents and who have a child for the au pair to look after, the opportunity to host an au pair in their home.  The au pair's childcare schedule cannot exceed 45 hours per week, and the au pair must receive weekend and other time off, including paid vacation.  The au pair also must receive a stipend for post-secondary classwork available in the family's locale and receive wages in compliance with the Fair Labor Standards Act and Department of Labor rules.  Au pairs who participate in this program must be between 18 and 26 years old on their arrival to the United States, pass a criminal background check in their home country, pass a standardized psychological test, speak English, have childcare experience, and be willing to become part of an American host family for at least a year.

244.     In 2019, EurAuPair sponsored 739 au pairs from 21 countries, who worked for and lived with families in 48 states.  So far in 2020, only 150 au pairs have been able to enter the United States through EurAuPair, despite the fact that during the COVID-19 pandemic, having live-in childcare would be a significant help to many families.

245.     Because the June Proclamation forbids the entry of individuals on J-1 visas – the type of visa used by participants in EurAuPair's exchange program – and because DOS has decided to implement the June Proclamation by no longer issuing J-1 visas, the June Proclamation has stopped EurAuPair from continuing to operate its exchange program.

246.     In 2020, EurAuPair has had to provide refunds of $434,500 to host families who would have hosted au pairs.

247.     EurAuPair is currently receiving no income because of the June Proclamation.

248.     EurAuPair has been forced to terminate three of its eleven full-time employees.  It has placed another two employees on furlough, with the furlough to begin on August 1, 2020. EurAuPair will need to eliminate one or two more positions by September 1, 2020, if the bar on the entry of J-1 visa holders continues.  Should the June Proclamation's restrictions on the entry of J-1 visa holders remain in effect for the remainder of the year, EurAuPair will forego $2.5 million in revenue.

249.     Absent the June Proclamation, EurAuPair would not have had to furlough or terminate multiple employees, and would not have had to pay hundreds of thousands of dollars in refunds.  EurAuPair anticipates that if the June Proclamation's entry restrictions do not end, it will run out of money by early 2021.

250.     Plaintiff **SEIU Healthcare (CIR)** is the largest medical housestaff union in the country, representing approximately 17,000 intern, resident, and fellow physicians nationwide in collective bargaining.  It is headquartered in Long Island City, New York, and has multiple additional offices across the country.

251.     CIR represents physicians working in the United States on H-1B and J-1 visas. These physicians are in training programs that last three to seven years.

252.     When physicians holding H-1B and J-1 visas join CIR, they become either dues-paying members or agency fee payors, who pay a fee for the benefits and services connected to their collective bargaining agreement.

253.    The June Proclamation has stopped physicians with H-1B and J-1 visas from traveling to the United States to start their residency programs, which typically begin in June and July.

254.    The June Proclamation has harmed CIR by lowering the number of H-1B and J-1 physicians joining CIR.  CIR has been denied the dues and fees that those individuals would have paid had they been able to start work in the United States.  CIR has already been deprived of dues and fees from at least 60 residents, who have been barred from entering the United States because of the June Proclamation.  Those residents were supposed to start work by July 1, 2020.  The loss of these unpaid dues and fees cannot be recouped, and during each week when those residents are not working in the United States, CIR's financial loss grows.  This financial harm will impede CIR's ability to provide services to its members.

255.    Additionally, current CIR members are harmed by the June Proclamation because they have to work extra hours to cover for the absent residents.  Current CIR members are working 80-hour work weeks because of the June Proclamation.  This creates additional stress during a time when physicians are already under heavy strain due to the COVID-19 pandemic.

256.    The June Proclamation has caused hospitals to work with fewer physicians, because it has forbidden the entry of qualified physicians.  This loss of staff negatively affects the U.S. healthcare system's ability to respond to the pandemic.  The absence of qualified physicians, due to the June Proclamation, will only exacerbate the economic harms caused by the COVID-19 pandemic – economic harms that CIR is already experiencing.[53]

---

[53] *See, e.g.*, Dara Lind, "Hospitals Are Suddenly Short of Young Doctors—Because of Trump's Visa Ban," ProPublica (July 17, 2020), https://www.propublica.org/article/hospitals-are-suddenly-short-of-young-doctors-because-of-trumps-visa-ban ("some [hospitals] are acutely short-staffed because of an ill-timed change to immigration policy and its inconsistent implementation").

257.    Plaintiff **PowerTrunk, Inc.** is a Delaware corporation that is headquartered in New Jersey.  It is a wholly owned subsidiary of Teltronic S.A.U., a Spain-based Professional Mobile Radio company.  PowerTrunk is a pioneer in bringing TETRA technology—a type of professional land mobile radio system—to the United States.  PowerTrunk has deployed TETRA technology in the New Jersey Transit Corporation, the Metropolitan Transit Authority in New York City, the Los Angeles International Airport, and the John F. Kennedy International Airport.

258.    PowerTrunk has 11 employees in the United States.  These employees are a mix of U.S. citizens, lawful permanent residents, and foreign nationals.  The foreign nationals are typically employees transferred from PowerTrunk's parent company.

