## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
 )
**DOMINGO ARREGUIN GOMEZ, et al.,** )
 )
    **Plaintiffs,** )
 )
          **v.** )      **Case No. 20-cv-01419 (APM)**
 )
**DONALD J. TRUMP, et al.,** )
 )
    **Defendants.** )
—————————————————————— )

—————————————————————— )
 )
**MOHAMMED ABDULAZIZ** )
**ABDUL MOHAMMED, et al.,** )
 )
    **Plaintiffs,** )
 )
          **v.** )      **Case No. 20-cv-01856 (APM)**
 )
**MICHAEL R. POMPEO, et al.,** )
 )
    **Defendants.** )
—————————————————————— )

—————————————————————— )
 )
**AFSIN AKER, et al.,** )
 )
    **Plaintiffs,** )
 )
          **v.** )      **Case No. 20-cv-01926 (APM)**
 )
**DONALD J. TRUMP, et al.,** )
 )
    **Defendants.** )
—————————————————————— )

—————————————————————— )
 )
**CLAUDINE NGUM FONJONG, et al.,** )
 )
    **Plaintiffs,** )
 )

|                        |     |                          |
|------------------------|-----|--------------------------|
| v.                     | )   | Case No. 20-cv-02128 (APM) |
|                        | )   |                          |
| DONALD J. TRUMP, et al., | ) |                          |
|                        | )   |                          |
| Defendants.            | )   |                          |

|                        |     |                          |
|------------------------|-----|--------------------------|
| CHANDAN PANDA, et al., | )   |                          |
|                        | )   |                          |
| Plaintiffs,            | )   |                          |
|                        | )   |                          |
| v.                     | )   | Case No. 20-cv-1907 (APM) |
|                        | )   |                          |
| CHAD F. WOLF, et al.,  | )   |                          |
|                        | )   |                          |
| Defendants.            | )   |                          |

## MEMORANDUM OPINION AND ORDER

These five consolidated cases concern recent actions taken by the President and the State Department to restrict the issuance of visas and entry of certain classes of foreign nationals into the United States due to the COVID-19 pandemic.  On March 20, 2020, the State Department temporarily suspended routine visa services at consular offices and embassies worldwide due to the pandemic, allowing only "emergency and mission critical visa services."  Then, on April 20, 2020, the President issued Presential Proclamation 10014, which suspended the entry of all immigrants into the United States for two months unless they qualified for an exception to the Proclamation.  That Proclamation was followed two months later by Presidential Proclamation 10052, which extended the entry suspension for immigrants until December 31, 2020, and also suspended the entry of foreign nationals seeking admission on temporary nonimmigrant visas, with limited exceptions.

The State Department has interpreted Proclamations 10014 and 10052 to suspend not just entry, but also the review and adjudication of visas for applicants who are covered by the Proclamations and not subject to any of their exceptions.  Consequently, at posts that have not resumed routine operations, visa processing and issuance have been suspended unless the applicant is both (1) eligible for an exception to the Proclamation and (2) considered "mission critical." Though these are distinct requirements, the exceptions to the Proclamations appear to heavily inform the types of applications considered to be mission critical.  The State Department has begun a phased reopening since July 15, 2020, but even at posts that have resumed routine operations, the processing and issuance of covered, non-exempt visas remains suspended pursuant to the Department's interpretation of the Proclamations.

Plaintiffs in these five consolidated actions are approximately 1,076 visa applicants, visa sponsors, and their derivative beneficiaries who represent various immigrant and nonimmigrant visa categories that are subject to the Proclamations' suspension of entry.  Plaintiffs have all filed motions for preliminary injunctions and temporary restraining orders, seeking to preliminarily enjoin Defendants from implementing or enforcing the Proclamations, and two of the actions seek to certify six putative subclasses.  Plaintiffs all challenge the validity of the Proclamations on various statutory and constitutional grounds, and they assert that the State Department's suspension of the processing and issuance of non-exempt visas pursuant to the Proclamations violates the Administrative Procedure Act.

In addition, a subset of Plaintiffs ("DV-2020 Plaintiffs") raise several challenges that are specific to one category of immigrant visas—diversity visas.  The DV-2020 Plaintiffs' opportunity to receive diversity visas and immigrate to the United States will permanently expire on September 30, 2020, unless Defendants process and issue their visas by then.  Diversity visa applications are

not currently being adjudicated, however, because they are, in general, ineligible for an exception to the Proclamation and not considered mission critical.  These Plaintiffs assert that the processing and adjudication of their visas has been unreasonably delayed, and that the State Department's exclusion of this category from its guidance regarding mission critical services is arbitrary.

For the reasons discussed below, the court grants in part and denies in part Plaintiffs' motions for preliminary relief.  Specifically, the court rejects Plaintiffs' statutory and constitutional challenges to the Proclamations, but holds that Plaintiffs are substantially likely to succeed on their claims that (1) the State Department's policy of not reviewing and adjudicating non-exempt visas is not in accordance with law, is in excess of statutory authority, and is arbitrary and capricious; (2) the State Department's non-processing of 2020 diversity visa applications constitutes agency action unreasonably delayed; and (3) the State Department's exclusion of 2020 diversity visa applications from its guidance on mission critical services is arbitrary and capricious.  The court further concludes that the DV-2020 Plaintiffs have met the additional requirements for preliminary injunctive relief pursuant to the court's equitable authority and 5 U.S.C. § 705, but the Non-DV Plaintiffs in *Gomez* have not.  In light of the foregoing, the court denies without prejudice the pending class certification motions as they pertain to the putative diversity visa classes, and defers ruling on the *Gomez* Plaintiffs' motion for class certification as it pertains to the other four putative subclasses of Non-DV Plaintiffs.

## I.  BACKGROUND

### A.    Relevant Visa Categories

Broadly speaking, a foreign national wishing to enter the United States must first obtain a visa from the State Department.  A visa is a travel document that allows its holder to travel to a port of entry and request permission to enter the United States, but it does not guarantee the right

to enter the country.  *See Almaqrami v. Pompeo*, 933 F.3d 774, 776 (D.C. Cir. 2019); *Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) (explaining the "basic distinction" between visa issuance and entry "that runs throughout the INA"); 8 U.S.C. § 1201(h).  There are two overarching categories of visas:  immigrant and nonimmigrant.  Nonimmigrant visas are issued to foreign nationals seeking to enter the United States on a temporary basis for tourism, business, medical treatment, and certain types of temporary work.  Immigrant visas are issued to foreign nationals intending to relocate permanently to the United States.  *See United States v. Idowu*, 105 F.3d 728, 731 (D.C. Cir. 1997); *Requirements for Immigrant and Nonimmigrant* Visas, U.S. CUSTOMS & BORDER PROTECTION (Jan. 3, 2018).[1]  Six visa categories are relevant for this case.

***Family-Based Immigrant Visas.***  Under the family-based immigrant visa program, a U.S. citizen or lawful permanent resident may "sponsor" a foreign-national relative (the "beneficiary") for an immigrant visa.  *See* 8 U.S.C. §§ 1151, 1153(a).  The sponsor may also petition for visas for certain relatives ("derivatives") of the principal beneficiary.  *Id.* §§ 1153(d), 1154(a).  A family member seeking to sponsor a beneficiary must file a petition with the United States Citizenship and Immigration Services ("USCIS").  Once the petition is approved, USCIS will forward the visa petition for consular processing.  Most approved visa applicants must then wait in a queue, determined by the applicant's country of origin and his or her relationship with the visa sponsor.  *See id.* § 1153(e); 22 C.F.R. §§ 42.51(a), 42.52(a)–(c); 9 FAM 504.1-2(c)–(d). When the applicant reaches the front of the queue, he or she completes the visa application, provides supporting evidence, pays the requisite fees, and attends an in-person interview with a

---

[1] Available at https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas.

consular officer, who issues the visa upon finding that the beneficiary is eligible and merits the visa. 8 U.S.C. § 1201; 22 C.F.R. § 42.73; 9 FAM 504.1-2(d), 504.1-3.

**Diversity Immigrant Visas.** Congress has reserved 55,000 "diversity" immigrant visas each year to randomly selected individuals from countries with historically low levels of immigration into the United States. *See* 8 U.S.C. § 1151(e); *id.* § 1153(c)(1)(A). Eligible applicants enter a "lottery" held once each fiscal year. *Id.* § 1153(c); 22 C.F.R. § 42.33. Demand regularly outstrips supply: in Fiscal Year 2018 there were approximately 14.7 million qualified entries. *See* Pls.' Mem. in Supp. of Pls.' Mot. for a Prelim. Inj., *Gomez v. Trump*, No. 20-cv-1419 (APM), ECF No. 53-1 [hereinafter *Gomez* PI Mem.], at 5. A lottery winner or "selectee" must complete a visa application and schedule a consular interview, and "if he meets the criteria to obtain one, the State Department shall issue him a diversity visa." *Almaqrami*, 933 F.3d at 777 (cleaned up). If the selectee does not receive a visa by the end of the fiscal year, however, he is out of luck: "Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the" fiscal year in which the visa applicant was selected. *Id.* A diversity visa is generally valid for six months after issuance. 8 U.S.C. § 1201(c).

**H-1B Nonimmigrant Visas**. The H-1B category enables U.S. employers to hire qualified foreign professionals in "specialty occupation[s]" requiring "theoretical and practical application of a body of highly specialized knowledge" and a "bachelor's or higher degree." *Id.* §§ 1184(i)(1), 1101(a)(15)(H)(i)(b). An employer seeking to hire an H-1B worker must first file a labor condition application with the Department of Labor, identifying the specialty occupation position, the location of employment, and attesting that the employer will pay the worker prevailing wage rates. *See id.* § 1182(n)(1)(A)–(D); 20 C.F.R. §§ 655.730(c)(4), 655.731(a). After the application is

approved, the employer may file a petition with USCIS to classify the foreign worker as an H-1B nonimmigrant.  *See* 8 U.S.C. § 1184(c)(1); 8 C.F.R. § 214.2(h)(4)(iii)(B)(1).  Once USCIS approves the petition, the worker may apply for an H-1B visa at a U.S. embassy or consulate, which will grant the visa, provided the application is complete and the worker is not otherwise ineligible to receive a visa.  9 FAM 402.10; 8 U.S.C. §§ 1182, 1201(g); *see also Almaqrami*, 933 F.3d at 776.  Spouses and minor children of H-1B workers may obtain derivative H-4 visas. 8 U.S.C. § 1101(a)(15)(H).

**Immigrant Visas Based on Permanent Labor Certification.**   While the H-1B program only allows for temporary work in this country, an employer may also petition for the classification of a foreign national seeking admission to the United States based on an offer of *permanent* employment as a skilled worker or a member of a profession holding an advanced degree.  *See id.* §§ 1153(b)(2)(A), 1153(b)(3)(A)(i), 1154(a)(1)(F).  Before doing so, the employer must obtain a labor certification from the Department of Labor stating that there are no qualified, able, and willing United States workers available to fill the employer's job opportunity, and the employment of the beneficiary will not adversely affect the wages and working conditions of similarly employed workers in the United States.  *See id.* §§ 1153(b)(3)(C), 1182(a)(5)(A)(i)(I)–(II); *Patel v. Johnson*, 2 F. Supp. 3d 108, 113–14 (D. Mass. 2014).

**H-2B Nonimmigrant Visas**.  An H-2B petition allows an employer to hire foreign nationals "to perform . . . temporary service or labor" in non-specialized, non-agricultural sectors "if unemployed persons capable of performing such service or labor cannot be found in this country."  8 U.S.C. § 1101(a)(15)(H)(ii)(b); *see also* 8 C.F.R. § 214.2(h)(6).  To hire an H-2B worker, an employer must certify to the Department of Labor that it has attempted to recruit domestic workers for the position, that no such workers are available, and that the temporary

employment of an H-2B worker will not adversely affect the wage rates or working conditions of similarly employed domestic workers.  *See* 8 C.F.R. §§ 214.2(h)(6)(iii)(A)–(D), (6)(iv)(A); *id.* § 655.0 *et seq.*  If the certification is approved, the employer may file a petition with USCIS.  *Id.* § 214.2(h)(6)(iii)(E).

**J Nonimmigrant Visas.**  The J visa category allows approved individuals to participate in work- and study-based exchange visitor programs.  *See* 8 U.S.C. § 1101(a)(15)(J); 22 U.S.C. §§ 2451, *et seq*.  Regulations establish 15 categories of exchange program eligibility, including trainees, teachers, au pairs, and summer work and travel for foreign students.  22 C.F.R. §§ 62.1, 62.4.  J visa applicants must be sponsored by designated entities, which include government agencies, academic institutions, businesses, and non-profits.  *Id.* §§ 62.3, 62.5–13, 62.15.

**L Nonimmigrant Visas.**  The L visa program allows multinational corporations to sponsor visas for temporary intracompany transfers to the United States of foreign managers and executives (L-1A visas) or employees with certain "specialized knowledge" about the petitioning company (L-1B visas).  *See* 8 U.S.C. § 1101(a)(15)(L); 8 C.F.R. §§ 214.2(l)(1)(ii)(B)–(D).

## B.    The State Department's COVID-19 Guidance

On March 20, 2020, the State Department "temporarily suspend[ed] routine visa services at all U.S. Embassies and Consulates" due to COVID-19, but continued to require posts to provide "emergency and mission critical visa services" as resources allowed.  *See* Certified Admin. R. ("CAR"), ECF No. 103-1 [hereinafter CAR], at 12–14 [hereinafter "COVID-19 Guidance"].  The State Department included as "mission critical or emergency services":

> [t]he processing of certain non-immigrant visas such as diplomatic and official visas, H-2 visas associated with food supply, certain medical professionals, air and sea crew and medical emergencies, . . . [and] cases in which an applicant is not protected by the Child Status Protection Act and is at risk of losing eligibility for a visa in his or her current category . . . , spouses and unmarried children of

> U.S. citizens, as well as visas for adopted children, Afghan and Iraqi
> Special Immigrant visas, certain medical professionals, and medical
> emergencies.

Defs.' Opp'n to Pls.' Mots. for Prelim. Inj., ECF No. 94 [hereinafter Defs.' Opp'n], Decl. of Brianne Marwaha, ECF No. 94-1 [hereinafter Marwaha Decl.], ¶ 8.

Between March 20 and July 15, 2020, "[p]osts [did] not have the authority to resume normal visa operations even if the host country ha[d] lifted most restrictions." CAR at 23, 35. Since July 15, however, the State Department has permitted posts to "begin a phased approach to the resumption of routine visa services." CAR 35. The phased reopening, termed "Diplomacy Strong," is "based on local health and safety conditions," and includes four operational tiers. CAR 36. In Phases Zero and One, posts "may continue processing only emergency and mission-critical . . . cases, as resources and local conditions allow." CAR 36, 38. Phase Two allows for a partial resumption of routine services, and Phase Three allows for full resumption. CAR 37–39. Each phase includes detailed guidance regarding the types of visa categories posts should prioritize for processing. CAR 36–39.

### C.      Proclamation 10014

On April 22, 2020, the President signed Presidential Proclamation 10014, which temporarily suspends the entry of immigrants into the United States pursuant to 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a). 85 Fed. Reg. 23,441 (Apr. 22, 2020). The Proclamation supplies three justifications for the action. First among those is to address the damage to the economy caused by the COVID-19 pandemic. *See id.* at 23,441–42. The Proclamation states that "we must be mindful of the impact of foreign workers on the United States labor market, particularly in an environment of high domestic unemployment and depressed demand for labor," and highlights the need to protect in particular "workers at the margin between employment and unemployment, who are

typically 'last in' during an economic expansion and 'first out' during an economic contraction." *Id.* at 23,441.  Second, the Proclamation notes that "introducing additional permanent residents when our healthcare resources are limited puts strain on the finite limits of our healthcare system at a time when we need to prioritize Americans and the existing immigrant population."  *Id.* at 23,442.  And third, the Proclamation explains that a pause on entry is required "so that consular officers may continue to provide services to United States citizens abroad."  *Id.* at 23,441.

Accordingly, Proclamation 10014 suspended for two months the "entry into the United States" of most immigrants abroad who did not already have a valid immigrant visa or travel document as of April 23, 2020.  85 Fed. Reg. at 23,442–43 §§ 1, 2(a), 5.  The Proclamation is subject to certain exceptions, including that "any alien whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees," is eligible to seek entry.  85 Fed. Reg. at 23,443 § 2(b)(ix).  The Secretaries of State and Homeland Security are tasked with implementing the Proclamation as it applies to visas and entry, respectively, though consular officers are directed to determine, "in their discretion, whether an immigrant has established his or her eligibility for an exception" to the Proclamation.  *Id.* at 23,443 § 3.

### D.    Proclamation 10052 and the National Interest Exception

On June 22, 2020, the President issued Proclamation 10052, which extended Proclamation 10014 and also suspended the entry of various nonimmigrants through December 31, 2020. 85 Fed. Reg. 38,263, 38,263–67 (June 25, 2020).  The President announced that the Secretaries of Labor and Homeland Security had reviewed nonimmigrant programs and "found that the present admission of workers within several nonimmigrant visa categories also poses a risk of displacing and disadvantaging United States workers during the current recovery." *Id.* at 38,263.

10

Proclamation 10052 acknowledges that "[u]nder ordinary circumstances, properly administered temporary worker programs can provide benefits to the economy," but explains that "under the extraordinary circumstances of the economic contraction resulting from the COVID-19 outbreak, certain nonimmigrant visa programs authorizing such employment pose an unusual threat to the employment of American workers." *Id.*

According to the Proclamation, "[t]he entry of additional workers through the H-1B, H-2B, J, and L nonimmigrant visa programs," in particular, "presents a significant threat to employment opportunities for Americans affected by the extraordinary economic disruptions caused by the COVID-19 outbreak." *Id.* at 38,264. The Proclamation cites various figures in support of this finding, noting that "between February and April of 2020, more than 17 million United States jobs were lost in industries in which employers are seeking to fill worker positions tied to H-2B nonimmigrant visas," and "more than 20 million United States workers lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions." *Id.* at 38,263–64. The Proclamation also highlights that "the May [2020] unemployment rate for young Americans, who compete with certain J nonimmigrant visa applicants, has been particularly high," and that "[t]emporary workers are often accompanied by their spouses and children, many of whom also compete against American workers." *Id.*

Based on these findings, the Proclamation suspends the entry of foreign nationals seeking entry pursuant to H-1B, H-2B, L, and certain J nonimmigrant visas, unless they are eligible for an exception, including a national interest exception. *Id.* at 38,264–65 §§ 2, 3. Proclamation 10052 also instructs the Secretaries of State, Labor, and Homeland Security to "establish standards to define categories of aliens covered by [the national interest exception] of [the] proclamation." *Id.*

at 28,265 § 4(i); *see also Gomez v. Trump, No. 20-CV-01419 (APM)*, 2020 WL 3429786, at *2 n.2 (D.D.C. June 23, 2020).

