# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DOMINGO ARREGUIN GOMEZ, et al.,** ) | **DEFENDANTS' REPORT ON GOOD** |
| ) | **FAITH EFFORTS TO IMPLEMENT** |
| **Plaintiffs,** ) | **THE PRELIMINARY INJUNCTION.** |
| ) | |
| v. ) | Case No. 20-cv-01419 (APM) |
| ) | |
| **DONALD J. TRUMP, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |
| **MOHAMMED ABDULAZIZ ABDUL MOHAMMED, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | Case No. 20-cv-01856 (APM) |
| v. ) | |
| ) | |
| **MICHAEL R. POMPEO, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| **AFSIN AKER, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Case No. 20-CV-01926 (APM) |
| ) | |
| **DONALD J. TRUMP, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

| | |
|---|---|
| **CLAUDINE NGUM FONJONG, et al.,** )<br>)<br>**Plaintiffs,** )<br>**v.** )<br>)<br>**DONALD J. TRUMP, et al.,** )<br>)<br>**Defendants.** )<br>)<br>)<br>) | Case No. 20-cv-02128 (APM) |
| **CHANDAN PANDA, et al.,** )<br>)<br>**Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**CHAD F. WOLF, et al.,** )<br>)<br>**Defendants.** )<br>)<br>) | Case No. 20-cv-01907 (APM) |

On September 4, 2020, this Court issued an order granting in part and denying in part Plaintiffs' motions for a preliminary injunction in these consolidated cases. ECF No. 123 (the "PI Order"). Specifically, the Court ordered Defendants to "undertake good-faith efforts … to expeditiously process and adjudicate DV-2020 diversity visa and derivative beneficiary applications and issue or reissue diversity and derivative beneficiary visas to eligible applicants by September 30, 2020 …." *Id*. at 84. The PI Order further states, "this order does not prevent any embassy personnel, consular officer, or administrative processing center from prioritizing the processing, adjudication, or issuance of visas based on *resource constraints, limitations due to the COVID-19 pandemic, or country conditions*." *Id*. (emphasis added).

2

Pertinently, this Court directed the Department of State ("the Department") to report on its progress implementing the PI Order, specifically requesting information on "which of the named DV-2020 Plaintiffs in this action have received diversity visas, the status of processing of the named DV-2020 Plaintiffs' applications who have not yet received visas" and "the number of unprocessed DV-2020 visa applications and unused diversity visas remaining for Fiscal Year 2020." ECF No. 123 at 84. Accordingly, the Government hereby reports: (1) the number of cases associated with named DV-2020 Plaintiffs in which diversity visas were issued; (2) the status of processing of the named DV-2020 Plaintiffs' applications who have not yet received visas; and (3) the number of unprocessed DV-2020 visa applications and unused diversity visas remaining for Fiscal Year 2020. The Government also reports on the Department's resource constraints, limitations due to COVID-19, and country conditions, as well as the good faith efforts in implementing the PI Order undertaken by the Kentucky Consular Center (KCC), the Department's Visa Office, and the consular sections abroad.

**A.      Status of DV-2020 Applications.**

*Named DV-2020 Plaintiffs Who Have Received Diversity Visas.* Between September 5, 2020, and September 21, 2020, consular officers issued 122 diversity visas[1] to the principal applicants in the cases associated with named Plaintiffs. Declaration of Laura Chamberlin, ("Chamberlin Decl.") ¶ 25.  In that same period, consular officers issued a total of 1,009 diversity

---

[1] The Department's visa processing software primarily tracks cases by case number rather than by individual applicants. *See* Chamberlin Decl. ¶ 14. In fact, the Department's systems do not populate adjudication records for derivative applicants associated with a case until after the case is transferred to post. *See* Chamberlin Decl. ¶ 14.  For these reasons, this report will focus on cases or family units when discussing Plaintiffs, rather than individual applicants. Once the principal applicant has established visa eligibility, all of the derivative applicants will receive a visa after they establish eligibility.

visas, which includes the 122 diversity visas referenced above. Declaration of Brenda L. Grewe ("Grewe Decl.") ¶ 4.

