# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOMINGO ARREGUIN GOMEZ, et al.,<br>　　　　　　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>DONALD J. TRUMP, et al.,<br>　　　　　　　　　　Defendants. | Civil Action No. 1:20-cv-01419 |
| MOHAMMED ABDULAZIZ ABDUL<br>MOHAMMED, et al.,<br>　　　　　　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>MICHAEL R. POMPEO, et al.,<br>　　　　　　　　　　Defendants. | Civil Action No. 1:20-cv-01856 |
| AFSIN AKER, et al.,<br>　　　　　　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>DONALD J. TRUMP, et al.,<br>　　　　　　　　　　Defendants. | Civil Action No. 1:20-cv-01926 |
| CLAUDINE NGUM FONJONG, et al.,<br>　　　　　　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>DONALD J. TRUMP,<br>　　　　　　　　　　Defendants. | Civil Action No. 1:20-cv-02128 |

**PLAINTIFFS' JOINT SUBMISSION REGARDING FURTHER RELIEF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 3

I.      THIS COURT HAS INHERENT AND EQUITABLE POWER TO GRANT
        FURTHER RELIEF............................................................................................................ 3

        A.      Case Law Supports This Court's Inherent And Equitable Authority To
                Protect Diversity Visa Selectees From Defendants' Unlawful Actions ............... 3

        B.      Defendants' Unlawful Conduct Necessitates Equitable Relief Here..................... 9

II.     SCOPE OF RELIEF ........................................................................................................ 14

CONCLUSION......................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. DHS,*
    328 F.3d 383 (7th Cir. 2003) ....................................................................8

*Almaqrami v. Pompeo,*
    933 F.3d 774 (D.C. Cir. 2019) ..................................................3, 4, 6, 7, 8, 9, 11

*Almaqrami v. Tillerson,*
    304 F. Supp. 3d 1 (D.D.C. 2018) ..............................................................6

*American Hosp. Ass'n v. Price,*
    867 F.3d 160 (D.C. Cir. 2017) ..................................................................7

*Coraggioso v. Ashcroft,*
    355 F.3d 730 (3d Cir. 2004) ....................................................................8

*Iddir v. I.N.S.,*
    301 F.3d 492 (2002) ..........................................................................7, 8

*I.N.S v. Pangilinan,*
    486 U.S. 875 (1988) ..........................................................................7

*Keli v. Rice,*
    571 F. Supp. 2d 127 (D.D.C. 2008) ............................................................8

*Paunescu v. I.N.S,*
    76 F. Supp. 2d 896 (N.D. Ill. 1999) ..........................................4, 5, 6, 7, 8, 9, 11

*Peacock v. Thomas,*
    516 U.S. 349 (1996) ..........................................................................4

*P.K. v. Tillerson,*
    302 F. Supp. 3d. 1 (D.D.C. 2017) ............................................4, 5, 6, 7, 9, 11, 18

*Przhebelskaya v. U.S.C.I.S.,*
    338 F. Supp. 2d 399 (E.D.N.Y. 2004) ..........................................5, 6, 7, 9, 11

*Smirnov v. Clinton,*
    806 F. Supp. 2d 1 (D.D.C. 2011) ..............................................................15

*In re Thornburgh,*
    869 F.2d 1503 (D.C. Cir. 1989) ................................................................7

## TABLE OF AUTHORITIES
(continued)

Page(s)

**Statutes**

5 U.S.C. § 555(b) ............................................................................................................3

5 U.S.C. § 706(2) .......................................................................................................3, 10

8 U.S.C. § 1151(e) .........................................................................................................14

8 U.S.C. § 1182(a) ...........................................................................................................3

8 U.S.C. § 1182(f) ..........................................................................................................12

8 U.S.C. § 1201(g) .....................................................................................................3, 10

8 U.S.C. § 1202(b) ...........................................................................................................3

8 U.S.C. § 1255 ................................................................................................................4

**Other Authorities**

136 Cong. Rec. H-8629-02 (1990) ................................................................................14

9 FAM 504.10-5(A) .......................................................................................................18

Chloe Stepney, *After 'painful' blunder, green card lottery results released today*,
     Christian Science Monitor (July 15, 2011) .............................................................15

Report of the Visa Office 2007, Table VII, Immigrant Number Use for Visa
     Issuances and Adjustments of Status in the Diversity Immigrant Category
     1998-2007 ................................................................................................................15

Report of the Visa Office 2016, Table VII, Immigrant Number Use for Visa Issuances and
     Adjustments of Status in the Diversity Immigrant Category Fiscal Years 2007-
     2016...........................................................................................................................15

## INTRODUCTION

Plaintiffs in *Gomez*, *Mohammed*, *Aker*, and *Fonjong* jointly and respectfully submit that this Court has inherent and equitable authority to grant effective relief both to the named Plaintiffs in these cases, and to the tens of thousands of other DV-2020 Selectees whom Defendants have deprived of the opportunity to obtain diversity visas through unlawful policies that this Court has already enjoined.  Courts around the country recognize that federal judges have the power to give practical effect to their orders.  And the courts have repeatedly and unanimously applied this straightforward principle to provide a remedy to diversity-visa applicants faced with a federal agency that is unwilling or unable to meet the statutory deadline for visa issuance.  The *only* prerequisite that the courts have adopted is that the applicant must seek and obtain some form of judicial relief before the end-of-fiscal-year deadline.  Plaintiffs have done that here.  Equitable relief is accordingly available to protect Plaintiffs and class members from the undisputed and "severe emotional, economic, educational, and personal harms that they and their families will imminently experience if … they permanently lose their opportunity to immigrate to the United States through the diversity visa program."  ECF 123, at 75.

