# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DOMINGO ARREGUIN GOMEZ, *et al*.,<br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States of America, *et al.*,<br><br>Defendants. | Civil Action No. 20-1419 (APM) |
| MOHAMMED ABDULAZIZ ABDULBAGI MOHAMMED, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL R. POMPEO, Secretary, U.S. Department of State, *et al.*,<br><br>Defendants. | Civil Action No. 20-1856 (APM) |
| CLAUDINE NGUM FONJONG, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States of America, *et al.*,<br><br>Defendants. | Civil Action No. 20-2128 (APM) |

AFSIN AKER, *et al*.,                                    )
                                                        )
                Plaintiffs,                             )
                                                        )
        v.                                              )        Civil Action No. 20-1926 (APM)
                                                        )
DONALD J. TRUMP, President of the United                )
States of America, *et al.*,                            )
                                                        )
                Defendants.                             )
                                                        )

MORAA ASNATH KENNEDY, *et al.*,                         )
                                                        )
                Plaintiffs,                             )
                                                        )
        v.                                              )        Civil Action No. 20-2639 (APM)
                                                        )
DONALD J. TRUMP, President of the United                )
States of America, *et al.*,                            )
                                                        )
                Defendants.                             )
                                                        )

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS'</u><br><u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

JOHN V. COGHLAN
Acting Assistant Attorney General, Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation, District
Court Section

COLIN A. KISOR
Deputy Director

GLENN M. GIRDHARRY
Assistant Director

AARON S. GOLDSMITH
Senior Litigation Counsel

_/s/ JAMES J. WEN_
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
(202) 532-4142
James.J.Wen@usdoj.gov

THOMAS B. YORK
Trial Attorney

_Attorneys for Defendants_

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

    *The COVID-19 Pandemic* .................................................................................3

    *The Suspension of Routine Visa Operations* ...................................................3

    *The Phased Resumption of Routine Visa Services* ..........................................4

    *Presidential Proclamations 10014, 10052, and 10131.* ...................................5

    *The National Interest Exceptions.* ...................................................................7

PROCEDURAL BACKGROUND .......................................................................................9

    *Gomez v. Trump,* No. 20-cv-1419 ....................................................................9

    *Mohammed v. Pompeo,* No. 20-cv-1856 .........................................................10

    *Fonjong v. Trump,* No. 20-cv-2128 .................................................................11

    *Kennedy v. Trump,* No. 20-cv-2639 ................................................................11

    *Aker v. Trump,* No. 20-cv-1926 ......................................................................11

STANDARD OF REVIEW ................................................................................................12

ARGUMENT .....................................................................................................................13

    **A.**    **Plaintiffs' Claims Are Barred By Principles Of Nonreviewability.** ...........13

    **B.**    **Defendants Have Properly Interpreted 8 U.S.C. § 1182(f) To Preclude Visa Issuances, Which Compels Consular Officers To Refuse Visas To Aliens Whose Entry Is Suspended Under Section 1182(f) And, Therefore, There Is No Reviewable Final Agency Action Under The APA** ...................................16

        1.    The INA requires consular officers to refuse visas to aliens whose entry is suspended under Section 1182(f) .............................................................17

        2.    The State Department's longstanding interpretation of section 1182(f) is both reasonable and lawful ........................................................................23

3.      State Department's longstanding interpretation of section 1182(f) as requiring visa refusals for covered aliens is entitled to deference ............26

4.      Proclamation 9645 and 9983 require visa refusals ...........................28

C.      **The Court should reject the Plaintiffs challenges to the State Department's COVID-19 Prioritization Guidance for Consular Operations. ......................29**

1.      The State Department's COVID-19 Prioritization Guidance are not subject to judicial review ...................................................................................30

2.      State Department's "mission critical" determinations within its COVID-19 Prioritization Guidance was rational .........................................................33

D.      **Plaintiffs' unreasonable delay claims fail because the TRAC factors favor the State Department. ................................................................................36**

E.      **Plaintiffs' mandamus claim fails. ................................................................40**

F.      **The State Department is not required to subject its actions to notice and comment ..........................................................................................40**

G.      **The *Gomez* Plaintiffs' APA challenge to the State Department's NIE guidance fails as a matter of law. .................................................................................42**

1.      There Is No Final Agency Action. .............................................................42

2.      Implementation of the National interest Exceptions is Committed to Agency Discretion. ....................................................................................44

**CONCLUSION .........................................................................................................45**

**CERTIFICATE OF SERVICE**

# TABLE OF AUTHORITIES

## CASE LAW

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001) ........................................................................... 12

*Americans for Safe Access v. DEA*,
   706 F.3d 438 (D.C. Cir. 2013) ............................................................................. 13

*Appeal of Bolden,*,
   848 F.2d 201 (D.C. Cir. 1988) ............................................................................. 13

*Ass'n of Admin. Law Judges v. U.S. Office of Pers. Mgmt.*,
   640 F. Supp. 2d 66 (D.D.C. 2009) ....................................................................... 44

*Bagherian v. Pompeo*,
   442 F. Supp. 3d 87 (D.D.C. 2020) ....................................................................... 25

*Barton v. Barr*,
   140 S. Ct. 1442 (2020) ......................................................................................... 20

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................. 43

*Brock v. Pierce Cty.*,
   476 U.S. 253 (1986) ............................................................................................. 37

*Castaneda-Gonzalez v. INS*,
   564 F.2d 417 (D.C. Cir. 1977) ............................................................................. 17

*Cheney v. United States Dist. Court*,
   542 U.S. 367 (2004) ............................................................................................. 39

*Christensen v. Harris County*,
   529 U.S. 576 (2000) ............................................................................................. 26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ............................................................................................. 13

*Clifford v. Pena*,
   77 F.3d 1414 (D.C. Cir. 1996) ............................................................................. 13

*CREW v. DHS*,
   387 F. Supp. 3d 33 (D.D.C. 2019) ....................................................................... 42

*Ctr. for Biological Diversity v. Trump*,
    453 F. Supp. 3d 11 (D.D.C. 2020) ........................................................................ 32

*Ctr. for Sci. in the Pub. Interest v. United States FDA*,
    74 F. Supp. 3d 295 (D.D.C. 2014) ........................................................................ 36

*Deppenbrook v. PBGC*,
    --- F.3d ---, 2015 WL 728062 (D.C. Cir. 2015) ..................................................... 12

*Didban v. Pompeo*,
    435 F. Supp. 3d 168 (D.D.C. 2020) ...................................................................... 25

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*,
    215 F.3d 41- (D.C. Cir. 2000) ............................................................................... 40

Doe #1 v. Trump
    —F.3d—2020 WL 7778213 (9th Cir. Dec. 31, 2020) ...................................... 13, 14

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) .............................................................................. 32

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................................. 12

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ........................................................................................ 14, 15

*Fulbright v. McHugh*,
    67 F. Supp. 81 (D.D.C. 2014) ............................................................................... 13

*Ghadami v. DHS*, No. 19-cv-00397,
    2020 WL 1308376 (D.D.C. Mar. 19, 2020) ................................................ 25, 36, 37

*Haig v. Agee*,
    453 U.S. 280 (1981) ............................................................................................. 32

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ............................................................................................. 15

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................... 30, 33, 44, 45

*Holistic Candlers & Consumers Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012) .............................................................................. 41

iv

*In re Barr Labs., Inc.*,
  930 F.2d 72 (D.C. Cir. 1997) ................................................................. 31, 36

*In re Core Commc'ns Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) ................................................................. 40

*In re Medicare Reimbursement Litig.*,
  414 F.3d 7 (D.C. Cir. 2005) ................................................................. 40

*In re People's Mojahedin Org. of Iran*,
  680 F.3d 832 (D.C. Cir. 2012) ................................................................. 36

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
  372 F.3d 420 (D.C. Cir. 2004) ................................................................. 44

*Jafari v. Pompeo*,
  Civ. A. No. 19-1819, 2020 WL 2112056 (D.D.C. May 3, 2020) ...................................... 25, 45

*Joorabi v. Pompeo*,
  Civ. A. No. 20-108, 2020 WL 2527209 (D.D.C. May 17, 2020) ........................................ 45

*Judulang v. Holder*,
  565 U.S. 42 (2011) ................................................................. 17

*Kangarloo v. Pompeo*,
  2020 WL 4569341 (D.D.C. Aug. 7, 2020) ...................................... 25, 45

*Kleindienst v. Mandel*,
  408 U.S. 766 (1972) ................................................................. 16

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
  104 F.3d 1349 (D.C. Cir. 1997) ................................................................. 30

*Loma Linda Univ. Med. Ctr. v. Sebelius*,
  684 F. Supp. 2d 42 (D.D.C. 2010) ................................................................. 12

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ................................................................. 48, 51, 52

*Mass. v. EPA*,
  549 U.S. 497 (2007) ................................................................. 31

*Moghaddam v. Pompeo*,
  424 F. Supp. 3d 104 (D.D.C. 2020) ................................................................. 25

*Mount Royal Joint Venture v. Kempthorne,*
    477 F.3d 745 (D.C. Cir. 2007) .................................................................. 26

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007) ............................................................................... 12

*Nat'l Fed. Of Federal Emps (NFFE) v. United States,*
    905 F.2d 400 (D.C. Cir. 1990) ............................................................. 30, 32

*Nat'l Rifle Ass'n of Am., Inc. v. Reno,*
    216 F.3d 127 (D.C. Cir. 2000) .................................................................. 37

*Norton v. S. Utah Wilderness All. (SUWA),*
    542 U.S. 55 (2004) ......................................................................... 39, 42, 43

*Olivares v. Transp. Sec. Admin.,*
    819 F.3d 454 (D.C. Cir. 2016) .................................................................. 13

*RCM Tech., Inc. v. U.S. Dep't of Homeland Sec.,*
    614 F. Supp. 2d. 39 (D.D.C. 2009) ........................................................... 44

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.,*
    130 F. Supp. 3d 81 (D.D.C. 2015) ............................................................ 12

*Richard v. United States,*
    369 U.S. 1 (1962) .................................................................................... 19

*Rural Cellular Ass'n v. FCC,*
    588 F.3d 1095 (D.C. Cir. 2009) ................................................................ 12

*Saavedra Bruno v. Albright,*
    197 F.3d 1153 (D.C. Cir. 1999) ..................................................... 15, 16, 19

*Sarlak v. Pompeo,*
    No. 20-35, 2020 WL 3082018 (D.D.C. Jun. 10, 2020) ............................... 25

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953) ............................................................................... 14

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ............................................................................... 26

*Southwestern Bell Tel. Co. v. FCC,*
    168 F.3d 1344 (D.C. Cir. 1999) ................................................................ 12

*Telecomms. Research & Action Center v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ........................................................................ 36, 39

*Thomas v. Pompeo*,
    438 F. Supp. 3d 35 (D.D.C. 2020) ................................................................ 25

*Trump v. Hawaii*,
    138 S. Ct. 2407 (2018) ..................................................................... 13, 15, 17

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ................................................................................. 14

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) ................................................................................. 37

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) .......................................................................... 26, 27

*Valero Energy Corp. v. EPA*,
    927 F.3d 532 (D.C. Cir. 2019) .............................................................. 40, 41

*Viet. Veterans of Am. v. Shinseki*,
    599 F.3d 654 (D.C. Cir. 2010) ................................................................. 40

