## **DECLARATION OF BRIANNE MARWAHA**

I, Brianne Marwaha, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am employed by the U.S. Department of State as the Division Chief in the Immigration and Employment Division, Office of Field Operations of the Visa Office, Bureau of Consular Affairs ("CA"). The Field Operations Office supports and monitors visa operations at posts around the world, provides updated guidance to our posts regarding changes in visa policy, and oversees the Visa Office's web unit, which maintains visa-related content on CA's public-facing website, travel.state.gov.

**Suspension of Routine Visa Services**

2. In that capacity, I have knowledge that in March 2020, the Office of Management and Budget ("OMB") directed all agencies to utilize the full scope of their legal authority to minimize face-to-face interactions in light of the COVID-19 pandemic. Specifically, OMB said that "agencies must take appropriate steps to prioritize all resources to slow the transmission of COVID-19, while ensuring our mission-critical activities continue." See Director, Office of Mgmt. and Budget, Federal Agency Operational Alignment to Slow the Spread of Coronavirus COVID-19 (Mar. 17, 2020) https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf (last visited Jan. 15, 2021). In response to that OMB directive, the Department of State suspended all routine visa services worldwide on March 20, 2020. The suspension of routine visa services included suspending the scheduling of immigrant visa interviews by the National Visa Center (NVC) and diversity visa interviews by the Kentucky Consular Center (KCC), as well as the cancellation of visa interviews at consular posts worldwide. Thereafter, posts continued to provide mission critical services, as required by the OMB directive, and emergency services to the extent they were able to do so safely.

3. Given the scarce resources available during the suspension of routine visa services in March 2020 as a result of the global outbreak of the COVID-19 pandemic when the Department was focused on providing vital assistance to U.S. citizens living or visiting abroad and ensuring the safety of consular staff and applicants, the Department suspended most non-immigrant and immigrant visa processing except for some very narrow exceptions. The Department included as "mission critical or emergency services" the processing of certain non-immigrant visas such as those for diplomats and government officials, temporary agricultural workers associated with ensuring the American food supply chain, certain medical professionals, air and sea crew, and applicants with medical emergencies. Immigrant visas considered "mission critical" included cases in which an applicant was not protected by the Child Status Protection Act and was at risk of losing eligibility for a visa in his or her current category after age 21 (i.e., "age-out" cases), spouses and children of U.S. citizens (IR2/CR2), adoptees and prospective adoptees (IR2, IR3/IH3, and IR4/IH4), Afghan and Iraqi Special Immigrant Visas (SQ/SI), and certain health care professionals. The Department did not include immigrant visas for siblings, adult children, and parents of U.S. citizens; spouses and children of lawful permanent residents; diversity visa applicants; and other categories of immigrant and nonimmigrant visas. Rather, the Department only included narrow exceptions such as the ones listed above as they were considered true emergency cases given the ages of the beneficiaries in cases likely involving family reunification

or they were deemed mission critical due to their importance to the national interest, such as medical workers or those essential to securing food and other vital supply chains, as well as those with close relationship to U.S. citizens. Diversity visa applicants did not meet any of that criteria.

4. I am also familiar with the Presidential Proclamation Suspending Entry of Immigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak, which was signed by the President on April 22 and was effective as of 11:59 p.m. EDT on April 23 (Presidential Proclamation 10014), and Presidential Proclamation Suspending Entry of Immigrants and Nonimmigrants Who Present Risk to the U.S. Labor Market During the Economic Recovery Following the COVID-19 Outbreak (Presidential Proclamation 10052), which was signed by the President on June 22 and was effective as of 12:01 a.m. EDT on June 24. Exceptions to Presidential Proclamations 10014 and 10052 also rendered some cases mission critical. Such exceptions included certain categories of immigrants such as certain healthcare professionals, aliens seeking to enter the United States pursuant to an EB-5 investor visa, spouses and children (categories IR2, CR2, IR3, IH3, IR4, IH4) of U.S. citizens, members of the United States Armed Forces and any spouse and children of a member of the United States Armed Forces, and aliens seeking to enter the United States pursuant to an Afghan and Iraqi Special Immigrant Visa.

