# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DOMINGO ARREGUIN GOMEZ et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Case No. 20-cv-01419 (APM)** |
| ) | |
| **JOSEPH R. BIDEN, JR. et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| **MOHAMMED ABDULAZIZ ABDUL** ) | |
| **MOHAMMED et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Case No. 20-cv-01856 (APM)** |
| ) | |
| **ANTONY BLINKEN et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| **AFSIN AKER et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Case No. 20-cv-01926 (APM)** |
| ) | |
| **JOSEPH R. BIDEN, JR. et al.,** ) | |
| ) | |
| **Defendants.** ) | |



CLAUDINE NGUM FONJONG et al.,                    )
                                                 )
          Plaintiffs,                            )
                                                 )
          v.                                     )          Case No. 20-cv-02128 (APM)
                                                 )
JOSEPH R. BIDEN, JR. et al.,                     )
                                                 )
          Defendants.                            )
                                                 )

MORAA ASNATH KENNEDY et al.,                     )
                                                 )
          Plaintiffs,                            )
                                                 )
          v.                                     )          Case No. 20-cv-02639 (APM)
                                                 )
JOSEPH R. BIDEN, JR. et al.,                     )
                                                 )
          Defendants.                            )
                                                 )

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case concerns the State Department's processing and issuance of visas for certain classes of foreign nationals during the COVID-19 pandemic, particularly selectees of the diversity visa lottery during the fiscal year that ended September 30, 2020.  On March 20, 2020, the State Department temporarily suspended routine visa services at consular offices and embassies worldwide due to the pandemic, allowing only "emergency and mission critical visa services." President Trump thereafter issued Presidential Proclamations that suspended the entry of various immigrant and nonimmigrant classifications into the United States unless the foreign national qualified for an exception to the Proclamations.  The State Department interpreted these

Proclamations to suspend not just entry, but also the adjudication of visas for foreign nationals who were subject to the Proclamations and did not qualify for any of the exceptions.

In the summer of 2020, Plaintiffs in these five consolidated cases challenged the Presidential Proclamations and the State Department's refusal to adjudicate visas, which the court termed the "No-Visa Policy." On September 4, 2020, this court granted in part Plaintiffs' motion for a preliminary injunction after finding that Plaintiffs were likely to succeed on their claims that (1) Defendants' "No-Visa Policy," as applied to 2020 diversity visa ("DV-2020") selectees, was not in accordance with law, was in excess of statutory authority, and was arbitrary and capricious; (2) Defendants had unreasonably delayed processing DV-2020 Plaintiffs' applications; and (3) Defendants' COVID-19 guidance arbitrarily excluded DV-2020 applicants from eligibility for mission-critical and emergency services. *Gomez v. Trump* (*Gomez I*), 485 F. Supp. 3d 145, 158 (D.D.C. 2020). The court ordered, among other things, (1) that Defendants halt the No-Visa Policy as it applied to DV-2020 selectees and their derivative beneficiaries, and (2) that they undertake good-faith efforts to expeditiously process and adjudicate DV-2020 and derivative beneficiary applications and issue or reissue diversity visa and derivative beneficiary visas to eligible applicants by the September 30, 2020 statutory deadline. *Id.* at 205. The court denied injunctive relief as it pertained to non-DV Plaintiffs because, without a hard deadline for visa issuance or an immediate prospect of entering the country, those Plaintiffs had not shown that a preliminary injunction was warranted on their Administrative Procedure Act ("APA") claims. *Id.* The court also found that Plaintiffs were not likely to succeed on their challenges to the related Presidential Proclamations. *Id.* at 204.

Despite the order of preliminary relief, approximately 40,000 of the 55,000 allotted diversity visas made available by Congress for Fiscal Year 2020 remained unissued by the

September 30, 2020 deadline.  So, the court issued supplemental equitable relief.  *Gomez v. Trump* (*Gomez II*), 490 F. Supp. 3d 276 (D.D.C. 2020).  The Immigration and Nationality Act ("INA") provides that diversity visa selectees "shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected."  8 U.S.C. § 1154(a)(1)(I)(ii)(II). Because at the time of the court's September 30 Order the fiscal year had not yet expired, and because additional relief was necessary to meet the exigencies of the case, the court concluded that it had the equitable authority to order Defendants to reserve visas for future processing pending final resolution of the merits of this case.  *Gomez II*, 490 F. Supp. 3d at 286.  Taking into consideration the impact of COVID-19 on the State Department's ability to process visas, the court ordered Defendants to reserve 9,095 diversity visa numbers after the fiscal year deadline, pending final adjudication of this matter.  *Id.* at 290.  The court also certified a class of "[i]ndividuals who have been selected to receive an immigrant visa through the U.S. Department of State's FY2020 Diversity Visa Lottery and who had not received their immigrant visa on or before April 23, 2020." *Id.* at 294.

The parties now move for partial summary judgment on Plaintiffs' APA, mandamus, and related claims.[1]  Plaintiffs seek, among other things, a final order that Defendants issue the 9,095 reserved diversity visas to DV-2020 selectees, and they ask the court to order the processing of even more diversity visas.  For the reasons that follow, the court grants in part and denies in part Plaintiffs' motion for summary judgment and grants in part and denies in part Defendants' motion for summary judgment.  The court will enter judgment in favor of Plaintiffs on some of their APA

---

[1] The court ordered briefing be limited to these claims for judicial economy given the possibility that a new administration would rescind the relevant Presidential Proclamations, which the Biden Administration did, thus mooting Plaintiffs' remaining claims.  *See* Order, ECF No. 184, at 3.

claims and will order the State Department to adjudicate the reserved 9,095 DV-2020 visas, but no more.

## II.    BACKGROUND

The factual history and procedural history of this case are well documented in the court's prior opinions. *See Gomez I*, 485 F. Supp. 3d at 145; *Gomez II*, 490 F. Supp. 3d at 276. The court therefore recounts below only the events that have transpired since *Gomez II*.

### A.    Recent Developments

On February 9, 2021, the visas that many Plaintiffs in this case were issued pursuant to *Gomez I* were approaching their six-month expiration. The D.C. Circuit, which at the time was considering Plaintiffs' appeal of *Gomez I*, ordered this court to "determine whether plaintiffs [were] eligible for interim relief." Order of U.S. Court of Appeals, ECF No. 200. The court expeditiously took up that question, and on February 19, while the court's decision was pending, the State Department announced that it would issue national interest exceptions to the Presidential Proclamations to all individuals with valid DV-2020 visas that had expired or were set to expire between February 17, and February 28, 2021. *See* Defs.' Notice on Recent Actions Taken by the State Department, ECF No. 208. That same day, the court granted in part Plaintiffs' request for interim relief. The court ordered Defendants to "treat all visas issued or renewed pursuant to *Gomez I* as having been issued in the first instance as of the date the Proclamations are no longer effective." Mem. Op. & Order, ECF No. 209, at 9. The Order did "not apply to DV-2020 Plaintiffs whose visas . . . were set to expire between February 17, and February 28, 2021," because those Plaintiffs lacked standing to seek interim relief after the State Department granted them a national interest exception. *Id.*

Less than a week later, President Biden issued Presidential Proclamation 10149, which revoked Proclamation 10014 and section one of Proclamations 10052 and 10131—the entry-restriction Proclamations issued by his predecessor that are challenged in this action.  Proclamation No. 10149, 86 Fed. Reg. 11,847, 11,847, § 1 (Feb. 24, 2021).  Following the rescission, the State Department granted DV-2020 visa holders a national interest exception "to the geographic COVID-19 Presidential Proclamations," which were still in effect.  *See* U.S. Dep't of State, Bureau of Consular Affs., Rescission of Presidential Proclamation 10014, https://travel.state.gov/content/travel/en/News/visas-news/rescission-of-presidential-proclamation-10014.html (last updated Feb. 24, 2021).  These geographic Proclamations, issued to combat the spread of COVID-19, prohibited persons who were physically present in certain parts of the world from entering the United States.  By granting the national interest exception to DV-2020 visa holders, the Biden Administration removed the final barrier to their entry.

### B.  Procedural Background

This matter involves five fully consolidated cases:  *Gomez v. Biden*, No. 20-cv-1419 (D.D.C.); *Mohammed v. Blinken*, No. 20-cv-1856 (D.D.C.); *Fonjong v. Blinken*, No. 20-cv-2128 (D.D.C.); *Aker v. Biden*, No. 20-cv-1926 (D.D.C.); and *Kennedy v. Biden*, No. 20-cv-2639 (D.D.C.).  *See* Minute Order, Aug. 7, 2020 (consolidating *Gomez*, *Aker*, *Fonjong*, and *Mohammed*); Minute Order, *Kennedy*, No. 20-cv-2639 (D.D.C. Oct. 9, 2020) (consolidating *Kennedy* with *Gomez*-led cases).

### *1.*  Gomez v. Biden*, No. 20-cv-1419*

The *Gomez* Plaintiffs seek partial summary judgment on behalf of Plaintiffs across three visa categories:  diversity immigrant visas, family-based immigrant visas, and nonimmigrant visas, including H-1B nonimmigrant visas and J nonimmigrant visas.  *See Gomez* Pls.' Cross-Mot. for

Partial Summ. J., ECF No. 195 [hereinafter *Gomez* Pls.' Mot.], *Gomez* Pls.' Mem. in Opp'n to

Defs.' Mot. for Partial Summ. J. & in Supp. of Pls.' Cross-Mot. for Partial Summ. J., ECF

No. 195-1 [hereinafter *Gomez* Pls.' Mem.], at 6–8.   Named Plaintiffs are eight family-based

immigrant sponsors, consisting of citizens and lawful permanent residents who are petitioning on

behalf of foreign family members; six DV-2020 selectees; and three employers or organizations

sponsoring individuals for various nonimmigrant visas.   *See id.*   Defendants are President

Joseph R. Biden, Jr., Attorney General Merrick Garland, the Department of State, Secretary of

State Antony J. Blinken, the Department of Homeland Security, and Secretary of Homeland

Security Alejandro Mayorkas.  *See* Second Am. Compl, ECF No. 111 [hereinafter *Gomez* SAC],

¶¶ 37–42.

The *Gomez* Plaintiffs move for partial summary judgment on the following causes of

action:  (1) the State Department's "implementation of the Proclamations violates the [APA],

5 U.S.C. § 706(2)[,] by preventing issuance of visas for which Plaintiffs and class members . . .

are otherwise eligible," *Gomez* SAC ¶ 310; (2) "Defendants' implementation of the Proclamations'

'national interest' exception violates the APA," *id.* ¶ 321; (3) Defendants' issuance and

implementation of Proclamation 10052 constitutes ultra vires agency action in violation of

8 U.S.C. § 1154(a)(1)(I)(ii)(II), *Gomez* SAC ¶ 337; (4) "Defendants' implementation of the

COVID-19 Guidance in conjunction with its enforcement of the Proclamations with respect to the

diversity visa Plaintiffs . . . violates the APA," *id.* ¶ 353; (5) "Defendants' application of the

COVID-19 Guidance in conjunction with the enforcement of the Proclamations to the diversity

visa plaintiffs . . . is ultra vires and in excess of their statutory authority, and is accordingly

unlawful under 5 U.S.C. § 706(2)(C)," *Gomez* SAC ¶ 362; (6) "Defendants' actions have caused

the adjudication of [] the diversity visa plaintiffs['] [applications] . . . to be unlawfully withheld

and unreasonably delayed," *id*. ¶ 369; and (7) Plaintiffs are entitled to relief under the Mandamus Act, 28 U.S.C. § 1361, because "Defendants have failed to adjudicate the visa petitions [of] the diversity visa plaintiffs . . . and have failed to issue visas to these individuals, who are statutorily entitled to receive such visas, in plain contravention of Defendants' nondiscretionary duty," *Gomez* SAC ¶ 375.