259.    Since 2009, PowerTrunk has filed approximately 10 nonimmigrant visa petitions in the L and H-1B categories.  Because TETRA technology is new to the United States— PowerTrunk has introduced it to this country—PowerTrunk relies on foreign talent to operate and expand its U.S. business.  With the help of that foreign talent, PowerTrunk hopes to hire and train more and more U.S. workers to work on its TETRA systems.

260.    On January 10, 2017, PowerTrunk filed an L-1B petition on behalf of Victor Manuel Hernandez, a Spanish national.  PowerTrunk filed an extension petition on October 11, 2019.

261.    Hernandez has worked for PowerTrunk as a Senior TETRA Systems Engineer since 2017.  He was employed by PowerTrunk's parent corporation, Teltronic, starting in 2012. Hernandez is a critical employee for PowerTrunk.

262.    USCIS approved the L-1B extension petition on October 22, 2019.   After Hernandez filed an application to renew his L-1B visa stamp, he was interviewed at the U.S.

embassy in Madrid, Spain on January 9, 2020.  He returned to the United States on January 18, 2020.

263.     Hernandez submitted all additional information that the embassy requested from him.  The embassy then asked him, around February 24, 2020, to provide his passport so that he could receive the new L-1 visa stamp.  He promptly flew back to Spain and submitted his passport to the embassy on March 10, 2020.

264.     Due to the COVID-19 pandemic, however, the embassy had suspended services. Weeks passed, during which the embassy told Hernandez that he could not receive a visa stamp until the embassy had resumed services.  Finally, PowerTrunk hired a law firm to request an emergency visa issuance, because it urgently needed Hernandez to return to the United States to provide essential services for New Jersey Transit.

265.     In response to the attorney's inquiry, the Madrid embassy responded that it would not issue a visa stamp to Hernandez until certain COVID-19 related restrictions had been lifted.

266.     Then, the June Proclamation suspended the entry of L-1 visa holders.  The Department of State decided to implement the June Proclamation by suspending the issuance of L-1 visas.  Hernandez now cannot receive his L-1 visa even if the COVID-19 restrictions end.

267.     To date, Hernandez has not received a new L-1 visa stamp, and he has been unable to return to the United States.  This has caused extreme hardship to Hernandez, who has been living with relatives and staying in hotels for several months.  He has been separated from his wife, who is in the United States, since March 2020.

268.     Hernandez's prolonged stay in Spain has also caused extreme hardship to PowerTrunk.  PowerTrunk has multiple contracts with transit agencies, which require it to complete crucial tasks on strict timelines.  Among those contracts is one with New Jersey Transit,

pursuant to which PowerTrunk is in the final stages of implementing mission-critical TETRA technology throughout New Jersey Transit operations. PowerTrunk urgently needs Hernandez to return so that this New Jersey Transit project can be completed. Hernandez is the most qualified and knowledgeable employee PowerTrunk has on certain TETRA features.

269.    Another of PowerTrunk's contracts is with the Metropolitan Transit Authority. Pursuant to this contract, PowerTrunk is implementing bus radio systems. Hernandez is the only engineer at PowerTrunk qualified to complete aspects of this project. Without Hernandez, PowerTrunk will not be able to meet its contractual deadlines and will need to seek an extension.

270.    The nonimmigrant visa ban is devastating for PowerTrunk's business and continued economic growth. PowerTrunk may be unable to meet its contractual obligations because of this ban, and may have to fire other employees if those obligations are not met. Without Hernandez present in the United States, PowerTrunk is already facing reputational damage among its U.S. customers and potential customers, which will cause additional financial hardship for the company and further hamper PowerTrunk's ability to grow and create more job opportunities for U.S. workers.

271.    Plaintiff **Shipco Transport Inc.** is a New Jersey corporation and one of the world's leading non-vessel operating common carriers. It has 425 employees in the United States and more than 2,000 employees at its affiliate international branches. In 2019, Shipco earned over $55 million in gross income, and it is continuing to expand.

272.    Shipco's co-founder and current CEO credits his company's success to the selection of key employees, who strategize, establish, and implement corporate processes and operations. He believes that the company's continued success hinges on strategic planning and expert application of the company's carefully developed methods, systems, and techniques. Shipco

operates in a competitive market, and such planning and execution helps Shipco stand out from its competitors.

273.    Approximately ninety percent of Shipco's U.S. staff are U.S. citizens or legal permanent residents.  Shipco has not furloughed or laid off any U.S. workers during the current economic downturn.  In fact, Shipco continues to give back to those communities where it has a presence.

274.    Shipco's success is critical to the success of other industries.  Shipco facilitates the shipment of all kinds of goods, including personal protective equipment, medical devices, cars, aircraft parts, food and beverages, household items, and retail items.  Shipco's continued efficiency (or lack thereof) has ripple effects on the industries that rely on its services.