Since then, the State Department has published guidance listing various scenarios in which an applicant in a covered visa category may qualify for a national interest exception to Proclamations 10014 and 10052. CAR 167–174. Under this guidance, certain H-1B, H-2B, J, and L nonimmigrant visa applicants who also meet additional criteria may qualify for a national interest exception; however, there appear to be no specific national interest exceptions available for diversity visa applicants or family-based visa applicants, except for minors who are at risk of aging out of their visa classification. CAR 173–74.

### E.   Defendants' Implementation of Proclamations 10014 and 10052 and the COVID-19 Guidance

The State Department has interpreted the Proclamations to suspend not only entry but also the issuance of visas in categories covered under the Proclamations and not subject to one of the enumerated exceptions. *See* CAR 38 ("Presidential Proclamation 10052 suspended the issuance of nonimmigrant visas in the H-1B, H-2B, L, and J-1. . . classifications until December 31, 2020, with certain exceptions."); CAR 28 ("This [Proclamation] effectively suspends issuance of certain H-1B, H-2B, J (for certain categories within the Exchange Visitor Program), and L" visas.); CAR 24 ("The issuance of many immigrant visas . . . was suspended by Presidential Proclamation" 10014.); CAR 36 (explaining that "Presidential Proclamation . . . 10014 suspending issuance of certain immigrant visas has been extended through at least December 31").

Based on this interpretation, the State Department has instructed consular posts that "[o]nly [visa] applicants that [the] post believes may meet an exception to the [Proclamation], including the national interest exception, *and* that constitute a mission-critical category should be adjudicated at this time," and that officers "may not issue any [visas] that are not also excepted under the

[Proclamation]."  CAR 24 (emphasis added); *see also* CAR 32 ("Posts may continue to schedule mission critical and emergency immigrant and nonimmigrant visa interviews as resources allow . . . , but should applicants not qualify for an exception under the relevant presidential proclamation, including in the national interest, post should refuse the case . . . ."); CAR 44 ("Under P.P. 10014, consular officers may continue to process visa applications for individuals who are expressly excepted from the Proclamation . . . .").

Thus, for consular posts that have not resumed routine visa services, the State Department has suspended processing and issuance of covered visas unless they (1) are eligible for an exception to the Proclamations, and (2) qualify for mission critical or emergency services under the State Department's COVID-19 Guidance.  Though these two requirements are distinct, *see* Marwaha Decl. ¶ 7, they appear to overlap, with the "exceptions to the Presidential Proclamations" being "used as a guide for additional mission-critical or emergency travelers."  CAR 38; *see also* CAR 189 ("Mission-critical immigrant visa categories include applicants who may be eligible for an exception under these presidential proclamations."); CAR 70 ("[C]onsular managers may, in their discretion, determine that a specific H-1B, H-2, J, or L application that is likely to meet the . . . national interest exception to P.P. 10052 or another exception is also 'mission critical.'").  Conversely, if a visa category "fall[s] under the proclamation" and is not eligible for an exception, then it "would not be considered mission critical," and a visa application "would not move forward."  8/27/2020 Oral Arg. Tr., ECF No. 122 [hereinafter 8/27/2020 Arg. Tr.], at 87.

Posts that have resumed routine visa services since July may process cases that are not designated as mission critical pursuant to a detailed prioritization scheme, *see* CAR 36–41, but those posts are still forbidden from "resum[ing] routine processing of [covered] visa classifications, unless the applicant qualifies for an exception under [Proclamations 10014 and

10052], until given a specific instruction to do so."  CAR 38; *see also* CAR 36.  This policy of suspending all processing and issuance of visas in categories covered by the Proclamation and not subject to an exception is referred to as the "No-Visa Policy."[2]

### F.    The Application of Defendants' COVID-19 Guidance and No-Visa Policy to Diversity Visa Applicants

The State Department has issued only approximately 12,000 Fiscal Year 2020 diversity visas, meaning that approximately 43,000 visas are still available to DV-2020 selectees.  *See* 8/27/2020 Arg. Tr. at 68.  Those selectees must receive visas by the end of the fiscal year, September 30, 2020, or their opportunity to immigrate to the United States will vanish.  8 U.S.C. § 1154(a)(1)(I)(ii)(II).   Despite this fast-approaching deadline, "[p]ursuant to guidance from the [State] Department on the suspension of routine visa services and implementation of P.P. 10014 and P.P. 10052," no "additional diversity visa case appointments with [consular] posts" have been scheduled since March 20, 2020.  Defs.' Opp'n, Decl. of Aaron Luster, ECF No. 94-3 [hereinafter Luster Decl.], ¶ 5.  "[O]nly when a consular post reaches Phase Three of the Diplomacy Strong Framework may the post resume diversity visa case processing, and only for cases that appear to be eligible for an exception to P.P. 10014."  *Id.*

Thus, DV-2020 selectees are doubly doomed.  Pursuant to the COVID-19 Guidance, diversity visa selects who are imminently going to lose their eligibility to receive a visa are not being treated as mission critical at those posts that have not resumed routine visa processing.  *See* 8/7/2020 Status Hr'g Tr., ECF No. 78 [hereinafter 8/7/2020 Status Hr'g Tr.], at 19.  And pursuant

---

[2] Communications from consular offices, embassies, and the Kentucky Consular Center to visa applicants and DV-2020 selectees reflect the execution of the State Department's No-Visa Policy.  *See, e.g.*, Second Am. Compl., *Gomez v. Trump*, 20-cv-1419, (APM), ECF No. 46, Ex. H, ECF No. 46-8 ("While the proclamation is in place, the issuance of diversity visas is not permitted."); *id.*, Ex. O, ECF No. 46-15 ("We will not be issuing H-1B, H-2B, L, or certain J visas . . . through December 31, 2020, unless an exception applies."); *Gomez* PI Mot., ECF No. 53-11 ¶ 21 ("We contacted the Kentucky Consular Center, which reported that no interviews would be scheduled due to the travel ban."); *id.*, ECF No. 53-24 ¶ 14 ("Please be informed that L visas issuance is suspended due to Presidential Proclamation 10052 until, at least, December 31st, 2020.").

to the State Department's "No-Visa Policy," the Department is not currently processing any diversity visas, unless an applicant qualifies for an exception to the Proclamations, even at posts that have resumed routine processing. *See* 8/27/2020 Arg. Tr. at 79–80; Luster Decl. ¶ 5. However, the average DV-2020 selectee who did not receive her visa before April 23, 2020, does not appear to be eligible for an exception: under the State Department's latest national interest exception guidance, diversity visas are not listed as among the categories of visas eligible for the exception. *See* CAR 167–174 (listing the categories of visas eligible for national interest exceptions); *see also* 8/7/2020 Status Hr'g Tr. at 18 ("[W]e are aware of . . . isolated cases of . . . Diversity Visa selectees being granted the national interest exception, but those are -- those would appear to be isolated cases.").

Thus, it appears that, as things currently stand, the substantial majority of the remaining 43,000 diversity visas for this fiscal year will go unissued, and most of this year's diversity visa selectees will permanently lose their opportunity to immigrate to the United States through the diversity visa program.[3]

### G.   Procedural Background

This matter involves four fully consolidated cases (*Gomez v. Trump*, No. 20-cv-1419; *Mohammed v. Pompeo*, No. 20-cv-1856; *Fonjong v. Pompeo*, No. 20-cv-2128; and *Aker v. Trump*, No. 20-cv-1926) and one partially consolidated case (only the merits of the first two arguments raised in *Panda v. Wolf*, No. 20-cv-1907). *See* Am. Order, *Gomez v. Trump*, No. 20-cv-1419 (APM), ECF No. 79.

---

[3] Selectees can always enter the diversity lottery again in future years, but with millions of applications submitted each year for 55,000 slots, the chances they will hit the lottery twice are vanishingly slim. *See Diversity Visa Program, DV 2016-2018: Number of Entries Received During Each Online Registration Period by Country of Chargeability, FY16– FY18*, U.S. DEP'T OF STATE, available at https://travel.state.gov/content/dam/visas/Diversity-Visa/DVStatistics/DV%20AES%20statistics%20by%20FSC%202016-2018.pdf.

### 1.     *Gomez v. Trump, No. 20-cv-1419*

In their Second Amended Complaint, the *Gomez* Plaintiffs challenge Proclamations 10014 and 10052 and their implementation in a putative class action consisting of 23 named plaintiffs across five subclasses representing the following five visa categories:   family-based immigrant visas, diversity immigrant visas, H-1B nonimmigrant visas, H-2B nonimmigrant visas, J nonimmigrant visas, and L nonimmigrant visas.   *See* Second Am. Compl., *Gomez v. Trump*, No. 20-cv-1419 (APM), ECF No. 111 [hereinafter *Gomez* SAC].   The named plaintiffs are nine family-based immigrant visa sponsors, consisting of citizens and lawful permanent residents, who are petitioning on behalf of foreign family members; seven diversity visa selectees for Fiscal Year 2020; and seven employers or organizations who either sponsor individuals for nonimmigrant visas, sponsor nonimmigrant visa programs, or represent nonimmigrant workers.   *Id.* ¶¶ 15–36. The Defendants are President Donald Trump, Attorney General William Barr, the Department of State, Secretary of State Michael Pompeo, the Department of Homeland Security, and Acting Secretary of Homeland Security Chad Wolf.   *Id.* ¶¶ 37–42.

The *Gomez* Plaintiffs have two pending motions for preliminary injunctive relief.   In the first, they argue that Proclamation 10052 is *ultra vires*, violates the separation of powers between Congress and the Executive Branch, and, in the alternative, that the statutory authority for the Proclamation, 8 U.S.C. § 1182(f), violates the nondelegation doctrine.   *See Gomez* PI Mem. at 22– 32.   They also argue that the State Department's No-Visa Policy violates the Administrative Procedure Act ("APA") because, among other things, it unlawfully and arbitrarily engrafts the Proclamations' restrictions on entry onto the requirements for visa eligibility, thereby causing the cessation of processing and issuance of visa applications for otherwise qualified visa applicants now deemed ineligible for an exception.   *Id.* at 33–38.   Plaintiffs ask the court to preliminarily

enjoin Defendants from implementing or enforcing Proclamation 10014 and 10052 against Plaintiffs and the proposed classes pursuant to 5 U.S.C § 705 and the court's traditional equitable powers.  *See* Pls.' Mot. for a Prelim. Inj., *Gomez v. Trump*, No. 20-cv-1419 (APM), ECF No. 53 [hereinafter *Gomez* PI Mot.]; *Gomez* PI Mem. at 33, 45.  In the alternative, Plaintiffs request an order requiring the State Department to reserve unused diversity visa numbers for fiscal year 2020. *Gomez* PI Mem. at 45.

In their supplemental preliminary injunction, the *Gomez* DV-2020 Plaintiffs argue that the State Department's COVID-19 Guidance also violates the APA insofar as it does not adequately explain its exclusion of 2020 diversity visas from the categories of visas eligible for mission critical and emergency processing.  *See* Pls.' Suppl. Mot. for Prelim. Inj., ECF No. 66 [hereinafter *Gomez* Suppl. PI Mem.].  These plaintiffs seek an order enjoining the State Department's application of the COVID-19 Guidance to diversity visa applicants pursuant to 5 U.S.C. § 705 and the court's equitable authority.  *Id.* at 7.  They also incorporate by reference the claims asserted in *Mohammed*, *Aker*, and *Fonjong*, and seek classwide relief directing Defendants to adjudicate their visa applications notwithstanding the suspension of routine visa services at certain consular posts.  *Id.* at 1, 8–9.

In addition, the *Gomez* Plaintiffs ask the court to certify the matter as a class action with the following subclasses:

a)  **Immediate Relative Parent Subclass**—Individual U.S. citizens with an approved immigrant visa petition for an immediate relative parent and whose sponsored relative is subject to Presidential Proclamation 10052.

b)  **Preference Relative Subclass**—Individual U.S. citizens and lawful permanent residents with an approved immigrant visa petition for a relative in a preference immigrant category, including a spouse, parent, child, or sibling, and any qualifying derivative relatives, where the immigrant visa is "current" or will become "current," meaning visas are authorized for issuance abroad, while

Presidential Proclamation 10052 is in effect, and whose sponsored preference relative is subject to Proclamation 10052.

c) **Diversity Visa Subclass**—Individuals who have been selected to receive an immigrant visa through the U.S. Department of State's FY2020 Diversity Visa Lottery and who had not received their immigrant visa on or before April 23, 2020, when the Presidential Proclamation 10014, later extended by Presidential Proclamation 10052, took effect.

d) **Temporary Worker Subclass**—United States employers who have an approved nonimmigrant visa petition for an employee or potential employee in the H-1B, H-2B, or L-1 nonimmigrant visa categories; where the employee or potential employee's petition for nonimmigrant status has been approved for temporary employment in the United States, and where the employee or potential employee is subject to Proclamation 10052.

e) **Exchange Visitor Program Subclass**—Entities designated by the U.S. Department of State as an Exchange Visitor Program sponsor for any category of J-1 exchange visitors included in Proclamation 10052.

*See* Pls.' Mot. for Class Cert., *Gomez v. Trump*, No. 20-cv-1419 (APM), ECF No. 52 [hereinafter *Gomez* Class Cert. Mot.], at 1.

### 2.    *Mohammed v. Pompeo, No. 20-cv-1856*

The *Mohammed* Plaintiffs include 493 DV-2020 selectees and their derivative beneficiaries, and the Defendants are President Trump and Secretary of State Pompeo. Am. Compl., *Mohammed v. Pompeo*, No. 20-cv-1856 (APM), ECF No. 5, ¶¶ 1, 2114–15.  In their pending motion for preliminary injunction, Plaintiffs argue that Defendants' policies, procedures, and practices suspending the adjudication and issuance of immigrant visa applications for Fiscal Year 2020 diversity visa selectees and their derivative beneficiaries violate the APA, and warrant mandamus relief.  *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj., *Mohammed v. Pompeo*, No. 20-cv-1856 (APM), ECF No. 8-1 [hereinafter *Mohammed* PI Mem.], at 15–23.  Plaintiffs seek an order: (1) requiring Defendants to reserve visa numbers for the Plaintiffs through the pendency of litigation; (2) declaring Defendants' policies, procedures, and practices suspending the

adjudication of immigrant visa applications for the fiscal year 2020 Diversity Visa Program unlawful; (3) setting aside Defendants' implementation of policies, procedures, and practices precluding issuance of visas for DV-2020 selectees and their derivative beneficiaries based on the entry suspension promulgated in Proclamations 10014 and 10052; and (4) mandating Defendants process Plaintiffs' immigrant visa applications, schedule Plaintiffs for immigrant visa interviews, and issue visas to eligible Plaintiffs. *Id.* at 26.

### 3.    *Fonjong v. Trump, No. 20-cv-2128*

Plaintiffs in this case include 243 DV-2020 selectees and their derivative beneficiaries. *See* Compl., *Fonjong v. Trump*, No. 20-cv-2128 (APM), ECF No. 1, ¶ 1.  They are suing President Trump and Secretary of State Pompeo. *Id.* ¶¶ 1091–93.  The *Fonjong* Plaintiffs have filed a motion for preliminary injunction and temporary restraining order, which raises identical arguments and seeks the same relief as the *Mohammed* Plaintiffs' motion.  *See* Mem. in Supp. of Pls.' Mot. for TRO & Prelim. Inj., *Fonjong v. Trump*, No. 20-cv-2128 (APM), ECF No. 70-1 [hereinafter *Fonjong* TRO/PI Mem.].

### 4.    *Aker v. Trump, No. 20-cv-1926*

The *Aker* Plaintiffs are 149 DV-2020 selectees and their derivative beneficiaries, and the Defendants in this case are President Trump, Secretary of State Pompeo, and the State Department. *See* Am. Compl., *Aker v. Trump*, No. 20-cv-1926 (APM), ECF No. 3 [hereinafter *Aker* Compl.], ¶¶ 4, 672–74.  These Plaintiffs are situated in the following four circumstances:

> (1) Those with issued, but expired immigrant visas; (2) [t]hose with completed immigrant visa interviews, but who[se] immigrant visa stamps were never issued; (3) [t]hose who completed all immigrant visa processing at the [Kentucky Consular Center] and were scheduled for or who were awaiting interviews; and (4) [t]hose who were in the process of completing their immigrant visa packages with the [Center], but who were then told all processing on their cases had ceased.

Pls.' Mot. for TRO & Prelim. Inj. & Mem. of P. & A. in Supp., *Aker v. Trump*, No. 20-cv-1926 (APM), ECF No. 4 [hereinafter *Aker* TRO/PI Mem.], at 15–16.   In their motion for temporary restraining order and preliminary injunction, the *Aker* Plaintiffs assert that the Proclamations are *ultra vires*, the State Department's implementation of the Proclamations violates the APA, and the Proclamations and their implementations violate the Take Care Clause, the Due Process Clause, and the Equal Protection clause of the Constitution.   *Id.* at 38–55.   They ask the court to: (1) postpone the end-date of visa issuance for DV-2020 selectees to September 30, 2021; (2) enjoin the State Department from suspending the issuance and reissuance of visas for the diversity visa program; (3) enjoin the State Department from suspending visa adjudication for DV-2020 selectees; (4) order the State Department and the Kentucky Consular Center to complete processing visas for DV-2020 selectees; (5) order the State Department to issue visas for individuals who completed the interview process prior to the Proclamations; and (6) order the State Department to reissue expired visas for Fiscal Year 2020 diversity visa selectees whose visas expired before they could complete travel to the United States.   *Id.* at 1–2.

In addition, the *Aker* Plaintiffs seek to certify the following class:

> All individual diversity visa immigrant applicants and their derivative beneficiaries whose diversity visas were issued prior to Presidential Proclamations 10052 and/or 10014 taking effect, but who were unable to enter the United States due to travel restrictions and who have subsequently been unable to obtain reissuance of their visas through the individual consulates of the Department of State pursuant to the Presidential Proclamations.

*See* Mot. for Class Cert. & Supporting Mem., *Gomez v. Trump*, No. 20-cv-1419 (APM), ECF No. 84 [hereinafter *Aker* Class Cert. Mot.], at 2.