***Status of processing of the named DV-2020 Plaintiffs' applications who have not yet received visas***. The Department determined that the named plaintiffs in the consolidated actions are associated with 425 diversity visa cases. *See* Chamberlin Decl. ¶ 18. As of September 21, 2020, the Department has transferred to a consular section and scheduled interviews for 422 of these 425 cases and transferred to U.S. Citizenship and Immigration Services one case for a Plaintiff who sought to adjust status in the United States. *See* Chamberlin Decl. ¶ 18; Declaration of Morgan D. Miles ("Miles Decl.") ¶¶ 4, 19. Moreover, of the 422 cases transferred to consular sections, all but five have either been interviewed or have interviews scheduled between now and September 30, 2020. *See* Chamberlin Decl. ¶ 24.[2] That leaves only two cases, or less than one-half of one percent, that could not be scheduled because the DV selectees never completed the DS-260, and thus could not be transferred to a consular post. *See* Miles Decl. ¶ 19.

As of Monday, September 21, consular officers issued visas to principal applicants in 122 of the 425 cases and refused visas to principal applicants in 128 of those 425 cases. Chamberlin Decl. ¶¶ 25-26. None of those refusals was under Presidential Proclamation 10014 or under the COVID-19 Regional Proclamations (9984, 9992, 9993, 9996, and 10041). *Id*., ¶ 26.

***Number of unprocessed DV-2020 visa applications and unused diversity visas remaining for Fiscal Year 2020***. The Department reports that the total number of diversity immigrant visas

---

[2] The Department's preference is to schedule and interview all applicants associated with a case at the same time. However, it is still possible that some applicants associated with a case are not scheduled or interviewed at the same time or even in the same place, but generally when family members associated with a case do not apply together it is for reasons beyond the Department's control.

issued so far during Fiscal Year 2020 is 12,641[3] of the 55,000 diversity visas allocated for Fiscal Year 2020, or roughly 23 percent.  *See* Grewe Decl. ¶¶ 3-4, 8.

***Comparison with FY2019***.  The Department believes it may help the Court evaluate the impact of the pandemic on the Department's ability to adjudicate visa applications generally by providing statistical information from Fiscal Years 2019 and 2020, including whole year totals (totals to date for 2020) and totals from October 1, the start of the fiscal year, until March 20, the date in 2020 when the Department of State suspended routine visa services in response to the global COVID-19 pandemic. *See generally* Grewe Decl.

In addition to providing statistics for diversity visa applicants, the Department includes information on two other numerically limited categories, first family preference immigrant visas (F-1) for an adult son or daughter of a U.S. citizen and the second family preference immigrant visas for a child of a lawful permanent resident (F-2A).  Presidential Proclamation 10014 did not grant F-1 or F-2A visa applicants a categorical exception.  For contrast, the Department will also present statistical information on immigrant visa applicants who were the spouses or children of U.S. citizens applying in the immediate relative classifications (IR-1 for spouses and IR-2 for children).  The IR-1 and IR-2 categories are not numerically limited and benefitted from a categorical exception in Presidential Proclamation 10014.

These statistics demonstrate the impact of the pandemic on State's overall visa operations; that diversity visa processing in Fiscal Year 2020 was roughly equivalent to Fiscal Year 2019 through March 20, 2020; that there was a steep drop off after March 20 in all visa categories reported, even the IR-1 and IR-2 categories which benefitted from a categorical exception under

---

[3] USCIS may have issued additional diversity visas.

PP 10014; and that in numerically limited categories the reduction in total use of the visa numbers for diversity visas for 2020 is not unique.

**Fiscal Year 2019.** As a baseline, the Department reports that from October 1, 2018, until September 30, 2019, consular officers issued[4]:

- 44,882 diversity visas[5]
- 20,858 first family preference immigrant visas (F-1)
- 63,890 second family preference immigrant visas (F-2A)
- 58,984 immediate relative (spouse) immigrant visas (IR-1)
- 32,283 immediate relative (child) immigrant visas (IR-2)

For those same categories, the Department reports that between October 1, 2018, until March 20, 2019, consular officers issued[6]:

- 12,897 diversity visas
- 10,711 F-1 immigrant visas
- 35,991 F-2A immigrant visas
- 27,988 IR-1 immigrant visas
- 16,633 IR-2 immigrant visas

**Fiscal Year 2020.** From October 1, 2019 through September 19, 2020, the Department reports that consular officers issued:[7]

- 12,641 diversity visas
- 7,530 F-1 immigrant visas
- 26,155 F-2A immigrant visas
- 37,054 IR-1 immigrant visas
- 18,400 IR-2 immigrant visas

For those same categories, the Department reports that between October 1, 2019, until March 20, 2020, consular officers issued:[8]