The Government's enforcement of its unlawful policies for nearly six months, and its inability to make full amends for its past legal violations over the last three weeks, fully justify invocation of the Court's inherent and equitable authority in this case.  Between March 20 (when the State Department first implemented its arbitrary and capricious COVID-19 Guidance) and September 9 (when the State Department began implementing this Court's September 4 Order), Defendants unlawfully barred adjudication of DV-2020 Selectees' visa applications.  And since the Court's Order went into effect, Defendants have continued to impair such adjudications through a raft of new and irrational policies and practices, one of which the Court has already enjoined after an emergency hearing.  Unless the Court grants relief as requested herein, many of

the named Plaintiffs, and virtually all of the proposed class of worldwide DV-2020 Selectees, will be denied visas on account of policies that the Court has already enjoined—and others adopted after the fact to procure the same unlawful effect.  Without relief, this Administration will succeed in illegally canceling almost three-quarters of the 2020 diversity visa program.  And, perversely, the Administration would achieve that unlawful policy goal by pointing to a statutory deadline that Defendants knowingly and unreasonably disregarded for six months.

Plaintiffs respectfully submit that the appropriate remedy is to direct the State Department to reserve (and to adjudicate) enough visas to make up for a reasonable estimate of the shortfall between the number of diversity visas that ought to have issued in fiscal year ("FY") 2020 and the number of visas that actually have issued.  Plaintiffs further respectfully submit that a reasonable estimate of that figure is 30,000 additional visas (beyond those issued prior to this filing), which would bring the total number of 2020 diversity visas (including the 15,401 that have issued to date) to approximately 45,401.  That proposed total figure is below average, but within the range of the number of diversity visas that have been issued in past years.  Plaintiffs also estimate that 30,000 additional visas could reasonably be processed within the next five months (by the end of February 2021):  The State Department ordinarily can process some 8,000 diversity visas per month, so five months should be more than enough time to process 30,000 such visas.  While Plaintiffs recognize that the pandemic imposes limitations on visa processing, Defendants should have excess diversity-visa processing capacity given that they are *not* processing many other categories of visas (due to the bans that remain in force).  And Plaintiffs respectfully submit that this proposed remedy befits the harm that Defendants have inflicted on Plaintiffs, class members, and the congressionally mandated diversity visa program writ large, without unduly burdening Defendants or the visa-processing system.

## ARGUMENT

## I.   THIS COURT HAS INHERENT AND EQUITABLE POWER TO GRANT FURTHER RELIEF

### A.   Case Law Supports This Court's Inherent And Equitable Authority To Protect Diversity Visa Selectees From Defendants' Unlawful Actions

In its September 4, 2020 Order, this Court ruled that Defendants' policy of refusing to issue diversity visas for 2020 Selectees—effectively extinguishing tens of thousands of individuals' opportunity to immigrate—is likely arbitrary, capricious, and contrary to the plain language of 8 U.S.C. §§ 1182(a) and 1201(g). *See* ECF 123, at 59-66; 5 U.S.C. § 706(2). The Court likewise ruled that Defendants had acted arbitrarily and capriciously in "excluding DV-2020 diversity visa applications from the categories of 'mission critical' visa services." ECF 123, at 73. Further, the Court ruled that "Defendants have unreasonably delayed processing … DV-2020 selectees' visa applications" (*id.* at 68), contravening Defendants' statutory duties to review and to adjudicate visa applications "within a reasonable time" (*id.* at 72 n.23 (quoting 5 U.S.C. § 555(b) and citing 8 U.S.C. § 1202(b))). Based on these rulings, and on the DV Plaintiffs' undisputed showing of irreparable harm (*id.* at 75-76), the Court ordered Defendants to "undertake good-faith efforts … to expeditiously process and adjudicate DV-2020 diversity visa and derivative beneficiary applications and issue or reissue diversity and derivative beneficiary visas to eligible applicants by September 30, 2020," and enjoined the unlawful policies that stood in the way of such adjudication (*id.* at 84; *see* ECF 132, at 6). The Court made clear that the relief that it granted is intended to "benefit all putative class members" who are seeking 2020 diversity visas. ECF 123, at 83.

Having issued an order granting relief to all DV-2020 Selectees, this Court has authority to enforce that order for the benefit of those Selectees who have yet not received relief. Indeed, as the D.C. Circuit has observed, Defendants themselves have elsewhere "acknowledge[d] that courts have th[e] power" under their equitable authority "to take steps to compel the issuance of diversity

visas, notwithstanding the end of [the relevant fiscal year]." *Almaqrami v. Pompeo*, 933 F.3d 774, 781 (D.C. Cir. 2019); *accord* ECF 53-1, at 14, *P.K. v. Tillerson*, No. 17-cv-1533 (D.D.C. Oct. 20, 2017) (Government acknowledging courts' "inherent power" to grant such relief); *see also Peacock v. Thomas*, 516 U.S. 349, 356 (1996) ("Without jurisdiction to enforce a judgment entered by a federal court, 'the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.'") (citation omitted).