*Visinscaia v. Beers*,
    4 F. Supp. 3d 126 (D.D.C. 2013) ........................................................... 12

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ............................................................................. 41

## STATUTES LAW

5 U.S.C. § 551(13) ........................................................................... 42, 44

5 U.S.C. § 553(a)(1) ................................................................................. 41

5 U.S.C. § 553(b)(3)(B) ............................................................................ 41

5 U.S.C. § 701(a)(2) ...................................................................... 30, 42, 44

5 U.S.C. § 702 ...................................................................................... 44

5 U.S.C. § 704 ...................................................................................... 42

5 U.S.C. § 706 ...................................................................................... 42

5 U.S.C. § 706(1) .................................................................................................. 35

5 U.S.C. § 706(2) .............................................................................................. 42, 43

5 U.S.C. § 706(2)(A) ............................................................................................ 12

5 U.S.C. § 706(2)(c) ............................................................................................ 10

6 U.S.C. § 236(f) ................................................................................................ 14

8 U.S.C. § 1101 .............................................................................................. 19, 21

8 U.S.C. § 1182 ........................................................................................ 17, 20, 21

8 U.S.C. § 1182(a) ............................................................................................... 17

8 U.S.C. § 1182(a)(2)(H) ..................................................................................... 24

8 U.S.C § 1182(f) ........................................................................................... *passim*

8 U.S.C. § 1182e ................................................................................................. 22

8 U.S.C. § 1182f ................................................................................................. 22

8 U.S.C. § 1182f(a) ............................................................................................. 22

8 U.S.C. § 1185(a) ............................................................................................. 4, 6

8 U.S.C. § 1185(a)(1) .......................................................................................... 18

8 U.S.C. § 1201(a) ............................................................................................... 20

8 U.S.C. § 1201(g) ............................................................................................... 17

8 U.S.C. § 1252 ................................................................................................... 14

22 U.S.C. § 2651a ..................................................................................... 30, 31, 41

47 U.S.C. § 251(d)(1) .......................................................................................... 37

## FEDERAL REGULATIONS

22 C.F.R. § 40.6 .................................................................................................. 20

22 C.F.R. § 42.62 ................................................................................................ 33

## FEDERAL RULE OF CIVIL PROCEDURE

Fed. R. Civ. P. 56 .................................................................................................. 11, 12

## PUBLIC LAW

Pub. L. No. 101-649 ...................................................................................................... 20

Pub. L. No. 103-236 .......................................................................................... 21, 22, 27

Pub. L. No. 104-208 ...................................................................................................... 21

## FEDERAL REGULATIONS

74 Fed. Reg. 4,093 ........................................................................................................ 24

74 Fed. Reg. 4,094 ........................................................................................................ 24

76 Fed. Reg. 49,277 ...................................................................................................... 24

76 Fed. Reg. 49,278 ...................................................................................................... 24

82 Fed. Reg. 13,209 ...................................................................................................... 23

85 Fed. Reg. 23,441 .................................................................................................... 1, 5

85 Fed. Reg. 23,443 ........................................................................................................ 7

85 Fed. Reg. 38,263 ................................................................................................ 1, 6, 7

85 Fed. Reg. 38,265 ........................................................................................................ 7

## EXCECUTIVE ORDER / PRESIDENTIAL PROCLAMATIONS

Exec. Order No. 13780 .................................................................................................. 23

Presidential Proclamation No. 8342 .............................................................................. 24

Presidential Proclamation No. 8697 ........................................................................ 23, 24

Presidential Proclamation No. 9645 .......................................................... 17, 25, 28, 29

Presidential Proclamation No.9983 ......................................................................... 28, 29

Presidential Proclamation No.10014 ..................................................................... *passim*

Presidential Proclamation No.10052 ...................................................................... *passim*

Presidential Proclamation No.10131 ......................................................................... 4, 6

## MISCELLANEOUS

Office of Mgmt. and Budget, Director, *Federal Agency Operational Alignment to Slow the Spread of Coronavirus COVID-19* (Mar. 17, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf (last visited Jan. 20, 2021) ...................................... 3, 37

U.S. Department of State–Bureau of Consular Affairs, *Annual Reports of the Visa Office, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports.html* (last visited Jan. 20, 2021)........................................................................................... 23

U.S. Department of State–Bureau of Consular Affairs, *National Interest Exceptions to Presidential Proclamations (10014 & 10052) Suspending the Entry of Immigrants and Nonimmigrants Presenting a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak* (August 12, 2020), https://travel.state.gov/content/travel/en/News/visas-news/exceptions-to-p-p-10014-10052-suspending-entry-of-immigrants-non-immigrants-presenting-risk-to-us-labor-market-during-economic-recovery.html (last visited Jan. 20, 2021) ............................................................... 8

U.S. Department of State–Bureau of Consular Affairs, *Phased Resumption of Routine Visa Services* (Nov. 12, 2020)*,* https://travel.state.gov/content/travel/en/News/visas-news/phased-resumption-routine-visa-services.html (last visited Jan. 20, 2021) ............................... 4

U.S. Department of State–Bureau of Consular Affairs, *Suspension of Routine Visa Services* (Jul. 22, 2020), https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-services.html (last visited Jan. 20, 2021)............................................................................. 3

## INTRODUCTION

This Court should grant Defendants' partial motion for summary judgment in connection to the agency implementation of two lawful Presidential actions: Proclamation 10014, *The Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 23,441 (Apr. 22, 2020), and Proclamation 10052, *Suspension of Entry of Immigrants and Nonimmigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 38,263 (Jun. 25, 2020).[1] In these Proclamations, the President lawfully exercised his broad authority to temporarily suspend the entry of certain aliens as immigrants and nonimmigrants to the United States, while the Nation addresses the harms to the labor market and the country that have been caused by the devastating COVID-19 pandemic.

Plaintiffs seek an end-run around the well-established principle that the Administrative Procedure Act (APA) does not provide Plaintiffs with a basis to seek judicial review of a presidential proclamation: Plaintiffs challenge the State Department's implementation of Proclamations 10014 and 10052, as well as its guidance to consular posts on how to prioritize diversity visa selectees during the COVID-19 pandemic. Plaintiffs cannot prevail. First, there is no independent agency action that is separate from the lawful Proclamations themselves that is reviewable under the APA because, under the Immigration and Nationality Act (INA), consular officers must refuse visas to aliens subject to an entry suspension imposed by the President under

---

[1] The Court's scheduling order directed that "Briefing shall be limited to issues raised by Plaintiffs' Administrative Procedure Act, mandamus, and related claims concerning visa adjudication and issuance. ECF 184 at 3. Accordingly, the government files this motion addressing only those issues as a partial motion for summary judgment and expressly reserves its right to seek summary judgment on all other remaining claims as well.

8 U.S.C § 1182(f). In other words, it is the Proclamations and the INA that preclude visa issuances, and there is no distinct State Department policy that this Court can review under the APA. Section 1182(f) read in context with the entire INA and its history confirms the State Department's longstanding interpretation of the statute, as reflected in the State Department's Foreign Affairs Manual (FAM), is not only permissible but correct.  And to the extent it is at all ambiguous whether restrictions imposed pursuant to section 1182(f) preclude visa issuance, as opposed to only admission into the United States, the State Department's historical interpretation of the statute that it administers is entitled to deference.

Second, the State Department's determinations under its COVID-19 Prioritization Guidance are unreviewable under the APA because such decisions are committed to agency discretion, and judicial review would impermissibly intrude on sensitive and difficult decision-making of the political branches on how to structure consular services abroad during a global pandemic. And even if APA review were available, the State Department's decision to deem diversity visa selectees as not mission critical is not arbitrary and capricious because it was sensible for the Department to reserve its limited consular resources for aliens who are permitted to enter the United States rather than aliens who are covered under the Proclamations and must therefore be refused visas.

Additionally, Plaintiffs cannot prevail on their various procedural claims. The State Department does not have a mandatory duty to process their visa applications during a global pandemic when the Proclamations render them ineligible to receive visas and be admitted to the United States. There is no dispute that COVID-19 has greatly affected the State Department's capacity to process visa applications, which dooms Plaintiffs' associated unreasonable delay and mandamus claims.

Finally, Plaintiffs' cannot prevail on their APA challenge of the implementation of the national interest exceptions (or "NIE") to the Proclamations because Plaintiffs fail to identify any final agency action, and even if they did, review under the APA is nonetheless unavailable because those determinations are also committed to agency discretion.

For these reasons, this Court should grant Defendants' motion for summary judgment.

## BACKGROUND

*The COVID-19 Pandemic.* The 2019 Novel Coronavirus (COVID-19) has caused a pandemic that presents extraordinary challenges for countries around the world, including the United States. The United States government has taken significant steps to respond to the pandemic, stem the spread of the virus, and protect its citizens and employees both at home and abroad. The pandemic has significantly affected the State Department's ability to operate its embassies and consulates, including the provision of consular services.

*The Suspension of Routine Visa Operations.* In March 2020, the Office of Management and Budget ("OMB") directed all agencies to "take appropriate steps to prioritize all resources to slow the transmission of COVID-19, while ensuring our mission-critical activities continue." *See* Director, Office of Mgmt. and Budget, Federal Agency Operational Alignment to Slow the Spread of Coronavirus COVID-19 (Mar. 17, 2020), available at https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf (last visited Jan. 20, 2021). On March 20, 2020, the State Department announced that it would "temporarily suspend routine visa services at all U.S. Embassies and Consulates," due to COVID-19, but directed consular posts to provide "emergency and mission critical visa services" as "local conditions and resources allow[ed]." U.S. Department of State–Bureau of Consular Affairs, Suspension of Routine Visa Services, https://travel.state.gov/content/travel/en/News/visas-news/suspension-of-routine-visa-

services.html (last visited Jan. 20, 2021); CAR12-14. Immigrant visa services considered "mission critical" included, among other things, services for spouses of U.S. citizens, unmarried children of U.S. citizens, and adopted children of U.S. citizens, Afghan and Iraqi Special Immigrants, and medical professionals. *See* U.S. Department of State–Bureau of Consular Affairs, Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak, https://travel.state.gov/content/travel/en/News/visas-news/Proclamation-Suspending-Entry-of-Immigrants-Who-Present-Risk-to-the-US-labor-market.html (last visited Jan. 20, 2021); *see* CAR12, 23-24, 26, 36-37, 186-87. During this period, the State Department did not permit consular posts to resume normal visa operations. *See* CAR23, 35.

 ***The Phased Resumption of Routine Visa Services.*** On July 14, 2020, State provided public guidance advising that "U.S. Embassies and Consulates are beginning a phased resumption of routine visa services." U.S. Department of State–Bureau of Consular Affairs, Phased Resumption of Routine Visa Services, https://travel.state.gov/content/travel/en/News/visas-news/phased-resumption-routine-visa-services.html (last visited Jan. 20, 2021); CAR190; *see* CAR35. The guidance explained: "The resumption of routine visa services … will occur on a post-by-post basis," as "post-specific conditions improve, our missions will begin providing additional services, culminating eventually in a complete resumption of routine visa services." CAR190. State's phased resumption plan was called "Diplomacy Strong," which was a conditions-based approach to phased in-person operations where the decision to move to a more robust phase of operations -- based primarily on medical and health conditions -- was evaluated at each individual location. *See* CAR36. There are four operational phases. In Phase Zero and One, posts "may continue processing only emergency and mission-critical . . . cases, as resources and local

conditions allow." CAR36, 38. Phase Two allows for a partial resumption of routine services, and Phase Three allows for full resumption. CAR37-39.