5. I am also aware that after the President signed PP 10014 on April 22, the Department did not categorically include diversity visas as mission critical or emergency services. As diversity visas applicants were subject to PP 10014 and, therefore, consular officers would have to refuse their visa applications under 8 U.S.C. 1182(f), it would have been a waste of scant resources to consider them mission critical and reserve a limited number of interview spots for them ultimately to be refused a visa. Inviting diversity visa applicants to interview would have been counterproductive to the Department's efforts in suspending visa processing to minimize face-to-face interactions in light of the COVID-19 pandemic, knowing they would all be refused per PP 10014.

**Phased Resumption of Routine Visa Services**

6. On July 14, 2020, the Department issued a notice regarding the phased resumption of routine visa services on a post-by-post basis in coordination with the Department's Diplomacy Strong framework for safely returning its workforce to Department facilities. The notice, which is available at https://travel.state.gov/content/travel/en/News/visas-news/phased-resumption-routine-visa-services.html (last visited Jan. 15, 2021), explained that "U.S. Embassies and Consulates have continued to provide emergency and mission-critical visa services since March and will continue to do so as they are able. As post-specific conditions improve, our missions will begin providing additional services, culminating eventually in a complete resumption of routine visa services." The notice referred the public to "each individual U.S. Embassy or Consulate's website for information regarding operating status and which services it is currently offering" and advised applicants with an urgent need to travel to "follow the guidance provided on their nearest embassy or consulate's website to request an emergency appointment."

**Overseas Operations**

7.  Significant resource constraints caused by the COVID-19 pandemic have forced the Department to structure overseas operations to protect the health and safety of not only its own personnel, but also of applicants and the general public as well. Additionally, these resource constraints have forced the Department to prioritize services while balancing a number of competing factors, including the interests of U.S. citizen relatives and employers of visa applicants; national security, foreign policy, and public health issues; and the legal requirements of the Immigration and Nationality Act and other related statutes and regulations.

8.  Moreover, numerous COVID-related factors have impacted posts' ability to resume routine visa services worldwide, including restrictions imposed by the host country government. These restrictions include, for example, limits on public gatherings, which have forced posts to drastically reduce appointment capacity. Other obstacles to the resumption of routine visa services include mandatory quarantines and restrictions on public movement. In addition, many posts' staffing levels have been affected by employees' illnesses, absence to care for family members diagnosed with COVID-19, or mandatory quarantine after possible exposure to the virus. For example, consular sections in the following locations that had resumed services have had to fully or partially reclose because of COVID-19 infections or concerns: Yerevan, Armenia; Kigali, Rwanda; Beirut, Lebanon; Rangoon, Burma; Skopje, Macedonia; Buenos Aires, Argentina; Lisbon, Portugal; Belgrade, Serbia; Ulaanbaatar, Mongolia; Lilongwe, Malawi; and Riga, Latvia.

9.  Here are some examples of the restrictions that consular posts are facing:

- Embassy Ankara had to close for security-related concerns in November and now is only semi-operational.
- Embassy London reduced services in January because of the COVID pandemic, including introduction of a highly transmissible variant of the virus along with new UK-government imposed lockdown restrictions.
- The Government of Qatar currently has travel restrictions that prevent anyone outside of the country from making a personal appearance at a U.S. Embassy or Consulate as required by law, and thus from making an application and being interviewed.
- The Government of Malaysia recently imposed a Movement Control Order reminiscent of the lockdowns of March 2020 with few exceptions (e.g., schoolchildren) and declared a state of emergency on January 12, 2021 due to last until August 1, 2021. Such restrictions on travel limit individuals from making visa applications.
- Embassy Dublin has suspended operations because the Government of Ireland has implemented COVID limitations that preclude visa processing.
- Embassy Moscow is extremely short staffed (as many posts are) for a variety of reasons, including bilateral relations with the host country government. Currently there is only one consular officer assigned to process immigrant visa applications.
- At Embassy Cairo, a number of staff have contracted COVID, requiring the consular section to operate at a reduced staffing posture. On January 3, the government of Egypt announced enhanced precautionary measures reducing

business capacity to 50% and imposing fines or potential prosecution for non-compliance. Due to the reduced personnel and social distancing guidelines imposed by the Egyptian government, Embassy Cairo's routine visa services have been suspended since March 2020.
- Embassy Kabul's routine visa service operations remain suspended and they are not even able to process mission critical IV cases.
- Embassy Baghdad is not able to process any visa applications due to security risks.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

January 19, 2021

*Brianne C Marwaha*

Brianne Marwaha, Division Chief
Immigration and Employment Division
Office of Field Operations, Visa Office
Bureau of Consular Affairs
United States Department of State