The *Gomez* Plaintiffs seek an order directing the State Department to adjudicate the class members' DV-2020 applications in the order in which they would have been adjudicated in the absence of Defendants' unlawful actions until it has issued the 9,095 visas reserved pursuant to *Gomez II. See Gomez* Pls.' Mem. at 44–45.

> 2.   Mohammed v. Blinken*, No. 20-cv-1856*

The *Mohammed* Plaintiffs are 493 DV-2020 selectees and their derivative beneficiaries. *See* Second Am. Compl., ECF No. 170 [hereinafter *Mohammed* SAC], ¶ 1. Defendants are President Biden and Secretary Blinken. *Id.* ¶¶ 2117–2118. The *Mohammed* Plaintiffs assert five claims relevant to the instant motion for partial summary judgment: (1) the State Department's "policies, procedures, and practices suspending the adjudication of immigrant visas for DV-2020 program selectees and their derivative beneficiaries are arbitrary and capricious, an abuse of discretion, and not in accordance with law" under 5 U.S.C. § 706(2), *Mohammed* SAC ¶ 2223; (2) in "implement[ing] [] its policies, procedures, and practices suspending the adjudication of immigrant visas for the DV-2020 program selectees and their derivative beneficiaries," the State Department "impermissibly announced a new rule without undertaking notice-and-comment rulemaking," *id.* ¶ 2236; (3) the State Department violated the APA by failing to adjudicate immigrant visas for DV-2020 selectees and their derivative beneficiaries within a reasonable time, *id.* ¶ 2248; (4) "Defendants arbitrarily and capriciously created a No-Visa Policy . . . that fail[ed]

to consider reliance interests or any of the other serious consequences flowing from their unlawful policy," *id.* ¶ 2261; and (5) Plaintiffs are entitled to relief under the Mandamus Act because "Defendants ha[d] a clear non-discretionary duty to adjudicate immigrant visa applications and issue visas to DV-2020 selectees . . . under 8 U.S.C. § 1182(a)," *Mohammed* SAC ¶ 2269.

The *Mohammed* Plaintiffs seek various forms of declaratory relief and an order "mandating the immediate processing and adjudication of Fiscal Year 2020 Diversity Visas," with priority given to named Plaintiffs. *Aker*, *Mohammed*, *Fonjong*, & *Kennedy* Pls.' Notice of Errata, ECF No. 196, *Aker*, *Mohammed*, *Fonjong*, & *Kennedy* Pls.' Mem. in Supp. of Their Mot. for Summ. J. & Opp'n to Defs.' Mot. for Partial Summ. J., ECF No. 196-1 [hereinafter *Aker et al.* Pls.' Mot.], at 25–26.

### 3.   Fonjong v. Biden, *No. 20-cv-2128*

The *Fonjong* Plaintiffs are 243 DV-2020 selectees and their derivative beneficiaries. *See Fonjong* Am. Compl., ECF No. 165 [hereinafter *Fonjong* Am. Compl.], ¶ 1. Defendants are President Biden and Secretary Blinken. *Id.* ¶¶ 1092–1093. The *Fonjong* Plaintiffs' Amended Complaint is nearly identical to the operative complaint in *Mohammed*, and they move for partial summary judgment on identical claims and seek identical relief as the *Mohammed* Plaintiffs. *See Aker et al.* Pls.' Mot. at 25–26.

### 4.   Kennedy v. Biden, *No. 20-cv-2639*

The *Kennedy* Plaintiffs are 3,288 DV-2020 selectees and their derivative beneficiaries. *See* First Am. Compl., *Kennedy*, No. 20-cv-2639, ECF No. 13 [hereinafter *Kennedy* Am. Compl.], ¶ 1. Defendants are President Biden and Secretary Blinken. *Id.* ¶¶ 9663–9664. The *Kennedy* Plaintiffs assert the same claims and seek the same relief as the *Fonjong* and *Mohammed* Plaintiffs. *See Aker et al.* Pls.' Mot. at 25–26.

5.   Aker v. Biden, *No. 20-cv-1926*

Finally, the *Aker* Plaintiffs are 149 DV-2020 selectees from 14 countries and their derivative beneficiaries.  *See* First Am. Compl., *Aker*, No. 20-cv-1926, ECF No. 3, [hereinafter *Aker* Am. Compl.], ¶ 4.  Defendants are President Biden and Secretary Blinken.  *Id.* ¶¶ 672, 674.  The *Aker* Plaintiffs assert three causes of action relevant to the instant motion for partial summary judgment:  (1) the State Department's No-Visa Policy is arbitrary and capricious in violation of the APA, *id.* ¶ 736; (2) the State Department's No-Visa Policy violates the APA because it was adopted without notice-and-comment rulemaking, *id.* ¶ 743; and (3) the State Department's "adjudication and issuance of visas constitutes unlawfully withheld action" under 5 U.S.C. § 706(1) and constitutes agency action unreasonably delayed under 5 U.S.C. § 555(b), *Aker* Am. Compl. ¶¶ 752–753.  The *Aker* Plaintiffs seek the same relief as the *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs.  *See Aker et al.* Pls.' Mot. at 25–26.

## III.   LEGAL STANDARD

When courts review agency action under the APA, "summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016).  The district court "sits as an appellate tribunal," reviewing the entire case as a question of law.  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001) (collecting cases).  Accordingly, the court need not engage in lengthy factfinding, and, as a general rule, judicial review is limited to the administrative record.  "It is black-letter administrative law that in an [APA] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision."  *CTS Corp. v. EPA*, 759 F.3d 52,

64 (D.C. Cir. 2014) (internal quotation marks omitted); *see also* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party . . . .").

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.* (*State Farm*), 463 U.S. 29, 43 (1983)). The court's review, however, is not toothless. The court must satisfy itself that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). When an agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999)). "Moreover, an agency cannot fail to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (cleaned up). After-the-fact rationalizations "advanced to remedy inadequacies in the agency's record" or in the agency's explanation will not suffice. *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1165 (D.C. Cir. 1987).

## IV. DISCUSSION

Defendants raise a host of arguments about the justiciability of Plaintiffs' claims. The court addresses these threshold contentions first, before turning to the merits of Plaintiffs' individual causes of action.

### A.      Justiciability Issues

Defendants raise three justiciability arguments: (1) a number of Plaintiffs lack standing to assert their claims, (2) the revocation of Proclamation 10014 and the State Department's grant of national interest exceptions to certain individuals has mooted many of Plaintiffs' claims, and (3) principles of nonreviewability bar Plaintiffs' claims.   *See* Defs.' Reply in Supp. of Mot. for Partial Summ. J. & Mem. in Opp'n to Pls.' Cross-Mots. for Summ. J., ECF No. 224 [hereinafter Defs.' Reply], at 1, 4–13.   The court takes up these arguments in turn.

### 1.      Standing

"Article III restricts federal courts to the resolution of cases and controversies."  *Davis v. FEC*, 554 U.S. 724, 732 (2008).   "That restriction requires that the party invoking federal jurisdiction have standing—the 'personal interest that must exist at the commencement of the litigation.'"  *Id.* (quoting *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).   "To establish standing, the plaintiff must show (1) [she] has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision . . . ."  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (cleaned up).   The plaintiff "bears the burden of establishing all three elements of standing," *id.* at 377, and that burden "grows heavier at each stage of the litigation," *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).   At the summary judgment stage, a plaintiff "can no longer rest . . . on mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).   When a case involves more than one plaintiff, "the court need only find one plaintiff who has standing."  *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see*

*also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.").

a.   Named Plaintiffs in receipt of DV-2020 visas

Defendants begin with this assertion:   the court lacks jurisdiction over the claims of Plaintiffs who received DV-2020 visas by the September 30, 2020 deadline, whether those visas are "facially-expired or not."   *See* Defs.' Reply at 4–7.  But, as the *Gomez* Plaintiffs point out, that argument "confuse[s] standing with mootness."   *Gomez* Pls.' Reply Mem. in Supp. of Cross-Mot. for Partial Summ. J., ECF No. 226 [hereinafter *Gomez* Reply], at 3.  Whereas "standing is assessed at the time of filing," *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012), mootness concerns "circumstances that destroy the justiciability of a suit previously suitable for determination," *Loughlin v. United States*, 393 F.3d 155, 169 (D.C. Cir. 2004) (internal quotation marks omitted); *see also Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("It is not enough that a dispute was very much alive when suit was filed; the parties must continue to have a personal stake in the ultimate disposition of the lawsuit." (cleaned up)); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (cleaned up)).  "[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Chafin*, 568 U.S. at 172 (cleaned up).

The court agrees that the claims of DV-2020 Plaintiffs who received their visas before September 30, 2020, are moot.  "[I]ntervening circumstance[s]" have deprived those Plaintiffs of a "'personal stake in the outcome of th[is] lawsuit.'"  *Genesis Healthcare Corp. v. Symczky*, 569 U.S. 66, 72 (2013).  Neither Proclamation 10014, the COVID-19 regional proclamations, nor the

travel ban proclamations[2] now impede those Plaintiffs' ability to immediately seek admission into the United States.  *See supra* section II.A.  And as for DV-2020 visa holders with facially expired visas, the State Department has issued public guidance that indicates that "individuals who received diversity visas in 2020 as a result of orders in the court case *Gomez v. Trump* may travel to the United States on an expired visa" at this time.  U.S. Dep't of State, Bureau of Consular Affs., Rescission of Presidential Proclamation 10014, http://travel.state.gov/content/travel/en/News/visas-news/rescission-of-presidential-proclamation-10014.html. (last updated Feb. 24, 2021). There is thus nothing left for the court to remedy with respect to those Plaintiffs with DV-2020 visas in hand.  *Cf. Hall v. CIA*, 437 F.3d 94, 99 (D.C. Cir. 2006) (finding the plaintiff's claim was moot where he "already ha[d] obtained everything that [he] could recover . . . by a judgment of th[e] court in [his] favor" (internal quotation marks omitted)).