275.    On or about May 7, 2020, Shipco filed an L-1A nonimmigrant visa petition for Brian Nielsen.  Shipco employs Nielsen as a chief financial officer at its sister office in Denmark.  Nielsen has unique knowledge of Shipco's global accounting and financial functions.  Shipco filed the nonimmigrant petition for Nielsen because it wished to employ Nielsen in the United States as the Finance Director of its Americas Region.

276.    USCIS approved Shipco's L-1A petition for Nielsen on June 30, 2020.  However, Nielsen cannot begin to work for Shipco in the United States unless he receives an L-1A visa from a U.S. consulate abroad and enters the United States with L-1A status.

277.    Shipco has now learned that DOS will not issue a visa to Nielsen because of the June Proclamation unless Nielsen qualifies for an exception to the June Proclamation.

278.    The inability to obtain an L-1A visa on behalf of Nielsen, Shipco's potential Finance Director, will harm Shipco's profitability.  Nielsen is expected to increase Shipco's efficiency and therefore allow Shipco to expand and hire even more U.S. workers.  The inability

to bring a knowledgeable and experienced employee from an affiliate international office to the United States has hamstrung Shipco and undermined the positive economic good that it could provide to its community and to the other industries that rely on it.

279.    Plaintiff **Superior Scape** is a landscape contractor and Michigan corporation. Superior Scape provides year-round landscaping services for commercial and residential properties.  Superior Scape has enjoyed consistent growth for at least the past five years.  Its gross sales have increased from $3.2 million in 2014 to $5.3 million in 2019.

280.    Superior Scape currently has 19 permanent employees.  Each year, from March until December – the months during which Superior Scape has the most work – Superior Scape also hires an additional 50 to 55 temporary workers.

281.    Superior Scape has found it difficult to find 50 to 55 temporary workers each year without seeking additional workers through the H-2B nonimmigrant visa program.  Although it pays above the prevailing wage, Superior Scape experiences a massive turnover rate:  Landscaping is hard, hot work.  Many of its U.S. employees are also college students who leave for school once summer ends.

282.    For the past 10 years, Superior Scape has received Department of Labor certifications to bring 10 to 28 workers into the United States on H-2B visas.  Many of Superior Scape's H-2B workers return year after year.

283.    Through the H-2B visa program, Superior Scape has been able to guarantee a steady supply of experienced workers.  This has enabled Superior Scape to plan, budget, set sales targets, and ensure that it can fulfill its contracts.

284.    Without H-2B visas, Superior Scape is unable to meet its contractual obligations or complete projects for its customers.  In 2017, Superior Scape's visa petition for H-2B workers was

not processed before the government ran out of H-2B visas for the year.  The resulting delays prevented Superior Scape from adding H-2B workers to its staff until mid-August that year.  The delay caused Superior Scape to lose $850,000.

285.    Superior Scape's owner and president, Terry Newman, credits the H-2B visa program for the company's growth since 2014.  Superior Scape has added four permanent positions to its company since it began participating in the H-2B program.

286.    Superior Scape was unable to obtain H-2B temporary workers in early 2020.  The government again ran out of H-2B visas before Superior Scape's visa petition was processed.

287.    Superior Scape's projected income for 2020, with H-2B workers, was $5.9 million.  Without H-2B workers, it now has a projected loss of $1.9 million.

288.    After losing the chance to hire H-2B workers for the spring, Superior Scape planned to file paperwork to bring 40 H-2B temporary workers into the United States for an October 1, 2020 start date.  These workers are necessary to save the company: without them, Superior Scape may be unable to complete its clients' major projects in the fall.  If Superior Scape receives all 40 temporary workers, it hopes to cut its losses for the year in half.

289.    The June Proclamation has ruined these plans.  Due to the June Proclamation, Superior Scape will be unable to hire the 40 H-2B workers that are desperately needed for its survival.  Superior Scape's attempts to hire U.S. workers have been unsuccessful – although it has hired some U.S. workers, it remains critically understaffed.

290.    Superior Scape's president fears that he is at risk of losing everything he worked his entire life to build.  He had expected to sell Superior Scape and retire soon.  However, with the company's looming financial losses, he fears that he will need to start all over again or seek employment elsewhere and may never be able to retire.

291.    Should Superior Scape not receive the H-2B workers it needs for the fall, its 14 permanent employees will lose their jobs.  Moreover, Superior Scape will no longer contribute to the local economy by purchasing equipment, vehicles, and supplies.   In short, the June Proclamation inflicts devastating financial harm on Superior Scape's owner, his employees, their families, and the local economy.

## DEFENDANTS' AUGUST 2020 DISCLOSURES

292.    As noted (*supra* ¶ 108 and accompanying footnotes), the State Department has published guidance (referred to herein as the "COVID-19 Guidance"[54]) stating that although consular posts had previously "suspended routine visa services," they have "now enter[ed] a phased resumption of visa services."  The COVID-19 Guidance further states that consular posts "will continue to provide emergency and mission critical visa services" to the extent that they have not resumed routine services.