###### 5.     *Panda v. Wolf, No. 20-cv-1907*

Plaintiffs in this case are 169 Indian nationals with approved H-1B petitions and their derivative beneficiaries.   *See* Compl., *Panda v. Wolf*, No. 20-cv-1907 (APM), ECF No. 1 [hereinafter *Panda* Compl.], at 21; *see also* 8/27/2020 Arg. Tr. at 54 (updating the court on the number of Plaintiffs in this action).  These Plaintiffs all were residing and working in the United States under H-1B or H-4 status.   *See* Pls.' Am. Mem. of P. & A. in Supp. of Their Mot. for a Prelim. Inj., ECF No. 8 [hereinafter *Panda* PI Mem.], at 1.  For various reasons they traveled to India, and now must receive visas to return to the United States.   *Id.*  However, they allege that Defendants, Acting Secretary of Homeland Security Wolf, Secretary of State Pompeo, and Secretary of Labor Eugene Scalia, have been withholding the adjudication of their DS-160 nonimmigrant visa applications, which if approved would allow them to re-enter the country.   *Id.*

The court has bifurcated briefing on the *Panda* Plaintiffs' motion for preliminary injunction, with the merits of their two overlapping claims being heard in this consolidated action, and the merits of the non-overlapping claim and other non-merits defenses being considered separately.  *See* Am. Order, *Gomez v. Trump*, No. 20-cv-1419 (APM), ECF No. 79; Order, *Panda v. Wolf*, No. 20-cv-1907 (APM), ECF No. 23.  As relevant here, the *Panda* Plaintiffs argue that Proclamation 10052 and its implementation are *ultra vires*, and that Defendants' withholding adjudication of Plaintiffs' visa applications violates the APA.  *See Panda* PI Mem. at 25–35.  They seek an order (1) enjoining Defendants from applying Proclamation 10052 in adjudicating Plaintiffs' visa applications and determining whether they are admissible to the United States to resume H-1B or H-4 status, and (2) directing the Secretary of State and the United States consulates to process, adjudicate, and render final decisions on Plaintiffs' DS-160 visa applications within fourteen days.  *Id.* at 40.

## II.   LEGAL STANDARD

Motions for temporary restraining orders and preliminary injunctions are analyzed using the same standards.   *See Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 81 (D.D.C. 2018); *Sterling Commercial Credit–Mich., LLC v. Phx. Indus. I, LLC*, 762 F. Supp. 2d 8, 12 (D.D.C. 2011).   Requests for preliminary relief under the APA, 5 U.S.C. § 705, are also governed by the same standards.   *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) (collecting cases).

These "extraordinary" remedies "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."   *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).   To prevail on such a motion, the movant bears the burden of showing that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest."   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Where, as here, the federal government is the opposing party, the balance of equities and public interest factors merge.   *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Courts in this jurisdiction evaluate the four preliminary injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."   *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009); *see also Confederated Tribes of Chehalis Reservation v. Mnuchin*, No. 20-CV-01002 (APM), 2020 WL 1984297, at *6–7 (D.D.C. Apr. 27, 2020) (explaining that, though the sliding scale framework has been called into question, in the absence of a D.C. Circuit decision overruling it, the approach "remains binding precedent that this

court must follow"). The weighing of the four factors is within the district court's discretion. *See Davis*, 571 F.3d at 1291.

## III.   LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Threshold Justiciability Questions

"[T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment" that the action is justiciable. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J.)); *Brown v. FEC*, 386 F. Supp. 3d 16, 25–26 (D.D.C. 2019). Defendants argue that there are three threshold impediments to this court's review of the merits of Plaintiffs' claims: Plaintiffs lack standing, consular non-reviewability bars review of their claims, and they lack a cause of action.

#### 1.   *Standing*

"To establish standing, the plaintiff must show (1) [she] has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (cleaned up). The plaintiff "bears the burden of establishing all three elements of standing," and "[i]n the context of a preliminary injunction" the court "require[s] the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Id.* at 377 (cleaned up). As a result, a plaintiff seeking such extraordinary relief "cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." *Id.* (cleaned up). To establish jurisdiction over

a claim, "the court need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).

At the threshold of the threshold issue of standing, Defendants challenge the evidentiary sufficiency of all Plaintiffs' standing. Citing this court's decision in *Nguyen v. U.S. Department of Homeland Security*, they argue that "all of the named plaintiffs in *Gomez*, *Mohammed*, *Fonjong*, and *Aker* . . . fail to provide the record evidence necessary to establish standing." Defs.' Opp'n at 19 (citing *Nguyen v. U.S. Dep't of Homeland Sec.*, 2020 WL 2527210, at *4 (D.D.C. May 18, 2020)). Defendants note that many of the declarations submitted by Plaintiffs and others "refer to emails to and from the State Department or various consular posts, but none of the purported messages are included among the voluminous filings in these cases." *Id.*

The *Gomez* Plaintiffs counter—correctly—that Defendants misunderstand the court's holding in *Nguyen*. Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj., ECF No. 108 [hereinafter *Gomez* Reply Mem.], at 2. The plaintiffs in that case "d[id] not even discuss standing, much less supply 'specific facts' that establish a substantial likelihood thereof." *Nguyen*, 2020 WL 2527210, at *4. Here, by contrast, as will be seen below, Plaintiffs' various declarants have supplied "specific facts" to establish a substantial likelihood of standing.[4]

a.   *Gomez* Plaintiffs

As discussed, the preliminary injunction motion in *Gomez* requests relief for 23 plaintiffs, including six DV-2020 selectees ("DV-2020 Plaintiffs"), nonimmigrant visa plaintiffs, and family-based immigrant visa plaintiffs, and five putative subclasses. *Gomez* PI Mem. at 12–18; *Gomez* Class Cert Mot. Additionally, on behalf of themselves, their beneficiaries, and the proposed subclass of diversity visa lottery winners, the DV-2020 Plaintiffs filed a separate supplemental

---

[4] Because the court will address standing and other justiciability issues for Plaintiffs in *Panda* separately, this opinion only addresses standing for the claims in *Gomez*, *Mohammed*, *Fonjong*, and *Aker*.

motion for a preliminary injunction directing Defendants to adjudicate their visa applications despite the suspension of routine visa services at particular consular posts. *Gomez* Suppl. PI Mem. at 1. Because each DV-2020 Plaintiff asserts every claim in the case (i.e., those common to all *Gomez* Plaintiffs as well as those specific to DV-2020 Plaintiffs), only one DV-2020 Plaintiff need demonstrate a substantial likelihood of standing for the court to maintain jurisdiction. *See Mendoza*, 754 F.3d at 1010. At least one does.

In support of their motion, Plaintiffs submit the declaration of Plaintiff Aya Nakamura, a diversity visa lottery winner and citizen of Japan. *Gomez* PI Mot., Decl. of Aya Nakamura, ECF No. 53-25 [hereinafter Nakamura Decl.], ¶¶ 1, 4. Nakamura had entered the diversity visa lottery for the past four years while pursuing her college education in the United States. *Id*. ¶ 2. After winning the lottery on May 7, 2019, she "decided to submit all the paperwork for the diversity visa as quickly as [she] could" and to return to Japan to complete "the necessary consular processing for [her] immigrant visa." *Id*. ¶ 5. She left for Japan on January 1, 2020. *Id*. ¶ 8. By then, Nakamura had completed her Associate in Applied Science Degree in Business Administration from ASA College in New York City and had begun a one-year post-completion Optional Practical Training ("OPT") period. *Id*. ¶ 3. She states that by leaving for Japan, she "forfeited nearly eight months remaining in [her] OPT period." *Id*. ¶ 8. Nakamura had to "buy a plane ticket, give up the lease on [her] apartment, and give away belongings [she] wouldn't be able to bring back with [her] on the plane." *Id*. ¶ 9. She also hired and paid a New York immigration attorney to "help advise [her] in pursuing [her] diversity visa." *Id*.

On June 19, 2020, Nakamura "received confirmation . . . that [she] had completed every step necessary for an interview to be scheduled." *Id*. ¶ 10. But on June 22, 2020, she "received the news that the President had extended the proclamation to restrict immigration through

December 31, 2020." *Id.* ¶ 13. Nakamura states that unless she could "show that [she] was eligible for a national interest exception, the president's proclamation would end [her] one chance at immigrating to the United States." *Id.* On July 13, 2020, Nakamura's attorney, Michael Dunn, contacted the U.S. Consulate in Tokyo to request an emergency interview before the end of the fiscal year, but the Consulate responded that "[a]ll diversity (DV) immigrant visa appointments have been cancelled at this time." *Id.* ¶ 15. Nakamura states that after Dunn reached out to the Kentucky Consular Center, he was told that "[d]ue to the novel COVID-19 outbreak[,] all interviews for the DV program have been suspended, [and] it is undetermined when scheduling will resume." *Id.* ¶ 16.

On July 16, 2020, Dunn contacted the Consulate on Nakamura's behalf once more to request an emergency interview "in order to specifically seek an exception to the proclamation." *Id.* ¶ 17. As of July 31, 2020, Nakamura states that Dunn has not received a response. *Id.* On July 28, 2020, Dunn contacted the Consulate a third time to request an emergency interview "in order to specifically seek a national interest exception to the proclamation." *Id.* ¶ 18. Again, Nakamura states that Dunn has not received a response. *Id.* She further states that if she had not pursued a diversity visa, she "would still be in the United States preparing to enter a university to complete a four-year degree in accounting." *Id.* ¶ 21. She worries that if she does "not get a visa on or before September 30, [she] will have wasted so much time and money [she] spent on [her] U.S. education," and she "will never be able to reach [her] dream of becoming a CPA . . . in the United States." *Id.* ¶ 21.

*Injury.* Defendants do not contest that Nakamura (or any of the other *Gomez* Plaintiffs, for that matter) fails to establish a cognizable injury in fact. And for good reason: she easily establishes the requisites for an imminent injury in fact. *Nakamura*, like all Plaintiffs in these

consolidated cases, asserts a procedural injury—the withholding of statutorily mandated, non-discretionary review and adjudication of her visa applications.[5]  This procedural deprivation is paired with a concrete interest—Nakamura's interest in obtaining a diversity lottery visa before September 30, 2020, which would allow her to enter the country as a lawful permanent resident—thereby rendering the procedural injury sufficient to establish standing.  *See Food & Water Watch*, 808 F.3d at 921 (stating that "[d]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009))); *see also E.B. v. U.S. Dep't of State*, 422 F. Supp. 3d 81, 86–87 (D.D.C. 2019); *Smirnov v. Clinton*, 806 F. Supp. 2d 1, 10 (D.D.C. 2011) (finding standing "based upon the plaintiffs' lost opportunity to have their visa applications—some of which have already been submitted—fully processed and considered"), *aff'd*, 487 F. App'x 582 (D.C. Cir. 2012); *Abboud v. INS*, 140 F.3d 843, 847 (9th Cir. 1998), *superseded in part on other grounds*, 8 U.S.C. § 1154.

*Causation.*  To establish causation, a plaintiff must show "a causal connection between the injury and the conduct complained of."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (cleaned up).  The Nakamura Declaration contains specific facts demonstrating that the State Department's implementation of the Proclamations and the COVID-19 Guidance is substantially likely preventing the adjudication of Nakamura's diversity visa application and thus her potential entry into the United States.

---

[5] For purposes of the standing inquiry, the court must assume Plaintiffs possess a mandatory, non-discretionary right of review and adjudication of their visa applications.  *See Estate of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) (stating that, when considering a plaintiff's standing, a federal court must assume the merits of his or her legal claim).

Nakamura Decl. ¶ 13 (addressing the impact of the Proclamations), *id.* ¶ 16 (noting the State Department's correspondence linking the cancellation of Nakamura's interview to COVID-19).[6] For their part, Defendants do not challenge the *Gomez* Plaintiffs on this prong of the standing analysis, choosing instead to focus on redressability.  Defs.' Opp'n at 20–25.

*Redressability.*  To establish redressability, a plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 425 U.S. 26, 38 (1976)). Causation and redressability are "closely related" concepts, which typically "overlap as two sides of a . . . coin."  *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).  The redressability requirement is "relaxed" when a plaintiff has alleged a procedural injury.  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013).  That more relaxed redressability inquiry means that "instead of needing to establish that compelling the agency to follow the correct procedure *would* lead to a substantive result that favors the [plaintiff's] concrete interests, the [plaintiff] need only show that its concrete interests *could* be better protected."  *Narragansett Indian Tribal Historic Pres. Office v. Fed. Energy Regulatory Comm'n*, 949 F.3d 8, 13 (D.C. Cir. 2020).  "In other words, the relaxed redressability requirement is met when correcting the alleged

---

[6] Other *Gomez* DV-2020 Plaintiffs have also received communications tying the suspension of processing of their applications to Proclamations 10014 and 10052.  *See, e.g.*, *Gomez* PI Mem., Decl. of Fatma Bushati, ECF No. 53-11 ¶ 21 ("We contacted the Kentucky Consular Center, which reported that no interviews would be scheduled due to the travel ban."); *id.*, Decl. of Iwundu Epouse Kouadio Ijeoma Golden, 53-16 ¶ 10 (Embassy email stating: "It will not be possible to schedule your DV interview before September 30, 2020 due to the restrictions in the Presidential Proclamation . . . . On June 22, the President extended these restrictions through December 30, 2020. At this time, applicants for the Diversity Visa do not meet the criteria provided for a national interest exception. We understand your request and desire for an interview, but unfortunately will not be able to facilitate this under the current immigration laws."); *id.*, Decl. of Jodi Lynn Karpes, ECF No. 53-19 ¶ 12 ("My attorney contacted the U.S. Consulate in Johannesburg, South Africa on July 13, 2020 to request an emergency appointment. The Consulate stated in an automatic email response to my attorney on July 13, 2020 that 'All routine visa processing has been suspended until 30 December 2020 due to the Presidential Proclamation for  Coronavirus'. On July 28, my attorney again requested an interview be scheduled in the National Interest but to date has not received a response.").

procedural violation *could* still change the substantive outcome in the [plaintiff's] favor; the [plaintiff] need not go further and show that it *would* effect such a change." *Id.*

Defendants assert that even if the court were to enjoin the Proclamations, "the State Department's suspension of routine visa services due to COVID-19, as well as processing backlogs" would "render it unlikely that the diversity visas at issue could be processed or adjudicated by September 30, 2020." Defs.' Opp'n at 20. But that argument is unpersuasive with respect to Nakamura. Having established a procedural injury, Nakamura need only demonstrate that the relief she requests *could* better protect her concrete interest in the adjudication of her diversity visa application. She has done so. As Defendants acknowledge, the consular post in Tokyo is now processing immigrant visa applications. *See* Defs.' Opp'n at 21; *see also* Pls.' Notice Regarding Number of Diversity Visas Issued in July 2020 and Bulletin Showing Number of Selected Entrants in DV-2020 by Country, ECF No. 115 [hereinafter Notice Regarding July 2020 Processing], at 16 (showing 84 immigrant visa issued from the Tokyo consulate in July 2020).[7] The relief she seeks would restart the processing of her application, and Defendants have offered no reason to believe that the Tokyo consulate could not complete processing and issuance of her diversity lottery visa by September 30, 2020. Nakamura therefore has satisfied the redressability requirement.

Defendants' additional contention that Nakamura cannot show redressability because she has not met her "burden of establishing eligibility for a visa 'to the satisfaction of the consular officer'" likewise fails. Defs.' Opp'n at 20 (quoting 8 U.S.C. § 1361). Even assuming Nakamura must make such a showing to redress her *procedural* injury, she attests that she has "met all the

---

[7] The government stresses that these diversity visas were replacement visas issued to applicants who previously had valid immigrant visas, *see* Defs.' Suppl. Notice, ECF No. 120, at 6, but that does not undermine the fact that the Tokyo post is currently capable of processing and issuing visas.

requirements for a diversity visa" and is "not aware of any reason why a consular officer might decide that [she is] inadmissible and refuse to issue [her] a visa."  Nakamura Decl. ¶ 11. Defendants offer no evidence to the contrary.  Nakamura therefore has established a substantial likelihood of redressability at the preliminary injunction stage.

***

In summary, because one *Gomez* DV-2020 Plaintiff has established a substantial likelihood of standing, the court has subject matter jurisdiction over all claims asserted by the *Gomez* Plaintiffs.

b.    <u>*Mohammed, Fonjong, and Aker* Plaintiffs</u>

The court likewise holds that there is at least one plaintiff in each of the *Mohammed*, *Fonjong*, and *Aker* cases who has demonstrated a substantial likelihood of standing.

The *Mohammed* Plaintiffs submit the declaration of Shereen Elsaid Rezk Abdelaziz Nawara, a citizen of Egypt who currently resides in the United Arab Emirates.  Pls.' Mot. for Prelim. Inj. Relief, *Mohammed v. Pompeo*, ECF No. 20-cv-1856 (APM), ECF No. 8 [hereinafter *Mohammed* Pls.' Mot.], Ex. 19, Decl. of Shereen Elsaid Rezk Abdelaziz Nawara, ECF No. 8-20 at 1.  After Nawara was selected for the DV-2020 lottery, she traveled to Egypt to obtain the needed documents.  *See id.* ¶ 15.  She sent them all to the Kentucky Consular Center and was informed that she had submitted the required documents and was ready to be scheduled for an interview when her case number became current.  *Id.*  Believing that her children would be attending school in the United States, Nawara did not enroll them in school in the UAE.  *Id.* ¶ 14.  But her interview was scheduled for May 2020, just a few weeks after Proclamation 10014 was issued, and it was cancelled.  *Id.* ¶¶ 11, 16.  She states that "this Proclamation [has] made it so that we cannot get the immigrant visas which we should be granted," and that this has been "terrible" news.  *Id.* ¶ 6.

Nawara describes the chance to move to the United States with her spouse and two children as a "once in a lifetime opportunity" to provide "a better life for [her] family," and she discusses her extreme disappointment at having potentially lost out on this opportunity. *Id.* ¶¶ 16, 19. In particular, she emphasizes that "[she] cannot stress enough how important it [is] to be able to give [her children] the chance to live, grow, and get an education in America." *Id.* ¶ 9.

The *Fonjong* Plaintiffs submit the declaration of Marina Filippova, a resident and citizen of Russia. Pls.' Mot. for T.R.O. and Prelim. Inj., *Fonjong v. Trump*, No. 20-cv-2128 (APM), ECF No. 7 [hereinafter *Fonjong* Pls.' Mot.], Ex. 13, Decl. of Marina Filippova, ECF No. 7-14 at 1. Filippova states that she was "extremely excited" when she learned that her spouse was selected for the DV-2020 lottery. *Id.* ¶ 7. Her and her husband's interview was scheduled to be held in June 2020, but was cancelled. *Id.* ¶ 9. She notes that the Proclamation has "made it impossible for [them] to get the immigrant visa." *Id.* ¶ 10. Believing they would obtain the visas, Filippova and her husband put their "entire life . . . on hold while [they] were waiting for the interview." *Id.* ¶ 7. The couple spent thousands of dollars on a trip to the United States last December to choose where to live, and her husband passed on a promotion. *Id.* ¶¶ 7–8. The couple hoped to "build [a] family and raise [their] future children" in the United States, but their "hopes and desires were crashed because of the Presidential Proclamation." *Id.* ¶¶ 10, 12.

The *Aker* Plaintiffs submit the declaration of Nora Abdelkhalek Abdelsalam Abdelsalam, who is from Egypt and is a resident of Saudi Arabia. Decl. of Nora Abdelkhalek Abdelsalam Abdelsalam, *Aker* TRO/PI Mem. at 93. She won the diversity visa lottery for 2020, and her husband and three children are derivative beneficiaries. *Id.* ¶ 1. After winning, she traveled to Egypt on multiple occasions to obtain the necessary documents for her application. *Id.* ¶ 3. In order to travel to the United States once their visas were issued, her husband "refused many job

offers in Saudi Arabia," which led to the "expiration [of] his Saudi medical practice license [in] May 2020."  *Id.*  Abdelsalam states that after she and her husband finished their interview at the U.S. Embassy in Saudi Arabia on March 16, 2020, they were "placed in Administrative Processing" as the Embassy had "suspended routine visa processing due to COVID-19."  *Id.* ¶ 4. She further declares that the Embassy "refus[ed] to issue [their] visas because of [the] presidential proclamation" and told her that "while [she is] documentar[il]y qualified, [her] case is subjected to the Presidential Proclamation Suspending Entry of Immigrants who present risk to the U.S. labor market."  *Id.*  Abdelsalam's husband "is now preparing to leave and travel to Egypt to renew [his] medical practice license" and she states that "[her] family will be separated."  *Id.* ¶ 5.