---

[4] *See* Grewe Decl. ¶ 6.
[5] Including visa numbers used in association with adjustments of status by USCIS will result in a higher total number.
[6] *See* Grewe Decl. ¶ 7.
[7] *See* Grewe Decl. ¶ 8
[8] *See* Grewe Decl. ¶ 9

- 11,023 diversity visas
- 7,426 F-1 immigrant visas
- 25,639 F-2A immigrant visas
- 30,434 IR-1 immigrant visas
- 14,667 IR-2 immigrant visas

The Department believes that these statistics demonstrate the impact the COVID-19 pandemic had on the total number of diversity and other immigrant visas issued during Fiscal Year 2020. The issuance statistics from Fiscal Year 2019 and the first half of Fiscal Year 2020 illustrate the Department's total capacity to process diversity and other immigrant visa categories under normal conditions. Diversity visa issuances through nearly the first half of Fiscal Year 2020 were roughly 86 percent of the issuances during the same period in Fiscal Year 2019, which covers a period where the COVID-19 pandemic was already affecting operations in many parts of the world. Likewise the other categories represented show comparable usage from one fiscal year to the next. Compared to Fiscal Year 2019, consular officers in the first half of Fiscal Year 2020 issued roughly 70 percent the amount of F-1 visas, 71 percent of F-2A visas, an eight percent increase in IR-1 visas, and a 12 percent increase in IR-2 issuances. After March 20, 2020, there was a steep drop-off in all immigrant visa categories, even those that are not numerically limited by statute and for which Proclamation 10014 provides a categorical exception.

While total diversity visa number usage is currently about 23 percent of the annual limit provided by Congress, visa number usage will likewise fall short for other numerically limited categories in Fiscal Year 2020. The Department estimates that in Fiscal Year 2020 it will issue approximately 7,555 of the 23,400 visa numbers allocated for the F-1 category, or 32.3 percent of this year's F-1 annual limit. By comparison in Fiscal Year 2019, consular officers issued 20,858 F-1 visas, or 89.1 percent of the total allocation. The Department estimates it will use 26,180 F-2A visas in Fiscal Year 2020, which represents 29.8 percent of the total allocation of 87,934. In

Fiscal Year 2019, the Department records 63,890 of the allotted 87,934 were used, which is 72.7 percent.

### B.  Department's Good Faith Efforts to Comply with the PI Order.

To put into context the Department's efforts to comply with the PI Order, a brief explanation of the Department's systems and processes used for diversity visa case management is necessary.  Because the PI Order required the Department to process cases in a way it does not normally and required direct oversight of individual cases being scheduled by consular sections to ensure compliance, the Department had to develop new business processes for prioritizing Plaintiffs and tracking their cases.  *See* Chamberlin Decl. ¶ 14.

First, in the normal course of business, the primary consideration with diversity visa processing is rank number.  The Immigration and Nationality Act requires as the "order of consideration" for diversity visas that they be processed "strictly in a random order established by the Secretary of State for the fiscal year involved." 8 U.S.C. § 1153(e)(2).  The Department assigns all qualifying entries a random rank ordering using standard computer software.  *See* Miles Decl. ¶ 3; 22 CFR § 42.33.  As the PI Order required the Department to prioritize Plaintiffs regardless of rank order, the Department had to develop new processes to comply.  *See* Miles Decl. ¶ 10.

Second, while the Department oversees global visa operations, scheduling decisions are made and managed locally.  *See* Chamberlin Decl. ¶ 14.  Other than the scheduling management process that exists for moving a diversity visa case from the Kentucky Consular Center (KCC) to the overseas consular section processing the application, the Department's systems do not report scheduling actions taken at post-by-post level.  *See* Chamberlin Decl. ¶ 14.  Thus, staff in the Department's Visa Office were not able to monitor scheduling decisions through an existing system and had to develop new processes with consular sections, most of which are operating in

time zones that are six to sixteen hours ahead of Washington and many of which are operating with limited resources due to the COVID-19 pandemic. *See* Chamberlin Decl. ¶¶ 15-16, 19-22.

Third, the Department's visa processing software primarily tracks cases by case number rather than by individual applicants. *See* Chamberlin Decl. ¶ 14. In fact, the Department's systems do not populate adjudication records for derivative applicants associated with a case until after the case is transferred to post. *See* Chamberlin Decl. ¶ 14. For that reason, this report focused on cases or family units, rather than individual applicants. Where relevant, the Department manually counted individual applicant outcomes to give the Court a clear understanding of the results of the Department's efforts since September 4.