Defendants' prior concessions are supported by an unbroken line of case law in this area. In *Paunescu v. I.N.S.*, 76 F. Supp. 2d 896 (N.D. Ill. 1999), for example, the district court ordered the Government to adjudicate a 1998 diversity visa application before the September 30 deadline, but the Government failed to do so. *Id.* at 898.[1]  The court found, just as this Court has found, that the defendants "owe[d] [the diversity visa applicants] a non-discretionary duty to complete the processing of their applications," that the applicants "had a right to have their applications adjudicated" before the end of the fiscal year, and that "defendants' failure to timely process their applications" deprived the applicants of that right.  *Id.* at 902-03.  The court ordered the Government "to process [the] applications and to grant [the applicants] all relief to which they would have been entitled had defendants processed their applications in a timely fashion"—even though the order compelling such relief was issued more than a year after the 1998 fiscal year had closed. *Id.* at 903.

---

[1] Technically the plaintiff in *Paunescu* sought an adjustment of status rather than a visa, because he was already present in the United States.  *See* 76 F. Supp. 2d at 898.  But the distinction makes no difference, because the adjustment of status was available only if the plaintiff was "eligible for a visa, and if a visa [was] available to him at the time his application [for adjustment of status was] filed."  *Id.* at 900 (citing 8 U.S.C. § 1255).

Likewise in *Przhebelskaya v. U.S.C.I.S.*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004), the district court had issued an order on September 24, 2003 compelling the Government to adjudicate a diversity visa application.  *See id.* at 402.[2]  When the Government failed to complete the adjudication, the court issued an order compelling adjudication of the applications after the fiscal-year deadline.  *See id.* at 406.  The court explained that "the expiration of the statutory deadline" did not "extinguish[] the [defendants'] obligation to comply with the court's order," and that where the court has ordered the Government to act on a diversity visa application, "the court has the power to vindicate its own order" by compelling post-deadline adjudication.  *Id.* at 403-04.

Most recently, Judge Chutkan relied on these prior cases to grant similar relief in *P.K. v. Tillerson*, 302 F. Supp. 3d. 1 (D.D.C. 2017).  In *P.K.*, the diversity visa selectees were subject to an executive order barring visa issuance to individuals from certain countries.  *See id.* at 3.  But the executive order's validity was subject to challenge in a case before the Supreme Court, and by its own terms, it was set to expire just before the September 30 deadline that year.  *Id*. at 3-5.  The plaintiffs sought a writ of mandamus to compel the State Department to process their diversity visa applications because otherwise, there would be little chance the Government could process thousands of applications in the few days remaining before the deadline.  *Id*. at 5-6.  To preserve the status quo pending resolution of the case before the Supreme Court, Judge Chutkan issued an order on September 29, 2017 directing the Government to "reserve … unused visa numbers for FY 2017 for processing following the Supreme Court's decision (should the Court rule in Plaintiffs' favor)."  *Id.* at 10.  Relying on *Paunescu* and *Przhebelskaya*, the court ruled that it had "equitable power to order the government to process visas, even though doing so would conflict

---

[2] As in *Paunescu*, the plaintiff in *Przhebelskaya* was present in the United States and so sought an adjustment of status rather than a visa, *see* 338 F. Supp. 2d at 400, but as explained that distinction makes no difference here.

with the statutory limitations on visa issuance," *id.* at 9, such that it could "order the State Department to process visas past the statutory deadline where Plaintiffs have sought relief prior to the end of the fiscal year, as Plaintiffs have here." *Id.* at 10. Thus, "[t]he statutory temporal … limitation[] on visa issuance do[es] not bar this court from ordering the State Department to reserve unused visa numbers for FY 2017 for future processing." *Id.* at 10-11.

In a later decision, *Almaqrami v. Tillerson*, 304 F. Supp. 3d 1 (D.D.C. 2018), Judge Chutkan reaffirmed that "[u]nder th[e] [prior] Order, the State Department was required to not merely reserve the unused visa numbers, but to do so for a specific purpose: the future processing of Plaintiffs' visa applications." *Id.* at 6. Although she found that the expiration of the challenged executive order mooted the case, Judge Chutkan reiterated that "if [the court] were to require the State Department's full compliance with [the] prior order, it would be within its 'inherent power to enforce prior orders' to do so," by ordering adjudication of diversity visa applications after the deadline. *Id.* at 6, 8.

On appeal, the D.C. Circuit unanimously ruled that Judge Chutkan's order directing reservation of visa numbers was plausibly within the district court's equitable power. *See Almaqrami*, 933 F.3d at 780-81. The D.C. Circuit reversed the district court's order dismissing the case as moot, ruling that "[i]t is … not 'implausible' that the district court … could rely on equity to take steps to compel the issuance of diversity visas, notwithstanding the end of FY 2017," including by "instructing the State Department to 'hold' … unused visa numbers for the purpose of enabling a later judicial judgment, which might require the government 'to process' plaintiffs' applications after any salient obstacles were removed." *Id.* at 781-82. The Court of Appeals ruled that the district court could plausibly issue a new judgment requiring the State Department to process the visa applications, and that "[l]ike in *Paunescu* and *Przhebelskaya*, such an order would give effect to the district court's prior directive, entered before the end of the selection FY, to