*Presidential Proclamations 10014, 10052, and 10131.* On April 22, 2020, the President exercised his authority under 8 U.S.C. §§ 1182(f) and 1185(a) to issue Proclamation 10014. That Proclamation temporarily suspended "entry into the United States of aliens as immigrants" who did not already have a valid immigrant visas or travel document. *See* Presidential Proclamation 10014, *Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 23,441 (Apr. 27, 2020). The President provided three justifications for suspending entry: (1) to address the damage to the economy, especially the significant unemployment, caused by the COVID-19 pandemic; (2) to allow consular officers to focus their limited resources on providing necessary services to American citizens abroad; and (3) to avoid the strain on our healthcare resources during the pandemic. *Id*. at 23,441-42.

The President, therefore, suspended entry into the United States, for 60 days, of intending immigrants abroad who did not already have a valid immigrant visa or travel document as of the effective date of the Proclamation, April 23, 2020. *Id.* at 23,442-43. The Proclamation specified exceptions, including that "any alien whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or other respective designees," is eligible to seek entry. *Id.* at 23,443. The Proclamation further directed that "[w]ithin 30 days of the effective date of his proclamation, the Secretary of Labor and the Secretary of Homeland Security, in consultation with the Secretary of State, shall review nonimmigrant programs and shall recommend ... other measures appropriate to stimulate the United States economy and ensure the prioritization, hiring, and employment of United States workers." *Id.*

In implementing the Proclamation 10014, the State Department advised consular posts that due to the March 20 suspension of routine visa services, "(the National Visa Center (NVC) and the Kentucky Consular Center (KCC)) have already suspended transmission to posts of most immigrant and diversity visa cases. Scheduling of any appointments by NVC and KCC will resume only when a post is authorized to resume routine services. . . . [S]hould applicants not qualify for an exception under the Proclamation, including in the national interest, post should refuse the case pursuant to INA 212(f) . . ." CAR20; *see also* CAR24 ("The issuance of many immigrant visas . . . was suspended by Presidential Proclamation [10014]"). The State Department further advised that applicants refused under the Proclamation "may be considered for reconsideration of the refusal . . ." CAR20.

On June 22, 2020, the President signed Proclamation 10052, which modified and extended Proclamation 10014 and suspended the entry of certain categories of nonimmigrant workers through December 31, 2020. *See* Presidential Proclamation 10052, *Suspension of Entry of Immigrants and Nonimmigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 38,263 (June 25, 2020). Again exercising his authority under 8 U.S.C. §§ 1182(f) and 1185(a), the President "determined that the entry, through December 31, 2020, of certain aliens as immigrants and nonimmigrants would be detrimental to the interests of the United States." *Id.* The Proclamation thus suspended the entry of foreign nationals seeking entry pursuant to H-1B, H-2B, L, and certain J nonimmigrant visas, unless they are eligible for an exception, including a national interest exception. *Id.* at 38,264-65.

In implementing Proclamation 10052, the State Department informed consular posts that they "may continue to schedule mission critical and emergency immigrant and nonimmigrant visa

interviews as resources allow . . . but should applicants not qualify for an exception under the relevant presidential proclamation, including in the national interest, post should refuse the case pursuant to INA 212(f) . . ." CAR32.

On December 31, 2020, the President signed Proclamation 10131, which extended Proclamations 10014 and 10052 until March 31, 2021. *See* ECF 187.

***The National Interest Exceptions*.** Proclamations 10014 and 10052 contained exceptions to the suspension of entry, including an exception for those whose entry into the United States would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees. *See*, *e.g.*, 85 Fed. Reg. 38,265. The Secretaries of State and Homeland Security are tasked with implementing the Proclamations as applied to visas and entry, respectively, though consular officers are directed to determine, "in their discretion, whether an immigrant has established his or her eligibility for an exception" to the Proclamations. *Id.* at 23,443.

Section 4(a)(i) of Proclamation 10052 directs the Secretaries of State, Labor, and Homeland Security to "establish standards to define categories of aliens covered by [the national interest exception] of [the] proclamation." 85 Fed. Reg. at 38,265; *see* CAR32. Section 4(a)(ii) states that "Aliens covered by [the national interest exception] of this proclamation, under the standards established in section 4(a)(i) of this proclamation, shall be identified by the Secretary of States, the Secretary of Homeland Security, or their respective designees, in his or her sole discretion." 85 Fed. Reg. at 38,265. Pursuant to the directive set out in section 4(a)(i) of the Proclamation, the Departments of State, Labor, and Homeland Security approved an interagency Agreement in Principle in which the agencies agreed "that entry into the United States by a 'a [sic] technical expert or specialist, as a senior level executive or manager, or as a worker that fills an

essential business need where an American worker is not available and whose denial would cause financial hardship to a U.S. business should be considered in the national interest.'" CAR130 (citing CAR137).

Consistent with the Interagency Agency Agreement in Principle, the Assistant Secretary for Consular Affairs made categorical determinations regarding national interest exceptions. CAR148-51. These categorical determinations were published on the State Department website on August 12, 2020, which explains national-interest exceptions to Presidential Proclamations 10014 and 10052 that may be available for certain nonimmigrant workers in H-1B, H-2B, L, and J visa categories. *See* https://travel.state.gov/content/travel/en/News/visas-news/exceptions-to-p-p-10014-10052-suspending-entry-of-immigrants-non-immigrants-presenting-risk-to-us-labor-market-during-economic-recovery.html (last visited Jan. 20, 2021); CAR175-85. The guidance provides "a non-exclusive list of the types of travel that may be considered to be in the national interest," and it is "based on determinations made by the Assistant Secretary of State for Consular Affairs, exercising the authority delegated to him by the Secretary of State under" Proclamations 10014 and 10052. *Id.* The guidance indicates that applicants "who are subject to any of these Proclamations, but who believe they may qualify for a national interest exception or other exception, should follow the instructions on the nearest U.S. Embassy's or Consulate's website regarding procedures necessary to request an emergency appointment and should provide specific details as to why they believe they may qualify for an exception." *Id.* The guidance also clarifies that "[w]hile a visa applicant subject to one or more Proclamations might meet an exception, the applicant must first be approved for an emergency appointment request and a final determination regarding visa eligibility will be made at the time of visa interview." *Id.* And, acknowledging the ongoing limitations of U.S. consular operations around the world due to the COVID-19 pandemic,

the State Department clarifies "that U.S. Embassies and Consulates may only be able to offer limited visa services due to the COVID-19 pandemic, in which case they may not be able to accommodate [a request for a national interest exception] unless the proposed travel is deemed emergency or mission critical." *Id.*

## PROCEDURAL BACKGROUND

This matter involves five fully consolidated cases. On August 7, 2020, the Court entered a Minute Order fully consolidating *Gomez v. Trump*, No. 20-cv-1419, with *Mohammed v. Pompeo*, No. 20-cv-1856, *Fonjong v. Pompeo*, No. 20-cv-2128, and *Aker v. Trump*, No. 20-cv-1926. On October 9, 2020, this Court consolidated *Kennedy v. Trump*, No. 20-2639, with the *Gomez*-led cases. *See* No. 20-2639, Minute Order, October 9, 2020.

***Gomez v. Trump*, No. 20-cv-1419.** Plaintiffs consist of (1) individual family-based immigrant visa sponsors, consisting of citizens and LPRs, who are petitioning on behalf of foreign family members, (2) employers or organizations sponsoring individuals for various nonimmigrant visas, (3) and diversity visa selectees for FY 2020. On September 30, 2020, this Court granted plaintiffs' renewed motion for class certification, certifying the following class under Rules 23(b)(2) and 23(b)(1)(A):

> Individuals who have been selected to receive an immigrant visa through the U.S. Department of State's FY2020 Diversity Visa Lottery and who had not received their immigrant visa on or before April 23, 2020, when the Presidential Proclamation 10014, later extended by Presidential Proclamation 10052, took effect.

ECF 151 at 24.

On behalf of the diversity visa class and individual plaintiffs within the various putative subclasses, Plaintiffs Second Amended Complaint (SAC), ECF 111, as relevant to this summary judgment scheduling order in ECF 184, asserts the following claims: (Count 1) the State

Department's "implementation of the Proclamations violates the [APA] by preventing issuance of visas for which Plaintiffs and class members who are otherwise eligible" SAC, ¶ 310; (Count 2) "Defendants' implementation of the Proclamations' 'national interest' exception violates the APA," *id.*, ¶ 321; (Count 8) "Defendants' implementation of the COVID-19 Guidance in conjunction with its enforcement of the Proclamations with respect to the diversity visa Plaintiffs . . . violates the APA," *id.*, ¶ 353; (Count 9) "Defendants' application of the COVID-19 Guidance in conjunction with the enforcement of the Proclamations to the diversity visa plaintiffs . . . is ultra vires and in excess of their statutory authority, and is accordingly unlawful under 5 USC 706(2)(c)," *id*, ¶ 362; (Count 10) "Defendants' actions have caused the adjudication of the diversity visa plaintiffs . . . to be unlawfully withheld or unreasonably delayed," *id.*, ¶ 369; (Count 11) "Defendants have failed to adjudicate the visa petitions to the diversity visa plaintiffs . . . and have failed to issue visas to these individuals, who are statutorily entitled to receive such visas, in plain contravention of Defendants' nondiscretionary duty." *Id*, ¶ 375.

*Mohammed v. Pompeo*, No. 20-cv-1856. Plaintiffs consist of 493 DV-2020 selectees and their derivative beneficiaries. In their SAC filed on November 2, 2020, ECF 170, plaintiffs assert the following claims: (Count 1) that the State Department's policy of suspending the adjudication of immigrant visas for DV-2020 program selectees and their derivative beneficiaries violates the APA because it is arbitrary and capricious, an abuse of discretion, and not in accordance with law; (Count 2) that the policy violates the APA because it was adopted without notice-and-comment rulemaking; (Count 3) that the State Department violated the APA by failing to adjudicate immigrant visas for DV-2020 program selectees and their derivative beneficiaries within a reasonable time; (Count 4) an APA claim that "Defendants arbitrarily and capriciously created a No-Visa Policy with no reasonable, reasoned, or rational explanation that fails to consider reliance

interests or any of the other serious consequences flowing from their unlawful policy"; (Count 5) a mandamus claim because Defendants have a mandatory duty to adjudicate diversity immigrant visa applications and issue diversity immigrant visas to statutorily eligible individuals. *See id.* at 252-61.

*Fonjong v. Trump*, **No. 20-cv-2128**. The plaintiffs filed a first amended complaint on October 29, 2020, ECF 165, that is identical to the operative complaint in *Mohammed*, on behalf of 243 other DV-2020 selectees and their derivative beneficiaries. The plaintiffs asserted the same claims and seek the same relief as the *Mohammed* plaintiffs.