The problem for the court, however, is that Defendants have not identified any particular Plaintiff whose claims are moot.  *See Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) ("The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot . . . .").  Thus, while the court agrees that the claims of some Plaintiffs are moot, the court cannot say which ones.  Nevertheless, in crafting relief, the court will exclude those Plaintiffs who received DV-2020 visas before the end of the fiscal year.

        b.      <u>Standing for *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs</u>

Defendants next assert that the 4,173 named Plaintiffs in the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* cases lack standing because they have failed to "assert[] anything more than general factual allegations of injury."  *See* Defs.' Reply at 7.  Relying on the heightened evidentiary

---

[2] President Biden rescinded the so-called "travel ban" Proclamation on January 20, 2021. *See* Proclamation No. 10141, 86 Fed. Reg. 7005 (Jan. 20, 2021).

standard for establishing standing at summary judgment, *see id.* at 8 (citing *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 604 (D.C. Cir. 2019)), Defendants assert that "[i]n their summary judgment motion, . . . no plaintiff from these cases supports their factual assertions by citing to particular parts of materials in the record, and no plaintiff has 'set forth by affidavit or other evidence' any specific facts that establish their standing to proceed," *id.* (quoting *Lujan*, 504 U.S. at 561). As a result, Defendants contend, "the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs have forfeited any claim to standing." *Id.*

Defendants' argument overlooks the procedural history of this case. In *Gomez I*, this court explained that "in the context of a preliminary injunction the court requires the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." 485 F. Supp. 3d at 169 (cleaned up); *see Elec. Privacy Info. Ctr.*, 878 F.3d at 377. The court went on to hold that at least one Plaintiff in the *Gomez*, *Aker*, *Fonjong*, and *Mohammed* cases had established a substantial likelihood of standing under that heightened standard.[3] *See Gomez I*, 485 F. Supp. 3d at 170–75 (finding that *Gomez* Plaintiff Aya Nakamura, *Mohammed* Plaintiff Shereen Elsaid Rezk Abdelaziz Nawara, *Fonjong* Plaintiff Marina Filippova, and *Aker* Plaintiff Nora Abdelkhalek Abd Abdelsalam had, via declarations, "demonstrated a substantial likelihood that they ha[d] been procedurally injured and that those injuries are traceable to Defendants' implementation of the Proclamations"). That holding was reaffirmed in *Gomez II*, where this court certified the DV-2020 class, finding that a class representative had standing to

---

[3] *Kennedy* was not consolidated with the *Gomez*-led cases until after *Gomez I* was decided. *See* Minute Order, *Kennedy*, No. 20-cv-2639 (D.D.C. Oct. 9, 2020). But because the *Kennedy* Plaintiffs are members of the class certified in *Gomez*, the court need not make an independent finding as to their standing here. *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019) ("It is settled that in a case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing.").

bring her claims.  *See Gomez II*, 490 F. Supp. 3d at 293.  The 4,173 named Plaintiffs in this consolidated action are thus members of a certified class, a representative of which this court has already found has standing under the heightened standard that applies at summary judgment.  *See id.* at 293 (citing *Gomez I*, 485 F. Supp. 3d at 169–72).

These details are important for at least two reasons.  First, because this is a class action, the class members who have not had their DV-2020 applications adjudicated remain "entitled to the relief already afforded" to the class representative.  *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 755 (1976); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991) (collecting cases and explaining that "the termination of a class representative's claim does not moot the claims of the unnamed members of the class" (internal quotation marks omitted)).  Although the court understands that the class representative in *Gomez II* has received her diversity visa, thus making her individual claims moot, the claims of those class members who did not receive a diversity visa before the end of the fiscal year remain live.  Those members include individual Plaintiffs in *Aker*, *Fonjong*, *Kennedy*, and *Mohammed*.

Second, because Plaintiffs established standing at the preliminary injunction phase, they likewise satisfied their burden for purposes of summary judgment.  *See Elec. Privacy Info. Ctr.*, 878 F.3d at 377 ("In the context of a preliminary injunction motion, we require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." (cleaned up)).  Defendants cite no authority to suggest that the court may not rely on record evidence submitted at earlier stages of the litigation to establish standing at the summary judgment phase so long as that evidence satisfies the heightened burden of proof and there remain Plaintiffs in the action with live claims.  *See* Oral Arg. Tr., ECF No. 236 [hereinafter Hr'g Tr.], at 50:3–11 (acknowledging that there are Plaintiffs in each case that have not received

DV-2020 visas).   And, importantly, Defendants have not come forward with any evidence demonstrating that the claims of those Plaintiffs in *Aker*, *Fonjong*, and *Mohammed* as to whom the court found standing are now moot.   The "heavy burden of establishing mootness is not carried by proving that the case is nearly moot, or is moot as to a 'vast majority' of the parties.   [Defendants'] heavy burden requires that they establish cessation, not near cessation."   *True the Vote v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016).   Defendants have not made that showing.

The court is thus satisfied that the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs, both as members of the DV-2020 class certified in *Gomez* and in their individual cases, have standing to assert their claims at the summary judgment stage.

### 2.    Mootness of Certain Claims

As briefly discussed above, "[a] lawsuit becomes moot . . . 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'"   *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Chafin*, 568 U.S. at 172); *see also Hall*, 437 F.3d at 99 ("The rule against deciding moot cases forbids federal courts from . . . deciding questions that cannot affect the rights of litigants in the case before them." (cleaned up)).   "The burden of establishing mootness rests on the party that raises the issue," *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998), and the burden is "heavy," *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).

Defendants contend that "[r]ecent executive and administrative actions," including the revocation of Proclamation 10014 and the expiration of Proclamation 10052, "have rendered moot the immigrant visa Plaintiffs' claims," including their challenge to the No-Visa Policy.   Defs.' Reply at 9–12; *see also* Defs.' Notice of Expiration of PP 10052, ECF No. 228.   This argument is based on the long-standing principle that an agency's "voluntary cessation of [a] challenged

17

practice[] . . . renders [moot a] dispute" about that practice.  *Porup v. CIA*, 997 F.3d 1224, 1233 (D.C. Cir. 2021).  The court agrees with Defendants in part.

The claims of the non-DV-2020 immigrant plaintiffs (family-based and employment-based immigrant visa beneficiaries) are moot, as neither the challenged Proclamations nor any implementing policy any longer impedes the processing of their visa applications or their entry into the country.[4]  The court can grant no meaningful relief to those Plaintiffs.  But the DV-2020 Plaintiffs' claims are not entirely moot because, should they prevail, relief plausibly remains available.  *See Arizonans for Official English*, 520 U.S. at 68 n.22.  To be sure, those Plaintiffs can no longer seek a declaration that the Proclamations and implementing policies were unlawful.  *See Almaqrami*, 933 F.3d at 783 ("Courts generally cannot declare unlawful or enjoin policies that are no longer in force.").  But their request that the court order the State Department to adjudicate the 9,095 visas reserved pursuant to *Gomez II* causes this case to remain a live controversy.  *See Gomez* Pls.' Mem. at 44–45; *Aker et al.* Pls.' Mot. at 26; *see also Gomez II*, 490 F. Supp. 3d at 294–95 (reserving visas).

The D.C. Circuit's opinion in *Almaqrami* illustrates why.  There, the Circuit reversed a district court order dismissing as moot a case very similar to this one.  A group of DV-2017 plaintiffs sought a preliminary injunction on the grounds that the State Department had unlawfully failed to process their applications pursuant to the agency's implementation of Executive Order 13780.  *See P.K. v. Tillerson*, 302 F. Supp. 3d 1 (D.D.C. 2017).  The district court found that it could not direct the State Department to process the plaintiffs' visas because of ongoing litigation in the Supreme Court over the validity of the so-called "travel ban," Executive Order

---

[4] No Plaintiff asserts that the now expired Proclamations are likely to recur, which might otherwise defeat mootness.  *See True the Vote*, 831 F.3d at 561.  The court also is satisfied that the Proclamations are not likely to be revived.

13780, and so it directed the State Department to "reserve any unused visa numbers for FY 2017 for processing following the Supreme Court's decision." *Id.* at 9–11.  After the fiscal year deadline passed and Executive Order 13780 had lapsed on its own terms, the State Department argued that the action was moot.  *See Almaqrami v. Tillerson*, 304 F. Supp. 3d 1 (D.D.C. 2018).  The district court agreed, finding that because the Supreme Court had dismissed the challenge to Executive Order 13780 as moot, there was no additional relief that the district court could grant the plaintiffs. *Id.* at 6–8.

On appeal, the D.C. Circuit reversed, holding that the district court improperly dismissed the case because it was "not implausible" that the court's pre–September 30 order left "open the possibility" that additional relief would be available.  *Almaqrami*, 933 F.3d at 781–82 & n.2.  The court stressed that whether a challenged agency action "has expired has no effect on the potential viability of plaintiffs' theories of relief, which [the court] must assume are valid unless they are wholly insubstantial and frivolous."  *Id.* at 783 (internal quotation marks omitted).  "[B]ecause there [was] some chance that [the requested] relief would be effective at securing plaintiffs' immigration to the United States," the court held that plaintiffs' "'suit remain[ed] live.'"  *Id.* at 784 (quoting *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019)); *cf. Ermuraki v. Renaud*, 987 F.3d 384, 386 n.2 (5th Cir. 2021) (interpreting *Almaqrami* to hold "that when a plaintiff files suit and the district court grants *some* relief—but not the visa—before the end of the fiscal year, the claim is not moot").

So, too, here.  If the court rules in Plaintiffs' favor that the No-Visa Policy and COVID-19 guidance violated the APA, the court's September 30 Order preserving 9,095 diversity visa numbers provides an avenue of relief for the DV-2020 Plaintiffs.  Under *Almaqrami*, the possibility that the processing of those reserved visas could result in Plaintiffs receiving a visa and

immigrating to the United States is "sufficient to preserve the [] court's subject matter jurisdiction" over Plaintiffs' claims.  933 F.3d at 783.

### 3.      Principles of Nonreviewability

Defendants next argue anew that "[p]rinciples of nonreviewability bar judicial review under the APA of Plaintiffs' claims that are not moot."  Defs.' Reply at 12; *see* Defs.' Mot. for Partial Summ. J., ECF No. 189 [hereinafter Defs.' Mot.], Mem. in Supp. of Defs.' Mot., ECF No. 189-1 [hereinafter Defs.' Mem.], at 13–16.   In *Gomez I*, this court rejected Defendants' argument that the doctrine of consular nonreviewability barred judicial review of Plaintiffs' claims. 485 F. Supp. 3d at 175–76.  And that argument has not improved with age.  The court observed that "not every legal challenge that touches on the admission or exclusion of foreign nationals is foreclosed by consular nonreviewability," and "[d]istrict courts in this jurisdiction consistently have held that 'when the suit challenges inaction, as opposed to a decision taken within the consul's discretion, there is jurisdiction." *Id.* at 176 (cleaned up) (quoting *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 114 (D.D.C. 2020)).  Defendants make no attempt to confront the court's prior analysis or the cases cited therein, and instead advance a more sweeping theory that *any* executive action that bears on visa processing is inherently unreviewable.  *See* Defs.' Mem. at 13–16. Defendants are wrong again.

The cases Defendants rely on do not help their cause.  They first cite to *Fiallo v. Bell* for the proposition that "[t]he Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  Defs.' Mem. at 14 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).  But that case involved a very different situation—a challenge to Congress's "immigration legislation," *Fiallo*, 430 U.S. at 793–94—not a challenge to the Executive Branch's

compliance with immigration legislation.  Appellants were "three sets of unwed natural fathers and their illegitimate offspring who sought . . . a special immigration preference by virtue of a relationship to a citizen or resident alien child or parent."  *Id*. at 790.  They had each been denied eligibility for an immigrant visa under sections 101(b)(1) and 101(b)(2) of the INA and challenged the constitutionality of the provisions.  "[N]oting that Congress' power to fashion rules for the admission of aliens was 'exceptionally broad,'" a three-judge district court panel dismissed the action, and the Supreme Court affirmed.  *Id.* at 791–92 (quoting *Fiallo v. Levi*, 406 F. Supp. 162, 165, 166 (E.D.N.Y. 1975)).  In rejecting the plaintiffs' claim that the statute was so unreasonable as to violate due process, the Court "underscore[d] the limited scope of judicial inquiry into immigration legislation," *id.* at 792, and recalled with approval Justice Frankfurter's concurrence in *Harisiades v. Shaughnessy*:

> The conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.

*Id.* at 796 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97 (1952) (Frankfurter, J., concurring)).