293.    On August 4, 2020, Defendants asserted in a motion for an extension of time (ECF 55) that "in response to the COVID-19 pandemic, U.S. consular posts worldwide have suspended 'routine visa services'" and are only "provid[ing] emergency and mission critical visa services." *Id.* at 3 (quoting COVID-19 Guidance). The motion suggested, but did not directly state, that Defendants would not process diversity visa applications or issue diversity visas before September 30, 2020 even if the Proclamations were enjoined.

294.    At a status conference before this Court on August 7, 2020, counsel for Defendants stated, for the first time, that qualified 2020 Diversity Visa Lottery winners are not generally considered to be "emergency" or "mission critical" cases under the COVID-19 Guidance—

---

[54] U.S. Dep't of State, Bureau of Consular Affairs, Suspension of Routine Visa Services, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html (last visited August 10, 2020).

notwithstanding that thousands of such individuals' visa eligibility will expire if they do not receive their visas by September 30, 2020. *See supra* ¶ 56.[55]

295.    Defendants' counsel reasserted this position during teleconferences with Plaintiffs' counsel held August 10 and August 11, 2020, and again at the August 12, 2020 status conference before the Court.

296.    During the August 11, 2020 teleconference, Defendants' counsel stated that DOS's policy is *not* to grant a blanket exemption from the COVID-19 Guidance to 2020 Diversity Visa Lottery winners.

297.    The beneficiaries of the visa petitions submitted by Plaintiffs Gomez and Mirna S. received "emergency" or "mission critical" treatment in the processing and issuance of their visa applications, based on the fact that they were minor children at risk of "aging out" of their visa eligibility—even at a time when "routine visa services" had not begun any "phased resumption." During the August 11, 2020 teleconference, Defendants' counsel were asked why similar treatment is not being afforded to 2020 Diversity Visa Lottery winners, who are similarly situated to "age outs" in that they will lose their visa eligibility on September 30, 2020.  In response, Defendants' counsel stated: "We don't have an answer to that."

## CLASS ALLEGATIONS

298.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), on behalf of themselves and all other persons for whom Defendants'

---

[55] Counsel did state that individual applicants may seek exceptions on a case-by-case basis, but Plaintiffs are aware of no statement regarding what constitutes an "emergency" or "mission critical" case.  The impending expiration of these individuals' visa eligibility evidently does not qualify.

implementation of the Proclamations interferes with family reunification or the issuance of visas in a manner consistent with federal law.  Plaintiffs seek certification of five subclasses:

(a)   Individuals who have been selected to receive an immigrant visa through the U.S. Department of State's FY2020 Diversity Visa Lottery and who had not received their immigrant visa on or before April 23, 2020, when the Presidential Proclamation 10014, later extended by Presidential Proclamation 10052, took effect.

(b)   Individual U.S. citizens with an approved immigrant visa petition for an immediate relative parent and whose sponsored relative is subject to Presidential Proclamation 10052.

(c)   Individual U.S. citizens and lawful permanent residents with an approved immigrant visa petition for a relative in a preference immigrant category, including a spouse, parent, child, or sibling, and any qualifying derivative relatives, where the immigrant visa is "current" or will become "current," meaning visas are authorized for issuance abroad, while Presidential Proclamation 10052 is in effect, and whose sponsored preference relative is subject to Proclamation 10052.

(d)   United States employers who have an approved nonimmigrant visa petition for an employee or potential employee in the H-1B, H-2B, or L-1 nonimmigrant visa categories; where the employee or potential employee's petition for nonimmigrant status has been approved for temporary employment in the United States, and where the employee or potential employee is subject to Proclamation 10052.

      (e)      Entities designated by the U.S. Department of State as an Exchange Visitor Program sponsor for any category of J-1 exchange visitors included in Proclamation 10052.

299.    This action meets all of the Rule 23(a) prerequisites for maintaining a class action.

300.    The Plaintiff Subclasses are so numerous that joinder is impracticable, satisfying Rule 23(a)(1). The White House has estimated that the June Proclamation will affect approximately 525,000 individuals who would otherwise come to the United States. Estimates from the CATO Institute suggest that the Proclamations will ban at least 361,000 nonimmigrant workers and 164,000 immigrants, affecting approximately 20,000 U.S. employers. State Department reports also suggest that each proposed subclass is so numerous that joinder is impracticable:

      (a)      The INA authorizes the State Department to issue up to 55,000 diversity visas through the annual diversity visa lottery. 8 U.S.C. § 1151(e). In 2019, the State Department issued 44,882 diversity visas at foreign service posts worldwide, and in the four years before that the number of diversity visas ranged from 45,664 to 49,067. State Department monthly reports show that, for the FY 2020 Diversity Lottery, tens of thousands of diversity visas remain to be issued before the September 30, 2020, deadline.

      (b)      Between 2015 and 2019, the average annual number of visa petitions issued to immediate relative parents of U.S. citizens was 83,759. In 2019, the number of immigrant visas issued to parents of U.S. citizens was 63,442. The number of individuals in the proposed immediate relative parent subclass is likely more than

half of the number of the average annual number of immigrant visas issued to immediate relative parents.