These Plaintiffs, like Nakamura, have demonstrated a substantial likelihood that they have been procedurally injured and that those injuries are traceable to Defendants' implementation of the Proclamations.  Defendants do not contend otherwise.  *See* Defs.' Opp'n at 22–23.  Nawara's, Filippova's, and Abdelsalam's injuries are also redressable.  Though the consular offices in Russia and Egypt do not appear to have fully resumed routine operations, they are continuing to process visas.  *See* Notice Regarding July 2020 Processing at 8 (listing immigrant visas issued in Egypt in July); *COVID-19 Information*, U.S. Embassy & Consulates in Russia (Aug. 31, 2020)[8] (confirming that the consulate is still providing limited visa services).  Defendants point to a worldwide backlog of immigrant visa applications, but they do not suggest that this backlog, or any in-country restrictions in Egypt or Russia, would make it impossible for these three Plaintiffs' applications to be processed.  To the contrary, Defendants have demonstrated in an earlier stage of this litigation that the State Department is more than capable of issuing visas within an extremely tight timeframe, notwithstanding difficult in-country conditions.  *See generally* Mem. Op. & Order,

---

[8] Available at https://ru.usembassy.gov/covid-19-information/.

ECF No. 41.  Furthermore, the *Aker*, *Fonjong*, and *Mohammed* Plaintiffs request that the court postpone the end-date of visa issuance for DV-2020 selectees to September 30, 2021, or, at a minimum, reserve visa numbers for the Plaintiffs through the pendency of litigation.  *See Mohammed* PI Mem. at 26; *Fonjong* TRO/PI Mem. at 28; *Aker* TRO/PI Mem. at 1.  Assuming such relief is legally available—which the court must do for purposes of its standing analysis, *see Almaqrami*, 933 F.3d at 779–80—it would provide a remedy to overcome any inability of Russia and Egypt consular offices to process these Plaintiffs' visa applications by the September 30 deadline.[9]

Defendants additionally assert that Plaintiffs in all three cases, "do not and cannot pinpoint any specific agency action," an argument that appears to be directed at the element of causation. Defs.' Opp'n at 24.  The court disagrees, as Plaintiffs in each case point to the State Department's implementation of the Presidential Proclamations against diversity visa applicants as the cause of their injury.  *Mohammed* PI Mem. at 10 (identifying "policies, procedures, and practices suspend[ing] all stages of the processing of immigrant visa applications for selectees and their beneficiaries, including . . . (3) mandatory scheduling of immigrant visa interviews, and (4) decision-making on already interviewed applications"); *Fonjong* TRO/PI Mem. at 11 (same); *Aker* TRO/PI Mem. at 42–43 (identifying "[t]he agency actions of suspending the adjudication of immigrant visas for the Diversity Visa Program" and "[t]he agency actions of suspending issuance

---

[9] Likewise, insofar as these posts are only processing visa applications deemed "mission critical" under the State Department's COVID-19 Guidance, the *Gomez* DV-2020 Plaintiffs seek to enjoin the applications of that Guidance to DV-2020 selectees' visa applications.  *See Gomez* Suppl. PI Mem. at 7.  That remedy would equally redress any COVID-19 Guidance-related impediment to processing Plaintiffs' DV-2020 applications at the Russia and Egypt consular offices.  *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency [actions] are unlawful, the ordinary result is that the [actions] are vacated—not that their application to the individual petitioners is proscribed." (cleaned up)).

of immigrant visas or reissuance of the same for the Diversity Visa Program"). Accordingly, these Plaintiffs' showing of causation and redressability is satisfied.

Nawara, Filippova, and Abdelsalam have established a substantial likelihood of standing as to each claim asserted in *Mohammed*, *Fonjong*, and *Aker*, respectively. The court therefore has subject matter jurisdiction over each action. *See Mendoza*, 754 F.3d at 1010.[10]

### 2. *Consular Non-Reviewability*

Defendants challenge Plaintiffs' suits at the starting gate on another ground: the doctrine of consular nonreviewability. They assert that, under that doctrine, "Plaintiffs cannot state a claim under the [Immigration and Nationality Act ("INA")] or the APA to challenge consular officers' visa determinations." Defs.' Opp'n at 28. Defendants are wrong.

The doctrine of consular nonreviewability "holds that a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). The doctrine is rooted in the ancient principle of international law that nation states have the inherent right to exclude or admit aliens, and that such matters are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952)). But not every legal challenge that touches on the admission or exclusion of foreign nationals is foreclosed by consular nonreviewability. District courts in this jurisdiction consistently have held that "when the suit challenges inaction, 'as opposed to a decision taken within the consul's discretion,' there is jurisdiction." *Moghaddam v.*

---

[10] Defendants fault the *Aker* Plaintiffs for not discussing standing in their brief. *See* Defs.' Opp'n at 18, 24. But the *Aker* Plaintiffs' brief provides an extensive, individualized discussion of numerous Plaintiffs' irreparable injury as a result of the Proclamations and Defendants' implementation thereof. *See Aker* TRO/PI Mem. at 16–26. While not specifically couched in standing terms, this discussion and the accompanying affidavits attesting to the harms these Plaintiffs have and will experience is sufficient to meet Plaintiffs' burden of showing a substantial likelihood of standing.

*Pompeo*, 424 F. Supp. 3d 104, 114 (D.D.C. 2020) (quoting *Patel v. Reno*, 134 F.3d 929, 931–32 (9th Cir. 1997)); *see also Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry ("Nine Iraqi Allies")*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) ("[T]he doctrine of consular nonreviewability is not triggered until a consular officer has a made a <u>decision</u> with respect to a particular visa application."). That distinction makes sense, as the doctrine of consular nonreviewability exists to insulate from review the political branches' prerogative to regulate the entry of foreign nationals. But "[w]hen the Government simply declines to provide a decision in the manner provided by Congress, it is not exercising its prerogative to grant or deny applications but failing to act at all." *Nine Iraqi Allies*, 168 F. Supp. 3d at 290–91.

The leading D.C. Circuit case on the doctrine, *Saavedra Bruno*, is illustrative. There, the plaintiff advanced three challenges under the APA: one directed to the revocation of his B-1/B-2 visa, a second to the refusal to renew his L-1 visa, and a third to the State Department's failure to act on a waiver application under 8 U.S.C. § 1182(d)(3). *See* 197 F.3d at 1156. After an extended discussion, the Circuit declined to review the first two claims due to consular nonreviewability, but not the third. *See id.* at 1162, 1164–65. As to the third claim—the State Department's refusal to act—the court held that claim to be moot because the agency had since denied the waiver request. *See id.* 1164–65. Had the doctrine of consular nonreviewability applied to the refusal-to-act claim, presumably the court would have said so.

Here, all Plaintiffs challenge the State Department's refusal to review and adjudicate their pending visa applications or issue or reissue a visa due to the Proclamations. None challenge an affirmative visa "determination." The doctrine of consular nonreviewability therefore does not foreclose review of their claims. *See Patel*, 134 F.3d at 931–32; *Moghaddam*, 424 F. Supp. 3d at 114–15.

35

### 3.    *Cause of Action*

Defendants deliver a third and final broadside attack.  Insisting that "[n]o matter how they frame their causes of action, the plaintiffs' TRO and PI motions all boil down to arguments resting entirely on claims against the proclamations under the APA," and because the President is not subject to the APA, Defendants say that "the Court cannot review" claims contesting the Proclamations.  *See* Defs.' Opp'n at 25 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (holding that the President is not subject to the requirements of the APA because his office is not an "agency" under the statute)).  Nor can the court review agency implementation of the Proclamations under the APA, Defendants continue, when as here, the "President relies on agencies, such as the State Department, to carry out his decision."  *Id.* at 27.  The court rejects these arguments.  They suffer from a fundamental misreading of Plaintiffs' complaints and a misunderstanding of the law.

All of Plaintiffs' claims do not arise under the APA.  The *Gomez*, *Aker*, and *Panda* Plaintiffs all advance causes of action against the President and Executive Branch officials asserting that the Proclamations exceed the scope of the President's congressionally granted authority under Section 212(f) of the INA, 8 U.S.C. § 1182(f).  *See Gomez* SAC ¶¶ 332–35 (Fourth Cause of Action); *Aker* Compl. ¶¶ 687–96 (First Cause of Action); *Panda* Compl. ¶¶ 1963–68 (First Cause of Action).  These claims can be construed as either a non-statutory *ultra vires* cause of action or a statutory cause of action under the INA.  The D.C. Circuit has long recognized the availability of "non-statutory review action" aimed at the legality of presidential executive orders. *See Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).  And, the Supreme Court recently characterized a challenge to presidential action taken pursuant to § 1182(f) as a "statutory claim[]" under the INA.  *Hawaii*, 138 S. Ct. at 2407.  Thus, no matter in

which box one places Plaintiffs' direct challenges to the Proclamations, they are cognizable outside of the APA.[11]

To the extent Defendants contend that the court is foreclosed from reviewing *agency actions* taken to implement the Proclamations, they are wrong.  The D.C. Circuit rejected a similar argument in *Chamber of Commerce*, a case in which the Secretary of Labor issued regulations following an executive order.  There, the government argued that "a cause of action under the APA is not available, even were appellants to rely on it, because a challenge to the regulation should be regarded as nothing more than a challenge to the legality of the President's Executive Order and therefore not reviewable."  74 F.2d at 1326–27.  The court soundly rejected that contention:  "that the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question."  *Id.* at 1327.  APA review of an Executive Branch official's actions is thus not precluded merely because the official is carrying out an executive order.  The court in *Chamber of Commerce* went on to hold that a non-statutory *ultra vires* cause of action is likewise available against Executive Branch officials.  *See id.* at 1328.  "That the 'executive's' action here is essentially that of the President does not insulate the entire executive branch from judicial review. We think it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'"  *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment)).  Plaintiffs assert such *ultra vires* causes of action against Executive Branch officials here.  *See Gomez* SAC ¶¶ 332–336 (Fourth Cause of

---

[11] The APA waives sovereign immunity for these non-monetary claims, *see* 5 U.S.C. § 702, but that does not mean that they arise under the APA.  *See Chamber of Commerce*, 74 F.3d at 1328 ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not.").

Action); *Aker* Compl. ¶¶ 687–96 (First Cause of Action); *Panda* Compl. ¶¶ 1963–68 (First Cause
of Action).

Defendants make no mention of *Chamber of Commerce* in their opposition brief.  Instead,
their entire argument rests on the district court's decision in *Detroit International Bridge Co. v.
Government of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016), *see* Defs.' Opp'n at 25–27, but that
case is easily distinguishable.  There, Congress had delegated to the President the power to issue
final approvals to build bridges across international boundaries.  *See id.* at 100.  The court held
that the Department of State's action in issuing a permit for a bridge approved by the President
was not subject to review under the APA, because such issuance implemented in a ministerial
sense "an exercise of discretionary authority committed to the President by law."  *Id.* at 102.  In
this case, by contrast, the Secretary of State's alleged actions are in no sense a ministerial
implementation of presidential action.  *See Public Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552
(D.C. Cir. 1993) ("*Franklin*['s denial of judicial review of presidential action] is limited to those
cases in which the President has final constitutional or statutory responsibility for the *final step*
necessary for the agency action directly to affect the parties.") (emphasis added).  Instead, the
Secretary of State is alleged to have expanded the scope of the Proclamations by grafting their
restrictions on entry onto the requirements for visa eligibility, thereby precipitating the cessation
of review and adjudication of visa applications for foreign nationals now deemed inadmissible.
That is a far greater step than the type of ministerial agency action that was deemed
indistinguishable from presidential action, and thus unreviewable, in *Detroit International Bridge*.
None of Plaintiffs' claims are foreclosed from judicial review merely because they challenge
agency action implementing the Proclamations.

### B.     Challenges to Proclamations 10014 and 10052

Having determined that each of the consolidated cases presents justiciable and reviewable claims, the court turns to the merits, starting with those causes of action directly challenging the validity of Proclamations.   The *Gomez* and *Aker* Plaintiffs assert the following: (1) the Proclamations are *ultra vires* because they do not satisfy the statutory prerequisites for suspension of entry under § 1182(f); and (2) the President's issuance of the Proclamations (and the State Department's implementation of them) violate (a) the Take Care Clause and (b) the Due Process Clause, and (c) deny equal protection under the law.   Separately, the *Gomez* Plaintiffs contend that (3) the Proclamations violate the separation of powers, and (4) Congress impermissibly delegated legislative power to the President under § 1182(f).   The court first addresses the *ultra vires* claim, then turns to the separation of powers and nondelegation claims, and concludes with the remaining three constitutional challenges.

### 1.     *Ultra Vires Presidential Action*

The text of § 1182(f) provides as follows:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).   The natural starting point of any dispute involving the President's exercise of authority under § 1182(f) is the Supreme Court's decision in *Trump v. Hawaii*.   That case involved a challenge to Presidential Proclamation No. 9645, better known as the "travel ban," which placed "entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate."   138 S. Ct. at 2404.   Following a "worldwide, multi-agency review," the President found that the entry of covered foreign

39

nationals from those eight countries would be detrimental to the national interest and excluded them from entry.  *Id.* at 2408.  The plaintiffs in that case argued, among other things, that § 1182(f) "confers only residual power to temporarily halt the entry of a discrete group of aliens engaged in harmful conduct."  *Id.*  The Court concluded otherwise.

It first observed that, "[b]y its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States."  *Id.*  The statute "exudes deference to the President in every clause."  *Id.*

> It entrusts to the President the decisions whether and when to suspend entry ("[w]henever [he] finds that the entry" of aliens "would be detrimental" to the national interest); whose entry to suspend ("all aliens or any class of aliens"); for how long ("for such period as he shall deem necessary"); and on what conditions ("any restrictions he may deem to be appropriate").

*Id.*  Thus, the Court concluded, § 1182(f) grants "'ample power' to impose entry restrictions *in addition* to those elsewhere enumerated in the INA."  *Id.* (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993)) (emphasis added).

The Court further explained that § 1182(f)'s "sole prerequisite" is that the President "find[ ]" that the entry of the covered aliens "would be detrimental to the interests of the United States."  *Id.*  The "finding" requirement is not particularly stringent.  The Court characterized the plaintiffs' assertion that the President must "explain that finding with sufficient detail to enable judicial review" to be "questionable," and in any event found the Proclamation at issue to be "more detailed than any prior order a President has issued under § 1182(f)."  *Id*. at 2409.

Plaintiffs in this matter acknowledge the President's broad scope of authority under § 1182(f), but argue that the Proclamations nevertheless are unlawful.  Primarily, they challenge the sufficiency of the "finding" made by the President, and attack that "finding" from multiple angles.  *See Gomez* PI Mem. at 22–23.  First, they contend that the "finding" requirement places

on the President the duties to "supply a rational justification" and to conduct "some rational investigation," neither of which are reflected in the Proclamations.  *Id.*  Second, Plaintiffs dispute the logic underlying the "finding."  They contend that, contrary to the justifications put forward in the Proclamation, immigrants like diversity lottery winners do not compete against American workers for scarce jobs; they also insist that nonimmigrants like H-1B and H-2B visa applicants work in sectors where "unemployment is *low*, rather than in the high-unemployment areas that the entry suspension is supposedly meant to target."  *Id.* at 25.  Finally, they maintain that the exclusion of immigrant and nonimmigrant labor actually is counterproductive to the President's stated goal of improving the economic prospects of American workers.  *See id.* at 26.  They cite declarations from experts, economic studies, and even statements from federal agencies to make the point that the entry of aliens in fact *creates* jobs for American workers, and the idea that new arrivals take jobs from Americans is a fallacy.  *See id.* at 26–29.  None of these arguments is ultimately persuasive.[12]

   a. Plaintiffs' demand for a "rational justification" and a "rational investigation" far exceeds what the Court in *Trump v. Hawaii* required for a valid presidential "finding."  As noted, the Court found it "questionable" that § 1182(f) required the President to "explain [the] finding with sufficient detail to enable judicial review."  138 S. Ct. at 2409.  "[A]

---

[12] The *Gomez* Plaintiffs advance claims titled "Ultra Vires—Violation of the INA" as their Third and Fifth Causes of Action.  *See Gomez* SAC ¶¶ 328–31, 337–40.  Each of those causes of action asserts that the Proclamations are unlawful because they suspend not only *entry* to the United States, but also the *issuance* of various categories of immigrant and nonimmigrant visas.  *See id.* ¶¶ 328–30; *see also Hawaii*, 138 S. Ct. at 2414 (observing that the "basic distinction between admissibility determinations and visa issuance [ ] runs throughout the INA").  The *Gomez* Plaintiffs did not, however, advance either of these claims in their motion for injunctive relief, which repeatedly stresses that "the Proclamations address only *entry* into the United States.  They do not say anything about suspending the *issuance of visas*."  *Gomez* PI Mem. at 2.  Rather, Plaintiffs asserted only the legal theory contained in their Fourth Cause of Action, which challenges the sufficiency and accuracy of the findings the President made to justify the suspension of entry.  *Compare id.* ¶¶ 332–35, *with Gomez* PI Mem. at 22–29.  Defendants must have read the *Gomez* Plaintiffs' motion the same way, as they do not address whether the Proclamations are directed to conditions of entry only, or also establish new conditions of visa eligibility.  *See* Defs.' Opp'n at 31–42.  Accordingly, consistent with the parties' briefing, the court does not opine on the question whether the Proclamations exceed the President's authority under § 1182(f) by impermissibly adding conditions of visa eligibility.

searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text and the deference traditionally accorded the President this sphere." *Id.* Although Plaintiffs recognize the restrictive nature of judicial review explained in *Trump v. Hawaii*, they say it is inapplicable because the President here acted not in the context of international affairs and national security, as in *Trump v. Hawaii*, but in the area of domestic affairs, in which he is not owed the same level of deference. *See Gomez* Reply Mem. at 8. But this argument suffers from several problems.