### 1. Summary of Resource Constraints, Limitations Due to the COVID-19 Pandemic and Country Conditions

#### i. Resource Constraints

**American Citizens Services.** The highest priority of the consular sections in U.S. embassies and consulates abroad is securing and promoting the safety and well-being of U.S. citizens and their interests abroad. *See* Declaration of Josh Glazeroff ("Glazeroff Decl.") ¶ 2. All consular sections provide what are called American Citizens Services, which includes a range of services such as welfare and whereabouts checks, death- and estate-related services, administering emergency financial and medical assistance programs, services related to arrest and detention, including prison visits, international judicial assistance, certain federal benefit services on behalf of other government agencies, citizenship services including adjudications of applications for passports and Consular Reports of Birth Abroad, and many others. *See id.* ¶ 2. Not all consular sections provide visa services. Even before the COVID-19 pandemic emerged, demand for these American Citizens Services was increasing, and in response to the pandemic the Department

provided record-breaking repatriation services due to the COVID-19 pandemic for 101,386 U.S. citizens on 1,140 flights from 136 countries by June 2020. *See id.* ¶ 2.

**Staffing Issues.** In addition to increased demand for consular officers to provide American Citizens Services in 2020, the COVID-19 pandemic has contributed to a worldwide staffing shortage of officers in consular sections. The Bureau currently has 1,966 authorized, full-time employee direct-hire American positions assigned to U.S. embassies and consulates (including vacant positions). *See id.* ¶ 5. As of September 11, 2020, there are 220 positions that are not filled by an officer who is in country. For example, our consular section in Addis Ababa has only three out of 10 officer positions filled; Abu Dhabi has only six out of 12 filled; Djibouti has one position filled out of four. *See id.* ¶ 5. The consular section in Freetown currently has no consular officers. *See* Chamberlin Decl. ¶ 21.

**Budget.** Funding to support consular operations is directly tied to visa fee revenue, not annual appropriations. *See* Glazeroff Decl. ¶ 3. Even before the pandemic began the Department had experienced a dramatic reduction in nonimmigrant visa fee collections, the primary funding source for worldwide visa operations. Since the initial impact of the pandemic in February, weekly worldwide visa application fee collections in Fiscal Year 2020 dropped by almost 50 percent compared to Fiscal Year 2019. *Id.* ¶ 3. In Fiscal Year 2019, the Bureau generated $2.1 billion in visa application fees. As of August 2020, the Bureau's Office of the Comptroller projected visa fee collections of only $766 million in Fiscal Year 2020. *Id.* ¶ 3.

As a result of this unprecedented loss of revenue, the Bureau has limited the hiring of new consular officers and adjudicators, frozen overseas hiring, effectively eliminated the use of overseas temporary duty assignments to provide "surge" capacity, and imposed a wide range of budget cuts to include restrictions on overtime. *Id.* ¶ 4. In July 2020, the Bureau provided guidance

to consular sections that they are not expected to resort to overtime or longer shifts to try to resolve the backlog in visa applicants caused by various COVID-19-related closures and reduced operations. *Id.* ¶ 4.

**Not All Consular Sections Can Adjudicate Diversity Visa Applications.** During normal periods of operations, there are approximately 223 consular sections that adjudicate visa applications. *See* Chamberlin Decl. ¶ 19. Of those 223 consular sections, only 136 are set up to process immigrant visa applications with some posts such as Nairobi, Dakar, Ciudad Juarez, and Guangzhou serving as the designated immigrant visa processing post for a region or country. *See id.* The consular sections that do not process immigrant or diversity visas are not equipped to do so and it would not be possible to start processing immigrant visas without extensive planning. Glazeroff Decl. ¶ 7. Those consular sections do not have the technology and information systems configured to process immigrant visa applications nor do they have staff – either local staff or U.S. consular officers – with the necessary expertise to prepare and adjudicate immigrant visa applications. *Id.* Additionally, every immigrant visa case requires a medical exam completed by an approved panel physician. While most consular sections have a designated panel physician who agrees to provide medical examinations of visa applicants, some panel physicians typically only conduct examinations for non-immigrant visa applicants. Like everyone else, panel physicians have been impacted by COVID-19 and some may have limited capacity or not be operational at this time. *Id.*

    **ii.**  **Limitations Due to the COVID-19 Pandemic or Country Conditions**

Many external factors beyond the Department's control affect consular sections' ability to operate at full or even partial capacity. The following posts currently cannot adjudicate new diversity visa applications: La Paz, Tashkent, Freetown, Rangoon, Kabul, Havana, and Baghdad.