-6-

preserve an essential (and otherwise expiring) ingredient of relief." *Id.* at 782. The Court observed that where, as in this case and in *Almaqrami*, "the court grants *some* relief—but not the visa—before October 1…, the court might lawfully take steps [after October 1] to compel the government to process the plaintiff's application and issue her a diversity visa anyway." *Id.* at 780.[3]

Plaintiffs are aware of no decision holding the contrary—that a federal court, having ordered the Government to adjudicate diversity visa applications prior to the statutory deadline, nevertheless lacks equitable authority to order the reservation of visa numbers or to compel adjudication of diversity visas after the end of the fiscal year. Instead, courts have denied relief in situations where either the plaintiff or the court has not acted in time, so that no relief was granted before the fiscal year expired. *See, e.g.*, *Iddir v. I.N.S.*, 301 F.3d 492, 500-01 (7th Cir. 2002). But even those courts recognize that it is a "a different case" where, as here and as in *Paunescu* and *Przhebelskaya*, "the district court order[s] the [Government] to adjudicate [visa applications] *while* the [Government] maintained the statutory authority to issue the visas." *Id.* at 501 n.2 (citing

---

[3] Defendants may cite *American Hospital Ass'n v. Price*, 867 F.3d 160 (D.C. Cir. 2017), as they have elsewhere, to suggest that this Court cannot "require an agency to break the law" or to "render performance that is impossible." *Id.* at 167. But it is neither unlawful nor impossible to reserve visa numbers that by statute ought to have been processed in FY 2020. Nor is it unlawful or impossible for Defendants to comply with a court order requiring them to take action that they should already have taken. *Almaqrami* proves as much: If *American Hospital* had negated the courts' equitable authority as set forth in cases like *P.K.*, *Przhebelskaya*, and *Paunescu*, the plaintiffs' claim to equitable relief in *Almaqrami* would have been "implausible"—*viz.*, entirely foreclosed by binding precedent. The D.C. Circuit held the opposite. 933 F.3d at 781.

Defendants may also cite *I.N.S. v. Pangilinan,* 486 U.S. 875 (1988), for the proposition that lower courts cannot "disregard statutory and constitutional requirements and provisions" to "creat[e] a remedy in violation of law." *Id.* at 883 (citation omitted). But as the D.C. Circuit has explained, "[t]he only form of relief specifically disapproved by the *Pangilinan* Court was the lower courts' asserted 'power to make someone a citizen of the United States.' " *In re Thornburgh,* 869 F.2d 1503, 1517 (D.C. Cir. 1989) (citation omitted). The Supreme Court's holding does not extend to the courts' authority in *other* contexts to grant equitable relief and to give force to their own orders requiring adjudication of diversity visa applications. And again, if *Pangilinan* had foreclosed equitable relief of the type awarded in *P.K.*, *Przhebelskaya*, and *Paunescu*, the D.C. Circuit would have said so in *Almaqrami*. The Court of Appeals did not so hold.

*Paunescu*, 76 F. Supp. 2d at 902-03).  In this situation, the Government is "on notice to reserve visas and must complete the task, as ordered, before time expires.  Allowing the [Government] to claim inability to issue visas at that point would impinge the authority of the court."  *Id.*; *see, e.g.*, *Coraggioso v. Ashcroft*, 355 F.3d 730, 734 n.8 (3d Cir. 2004) (citing *Iddir* and *Paunescu* with approval; court might have afforded relief if petitioner had "sought relief prior to the expiration of the … fiscal year"); *Ahmed v. DHS*, 328 F.3d 383, 387 (7th Cir. 2003) (*Iddir* properly "recognized that the case would have been different if it had been filed before the end of the visa year, while the [Government] still had statutory authority to issue the visa, and if the district court had acted within that time period"); *Keli v. Rice*, 571 F. Supp. 2d 127, 135 (D.D.C. 2008) (Walton, J.) (drawing same distinction); *accord Almaqrami*, 933 F.3d at 780 (discussing this distinction and stating that where "[t]he plaintiff files suit and the court grants some relief—but not the visa— before … the selection FY has ended, the court might lawfully take steps to compel the government to process the plaintiff's application and issue her a diversity visa anyway").

Unanimous authority thus establishes this Court's power to grant equitable relief before the expiration of the fiscal-year deadline, including an order to reserve visa numbers for the named Plaintiffs and other DV-2020 Selectees, and to issue orders after the deadline to give force to that relief.[4]

In the event that the Court nevertheless has doubts regarding its authority to order Defendants to reserve visa numbers for processing after the end of the fiscal year, Plaintiffs respectfully submit that the Court should resolve those doubts in favor of granting relief.  Granting relief before September 30 would preserve the status quo, and Defendants would be entitled to

---

[4] *Mohammed* and *Fonjong* Plaintiffs do not join in any arguments contained within this submission that advocate for or advance the interests of 2020 DV selectees who are not named Plaintiffs in the *Mohammed*, *Aker*, *Gomez*, and *Fonjong* consolidated cases.

appeal the decision—allowing the Court of Appeals to resolve the question on the merits.  But if this Court were to *refuse* an order compelling reservation of visa numbers before September 30, the Court of Appeals might conclude that it lacks authority to grant such relief after the deadline. *Cf. Almaqrami*, 933 F.3d at 780 (outlining similar distinction).  The result could be to foreclose appellate review of the merits of this important issue, and to deprive tens of thousands of DV-2020 Selectees of the possibility of relief even if the D.C. Circuit concludes that Plaintiffs are correct on the merits.  This Court should grant relief for this reason as well.