*Kennedy v. Trump*, **No. 20-cv-2639.** The plaintiffs filed a first amended complaint on September 23, 2020, ECF 13 under 20-cv-2639, that is identical to the operative complaints in *Mohammed* and *Fonjong*, on behalf of 3,288 DV-2020 selectees and their derivative beneficiaries. *See id.* ¶ 1. The plaintiffs asserted the same claims and seek the same relief as the *Mohammed* and *Fonjong* plaintiffs.

*Aker v. Trump*, **No. 20-cv-1926.** The plaintiffs are 149 individually named diversity visa selectees and their derivative beneficiaries from 14 different countries challenging Proclamations 10014 and 10052. *See* No. 20-cv-1926, ECF No. 3, ¶ 4. The *Aker* plaintiffs assert eight claims as relevant to the instant summary judgment briefing pursuant to ECF 184: (Count 2) that the State Department policy of suspending visa issuance was arbitrary and capricious in violation of the APA; (Count 3) that the State Department policy violates the APA because it was adopted without notice-and-comment rulemaking; (Count 5) that the State Department violated the APA by failing to adjudicate immigrant visas for DV-2020 program selectees and their derivative beneficiaries within a reasonable time. *See* No. 20-cv-1926, ECF No. 3 at 117-28.

## STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56 is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the standard of review under the APA. *See Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010). Due to the limited role the Court plays in reviewing the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable. *See Visinscaia v. Beers*, 4 F. Supp. 3d 126, 130 (D.D.C. 2013); *see also* Comment to Local Civil Rule 7(h). Rather, the Court should enter summary judgment for the agency unless it violated the APA by taking an action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Deppenbrook v. PBGC*, --- F.3d ---, 2015 WL 728062, at *4 (D.C. Cir. 2015); *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 81, 89 (D.D.C. 2015). Whether the agency complied with the governing APA standard is entirely a question of law. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It requires the Courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "highly deferential" standard, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007), which "presume[s] the validity of agency action," *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999), and precludes the Court from substituting its judgment for that of the agency, *see Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). The Court "will not disturb the decision of an agency that has

examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Americans for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quotations and citation omitted). A court's reversal of an agency's decision, therefore, is appropriate only where the decision was not "based on a consideration of the relevant factors" or where there "has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The plaintiff bears the burden of establishing the invalidity of the agency's action. *Fulbright v. McHugh*, 67 F. Supp. 81, 89 (D.D.C. 2014) (citation omitted).

Additionally, the Government may provide the declaration of an agency official in an APA case to "illuminate reasons obscured but implicit in the administrative record." *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (citations omitted); *see also Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 464 (D.C. Cir. 2016) (considering "post-hoc account" of agency decision in declaration form where it "furnishes an explanation of the administrative action that is necessary to facilitate effective judicial review"); *Appeal of Bolden*, 848 F.2d 201, 207 (D.C. Cir. 1988) (admitting post-decisional document into the record in an APA case where it helped "to amplify the administrative record").

## ARGUMENT

The Court should grant summary judgment in favor of Defendants because all of Plaintiffs' challenges to the agencies' implementation of the Proclamations fail.

### A.    Plaintiffs' Claims Are Barred By Principles Of Nonreviewability.

At the threshold, judicial review of Plaintiffs' challenges to the agencies' implementation of the Proclamations are barred by principles of nonreviewability. *See Doe #1 v. Trump*, —F.3d—

13

2020 WL 7778213 (9th Cir. Dec. 31, 2020). Relying on *Hawaii*, 138 S. Ct. at 2407, the Ninth Circuit recently indicated that "[o]f course, if we had concluded that Plaintiffs were likely to succeed on the merits [on their challenge to a Presidential Proclamation], we would have been required to address the Government's properly asserted arguments concerning the consular nonreviewability doctrine." 2020 WL 7778213 at *7 n. 7.

For non-constitutional claims by U.S. citizens or any claims asserted by aliens abroad, it is a fundamental and long-recognized separation-of-powers principle that the political branches' decisions relating to the exclusion of aliens abroad is not subject to judicial review. The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). Accordingly, "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power" of courts to control. *Fiallo*, 430 U.S. at 796 (citation omitted).

Outside of a narrow exception for certain constitutional claims brought by U.S. resident plaintiffs—because exclusion is "a fundamental act of sovereignty" by the political branches and noncitizens have no "claim of right" to enter the United States—courts may not review decisions to exclude aliens "unless expressly authorized by law." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950). Congress has established a comprehensive statutory framework for judicial review of decisions concerning an alien's ability to remain in the United States. *See* 8 U.S.C. § 1252. But Congress has never authorized review of a visa denial—and in

fact has expressly rejected a cause of action to seek judicial review of visa denials. *See* 6 U.S.C. § 236(f) (no "private right of action" to challenge decision "to grant or deny a visa"); *see also Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (denial of visa to alien abroad "is not subject to judicial review ... unless Congress says otherwise"). Accordingly, any statutory claim challenging the exclusion of aliens is non-justiciable.[2]

Under these principles, Plaintiffs' claims are barred from judicial review. Just as the doctrine of consular nonreviewability precludes judicial review of consular officers' decisions to deny visa applications at posts overseas, *see Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999), it similarly precludes review of the Secretary's decision not to prioritize the processing of visa applications made by aliens whose entry into the United States is suspended under 8 U.S.C. § 1182(f) and who are therefore ineligible for a visa. In essence, Plaintiffs seek judicial review of the Executive Branch's exercise of power clearly provided to it by Congress to govern the entry of foreign nationals. *See Fiallo*, 430 U.S. at 796. The State Department's determination how to prioritize consular services abroad during a global pandemic and not to expend scarce resources processing visa applications for persons subject to restrictions imposed by the President under 8 U.S.C. § 1182(f) —made pursuant to express congressional authority— is "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations," and such "matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). It does not matter that Plaintiffs here purport to

---

[2] The Supreme Court did not find it necessary to address these limits on judicial review in *Hawaii* and instead "assume[d] without deciding that plaintiffs' statutory claims [were] reviewable," because, "even assuming that some form of review is appropriate," the challenges to the entry restrictions at issue in that case failed on the merits. 138 S. Ct. at 2407, 2409-11.

challenge a "policy" rather than individual visa adjudications. *See Hawaii*, 138 S. Ct. at 2420 ("asking only *whether the policy* is facially legitimate and bona fide" and noting how, if the answer to that question is yes, it "would put an end to our review" (emphasis added)). Regardless of how Plaintiffs frame the issue, because they challenge the "terms and conditions upon which [aliens] may come to this country," the nonreviewability principles set forth above bar review. *Mandel*, 408 U.S. at 766; *Saavedra Bruno*, 197 F.3d at 1160 (collecting cases) ("[T]his court and other federal courts have adhered to the view that consular visa determinations are not subject to judicial review.").

Accordingly, review of Plaintiffs' challenges to the agencies' implementation of the Proclamations is barred by the doctrine of nonreviewability.

**B.      Defendants Have Properly Interpreted the Restrictions Imposed by the President Under 8 U.S.C. § 1182(f) To Preclude Visa Issuance, Which Compel Consular Officers To Refuse Visas To Aliens Whose Entry Is Suspended Under Section 1182(f) And, Therefore, There Is No Reviewable Final Agency Action Under The APA.**

Plaintiffs challenge the State Department's longstanding understanding that the INA requires the refusal of visas to persons subject to the suspension of entry or restrictions imposed by the President under 8 U.S.C. § 1182(f). The Court has described this practice as the "policy of suspending all processing and issuance of visas in categories covered by the Proclamation and not subject to an exception," and referred to it as the "No-Visa Policy." PI Order, ECF 123 at 14. One component of the so-called No-Visa Policy is that a consular officer must refuse a visa to an individual subject to an entry suspension under section 1182(f). At the outset, the administrative record clearly shows that the State Department understood that proclamations under section 1182(f) require visa refusals. *See*, *e.g.*, CAR24, 28, 36, 38, 156. Accordingly, Plaintiffs' challenges to this aspect of the No-Visa Policy fail for three reasons. First, consular officers' refusal of visas

16

to persons whose entry is suspended by the Proclamations is required by the INA, and the text and context of section 1182(f) supports the State Department's interpretation of this statutory provision. Second, even if the Court doubts that such denials are required, the State Department's long-held interpretation that denials are required is both a reasonable and lawful approach to carry out its role in effectively administering the United States visa system. Third, to the extent the plain text of section 1182(f) is ambiguous, the State Department's interpretation of the statute, which is consistent with the FAM and its longstanding practice, is entitled to deference.

### 1. The INA requires consular officers to refuse visas to aliens whose entry is suspended under Section 1182(f).

Pursuant to 8 U.S.C. § 1201(g), a visa may not be issued by a consular officer if the applicant "is ineligible to receive a visa . . . under section 1182 of [the INA], or any other provision of law." Whatever the relevant underlying ground for ineligibility in any individual case, the applicant is denied a visa because she is "ineligible" to enter "under section 1182," including foreign nationals who are ineligible because they are subject to a suspension of entry under section 1182(f). The fact that section 1182(f) does not specifically use the word "visas" is irrelevant. The D.C. Circuit has explained that "as an absolute precondition to admission, an alien must submit his proof *that he is not excludable* to a preliminary screening by a consular officer." *Castaneda-Gonzalez v. INS*, 564 F.2d 417, 426 (D.C. Cir. 1977) (interpreting 8 U.S.C. § 1201(g) (emphasis added)); *see also* 8 U.S.C. § 1182(a). The conditions for being "excludable"—or now, inadmissible, *see Judulang v. Holder*, 565 U.S. 42, 46 (2011)—are contained in 8 U.S.C. § 1182. There are no exceptions in the INA that would lawfully permit a consular officer to issue a visa to an applicant who was determined to be inadmissible under section 1182. In conjunction with this provision, section 1201(g) provides that "[n]o visa . . . shall be issued to an alien if . . . it appears

to the consular officer . . . that such alien is ineligible to receive a visa or other such documentation under section 1182." 8 U.S.C. § 1201(g).

The Supreme Court has acknowledged that aliens subject to exclusion under section 1182(f) are similarly ineligible for visas. In *Hawaii*, the Supreme Court rejected a claim that the agency's refusal to issue visas under that Proclamation 9645 was inconsistent with the INA. 138 S. Ct. at 2414-15. This Court stated in the PI Order that *Hawaii* "never held that the President's suspension of entry under § 1182(f) renders a person ineligible to receive a visa." ECF 123 at 62. But, respectfully, the *Hawaii* Court *did* suggest, and issued a decision consistent with an interpretation, that the State Department's refusal of visas pursuant to a presidential proclamation is compelled by the INA:

> Section 1182 defines the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa). Once Section 1182 sets the boundaries of admissibility into the United States, Section 1152(a)(1) prohibits discrimination in the allocation of immigrant visas based on nationality and other traits.

138 S. Ct at 2414 (suggesting that aliens who are inadmissible under any subsection of section 1182, including 1182(f), are ineligible to receive visas).

In addition, the Proclamations challenged here also rely upon section 1185(a)(1), which renders it unlawful for an alien to enter or to *attempt to enter* the United States in violation of a Proclamation or executive order. 8 U.S.C. § 1185(a)(1). In the PI Order, this Court stated that the Proclamations "solely address the *entry* of immigrants and certain nonimmigrants into the country; they say nothing about the issuance and adjudication of visas." ECF 123 at 60. Additionally, the PI Order emphasized that section 1185(a)(1) makes it unlawful for an alien to "*enter*" the United States in violation of a presidential order. But the Court must also consider the language in section

1185(a)(1) that makes it unlawful for an alien to *attempt* to enter the United States in violation of a presidential order.