Here, however, Plaintiffs do not ask the court to interfere with Congress's legislative power over the admission of aliens.  To the contrary, Plaintiffs ask the court to enforce the law as Congress, in its authority, has written it.  Just as this court has held that "[w]hen the Government simply declines to provide a decision in the manner provided by Congress" its actions are not shielded under the doctrine of consular nonreviewability, *Gomez I*, 485 F. Supp. 3d at 176, the Government's actions are not shielded by deference that is reserved solely for Congress to legislate in this area.

21

Defendants' reliance on *Kleindienst v. Mandel* is similarly unavailing. That case did not involve a request for visa adjudication, but instead involved a request to reverse a visa *denial*. 408 U.S. 753, 757–59, 769 (1972). At issue was the Attorney General's refusal to waive the ineligibility of a Marxist Belgian journalist to travel on a temporary nonimmigrant visa. *See id.* at 756–59. The INA authorizes the Attorney General to grant a waiver of ineligibility upon recommendation of the Secretary of State or a consular officer. *See* 8 U.S.C. § 1182(d)(3). That authority, committed to the Executive Branch's discretion by law, is fundamentally different from the challenged agency action in this case.

Here, "Plaintiffs challenge the State Department's refusal to review and adjudicate their and the class members' pending visa applications" in accordance with law, *Gomez* Reply at 4 (cleaned up), not "a particular determination in a particular case of matters which Congress has left to executive discretion," *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985). Such a challenge—to a general policy and not a "particular determination"—was expressly recognized as reviewable by the D.C. Circuit in *Bricklayers*, *id.* at 799–801. And that "precedent has been applied [by multiple courts] in this district to allow challenges to the legality of State Department policies—and their application—without implicating the discretionary decisionmaking of individual consular officers." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 142 (D.D.C. 2021) (citing *P.K.*, 302 F. Supp. 3d at 12 ("[T]he doctrine of consular non-reviewability does not apply because Plaintiffs challenge the State Department's policy, not the discretion of a specific consular officer in applying the policy.")), *appeal filed*, No. 21-5068 (D.C. Cir.). Only at oral argument did Defendants attempt to meaningfully distinguish *Bricklayers*, *see* Hr'g Tr. at 54:11–57:8, and the court remains unpersuaded. This case does not, as Defendants contend, concern a particular admission decision. *See* Defs.' Mem. at 13;

Hr'g Tr. at 57:6–8.  It concerns whether an "executive department[] abide[d] by [] legislatively mandated procedures," and "federal courts have [long been understood to have] jurisdiction over" such a case.  *Bricklayers*, 761 F.2d at 801 (providing cases).

The court is similarly unpersuaded by Defendants' alternative argument that "courts may not review decisions to exclude aliens 'unless expressly authorized by law.'"  Defs.' Mem. at 14 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542–43 (1950)).  They base that argument on the assertions that (1) "Congress has established a comprehensive statutory framework for judicial review of decisions concerning an alien's ability to remain in the United States," *id.* (citing 8 U.S.C. § 1252); and (2) Congress has "expressly rejected a cause of action to seek judicial review of visa denials," *id.* at 15 (citing 6 U.S.C. § 236(f)).  The former contention misstates the scope of  section 1252, which governs only judicial review of *removal orders*, and the latter does nothing more than articulate the same doctrine of consular nonreviewability that the court has already found does not preclude review in this case.  Neither provision has any bearing on the question of whether judicial review is permitted in *this* context, where Congress has commanded action by the executive branch to adjudicate diversity visa applications and where Congress has not expressly rejected a cause of action.

Defendants thus have not shown why the APA's "basic presumption of judicial review" does not apply in this case.  *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 (1986) ("Congress intends the executive to obey its statutory commands[,] and . . . it expects the courts to grant relief when an executive agency violates such a command."); *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983) ("Executive action under legislatively delegated authority . . . is *always* subject to

check by the terms of the legislation[,] . . . and if that authority is exceeded it is open to judicial review.").

*  *  *

For these reasons, the court is satisfied it has jurisdiction over the claims of Plaintiffs who have not yet had their DV-2020 applications adjudicated and turns now to the merits.

### B.  Merits Arguments

#### 1.   *No-Visa Policy – Not in Accordance with Law*

The *Gomez*, *Fonjong*, *Mohammed*, and *Kennedy* Plaintiffs seek summary judgment on their claims that Defendants' No-Visa Policy is "not in accordance with law and [is] in excess of statutory authority." *See Gomez* Pls.' Mem. at 22 (cleaned up). The court previously described the No-Visa Policy as the State Department's "policy of suspending all processing and issuance of visas in categories covered by the Proclamation[s] and not subject to an exception." *Gomez I*, 485 F. Supp. 3d at 163. Though the No-Visa Policy expired with the challenged Proclamations, as discussed above, Plaintiffs' challenge to the policy remains a live controversy because the court can plausibly grant relief in the form of an order to process reserved DV-2020 visas.

Plaintiffs contend that the policy is contrary to, among other provisions: (1) the INA's mandate that all immigrant and nonimmigrant "visa applications *shall* be reviewed and adjudicated by a consular officer," *Gomez* Pls.' Mem. at 16–17 (quoting 8 U.S.C. § 1202(b), (d)); (2) the INA's provision that a "consular officer may issue" a visa to an individual who has "made proper application therefor," *id.* at 17 (quoting 8 U.S.C. § 1201(a)(1)); and (3) the statutory mandate that DV-2020 selectees "*shall* remain eligible" to receive a visa through the end of the fiscal year, *id.* (quoting 8 U.S.C. § 1154(a)(1)(I)(ii)(II)). The No-Visa Policy's effect, Plaintiffs argue, "was to

24

declare otherwise-qualified DV-2020 selectees [] *in*eligible for visas before the fiscal year's close." *Id.*

Defendants' primary response is that the No-Visa Policy was an automatic consequence of another statutory provision of the INA—8 U.S.C. § 1201(g)—and therefore it did not violate the APA. *See* Defs.' Mem. at 17–23. Section 1201(g) provides that "[n]o visa . . . shall be issued to an alien if . . . it appears to the consular officer . . . that such alien is ineligible to receive a visa or other such documentation under section 1182." 8 U.S.C. § 1201(g). Defendants interpret section 1201(g) to mean that a person who is not permitted to enter the United States under section 1182(f), as the DV-2020 Plaintiffs were not because of the Proclamations, is rendered ineligible to receive a visa.

The court rejected this argument in *Gomez I* and reaffirms and incorporates that analysis in full. *Gomez I*, 485 F. Supp. 3d at 191. The court summarizes its rationale here. There is a "'basic distinction between admissibility determinations,' i.e., entry determinations, and 'visa issuance that runs throughout the INA.'" *Gomez I*, 485 F. Supp. 3d 191 (footnote omitted) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2414 & n.3 (2018)). Section 1201(g) precludes the issuance of visas to only persons who are "ineligible to *receive a visa*" under section 1182—it says nothing about persons who are ineligible *to enter* the country. *See* 8 U.S.C. § 1201(g) (emphasis added). The categories of persons deemed ineligible to *receive a visa* under section 1182 are found in subsection 1182(a), which provides that "aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States." *Id.* § 1182(a). The reference to "paragraphs" in subsection 1182(a) does not include the entirely distinct *subsection* of 1182(f), but instead refers to "the ten paragraphs of § 1182(a)." *Gomez I*, 485 F. Supp. 3d at 192. Subsection (f), by contrast, authorizes the President to adopt a restriction

on only *entry*; it does not authorize him to add *eligibility* requirements.  *See* 8 U.S.C. § 1182(f)

(noting consequences of presidential finding "that the *entry* of any aliens . . . would be detrimental

to the interests of the United States" (emphasis added)); *see also Castaneda-Gonzalez v. INS*, 564

F.2d 417, 426 (D.C. Cir. 1977) (explaining that section 1201(g) "directs [consular officers] not to

issue visas to any alien who falls within one of the excludable classes described in [8 U.S.C.

§ 1182(a)]").  A restriction on entry pursuant to subsection 1182(f) therefore does not render a

person ineligible to receive a visa.  Three other district courts have since agreed with this court's

interpretation of these sections of the INA.  *See Tate*, 513 F. Supp. 3d at 144–45; *Milligan v.

Pompeo*, 502 F. Supp. 3d 302, 316 (D.D.C. 2020); *Young v. Trump*, 506 F. Supp. 3d 921, 944–45

(N.D. Cal. 2020).

     None of the new arguments that Defendants offer in their motion for partial summary

judgment can overcome the clear statutory text.  To begin, Defendants again attempt to invoke the

Supreme Court's decision in *Trump v. Hawaii*, but the court stands by its prior assessment that

*Hawaii* does not support Defendants' interpretation of the INA.  *See Gomez I*, 485 F. Supp. 3d

at 192 ("[T]he [*Hawaii*] court never held that the President's suspension of entry under § 1182(f)

renders a person ineligible to receive a visa.").  Citing a single passage, Defendants assert that the

"*Hawaii* Court [] *suggest[ed]* . . . that the State Department's refusal of visas pursuant to a

presidential proclamation is compelled by the INA."  Defs.' Mem. at 18 (emphasis added).  They

quote:

> Section 1182 defines the universe of aliens who are admissible into
> the United States (and therefore eligible to receive a visa).  Once
> § 1182 sets the boundaries of admissibility, § 1152(a)(1)(A)
> prohibits discrimination in the allocation of immigrant visas based
> on nationality and other traits.

*Id.* (quoting *Hawaii*, 138 S. Ct. at 2414).  But this passage of *Hawaii* cannot be read to "suggest" what Defendants claim it does.

The *Hawaii* Court distinguished between entry, on the one hand, and visa eligibility and issuance, on the other, in a myriad of places.  For example, in the introduction to section III of its opinion, the Court distinguished between the "grounds on which an alien abroad may be inadmissible to the United States and [therefore] *ineligible for a visa*," and the "authority [of the President] to suspend or restrict the *entry* of aliens in certain circumstances."  *Hawaii*, 138 S. Ct. at 2407 (emphasis added).  For the former, the Court cited to section 1182(a) and included examples of the various reasons an alien may be deemed ineligible for a visa:  health-related grounds, criminal history, terrorist activities, and foreign policy grounds.  *Id.*  For the latter, pertaining to the President's authority to suspend or restrict entry, the Court cited to section 1182(f).  *Id.*  Elsewhere too, whenever the Court discussed the President's authority under section 1182(f), it focused on the President's "'power' to impose *entry* restrictions."  *Id.* at 2408 (emphasis added); *see also id.* at 2408–09 (discussing the President's ability to "restrict *entry of aliens*" (emphasis added)).

The distinction comes into clearest focus in section III.C, where the Court discussed the plaintiffs' discrimination claim.  *Id.* at 2413–15.  The provision under which that claim was brought provides that "no person shall . . . be discriminated against in the *issuance of an immigrant visa* because of the person's race, sex, nationality, place of birth, or place of residence."  8 U.S.C. § 1152(a)(1)(A) (emphasis added).  The *Hawaii* plaintiffs argued that this provision "applies to the predicate question of a visa applicant's eligibility for admission *and* the subsequent question [of] whether the holder of a visa may in fact enter the country."  *Hawaii*, 138 S. Ct. at 2414 (emphasis added).  The Court "reject[ed] plaintiffs' interpretation," however, on the basis that "it

ignore[d] the basic distinction between admissibility determinations and visa issuance that runs throughout the INA." *Id.*; *see also id.* at 2414 n.3 (citing examples). In so doing, the Court expressly observed that "[t]he concepts of entry and admission—*but not issuance of a visa*—are used interchangeably in the INA." *Id.* at 2414 n.4 (emphasis added). *Hawaii* thus does not help Defendants' cause, and Defendants cite to no other case for the proposition that a section 1182(f) restriction on entry constitutes a disqualification for visa eligibility.