(c)     The preference relative subclass includes every U.S. citizen and lawful permanent resident with an approved immigrant visa petition for a preference relative that is current, or that will become current, between April 23, 2020, and December 31, 2020, and that does not fall within an exception to the April or June Proclamations. Like the immediate relative parent subclass, State Department statistics demonstrate that the number of members in the preference relative subclass is tens of thousands of individuals.

(d)     In 2019, the State Department issued 8,742,068 nonimmigrant visas.  It issued 188,123 nonimmigrant visas in the H-1B category; 97,623 nonimmigrant visas in the H-2B category; and 76,988 nonimmigrant visas in the L-1 category.  The proposed temporary worker subclass includes every employer of H-1B, H-2B, and L-1 employees or potential employees not subject to exceptions to the June Proclamation.

(e)     State Department online records show that the number of members of Plaintiffs' proposed exchange visitor program subclass is 439.

301.    Moreover, a class action is the only appropriate procedural avenue for the protections of the class members' statutory and constitutional rights and rights under the APA.

302.    The claims of the Plaintiff Class members share common issues of law and fact and will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2).  Such common questions of law and fact include, but are not limited to:

(a)     Whether, in issuing the Proclamations, Defendants acted in a manner outside the authority delegated to them by Congress under INA;

(b)     Whether the Proclamations violate the INA to the extent that they impose requirements that contravene or conflict with certain provisions of the INA, including labor market protections that the INA requires relating to the issuance of visas and the Diversity Visa Lottery program that guarantees the issuance of visas to individuals who are selected to receive a visa through that program;

(c)     Whether the terms of the Proclamations are unconstitutionally vague;

(d)     Whether, in issuing and implementing the Proclamations, Defendants relied on factors that Congress did not intend for it to consider;

(e)     Whether, in issuing and implementing the Proclamations, Defendants failed to consider important aspects of the problem it sought to address;

(f)     Whether Defendants quantified or considered harms, including reliance interests of visa applicants and their families and communities, that would result from the Proclamations and their implementation;

(g)     Whether the Proclamations are being or will be implemented and enforced so as to either prevent class members from reuniting with family members in the United States, or to force their separation from family members in the United States, and thereby infringe on class members protected liberty interests in family unity;

(h)     Whether class members have suffered harm as a result of the Proclamations, Defendants' actions taken to implement the Proclamations, and/or Defendants' actions to implement the COVID-1 Guidance;

(i)      Whether Defendants should be compelled to adjudicate class members' visa applications.

303.    The claims of the named Plaintiffs are typical of the claims of the members of the Plaintiff Class, satisfying Rule 23(a)(3).  Like other members of the class, Plaintiffs have been harmed by the Proclamations' contravention of multiple provisions of the INA and separation-of-powers principles of the U.S. Constitution, as well as Defendants' failure to abide by statutory limitations on their actions, thereby leading to arbitrary, capricious, and unlawful agency action that fails to account for important aspects of the supposed problems the Proclamations seek to address.  Plaintiffs have further been harmed by Defendants' failure to adequately explain their decision to issue and implement the Proclamations, to account for the reliance interests at stake, or to explain why suspending visa issuance and entry for members of the Plaintiff Class serves the interests of Defendants or is otherwise a valid exercise of their respective authority.  Plaintiffs have further been harmed by the arbitrary and capricious manner by which Defendants have implemented the Proclamations together with the COVID-19 Guidance.  Each of these actions, independently and collectively, have caused harm to Plaintiffs and the Plaintiff Class.

304.    The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class, satisfying Rule 23(a)(4).  The named Plaintiffs have no interest that is now or may become antagonistic to the interests of the Plaintiff Class.  The attorneys representing the named Plaintiffs include experienced civil rights and immigration attorneys who are considered able practitioners in federal constitutional litigation.  These attorneys should be appointed as class counsel.

305.    The members of the proposed class are readily ascertainable through Defendants' records.

306.     Counsel for Plaintiffs do not anticipate any conflicts of interest between the named Plaintiffs and the other class members nor does Counsel anticipate any reason that the other class members would dispute the adequacy of Counsel's representation.

307.     Defendants have acted, have threatened to act, and will act on grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

308.     Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class. The Plaintiff Class may therefore by properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the APA, 5 U.S.C. § 706(2)—Against Defendants DOS and Pompeo**

309.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

310.     DOS's implementation of the Proclamations violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2) by preventing issuance of visas for which Plaintiffs and class members who are otherwise eligible.

311.     The INA distinguishes between entry, admission, and visa issuance. Section 1182(f) authorizes the President only to suspend the entry of certain aliens into the United States. It does not authorize the President to suspend the issuance of visas.  Section 1185(a) likewise does not authorize suspension of visa issuance.

312.    DOS has implemented the Proclamations in a manner that suspends the issuance of visas while the Proclamations are in effect.

313.    DOS's implementation of the Proclamations constitutes final agency action within the meaning of the APA.  *See Bennett v. Spear*, 520 U.S. 154 (1997).