To start, the foreign/domestic distinction advocated by Plaintiffs finds no support in the statutory text. Section 1182(f) simply speaks in terms of restricting entry of aliens "detrimental to the United States"; it does not limit such detriment to any particular sphere, foreign or domestic. The distinction also finds no support in Supreme Court case law. The Court has long recognized that "[t]he exclusion of aliens is a fundamental act of sovereignty" that "is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). The Court also has said that "*any policy* towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Harisiades*, 342 U.S. 588–89 (emphasis added). Plaintiffs' effort to characterize the Proclamations' exclusion of aliens in purely or predominately domestic terms therefore runs headlong into Supreme Court precedent. Finally, even if Plaintiffs' foreign/domestic dichotomy is a practically feasible one, it does not follow that judicial deference is any less when the overarching purpose for the exclusion of aliens is domestic in nature. In *Trump v. Hawaii*, the Court stated that, because decisions involving "the admission and exclusion of foreign nationals" may "implicate 'relations with foreign powers,' *or* involve 'classifications defined in the light of changing political and *economic circumstances*,' such judgments 'are frequently of a character

more appropriate to either the Legislature or the Executive.'"  138 S. Ct. at 2418–19 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)) (emphasis added).  No one could reasonably dispute that the COVID-19 pandemic has caused "chang[ed]" "economic circumstances."  The wisdom of the President's decision to address those changed circumstances by restricting the entry of certain classes of aliens is a policy decision the judiciary is not well equipped to evaluate.

The court is aware that recently the Ninth Circuit, in declining to stay a district court's injunction of a different Presidential Proclamation, expressed the view that the President's powers under § 1182(f) are diminished when he acts to "deny visas to immigrants based on purely long-term economic concerns."  *Doe #1 v. Trump*, 957 F.3d 1050, 1065 (9th Cir. 2020).  The Presidential Proclamation at issue in *Doe #1* excluded foreign nationals unless they could demonstrate coverage by specified types of health care insurance within 30 days of entry or that they had the resources to cover foreseeable healthcare costs.  *Id.* at 1057.  The court determined that the Proclamation dealt "with a purely domestic economic problem" and, for that reason, accorded it less deferential review than that proscribed in *Trump v. Hawaii*.  *Id.* at 1067.  For the reasons already stated, this court respectfully declines to adopt this approach and finds the dissenting opinion in *Doe #1* to be more persuasive.  *See id.* at 1078–79 (Bress, J., dissenting).

The other cases that Plaintiffs cite to support a more searching, "rational" findings requirement are inapplicable.  None involve an interpretation of § 1182(f).  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68 (1962), involved the classic formulation of the need for a "rational connection between the facts found and the choice made" in the context of the APA.  *See Gomez* Reply Mem. at 5.  *Temple University v. White*, 941 F.2d 201, 208–09 (3d Cir. 1991), involved a "find[ing]" requirement under the Medicaid law, specifically Title XIX of the Social Security Act.  *See Gomez* PI Mem. at 23 n.19.  And, oddly, Plaintiffs cite two cases, *United States*

*v. Bikundi*, 926 F.3d 761, 776–77 (D.C. Cir. 2019), and *United States v. Sanders*, 485 F.3d 654, 659 (D.C. Cir. 2007), which articulate the standard for granting an ends-of-justice continuance under the Speedy Trial Act.  *See Gomez* PI Mem. at 23.  Suffice it to say none of these cases supply a more controlling or persuasive interpretation of the "finding" requirement under § 1182(f) than *Trump v. Hawaii*.

        b.     Plaintiffs' attack on the sufficiency of the President's findings also fails. In Proclamation 10014, the President identified the massive displacement of American workers due to the COVID-19 pandemic as the reason for executive action:  "[W]e must be mindful of the impact of foreign workers on the United States labor market, particularly in an environment of high domestic unemployment and depressed demand for labor."  85 Fed. Reg. at 23,441.  The President continued that excess labor supply affects all workers and potential workers, particularly those who are "last in" during an economic expansion and "last out" during an economic contraction, including most significantly "historically disadvantaged groups," such as African-Americans and other minorities, those without college degrees, and the disabled.  *Id.*  An influx of new lawful permanent residents would exacerbate the strain on the labor market.  The President noted that new lawful permanent residents are granted "open-market" employment authorization allowing them to compete in almost any sector of the economy, and that "[e]xisting immigrant visa processing protections are inadequate for recovery from the COVID-19 outbreak."  *Id.*  Most immigrant visa categories, the President stated, "do not require employers to account for displacement of Untied States workers" and, though some employment-based visas require a labor certification, "because visa issuance happens substantially after the certification is completed, the labor certification process cannot adequately capture the status of the labor market today."  *Id.* at 23,441–42.  Proclamation 10052, issued nearly 60 days later, amplified the President's rationale

for the initial exclusion and explained its expansion.  He found that the "considerations present in Proclamation 10014 remain," and added that "the Secretary of Labor and the Secretary of Homeland Security reviewed nonimmigrant programs and found that the present admission of workers within several nonimmigrant visa categories also poses a risk of displacing and disadvantaging United States workers during the current recovery."  85 Fed. Reg. at 38,263.  The President noted, for example, that between February and April 2020, more than 17 million United States jobs were lost in industries in which employers seek to fill positions with "worker positions tied to H-2B immigrant visas."  *Id.* at 38,263–64.  During that same period, 20 million United States workers "lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions."  *Id.* at 38,264.  And, finally, the President explained that certain J nonimmigrant visa applicants compete for jobs with young Americans, whose job prospects have been hit particularly hard during the pandemic.  *Id.*

These findings are more than adequate.  They are in fact far more detailed than those contained in past § 1182(f) proclamations identified by the Court in *Trump v. Hawaii*.  *See* 138 S. Ct. at 2409 (observing that previous proclamations had contained as little as one and five sentences of justification for entry restrictions).  And although the findings here may not be as robust as those in *Trump v. Hawaii* or supported by any evident "worldwide, multi-agency review," the Court surely did not mean for the findings and administrative efforts in that case to set a floor for future presidential actions under § 1182(f).

Plaintiffs take issue with the underlying premise of the Proclamations—that the U.S. jobs market is a zero-sum game in which foreign workers displace U.S. workers upon arrival—and marshal an array of evidence showing, to the contrary, that new entrants to this country actually create jobs and provide overall benefits to the U.S. economy.  Plaintiffs go so far as to say that "it

is undisputed that the President's purported 'findings' are false." *Gomez* Reply Mem. at 9. These arguments, however persuasive they might be in a policy forum or even in a contest under the APA, do not win the day in a legal challenge to presidential action under § 1182(f). "'Whether the President's chosen method' of addressing perceived risk is justified from a policy perspective is '*irrelevant* to the scope of his [§ 1182(f)] authority." *Hawaii*, 138 S. Ct. at 2409 (quoting *Sale*, 509 U.S. at 187–188) (emphasis added). The plaintiffs in *Trump v. Hawaii* mounted a similar attack on the travel ban "based on their perception of its effectiveness and wisdom." *Id.* at 2421 ("They suggest that the policy is overbroad and does little to serve national security interests."). The Court held that "we cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'" *Id.* (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)). The same holds true here.

Plaintiffs respond that this hands-off approach to presidential action "amounts to a claim that the President is free under § 1182(f) to suspend immigration under plainly false pretenses, and in any manner he chooses. That alarming proposition is not the law." *Gomez* Reply Mem. at 11. As "alarming" as that proposition may be to Plaintiffs, the judicial role in evaluating presidential action pursuant to § 1182(f) is decidedly constrained. In this sphere, Congress provides the stronger counterweight to Executive Branch excess. If the President were to act on "plainly false pretenses," as Plaintiffs fear, Congress possesses ample powers to right that wrong. The scope of judicial review is circumscribed.

c.   The *Aker* Plaintiffs advance one more contention in support of their claim that the Proclamations exceed the President's authority under § 1182(f). In *Trump v. Hawaii*, the Court recognized that § 1182(f) contains a temporal limitation because Congress's inclusion of the

word "suspend" connotes a "deferral until later." *See* 138 S. Ct. at 2409–10 (cleaned up).  To satisfy that limitation, the Court stated, the President need not "prescribe in advance a fixed end date for the entry restriction," but may "link the duration of those restrictions, implicitly or explicitly, to the resolution of the triggering condition." *Id.*  The *Aker* Plaintiffs assert not that the Proclamations fail to include a "triggering condition"; rather, citing the President's own tweets and words, they argue that the "triggering condition"—recovery of the economy—has been satisfied, thereby "the basis of the Proclamation has been overcome." *Aker* TRO/PI Mem. at 39–42. This argument has no merit.  Section 1182(f) "exudes deference" to the President as to "how long" and on "what conditions" restrictions on entry shall remain. *Hawaii*, 138 S. Ct. at 2408. The economic conditions triggering the Proclamations have not by any stretch returned to normal, and Plaintiffs cannot seriously contend otherwise.  Thus, to the extent the judicial branch has any role in assessing whether such a "triggering condition" has been resolved, it plainly has not in this case.

### 2. *Separation of Powers*

The *Gomez* Plaintiffs contend that, even if the President made the requisite statutory findings, the Proclamations are "independently invalid because [they] . . . violate[] foundational separation-of-powers principles." *Gomez* PI Mem. at 29.  They maintain that Congress already has "carefully prescribed" the requirements for foreign nationals who seek to enter the United States as skilled and unskilled workers, and the Proclamations nullify those requirements. *See id.* at 30–31.  For immigrant visa categories, like diversity visas, Congress elected not to place restrictions on their labor market participation. *See id.* at 31.  The Proclamations, they say,

overturn the balance carefully struck by Congress between admitting foreign nationals and protecting American workers.[13]

The *Panda* Plaintiffs put forth a similar contention particular to H-1B visa applicants: "Proclamation 10052 subverts Congress's detailed regulatory scheme that intertwines the H-1B and permanent labor certification programs to ensure the retention of skilled foreign labor to benefit the national economy and induce job growth while protecting domestic workers." *Panda* PI Mem. at 26–27. Proclamation 10052, they maintain, "specifically overrides" 8 U.S.C. § 1182(a)(5)(A) (which governs permanent immigrant visas based on labor certifications) and § 1182(n) (which governs labor condition applications for H-1B nonimmigrant visas). *Id.* at 27. To be eligible for a permanent immigrant visa based on employment, for instance, the sponsoring employer must obtain a certification from the Department of Labor confirming that there are no qualified, able, and willing United States workers available to fill the employer's job opportunity, 8 U.S.C. §§ 1153(b)(3)(C), 1182(a)(5)(A)(i)(I), and that the hire will not adversely affect the wages and working conditions of similar employed workers in the United States, *id.* § 1182(a)(5)(A)(i)(II). A similar labor certification is mandated for temporary H-1B nonimmigrant workers. *See id.* § 1182(n). "The Proclamation's broad programmatic objective of purporting to help the domestic labor market," the *Panda* Plaintiffs assert, "cannot trump the statute's specific instructions to allow for the importation of skilled foreign labor under the statutory conditions that have already been satisfied." *Panda* PI Mem. at 27.

Faced with similar arguments, the Court in *Trump v. Hawaii* stated that "[w]e may assume that § 1182(f) does not allow the President to *expressly override* particular provisions of the INA."

---

[13] The *Gomez* Plaintiffs' separation-of-powers arguments appears to be a variant of their *ultra vires* claim—that the President has acted in excess of his congressionally granted authority under § 1182(f). The *Panda* Plaintiffs advance a similar argument, but couch it in statutory, not constitutional, terms. Whether framed as a statutory or constitutional claim, the arguments fail.

138 S. Ct. at 2411 (emphasis added).  The Proclamations at issue in this case do not "expressly override" any "particular provision" of the INA.  On their face, the Proclamations make no mention of any provision of the INA other than § 1182(f) and § 1185(a) (making it unlawful for "any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"), 8 U.S.C. § 1185(a)(1).  The Proclamations do, of course, restrict from entry various immigrant and nonimmigrant visa classifications, but they do not expressly override any of them.  Those classifications are not abolished.  Presumably, their full admission will resume once the labor market recovers and the surplus labor concerns identified in the Proclamations are ameliorated.

But even now, certain categories of immigrants and nonimmigrants are eligible for admission if they can satisfy an exception set forth in the Proclamations.  *Cf. Hawaii*, 138 S. Ct. 2422 (explaining that "significant exceptions" for various categories of foreign nationals from the designated countries supported the government's claim of a legitimate national security interest).  For instance, under Proclamation 10014, foreign nationals may enter the United States on an immigrant visa as a physician, nurse, or other healthcare professional (§ 2(b)(ii)); to perform medical research or other research to combat the spread of COVID-19 (§ 2(b)(ii)); or to perform other work essential to combating, recovering from, or otherwise alleviating the effects of the outbreak (§ 2(b)(iii)).  So, too, may any foreign national enter who is a spouse or minor child of a United States citizen (§§ 2(b)(iv), (v)), or who is a member of the armed forces or any spouse or child of such member (§ 2(b)(vii)).  Proclamation 10052 likewise includes exceptions for nonimmigrant visa categories.  It permits entry of a foreign national who is a spouse or child of a United States citizen (§ 3(b)(ii)) and any foreign national seeking to enter to provide temporary

49

labor or services essential to the food supply chain (§ 3(b)(iii)).  Finally, and critically, both Proclamations contain a "national interest" exception, whereby a foreign national may enter under criteria determined by the Secretary of State and the Secretary of Homeland Security.  85 Fed. Reg. at 23,443 § 2(b)(ix); 85 Fed. Reg. at 38,265 § 3(b)(iv).  The State Department on August 12, 2020, issued guidance on the "national interest" exception.  CAR 167–74.  By way of illustration, H-1B visa holders qualify for the exception if, among other things, they are "seeking to resume ongoing employment in the United States in the same position with the same employer and visa classification" or are "technical specialists, senior level managers, and other workers whose travel is necessary to facilitate the immediate and continued economic recovery of the United States." CAR 169.  Consular officers are to consider five criteria in assessing this latter category approved for travel.  CAR 169–70.  H-2B temporary workers, as another example, may enter the country "to facilitate the immediate and continued economic recovery of the United States (e.g. those working in forestry and conservation, nonfarm animal caretakers, etc.)," with consular officers instructed to consider three criteria under this class accepted for travel.  CAR 170–71.  The guidance also sets forth various exceptions for the J-1 and L visa categories.  CAR 171–73.

It may be a fair criticism that these exceptions are overly narrow and indiscriminately exclude large numbers of aliens seeking to enter the United States.  But these exceptions demonstrate that the Proclamations do not "expressly override" any "particular" provision of the INA.  *Hawaii*, 138 S. Ct. at 2411.  Aliens still may travel to the United States under the visa categories established by Congress.  That the Proclamations add burdensome conditions to entry is not a valid objection.  The Court in *Hawaii* made clear that § 1182(f) grants the President "'ample power' to impose entry restrictions *in addition to* those elsewhere enumerated in the INA." *Id.* at 2408 (quoting *Sale*, 509 U.S. at 187) (emphasis added); *see also id.* at 2412 (stating that

§ 1182(f) "vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA").  Placing sweeping limitations on entry is within the broad presidential powers conferred under § 1182(f).

Plaintiffs rely primarily on the district court's decision in *Doe #1*, which enjoined a presidential proclamation in part on separation-of-powers grounds.  *See Doe #1 v. Trump*, 418 F. Supp. 3d 573, 593–98 (D. Or. 2019).  There, the court held that a presidential proclamation requiring aliens to demonstrate proof of health insurance as a condition of entry was unlawful because it conflicted with the INA's "public charge" provision, which excludes aliens from admission who would create a financial burden on the United States. *See id.* at 594 (citing 8 U.S.C. § 1182(a)(4)).  The key deficiencies that the court in *Doe #1* identified are not present here.  First, the reason for the entry suspension in that case was the widespread problem of "uncompensated costs" in the national healthcare system.  *See id.* at 596.  This "triggering condition," the court found, was apt to lead to an unauthorized "indefinite" suspension, because "[t]here is no reasonable interpretation of the Proclamation showing that this intractable problem is going to end any time soon" and the Proclamation provides no guidance "for determining under what circumstances the necessity for the Proclamation would be over."  *Id.*  The same concerns are not present here. Though the job displacement in the U.S. labor market caused by the COVID-19 pandemic has been immense and swift, even Plaintiffs do not suggest that its lasting effects will be indefinite. Second, the court in *Doe #1* found that the entry restriction in that case reinstated a "bar that Congress expressly eliminated from the INA—the bar to 'paupers.'"  *Id.*  Plaintiffs here have identified no similar conflict.  In the end, the constitutional concerns that led to the court's decision in *Doe #1* are not present in this case.  The Proclamations here do not run afoul of separation of powers.

### 3. Unconstitutional Delegation of Legislative Authority

The *Gomez* Plaintiffs challenge the constitutionality of § 1182(f) itself. They contend that, by granting the President the power to exclude aliens under § 1182(f), Congress impermissibly delegated its exclusive legislative authority to the Executive Branch. *See Gomez* PI Mem. at 32–33. This nondelegation problem did not arise in *Trump v. Hawaii*, the *Gomez* Plaintiffs argue, because that case involved the President's exercise of § 1182(f) authority in the sphere of international affairs and national security, where nondelegation concerns are "diminished." *Id.* at 32. But here, they say, the President's exercise of § 1182(f) power exceeds constitutional limits because he was operating in the realm of "domestic policymaking"—a power that rests within Congress's exclusive legislative authority. *See id.*

Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., Art. 1 § 1. "Accompanying that assignment of power to Congress," the Supreme Court has explained, "is a bar on its further delegation." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). Congress may not convey to another branch "powers which are strictly and exclusively legislative." *Id.* (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). That restriction does not mean that Congress is forbidden from relying on coordinate Branches to assist in its legislative function. To the contrary, the Supreme Court has recognized that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). "[I]n particular," Congress "may confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy*, 139 S. Ct. at 2123. In light of the practical need for flexibility in carrying out its legislative functions, "a statutory delegation is constitutional so long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body

authorized to [exercise the delegated authority] is directed to conform.'"  *Id.* (quoting *Mistretta*, 488 U.S. at 372).

The "intelligible principle" standard is "not demanding."  *Id.* at 2129.  As the Supreme Court recently observed in *Gundy*, "[o]nly twice in this county's history (and that in a single year) have we found a delegation excessive—in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion."  *Id.* (quoting *Mistretta*, 488 U.S. at 373 n.7).   On the other hand, the Court has upheld "over and over" "even very broad delegations."  *Id.*  In *Gundy*, the Court cited its past approval of delegations as including statutes authorizing agencies to act in "the public interest," *id.* (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943); *New York Central Securities Corp. v. United States*, 287 U.S. 12, 24 (1932); to set "fair and equitable prices" and "just and reasonable rates," *id.* (citing *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944) ; *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944)); and to issue air quality standards "requisite to protect the public health," *id.* (citing *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001)).  In view of these approved broad delegations, the D.C. Circuit has remarked that "the basic doctrine of unconstitutional delegation, while by no means repudiated, remains only a shadowy limitation on congressional power."  *Chamber of Commerce*, 74 F.3d at 1327.