*See* Chamberlin Decl. ¶ 21. These closures illustrate the many variables from country conditions and the COVID-19 pandemic to resource constraints that impact a consular section's ability to process cases. *See id.* For example, Freetown currently has no consular officers at post; due to injuries sustained by U.S. diplomatic staff in Havana, visa processing for Cuban immigrant visa applicants is presently taking place in a third country; Baghdad's consular waiting room was rendered unusable in the December 19, 2019, attack on the embassy; and Rangoon has had recent COVID cases among embassy staff leading to mandatory 100 percent telework while the embassy is cleaned and contacts are traced. *See id.*

To varying degrees and in accordance with local constraints, all other consular sections that process immigrant visas are adjudicating diversity visa applications. *See id.* However, these consular sections are limited in a variety of ways as illustrated by the following examples (this is not an exhaustive list and is intended to give a sense of the scale and numbers of obstacles):

- Argentina, Colombia, Japan, Paraguay, Peru, South Africa, and Uruguay are among posts with borders closures;

- The United Arab Emirates, Georgia, and India are examples of countries where the host government requires 14 days of quarantine upon arrival;

- The Consulate General in Frankfurt is working to assist with overflow cases from other posts, but the German government only allows arrivals from EU member states;

- The Regional Security Officer and Medical Office responsible for the embassy and consulates in Turkey have determined that local conditions are not sufficiently favorable to permit entry in consular sections to individuals who have not been in Turkey for the prior 14 days (such decisions related to post safety and security are made routinely by responsible officers serving at those posts and are unrelated to U.S. immigration issues);

- The Emergency Action Committees, an interagency or interoffice working group within a U.S. diplomatic mission responsible for addressing emergent safety and security threats, in Bulgaria and Georgia have determined that local conditions require consular customers, just like new staff members arriving to work at those missions, to quarantine for 14 days upon entering the country.

- In Angola there is currently no functioning lab to handle required medical tests. All tests have to be sent to Portugal, adding considerable processing time to those cases.

- Posts in Canada have reported delays in the postal service that have extended case timelines; and

- In Macedonia, post's only consular officer is on medical isolation due to close contact with another consular employee who tested positive with COVID-19. Post's back-up consular officers have no experience processing immigrant visas and, therefore, are unable to processes diversity visas. Current post safety protocols as determined by post's Emergency Action Committee only allow a total of seven consular applicants per day. Also, the lone panel physician in Macedonia has limited patients seeking medical exams to four per day. Panel physicians are not U.S. government employees. Consular sections have agreements with private practitioners who agree to provide medical examinations of visa applicants consistent with the Centers of Disease Control's technical instructions.

Chamberlin Decl. ¶ 22.

### 2. Good Faith Efforts by the KCC

As soon as KCC learned about the PI Order, it immediately began to work with the Visa Office over the Labor Day Weekend on planning for compliance with the order. *See* Miles Decl. ¶ 10. After first meeting with other Department officials to devise guidance for posts, KCC focused its efforts on identifying Plaintiffs to prioritize the scheduling of those cases for interviews at consular sections as well as scheduling any other cases at posts that had additional capacity in accordance with the PI Order. *See id.* ¶¶ 10, 18. Indeed, KCC's priority – including at the managerial level – since becoming aware of the court's order on September 5 has been working document review and scheduling DV 2020 cases. *See id.* ¶ 21. KCC managers are working on production tasks and the KCC Acting Director has spent the majority of his time since the PI Order was issued coordinating with the Visa Office and posts about appointment schedules and consular sections' capacity. *See id.*

**Identifying Plaintiffs.** On September 8, officials at the Department sent KCC a master spreadsheet with a list of named Plaintiffs in the *Gomez, Aker, Mohammed,* and *Fonjong* cases.