### B.    Defendants' Unlawful Conduct Necessitates Equitable Relief Here

This Court should exercise its equitable authority to order reservation of visa numbers for DV-2020 Selectees so that their applications may be adjudicated after September 30.  *Paunescu* and *Przhebelskaya* establish that equitable relief is warranted where the Government has failed to complete steps necessary to fulfill its obligation to adjudicate diversity visa applications within a reasonable time.  *See Przhebelskaya*, 338 F. Supp. 2d at 402 (failure to complete background check); *Paunescu*, 76 F. Supp. 2d at 902 (failure to process fingerprints).  And *P.K.* establishes that this Court has "clear" authority to fashion equitable relief by directing the Government to reserve visa numbers where "the State Department's implementation" of an executive action "violate[s] the INA," so as to preserve DV Selectees' "right to have their applications processed in accordance with the law," 302 F. Supp. 3d at 9, by allowing their applications to be adjudicated "after [the] salient obstacles [a]re removed," *Almaqrami*, 933 F.3d at 781-82.

These rationales apply fully here.  As this Court has ruled, Defendants imposed multiple unlawful obstacles to visa processing, over a period of months from March 2020 through at least September 9, 2020, when they began implementing this Court's September 4 Order.  And even after the Order issued, Defendants have continued to throw up artificial barriers that impeded visa processing in contravention of the Order.

*First*, the State Department's COVID-19 Guidance, first issued on March 20, 2020 (CAR 12), unlawfully omitted DV-2020 Selectees from its identification of visa categories eligible for "mission critical" services.  *See* ECF 123, at 73 (Defendants acted arbitrarily and capriciously in "excluding DV-2020 diversity visa applications from the categories of 'mission critical' visa services"); *id.* at 8, 72-73 (identifying March 20 cable as initiation of arbitrary and capricious COVID-19 Guidance).  As this Court observed, "Defendants d[id] not attempt to defend the rationality of their COVID-19 Guidance."  *Id.* at 73.  Thus, from March 20 until September 9, Defendants were unlawfully enforcing an arbitrary and capricious bar on diversity visa processing.

*Second*, beginning when Proclamation 10014 went into force on April 23, Defendants began enforcing their No-Visa Policy, which (as the Court has found) was arbitrary, capricious, and not in accordance with law.  ECF 123, at 65-66; *see* 5 U.S.C. § 706(2).  Not only do Defendants have no rational justification for this policy, it is contrary to the INA:  "neither the Proclamation[s] nor § 1201(g) of the INA compel or empower the State Department to suspend the processing and issuance of visas."  ECF 123, at 63.  Section 1201(g)'s bar on visa issuance "does not apply here," *id.* at 65, and it has *never* provided Defendants a valid basis for the unlawful No-Visa Policy.

*Third*, after the Court issued the September 4 Order, Defendants unlawfully enforced other Proclamations' *entry* suspensions as a "Quarantine Requirement," creating an additional barrier to *visa issuance*.  This action caused additional delays in visa processing and necessitated an emergency hearing—after which the Court enjoined the Quarantine Requirement on grounds that it was "premised on a faulty legal position," and was "irrational, too."  ECF 132, at 4-6.

Defendants' serial failures to adhere to their express statutory obligations to process and adjudicate visa applications call out for equitable relief.  Defendants never had a sound justification for their policies; the law required them to process diversity visa applications to the fullest extent possible between March and September, but instead they ceased diversity visa processing and

failed to resume it until the Court ordered them to do so.  And even then, Defendants imposed a new and unfounded Quarantine Requirement that contravened the Court's Order and further delayed visa processing until the Court could amend its injunction.[5]

Defendants' refusal to comply with the INA's clear directives (not to mention the terms of the Court's Order), without rational basis or statutory justification, is akin to the Government's failure to complete the necessary background check in *Przhebelskaya*, 338 F. Supp. 2d at 402, and to complete processing of fingerprints in *Paunescu*, 76 F. Supp. 2d at 902.  Indeed, Defendants' intentional failures here are more troubling than the Government's conduct in *Przhebelskaya or Paunescu*: Whereas the plaintiffs in those cases fell victim to "bureaucratic nightmare[s]," *see id.*, the named Plaintiffs and other DV-2020 Selectees here have been denied the processing and adjudication to which they were entitled as a result of the Government's baseless and irrational failure to follow clear statutory commands.  If the Government's unaccountable failures to complete ministerial processing were sufficient to warrant relief in *Przhebelskaya* and *Paunescu*, surely the Government's unjustified, months-long disregard of its statutory obligations suffices to warrant relief here.  And because the State Department is evidently incapable of rectifying its own past errors before September 30, this Court is amply justified in ordering the same equitable relief that Judge Chutkan granted in *P.K.*—reservation of visa numbers so that eligible individuals are not deprived of their "right to have their applications processed in accordance with the law," 302 F. Supp. 3d at 9, now that the "salient obstacles" have been removed, *see Almaqrami*, 933 F.3d at 781-82.

---

[5] To be sure, Plaintiffs do not argue that Defendants were required to process diversity visas at full capacity even where consulates were closed.  But it was incumbent upon Defendants to process as many applications as they could.  They failed to fulfill that obligation, and instead established unlawful policies that prevented DV-2020 processing—the *reverse* of what was lawfully required.