As the D.C. Circuit has noted, a visa is not merely an inert document; a visa gives an individual permission to arrive at a port of entry and to apply for lawful admission. *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999) (citing 8 U.S.C. 1201(h)). Thus, a visa confers the right to attempt to lawfully enter the United States, but section 1185(a)(1), on which the President specifically relied in issuing Proclamations 10014 and 10052, makes it unlawful to attempt to enter the United States in violation of rules, regulations and orders prescribed by the President. When the President issues a proclamation or executive order that bars an alien from entering the United States, he has, pursuant to section 1185(a)(1), made it unlawful for an alien *to attempt to enter* the United States in violation of that proclamation or executive order. An interpretation that requires consular officers to grant visas—documents which grant permission to the bearer to seek lawful entry to the United States—to individuals who are not permitted to attempt to enter the United States under section 1185(a)(1) does not harmonize this provision with the rest of the INA and invites confusion.

Section 1201(g) must be read in light of the INA as a whole. As the Supreme Court has explained, "it [is] fundamental that a section of a statute should not be read in isolation from the context of the whole Act." *Richard v. United States*, 369 U.S. 1, 591–92 (1962). The Court's interpretation "must not be guided by a single sentence or member of a sentence, but (should) look to the provisions of the whole law, and to its object and policy." *Id*. at 592. Here, the INA creates a significant legal infrastructure for ensuring that visas are not issued to individuals who are not eligible to enter.

The State Department's interpretation is also grounded in other INA provisions. Section 1201(a) confers upon consular officers the authority to issue "*immigrant visas*" and "*nonimmigrant visas.*"  Those terms are specifically defined in 8 U.S.C. § 1101 as follows:

> (16) The term "immigrant visa" means an immigrant visa required by this Act and properly issued by a consular officer at his office outside of the United States to an *eligible immigrant under the provisions of this Act.*
>
> . . . .
>
> (26) The term "nonimmigrant visa" means a visa properly issued to an alien as *an eligible nonimmigrant* by a competent officer as *provided in this Act.*

8 U.S.C. § 1101 (emphasis added).

Those definitions, in conjunction with 8 U.S.C. § 1201(a), require that a consular officer can issue a visa only to an alien who is an "eligible immigrant" or an "eligible nonimmigrant" under the provisions of the INA. Those provisions are most sensibly read to refer to an alien who is eligible to lawfully enter the United States, because an alien who is not permitted to enter is not eligible to immigrate. Thus, those definitions prohibit a consular officer from issuing visas to aliens who were not eligible immigrants or nonimmigrants under the entirety of the INA. An alien who the President has specifically barred from entry pursuant to section 1182(f) is not, under the INA, an "eligible immigrant" entitled to an immigrant visa. Similarly, the regulation that requires a consular officer to have a legal basis for a visa refusal notes that the applicant bears the burden to establish that he is eligible under the entirety of the provisions of the INA, not simply under section 1182(a).  *See* 22 C.F.R. § 40.6 ("The burden of proof is upon the applicant to establish eligibility to receive a visa under INA 212 or any other provision of law or regulation.").

The Department's longstanding interpretation is also grounded in provisions of immigration law that refer to the treatment of "excludable" aliens. The INA and other U.S. immigration laws include examples of Congress using "excludability" to refer to grounds for both

the refusal of visas and the denial of entry or admission. For example, prior to being amended in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), section 1182(a) identified "classes of excludable aliens" and provided that, "[e]xcept as otherwise provided in this chapter, the following describes classes of excludable aliens who are ineligible to receive visas and who shall be excluded from admission to the United States." IIRIRA's amendments to the INA replaced the term of excludable, which included visa ineligibility and exclusion from admission, with inadmissible. *See Barton v. Barr*, 140 S. Ct. 1442, 1455 (2020) (Under IIRIRA "noncitizens previously labeled 'excludable' are now labeled 'inadmissible.'").[3]

However, "excludability" as a concept is still preserved in the INA and relevant to the State Department's interpretation of section 1182(f).  In 1990, prior to IIRIRA, Congress required the Attorney General and the Secretary of State to develop "exclusion lists" that both agencies would use—one abroad and one at ports of entry—to identify aliens who were excludable. *See* Pub L. 101-649, 104 Stat. 5075 (8 U.S.C. 1182 note). The statute directed the development of "protocols and guidelines for updating lookout books and the automated visa lookout system and similar mechanisms for the screening of aliens applying for visas for admission, or for admission, to the United States." *Id*.

In 1994, Congress passed legislation requiring consular officers to confirm that a non-citizen is not "excludable" to the United States prior to visa issuance. *See* Foreign Relations Authorization Act, Years 1994 and 1995, Pub. L. No. 103-236, § 140(c)(1)(B) (8 U.S.C. 1182

---

[3] IIRIRA's amendments were intended to ensure that the terminology, excludability versus inadmissibility, conformed with changes made to removal provisions, and there is no indication in the text of the statute or the legislative history that Congress intended to alter the treatment for 1182(f) whereby an alien who was barred from entry into the United States could nonetheless be considered eligible for a visa. *See* Pub. L. 104-208 § 308(d) ("Additional Conforming Amendments Relating to Exclusion and Inadmissibility").

note). Under that legislation, "whenever a United States consular officer issues a visa for admission to the United States, that official shall certify, in writing, that a check of the Automated Visa Lookout System, or any other system or list which maintains information about the <u>excludability</u> of aliens under the [INA] [8 U.S.C. 1101 et seq.], has been made and that there is <u>no basis under such system for the exclusion of such alien</u>." (emphasis added). A determination that an individual is subject to a section 1182(f) proclamation will result in the alien's name being included in the automated visa lookout system. Ramotowski Decl., ¶ 8. As a result, a consular officer who issues a visa to an applicant subject to a 1182(f) restriction could be found to have violated Visa Lookout Accountability requirements. *See* Pub. L. No. 103-236, § 140(c)(1)(B); Ramotowski Decl., ¶¶ 7-8. Thus, The INA provisions concerning visas and excludability, coupled with the statutory provisions governing the automated visa lookout system, support the Department's historical understanding that an entry restriction under section 1182(f) is a basis for ineligibility to receive a visa.

Additionally, the State Department's interpretation comports with other provisions of law. For example, 8 U.S.C. § 1182e, under the heading "*Denial of Entry*," provides, "Notwithstanding any other provision of law, the Secretary of State *may not issue any visa* to . . . any foreign national whom the Secretary finds . . . to have been directly involved in the establishment or enforcement of population control policies forcing a woman to undergo an abortion against her free choice . . ." 8 U.S.C. § 1182e (emphasis added). Section 1182f contains similar language construing the "denial of entry" as barring the issuance of visas. *See* 8 U.S.C. § 1182f(a). Thus, sections 1182e and 1182f are *in pari materia* to the proper interpretation of section 1182(f).

In sum, relevant statutes strictly prohibit consular officers from issuing visas to individuals who are not admissible. Reading all of these provisions together, it is clear that Congress prohibited

the issuance of visas to individuals who are inadmissible to the United States, and the refusal of visas to persons subject to entry restrictions issued by the President under section 1182(f) is required under the INA.

### 2. The State Department's longstanding interpretation of section 1182(f) is both reasonable and lawful.

Even if the Court disagrees that visa refusal is compelled under section 1182(f), the State Department's long-held understanding that the INA authorizes it is reasonable and consistent with law. Indeed, since at least 1995, the State Department has applied section 1182(f) Presidential Proclamations as a basis for visa refusal. Ramotowski Decl., ¶ 2. The FAM at 9 FAM 301.4-1(a) advises consular officers that the basis on which applicants must be denied visas are established by law and lists section 1182(f) as such a ground of refusal.[4] Ramotowski Decl., ¶ 3. In addition to listing section 1182(f) as a ground of refusal generally, the FAM also lists several major Presidential Proclamations related to human rights violations or national security grounds imposing restrictions and requiring refusals pursuant to this authority.[5] *Id.*

State Department visa statistics confirm that consular officers have regularly refused immigrant and nonimmigrant visa applications pursuant to section 1182(f) in the years prior to the Presidential Proclamations and Executive Orders on immigration beginning in 2017. *See* Annual Reports of the Visa Office, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports.html, including reports from 2000-2020.

---

[4] This Court acknowledged in the PI Order that 9 FAM 301.4-1 "does suggest that aliens excluded under § 1182(f) may be ineligible to receive visas," but did not address its merits because "[t]hat section has not been briefed." ECF 123 at 62 n.20. The government presents it for consideration here.

[5] *E.g.*, Ramotowski Decl. ¶ 4 (FAM 301.1-1(c)(7) regarding Apr. 4, 2011 PP 8697 applying to human rights violators).

This practice by the Department of State is well-established and extends far beyond the context of the COVID-19 Proclamations. There are several examples of presidential proclamations barring entry that clearly envision enforcement of the proclamation through visa refusals. For example, in Executive Order 13780, the President invoked 8 U.S.C. § 1182(f), among other authority, to improve "the screening and vetting protocols and procedures associated with the *visa-issuance* process" and the United States Refugee Admissions Program. 82 Fed. Reg. at 13,209 (Mar. 6, 2017) (emphasis added). Presidential Proclamation 8697 invoked 8 U.S.C. § 1182(f) to restrict entry of persons participating in serious human rights and humanitarian law violations, and directed "[t]he Secretary of State, or the Secretary's designee, in his or her sole discretion, shall identify persons covered by section 1 of this proclamation, pursuant to such standards and procedures as the Secretary may establish." Presidential Proclamation 8697, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses*, 76 Fed. Reg. 49,277, 49,278 (Aug. 4, 2011) ("PP 8697") (emphasis added); *see also* 9 FAM 301.4-1(c)(7)(i) (identifying PP 8697 as grounds for refusal under the category of human rights violations); *accord* 9 FAM 302.7-11(b) (prohibiting, under 8 U.S.C. § 1182(f), "the *issuance* of a visa" to individuals involved in specific conduct (emphasis added). And, in Presidential Proclamation 8342, the President invoked 8 U.S.C. § 1182(f) to suspend entry of foreign government officials who failed to combat human trafficking, delegating authority to the Secretary of State to implement the proclamation. Proclamation 8342, *To Suspend Entry As Immigrants And Nonimmigrants of Foreign Government Officials Responsible for Failing To Combat Trafficking In Persons*, 74 Fed. Reg. 4,093, 4,094 (Jan. 21, 2009) ("PP 8342"); *see* 9 FAM 301.4-1(C)(3)(e) (identifying human trafficking as a criminal

ground for refusal); *see also* 9 FAM 302.3-8 (deeming an alien ineligible under 8 U.S.C. § 1182(a)(2)(H)).

This history indicates that Presidents have consistently intended for the bar on "entry" pursuant to section 1182(f) to be implemented at the first step of immigrant or nonimmigrant travel to the United States (that is, at the time of the alien's visa application abroad) and not at the last step (when the alien attempts to board an airplane or when the alien attempts to enter at the U.S. border port-of-entry).