Scrambling to find statutory authority for their actions, Defendants point to two other statutory provisions they claim are in tension with the court's interpretation of section 1182(f). They first point to 8 U.S.C. § 1185(a)(1), which makes it unlawful "for any alien to . . . enter or attempt to . . . enter the United States" in violation of Presidential Proclamations. *See* Defs.' Mem. at 18–19. Because it is illegal for anyone subject to a Proclamation to "attempt entry," and because visa issuance is a predicate step to entering the country, the argument goes, "requir[ing] consular officers to grant visas . . . to individuals who are not permitted to attempt to enter the United States" conflicts with section 1185(a)(1) and "invites confusion." *Id.* at 19. The court agrees with the two other courts in this District that have rejected this argument. *See Tate*, 513 F. Supp. 3d at 145; *Milligan*, 502 F. Supp. 3d at 316. Section 1185(a)(1) says nothing about issuance of a visa. *See* 8 U.S.C. § 1185(a)(1); *see also Hawaii*, 138 S. Ct. at 2414 n.3 (showing that the INA is "rife with examples distinguishing between the [] concepts" of admission or entry and visa eligibility or issuance). Because the issuance of a visa and an attempt to enter the country are distinct acts, Defendants are wrong to suggest that the issuance of a visa to an alien that is barred from entering the United States under a Proclamation would violate section 1185(a)(1).

Defendants' position that a visa may not issue if an alien cannot enter the country is further untenable given that some proclamations restrict entry for short periods of time, and aliens subject

to those Proclamations may be issued visas consistent with the INA despite such restrictions. For example, the COVID-19 regional proclamations bar certain foreign nationals from entry, or attempted entry, into the United States if they have been physically present in certain countries within the preceding 14 days. *See, e.g.*, Proclamation No. 9996, 85 Fed. Reg. 15,341 (Mar. 14, 2020). Whereas a visa recipient subject to the regional proclamations would be prohibited from attempting to enter the United States before the 14 days expired, that person would not be barred from attempting to enter or entering the United States from a country not covered by a proclamation after the 14th day. *See Tate*, 513 F. Supp. 3d at 145. It thus cannot be said that a consular officer would violate section 1185(a)(1) by issuing a visa to an alien who would be eligible to enter the United States 14 days later. But under Defendants' interpretation, such an issuance would be unlawful. That is not the law. After all, "[o]btaining a visa from an American consul has never guaranteed an alien's entry into the United States." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1157 (D.C. Cir. 1999). It "merely gives the alien permission to arrive at a port of entry and have an immigration officer independently examine the alien's eligibility for admission." *Id.*; *see also* 8 U.S.C. § 1185(d) ("Nothing in this section shall be construed to entitle an alien to whom a permit to enter the United States has been issued to enter the United States, if, upon arrival in the United States, he is found to be inadmissible under any of the provisions of this chapter, or any other law . . . ."). It is the act of arriving at a port and presenting documentation—not the remote act of obtaining a visa from a consular officer—that constitutes "attempt[ing] to enter." 8 U.S.C. § 1185(a).

Nor is the court persuaded that its interpretation of the law "invites confusion," Defs.' Mem. at 19, because U.S. Customs and Border Protection officers may need to "deny entry despite the existence of a recently-issued visa," *id.* at 26. *See Gomez I*, 485 F. Supp. 3d at 192. Defendants

have not demonstrated any *actual* confusion resulting from the court's ruling in *Gomez I*, which was more than 10 months and approximately 3,200 diversity visas ago.  *See* Defs.' Suppl. Report on Good Faith Efforts to Implement the Prelim. Inj., ECF No. 143, at 3.  To the contrary, Plaintiffs have submitted declarations showing that the system is working as well as can be expected. DV-2020 Plaintiffs who were issued diversity visas prior to the deadline were advised that they were not permitted to attempt to enter the country while the Proclamations remained in effect, and their visas contained annotations to that effect.  *See, e.g.*, *Gomez* Pls.' Mot., Decl. of Fatma Bushati, ECF No. 195-4, ¶ 27; *Gomez* Pls.' Mot., Decl. of Jodi Lynn Karpes, ECF No. 195-8, ¶ 18; *Gomez* Pls.' Mot., Second Suppl. Decl. of Aja Tamamu Mariama Kinteh, ECF No. 195-9, ¶¶ 11–12.  In any event, to the extent Defendants' argument rests on the potential for confusion, that is a policy argument and one better addressed to Congress.  Defendants should ask Congress to amend the statute to permit consular officers to deny visas to persons who are ineligible for entry under section 1182(f).

Defendants next point to a statute requiring consular officers to certify, before issuing a visa, "that a check of the Automated Visa Lookout System, or any other system or list which maintains information about the excludability of aliens under the [INA] has been made and that there is no basis under such system for the exclusion of such alien."  Defs.' Mem. at 22 (emphasis omitted) (quoting Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103-236, § 140(c)(1)(A), 108 Stat. 382, 400 (1994) (note to 8 U.S.C. § 1182)).  Defendants assert, without further explanation, that "[a] determination that an individual is subject to a section 1182(f) proclamation will result in the alien's name being included in the automated visa lookout system."  *Id.* (citing Defs.' Mot., Decl. of Edward J. Ramotowski, ECF No. 189-2 [hereinafter Ramotowski Decl.], ¶ 8).  And, "[a]s a result, a consular officer who issues a visa to

an applicant subject to a 1182(f) restriction could be found to have violated Visa Lookout Accountability requirements." *Id.*  This argument is unavailing for at least two reasons.  First, there simply is no evidence in the record that any Plaintiff's name was entered into this "Automated Visa Lookout System" or that the System's existence had any impact on the State Department's decision to implement the No-Visa Policy.  Under the APA, the court is "limited to the grounds that the agency invoked when it took the action."  *Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 (internal quotation marks omitted).  Second, it is entirely unclear what consequences would follow from a consular officer's issuance of a visa to an individual listed in the system.  The statute says only that the consular officer "shall certify, in writing, that a check of the Automated Visa Lookout System . . . has been made"; it does not say that the officer shall not issue a visa to an individual listed in it.  *See* Pub. L. No. 103-236, § 140(c)(1)(A), 108 Stat. at 400.  Defendants thus have not shown how this provision "is inconsistent, or even in tension, with [the court's] interpretation of § 1182(f)."  *Tate*, 513 F. Supp. 3d at 146.

Still not willing to concede the issue, Defendants go on to assert the reasonableness of their interpretation of the INA with a flurry of arguments about statutory structure and historical practice at the State Department.  *See* Defs.' Mem. at 19–28.  None of these "argument[s] justifies departing from the clear text of the statute."  *Hawaii*, 138 S. Ct. at 2410.  The mental gymnastics Defendants would have the court perform in piecing together various provisions of the INA to arrive at their interpretation of section 1182(f), *see* Defs.' Mem. at 19–21, is counter to the principle that "in matters of immigration policy, where deference to the political branches is high, [courts] require clear[] legislative direction . . . before adopting a reading of the statute that effects . . . sweeping and monumental change in immigration policy," *Wang v. Blinken*, 3 F.4th 479, 483 (D.C. Cir. 2021).

And Defendants are wrong that the court must defer to their interpretation because "the State Department's long-held understanding that the INA authorizes [visa refusal] is reasonable and consistent with law." Defs.' Mem. at 23.  It is a basic tenet of administrative law that "[w]hen the words of a statute are unambiguous . . . judicial inquiry is complete." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 340 (D.C. Cir. 2020) (internal quotation marks omitted).  No matter how entrenched Defendants' flawed interpretation of the law may be in State Department practice, "past practice cannot provide a justification for agency action clearly contrary to statute." *Tate*, 513 F. Supp. 3d at 146; *Milligan*, 502 F. Supp. 3d at 315 ("Given the clarity of section 1182(f), [] this Court finds no basis to defer to State's practice, however well established it may be."); *see also SEC v. Sloan*, 436 U.S. 103, 118 (1978) ("[C]ourts are the final authorities on issues of statutory construction, and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." (cleaned up)); *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) ("Even an agency's consistent and longstanding interpretation, if contrary to statute, can be overruled.").[5]

Because Defendants have identified no applicable statutory authority permitting the State Department to suspend visa processing on the basis of the entry restrictions imposed by the

---

[5] Defendants also cite a number of cases in which they claim other courts in this District have "accepted the application of restrictions imposed under section 1182(f) as a basis for a visa denial." Defs.' Mem. at 25.  But in none of those cases was the court ever presented with the question of whether section 1182(f) was in fact a proper basis for denying or not processing visas.  *See Kangarloo v. Pompeo*, 480 F. Supp. 3d 134, 140–41 (D.D.C. 2020) (resolving case on unreasonable delay grounds); *Sarlak v. Pompeo*, No. 20-cv-35(BAH), 2020 WL 3082018, at *6 (D.D.C. June 10, 2020) (same); *Jafari v. Pompeo*, 459 F. Supp. 3d 69, 77 (D.D.C. 2020) (finding plaintiff did not have a right to a waiver); *Ghadami v. U.S. Dep't of Homeland Sec.*, No. 19-cv-397(ABJ), 2020 WL 1308376, at *7 (D.D.C. Mar. 19, 2020) (resolving case on unreasonable delay grounds); *Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 96 (D.D.C. 2020) (same); *Thomas v. Pompeo*, 438 F. Supp. 3d 35, 44 (D.D.C. 2020) (finding plaintiffs had stated a claim for unreasonably delayed adjudication); *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 116, 121 (D.D.C. 2020) (denying motion to dismiss after finding plaintiffs had adequately alleged unreasonable delay and *Accardi* claims); *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020) (resolving case on unreasonable delay grounds).

Presidential Proclamations, and because persons subject to the Presidential Proclamations are not ineligible to receive visas under sections 1182(f) and 1201(g), the court grants summary judgment to the *Gomez*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs on their claims that the State Department's No-Visa Policy was "not in accordance with law" and "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

> 2. *No-Visa Policy – Arbitrary and Capricious*

The court turns next to the claims asserted by all five Plaintiff groups that the Department's No-Visa Policy was arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A).  *See Gomez* SAC ¶ 315; *Aker* Am. Compl. ¶ 736; *Mohammed* SAC ¶ 2223.  As before, the court need not linger on this question because "[t]he Administrative Record reveals no justification for Defendants' No-Visa Policy except the incorrect assumption that it is compelled by the Proclamations and § 1201(g)."  *Gomez I*, 485 F. Supp. 3d at 194 (citing Certified Admin. R., ECF No. 103-1 [hereinafter CAR], at 24, 26, 28, 36, 38).  The post hoc rationalization Defendants now offer for the policy through the Ramotowski Declaration does not help their cause, as it serves only to reaffirm that the policy was based on a misinterpretation of the law.  *See* Ramotowski Decl. ¶¶ 2, 11 ("The Department's understanding has been that the INA requires the refusal of visas where section 212(f) applies and that the Department has no policy discretion to interpret section 212(f) differently.").  As stated in the court's prior opinion, "[a]gency action that 'stands on a faulty legal premise and [lacks] adequate rationale' is arbitrary and capricious."  *Gomez I*, 485 F. Supp. 3d at 194 (second alteration in original) (quoting *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985)); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law.").  Because the court has now held that the No-Visa Policy was based on a misconception of the law, the court grants summary judgment to the *Gomez*, *Aker*, *Fonjong*,

*Kennedy*, and *Mohammed* Plaintiffs on their claims that the No-Visa Policy was arbitrary and capricious under section 706(2)(A) of the APA.