314.    DOS's implementation of the Proclamations is in excess of authority in violation of the APA, § 706(2)(C), because, among other things, 8 U.S.C. § 1182(f) does not permit Defendants to suspend the issuance of visas or deprive consular officers of the authority to issue visas to individuals "who ha[ve] made proper application therefore."  8 U.S.C. § 1201(a)(1).

315.    In implementing the Proclamations, DOS also failed to consider all relevant facts and circumstances, including the purposes of the visa system and the interests, including reliance interests, of Plaintiffs, other class members, and other segments of society such as employers. DOS also failed to articulate a rational connection between any relevant facts and the choice to discontinue visa issuance for those who have paid the applicable fees and submitted the necessary documentation for issuance of the visa.   It has thus failed to provide a rational explanation for its action.  The State Department's implementation of the Proclamations is thus "arbitrary, capricious, [and] an abuse of discretion," in violation of the APA.  5 U.S.C. § 706(2)(A).

316.    DOS's implementation of the Proclamations as to visas is also "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B), because, among other things, it denies family members their protected right to family unity without due process of law.

317.    DOS's actions are without good cause.

318.    DOS's actions have caused, and will continue to cause, ongoing harm to Plaintiffs.

319.    Plaintiffs have no adequate alternative to review under the APA.

## SECOND CAUSE OF ACTION

**Violation of the APA, 5 U.S.C. § 706(2)—Against All Agency Defendants**

320.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

321.     Defendants' implementation of the Proclamations' "national interest" exception violates the APA, 5 U.S.C. § 706.

322.     The June Proclamation directs the Secretaries of State and of Homeland Security to "establish standards to define categories of aliens covered by" its "national interest" exception.

323.     To the extent that Defendants have (through DOS's July 16 website posting or otherwise) established policies, procedures, and/or standards to govern their implementation of the "national interest" exception, those policies, procedures, and/or standards constitute final agency action reviewable under 5 U.S.C. § 706(2).   Such final agency action is arbitrary, capricious, an abuse of discretion, and not in accordance with law in at least the following ways.

   (a)     Defendants' actions, as set forth above, are based on legal error; failed to consider all relevant factors; and lacked a rational explanation, particularly in light of the reliance interests at stake; and are therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

   (b)     Defendants' actions, as set forth above, are contrary to constitutional rights, including Plaintiffs' rights not to be deprived of their liberty interests in family reunification, without due process and as protected by the First and Fifth Amendments to the U.S. Constitution, in violation of the APA, *id.* § 706(2)(B).

324.     Defendants' actions are without good cause.

325.     Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs.

326.    Plaintiffs have no adequate alternative to review under the APA.

## THIRD CAUSE OF ACTION

### Ultra Vires—Violation of the INA, 8 U.S.C. § 1182(f)—Against Defendants Trump, DOS, and Pompeo

327.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

328.    Congress has afforded consular officers the authority to issue visas to immigrants and nonimmigrants "who ha[ve] made proper application therefore."  8 U.S.C. § 1201(a)(1).

329.    Neither § 1182(f) nor § 1185(a) permits the President by proclamation to suspend consular officers' discretion to issue visas in cases where proper applications have been made.

330.    To the extent that the Proclamations purport to suspend not only the entry of noncitizens into the United States, but also the issuance of visas to individuals who are otherwise eligible to receive them, they are ultra vires, in excess of the President's authority under the INA. The Proclamations therefore are accordingly invalid, null, and void.

## FOURTH CAUSE OF ACTION

### Ultra Vires—Violation of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)—Against All Defendants

331.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

332.    Section 1182(f) requires, as a prerequisite to an entry suspension, the President to "'fin[d]' that the entry of the covered aliens 'would be detrimental to the interests of the United States.'"  *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018).

333.    The June Proclamation does not include findings sufficient to satisfy § 1182(f)'s statutory prerequisite.  The statements and/or justifications on which the June Proclamation relies to support its entry suspension are wholly unsupported by facts or evidence.  The President cannot rationally have found that the entry of the immigrant and nonimmigrant classes of noncitizens that the June Proclamation suspends would be detrimental to the interests of the United States.

334.     For the same reasons, the restrictions imposed by the June Proclamation are not reasonable within the meaning of 8 U.S.C. § 1185(a).

335.     Because the June Proclamation does not satisfy the requirements of § 1182(f) or § 1185(a), it is ultra vires and invalid.

## FIFTH CAUSE OF ACTION

### Ultra Vires—Violation of the INA, 8 USC § 1154(a)—Diversity Visa Subclass Only—Against All Defendants

336.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

337.     The issuance and implementation of the June Proclamation are invalid to the extent that they halt the processing and issuance of diversity visas and the entry of immigrants pursuant to such visas.

338.     Under 8 U.S.C. § 1154(a)(1)(I)(ii)(II), noncitizens "who qualify, through random selection, for [a diversity visa] *shall remain eligible* to receive such visa only through the end of the specific fiscal year for which they were selected."  (Emphasis added.)

339.     The President is not authorized "to expressly override particular provisions of the INA." *Hawaii*, 138 S. Ct. at 2411.