That "shadowy limitation" presents no constitutional constraint on the presidential action challenged here.   The language of § 1182(f), according to the Supreme Court, provides a "comprehensive delegation" of authority to the President, and its text is "clear."  138 S. Ct. at 2408, 2410.  The statute, the Court observed, contains "textual limits."  *Id.* at 2409.  Those include the requirement that the President make a "find[ing]"; identify a "class of aliens" whose entry is restricted; and "suspend" such entry for a fixed period of time or until resolution of a triggering condition.  *See id.* at 2409–10.  To be sure, standards such as "detrimental to the interests of the

United States" and as "he may deem to be appropriate" convey an expansive grant of power, but they are no more capacious than the broad standards deemed sufficiently intelligible by the Supreme Court in all but two of its cases.  *See Gundy*, 139 S. Ct. at 2129.  Section 1182(f) thus "does not suffer from a mortal constitutional defect hiding in plain sight."  *Doe #1*, 957 F.3d at 1079 (Bress, J., dissenting).

The *Gomez* Plaintiffs suggest that a nondelegation problem arises here because the President acted in the sphere of domestic policymaking, as opposed to international affairs or national security.  That argument misses the mark.  As already discussed, that less deference is warranted here because the Proclamations targeted "domestic" matters, as distinct from foreign affairs or national security matters, is a dubious proposition.  *See* pp. 40–41, *supra*.  But the distinction also misapprehends the nondelegation inquiry.  Whether Congress exceeded *its* broad authority to delegate depends not on the setting in which that authority is exercised, but on the text of the statute.  Otherwise, "[t]he very choice of which portion of the power to exercise"—domestic or foreign power—"would *itself* be an exercise of the forbidden legislative authority."  *Whitman*, 531 U.S. at 473.  "[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation."  *Gundy*, 139 S. Ct. at 2123.  "The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."  *Id.*  The context in which the delegee exercises that discretion is not the proper lens through which to make the nondelegation inquiry.[14]  The *Gomez* Plaintiffs thus have failed to establish a likelihood of success on their nondelegation claim.

---

[14] The court recognizes that the district court in *Doe #1 v. Trump* held that when the President uses his authority under § 1182(f) "to engage in *domestic* policymaking, without addressing any foreign relations or national security issue or emergency . . . .  the delegation by Congress is without any intelligible principle and thus fails under the nondelegation doctrine."  418 F. Supp. 3d at 592.  For the reasons discussed, this court respectfully disagrees with that conclusion.

### 4.      *Remaining Constitutional Claims*

The *Aker* Plaintiffs, joined by the *Gomez* DV-2020 Plaintiffs, advance three other constitutional arguments to nullify the Proclamations and their implementation specific to diversity visa applicants. *See Aker* TRO/PI Mem. at 53–56; *Gomez* Suppl. PI Mem. at 8. The court easily disposes of these claims.

*First*, Plaintiffs assert that the President has violated the Constitution's Take Care Clause, *see* U.S. Const. Art. II § 3, Cl. 5, because "the INA holds diversity visa eligibility and the ability to apply for these visas as mandatory" and "the State Department's unlawful and *ultra vires* suspension of and untimely adjudication of cases and issuance or reissuance of visas is 'unfaithful' to the INA." *Aker* TRO/PI Mem. at 53–54. As framed, Plaintiffs' Take Care Clause claim is duplicative of that aspect of their APA arbitrary-and-capricious claim asserting that the State Department has unlawfully withheld nondiscretionary review and adjudication of diversity visa applications and renewals. Because, as discussed below, the court finds in favor of Plaintiffs on their APA claim, the court need not reach their claim under the Take Care Clause. *See Qassim v. Trump*, 927 F.3d 522, 530 (D.C. Cir. 2019) (stating that "courts must 'avoid the premature adjudication of constitutional questions' and 'not . . . pass on questions of constitutionality . . . unless such adjudication is unavoidable'" (quoting *Matal v. Tam*,137 S. Ct. 1744, 1755 (2017)).

*Second*, Plaintiffs contend that the President's and the State Department's suspension of diversity visa application processing violates the Due Process Clause. *Aker* TRO/PI Mem. at 54–55. Plaintiffs do not, however, invoke a constitutional framework to support this claim. Instead, they argue that "[b]y failing to comply with the APA," "the procedural due process rights of the Plaintiffs have been violated," citing in particular the State Department's failure to provide "any notice or meaningful opportunity to comment on its application of the Presidential Proclamations."

*Id.* Plaintiffs, however, cite no case to support the notion that the Due Process Clause's protections are co-extensive with the APA's notice-and-comment requirements, and this court is aware of none. *Cf. Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (holding that rulemaking activities that affect a large number of people without regard to the facts of individual cases do not implicate due process protections). In their reply brief, the *Aker* Plaintiffs recast their due process claim in more traditional constitutional terms, asserting that certain plaintiffs who are legal permanent residents "have a protected liberty interest in the marital relationship and to establish a home and bring up children" that was denied without adequate process. *See Mohammed*, *Aker*, and *Fonjong* Pls.' Reply in Support of Mot. for Prelim. Inj. & TRO, ECF No. 110 [hereinafter *Mohammed* Reply], at 26–28. But that argument comes too late, so the court declines to consider it. *See Rollins Envtl. Servs. Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").

*Third*, Plaintiffs challenge the Proclamations on equal protection grounds. They contend that, on their face, the Proclamations draw an irrational distinction between diversity visa applicants who were inside the United States versus those who were outside of the country on the Proclamations' effective dates. *See Aker* TRO/PI Mem. at 55. The Proclamations apply to the latter group but not the former. *See* 85 Fed. Reg. 23,442 § 2(i) (stating that Proclamation applies only to aliens "outside the United States on the effective date of this proclamation"); 85 Fed. Reg. 38,265 § 3(i) (same). But this argument fails for two reasons. At the threshold, the Fifth Amendment's equal protection clause does not protect any Plaintiff outside the United States, so they have no constitutional claim. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1354 (D.C. Cir. 1997) (stating that "migrants, as aliens, may not assert a Fifth Amendment right in challenging the procedures for granting

immigrant visas") (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990)).  There

are three *Aker* diversity visa lottery winners who have entered the United States and whose

families, as derivative beneficiaries, remain outside the country, *see Aker* Compl. ¶¶ 75–82

(Utkirbek Abdumominov), ¶¶ 101–110 (Laila Faizi Sohail), ¶¶ 111–121 (Oleg Kamanev), who

arguably may challenge the Proclamations on equal protection grounds, *see Legal Assistance for

Vietnamese Asylum Seekers*, 104 F.3d at 1354 ("The equal protection claim must be asserted, if at

all, by the citizen sponsors of the migrants."); *see also Hawaii*, 138 S. Ct. at 2419 (stating that the

Court has "engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens

the constitutional rights of a U.S. citizen").[15]   But their claims fail on the merits.  Because the

Proclamations create a classification based on the foreign national's location, the classification

"must be upheld against [an] equal protection challenge if there is any reasonably conceivable state

of facts that could provide a rational basis for the classification."  *FCC v. Beach Commc'ns, Inc.*,

508 U.S. 307, 313 (1993).  Where there is a "plausible reason" for the challenged classification,

the "[judicial] inquiry is at an end."  *Id.* (quoting *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166,

174–179 (1980)); *see also Hawaii*, 138 S. Ct. at 2420 (observing that the Court "hardly ever strikes

down a policy as illegitimate under rational basis scrutiny").  Here, the "plausible reason" for

treating foreign nationals in the United States differently from those outside of it is plain on the

face of the Proclamations.  The Proclamations exclude categories of foreign nationals from *entry*

into the United States to protect U.S. workers.  Entry cannot logically be denied to those persons

---

[15] The court recognizes that it is not free from doubt whether a diversity lottery winner who becomes a lawful permanent resident and resides in the United States has a Fifth Amendment right to challenge the exclusion of a spouse or child as a derivative beneficiary.  *See Singh v. Tillerson*, 271 F. Supp. 3d 64, 71 (D.D.C. 2017) (observing that, "while the Constitution protects an individual's right to marry and the marital relationship, these constitutional rights are not implicated when a spouse is removed or denied entry to the United States" (citing *Swartz v. Rogers*, 254 F.2d 338, 339 (D.C. Cir. 1958))); *Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) (holding that "a parent does not have a constitutionally-protected liberty interest in the companionship of a child who is past minority and independent").  Nevertheless, for present purposes, the court assumes that such a right exists.

already in the United States.  Indeed, any effort by the President to exercise his authority under § 1182(f) to oust foreign nationals already in the country would present its own problems, as the statute says nothing about the power of removal.  The Proclamations' different treatment based on a foreign national's location presents no equal protection problem.[16]

Plaintiffs advance one other challenge under the equal protection rubric:  the Proclamations are unconstitutional because they are the product of "the President's preexisting animus toward the Diversity Visa program."  *Aker* TRO/PI Mem. at 56.  To support their position, Plaintiffs cite various tweets and statements from the President denouncing the diversity visa lottery program. *See id.* at 32–36.  The President's hostility towards the diversity visa lottery program is well documented.  The President has questioned its value, mischaracterized its requirements, and disparaged its recipients.  He has referred to diversity lottery visa winners as "dangerous," "not [the] country's finest," "the worst of the worst," bank robbers, and "murderers."  *Id.* at 33–36. They are nothing of the sort.  Diversity visa lottery winners are people who have come to this nation, like millions before, to seek a better life for themselves and their families, and to pursue the American Dream.  They do not deserve to be caricatured as common criminals, or to be used as a political wedge issue.  But for the same reasons that the Court in *Trump v. Hawaii* rejected a similar challenge based on purported religious animus, *see* 136 S. Ct. at 2421–23, the court does so here, too.

### C.    Challenges to the Implementation of Proclamations 10014 and 10052

Plaintiffs raise a host of APA and Mandamus Act challenges to how federal agencies have implemented the Proclamations.  First, all Plaintiffs except the *Panda* Plaintiffs assert that

---

[16] The *Aker* Plaintiffs for the first time in their reply brief attempt to recharacterize the Proclamations as containing suspect classifications based on "alienage and/or national origin."  *Mohammed* Reply at 30.  The court declines to consider this belatedly raised argument.  *See Rollins Envtl. Servs.*, 937 F.2d at 652 n.2.

Defendants'[17] suspension of adjudication and issuance of covered, non-exempt visas—i.e., the "No-Visa Policy"—is contrary to law, in excess of Defendants' statutory authority, and usurps the role of consular officers.  Second, the *Gomez*, *Panda*, and *Aker* Plaintiffs argue that Defendants' No-Visa Policy is arbitrary and capricious because it lacks any reasoned explanation, fails to consider reliance interests, and fails to consider important aspects of the problem.  Third, the *Aker* Plaintiffs argue that Defendants failed to undergo notice-and-comment rulemaking before issuing their No-Visa Policy.   Fourth, the *Gomez*, *Mohammed*, *Fonjong*, and *Aker* DV-2020 Plaintiffs argue that Defendants have unreasonably delayed adjudicating DV-2020 visa applications.  The *Mohammed* and *Fonjong* Plaintiffs also argue that this delay entitles them to relief under the Mandamus Act.  And fifth, the *Gomez* diversity visa Plaintiffs contend that the State Department's decision not to treat 2020 diversity visa selectees as "mission critical" or "emergency" cases in its COVID-19 Guidance also violates the APA.  The court considers each argument in turn.

### 1.    *No-Visa Policy – Not in Accordance with Law*

The *Gomez*, *Mohammed*, *Aker*, and *Fonjong* Plaintiffs each assert that Defendants' No-Visa Policy is "'not in accordance with law' and 'in excess of statutory authority."  *See Gomez* PI Mem. at 35; *Mohammed* PI Mem. at 21–23; *Aker* TRO/PI Mem. at 42–43, 52–53; *Fonjong* TRO/PI Mem. at 20–23.  Broadly speaking, these Plaintiffs contend that (1) neither Proclamation directs the State Department to suspend the processing and issuance of visas and nothing in the INA or the State Department's implementing regulations give Defendants such power; and so (2) Defendants' No-Visa Policy unlawfully usurps consular officers' sole and express statutory authority to issue visas to qualifying applicants.  *See, e.g.*, *Aker* TRO/PI Mem. at 42–43; *Gomez* PI Mem. at 35.  Defendants retort that Plaintiffs have not alleged final agency action, *see* Defs.'

---

[17] The court's use of the term "Defendants" for the purpose of discussing Plaintiffs' APA claims excludes the President.

Opp'n at 29, and that the State Department's refusal to process non-exempt covered visas is lawful because 8 U.S.C. § 1201(g) prohibits consular officers from issuing visas to persons declared ineligible for entry under § 1182(f), *see id.* at 42–44.  Neither defense is persuasive.

First, Defendants incorrectly assert that Plaintiffs have not alleged final agency action because the "legal consequences that Plaintiffs challenge flow from the Proclamations, not action by the State Department."  *Id.* at 31.  The Proclamations solely address the *entry* of immigrants and certain nonimmigrants into the country; they say nothing about the issuance and adjudication of visas.  And the statutory authorities cited in the Proclamations also address only entry, not visa issuance.  *See* 8 U.S.C. § 1182(f) (empowering the President to "suspend the *entry* of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the *entry* of aliens any restrictions he may deem to be appropriate"); 8 U.S.C. § 1185(a) ("[I]t shall be unlawful . . . for any alien to depart from or *enter* . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.").  The Proclamations themselves do not dictate Defendants' No-Visa Policy.

Defendants' primary argument is that the No-Visa Policy is an automatic consequence of another statutory provision of the INA—8 U.S.C. § 1201(g)—and therefore does not violate the APA.  *See* Defs.' Opp'n at 42–44; *see also* CAR 156 ("All [covered, non-exempt] cases must be refused under INA [§ 1201(g)] until further guidance is received from the Department.").  Subsection 1201(g) provides that "[n]o visa . . . shall be issued to an alien if . . . it appears to the consular officer . . . that such alien is ineligible to receive a visa or other such documentation under section 1182."  A person declared inadmissible to enter the United States under § 1182(f), the theory goes, is therefore ineligible to receive a visa under § 1201(g).  Defs.' Opp'n at 42–44.  But that argument ignores "the basic distinction between admissibility determinations," i.e., entry

determinations,[18] and "visa issuance that runs throughout the INA." *Hawaii*, 138 S. Ct. at 2414 & n.3 (collecting statutory examples). Subsection 1201(g) precludes the issuance of visas only as to persons who are "ineligible to *receive a visa*" under Section 1182, not to persons who are only ineligible *to enter* under that provision. 8 U.S.C. § 1201(g) (emphasis added).

The categories of persons deemed ineligible to receive a visa pursuant to § 1201(g) appear in § 1182(a), not § 1182(f).[19]   *See Castaneda-Gonzalez v. Immigr. & Naturalization Serv.*, 564 F.2d 417, 426 (D.C. Cir. 1977) (explaining that § 1201(g) "directs [consular officers] not to issue visas to any alien who falls within one of the excludable classes described in [8 U.S.C. § 1182(a)]"). Subsection 1182(a) provides that "aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States." Thus, a person who falls into one of the categories of inadmissible persons outlined in § 1182(a) is both ineligible to enter the country *and* ineligible to receive a visa pursuant to § 1201(g). "For example, an alien cannot receive a visa if she has 'a communicable disease of public health significance,' and if she contracts such a disease after receiving her visa, she will be denied entry." *Almaqrami*, 933 F.3d at 776 (quoting 8 U.S.C. § 1182(a)(1)(A)). Subsection 1182(a) does not provide the President or the State Department any authority to supplement the listed categories of dual ineligibility and inadmissibility.

The reference to "the following paragraphs" in § 1182(a) does not "includ[e] § 1182(f)," as Defendants suggest. Defs.' Opp'n at 43. Section 1182 of the INA carefully distinguishes between *subsections*, which include §§ 1182(a) and 1182(f), and *paragraphs*, which are subunits

---

[18] "The concepts of entry and admission—but not issuance of a visa—are used interchangeably in the INA." *Hawaii*, 138 S. Ct. at 2414 n.4; *see* 8 U.S.C. § 1101(a)(13)(A) (defining "admission" as the "lawful entry of the alien into the United States").

[19] Other subsections of § 1182, including § 1182(e), provide additional limitations on eligibility for visas, but Defendants do not contend that these subsections have any bearing on the question of whether a person suspended from entering under § 1182(f) is ineligible for a visa under § 1201(g).

of those subsections.  *See generally* 8 U.S.C. § 1182.  Thus, "the following paragraphs" in § 1182(a) include only the ten paragraphs of § 1182(a); they do not also include § 1182(f), a distinct subsection of § 1182.  A suspension of entry under § 1182(f) therefore has no bearing on whether the person is "inadmissible" under § 1182(a) or ineligible to receive a visa under § 1201(g).  *See Almaqrami*, 933 F.3d at 776 (explaining that "[f]ailure to satisfy" the requirements of § 1182(a) "will render an alien ineligible for a visa *and* ineligible for entry," while "[o]ther parts of the INA apply to only visas *or* entry" (emphasis in original)).

Losing the textual battle, Defendants invoke the Supreme Court's decision in *Trump v. Hawaii*, which held that "any alien who is inadmissible under § 1182 (based on, for example, health risks, criminal history, or foreign policy consequences) is screened out as 'ineligible to receive a visa.'" *Hawaii*, 138 S. Ct. at 2414 (quoting § 1201(g)); Defs.' Opp'n at 43.  But the Court never held that the President's suspension of entry under § 1182(f) renders a person ineligible to receive a visa.  To the contrary, all the examples *Hawaii* cites all come from § 1182(a), *see* 8 U.S.C. § 1182(a)(1) (health risks); *id.* § 1182(a)(2) (criminal history); *id.* § 1182(a)(3)(C) (foreign policy).  And the Court specifically cited § 1182(f) as a screen on *entry* into the United States.  *See* 138 S. Ct. at 2414.  Subsection 1182(a), unlike § 1182(f), *does* establish categories of applicants that are ineligible to receive visas under § 1201(g).  And, as discussed, the Court repeatedly stressed the distinction between entry and visa issuance, *see Hawaii*, 138 S. Ct. at 2414, a distinction which Defendants' position elides.[20]

---

[20] Defendants also argue that the "State Department's practice, consistent with section 1201(g), has thus been to treat aliens covered by Presidential orders under section 1182(f) as ineligible for visas," Defs' Opp'n at 43, but the provision of the Foreign Affairs Manual they cite for that proposition, 9 FAM 302.14-3(B), does not mention visas at all—it simply describes the President's authority "to suspend entry into the United States."  The court notes that another provision of the Manual, 9 FAM 301.4-1, does suggest that aliens excluded under § 1182(f) may be ineligible to receive visas.  That section has not been briefed, however, and so the court does not opine on its validity or persuasive force.

Nor is the court persuaded by Defendants' argument that interpreting the INA to allow the issuance of visas to persons who might be ineligible to enter the country under a § 1182(f) proclamation "would only result in administrative confusion." Defs.' Opp'n at 44. The court acknowledges that such a system could create the odd result of persons receiving visas only to be turned away at ports of entry. However, "[a] visa does not guarantee entry into the United States; it only confers the right to travel to a port of entry and apply for admission to enter the country." *Almaqrami*, 933 F.3d at 776. In any event, there may be sound reasons for Congress's distinction. For instance, most immigrant visas are valid for six months, and some are valid for three years. 8 U.S.C. § 1201(c)(1). Congress may not have wished to halt visa processing and issuance for categories of persons who are only temporarily "suspend[ed]" from entering the country under § 1182(f), particularly where, as here, the visa applicant's opportunity to receive a visa is time delimited. For example, if a DV-2020 selectee receives her visa by the end of this month, it will be valid for another three months after the Proclamations are set to expire, giving her three months to enter the country.