13

*See* Miles Decl. ¶ 11; Chamberlin ¶ 11.  Department staff in the Visa Office and KCC have access to and update this document, tracking the status of each case.  *See* Chamberlin ¶ 16.  Upon receiving the spreadsheet, KCC immediately began to add information to help in scheduling Plaintiffs such as the intended location of the interviews for each plaintiff, case numbers, contact information, nationality, and other fields that would help in scheduling Plaintiffs.  *See* Miles Decl. ¶ 11.  Because several entries contained errors that made it difficult to identify the cases associated with Plaintiffs, KCC had to run queries to eliminate duplicates, misspelled names, typos in case numbers, and selectees for the 2021 Diversity Visa Program.  *See* Miles Decl. ¶ 11.

**Document Review.**  Once KCC had a master spreadsheet of the plaintiffs, it focused its efforts on ensuring that document review for the plaintiffs was complete.  Generally, when KCC confirms that an applicant has submitted all the necessary documentation, the case is deemed "documentarily qualified," and the applicant may be scheduled for a visa interview at a consular section.  *See* Miles Decl. ¶ 4.  By September 9, KCC completed all document review for all of the plaintiffs' cases.  *See* Miles Decl. ¶ 17.  KCC also proactively reached out to any plaintiffs who were not yet documentarily qualified to let them know their packets were not complete.  *See Id.* ¶ 12.

**Scheduling.**  Next, the master spreadsheet was made available to all consular sections so that they could look for plaintiffs who would interview in their consular section or nearby.  *See* Miles Decl. ¶ 13.  KCC received inquiries directly from posts as they located eligible cases, and they were scheduled as KCC reviewed them.  *Id.* ¶ 13.  The KCC contractors working on correspondence proactively used the search function to find plaintiff-relevant inquiries in the thousands of emails it received daily after the order was made public.  *Id.* ¶ 12.

By September 8, KCC was working with the Visa Office to gather information about the posts where plaintiffs had intended to interview in order to determine if they could be scheduled at the intended post. *Id.* ¶ 12; Chamberlin Decl. ¶ 17. KCC also needed information about other consular sections that might be able to take transfer cases as many consular sections could not provide even emergency visa services. *See* Miles Decl. ¶ 12; Chamberlin Decl. ¶ 17. As soon as KCC verified that a consular section could accept a plaintiff's case, KCC scheduled the case and transferred the electronic files to the designated consular section. *See* Miles Decl. ¶ 12.

Moreover, KCC requested that plaintiffs' counsel provide three rank-ordered alternate posts for individual Plaintiffs in the event that they would not be able to interview at their designated processing post. *Id.* ¶ 14. The reason for this request was to efficiently locate a place where they could interview based on their current location and ability to travel. *Id.*

While scheduling cases for interview and transferring them to posts, KCC continued to update the master spreadsheet with new information from Plaintiffs and their counsel including additions and deletions, incorrect case numbers, and alternate processing posts. *Id.* ¶ 15. KCC has also tracked when applicants were scheduled so that KCC and the Visa Office could monitor progress. *Id.* There were several large additions of entries as KCC continued to receive new names and case numbers from the attorneys. *Id.*

The Visa Office continued to provide information from posts on their local operating conditions and contributed notes about individual applicants who had provided information while KCC scheduled and confirmed the status of individual cases. *See* Miles Decl. ¶ 16; Chamberlin Decl. ¶ 17. Once cases were initially scheduled and transferred to post, KCC computer systems can no longer track its status. *See* Miles Decl. ¶ 16. At that point, the Visa Office was responsible for looking at Plaintiffs and other diversity visa cases that could be transferred between posts for

interviews. *Id.* Nonetheless, KCC assisted them by compiling information from its public inquiry emails and phone lines. *Id.*

On September 15, KCC scheduled even the named plaintiff cases that were not documentarily complete in order to let consular adjudicators review the physical documents and determine if the applications were issuable. *See* Miles Decl. ¶ 17. As of September 18, the only two Plaintiffs who were not scheduled for document issues were those who never submitted a DS-260 visa application, and KCC sent emails to both notifying them that their packets were not complete. *Id.*

While prioritizing the scheduling of named plaintiff cases, KCC also scheduled non-plaintiff cases. *Id.* ¶ 18. If there was capacity in a consular district that could not accept transfers of Plaintiffs from other posts because of closed borders or local restrictions unrelated to the COVID-19 Regional Proclamations, we began to fill that capacity with non-Plaintiffs from the 2020 program year who were believed to already be in that consular district. *Id.* The intent was to prioritize the cases as directed in the PI Order, but not to leave capacity unused because higher priority cases could not travel to a location where there was capacity. *Id.*