Relief is also necessary because Defendants' response to the Court's directive to "expeditiously process" as many applications as possible (ECF 123, at 84), has been far from sufficient.  For one thing, Defendants waited five days after the order issued—nearly 20% of the time that remained before the deadline—to issue implementing guidance to consular posts.  *See* ECF 127, at 2.  Defendants also insisted on enforcing the Quarantine Requirement, despite the clarity of this Court's ruling that a § 1182(f) Proclamation may not be invoked to bar visa issuance.  *See* ECF 132.  And Defendants have adopted a variety of other policies and practices that have prevented interviews and precluded issuance of diversity visas that ought to have been issued by now.  For example:

- Named Plaintiffs Ramin Yousofi and Ahmed Fahim, residents of Afghanistan, were informed by the State Department on September 21, 2020 that they had an appointment the next day at 8 AM at the U.S. Embassy in Cameroon.  Ex. 1, Interview Notices.

- Named Plaintiff Uman Huseynli, a resident of Azerbaijan, was scheduled for an interview at the U.S. Embassy in Tbilisi, Georgia on the September 28, 2020.  Huseynli and other DV-2020 Selectees were granted special permission by the Georgian government to enter Georgia with only an eight-day quarantine requirement or to produce a negative COVID-19 test upon arrival and leave within 72 hours.  But on September 16, 2020, the U.S. Embassy in Tbilisi imposed a new 14-day in-country requirement, and stated that anyone not already in the country would not be interviewed.  Ex. 2, Embassy of Tbilisi Emails.

- Named Plaintiffs Shahpour Safaei and Shahram Mehrafrooz, residents of Iran, received an email from the U.S. Embassy in Ankara, Turkey on September 16, 2020, informing them that they were required to arrive in Turkey on September 15, 2020 to be scheduled for an interview.  Ex. 3, Embassy of Ankara Emails.

- The Kentucky Consular Center (KCC) expressly told Ahmet Atasaydir that "if you['re] not [a] plaintiff, you lost your chance," and "[w]e will not process your documents." ECF 137, Ex. C, at 103; *see also* Dahab Decl. ¶¶ 9(b), 9(c), 9(f) (similar as to Karima Jalal (Morocco), Nil Kutliuk (Turkey), and Maria Nemirovksia (Russia)).

- The consular post in Uganda similarly advised Evelyn Babirye that the post is only working on applications for the named Plaintiffs.  Dahab Decl. ¶ 9(a).

- State Department staff urged Sergey Stryukov (Russia) not to "g[o] forward" because Defendants "will not issue [his] visa by the 30th anyway." *Id.* ¶ 9(d).

- As late as September 15, the U.K. consulate advised Gustinnawadu Silva that DV appointments simply were not being scheduled. *Id.* ¶ 9(e).

- KCC advised Grace Barry that the consular post in her home country of Liberia is only processing visa reissuances. *See* ECF 137, Ex. C, at 72.

Overall, of 1,794 individuals who have advised the *Gomez* Plaintiffs' counsel that they have requested emergency appointments based on the September 4 Order, 95.5 percent have had their requests denied, have received no response, or have been told by the State Department that only named Plaintiffs will receive visa interviews pursuant to the Order.  Dahab Decl. ¶ 8.

As a result of these failures to adhere to this Court's directive, the State Department has adjudicated only 745 of the 974 named Plaintiffs' diversity visa applications to date, and have issued only 3,208 diversity visas between September 5 and September 24—a monthly rate of about 4,800 visas.  *See* ECF 143, at 3.[6]  In comparison, Defendants are capable of issuing *between 7,000 and 8,000* diversity visas per month (3,500 to 4,000 cases, inclusive of derivative beneficiaries). *See* Paul Decl., ECF 137, Ex. A.  Defendants have thus been operating at only 60% of capacity, despite this Court's order to proceed "expeditiously" (ECF 123, at 84) and the fact that Defendants' various other restrictive policies mean that they are *not* currently expending resources to process family-based or employment-based visa applications—such that Defendants should have free capacity that could be devoted to DV-2020 Selectees.  In view of all the evidence, it is plain that Defendants have not done all they could to comply with this Court's order.

---

[6] Combined with the approximately 12,000 visas that issued in the first six months of the fiscal year (October 2019 through March 2020), that is approximately 15,401 diversity visas total—just 28 percent of the diversity visas allocated for 2020.  ECF 136, at 4-5; ECF No. 143 at 3.

Without additional judicial relief, many of the named Plaintiffs and tens of thousands of other DV-2020 Selectees will be deprived of benefits that Defendants ought to have granted them months ago, or at minimum during the period after the Court issued its September 4 Order. Without relief, Defendants will have largely succeeded in their unlawful effort to effectuate the President's "well documented" "hostility towards the diversity visa lottery program" (ECF 123, at 58), by permanently "cancel[ing]" nearly 75 percent of the DV-2020 program (*see* ECF 109-17, Ex. A).  The Court should direct Defendants to comply to the fullest possible extent with their statutory obligations to adjudicate the named Plaintiffs' and other DV-2020 Selectees' applications.[7]

## II.     SCOPE OF RELIEF

Plaintiffs respectfully submit that in the circumstances of this case, it would be appropriate for the Court to order Defendants to reserve approximately 30,000 FY 2020 diversity visa numbers for adjudication after September 30, and to order Defendants to issue the reserved visas expeditiously through February 28, 2021.  As Defendants have issued approximately 15,401 diversity visas in FY 2020 to date (*see supra* note 6), such an order would allow a total of approximately 45,401 diversity visas to be issued for this fiscal year.