Further, prior to the PI Order, courts have consistently accepted the application of restrictions imposed under section 1182(f) as a basis for visa denial. In a series of cases challenging visa refusals and waiver decisions under Presidential Proclamation 9645, courts within the D.C. Circuit repeatedly accepted the premise that an alien's visa application may properly be denied pursuant to section 1182(f).  For example, in *Kangarloo v. Pompeo*, 2020 WL 4569341 (D.D.C. Aug. 7, 2020), the Court stated that the plaintiff's visa refusal "was made under 8 U.S.C section 1182(f), which permits consular officers to refuse visas pursuant to presidential immigration restrictions." (emphasis added); s*ee also, Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 114-15 (D.D.C. 2020); *Didban v. Pompeo*, 435 F. Supp. 3d 168, 173-74 (D.D.C. 2020); *Thomas v. Pompeo*, 438 F. Supp. 3d 35, 41 (D.D.C. 2020); *Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 92-93 (D.D.C. 2020); *Ghadami v. DHS*, No. 19-cv-00397, 2020 WL 1308376, at *4–5 (D.D.C. Mar. 19, 2020); *Jafari*, 2020 WL 2112056 at *3; *Sarlak v. Pompeo*, No. 20-35, 2020 WL 3082018, at *3–4 (D.D.C. Jun. 10, 2020).  In none of these cases did the Court question the legality of a visa denial based on section 1182(f).

Additionally, this approach serves important operational and national security interests. By delegating responsibility to implement entry-suspension proclamations to the Secretary of State,

the President is ensuring that the suspension be implemented through denial of a visa, the first-step of an immigrant or nonimmigrant's travel to the United States, and not when the alien later attempts to enter the United States at the border port-of-entry. Ramotowski Decl., ¶ 11. Indeed, the administrative record demonstrates that the State Department's non-processing of cases where entry would be barred by one of the Proclamations was based on a rational explanation—ensuring that the limited resources of consular posts will be focused on those permitted to enter the United States, particularly when it "already suspended routine [nonimmigrant visa] and [immigrant visa] services due to the COVID-19 pandemic." *See*, *e.g.*, CAR17. This practice also avoids the confusion that would occur if an alien receives a visa despite being prohibited from entering by the Proclamations and then attempts to enter the United States. In that instance, it would be up to a U.S. Customs and Border Protection Officer to deny entry despite the existence of a recently-issued visa. This puts an undue burden on officers at the port of entry to double-check entry restrictions and will inevitably lead to mistakes, disruption, and delays at ports of entry. *See* Ramotowski Decl., ¶ 12.

In sum, for decades, Presidents have consistently acted under the INA to impose restrictions on visa eligibility under section 1182(f), and the Department's decades-long understanding of this authority with the acquiescence of the federal courts, is both lawful and necessary to the effective enforcement of such entry restrictions. In that light, the Court should uphold this longstanding practice and reject Plaintiffs' requested relief.

### 3. State Department's longstanding interpretation of section 1182(f) as requiring visa refusals for covered aliens is entitled to deference.

Even if the Court determines that the INA is either ambiguous or silent as to the State Department's authority to issue visas, its interpretation is entitled to deference. *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) (citing *United States v. Mead Corp.*,

533 U.S. 218 (2001)).  "[I]f the agency enunciates its interpretation through informal action that lacks the force of law, [courts] accept the agency's interpretation only if it is persuasive." *Mount Royal Joint Venture*, 477 F.3d at 754 (citing *Mead*, 533 U.S. at 235); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (explaining that courts may accord an informal agency determination some deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "but only to the extent that [agency] interpretations have the 'power to persuade[.]'" (quoting *Skidmore*, 323 U.S. at 140)). The agency interpretation's "power to persuade" is determined by the thoroughness evident in the agency's consideration, the validity of its reasoning, and its consistency with earlier pronouncements. *Skidmore*, 323 U.S. at 140. An agency's interpretation "may merit some deference whatever its form, given the specialized experience and broader investigations and information available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires[.]" *Mead*, 533 U.S. at 234.

The State Department's challenged practice here clearly meets this standard. The Department objectively has the benefit of "specialized experience and broader … information available" to it in administering visa operations and justifies the judicial branch's deference. Moreover, particularly in the function of carrying out Presidential proclamations authorized by statute to serve the national interest, "the value of uniformity in its administrative and judicial understandings of what a national law requires" cannot reasonably be questioned. To that end, the State Department's role in enforcing the nation's visa laws clearly qualifies for the type of informal interpretation that is worthy of *Skidmore* deference.

Moreover, as demonstrated thoroughly above, the State Department's interpretation clears the "power to persuade" standard. First, the thoroughness of the State Department's consideration is demonstrated by the decades of FAM guidance instructing its consular officers that section

1182(f) is a basis for visa refusal, particularly in light of the statutory requirements imposing penalties on these officers for issuing a visa to someone who is excludable. *Supra* at 21-24. Indeed, the maintenance of the Automated Visa Lookout System further evidences the resources that have been dedicated to ensure that visas are only issued to those who are eligible to enter. Pub. L 103-236. Second, the validity of the State Department's reasoning is also confirmed when the INA is properly read as a whole. Section 1201(g), in combination with section 1182, as well as the provisions barring consular officers—the exclusive conduit for visa issuance—from issuing visas to inadmissible individuals provide an objectively valid understanding of the statutory framework Congress enacted for the management of the visa system as well as to aid the President's enforcement of exclusionary proclamations. *Supra* at 17-23. Finally, the consistency of the State Department's application is clear. This interpretation did not originate in January 2017. Rather, it has been the consistent practice over decades by Secretaries of State and Presidents of all partisan and ideological stripes, with the acquiescence of the judiciary. *Supra* at 23-25.

In sum, even without the trappings of formal rulemaking, the State Department's interpretation of the INA as requiring and authorizing it to deny visas to individuals who are ineligible for entry into the United States has the "power to persuade" recognized under *Skidmore*. Therefore, that interpretation should be accorded deference, and the Court should grant summary judgment in favor of the government.

### 4. Proclamations 9645 and 9983 require visa refusals.

Plaintiffs in *Mohammed*, *Fonjong*, and *Kennedy* challenge the No-Visa Policy in connection with the State Department's implementation of Proclamations 9645 and 9983. *See*, *e.g.*, *Kennedy* FAC, ¶¶ 9777, 9806, 9816. But those arguments do not bear at all on Proclamations 9645 and 9983. Contrary to their arguments, those proclamations on their face address visa eligibility,

28

waivers of visa ineligibility, and permit aliens to demonstrate eligibility for waivers. Proclamation 9645, for example, explicitly introduces restrictions on visa issuance. Section 1 explains that "[s]creening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing" the policy of protecting United States citizens from terrorist attacks and other public safety threats.  82 Fed. Reg. at 45,162.  In Section 2, the President suspended and limited the entry of certain foreign nationals "subject to categorical exceptions and case-by-case waivers." *Id*. at 45,165.  Section 3(c) establishes a detailed framework that addresses waivers for "the suspensions of and limitations on entry" under Section 2, *id*. at 45,167, explaining that "[n]otwithstanding the suspensions of and limitations on entry set forth in section 2 of this proclamation, a consular officer . . . may . . . grant waivers on a case-by-case basis to permit the entry of foreign national for whom entry is otherwise suspended or limited," *id*. at 45,168.  Section 3(c)(E)(iii) provides that "any waiver issued by a consular officer as part of the visa adjudication process will be effective both for the issuance of a visa and for any subsequent entry on that visa, but will leave unchanged all other requirements for admission or entry." *Id*. at 45,169. Any waiver issued during the visa adjudication process is effective both for issuance of a visa and subsequent entry in the United States on that visa.  *See* 82 Fed. Reg. at 45,169.

As a result, Plaintiffs cannot state a claim under the APA against the President or any agency with respect to Proclamations 9645 and 9983.

*       *       *

In sum, this Court should grant summary judgment in favor of Defendants on the issue of visa issuance in the context of section 1182(f).

### C.     The Court should reject the Plaintiffs challenges to the State Department's COVID-19 Prioritization Guidance for Consular Operations.

A separate aspect of the No-Visa Policy challenged by the Plaintiffs is the State

Department's COVID-19 Prioritization Guidance regarding the suspension of routine visa services. The *Gomez* Plaintiffs ignore the reality of the COVID-19 pandemic and challenge the State Department's implementation of its COVID-19 Guidance as being *ultra vires*, ECF 111, ¶¶ 358-64, and in violation of the APA, *id*, ¶¶ 365-72, by claiming that the Department's definition of "emergency" and "mission critical" services was arbitrary and capricious.[6] But both of these claims fail because Congress has imbued the State Department with broad authority to "administer, coordinate, and direct the Foreign Service of the United States and the personnel of the Department of State," 22 U.S.C. § 2651a. Plaintiffs' claims are not reviewable under the APA, and even if they were, reasonable inferences to be drawn from the Administrative Record supports the State Department's rational determination on which visa services at U.S. consular posts in different countries during the uncertainty of the pandemic would be considered "mission critical."

## 1. The State Department's COVID-19 Prioritization Guidance are not subject to judicial review.

The government disputes that the State Department's COVID-19 Prioritization Guidance constitutes a final agency action. *See* ECF 123 at 74. But even if it is, the Department's determination on its prioritization of visa services is not subject to judicial review because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under the APA, a court may not review a discretionary final agency action if the action fails to provide a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action." *Legal Assistance*

---

[6] *Mohammed*, *Fonjong*, and *Kennedy* plaintiffs also appear to make related APA claims in connection to "mission critical" exception to the COVID-19 Guidance. *See*, *e.g.*, *Fonjong* FAC, ECF 165, ¶¶ 1238, 1242. Their claims fail for the same reasons discussed here.

*for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (quoting *Heckler*, 470 U.S. at 830). The D.C. Circuit has held that agency determinations dealing with national interest and foreign policy issues are not proper subjects of judicial intervention. *See*, *e.g.*, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 41-42 (D.C. Cir. 2000) (finding that "determinations regarding military value" and "judgments on questions of foreign policy and national interest" are "not subjects fit for judicial involvement"); *Nat'l Fed. Of Federal Emps. (NFFE) v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990) ("[T]he federal judiciary is ill-equipped to conduct reviews of the nations' military policy.").

Here, Congress has delegated to the Secretary of State the responsibility for the operation of over 300 U.S. missions worldwide, the safety and security of all employees of the U.S. Foreign Service and the allocation of resources to the different consular posts resources necessary for consular officers to administer the INA and process over 110 classifications of immigrant and nonimmigrant visas. 22 U.S.C. § 2651a. There can be no dispute that the Secretary of State's discretion to carry out this congressional mandate is crucial in the midst of the COVID-19 pandemic, a circumstance that illustrates the D.C. Circuit's wisdom in deferring to agencies to make their own decisions on allocating scarce resources within their agencies. *Mass. v. EPA*, 549 U.S. 497, 527 (2007) ("an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."); *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1997) (declining to enter an injunction compelling the Food and Drug Administration to act because courts "have no basis for reordering agency priorities"); *see also id*. at 74 (recognizing that "respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice

of priorities").