> 3.    *No-Visa Policy – Notice and Comment*

The *Aker, Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs move for summary judgment on their claims that Defendants' No-Visa Policy violated the APA because it did "not me[e]t the requirements for any exception to the APA's requirement of Notice and Comment Rulemaking." *Aker et al.* Pls.' Mot. at 14; *see Aker* Am. Compl. ¶ 742; *Mohammed* SAC ¶ 2232. Defendants argue that summary judgment in their favor is warranted because "the suspension of routine visa services due to the COVID-19 emergency does not require notice-and-comment" since (1) "Congress has granted the Secretary of State broad authority to 'administer, coordinate, and direct the Foreign Service of the United States and the personnel of the Department of State,'" Defs.' Mem. at 41 (quoting 22 U.S.C. § 2651a), and (2) the formal rulemaking exception for "foreign affairs functions of the United States" applies, *id.* (quoting 5 U.S.C. § 553(a)(1)). Plaintiffs offer no meaningful response to these arguments. In fact, Plaintiffs devote only a single sentence to this issue in their opposition and make no mention of it in their reply brief. *See Aker et al.* Pls.' Mot. at 14; *Mohammed*, *Aker*, *Fonjong*, & *Kennedy* Pls.' Reply in Supp. of Cross-Mots. for Summ. J., ECF No. 227 [hereinafter *Aker et al.* Pls.' Reply]. Because "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived," *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013); *see also Lash v. Lemke*, 786 F.3d 1, 10 (D.C. Cir. 2015) ("As a general matter, we decline to consider arguments made in

such a perfunctory fashion."), the court enters summary judgment in favor of Defendants on this claim.[6]

>    4.    *Exclusion of DV-2020 Visa Applications from Mission-Critical Processing*

The *Gomez* Plaintiffs next move for summary judgment on their claim that "the State Department's treatment of DV-2020 selectees under the COVID-19 Guidance—both their exclusion from 'mission critical' visa services and their relegation to the lowest priority for visa processing at reopened consular posts—[was] arbitrary, capricious, and unlawful under the APA." *Gomez* Pls.' Mem. at 26; *Gomez* SAC ¶¶ 353, 362.  The *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs make a related claim that "Defendants arbitrarily and capriciously defined 'mission critical' to exclude Diversity Visa Lottery winners." *Mohammed* SAC ¶ 2263.

Defendants first defend the COVID-19 guidance on the grounds that it "is not subject to judicial review [under the APA] because it is 'committed to agency discretion by law.'"  Defs.' Mem. at 30 (quoting 5 U.S.C. § 701(a)(2)).  Not so.  There is a "strong presumption that Congress intends judicial review of administrative action," and attempts to overcome that presumption must be supported with "clear and convincing evidence that Congress intended that result." *Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 823–24 (D.C. Cir. 2020) (internal quotation marks omitted).  The Supreme Court has interpreted the exception to judicial review for agency "action committed to agency discretion quite narrowly," and has "generally limited the exception" to administrative decisions that are "traditionally" left to agency discretion. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).  In limited circumstances, courts have found that the presumption of reviewability is overcome (1) for "certain categories of administrative decisions that . . . [are]

---

[6] Because the court rules in Defendants' favor based on waiver, it takes no position on their arguments, including that the suspension of visa processing falls under the foreign affairs, or any other, exception to formal rulemaking.

committed to agency discretion," such as "a decision not to institute enforcement proceedings" or to "allocat[e] . . . funds from a lump-sum"; and (2) where a "statute is drawn so that a court would have no meaningful standard by which to judge the agency's exercise of discretion." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (internal quotation marks omitted).

Defendants suggest that "agency determinations dealing with national interest and foreign policy issues" are traditionally left to agency discretion. Defs.' Mem. at 31. But the cases they rely on for this proposition bear few similarities to the visa-processing questions before this court. For example, Defendants rely on a case that challenged the transfer of marine vessel registrations in which the court declined to reach the merits because it would need to "second guess[] not only the Executive's determinations regarding the military value of . . . eight vessels but also its judgments on questions of foreign policy and national interest." *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Maritime Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000). They also rely on a case that the D.C. Circuit concluded "would necessarily involve second-guessing the Secretary's assessment of the nation's military force structure and the military value of the bases within that structure." *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990). No such concerns about interfering with the Executive's military power inhere in the court's review of the State Department's COVID guidance. All that Plaintiffs ask the court to do is determine whether the State Department considered the relevant factors in adjusting its visa adjudication protocols during the pandemic.

And, unlike in the military context, the INA and the APA readily permit the court to identify what factors the State Department needed to consider. Congress's express directives in the INA include that "[a]ll immigrant visa applications" and "[a]ll nonimmigrant visa applications *shall* be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b), (d) (emphasis

added).   Accordingly, while the State Department of course retained discretion to organize its

priorities as necessary, it nonetheless remained obligated by Congress to carry out certain

functions.   And once it took action to reorganize its priorities, the agency was required to act in

accordance with the APA.   *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 n.12 (D.C. Cir. 1995)

("[T]he APA provides a default standard of judicial review—arbitrary and capricious—precisely

for situations . . . where a statute does not otherwise provide a standard of judicial review.").   The

court thus has available judicial standards by which to judge Defendants' conduct.

On the merits, the court stands by its prior holding.   Although Defendants now attempt to

provide a rationale for the COVID-19 guidance,[7] *see* Defs.' Mem., Decl. of Brianne Marwaha,

ECF No. 189-3 [hereinafter Marwaha Decl.], that post hoc rationalization cannot make up for the

lack of contemporaneous evidence showing that the agency gave any consideration to the

September 30 deadline for issuance of diversity visas or the "detrimental effects that will be

wrought on diversity visa selectees if they do not receive visas," *Gomez I*, 485 F. Supp. 3d at 199;

*Regents of the Univ. of Cal.*, 140 S. Ct. at 1909 (declining to consider "*post hoc* rationalizations"

from the agency in light of "[t]he basic rule" that "[a]n agency must defend its actions based on

the reasons it gave when it acted").   The State Department surely understood the consequences of

an expiring statutory time period on a visa application.   For example, the State Department

specifically designated "Age-Out IV cases" as an "example[] of mission-critical visa services."

CAR at 12.   These cases involve minor, family-based visa applicants who, if they turn 21 years of

---

[7] At the preliminary injunction phase of this litigation, Defendants "d[id] not attempt to defend the rationality of their COVID-19 Guidance[,] [n]or d[id] they dispute that the Guidance constitutes final agency action."   *Gomez I*, 485 F. Supp. 3d at 199.   Defendants now assert, without additional support, that they "dispute[] that the State Department's COVID-19 Prioritization Guidance constitutes a final agency action."   Defs.' Mem. at 30.   This perfunctory argument is inadequately presented, *see Johnson*, 953 F. Supp. 2d at 250, and, in any event, fails to overcome the court's prior holding that the COVID-19 guidance is final agency action.   *Gomez I*, 485 F. Supp. 3d at 199.   The policy "mark[ed] the consummation of Defendants' decisionmaking and impose[d] significant legal consequences on DV-2020 selectees applying for visas at posts that ha[d] not resumed routine visa services."   *Id.*

age, are placed in a less favored visa category and lose their opportunity to immigrate for the foreseeable future. *See Gomez v. Trump*, No. 20-cv-01419 (APM), 2020 WL 3429786, at *1 (D.D.C. June 23, 2020). DV-2020 selectees faced a similar, if not more dire, fate—they would lose the ability to immigrate altogether if not issued a visa by a statutory deadline. *See* 8 U.S.C. § 1154(a)(1)(I)(ii)(II). Yet nothing in the record suggests that the State Department even considered this consequence as to DV-2020 selectees, and Defendants concede that no consideration was given to this loss of eligibility. *See* Hr'g Tr. at 151:20–52:2 (Respondents' counsel stating that, "in March," the Secretary did not "consider[] the fact of timing out and the loss of the opportunity to immigrate"). The State Department therefore failed to consider an important aspect of the problem in issuing the COVID-19 guidance.

Defendants claim that the COVID-19 guidance was nonetheless rational because, pursuant to its interpretation of section 1182(f), DV-2020 selectees "could not be issued visas" while Proclamations 10014 and 10052 were in place and Defendants did not want to "waste" their "scarce resources" on processing applications for individuals who could not enter the country. Defs.' Mem. at 35. That argument fails for two reasons. First, it fails as a matter of timing. Proclamations 10014 and 10052 were not issued until *after* the State Department released the COVID-19 guidance. *Compare* CAR at 12 (COVID-19 guidance dated March 20, 2020), *with* Proclamation No. 10014, 85 Fed. Reg. 23,441 (Apr. 22, 2020); Proclamation No. 10052, 85 Fed. Reg. 38,263 (June 22, 2020). It is therefore impossible that the agency's decision to exclude diversity visas from its mission-critical processing was informed by the Proclamations. Second, and perhaps predictably given that the Proclamations had not yet been issued, there is simply nothing in the record to suggest that Defendants decided not to process DV-2020 applications because they were conserving resources for individuals who could actually enter the country. The

court cannot now consider such a post hoc justification. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1908–09 (declining to consider "impermissible *post hoc* rationalizations" that agency belatedly adopted).

Defendants also rely on the Declaration of Brianne Marwaha to justify their decision to exclude DV-2020 selectees from mission-critical processing. *See* Defs.' Mem. at 35. The *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs have moved "to strike Defendants' extra-record declarations," including the Marwaha Declaration on which Defendants rely here. *See Mohammed*, *Fonjong*, *& Kennedy* Pls.' Mot. to Limit Review to the Admin. R. & to Strike Defs.' Extra-R. Evid. & Its References, ECF No. 192, at 3. Judicial review is typically limited to the record that was before the agency. *See CTS Corp.*, 759 F.3d at 64. As an exception to that general rule, the court may accept a declaration from an agency decisionmaker that "contains no new rationalizations" and "is merely explanatory of the original record." *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 464 (D.C. Cir. 2016) (internal quotation marks omitted). "But this exception may not be employed to offer post-hoc rationalizations where no rationalization exists." *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987). Thus, where the agency "provided no rationalization at the agency level," it is "precluded from initially offering one on judicial review." *Id.* Here, because the Marwaha Declaration offers entirely new explanations for Defendants' conduct, it is not within the scope of this court's review, and the court will not consider Defendants' arguments based on the declaration. And because the court declines to consider the Marwaha Declaration or any other declarations containing post hoc rationalizations, it denies the *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs' motion to strike as moot.

5.        *Unreasonable Delay and Unlawful Withholding*

All five Plaintiff groups move for summary judgment on their claims that Defendants unreasonably delayed and unlawfully withheld adjudication of their DV-2020 applications in violation of 5 U.S.C. § 706(1).  *See Gomez* Pls.' Mem. at 38–44; *Aker et al.* Pls.' Mot. at 15–20. In *Gomez I*, the court ruled that Plaintiffs were substantially likely to succeed on their claim that Defendants had unreasonably delayed processing Plaintiffs' DV-2020 applications.  485 F. Supp. 3d at 197.  The court did not, however, reach the merits of Plaintiffs' overlapping claim that Defendants had unlawfully withheld processing DV-2020 selectees' applications, given the posture of the case and the fact that the relief sought for the two claims was identical.  *Id.* at 198. The court reaches it now and finds in favor of Plaintiffs on both claims.

a.        Unreasonable delay

Defendants have offered no compelling reason for the court to depart from its prior holding that Plaintiffs have satisfied the factors required to show unreasonable delay under *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70, 79 (D.C. Cir. 1984).[8]

---

[8] The six *TRAC* factors are:

> (1) [t]he time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 836–37 (D.C. Cir. 2012) (internal quotation marks omitted) (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999)).