340.     The June Proclamation effectively revokes and renders void qualified applicants' statutorily guaranteed eligibility for a diversity visa by suspending the issuance of visas beyond the Diversity Lottery Program deadline of September 30, 2020.  The June Proclamation therefore violates § 1154(a)(1)(I)(ii)(II), is ultra vires, and is invalid.

## SIXTH CAUSE OF ACTION

### Separation of Powers/Nondelegation Doctrine—Against All Defendants

341.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

342.    It is the role of Congress, not the President, to "exclude aliens altogether or prescribe terms and conditions upon which they may come into or remain in this country." *See Fok Young Yo v. United States*, 185 U.S. 296, 302 (1902).

343.    In that role, and pursuant to that power, Congress has crafted a complex and carefully balanced system of immigrant and nonimmigrant visas, and in doing so considered the effects that the issuance of visas and entry of foreign nationals may have on the U.S. economy and labor market.   Within the system, Congress specifically provided labor-market protections designed to ensure that workers who enter the country from abroad will not displace or disadvantage U.S. workers.

344.    In this context, Congress cannot be understood to have delegated to the President (through 8 U.S.C. § 1182(f) or § 1185(a)) the authority to override decades of Congressional judgment regarding the interaction of immigration policy and the labor market.

345.    The June Proclamation therefore exceeds the authority delegated to the President under the INA.  It is invalid, null, and void.

346.    To the extent that 8 U.S.C. §§ 1182(f) and/or § 1185(a) could be interpreted to delegate to the President authority to engage in domestic policy-making concerning purely economic matters such as the labor market, the statutes provide no intelligible principle to guide the President's exercise of discretion.   They therefore violate constitutional nondelegation principles and are invalid.  *See Doe v. Trump*, 418 F. Supp. 3d 573, 589-93 (D. Or. 2019).  A Proclamation issued under such an unconstitutional delegation of legislative authority is invalid, null, and void.

347. The June Proclamation is accordingly in conflict with either the INA or the Constitution, and in either case it impermissibly violates the Constitution's separation of powers. It is therefore invalid, null, and void

## SEVENTH CAUSE OF ACTION

**Violation of the Due Process Clause of the Fifth Amendment—Subclasses (b) and (c) Only—Against All Defendants**

348. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

349. The Due Process Clause of the Fifth Amendment states that no person will "be deprived of life, liberty, or property, without due process of law."

350. U.S. citizens and lawful permanent residents have constitutionally protected liberty interests in family unity. Individuals must be given due process prior to any deprivation of these liberty interests.

351. The Proclamations, and Defendants' implementation thereof, unconstitutionally deny Plaintiffs their constitutional rights by preventing visas from being issued and thereby foreclosing their reunification with family members without the process due under the Fifth Amendment.

## EIGHTH CAUSE OF ACTION

**Violation of the APA, 5 U.S.C. § 706(2)—Subclass (a) Only—Against Defendants DOS and Pompeo**

352. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

353. Defendants' implementation of the COVID-19 Guidance in conjunction with its enforcement of the Proclamations with respect to the diversity visa Plaintiffs, their derivatives, and members of subclass (a) violates the APA, 5 U.S.C. § 706.

354. The COVID-19 Guidance and Defendants' implementation of that guidance with the Proclamations constitute final agency action reviewable under 5 U.S.C. § 706(2). *See Bennett*

*v. Spear*, 520 U.S. 154 (1997).  Such final agency action is arbitrary, capricious, an abuse of discretion, and not in accordance with law in at least the following ways:  Defendants' actions, as set forth above, are based on legal error; failed to consider all relevant factors; failed to account for matters of importance under the relevant statutes; lacked any coherence because of the irrational and inconsistent manner in which the Guidance was applied; and lacked a rational explanation, particularly in light of the reliance interests at stake; and are therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

355.    Defendants' actions are without good cause.

356.    Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs.

357.    Plaintiffs have no adequate alternative to review under the APA.

### NINTH CAUSE OF ACTION

### Ultra Vires/Separation of Powers—Subclass (a) Only—Against Defendants DOS and Pompeo

358.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

359.    Defendants' application of the COVID-19 Guidance in conjunction with its implementation of the Proclamations to 2020 diversity visa applicants violates the separation of powers because its effect is to unlawfully abolish the Congressionally mandated diversity visa program for more than half of fiscal year 2020.

360.    Defendants have no authority to unilaterally eliminate the diversity visa program, contrary to the will of Congress.

361.    Defendants' application of the COVID-19 Guidance in conjunction with the enforcement of the Proclamations to the diversity visa plaintiffs, their derivatives, and members of subclass (a) thus violates the separation of powers and is constitutionally invalid.

362.    Defendants' application of the COVID-19 Guidance in conjunction with the enforcement of the Proclamations to the diversity visa plaintiffs, their derivatives, and members of subclass (a) is ultra vires and in excess of their statutory authority, and is accordingly unlawful under 5 U.S.C. § 706(2)(C).

363.    Defendants' application of the COVID-19 Guidance in conjunction with the enforcement of the Proclamations causes irreparable injury to the diversity visa plaintiffs, their derivatives, and members of subclass (a).