Because neither the Proclamation nor § 1201(g) of the INA compel or empower the State Department to suspend the processing and issuance of visas, Defendants' argument that Plaintiffs have alleged no final agency action collapses. The term "agency action" "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman*, 531 U.S. at 478. To be "final," that action need only "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). Defendants, through a cluster of guidance documents, cables, and directives, have ordered consular offices and embassies to cease processing and issuing visas for otherwise

qualified applicants not exempt or excepted from the Proclamation, under the mistaken belief that they are legally required to do so.  *See e.g.*, CAR 24 (instructing that "[o]nly [visa] applicants that post believes may meet an exception to the [Proclamation], including the national interest exception, and that constitute a mission-critical category should be adjudicated at this time," and clarifying that officers "may not issue any [visas] that are not also excepted under [Proclamation]"); CAR 38 ("Presidential Proclamation 10052 suspended the issuance of nonimmigrant visas in the H-1B, H-2B, L, and J-1 . . . classifications until December 31, 2020, with certain exceptions . . . . Posts should NOT resume routine processing of these visa classifications, unless the applicant qualifies for an exception under this or any subsequent Proclamation, until given a specific instruction to do so."); CAR 36 (providing similar instructions for immigrant visas); Luster Decl. ¶ 5 (explaining that "[p]ursuant to guidance from the Department on . . . the implementation of P.P. 10014 and P.P. 10052," no "additional diversity visa case appointments with [consular] posts" have been scheduled," and "only when a consular post reaches Phase Three of the Diplomacy Strong Framework may the post resume diversity visa case processing, and only for cases that appear to be eligible for an exception to P.P. 10014").

Both of the *Bennett* factors are met here.  Defendants' decisionmaking process is not in flux; they believe the policy is statutorily required.  As a consequence, it appears that thousands of otherwise qualified visa applications are not being processed or issued.  And even those applicants who may be able to meet an exception to the Proclamations are, as the *Mohammed* Plaintiffs note, subject to additional "eligibility requirements for decisions on diversity visa applications that cannot be . . . found in the statutes, regulations, or executive orders governing their adjudications."  *See Mohammed* PI Mem. at 21; *see* CAR 167–74 (detailing various extra-statutory requirements for applicants to qualify for the national interest exception).  That is

paradigmatic final agency action. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (Finality is determined "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it."); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (finding final agency action where "the entire Guidance, from beginning to end . . . reads like a ukase.  It commands, it requires, it orders, it dictates"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 (D.C. Cir. 1986) ("[A]n agency's interpretation of its governing statute, with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for judicial review." (cleaned up)).

Likewise, Defendants' argument that their No-Visa Policy is consistent with the INA and does not "usurp[] consular officers' sole and express statutory authority to issue visas" rises and falls on their incorrect assumption that "Plaintiffs are inadmissible" under § 1182(f) "and, in turn, 'ineligible to receive a visa' for the purposes of 8 U.S.C. § 1201(g)(1)."  Defs.' Opp'n  at 43–44. Apart from § 1201(g), which does not apply here, Defendants identify no statutory authority that would authorize Defendants to order consular officers to cease processing and issuing qualifying visas.  Under the INA, "[a]ll immigrant visa applications," and "[a]ll nonimmigrant visa applications" "shall be reviewed and adjudicated by a consular officer."  8 U.S.C. § 1202(b), (d). "[A] consular officer may issue" visas to individuals who have "made proper application therefor," *id.* § 1201(a)(1), and the INA expressly deprives the Secretary of State of "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas," *id.* § 1104(a).  Because Defendants have not identified any statutory authority that would permit the suspension of this ordinary process, the court concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants' No-Visa Policy is "not in accordance with law" and "in excess of statutory . . . authority."  5 U.S.C. § 706(2).

### 2.     *No-Visa Policy – Arbitrary and Capricious*

Next, the *Gomez, Panda*, and *Aker* Plaintiffs argue that Defendants' No-Visa Policy is arbitrary and capricious because it lacks any reasoned explanation, fails to consider reliance interests, and fails to consider important aspects of the problem.  *See Gomez* PI Mem. at 35–38; *Aker* TRO/PI Mem. at 43; *Panda* PI Mem. 32–35.  The court need not linger on these arguments long.  The Administrative Record reveals no justification for Defendants' No-Visa Policy except the incorrect assumption that it is compelled by the Proclamations and § 1201(g).  *See, e.g.*, CAR 24, 26, 28, 36, 38.  In promulgating the No-Visa Policy, Defendants offered no rational explanation for the policy, nor did they account for the serious consequences the policy would impose on DV-2020 selectees, whose opportunity to receive visas will expire by the end of this fiscal year.  The court assumes that Defendants may in some circumstances permissibly prioritize the processing of visas for applicants who are actually eligible to enter the United States, particularly given the operational difficulties posed by the COVID-19 pandemic, but no such rationale was given.  Agency action that "stands on a faulty legal premise and [lacks] adequate rationale" is arbitrary and capricious.  *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law.").  Plaintiffs are therefore likely to succeed on their argument that Defendants' No-Visa Policy is arbitrary and capricious.

### 3.     *No-Visa Policy – Notice and Comment Rulemaking*

The *Aker* Plaintiffs additionally argue that Defendants' No-Visa Policy violates the APA because it was issued without giving notice and an opportunity to comment.  *See Aker* TRO/PI Mem. at 44–49.  Defendants retort that the policy is at most an interpretive rule, and is not subject to the same notice-and-comment rulemaking requirements as legislative rules.  *See* Defs.' Opp'n

at 56–58.  But a rule is legislative, not interpretive, "when it 'change[s] the law.'"  *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 66 (D.D.C. 2020) (quoting *Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011)).  As discussed, Defendants' No-Visa Policy is not an automatic consequence of the Proclamations or 8 U.S.C. § 1201(g), and so it changes the law by suspending processing and issuance of covered, non-exempt visa applicants and subjecting potentially exempt applicants to additional eligibility requirements.  Defendants' policy therefore bears the hallmarks of a legislative rule.

However, the court declines to rule on whether notice-and-comment rulemaking was required for Defendants' policy for three reasons.  First, it is unnecessary.  A ruling on this issue would provide Plaintiffs no additional relief than they will otherwise receive.  Second, Defendants have not identified any authority granted to the Secretary of State to suspend the processing and issuance of visas in the first place.  The court cannot assess whether notice-and-comment rulemaking is required absent this information.  And finally, insofar as Defendants do have authority to issue such a legislative rule, certain exceptions to the APA's notice-and-comment requirements might apply, *see* 5 U.S.C. § 553(a)(1), 553(b)(3)(B), but Defendants have not briefed any of those exceptions.  Therefore, the court declines to rule on the likelihood of Plaintiffs' success on this issue.

### 4.   *Unreasonable Delay of Processing DV-2020 Visa Applications*

The *Gomez* DV-2020 Plaintiffs and the *Mohammed*, *Aker*, and *Fonjong* Plaintiffs argue that Defendants have unreasonably delayed and unlawfully withheld adjudicating their DV-2020 visa applications, and the *Mohammed* and *Fonjong* Plaintiffs also argue that this delay entitles them to relief under the Mandamus Act.  *See Gomez* Suppl. PI Mem. at 8; *Mohammed* PI Mem. at 16–20, 23; *Aker* TRO/Mot. at 49–50; *Fonjong* TRO/PI Mem. at 16–22, 25–26.

The court agrees that Defendants have unreasonably delayed processing Plaintiffs' DV-2020 selectees' visa applications. Courts in this Circuit analyze a claim of unreasonable delay under the six-part standard outlined in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*"):

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80) (quotation marks omitted). Plaintiffs have established each of the required *TRAC* elements.

*First and Second TRAC Factors.* First, the INA provides a clear "indication of the speed with which it expects the agency to proceed in" processing diversity lottery selectees' visa applications, which supplies content for the *TRAC* rule of reason. *TRAC*, 750 F.2d at 80. Section 1154 sets an absolute, unyielding deadline by which selectees must receive their visas: "Aliens who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). While Defendants correctly note that that provision does not expressly require the State Department to conclude processing diversity visas by that date, Defs.' Opp'n at 53, they ignore that the second *TRAC* factor may be satisfied by an express timetable *or* any "other indication of [] speed," 750 F.2d at 80. Here, "[t]he specificity and relative

brevity" of the September 30 deadline manifests Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline. *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012). "[A] reasonable time for agency action is typically counted in weeks or months, not years"; surely a delay that results in the *permanent* loss of a statutory benefit is not reasonable. *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).

To be clear, there is no statutory requirement that every available diversity visa be issued each year. But that does not mean that the State Department could effectively extinguish the diversity program for a given year by simply sitting on its hands and letting all pending diversity visa applications time out. Doing so would "plainly frustrate[] the congressional intent" to make available 55,000 diversity immigrant visas each year. *See In re People's Mojahedin Org. of Iran*, 680 F.3d at 837; *see also* 8 U.S.C. § 1151(e) ("The worldwide level of diversity immigrants is equal to 55,000 for each fiscal year."); *id.* § 1153(c)(1)(A) (providing that persons "subject to the worldwide level specified in section 1151(e) of this title for diversity immigrants shall be allotted visas each fiscal year" pursuant to a detailed statutory scheme); H.R. Rep. No. 101-723, pt. 1 (1990) (finding that it is important "to promote diversity in [the] immigration system").[21] These factors favor Plaintiffs.

*Third and Fifth TRAC Factors.* Defendants do not dispute that the third and fifth *TRAC* factors favor a finding of unreasonable delay, *see* Defs.' Opp'n at 53, and for good reason. The prejudice from delay is dire—DV-2020 applicants might permanently lose their opportunity to

---

[21] The only case Defendants cite in support of their position, *Ghadami v. Department of Homeland Security*, 19-cv-00397 (ABJ), 2020 WL 1308376 (D.D.C. Mar. 19, 2020), involved a request for a waiver to an entry ban, for which there was no expiration date or "any particular time frame" associated with processing the request. *See id.* at *2, *8. That case is therefore inapposite.

immigrate to the United States—and such delay is "less tolerable" in cases like this one, where "human . . . welfare" is "at stake." *TRAC*, 750 F.2d at 80.

*Fourth Factor.*  The fourth *TRAC* factor—"the effect of expediting delayed action on agency activities of a higher or competing priority," *see TRAC*, 750 F.2d at 80—is a closer call, but ultimately does not militate against a finding of unreasonable delay.  Defendants argue that "given that diversity visa selectees are ineligible to receive visas for the remainder of the fiscal year, the agency understandably has not prioritized the scheduling of consular interviews for diversity visa selectees." Defs.' Opp'n at 54.  But, as discussed, that premise is plainly incorrect: qualified DV-2020 selectees have no legal impediment to receiving visas.

Defendants argue more persuasively that "[t]he COVID-19 pandemic has disrupted the State Department's operations and strained its resources to an unprecedented degree[,]" and that "[m]any embassies and consulates continue to suspend routine operations." *Id.*  The court is not insensitive to these concerns, but they do not render reasonable the agency's complete refusal to process diversity visa applications for two reasons.  For one, the agency's declarant, Brianne Marwaha, has informed the court that despite in-country "restrictions, the Department is committed to processing visa services that are deemed 'mission critical.'" *See* Marwaha Decl. ¶ 8.  As discussed below, the agency has not provided an adequate explanation for why it does not consider DV-2020 applications mission critical.  And two, posts have been resuming visa processing to various degrees since July 15 of this year but are directed to treat DV-2020 applications as low priority.  *See* CAR 35.  There may well be certain consular offices that are simply incapable of processing additional visa applications at this time, but that does not justify a blanket withholding of processing worldwide.

Finally, Defendants argue that the INA "sets forth a policy of a 30-day timeframe for the processing of K-1 visa applications[22] and a 60-day timeframe for the processing of all other family-preference cases," and suggest that Plaintiffs are impermissibly attempting to "be prioritized at the expense of other prospective visa applicants." Defs.' Opp'n at 53–54. But Defendants cite no evidence suggesting that they would be unable to process these other visa applications if ordered to expeditiously process DV-2020 visa applications. Nor do they identify any statutory authority that sets the processing of these other visa categories as a more important priority than diversity visa applications that will expire in less than thirty days. In the end, Defendants' argument boils down to the notion that it "has acted reasonably in prioritizing family-preference cases and other visa categories in which prospective applicants are not ineligible to receive visas." Defs.' Opp'n at 54. For the reasons already discussed, that premise is incorrect. Accordingly, the fourth factor does not favor Defendants.

*Sixth TRAC Factor.* Plaintiffs argue that "impropriety lurking behind agency lassitude" further favors a finding that processing of DV-2020 visa applications has been unreasonably delayed. *TRAC*, 750 F.2d at 80. The court "need not" make any such finding to find unreasonable delay, however, and so it declines to do so here. *Id.*

Therefore, the court finds that Plaintiffs are likely to succeed on their claim that Defendants have unreasonably delayed processing their DV-2020 visa applications. In view of this conclusion, the court does not separately address the merits of Plaintiffs' overlapping claim that Defendants have unlawfully withheld processing DV-2020 selectees' applications, as that additional claim

---

[22] A K-1 visa is a nonimmigrant visa for the foreign-citizen fiancé of a United States citizen. *See Nonimmigrant Visa for a Fianc(é)e (K-1)*, U.S. DEP'T OF STATE, available at https://travel.state.gov/content/travel/en/us-visas/immigrate/family-immigration/nonimmigrant-visa-for-a-fiance-k-1.html.

seeks identical relief.[23]  Likewise, any separate mandamus relief is unwarranted.  "[T]he standards

for obtaining relief" under § 706(1) of the APA and the Mandamus Act are "essentially the same,"

*Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010), and relief under the

Mandamus Act is only warranted when "there is no other adequate remedy available to the

plaintiff," *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (citations

omitted).

### 5.    *Exclusion of DV-2020 Visa Applications from Mission Critical Processing*

Defendants' interpretation of the Proclamations and 8 U.S.C. § 1201(g) as suspending the

processing and issuance of covered, non-exempt visa applications is not the only impediment the

diversity visa Plaintiffs must overcome.  Since March 20, 2020, the State Department has also

suspended the routine processing of visas worldwide due to the COVID-19 pandemic, and has

only recently begun to resume routine services at some posts.  *See* CAR 12–14, 35.  The State

Department has continued to process "mission critical" applications, *id.*, *see also* Marwaha Decl.

¶ 8, but DV-2020 applications are not being treated as mission critical, *see* 8/7/2020 Status Hr'g

Tr. at 19; *see also* CAR 26 (listing "examples of categories of visa services that should be

considered mission-critical," but not including DV-2020 applications).  Even as consular offices

resume routine visa operations, diversity visa applications eligible for an exception to the

---

[23] Defendants suggest that Plaintiffs have failed to establish that any agency action has been unlawfully withheld
because they owe Plaintiffs no non-discretionary duty, and that fact "dooms Plaintiffs' unreasonable-delay claim."
Defs.' Opp'n at 51.  But the APA provides for judicial review of agency action "unlawfully withheld *or* unreasonably
delayed."  5 U.S.C. § 706(1) (emphasis added).  Defendants identify no authority for the notion that a plaintiff must
prove the former to obtain relief on the latter.  Moreover, agencies are separately required to "proceed to conclude a
matter presented to it" "within a reasonable time."  5 U.S.C. § 555(b).  Given this obligation under the APA, any
absence of an additional statutory mandate is "beside the point."  *In re Am. Rivers & Idaho Rivers United*, 372 F.3d
413, 419 (D.C. Cir. 2004).  In any event, Defendants' argument that they have no "nondiscretionary duty to afford
Plaintiffs the opportunity to apply for immigrant visas at consular interviews," Defs.' Opp'n at 51, is flatly contradicted
by § 1202(b) and 1202(d) of the INA, which require that all immigrant and nonimmigrant visa applications "shall be
reviewed and adjudicated by a consular officer," 8 U.S.C. § 1202(b), (d).

Proclamations are still given the lowest priority for processing under the State Department's guidance. *See* CAR 38. Pursuant to this guidance, and the State Department's additional guidance implementing the Proclamations, the State Department "has not scheduled additional diversity visa case appointments with posts since March 20, 2020." Luster Decl. ¶ 5.

The *Gomez* DV-2020 Plaintiffs assert that Defendants' COVID-19 Guidance excluding DV-2020 diversity visa applications from the categories of "mission critical" visa services is arbitrary and capricious because, among other reasons, it does not reflect any "meaningful consideration to the exceptionally harsh result of failing to issue visas to diversity visa lottery winners." *Gomez* Suppl. PI Mem. at 5. The court agrees. The record reveals no explanation whatsoever for the exclusion of DV-2020 selectees from mission critical services, nor does it reflect any reasoned consideration of the detrimental effects that will be wrought on diversity visa selectees if they do not receive visas. The agency thus "failed to consider [an] important aspect of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

Defendants do not attempt to defend the rationality of their COVID-19 Guidance. Nor do they dispute that the Guidance constitutes final agency action. Instead, they argue that Plaintiff's claim is untimely because it was after the court issued a scheduling order for consolidated, omnibus briefing in these consolidated cases and the information was allegedly available to Plaintiffs since June. *See* Defs.' Opp'n at 29–30 n.6. However, Defendants' policy of excluding DV applications from mission critical services was only revealed at the status conference on August 7, 2020. *See* 8/7/2020 Status Hr'g Tr. at 19. Plaintiffs acted promptly after that, filing a supplemental preliminary injunction motion on August 10, 2020, ECF No. 66, and a motion to file a second amended complaint two days later, ECF No. 76. Defendants could have asked the court for an

73

expansion of pages in their omnibus opposition brief or filed a separate opposition to Plaintiffs' supplemental motion, but they did neither.  Plaintiffs' additional argument is therefore neither untimely nor prejudicial.

Defendants' final argument—that Plaintiffs do not state a claim under § 706(1) of the APA because "there is no non-discretionary duty to consider [DV-2020 selectees] as emergency/mission critical under the State Department's COVID-19 guidance," Defs.' Opp'n at 29 n.6—misconstrues the nature of Plaintiffs' claim.  Plaintiffs argue that Defendants' COVID-19 Guidance "is arbitrary, capricious, and unlawful," under § 706(2) of the APA, not that Defendants have unlawfully withheld a non-discretionary duty under § 706(1).  *See Gomez.* Suppl. PI Mem. at 3; *see also Gomez* SAC ¶ 353–54.[24]  The COVID-19 Guidance is final agency action (it marks the consummation of Defendants' decisionmaking and imposes significant legal consequences on DV-2020 selectees applying for visas at posts that have not resumed routine visa services), and, in issuing and implementing the Guidance, Defendants failed to consider an important aspect of the problem in violation of § 706(2) of the APA.  Defendants' insistence that the State Department "was not required" to include DV-2020 applicants in its COVID-19 Guidance simply "misses the point."  *Regents*, 140 S. Ct. at 1913.