### 3. Good Faith Efforts By State Department's Visa Office and its Consular Sections Abroad

The Office of Field Operations, which is comprised of one Office Director, three Division Chiefs, and 24 visa analysts, divides up responsibility regionally and functionally, with each visa analyst covering a given number of countries and functional topics, like DVs. *See* Chamberlin Decl. ¶ 11. Before September 4, there was one visa analyst and one Division Chief responsible for providing guidance to posts regarding diversity visas. *Id.* Under the supervision of the Division Chief, that analyst's job was to provide general oversight of the Department's DV program, including operation of the lottery from entry to selection, and to respond to any questions from

consular officers adjudicating diversity visa applications based on guidance in the Foreign Affairs Manual. *Id.*

Since September 4, a team of four visa analysts have worked full time on the diversity visa portfolio to ensure compliance with the PI Order. *Id.* ¶ 12. To that end, they are in regular contact with consular posts to (1) gather data on posts' operating capacity to identify posts that can process more cases as well as those that are limited by resource constraints, local conditions, and health safety concerns stemming from the global pandemic; (2) gather data regarding scheduled interviews and adjudications to update the master spreadsheet regarding named Plaintiffs; (3) answer questions from consular officers processing diversity visa applications; and (4) investigate and resolve issues raised by Plaintiffs' counsel. *Id.* All three Division Chiefs and the Office Director have also worked to provide guidance to consular officers adjudicating diversity visa applications, to update outreach materials, and to coordinate with the KCC in determining how best to match posts' capacity with applicants' needs. *Id.*

As stated above, the Visa Office worked closely with KCC to update the master spreadsheet with information regarding the scheduling of named Plaintiffs. *Id.* ¶ 16. The Department also tracked consular sections' capacity to process diversity visas and any limitations based on resource constraints, local conditions, and health and safety concerns. *Id.* ¶ 17. To that end, visa analysts regularly communicated with consular sections regarding local travel restrictions, staffing shortages, or any other factor that affected consular sections' capacity so that the Visa Office and KCC could work together to determine where Plaintiffs' who were unable to interview at their designated post could be scheduled or transferred. *Id.*

> **4. The Department's Continued Implementation of Other Presidential Proclamations Not Addressed by the Court's Order is a Good Faith Effort to Comply Both with the Court's Order and Relevant Statutory Requirements**

17

As a result of the September 4 PI Order and September 14 amended order, the Department is not applying 8 U.S.C. § 1182(f) as a basis for visa refusal for DV-2020 applicants subject to Presidential Proclamations 10014 or 10052, or to the five Regional COVID-19 Proclamations (9984, 9992, 9993, 9996, and 10041). However, absent a subsequent order by the court, the Department believes it is legally obligated to continue to implement any other applicable Presidential Proclamations, including Presidential Proclamations 9645, 82 Fed. Reg. 45,161 (Presidential Proclamation Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats) and 9983, 85 Fed. Reg. 6,699 (Improving Enhanced Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats). The Department is prepared to provide additional briefing on this issue that explains the Department's legal position regarding the application of restrictions under section 1182(f) to visa issuance should the Court find it helpful.

**C.    Conclusion**

The Court in its PI Order required the Department to provide this report, noting that it was "declin[ing] Plaintiff's request to order Defendants to reserve unprocessed DV-2020 visas past the September 30 deadline or until a final adjudication on the merits" but would "revisit the issue closer to the deadline." ECF No. 123 at 84. The Department respectfully submits this report and believes it reflects not just good faith efforts, but extraordinary efforts to comply with the PI Order. If after reading this report the Court is still considering Plaintiffs' request to reserve unprocessed DV-2020 visas past the September 30 deadline, the Department respectfully request to opportunity to brief that specific issue.

| | |
|---|---|
| September 21, 2020 | JEFFREY BOSSERT CLARK<br>Acting Assistant Attorney General, Civil Division<br><br>WILLIAM C. PEACHEY<br>Director, Office of Immigration Litigation, District Court Section<br><br>COLIN A. KISOR<br>Deputy Director<br><br>GLENN M. GIRDHARRY<br>Assistant Director<br><br>*/s/ James J. Wen*<br><br>Trial Attorney<br>U.S. Department of Justice, Civil Division<br>Office of Immigration Litigation<br>District Court Section<br>Washington, D.C. 20044<br>(202) 532-4142<br>James.J.Wen@usdoj.gov<br><br>*Attorneys for Defendants* |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2020, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ James J. Wen*
Trial Attorney