Plaintiffs' proposal comports with both Congress's intent in enacting the diversity visa program to "ensure[] long-term diversity in our flow of immigrants from around the world," 136 Cong. Rec. H-8629-02 (1990), and with the Government's historical practice.  The INA provides for a statutory maximum of 55,000 diversity visas to be issued each year,  8 U.S.C. § 1151(e), and

---

[7] To ensure that individuals not named in the complaints receive the benefit of an order reserving visas for processing after September 30, Plaintiffs in *Gomez* are simultaneously renewing their motion for class certification with respect to the Diversity Visa sub-class (*see* ECF 52).

the State Department has historically striven to issue as many of those visas as possible: Between 1998 and 2016, the State Department issued an average of 47,404 diversity visas per year—exceeding 50,000 diversity visas seven times, and issuing fewer than 40,000 diversity visas only once.[8]   Even in FY 2002, which began shortly after the 9/11 attacks, and which saw the introduction of significant and burdensome new security measures, the Government still issued more than 43,000 diversity visas.  Plaintiffs respectfully submit that their proposed target is appropriate for this fiscal year, as it falls within the historical range of diversity visa issuance (though below the average), while reasonably balancing the challenges presented this fiscal year against the irreparable harms faced by the named Plaintiffs and DV-2020 Selectees who would otherwise lose their opportunity to obtain visas on account of Defendants' unlawful conduct.

A directive to Defendants to reserve approximately 30,000 additional diversity visas for this fiscal year (allowing for 45,401 such visas to issue in total) is also reasonably related to the extent of Defendants' statutory violations, as it would be consistent with the number of visas that ought to have been issued over the period affected by the policies invalidated by the Court's

---

[8] *See* Report of the Visa Office 2016, Table VII, Immigrant Number Use for Visa Issuances and Adjustments of Status in the Diversity Immigrant Category Fiscal Years 2007-2016, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16 AnnualReport-TableVII.pdf; Report of the Visa Office 2007, Table VII, Immigrant Number Use for Visa Issuances and Adjustments of Status in the Diversity Immigrant Category 1998-2007, https://travel.state.gov/content/dam/visas/Statistics/FY07AnnualReportTableVII.pdf.

The outlier year, 2012, was affected by a computer glitch that forced the State Department to void the initial lottery results that had been released May 1, 2011, and to conduct a new lottery that was not completed until July 15, 2011—more than two months after that first stage of the process would ordinarily have been completed.  *See generally Smirnov v. Clinton*, 806 F. Supp. 2d 1 (D.D.C. 2011) (rejecting challenge to State Department's decision to conduct new lottery); Chloe Stepney, *After 'painful' blunder, green card lottery results released today*, Christian Science Monitor (July 15, 2011), https://www.csmonitor.com/USA/2011/0715/After-painful-blunder-green-card-lottery-results-released-today. Even with that delay, the State Department still issued 34,463 diversity visas.  And the outlier situation in 2012 is not analogous to the facts here:  The State Department's failure to issue diversity visas for nearly six months in 2020 was not driven by an innocent computer error, but by unlawful policies that Defendants intentionally adopted.

September 4 Order. Although Plaintiffs appreciate that the pandemic has placed a strain on normal visa processing, Defendants are capable of processing and issuing approximately 8,000 diversity visas (including derivative beneficiaries' visas) per month, or approximately 267 per day, world-wide. *See* Paul Decl. at 2, ECF 137-1. Between March 20, 2020 (when the unlawful COVID-19 Guidance went into effect) and the end of the fiscal year on September 30, 195 days will elapse— meaning that in the ordinary course, Defendants could have issued approximately 52,000 diversity visas during this period. *See id*. Reserving 30,000 visa numbers thus would amount to less than 58 percent of Defendants' capacity to issue diversity visas over the period for which Plaintiffs seek a remedy. Plaintiffs respectfully submit that this is a reasonable approximation of what Defendants could and should have accomplished during that period had their unlawful policies not been in force, even accounting for the consular closures and restrictions that were in place for part of that period due to COVID-19.

Plaintiffs also respectfully submit that Defendants are fully capable of processing 30,000 diversity visas within a reasonable period. At a rate of 8,000 diversity visas per month, issuing 30,000 diversity visas would amount to less than four months' work. *See* Paul Decl. at 2, ECF No. 137. Although Plaintiffs acknowledge that present circumstances are far from ordinary, Defendants' No-Visa Policy remains in force for all affected categories of visas other than DV-2020 Selectees—meaning that both the KCC and the consular posts should have additional processing capacity at this time, allowing them to process FY 2020 diversity visa applications more efficiently than would otherwise be possible. It is thus reasonable to expect Defendants to complete processing of 30,000 reserved visas within four months of October 1, so that processing could be complete by the end of January 2021—just a month after the Proclamations are set to expire by their own terms. To allow Defendants additional time in the exigent circumstances, and to account for unanticipated delays, Plaintiffs respectfully propose that the Court direct Defendants

-16-

to complete processing of the named Plaintiffs and additional FY 2020 diversity visas by February 28, 2020.  Plaintiffs submit that this is a reasonable accommodation to all parties and affected individuals in these exigent circumstances.