Through their challenge to the State Department's COVID-19 Prioritization Guidance, Plaintiffs are asking this Court to disregard the authority of the D.C. Circuit and instead "reorder[] [the State Department's] priorities" and "assume command over [the State Department's] choice of priorities" at U.S. consular posts around the world, regardless of the impact of such an action on State Department employees and U.S. foreign relations. This would contravene the broad discretionary authority granted to the Secretary in 22 U.S.C. § 2651a and has already lead to anomalous results such as delaying visas for individuals who are excepted under the Proclamations and who could otherwise enter the United States, while expediting the processing of visa applications for individuals whose entry to the country remains suspended.

In *National Federation of Federal Employees*, the D.C. Circuit held that the Defense Secretary's decisions regarding military base closures and realignments were "committed to agency discretion by law" and hence not subject to review under the APA. 905 F.2d at 405. Although the Base Closure Act incorporated nine specific criteria that had informed the Secretary's closure and realignment decisions, the court held that his decisions were not reviewable because the "subject matter of those criteria is not 'judicially manageable.'" *Id*. The court concluded that review of the Secretary's decisions would, therefore, require "second guessing the Secretary's assessment of the nation's military force structure and the military value of the bases within that structure," and courts are "ill-equipped to conduct reviews of the nation's military policy." *Id.* at 405-06. Here, too, the consideration of whether to prioritize and expedite diversity visa cases during the State Department's suspension of routine visa services due to COVID-19 is not judicially manageable, and such review would require second guessing the politically sensitive determinations of the State Department. *See Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters

intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

This Court should, therefore, decline to resolve the merits of Plaintiffs' APA claim concerning the State Department's COVID-19 Prioritization Guidance because such review would require the court to "reconsider[] the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security." *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 32 (D.D.C. 2020) (*quoting El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010)). Indeed, recently, Judge Howell declined to review essentially the same argument presented here, which alleged that State Department's "decisions to exclude [visa] applicants from the list of 'mission critical' functions . . . were arbitrary and capricious . . ." *Tate v. Trump*, No. 20-cv-3249-BAH (D.D.C., Jan. 16, 2021), ECF 16 at 21 n. 8. Judge Howell found that "In challenging defendants' prioritization, plaintiffs suggest no standard to employ in reviewing and forcing the State Department to give them priority or even how to evaluate internal and purely discretionary State Department actions ordering its priorities and allocating resources in [a] pandemic." *Id.* Judge Howell further noted that "the determination and prioritization of 'mission critical' functions during a time of crisis and administrative triage lies squarely within the discretion of the Secretary of State, under 22 U.S.C. § 2651a, and is not subject to judicial review." *Id.* (citing *Heckler*, 470 U.S. at 830).

In sum, judicial review is inappropriate, and the Court should dismiss Plaintiffs' claims.

## 2. State Department's "mission critical" determinations within its COVID-19 Prioritization Guidance was rational.

Even if Plaintiffs' claims are reviewable under the APA, the State Department's decisions on what services to prioritize was reasonable. In other words, the exclusion of diversity visa cases from "mission critical" processing during the COVID-19 pandemic was not arbitrary and

capricious due to the significant resource constraints.

On March 20, 2020, the Department instructed all posts "to immediately suspend all routine nonimmigrant and immigrant visa services due to the COVID-19 pandemic," but "to continue to provide mission-critical and emergency visa services." CAR12. The suspension of routine visa services was necessary because applicants are legally required to make a personal appearance and to be interviewed by a consular officer. 22 C.F.R. § 42.62. The State Department identified "some examples of mission-critical visa services" such as: "age-out" cases, spouses and children of U.S. citizens (IR2/CR2), adoptees and prospective adoptees (IR2, IR3/IH3, and IR4/IH4), Afghan and Iraqi Special Immigrant Visas (SQ/SI), and certain health care professionals. *See* CAR12; Marwaha Decl., ¶ 3. Moreover, State Department advised that "[i]n determining the use of scarce resources, posts may want to consider the purpose of travel (e.g., an alien spouse accompanying an evacuating U.S. citizen is mission-critical)," and that posts may continue visa processing for interview waiver cases and those that did not legally require an in-person interview. CAR12. In other words, State Department acknowledged that its capacity for processing visas would be enormously diminished through its efforts to protect against COVID, particularly due to in-person interview requirements that could not legally be waived, but to continue those processes that would most efficiently serve State Department's mission overseas. *See, e.g.* CAR39 ("If a case falling within an [interview waiver] category is found to require an interview, it should be treated as a normal NIV application, which may mean the case cannot be processed further until post can bring the applicant in for an interview."). In June 2020, additional family-based categories were added. CAR26.

Plaintiffs argue that it was arbitrary and capricious for State Department to exclude DV-2020 applicants from the class of "mission critical" services due to the fiscal year cut-off. *See, e.g.*,

*Gomez* SAC, ¶ 354. This decision, however, was rational, especially considering State Department's understanding that a visa applicant subject to the Proclamation must be refused a visa. *See*, *e.g.*, CAR24, 26, 28, 36, 38. First, the State Department only included "narrow exceptions" for its worldwide suspension of routine visa services, "such as medical workers or those essential to securing food and other vital supply chains," and individuals with close relationships to U.S. citizens." *See* Marwaha Decl., ¶ 3; *see also* CAR30. Diversity visa applicants do not meet that criteria. *See* Marwaha Decl., ¶ 3. Second, because diversity visa applicants are subject to Proclamations 10014 and 10052, and, consequently, could not be issued visas under section 1182(f), it would have been a waste of scarce resources to deem them mission critical and "reserve a limited number of interview spots for them ultimately to be refused a visa." Marwaha Decl., ¶ 5. Put another way, it was sensible for the State Department to reserve its limited consular resources to aliens who are eligible to enter rather than aliens covered under the Proclamations who must be refused visas. *Cf.* CAR14 ("During this period of rapid situational changes, many posts worldwide have already moved consular resources to support [American Citizen Services] units. Many posts have seen large increases in inquiries . . . Utilize the entire consular section staff to help triage and answer inquiries."). Third, inviting diversity visa applicants for interviews would have undermined the Department's efforts to "minimize face-to-face interactions in light of the COVID-19 pandemic . . ." Marwaha Decl., ¶ 5; CAR26. While the Administrative Record does not provide an analysis of the pros and cons for each of the 110 classifications of immigrant and non-immigrant visas, it is clear from those classes that were selected that State Department, presented with no perfect options, prioritized as "mission critical" children at risk of "aging out," uniting family members of U.S. citizens, continuing government functions, and protecting food supply chains. Given the complexity of a sprawling, world-wide apparatus, these choices are

perfectly rational.

In sum, the circumstances required the State Department to exercise its best discretion to draw lines in the midst of a rapidly-changing *sui generis* event with far-reaching impacts both abroad and at home.

### D. Plaintiffs' unreasonable delay claims fail because the *TRAC* factors favor the State Department.

All diversity visa plaintiffs in the consolidated cases allege that under 5 U.S.C § 706(1), Defendants unreasonably delayed the adjudication of their visa applications. Plaintiffs' claim fails because the six factors outlined by the D.C. Circuit in *Telecomms. Research & Action Center v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) (the "*TRAC*" factors) favor the State Department.

Courts considers the six *TRAC* factors when evaluating the reasonableness of an agency delay:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'

*In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836–37 (D.C. Cir. 2012) (quoting *TRAC*, 750 F.2d at 79-80.  The D.C. Circuit has cautioned that the reasonableness of an agency delay "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C.

Cir. 2003).  A court instead must take into account "the importance of 'competing priorities.'"  *Id.* (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 75 (1991)).

The first and second factors favor Defendants.  Courts often evaluate the first and second *TRAC* factors in conjunction.  *See, e.g.*, *Ghadami v. U.S. Dept. of Homeland Sec.*, No. 19-CV-397-ABJ, 2020 WL 1308376, at *8 (D.D.C. Mar. 19, 2020).  First, the rule of reason favors the Department of State.  *See Ctr. for Sci. in the Pub. Interest v. United States FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014) (defining the rule of reason as whether an agency action is "governed by an identifiable rationale.").  Here, the Secretary of State's decision to reduce consular processing is to protect the health of consular officers and the public, *see* Marwaha Decl., ¶ 2, and is consistent with the direction to "adjust operations and services to minimize face-to-face interactions" in order to slow the transmission of COVID-19,  Director, Office of Mgmt. and Budget, *Federal Agency Operational Alignment to Slow the Spread of Coronavirus COVID-19* (Mar. 17, 2020) https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf  (last  visited  Jan.  19, 2021).

Second, there is no statute or regulation that sets a timetable for the State Department to afford diversity visa selectees the opportunity to apply for immigrant visas. Given the absence of any relevant statutory or regulatory timetable, the first and second *TRAC* factors favor the government. *Ghadami*, 2020 WL 1308376, at *8. Congress knows how to formulate a requirement to direct an agency to act within a time certain.  In *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 62 (2004), the Supreme Court offered 47 U.S.C. § 251(d)(1) as an example of just such a requirement. That statute provides that "[w]ithin 6 months after February 8, 1996, the Commission *shall* complete all actions necessary to establish regulations to implement the requirements of this section."  47 U.S.C. § 251(d)(1) (emphasis added).  Further, a statutory or regulatory time limit is

not mandatory unless it both (1) "expressly requires an agency or public official to act within a particular time period," and (2) "specifies a consequence for failure to comply with the provision." *Brock v. Pierce Cty.,* 476 U.S. 253, 259 (1986) (internal citation and quotations omitted); *see United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993) ("If a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction."); *Nat'l Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d at 127 ("When Congress wants to instruct an agency not only to take certain action, but to take it immediately, it knows how to do so.").  None of those hallmarks are present here. All plaintiffs point to is the September 30th deadline for the issuance of diversity visas under 8 U.S.C. § 1154(a)(1)(I)(ii)(II), but this provision does not require the agency to do *anything* prior to September 30th; rather, it *prohibits* the agency from issuing diversity visas after that date.

Even if the third and fifth factors favor Plaintiffs, those factors are less important than the other factors. *See Mashpee*, 336 F.3d at 1100. Indeed, where the fourth factor—"competing priorities"—has weighed in an agency's favor, courts have "refused to grant relief, even though all the other factors considered in *TRAC* favored it." *Id.*  The COVID-19 pandemic has disrupted the State Department's operations and strained its resources to an unprecedented degree, creating a significant visa application backlog and reducing visa processing to a fraction of its historical norms. *See* ECF 94-2, Austin Decl., ¶¶ 4, 6, 11; ECF 94-3, Luster Decl., ¶¶ 4-5. Thus, the Secretary of State must be permitted to address this immense backlog of applicants, while balancing the health and welfare of consular resources.

Indeed, even where this Court preliminarily found this decisive, fourth factor in favor of Plaintiffs, it acknowledged that it was a "closer call." *See* ECF 123 at 70. After this Court entered the preliminary injunction, the Court had further opportunity to evaluate the effects of the

pandemic from reports of the State Department's good faith efforts to implement the Court's order. ECF 136, 143. Accordingly, in this Court's September 30th order, it recognized that "[t]he COVID-19 pandemic has caused worldwide operational disruptions of the State Department's consular and visa processing operations." ECF 151 at 16. This Court further found that the pandemic's "impact on visa processing has been substantial," observing that even uncapped visas not subject to the Proclamations "fell dramatically." *Id*. Thus, the fourth factor weighs in favor of Defendants.