*Gomez I*, 485 F. Supp. 3d at 196.  The court reaffirms and incorporates its prior analysis in full here and briefly addresses Defendants' arguments below.

To begin, Defendants contend that the first factor favors them because "the Secretary of State's decision to reduce consular processing [was] to protect the health of consular officers and the public" and was intended to comply with guidance to slow the transmission of COVID-19.  *See* Defs.' Mem. at 37.  But that argument overlooks the fact that, at least with regard to DV-2020 applicants, the Secretary of State did not just "reduce consular processing," but instructed consular posts to process only the applications of "applicants that . . . meet an exception to the [Proclamation], . . . *and* that constitute a mission-critical category."  CAR at 24 (emphasis added). Based on that instruction, consular officers stopped the processing of DV-2020 applications altogether.  Defendants have not shown how *that* policy, which the court has found was based on a faulty legal premise, was governed by a rule of reason.

As for the second factor—whether Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed—Defendants again ignore that this factor "may be satisfied by an express timetable *or* any other indication of speed."  *Gomez I*, 485 F. Supp. 3d at 196 (cleaned up) (citing *TRAC*, 750 F.2d at 80).  To be sure, the INA contains no firm timetable for adjudicating a diversity visa application, *see* Defs.' Mem. at 37–38 (providing examples such as 47 U.S.C. § 251(d)(1), which sets a six-month deadline for action), but that does not mean Congress gave no "other indication of [] speed."  *TRAC*, 750 F.2d at 80.  As explained in *Gomez I*, "'[t]he specificity and relative brevity' of the September 30 [diversity visa] deadline manifests Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline."  485 F. Supp. 3d at 196 (first alteration in original) (quoting *In re People's Mojahedin*, 680 F.3d at 837).  Here, the State

Department entirely ceased processing diversity visa applications. "'[A] reasonable time for agency action is typically counted in weeks or months, not years'; surely a delay that results in the *permanent* loss of a statutory benefit is not reasonable." *Id.* (alteration in original) (quoting *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004)).

Defendants do not dispute that the third and fifth factors—concerning health, welfare, and the interests prejudiced—favor Plaintiffs, and for good reason. Defs.' Mem. at 38. "[P]rejudice from delay is dire," as thousands of DV-2020 selectees risk losing their (likely) once-in-a-lifetime opportunity to immigrate to the United States, and "delay is 'less tolerable' in cases like this one, where 'human . . . welfare' is 'at stake.'" *Gomez I*, 485 F. Supp. 3d at 196 (alteration in original) (quoting *TRAC*, 750 F.2d at 80).

But it is the fourth factor, concerning the effect of expediting delayed action on competing agency priorities, that Defendants argue is dispositive. *See* Defs.' Mem. at 38. They point to the impact of the COVID-19 pandemic on visa processing across the board, noting that it has "creat[ed] a significant visa application backlog and reduc[ed] visa processing to a fraction of its historical norms." *See id.* "[T]he Secretary of State must be permitted to address this immense backlog of applicants," Defendants argue, "while balancing the health and welfare of consular resources." *Id.*

This court has never denied or discounted the impact of the COVID-19 pandemic on the State Department's consular and visa-processing operations. *See, e.g.*, Mem. Op. & Am. Order, ECF 151, at 16 (recognizing that "[t]he COVID-19 pandemic has caused worldwide operational disruptions of the State Department's consular and visa processing operations"). In *Gomez I*, the court acknowledged that the fourth *TRAC* factor was a "closer call," but ultimately concluded that, resource constraints notwithstanding, Defendants' argument did "not render reasonable the

agency's complete refusal to process diversity visa applications." 485 F. Supp. 3d at 197. The court stands by its prior holding. Defendants still have not "provided an adequate explanation for why [they did] not consider DV-2020 applications mission critical," nor have they justified the State Department's directive to treat such applications "as low priority" even at posts where visa processing resumed. *Id.* (citing CAR at 35). Even if certain posts faced resource constraints, "that does not justify a blanket withholding of processing worldwide." *Id.* This is not a matter of reordering "competing priorities," *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (internal quotation marks omitted), but of an abject failure to comply with statutory obligations and make rational decisions. The fourth factor, which ordinarily favors the agency, is neutral here.

Finally, on the sixth factor, Plaintiffs continue to urge this court to find that Defendants acted in bad faith. *See Gomez* Pls.' Mem. at 42; *Aker et al.* Pls.' Mot. at 20. But because "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed," *TRAC*, 750 F.2d at 80 (internal quotation marks omitted), it declines to do so now.

The court therefore concludes that the *TRAC* factors favor a finding that Defendants unreasonably delayed processing Plaintiffs' DV-2020 visas.

b.     Unlawful withholding

The *Gomez* Plaintiffs next argue that the State Department unlawfully withheld their visa adjudications in violation of section 706(1). *See Gomez* Pls.' Mem. at 43–44. Under section 706(1) of the APA, the court may "compel agency action unlawfully withheld." 8 U.S.C. § 706(1); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). A plaintiff can proceed under section 706(1) only where she "asserts that an agency failed to take a *discrete* agency action that

it is *required to take*." *Norton*, 542 U.S. at 64; *see also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). Put differently, section "706(1) grants judicial review only if a federal agency has a 'ministerial or non-discretionary' duty amounting to a 'specific, unequivocal command.'" *Anglers*, 809 F.3d at 670 (quoting *Norton*, 542 U.S. at 63–64).

In *Meina Xie v. Kerry*, the D.C. Circuit concluded that the INA created a discrete, legally required action when it commanded that "[i]mmigrant visas made available under subsection (a) or (b) of [8 U.S.C. § 1153] *shall* be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed." 780 F.3d 405, 406 (D.C. Cir. 2015) (emphasis added) (quoting 8 U.S.C. § 1153(e)(1)). Because the plaintiff "point[ed] to a precise section of the INA" that "establish[ed] a specific principle of temporal priority that clearly reins in the agency's discretion," the court concluded that she was entitled to a determination of whether the State Department had carried out that discrete, legally required action. *Id.* at 408. *Meina Xie* compels a similar result here. Plaintiffs in this case have identified a specific section of the INA that establishes a legally required action. They point to section 1202(b), which prescribes that "immigrant visa applications *shall* be reviewed and adjudicated by a consular officer."[9] 8 U.S.C. § 1202(b) (emphasis added). "Ordinarily," legislation like section 1202(b) that uses the word "'shall' indicates a mandatory duty." *Anglers*, 809 F.3d at 671. Congress's use of the word "shall" in section 1202(b), like its use of the word shall in 8 U.S.C. § 1153(e)(1) in *Meina Xie*, thus imposes a mandatory duty on consular officers to review and adjudicate immigrant visa applications.

---

[9] In addition to section 1202(b), on which Plaintiffs hang their hats, the Seventh Circuit has noted that "[t]he section on diversity immigration visas repeatedly commands the Attorney General [and the Secretary of State], in nondiscretionary language, to do a variety of tasks related to the DV Program." *Iddir v. INS*, 301 F.3d 492, 499 (7th Cir. 2002) (citing 8 U.S.C. § 1153(c)(1)(A), (c)(1)(B)(i), (c)(1)(C), (c)(1)(D), (c)(1)(E)(iv), (e)).

Defendants' obligations under section 1202(b) are specific and nondiscretionary, such that judicial review under section 706(1) is appropriate.

Plaintiffs have also established that Defendants withheld processing their applications contrary to law.  As this court has already concluded, due to their erroneous interpretation of 8 U.S.C. § 1182(f), Defendants ordered consular officers not to review and adjudicate the DV-2020 Plaintiffs' immigrant visa applications.  *See supra* section IV.b.1.  That order was contrary to law. Accordingly, Plaintiffs have established that Defendants unlawfully withheld review and adjudication of their immigrant visas, and they are entitled to summary judgment on their claim under 8 U.S.C. § 706(1).

Defendants respond that they "did not have any nondiscretionary duty to prioritize the adjudication of FY 2020 DV applications over the processing of other visa applications or providing mission critical consular services."  Defs.' Reply at 32.  That may be true, but it misses the point.  The record reveals that Defendants stopped processing DV-2020 applications not because of a prioritization scheme but because they interpreted section 1182(f) to render DV-2020 applicants ineligible for visas.  *See* Defs.' Mem. at 2 ("The State Department does not have a mandatory duty to process [Plaintiffs'] visa applications during a global pandemic when the Proclamations render them ineligible to receive visas and be admitted to the United States.").  As the court already has explained, this interpretation of section 1182(f) was wrong, and Defendants' concomitant withholding of visa processing was unlawful.

### 6.    *Defendants' Implementation of the National Interest Exception*

The *Gomez* Plaintiffs next argue that Defendants' implementation of the national interest exception, which permitted otherwise barred foreign nationals to enter the country under the Proclamations, violates the APA.  *See Gomez* Pls.' Mem. at 37–38.  The State Department's

guidance on the issuance of national interest exceptions listed just one category of immigrants who might satisfy the exception: "[a]pplicants who are subject to aging out of their current immigrant visa classification before P.P. 10014 expires or within two weeks thereafter." CAR at 167; *see also Gomez I*, 485 F. Supp. 3d at 164 (noting DV-2020 selectees were not considered for the national interest exception). Plaintiffs argue that it was arbitrary and capricious not to also consider DV-2020 applicants for the national interest exception because they too risked losing out on their opportunity to immigrate to the United States.

Plaintiffs' challenge is a nonstarter, however, because the Proclamations necessitating the national interest exception have been rescinded, and Plaintiffs no longer require a national interest exception to enter the country. *See* 86 Fed. Reg. at 11,847, § 1. Plaintiffs therefore are not suffering an ongoing injury from Defendants' decision to exclude them from consideration for a national interest exception, and enjoining the national interest exception guidance would not provide Plaintiffs any relief. The only relief that is theoretically available to Plaintiffs is declaratory relief that the application of the national interest exception was arbitrary and capricious. *See Gomez* SAC at 104 (requesting "[a]n order pursuant to 5 U.S.C. § 706 that the agency defendants' implementation of the Proclamation and the COVID-19 Guidance are unlawful and are set aside"). But "courts generally cannot declare unlawful or enjoin policies that are no longer in force." *Almaqrami*, 933 F.3d at 783; *see also Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1288 (D.C. Cir. 2016) (holding that unless a policy is "capable of repetition, yet evading review[,] . . . expiration of a government policy ordinarily moots a challenge to it"). Because the rescinded policy no longer presents a live controversy, the *Gomez* Plaintiffs' challenge to the national interest exception is dismissed as moot.

7.      *Mandamus Act*

Finally, the *Gomez*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs seek relief under the Mandamus Act, 28 U.S.C. § 1361.   *See Gomez* Reply at 21 n.18; *Fonjong* Am. Compl. ¶¶ 1243–1247; *Kennedy* Am. Compl. ¶¶ 9814–9818; *Mohammed* SAC ¶¶ 2268–2272.   Mandamus relief, however, is available only if "there is no other adequate remedy available to the plaintiff." *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 11 (D.C. Cir. 2005) (internal quotation marks omitted).   Plaintiffs not only have another adequate remedy available, but the court has ruled that they are entitled to that remedy:  the court has granted Plaintiffs summary judgment "compel[ling] delayed agency action under the APA," which is "essentially the same" as relief under the Mandamus Act, *Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010); *see also Gomez* Reply at 21 n.18 (conceding that relief under the Mandamus Act is appropriate only "if the Court concludes that relief is otherwise unavailable").   Because the court has already found that Plaintiffs are entitled to relief due to Defendants unreasonably delaying and unlawfully withholding agency action under section 706(1) of the APA, the *Gomez*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs' request for relief under the Mandamus Act is denied.