364.    Defendants should be enjoined from enforcing the COVID-19 Guidance in conjunction with its enforcement of the Proclamations against the diversity visa plaintiffs, their derivatives, and members of subclass (a).

## TENTH CAUSE OF ACTION

### Violation of the APA, 5 U.S.C. §§ 555(b), 706(1)—Subclass (a) Only—Against Defendants DOS and Pompeo

365.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

366.    Defendants have a nondiscretionary duty to "conclude a matter presented to" them "within a reasonable time."  5 U.S.C. § 555(b).

367.    This Court is authorized under the APA to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

368.    Defendants' COVID-19 Guidance, their implementation of the COVID-19 Guidance as to the diversity visa plaintiffs, their derivatives, and members of subclass (a), and their implementation of the Proclamations, are unlawful for the reasons set forth above.

369. Defendants' actions have caused the adjudication of to the diversity visa plaintiffs, their derivatives, and members of subclass (a) to be unlawfully withheld and unreasonably delayed.

370. Defendants' actions are without good cause.

371. Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs. The harm caused to the plaintiff 2020 Diversity Visa Lottery winners, their derivatives, and members of subclass (a) is time-sensitive because their collective eligibility for an immigrant visa will expire for qualified applicants unless the visas issue on or before the September 30, 2020 deadline. By delaying the adjudication and issuance of diversity visas, Defendants have unilaterally and unlawfully suspended Congress' Diversity Visa Lottery program for 2020.

372. Plaintiffs have no adequate alternative to review under the APA.

## ELEVENTH CAUSE OF ACTION

## Mandamus Act, 28 U.S.C. § 1361—Subclass (a) Only—Against Defendants DOS and Pompeo

373. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

374. Defendants have a nondiscretionary, mandatory duty to adjudicate submitted visa petitions and to issue visas pursuant to those adjudications to those individuals who are statutorily entitled to receive visas.

375. Defendants have failed to adjudicate the visa petitions to the diversity visa plaintiffs, their derivatives, and members of subclass (a), and have failed to issue visas to these individuals, who are statutorily entitled to receive such visas, in plain contravention of Defendants' nondiscretionary duty.

376. Defendants' actions are without good cause.

377. Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs.

378.   Plaintiffs have no adequate alternative remedy to compel Defendants to comply with their nondiscretionary duty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A.   A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any part of the Proclamations and/or the COVID-19 Guidance so as to delay processing visas in a timely manner, deny or refuse visas, and/or deny or refuse entry into the country to any otherwise eligible foreign national;

B.   A preliminary and permanent injunction requiring Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them, to process and to adjudicate on or before September 30, 2020 the visa applications of the diversity visa Plaintiffs, their derivative family members, and similarly situated class members and their derivative family members;

C.   A preliminary and permanent injunction requiring Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them, to reserve unused diversity visa numbers for fiscal year 2020, so that visas may be granted to the diversity visa Plaintiffs upon a determination that the Proclamations and Defendants' implementation of the Proclamations and COVID-19 Guidance are unlawful;

D.   A preliminary and permanent injunction requiring Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with

them, to hold diversity visa numbers beyond the September 30, 2020 deadline, so that visas may be granted to the diversity visa Plaintiffs upon a determination that the Proclamations and Defendants' implementation of the COVID-19 Guidance are unlawful;

E.    A preliminary and permanent injunction requiring Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them, to immediately schedule consular interviews for those to the diversity visa plaintiffs, their derivatives, and members of subclass (a) who have submitted the required documentation and are waiting now for their interviews to be scheduled;

F.    An order of mandamus requiring Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them, to comply with their nondiscretionary duty to adjudicate visa petitions, and to issue visas to to the diversity visa plaintiffs, their derivatives, and members of subclass (a) who are statutorily entitled to receive them;

G.    A declaration pursuant to 28 U.S.C. § 2201 that the Proclamations are unlawful and are set aside;

H.    An order pursuant to 5 U.S.C. § 706 holding that the agency defendants' implementation of the Proclamation and the COVID-19 Guidance are unlawful and are set aside;

I.    An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

J.    Such other relief as this Court deems equitable, just, and proper.

August 12, 2020

Respectfully submitted,

/s/ Andrew J. Pincus

Jesse M. Bless (D.D.C. Bar No. MA0020)
AMERICAN IMMIGRATION LAWYERS
  ASSOCIATION
1301 G Street NW, Ste. 300
Washington, D.C. 20005
(781) 704-3897
jbless@aila.org

Andrew J. Pincus (D.D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Karen C. Tumlin (*pro hac vice*)
Esther H. Sung (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Stephen Manning (*pro hac vice*)
Nadia Dahab (*pro hac vice*)
Tess Hellgren (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
nadia@innovationlawlab.org
tess@innovationlawlab.org

Cleland B. Welton II (*pro hac vice*)
MAYER BROWN MEXICO, S.C.
Goldsmith 53, Polanco
Ciudad de México 11560
Telephone: (502) 314-8253
cwelton@mayerbrown.com

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
Justice Action Center Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
laboni@hoqlaw.com