Therefore, the *Gomez* diversity visa plaintiffs are likely to succeed on the merits of this claim.

---

[24] Likewise, in the context of this claim, the *Gomez* Plaintiffs seek only an order "holding that the agency defendants' implementation of the Proclamation and the COVID-19 Guidance are unlawful and are set aside," see *Gomez* SAC at 104; *Gomez* Suppl. PI Mem. at 7.  Their requests for an order compelling the State Department to adjudicate their claims is tied to their adoption of the *Mohammed*, *Fonjong*, and *Aker* Plaintiffs' § 706(1) claims.  *See Gomez* Suppl. PI Mem. at 1, 8.

## IV.    REMAINING FACTORS GOVERNING PRELIMINARY RELIEF

Having found that Plaintiffs are likely to succeed on their APA claims regarding Defendants' implementation of the Proclamations 10014 and 10052 and the COVID-19 Guidance, the court now turns to the remaining factors governing preliminary injunctive relief.  The court first discusses those factors as they pertain to the DV-2020 Plaintiffs, and then considers the non-diversity visa Plaintiffs' claims for equitable relief in *Gomez*. [25]

### A.    DV-2020 Plaintiffs

The DV-2020 Plaintiffs have demonstrated that they are likely to experience irreparable harm absent injunctive relief, and that the balance of equities and public interest tip in their favor.

#### 1.    *Irreparable Harm*

A party seeking preliminary injunctive relief bears the burden of showing that she imminently will be irreparably harmed by the challenged action or inaction.   The "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up).

Defendants do not contest that the DV-2020 Plaintiffs have met their burden of showing irreparable harm.  *See* Defs.' Opp'n at 68–72.  That was a smart choice.  Plaintiffs in each case have provided a mountain of affidavits attesting to the severe emotional, economic, educational, and personal harms that they and their families will imminently experience if Defendants' actions are not enjoined by September 30, 2020, and they permanently lose their opportunity to immigrate to the United States through the diversity visa program.  *See, e.g.*, *Gomez* PI Mem. ECF No. 53-11, 53-16, 53-19, 53-20, 53-21, 53-25; *Mohammed* PI Mem., ECF Nos. 8-5–8-41; *Fonjong*

---

[25] The equitable factors governing whether the *Panda* plaintiffs are entitled to preliminary injunctive relief are being briefed separately in that case.

TRO/PI Mem., ECF Nos. 7-5–7-24; *Aker*, TRO/PI Mem., Ex. A–0, at PDF pp. 70–104.  They have

met their burden of showing imminent, irreparable harm.  *See P.K. v. Tillerson*, 302 F. Supp. 3d

1, 10 (D.D.C. 2017) (granting a preliminary injunction based on DV selectees' imminent loss of

opportunity to receive diversity visas); *see also Mohamed v. Pompeo*, No. 1:19-cv-01345-LJO-

SKO, 2019 U.S. Dist. LEXIS 167266, at *1 (E.D. Cal. Sep. 27, 2019) (finding that if diversity visa

selectees' applications were not adjudicated by the end of the fiscal year, the plaintiffs would "be

harmed irreparably, pursuant to the mandates of 8 U.S.C. § 1154(a)(1)(I)(ii)(II)").

### 2.    *Balance of Equities and Public Interest*

The DV-2020 Plaintiffs have also established the final two *Winter* factors for injunctive

relief—that the "balance of equities tips in [their] favor and that an injunction is in the public

interest."  *See Winter*, 555 U.S. at 20.  Where, as here, the federal government is the opposing

party, these two factors merge.  *See Nken*, 556 U.S. at 435.

Defendants' No-Visa Policy, unreasonable delay in processing DV-2020 selectees'

applications, and COVID-19 Guidance will imminently cause severe harms to the DV-2020

Plaintiffs and thousands of other similarly situated DV-2020 applicants.  If the court does not grant

preliminary relief now, there is a strong likelihood that these Plaintiffs will lose any opportunity

for permanent relief later.  These drastic harms heavily favor preliminary relief.  On the public

interest side of the ledger, "[t]here is generally no public interest in the perpetuation of unlawful

agency action."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir.

2016).  "To the contrary, there is a substantial public interest in having governmental agencies

abide by the federal laws that govern their existence and operations."  *Id.* (cleaned up); *see also*

*E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ("[T]he public interest

is served by compliance with the APA." (cleaned up)).  Plaintiffs are highly likely to succeed on

the merits of their challenges to these agency actions and inactions.  Accordingly, the public interest also favors preliminary relief.

Defendants focus on the public interest harms that would purportedly stem from enjoining the Proclamations.  *See* Defs.' Opp'n at 71–72.  However, Plaintiffs have not shown a substantial likelihood of success on their challenges to the Proclamations, and so the associated public interests undergirding them are irrelevant to the court's balancing.  Defendants also fret that if the court were to grant an order enjoining "the State Department's suspension of routine visa services due to COVID-19," it could threaten the health of "foreign-service employees and their families located all over the world."  *Id.* at 72 n.15.  But the *Gomez* DV-2020 Plaintiffs only ask the court to enjoin "the State Department's application of the COVID-19 Guidance to diversity visa applicants," not to vacate the agency's entire guidance to embassies and consular offices concerning the resumption of visa processing services in light of the COVID-19 pandemic.  *See Gomez* Suppl. PI Mem. at 7.  The court's relief, described below, does not place foreign-service employees at any greater risk than they already are experiencing under the agency's current "Diplomacy Strong" operating procedures.

The court is cognizant of the extreme exigencies caused by the COVID-19 pandemic, and acknowledges that certain consular offices may, for reasons outside Defendants' control, find it impossible to process all pending diversity visa applications by September 30.  But this does not tip the scale against a remedy for Defendants' unlawful conduct, because the court is capable of fashioning a tailored remedy that accounts for these extrinsic limitations.

### B.     *Gomez* Non-DV Plaintiffs

The court reaches a different conclusion with respect to the *Gomez* Non-DV Plaintiffs. A "plaintiff must establish a causal link between the injunction sought and the alleged injury,"

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (cleaned up), and she must "demonstrate[] that the Court's injunction" is likely to "eliminate the harm that already exists," *Ass'n of Flight Attendants-CWA, AFL-CIO v. Pension Ben. Guar. Corp.*, 372 F. Supp. 2d 91, 102 (D.D.C. 2005) (cleaned up).  Unfortunately for these Plaintiffs, their asserted irreparable harms cannot be remedied by granting relief on their APA claims.  For instance, the family-visa Plaintiffs identify vast harms stemming from being separated from their family members.  *See Gomez* Pls.' Mem. at 39–40.  The court has no doubt that this separation has been devastating for these Plaintiffs and their families, but this harm would continue to flow from the Proclamations' ban on entry, even if the court were to grant relief on these Plaintiffs' challenges to Defendants' No-Visa Policy.  Likewise, the companies sponsoring nonimmigrant visa applicants assert that their businesses will likely cease if they cannot continue to recruit nonimmigrant workers to fill positions.  *Id.* at 41–42.  Once again, these workers will continue to be unable to enter the country even if the court were to grant their claims for APA relief.

The court acknowledges that the *Gomez* Non-DV Plaintiffs have also experienced a procedural injury from Defendants' No-Visa Policy, but "courts generally will not base a finding of irreparable injury on a procedural violation standing alone." *Elk Assocs. Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012) (cleaned up).  Likewise, these Plaintiffs' assertion that granting relief on their APA claims will give them an opportunity to enter the country more quickly after the Proclamations expire, *see Gomez* Pls.' Mem. at 3, might be sufficient to support standing, but it does not constitute "a clear and present need for equitable relief" and, in any event, is too speculative a reed on which to stand.  *Mexichem*, 787 F.3d at 555.

The public interest factor also does not support these Plaintiffs.  Issuing injunctive relief that could be construed to mean that the State Department must issue visas to people who have no

immediate prospect for entering the country could create substantial havoc and confusion.  While

such risk is warranted in the context of DV-2020 applicants who have a swiftly expiring window

of time to receive their visas, it counsels in favor of staying the court's hand as to the *Gomez* Non-

DV Plaintiffs.

Accordingly, preliminary injunctive relief is not warranted for the *Gomez* Non-DV

Plaintiffs, even though they are substantially likely to succeed on their challenges to Defendants'

No-Visa Policy.  Because preliminary relief is unwarranted for these Plaintiffs at this time, the

court defers ruling on the *Gomez* Plaintiffs' motion for class certification with respect to the four

Non-DV putative subclasses.

## V.    REMEDY AND CLASS CERTIFICATION FOR THE DV-2020 PLAINTIFFS

Finally, the court considers the scope of relief due to the DV-2020 Plaintiffs, along with

the *Gomez* and *Aker* Plaintiffs' motions for class certification.

### A.    Scope of Relief

Defendants assert that any injunctive relief must be "sharply limited," and "tailored to the

injury asserted by the plaintiffs."  Defs.' Opp'n at 4.  In support of their argument against a

universal injunction, Defendants invoke *Califano v. Yamasaki* for the proposition that "injunctive

relief should be no more burdensome to the defendant than necessary to provide complete relief *to*

*the plaintiffs*."  Defs.' Opp'n  at 75 (emphasis in original) (quoting 442 U.S. 682, 702 (1979)).  The

court agrees that "[a]n injunction must be narrowly tailored to remedy the specific harm shown,"

*Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330

(D.C. Cir. 2006) (cleaned up), and so it will tailor its relief under the APA to apply only to DV-

2020 applicants, as the DV-2020 Plaintiffs are the only plaintiffs in these consolidated cases who

have met the equitable requirements for injunctive relief.  In the context of granting relief under

the APA to the DV-2020 Plaintiffs, however, this court is bound by D.C. Circuit precedent, which holds that "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated — *not that their application to the individual petitioners is proscribed*." *Nat'l Mining Ass'n*, 145 F.3d at 1409 (cleaned up and emphasis added); *see also, e.g.*, *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("A common remedy when we find a rule is invalid is to vacate.").   The APA provision underlying that principle, 5 U.S.C. § 706, applies not just to agency regulations but any "agency action," which includes a "failure to act," 5 U.S.C. § 704.   As Justice Blackmun observed "in dissent but apparently expressing the view of all nine justices," *Nat'l Mining Ass'n*, 145 F.3d at 1409, "when a plaintiff 'prevails' on a challenge under the APA to 'a rule of broad applicability,' 'the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual,'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting).   Justice Blackmun contrasted "these circumstances," with a case where "a generally lawful policy is applied in an illegal manner on a particular occasion," and "one who is injured is not thereby entitled to challenge other applications of the rule."   *Id.*   This case falls into the former category: the State Department adopted a blanket policy of suspending adjudication and issuance of diversity visa applications and visas pursuant to Proclamations 10014 and 10052—an action that the court now finds unlawful.   Accordingly, the DV-2020 Plaintiffs in this case, having established that they were injured by the policy, may obtain "relief that affects the rights of parties not before the court."   *Id.*

Defendants suggest that the holding in *National Mining* does not control because that case involved a final decision on the merits, whereas this case is in a preliminary posture.   *See* Defs.' Opp'n at 74.   But the section of the APA governing preliminary relief, 5 U.S.C. § 705, also "authorize[s] relief from agency action for any person otherwise subject to the action, not just as

to plaintiffs," *District of Columbia* v. *USDA*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020).  That provision allows "the reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" to "the extent necessary to prevent irreparable injury." 5 U.S.C. § 705.  It therefore "authorizes courts to stay agency [action] pending judicial review," not just to enjoin their application to the injured parties before the court.  *See Mexichem*, 787 F.3d at 562 (Kavanaugh, J., dissenting in part); *see also In re GTE Service Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (recognizing that § 705 supplies "statutory authority to stay agency orders pending review in this court"); *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (staying a final rule "in its entirety" across the country in a case brought by Texas, other state regulators, and private parties).  By the same token, § 705's grant of power to "issue all necessary and appropriate process" includes the power to compel agency inaction when necessary "to preserve status or rights pending conclusion" of the action.  5 U.S.C. § 705.

Even if Defendants' citationless assertion that "the APA does not authorize relief beyond the parties before the Court," Defs.' Opp'n at 74, were correct, more expansive relief for the DV-2020 Plaintiffs and those similarly situated is merited under the court's equitable authority. "Crafting a preliminary injunction," indeed any equitable relief, "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017); *see also Winter*, 555 U.S. at 20, 24; 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (3d ed. 2013).  An important equity here, as recognized by at least two other circuits, is "our country's strong interest in the uniform application of immigration law and policy."  *See Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017) ("Because this case implicates

immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."), *rev'd on other grounds*, 138 S. Ct. 2392; *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) (finding that limiting the geographic scope of an injunction on an immigration enforcement policy "would run afoul of the constitutional and statutory requirements for uniform immigration law and policy"); *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (holding that uniform application of the immigration laws justified a nationwide injunction). Were the court to limit relief to the DV-2020 Plaintiffs only, and not the thousands of other DV-2020 applicants whose applications have also been suspended by Defendants' policies, thousands of individual lawsuits would likely follow, and the potentially disparate outcomes of those cases would result in widespread administrative confusion. That cannot be the outcome that Defendants desire.

### B.      Class Certification

In light of the foregoing, the court also finds that it need not rule on the DV-2020 Plaintiffs' pending motions to certify classes of DV-2020 applicants, *see Aker* Mot. for Class Cert.; *Gomez* Mot. for Class Cert, because all proposed class members will benefit from the preliminary relief granted by this Order. "The question of whether to allow a suit to proceed as a class action is one primarily for the determination of the trial judge," *Bermudez v. U.S. Dep't of Agr.*, 490 F.2d 718, 725 (D.C. Cir. 1973), who has "broad discretion in deciding whether to permit a case to proceed as a class action," *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994). It is not uncommon for courts to deny class certification on the basis that certification is not needed "when the particular facts and circumstances of the case warrant doing so." *Mills v. District of Columbia*, 266 F.R.D 20, 22 (D.D.C. 2010). A particularly common reason for declining to certify a class is where, as here, plaintiffs contend that their proposed class qualifies under Rule 23(b)(1) or

23(b)(2), and "all [putative] class members [would] benefit from an injunction issued on behalf of the named plaintiffs." *Kan. Health Care Ass'n v. Kan. Dep't of Soc. and Rehab. Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994); *see also, e.g.*, *Davis v. Smith*, 607 F.2d 535, 540 (2d Cir. 1978) ("Where . . . the prospective benefits of declaratory and injunctive relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment, a district court may decline certification."); *Sargent v. Block*, 576 F. Supp. 882, 888 (D.D.C. 1983) ("[T]he Court finds that class certification is unnecessary in this action since the defendants are government officials and the declaratory and injunctive relief sought by the named plaintiffs would benefit all proposed class members."). The relief issued by the court's ruling will benefit all putative class members. Thus, because there is nothing left to achieve by certifying the class and doing so would only "needlessly burden this litigation," *Mills*, 266 F.R.D. at 23, the court denies without prejudice the DV-2020 Plaintiffs' requests for class certification, pending a final resolution of the merits of their claims.

## VI.   CONCLUSION AND ORDER

For the reasons set forth above, the court concludes that the Plaintiffs are not likely to succeed on their challenges to the Proclamations. Plaintiffs, however, are likely to succeed on their claims that (1) Defendants' No-Visa Policy is not in accordance with law, is in excess of statutory authority, and is arbitrary and capricious; (2) Defendants have unreasonably delayed processing DV-2020 Plaintiffs' visa applications; and (3) Defendants' COVID-19 Guidance arbitrarily excludes DV-2020 visa applications from the categories of applications eligible for mission critical and emergency services. The court additionally finds that the DV-2020 Plaintiffs have met the equitable requirements for injunctive relief, but the Non-DV Plaintiffs have not. The

court therefore orders the following pursuant to 5 U.S.C. § 705 and the court's traditional equitable powers:

1.  The court preliminarily stays the No-Visa Policy as applied to DV-2020 selectees and their derivative beneficiaries.   Defendants[26] may not interpret or apply the Proclamations in any way that forecloses or prohibits embassy personnel, consular officers, or any administrative processing center (such as the Kentucky Consular Center) from processing, reviewing, or adjudicating a 2020 diversity visa or derivative beneficiary application or issuing or reissuing a 2020 diversity or derivative beneficiary visa based on the entry restrictions contained in the Proclamations.  Except as provided in paragraphs 2 and 3 below, this order does not prevent any embassy personnel, consular officer, or administrative processing center from prioritizing the processing, adjudication, or issuance of visas based on resource constraints, limitations due to the COVID-19 pandemic, or country conditions;

2.  Defendants shall undertake good-faith efforts, directly and through their designees, to expeditiously process and adjudicate DV-2020 diversity visa and derivative beneficiary applications and issue or reissue diversity and derivative beneficiary visas to eligible applicants by September 30, 2020, giving priority to the named diversity visa Plaintiffs in *Gomez*, *Aker*, *Mohammed*, and *Fonjong* and their derivative beneficiaries;

3.  The court preliminarily enjoins Defendants from interpreting and applying the COVID Guidance to DV-2020 selectees and their derivative beneficiaries in any way that requires embassy personnel, consular officers, or administrative processing centers (such as the Kentucky Consular Center) to refuse processing, reviewing, adjudicating 2020 diversity visa applications or issuing or reissuing diversity visas on the ground that the DV-2020 selectee or derivative beneficiary does not qualify under the "emergency" or "mission critical" exceptions to the COVID Guidance;

4.  At this time, the court declines Plaintiffs' request to order Defendants to reserve unprocessed DV-2020 visas past the September 30 deadline or until a final adjudication on the merits, but will revisit the issue closer to the deadline.  Accordingly, the court orders the State Department to report, by not later than September 25, 2020, which of the named DV-2020 Plaintiffs in this action have received diversity visas, the status of processing of the named DV-2020 Plaintiffs' applications who have not yet received visas, and the number of unprocessed DV-2020 visa applications and unused diversity visas remaining for Fiscal Year 2020.

5.  The *Aker* and *Gomez* Plaintiffs' motions for class certifications as to DV-2020 selectees are denied without prejudice, subject to final resolution on the merits of Plaintiffs' challenges to the Proclamations.

6.  The court defers ruling on the *Gomez* Plaintiffs' motion for class certification with respect to the four putative subclasses representing Non-DV Plaintiffs, as the named

---

[26] The court's reference to "Defendants" in its Order excludes the President.

Plaintiffs representing these putative subclasses have not demonstrated entitlement to preliminary injunctive relief.

7. Plaintiffs' requests for the court to preliminarily enjoin Defendants from implementing or enforcing Proclamations 10014 and 10052 against Plaintiffs are denied.

The Parties shall meet and confer and, by September 25, 2020, file a Joint Status Report proposing a briefing schedule for the court's resolution of the merits.

Dated:  September 4, 2020

_____
Amit P. Mehta
United States District Judge