Defendants filed with the Court earlier today their "Supplemental Report on Good Faith Efforts to Implement the Preliminary Injunction."  ECF 143.  Plaintiffs are grateful that Defendants have interviewed or scheduled nearly all of the named Plaintiffs, and well as many non-Plaintiffs. That said, Plaintiffs respectfully submit that the Report is incomplete and misleading.  It is incomplete in that it contains no mention at all of the work of the KCC, how many cases it documentarily cleared for consular interviews, and how many cases it normally clears during the shortened time frame that the rest of Defendants' Report  focused on.  Plaintiffs and the Court simply do not know, today, how many more DV-2020 Selectees are currently documentarily qualified and ready for interviews, how many are in process of finalizing their document submissions, or KCC's current monthly capacity to process cases.  Defendants' failure to provide this updated information (which Defendants had provided in their previous status report) suggests that Defendants could be doing more to process DV-2020 Selectees through consular adjudication.

The Report is misleading in that it only provides information over a limited time frame as to the consulates' capacity to process immigrant visas, and does not compare "apples to apples" in doing so.  The key to consular capacity to process DV-2020 Selectees is not how many diversity visa cases were adjudicated from July to September in prior years, because (as discussed) Defendants are currently processing very few other visas—which should free up processing capacity at consulates around the world.  Considering *total* "consular capacity" year over year, it appears that consulates have the ability to process at least 30,000 immigrant visas per month, on average—a figure that is far short of the 5,093 total immigrant visas that Defendants processed in September 2020.  Defendants also still have not explained why, in the first half of FY 2020, they

processed only about 20% of the total number of 2020 DVs—far below the expected 50%.

Finally, Plaintiffs further respectfully request that the Court direct Defendants to renew or reissue visas that would expire after the end of the fiscal year but before the visa-holder is able to enter the United States. Nothing in the INA forecloses the Court or Defendants from granting such relief, and, in the extraordinary circumstances here, Plaintiffs submit that such relief is warranted to fully effectuate the Court's Orders. If the Proclamation is extended beyond March 2021 (six months after the visas issued this month), and if Defendants enforce a policy of refusing to reissue diversity visas after the end of this fiscal year (*see* 9 FAM 504.10-5(A)), visas issued pursuant to the Court's orders in this case will have no value: They will all expire before their holders could possibly use them to enter the country. The Court has inherent equitable authority to prevent Defendants from nullifying the September 4 Order, and it should exercise that authority here. *See, e.g.*, *P.K.*, 302 F. Supp. 3d at 9-10 (court may exercise "equitable power" to give relief "even though doing so would conflict with … statutory limitations on visa issuance").

## CONCLUSION

Defendants should be ordered to reserve 30,000 visa numbers for DV-2020 Selectees, and to process DV-2020 Selectees' visa applications until those visa numbers are exhausted, without regard for the statutory deadline for visa issuance. Defendants should further be directed to renew FY 2020 diversity visas after the end of the fiscal year, as necessary to permit the visa recipients a reasonable opportunity to use their visas to enter the country.

September 25, 2020

Jesse M. Bless (D.D.C. Bar No. MA0020)
AMERICAN IMMIGRATION LAWYERS
  ASSOCIATION
1301 G Street NW, Ste. 300
Washington, D.C. 20005
Telephone: (781) 704-3897
jbless@aila.org

Karen C. Tumlin (*pro hac vice*)
Esther H. Sung (*pro hac vice*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org

Stephen W. Manning (*pro hac vice*)
Nadia Dahab (*pro hac vice*)
Tess Hellgren (*pro hac vice*)
Jordan Cunnings (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
nadia@innovationlawlab.org

Respectfully submitted,

/s/ Andrew J. Pincus
Andrew J. Pincus (D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500

Cleland B. Welton II (*pro hac vice*)
MAYER BROWN MEXICO, S.C.
Goldsmith 53, Polanco
Ciudad de Mexico 11560
Telephone: (502) 314-8253
cwelton@mayerbrown.com

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
Justice Action Center Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
laboni@hoqlaw.com

*Counsel for Gomez Plaintiffs*

Abadir Barre
BARRE LAW LLC
30 Broad St., 14th Floor
New York, NY 10004
(646) 244-8784
abadir@barrelaw.com

/s/ Curtis Lee Morrison
Curtis Lee Morrison
LAW OFFICE OF CURTIS MORRISON
P.O. Box 7140
Huntington Beach, CA 92615
(714) 661-3446
curtis@curtismorrisonlaw.com

Rafael Urena
THE LAW OFFICE OF RAFAEL URENA
925 N. La Brea Ave, 4th Floor
Los Angeles, CA 90038
(703) 929-4424
ru@urenaesq.com

*Counsel for Mohammed and Fonjong Plaintiffs*

|  | /s/ Charles H. Kuck |
| Greg Siskind | Charles H. Kuck |
| SISKIND SUSSER PC | Phillip C. Kuck |
| 1028 Oakhaven Rd. | Danielle M. Claffey |
| Memphis, TN 39118 | KUCK BAXTER IMMIGRATION, LLC |
|  | Bar No. 429940 |
| Jeff D. Joseph | 365 Northridge Rd, Suite 300 |
| JOSEPH & HALL P.C. | Atlanta, GA 30350 |
| 12203 East Second Avenue | 404.816.8611 |
| Aurora, CO 80011 | ckuck@immigration.net |

*Counsel for Aker Plaintiffs*