Finally, per the sixth factor, "the [C]ourt need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC*, 750 F.2d at 80. Defendants have not engaged in any impropriety. Even if the court disagrees with Defendant's interpretation of the INA, provisions of the FAM, as well as the administrative record as a whole, reflect that this was the State Department's good faith understanding of its obligations in implementing a presidential proclamation. *See*, *e.g.*, 9 FAM 301.4-1(a) ("The basis on which applicants must be denied visas are established by law, as part of the [INA]. . . . Other grounds for refusal are found in INA 212 (INA 212(a), INA 212(e) and *INA 212(f)*)" (emphasis added); 302.14-3(B) (listing "Suspension of Entry by President – INA 212(F)" under section titled, "Ineligibility [to receive a visa] Based on Sanctioned Activities – … INA 212(F).").

In sum, the State Department does not have a nondiscretionary duty to afford Plaintiffs the opportunity to apply for immigrant visas at consular interviews when they are subject to entry suspensions under section 1182(f); and even if such a duty existed, the agency would not have unreasonably delayed. The COVID-19 pandemic has severely strained the Department's resources; and given that diversity visa selectees are ineligible to receive visas for the remainder

of the fiscal year, the Department has acted reasonably in prioritizing other visa cases. Plaintiffs are not likely to succeed on the merits of their unreasonable delay claim.

### E.    Plaintiffs' mandamus claim fails.

Plaintiffs in *Gomez* (Count 11), *Mohammed* (Count 5), *Fonjong* (Count 5), and *Kennedy* (Count 5) assert mandamus claims regarding the processing of the diversity visa applications. The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. United States Dist. Court*, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted). Mandamus relief is available only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (citations omitted). "[T]he standards for obtaining relief [through mandamus and through the APA] are essentially the same." *Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010) (citing *In re Core Commc'ns Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)).

Plaintiffs' mandamus claim overlaps entirely with their claim under the APA for unreasonable delay and fails for the same reasons as set forth in the preceding section of this brief.

### F.    The State Department is not required to subject its actions to notice and comment.

Plaintiffs raise notice-and-comment claims in *Aker* (Count 3), *Mohammed* (Count 2), *Fonjong* (Count 2), and *Kennedy* (Count 2). They allege that the State Department failed to follow notice-and-comment rulemaking procedures in suspending visa issuances. *See, e.g.*, *Aker* FAC, ¶ 742 ("The Department of State was not allowed to suspend issuance of visas or adjudication of cases . . . without giving notice and providing opportunity to comment."); *Fonjong* FAC, ¶ 1,207 ("The Department promulgated and relied upon the policies . . . suspending adjudication and issuance or reissuance of immigrant visas . . . without notice-and-comment rulemaking"). This

claim fails because the public guidance regarding the suspension of routine visa services due to the COVID-19 pandemic merely provided information and did not establish any rules or requirements. Such announcements are simply explanations of existing rules and the status of operations at embassies and consulates during the pandemic. As such, they are the type of "informal communications between agencies and their regulated communities that are vital to the smooth operation of both government and business." *Valero Energy Corp. v. EPA*, 927 F.3d 532, 538 (D.C. Cir. 2019). Indeed, this Court has long treated these as non-final and thus not judicially reviewable (much less subject to notice-and-comment rulemaking). Such informal communications merely state the agency's view of the law. *Valero Energy Corp.*, 927 F.3d at 538; *see also Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 945 (D.C. Cir. 2012).

Moreover, the suspension of routine visa services due to the COVID-19 emergency does not require notice-and-comment because Congress has granted the Secretary of State broad authority to "administer, coordinate, and direct the Foreign Service of the United States and the personnel of the Department of State." 22 U.S.C. § 2651a. Thus, "absent constitutional constraints or extremely compelling circumstances the 'administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (internal citations omitted). Indeed, this suspension concerns consular affairs and the operation of foreign posts squarely fit the formal rulemaking exception involving the "foreign affairs function of the United States" under 5 U.S.C. § 553(a)(1). And especially true of the State Department's suspension of visa services, the "good cause" exception under 5 U.S.C. § 553(b)(3)(B) applies because this was intended to safeguard the health and welfare of U.S. mission staff and the public. *See*, *e.g.*, CAR26 ("Safety remains the Department's top priority"); CAR35

41

("The health and safety of consular teams, mission colleagues, and applicants for consular services should guide every decision and action in planning for the resumption of consular services at overseas posts").

Accordingly, under the precedent of this Circuit, Plaintiffs cannot prevail on their notice and comment claim.

### G. The *Gomez* Plaintiffs' APA challenge to the State Department's NIE guidance fails as a matter of law.

The *Gomez* plaintiffs allege in their operative complaint that "Defendants' implementation of the Proclamations' 'national interest' exception violates the APA, 5 U.S.C. § 706." SAC, ¶ 321. Specifically, they allege "[t]o the extent that Defendants have (through DOS's July 16 website posting or otherwise) established policies, procedures, and/or standards to govern their implementation of the 'national interest' exception, those policies procedures, and/or standards constitute final agency action reviewable under 5 U.S.C. § 706(2)." SAC, ¶ 323. Plaintiffs further specifically allege that this purported action "are based on legal error; failed to consider all relevant factors; and lacked a rational explanation," *id*, ¶ 323(a), and "are contrary to constitutional rights." *Id*., ¶ 323(b). The *Gomez* Plaintiffs do not request any specific relief in connection to this claim, but presumably, they ask this Court to invalidate the challenged guidance and remand the matter back to the agency. This claim fails as a matter of law. First, the State Department's NIE guidance does not constitute final agency action. Second, even if it did constitute final agency action, it is not subject to judicial review under 5 U.S.C. § 701(a)(2).

### 1. There Is No Final Agency Action.

In general, the APA allows for judicial review of "final agency action." 5 U.S.C. § 704. The "final agency action" requirement involves two discrete inquiries. First, Plaintiffs must identify an "agency action." The APA defines "[a]gency action" to "include[] the whole or a part

of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13).  "'[A]s their definitions make clear,'" "[t]he five listed categories—and their equivalent or the denial thereof—all 'involve circumscribed, discrete agency actions[.]'" *CREW v. DHS*, 387 F. Supp. 3d 33, 48–49 (D.D.C. 2019) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004)).  Second, the challenged agency action must be "final."  An "agency action" is "final" if it (1) "mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "[is] one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted).

At the outset, the *Gomez* Second Amended Complaint fails to identify any final agency action. Instead, it states that "[t]o the extent that Defendants have (through DOS's July 16 website posting or otherwise) established policies, procedures, and/or standards to govern their implementation of the 'national interest' exception, those policies, procedures, and/or standards constitute final agency action reviewable under 5 U.S.C. § 706(2)", and that such action violates the APA. *See* SAC, ¶ 323. It is not at all evident, even considering the entirety of the operative complaint, what Plaintiffs contend to be the challenged final agency action. Count II of the operative complaint singles out the State Department's July 16 public guidance regarding national interest exceptions on its website. *See id*. Plaintiffs acknowledge that the State Department updated its public guidance on August 12, 2020. *Id.*, ¶ 118. The operative complaint further states that "Plaintiffs are analyzing what effects (if any) this new guidance may have on their claims." *Id*. Accordingly, the viability of this claim is in light of the updated guidance is unclear. It is worth noting that Plaintiffs voluntarily dismissed at least two employer-based plaintiffs because the State Department granted national interest exceptions under this guidance. *See* ECF 164, 185.

In any event, any guidance on the State Department website regarding the implementation of the national interest exceptions does not constitute a final agency action. The D.C. Circuit has concluded, for example, that an agency letter did not constitute agency action because "it was purely informational in nature; it imposed no obligations and denied no relief." *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also Ass'n of Admin. Law Judges v. U.S. Office of Pers. Mgmt.*, 640 F. Supp. 2d 66, 73 (D.D.C. 2009) (holding that a notice that an agency intended to post was not subject to judicial review under the APA because, among other things, the notice was not a rule, order, sanction, or relief under 5 U.S.C. § 551(13)). Moreover, the website guidance, by its terms, present "a *non-exclusive* list of the types of travel that *may* be considered to be in the national interest . . ." *See, e.g.*, CAR 168. The public guidance does not cabin the agency's discretion and is, therefore, akin to an interpretive rule. *See, e.g*., *RCM Tech., Inc. v. U.S. Dep't of Homeland Sec*., 614 F. Supp. 2d. 39, 46 (D.D.C. 2009) (noting that, in the context of the H-1B program, purported policy that "gives adjudicators *permission* to require master's degrees" but which does not "*require* adjudicators to require master's degrees in all cases" is not binding) (emphasis original).

In sum, there is no final agency action that is unlawful under the criteria of the APA's judicial review provision at § 706.

### 2. Implementation of the National interest Exceptions is Committed to Agency Discretion.

Even if the creation and publication of NIE guidance constitutes a final agency action, APA review is still unavailable because such actions are based on determinations committed to agency discretion by law under 5 U.S.C. § 701(a)(2).

As previously discussed, while the APA permits judicial review for "[a] person suffering legal wrong because of agency action," 5 U.S.C. § 702, it explicitly excludes review "to the extent

that . . . agency action is committed to agency discretion by law," *id.* § 701(a)(2). "[R]eview is not to be had if the [law] is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler*, 470 U.S. at 830.

Here, Section 3(b)(iv) of Proclamation 10052 states that the entry suspension shall not apply to "any alien whose entry would be in the national interest as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees." 85 Fed. Reg. at 38,265.  Proclamation 10052 further explicitly states that "Aliens covered by section 3(b)(iv) of this proclamation, under the standards established in section 4(a)(i) of this proclamation, shall be identified by the Secretary of State, the Secretary of Homeland Security, or their respective designees, in his or her *sole discretion*." *Id.* (emphasis added). The national interest exceptions are, therefore, governed solely by the Proclamation, and this claim is unreviewable because without any statutory authority to guide the Court, there would be "no meaningful standard which to judge the agency's exercise of discretion." *See Heckler*, 470 U.S. at 830; *see, e.g., Kangarloo*, 2020 WL 4569341, at *5; *Joorabi v. Pompeo*, Civ. A. No. 20-108, 2020 WL 2527209, at *5 (D.D.C. May 17, 2020); *Jafari v. Pompeo*, Civ. A. No. 19-1819, 2020 WL 2112056, at *4 (D.D.C. May 3, 2020). Thus, the *Gomez* plaintiffs' claim regarding the agency implementation of the national interest exception fails as a matter of law.

## CONCLUSION

The Court should grant summary judgment in favor of Defendants.

Dated: January 20, 2021                    Respectfully submitted,

                                           JOHN V. COGHLAN
                                           Acting Assistant Attorney General
                                           Civil Division

                                           WILLIAM C. PEACHEY
                                           Director, Office of Immigration Litigation,

District Court Section

COLIN A. KISOR
Deputy Director

GLENN M. GIRDHARRY
Assistant Director

AARON S. GOLDSMITH
Senior Litigation Counsel

*s/ James J. Wen*
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
Washington, D.C. 20044
(202) 532-4142
James.J.Wen@usdoj.gov

THOMAS B. YORK
Trial Attorney

Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 20, 2021 I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

*s/ James J. Wen*

JAMES J. WEN
Trial Attorney
United States Department of Justice
Civil Division