### C.      Challenges to the Proclamations

The court previously ordered that summary judgment briefing "shall be limited to issues raised by Plaintiffs' Administrative Procedure Act, mandamus, and related claims concerning visa adjudication and issuance."   *See* Order, ECF No. 184.   In addition to those claims, Plaintiffs' Complaints raise several challenges to now-expired Presidential Proclamations.   *See Gomez* SAC ¶¶ 331–335, 341–347; *Aker* FAC ¶¶ 722–731, 747, 760–764; *Fonjong* Am. Compl. ¶¶ 1248–1254; *Kennedy* Am. Compl. ¶¶ 9819–9825; *Mohammed* Am. Compl. ¶¶ 2273–2279.   Because the challenged Proclamations have expired, *see* 86 Fed. Reg. at 11,847, § 1; Defs.' Notice of

Expiration of Presidential Proclamation 10052, ECF No. 228, the court dismisses Plaintiffs' remaining challenges to the Proclamations as moot. *See Almaqrami*, 933 F.3d at 783.

### D.     Relief

Having concluded that Plaintiffs are entitled to summary judgment on their claims that (1) the No-Visa Policy is contrary to law and arbitrary and capricious, (2) Defendants arbitrarily and capriciously excluded DV-2020 applicants from mission-critical processing, and (3) Defendants unreasonably delayed and unlawfully withheld Plaintiffs' visa adjudications, the court turns next to the appropriate relief for these violations.  In *Gomez II*, this court ordered "the State Department to reserve 9,095 diversity visa numbers" for processing "pending final adjudication of this matter."  490 F. Supp. 3d at 294–95.  The *Gomez* Plaintiffs now request that the court direct the State Department "to adjudicate DV-2020 visa applications in the order in which those applications would have been adjudicated in the absence of Defendants' unlawful actions . . . until all of the 9,095 reserved visas have been issued."  *Gomez* Pls.' Mem. at 45.  The *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs are not satisfied with the 9,095 reserved visa numbers:  they argue that Defendants acted in bad faith and thus the court should order Defendants to adjudicate the maximum number of diversity visas possible in a year, 55,000.  *See Aker et al.* Pls.' Mot. at 21–23.  In addition, the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs argue that when Defendants begin processing DV-2020 visas the "Named Plaintiffs should be given priority over the *Gomez* class members."[10]  *Id.* at 25.

---

[10] In their opening brief, the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs also requested that the court order "reissuance of visas expired or expiring prior to the deadline to immigrate to the United States."  *Aker et al.* Pls.' Mot. at 24.  Following this court's February 19, 2021 Order "that Defendants . . . treat all visas issued or renewed pursuant to *Gomez I* as having been issued in the first instance as of the date that this court renders a final judgment in this action," Mem. Op. & Order, ECF No. 209, at 8, this request is moot.  And, perhaps realizing this, the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs did not raise this request again in their reply brief.  *See Aker et al.* Pls.' Reply.

For their part, Defendants largely reprise their arguments from *Gomez II* that the court lacks the power to order the State Department to adjudicate DV-2020 applications because the INA prohibits the issuance of diversity visas past the close of the fiscal year. *See* Defs.' Reply at 35–38 (citing 8 U.S.C. § 1154(a)(1)(I)(ii)). Defendants cite a string of cases for the principle that a court's power to order the State Department to adjudicate a visa expires with the end of the fiscal year. *See* Defs.' Reply at 36–41. But every case that Defendants cite is distinct from the present matter in one critical way: the plaintiff filed suit or first sought relief only *after* the fiscal year had concluded. *See Nyaga v. Ashcroft*, 323 F.3d 906, 907 (11th Cir. 2003) (per curiam) (plaintiff won 1998 DV lottery and sought an order to compel in 2001); *Mwasaru v. Napolitano*, 619 F.3d 545, 547 (6th Cir. 2010) (plaintiff sought reservation of "a 2007 diversity visa . . . despite the expiration of the fiscal year"); *Mohamed v. Gonzales*, 436 F.3d 79, 80 (2d Cir. 2006) (considering two lawsuits that sought diversity visas from the 1998 fiscal year); *Carillo-Gonzalez v. INS*, 353 F.3d 1077, 1079 (9th Cir. 2003) (plaintiff failed to submit application before end of fiscal year); *Keli v. Rice*, 571 F. Supp. 2d 127, 135 (D.D.C. 2008) ("Unfortunately for the petitioner, he did not seek, and the Court did not grant, a temporary restraining order, preliminary injunction, or any other relief in this case prior to the expiration of the fiscal year in which he was eligible for a diversity visa."); *Yung-Kai Lu v. Tillerson*, 292 F. Supp. 3d 276, 278 (D.D.C. 2018) (plaintiff "was never granted a visa" during the fiscal year, and he "then brought this suit"). Plaintiffs in this case filed suit *before* the end of the fiscal year, and they sought and received relief prior to its expiration. *See Gomez II*, 490 F. Supp. 3d at 286. In fact, two of the circuit cases that Defendants cite explicitly suggest that the plaintiffs in those actions could have secured a better outcome had they, like Plaintiffs here, sought relief in court prior to the expiration of the fiscal year. *See Iddir*, 301 F.3d at 501 n.2 ("It would be a different case had the district court ordered the INS to adjudicate the

appellants' status *while* the INS maintained the statutory authority to issue the visas."); *Coraggioso v. Ashcroft*, 355 F.3d 730, 734 n.8 (3d Cir. 2004) ("Had Coraggioso sought relief prior to the expiration of the 1998 fiscal year, our analysis may have been different.").  And the D.C. Circuit has likewise suggested that where "[t]he plaintiff files suit and the court grants *some* relief—but not the visa—before the" end of the fiscal year, "after the selection FY has ended, the court might lawfully take steps to compel the government to process the plaintiff's application and issue her a diversity visa anyway." *Almaqrami*, 933 F.3d at 780.  Defendants have not identified a single case where the plaintiff sought and received some relief prior to the close of the fiscal year but was denied final relief because the fiscal year expired before entry of judgment.

As the court explained in *Gomez II*, the court retains power to grant relief to a plaintiff who seeks relief prior to the close of the fiscal year.  *See Gomez II*, 490 F. Supp. 3d at 284 (first citing *Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999); and then citing *Przhebelskaya v. U.S. Bureau of Citizenship & Immigr. Servs.*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004)).  Having reserved visa numbers prior to the end of the fiscal year, the court can now order Defendants to process those visas without "creat[ing] any conflict with the INA because 'such an order would give effect to the district court's prior directive, entered before the end of the selection [fiscal year], to preserve an essential (and otherwise expiring) ingredient of relief.'"  *Id.* at 286 (quoting *Almaqrami*, 933 F.3d at 782).

Defendants argue that *Paunescu* and *Przhebelskaya*, upon which the court relied to reserve diversity visa numbers, are distinguishable from the present context because the courts in those cases had ordered the State Department to adjudicate or process visas prior to the end of the fiscal year rather than simply to reserve visa numbers.  *See* Defs.' Reply at 40–42.  But Defendants have not offered any reason for the court to reverse its prior conclusions that (1) reserving visa numbers

50

is the functional equivalent of an order to adjudicate or process a visa and (2) the reservation of visas is similar to "reserving a congressionally afforded benefit past a statutory deadline" in the appropriations context, *see Gomez II*, 490 F. Supp. 3d at 285–86.  They also do not grapple with the D.C. Circuit's rejection of that distinction in *Almaqrami*, 933 F.3d at 782 (stating that *Paunescu* and *Przhebelskaya* "offer useful examples, not binding models, and neither of those courts limited their holdings to the precise scenario they confronted" and that the present case "is more similar to *Paunescu* and *Przhebelskaya* than the cases dismissed as moot because the plaintiff filed too late or the court did not act in time").  In the end, Defendants have identified no case that prevents the court from effectuating its previous order to grant Plaintiffs relief for Defendants' violations of law.

At the same time, the court rejects the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs' request to expand the number of reserved DV-2020 visas for processing.  Plaintiffs have offered no proof, and instead rely entirely on supposition, to support their contention that Defendants acted in bad faith.  Particularly at the summary judgment stage, the court cannot accept Plaintiffs' conclusory allegations that Defendants took advantage of the pandemic to flout court orders and disrupt the diversity visa program.  Those allegations, made without evidentiary support or citation, are not well taken, and the court will not order Defendants to issue more than the 9,905 reserved diversity visas.

Additionally, the court declines the *Aker*, *Fonjong*, *Kennedy*, and *Mohammed* Plaintiffs' request that the named Plaintiffs be given priority over the *Gomez* class.  Plaintiffs have not identified any reason that the court should deviate from the INA's provision that diversity visas "shall be issued to eligible qualified immigrants *strictly in a random order* established by the Secretary of State for the fiscal year involved," 8 U.S.C § 1153(e)(2) (emphasis added).  The court

appreciates that the named Plaintiffs have made additional efforts by filing suit, but it is bound to respect Congress's decision that the processing of diversity visas proceed in a random order, and the court will not order Defendants to prioritize certain DV-2020 applicants over other class members.

Accordingly, the court orders Defendants to in good faith adjudicate DV-2020 applications until the 9,905 reserved diversity visas for the 2020 Fiscal Year are filled. As for timing, the court will leave it to the parties in the first instance to attempt to negotiate a reasonable time frame within which Defendants must complete processing the reserved visas.

## V.     CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Defendants' Motion for Partial Summary Judgment, ECF No. 189, and grants in part and denies in part the *Aker*, *Mohammed*, *Fonjong*, and *Kennedy* Plaintiffs' Motion for Partial Summary Judgment, ECF No. 194, and the *Gomez* Plaintiffs' Motion for Partial Summary Judgment, ECF No. 195.

The court grants Defendants' motion for partial summary judgment as to Plaintiffs' claims that (1) the No-Visa Policy was required to be issued via notice and comment, and (2) the Mandamus Act provides Plaintiffs relief. The court grants Plaintiffs' motions for partial summary judgment as to their claims that (1) the No-Visa Policy is not in accordance with law and is arbitrary and capricious, (2) Defendants acted arbitrarily and capriciously in excluding diversity visas from mission-critical processing, and (3) Defendants unreasonably delayed and unlawfully withheld adjudication of their diversity visas. In addition, the court denies as moot (1) the non-DV immigrant Plaintiffs' claims; (2) Plaintiffs' claim that the national interest exception violates the APA; (3) the *Mohammed*, *Fonjong*, and *Kennedy* Plaintiffs' Motion to Limit Review to the

Administrative Record and to Strike Defendants' Extra-Record Evidence and Its References, ECF No. 192; and (4) Plaintiffs' remaining claims that the Proclamations are unlawful.

Defendants shall process DV-2020 applications in a random order until all 9,905 diversity visas have been granted.  The parties shall notify the court by August 25, 2021, whether they have agreed to a time within which to process the reserved visas.  The court will issue a final order once that question is resolved.


Dated:  August 17, 2021                                   Amit P. Mehta
                                                          United States District Court Judge

53