UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOMINGO ARREGUIN GOMEZ, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JOSEPH R. BIDEN, JR., President of the )<br>United States of America, *et al.*, )<br><br>Defendants. ) | Civil Action No. 20-1419 (APM) |
| MOHAMMED ABDULAZIZ ABDULBAGI )<br>MOHAMMED, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ANTONY BLINKEN, Secretary, )<br>U.S. Department of State, *et al.*, )<br><br>Defendants. ) | Civil Action No. 20-1856 (APM) |
| CLAUDINE NGUM FONJONG, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JOSEPH R. BIDEN, JR., President of the )<br>United States of America, *et al.*, )<br><br>Defendants. ) | Civil Action No. 20-2128 (APM) |

| | |
|---|---|
| AFSIN AKER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 20-1926 (APM) |
| | ) |
| JOSEPH R. BIDEN, JR., President of the United States of America, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

| | |
|---|---|
| MORAA ASNATH KENNEDY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 20-2639 (APM) |
| | ) |
| JOSEPH R. BIDEN, JR., President of the United States of America, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR STAY

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

BACKGROUND.................................................................................................3

LEGAL STANDARD .........................................................................................6

ARGUMENT .....................................................................................................7

I.      Defendants Are Likely To Succeed On Appeal ...............................................7

          A.     The Court Erred In Holding That State's Refusal To Process Visa Applications And Issue Visas To Non-Citizens Barred From Entry By The Proclamations Is Not In Accordance With Law And Is Arbitrary And Capricious..................................................................................8

          B.     The Court Erred in Holding that State's Mission-Critical Guidance was Arbitrary and Capricious Because the Determinations Underlying the Guidance is Committed to Agency Discretion and Unreviewable Under the APA, and Even if the Guidance Were Reviewable, it was Reasonable in Light of the Pandemic..................12

          C.     The Court Erred in Holding that State Unreasonably Delayed and Unlawfully Withheld Adjudication of DVs. .......................................15

          D.     The Court Erred In Holding That It Has The Equitable Authority To Order State To Adjudicate And Issue Reserved DVs Beyond The End Of The FY 2020...............................................................................20

II.     Defendants Will Suffer Irreparable Harm Without A Stay ..........................24

          A.     Resource-Intensive Systems Modifications ........................................24

          B.     Reordering State Department Priorities...............................................26

III.    Plaintiffs Will Not Be Harmed By A Stay Pending Appeal...........................28

IV.    A Stay Pending Appeal Would Serve The Public Interest ............................28

CONCLUSION..................................................................................................29

CERTIFICATE OF SERVICE...........................................................................30

# TABLE OF AUTHORITIES

## CASE LAW

*Al-Adahi v. Obama*,
  672 F. Supp. 2d 81 (D.D.C. 2009) .......................................................... 7, 8

*Almaqrami v. Pompeo*,
  933 F.3d 774 (D.C. Cir. 2019) ............................................................21, 22

*Castaneda-Gonzalez v. INS*,
  564 F.2d 417 (D.C. Cir. 1977) ................................................................. 9

*Ctr. for Sci. in the Pub. Interest v. United States FDA*,
  74 F. Supp. 3d 295 (D.D.C. 2014) ......................................................... 18

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
  772 F.2d 972 (D.C. Cir. 1985) ............................................................. 1, 7

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
  319 F. Supp. 3d 70 (D.D.C. 2018) ...........................................................7

*Gjoci v. Dep't of State*,
  — F. Supp. 3d —, 2021 WL 3912143 (D.D.C., Sept. 1, 2021) .................................. 28

*Gomez v. Biden* (*Gomez III*),
  2021 WL 3663535 (D.D.C. Aug. 17, 2021).................................................... *passim*

*Gomez v. Trump* (*Gomez I*),
  485 F. Supp. 3d 145 (D.D.C. 2020)........................................................5, 11

*Gomez v. Trump* (*Gomez II*),
  490 F. Supp. 3d 276 (D.D.C. 2020)........................................................5, 23

*Heckler v. Chaney*,
  470 U.S. 821 (1985)......................................................................13, 14

*In re Barr Laboratories, Inc.*,
  930 F.2d 72 (D.C. Cir. 1991)..............................................................14, 19

*INS v. Pangilinan*,
  486 U.S. 875 (1988)......................................................................... 20

*Judulang v. Holder*,
  565 U.S. 42 (2011)......................................................................... 10

*Kerry v. Din,*
    576 U.S. 86 (2015) ................................................................................. 9

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
    336 F.3d 1094 (D.C. Cir. 2003) ........................................................... 19

*Mogu v. Chertoff,*
    550 F. Supp. 2d 107 (D.D.C. 2008) ..................................................... 21

*Paunescu v. INS,*
    76 F. Supp. 2d 896 (N.D. Ill. 1999) .................................................... 22

*Przhebelskaya v. USCIS,*
    338 F. Supp. 2d 399 (E.D.N.Y. 2004) ................................................ 22

*Skalka v. Kelly,*
    246 F. Supp. 3d 147 (D.D.C. 2017) ..................................................... 19

*Sunny v. Biden,*
    — F. Supp. 3d —, 2021 WL 5294879 (E.D.N.Y. Nov. 12, 2021) ......... 13, 22

*Tate v. Pompeo,*
    513 F. Supp. 3d 132 (D.D.C. 2021) .................................................. 12, 13

*Telecomms. Research & Action Center ("TRAC") v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ........................................................... 18, 19

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ......................................................................... 10

*United States v. Oakland Cannabis Buyers' Co-Op,*
    532 U.S. 483 (2001) ............................................................................. 20

*Whitman v. Am. Trucking Assns Inc.,*
    531 U.S. 457 (2001) ............................................................................. 16

*Xiaobing Liu v. Blinken,*
    No. 21-629-TJK, 2021 WL 2514692 (D.D.C. June 18, 2021) ............... 19

*Yung-Kai Lu v. Tillerson,*
    292 F. Supp. 3d 276 (D.D.C. 2018) .................................................. 21, 22

## STATUTES LAW

5 U.S.C. § 701(a)(2) ................................................................................. 12, 13, 14

6 U.S.C. § 236 ................................................................................................................. 11

6 U.S.C. § 236(c)(2)(H) ................................................................................................. 11

6 U.S.C. § 236(d)(2) ...................................................................................................... 11

8 U.S.C. § 1104 .............................................................................................................. 18

8 U.S.C. § 1104(a) ......................................................................................................... 17

8 U.S.C. § 1153(c)(1) ................................................................................................1, 21

8 U.S.C. § 1153(e)(2) .................................................................................................... 22

8 U.S.C. § 1154(a)(1)(I)(ii)(II) ....................................................................................... 1

8 U.S.C. §1154(a)(1)(I)(II) ........................................................................................... 22

8 U.S.C. § 1181(a) ........................................................................................................... 9

8 U.S.C. § 1182 .............................................................................................................. 10

8 U.S.C. § 1182e ............................................................................................................ 11

8 U.S.C. § 1182f ............................................................................................................. 11

8 U.S.C. § 1182(f) .................................................................................................3, 5, 11

8 U.S.C. § 1185(a) ......................................................................................................... 3,

8 U.S.C. § 1202(a) ......................................................................................................... 17

8 U.S.C. § 1202(b) ......................................................................................................... 16

22 U.S.C. § 2651a ........................................................................................ 12, 13, 16, 18

31 U.S.C. § 1102 .............................................................................................................. 1

31 U.S.C. § 1301 ............................................................................................................ 22

## FEDERAL REGULATIONS

22 C.F.R. § 42.33 ........................................................................................................... 17

22 C.F.R. § 42.33(a)(1) ...........................................................................................21, 22

22 C.F.R. § 42.33(f) ................................................................................................ 22

# FEDERAL REGISTER

85 Fed. Reg. 23,411 ...................................................................................................3

85 Fed. Reg. 23,443 ................................................................................................ 11

85 Fed. Reg. 38,263 ...................................................................................................4

86 Fed. Reg. 417 ........................................................................................................4

86 Fed. Reg. 11,847 ...................................................................................................6

# PUBLIC LAW

Pub. L. No. 103-236.................................................................................................. 10

# PRESIDENTIAL PROCLAMATIONS

Proclamation No. 9645 ............................................................................................ 27

Proclamation No. 10014 ....................................................................................... *passim*

Proclamation No. 10052 ....................................................................................... *passim*

Proclamation No. 10131 .......................................................................................4, 6

Proclamation No. 10149 ..............................................................................................6

# MISCELLANEOUS

U.S. Dep't of State Bureau of Consular Affairs, *Visa Bulletin for May 2020, State Dep't.,*
available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-
bulletin/2020/visa-bulletin-for-may-2020.html (last visited Feb. 2, 2022) .................. 20

# INTRODUCTION

Defendants respectfully request that this Court stay its October 13, 2021 final order and judgment, *see* ECF Nos. 243, 244, which require the U.S. Department of State (the "State Department," "State," or "the Department") to issue 9,095 diversity visas ("DVs") from Fiscal Year ("FY") 2020 by September 1, 2022, pending Defendants' appeal to the U.S. Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"), *see* ECF No. 248. Defendants request that this Court act on this stay request by February 15, 2022, and will seek stay relief at that time from the D.C. Circuit if Defendants do not obtain relief from this Court.

A stay pending appeal is warranted under the standard set by the D.C. Circuit. *See Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam). First, Defendants have identified serious questions on appeal, on which they are likely to prevail: (1) State's interpretation that the Immigration and Nationality Act ("INA") requires the refusal of DVs to persons whose entry is suspended by Proclamations 10014 and 10052 is reasonable, lawful, and entitled to deference; (2) State's determinations regarding its mission-critical guidance are unreviewable under the Administrate Procedure Act ("APA"), and, even if they were reviewable, they are not arbitrary and capricious; (3) State did not unreasonably delay or unlawfully withhold the adjudication of Plaintiffs' DV applications because State lawfully suspended the adjudication of DVs in implementing the Proclamations and pursuant to its mission-critical guidance; and (4) compliance with the Court's order requires State to issue DVs beyond the end of the corresponding fiscal year in violation of statute. *See* 8 U.S.C. §§ 1153(c)(1), 1154(a)(1)(I)(ii)(II); 31 U.S.C. § 1102.

Second, compliance with the Court's order while the appeal is pending will cause irreparable harm to State and will result in actions that cannot be reversed should the government

1

prevail on appeal. The Court's order requires State to engage in resource-intensive actions that disrupts its normal consular and immigrant visa application processing operations. That order undermines the Secretary of State's discretionary authority over the prioritization of finite Department resources to support worldwide consular operations, particularly during the ongoing COVID-19 pandemic and its effect on an unprecedented backlog of immigrant visa applicants seeking visa appointments at consular posts around the world. These harms cannot be undone if the D.C. Circuit reverses the Court's order.

Third, Plaintiffs, conversely, will not be irreparably harmed if the Court enters a stay. At most, Plaintiffs will experience additional delay in receiving visas beyond the delay that the pandemic has already caused. Any additional delay, however, is outweighed by the irreparable harms to State and the benefits of further appellate review by the D.C. Circuit.

Finally, it is in the public interest to receive a decision from the D.C. Circuit on Defendants' appeal prior to enforcement of the Court's order in this case. As mentioned, the government is entitled to appellate review of this Court's ruling prior to being required to take the irreversible action of granting visas in violation of the law. Further, the Court's order to issue diversity visas to the DV2020 plaintiffs will displace many other applicants seeking services at U.S. consular posts, such as U.S. citizen petitioners sponsoring their noncitizen family members for immigrant visas, and other categories of immigrant-visa applicants, including FY 2022 DV selectees. In this zero-sum environment, these third parties will suffer harm because State will need to divert its limited consular resources to the DV2020 plaintiffs' applications, which will inevitably delay the reunifications of U.S. citizens and lawful permanent residents with their family members eligible for immigrant visas.

For these reasons, Defendants respectfully request that this Court stay its October 13, 2021 final order and judgment.

## BACKGROUND

Following the outbreak of the COVID-19 pandemic, on March 20, 2020, the State Department directed all U.S. embassies and consulates "to immediately suspend all routine nonimmigrant and immigrant visa services"—which included processing of immigrant visa applications submitted by persons selected in the DV program lottery—but "continue to provide mission-critical and emergency visa services" as resources allowed. CAR12. The State Department designated immigrant visa applications filed by the following persons as "mission critical" under COVID-19 operational protocols requiring emergency processing: spouses and children of U.S. citizens; children adopted by U.S. citizens; certain Iraqi and Afghan nationals employed by the United States government; certain employment-based medical professionals; and derivative minor applicants who may "age-out." *Id.*

In response to the damage the COVID-19 pandemic inflicted on the U.S. economy, on April 22, 2020, President Trump signed Proclamation 10014, *Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 23,441 (Apr. 27, 2020). Proclamation 10014, issued under 8 U.S.C. §§ 1182(f) and 1185(a), suspended the entry into the United States of several categories of intending immigrants abroad (including FY 2020 DV lottery selectees and their derivative family members) who lacked a valid immigrant visa or travel document, unless they qualified for an exception. Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," he may "for such period as he shall deem necessary, suspend the

entry of all aliens or any class of aliens as immigrants or nonimmigrants." Section 1185(a)(1) grants the President authority to adopt "reasonable rules, regulations, and orders" governing the entry of aliens, "subject to such limitations and exceptions as [he] may prescribe." Proclamation 10014 is subject to exceptions, including "any alien whose entry would be in the national interest," as determined by the Secretaries of State and Homeland Security "or other respective designees." *Id*. at 23,443.

On June 22, 2020, President Trump signed Proclamation 10052, which extended Proclamation 10014 and expanded its scope to suspend also the entry of temporary workers seeking H-1B, H-2B, L, and certain J nonimmigrant visas through December 31, 2020. *Suspension of Entry of Immigrants and Nonimmigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 38,263 (June 25, 2020). Proclamation 10052 applied to DV lottery selectees and extended the suspension of their entry into the United States through December 31, 2020. On December 31, 2020, President Trump signed Proclamation 10131. *Suspension of Entry of Immigrants and Nonimmigrants Who Continue To Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*. 86 Fed. Reg. 417. Proclamation 10131 extended Proclamations 10014 and 10052 through March 31, 2021.

Taking into account the effect of the COVID-19 pandemic in countries around the world, the safety of agency employees, and the significantly limited resources available at each U.S. consular post, the State Department implemented the Proclamations by suspending the issuance of visas for those noncitizens subject to the Proclamations and the processing of visa applications from such individuals. The State Department instructed consular posts that "[o]nly [visa] applicants that [the] post believes may meet an exception to the [Proclamation], including the

national interest exception, *and* that constitute a mission-critical category [under the COVID-19 guidance] should be adjudicated" and that consular officers "may not issue any [visas] that are not also excepted under the [Proclamation]." CAR24.

During summer 2020, plaintiffs from four cases, which included a large number of FY 2020 DV selectees, filed suit before the district court challenging the Labor Proclamations, as well as the agency actions implementing those proclamations. *Gomez v. Trump* (*Gomez I*), 485 F. Supp. 3d 145, 157 (D.D.C. 2020). As relevant here, all DV plaintiffs sought preliminary injunctive relief requiring the State Department to process DV applications before September 30, 2020, and further requested that the district court reserve DV numbers for future adjudication after the conclusion of FY 2020. *Id.* On September 4, 2020, this Court issued a preliminary-injunction order that largely denied the plaintiffs' motions except as to the DV plaintiffs. *Id.*[1] In pertinent part, the Court found the State Department's determination that Proclamation 10014's bar on entry foreclosed the issuance of FY 2020 DVs was likely contrary to law and granted preliminary injunctive relief only as to the DV plaintiffs, requiring the State Department to adjudicate FY 2020 DV applications. *See id.* at 190–94, 202–05. Between September 5 and September 24, 2020, in compliance with the Court's preliminary injunction order, the State Department adjudicated 5,093 DV applications and issued 3,208 DVs, and continued its efforts to adjudicate DV applications until the statutory deadline of September 30, 2020. *Gomez v. Trump* (*Gomez II*), 490 F. Supp. 3d 276, 292 (D.D.C.

---

[1] The *Gomez* plaintiffs appealed from the September 4, 2020 order, No. 20-5292 (D.C. Cir.). Plaintiffs' opening brief, filed on October 29, 2020, raised the following issues: (1) whether the Proclamations are invalid because they "(a) fail the requirement in 8 U.S.C. § 1182(f) to be supported by a 'find[ing] that the entry of [the affected foreign nationals] would be detrimental to the interests of the United States,'" (b) "violate the separation of powers," and (c) are issued in violation of the nondelegation doctrine; and (2) whether the non-DV plaintiffs suffered irreparable harm. While the appeal was pending, President Biden rescinded Proclamation 10014, and Proclamation 10052 expired by its own terms. Because none of the challenged Proclamations remained in effect, the D.C. Circuit dismissed the appeal as moot.

2020). On September 30, 2020, the Court amended its preliminary injunction order, directing the State Department to reserve 9,095 DV numbers after the conclusion of FY 2020 for future adjudication pending a final ruling on the merits. *See id.*, at 294–95. Subsequently, during the pendency of the case, the relevant proclamations were rescinded or expired: on February 24, 2021, the President issued Proclamation 10149, revoking, in relevant part, the restrictions on immigrant visas imposed by Proclamations 10014, 10052, and 10131. *Revoking Proclamation 10014*, 86 Fed. Reg. 11847.

On August 17, 2021, the Court issued an opinion granting summary judgment in favor of the DV plaintiffs on most of their remaining APA claims against the State Department regarding its actions in implementing the Labor Proclamations.[2] *Gomez v. Biden* (*Gomez III*), 2021 WL 3663535 (D.D.C. Aug. 17, 2021). In particular, the Court held the following: (1) the State Department's policy of suspending adjudication and issuance of visas (or "No-Visa Policy") was not in accordance with law and was arbitrary and capricious; (2) the State Department's exclusion of FY 2020 DV selectees from its guidance on emergency and mission-critical services was arbitrary and capricious; (3) the State Department's non-processing of the DV applications constituted agency action unreasonably delayed and unlawfully withheld. *See id.* at 24. On October 13, 2021, the Court issued a Minute Order directing the State Department to issue the 9,095 FY 2020 DVs that it had previously "reserved" under the preliminary injunction to class members by September 30, 2022, two years after the statutory September 30, 2020 deadline for FY 2020 DV processing. *See* ECF No. 244. On December 10, 2021, Defendants filed their notice of appeal.

**LEGAL STANDARD**

---

[2] Due to the rescission and expiration of the challenged proclamations, the court's summary judgment opinion denied as moot (1) the non-DV immigrant plaintiffs' claims; (2) APA claims against the national interest exception; and (3) the claims that the Proclamations are unlawful.

A party seeking a stay pending appeal must show that four factors weigh in favor of a stay: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam). "A party does not necessarily have to make a strong showing with respect to the first factor (likelihood of success on the merits) if a strong showing is made as to the second factor (likelihood of irreparable harm)." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 83 (D.D.C. 2018) (citing *Cuomo*, 772 F.2d at 974).

## ARGUMENT

### I.     Defendants Are Likely To Succeed On Appeal

Defendants have appealed the Court's holdings that (1) the State Department's policy of suspending adjudication and issuance of visas (or "No-Visa Policy") was not in accordance with law and was arbitrary and capricious; (2) the State Department's exclusion of FY 2020 DV selectees from its guidance on emergency and mission-critical services was arbitrary and capricious; (3) the State Department's non-processing of DV applications constituted agency action unreasonably delayed and unlawfully withheld; and (4) it had the equitable authority to reserve DVs and order State to adjudicate and issue DVs beyond the statutory FY deadline. *See* ECF No. 243. Defendants are reasonably likely to succeed on the merits at the D.C. Circuit.

Notwithstanding the Court's disagreement with Defendants' positions regarding these issues, the Court should stay its order because the issues presented in this case deal with complicated matters of immigration policy and the operations of U.S. consular posts worldwide, and the D.C. Circuit may view these matters in a different light on appeal. *See, e.g.*, *Al-Adahi v.*

*Obama*, 672 F. Supp. 2d 81, 83 (D.D.C. 2009) ("While the Court believes that the Memorandum Opinion speaks for itself in terms of how the case should be decided, it is true that it deals with complicated issues that represent fair ground for litigation and thus for more deliberative investigation. Therefore, the Government prevails on the first factor." (internal quotation marks and citation omitted)).

### A. The Court Erred In Holding That State's Refusal To Process Visa Applications And Issue Visas To Non-Citizens Barred From Entry By The Proclamations Is Not In Accordance With Law And Is Arbitrary And Capricious.

Defendants are likely to prevail on their appeal of the Court's holding that State's refusal to process visa applications and issue visas to persons barred from entry by Presidential Proclamations 10014 and 10052 is not in accordance with law and is arbitrary and capricious because: (1) consular officers' refusal of DVs to persons whose entry was suspended by the Proclamations is required by the relevant overlapping provisions of the INA, and the text and context of Section 1182(f), together with Section 1201(g) and other provisions of law, support State's consistent historical interpretation of the law; (2) State's long-held interpretation that denials are required when the consular officer knows at the time of visa adjudication that the applicant is inadmissible is both a reasonable and lawful approach to carry out its role in effectively administering the United States visa system; and (3) to the extent the INA is ambiguous, State's interpretation of the statute, which is consistent with the Foreign Affairs Manual ("FAM") and its longstanding practice, is entitled to deference.

First, Section 1201(g) prevents State from issuing visas to noncitizens subject to Proclamations 10014 and 10052 suspending entry under Section 1182(f). This Court disagreed, determining that "[a] restriction on entry pursuant to subsection 1182(f) therefore does not render a person ineligible to receive a visa" because the categories of individuals "ineligible to receive a

visa" under section 1201(g) is cabined strictly within the paragraphs under section 1182(a), which lists "Classes of aliens ineligible for visas . . .", thus excluding the distinct subsection of 1182(f). *See Gomez III*, 2021 WL 3663535 at *12.

But this Court's interpretation of the applicable statutory provisions is circular and severs the closely linked concepts of admissibility and visa eligibility. The INA requires a foreign national to possess a valid, unexpired visa in order to seek admission into the United States. *See* 8 U.S.C. § 1181(a) ("no immigrant shall be admitted into the United States unless at the time of application for admission he . . . has a valid unexpired immigrant visa. . . ."). This Court's interpretation, therefore, suggests that a consular officer abroad and an immigration officer at the port of entry must employ different criteria and standards when adjudicating a visa application versus making an admission determination, respectively. But that runs contrary to settled law and frustrates the INA's administrative framework. In *Castaneda-Gonzalez v. INS*, the D.C. Circuit described the relationship between visa issuance by consular officers and admission determinations by immigration officers as a "'double check' system, which requires an alien to demonstrate his admissibility before two different administrative officials with independent and coequal authority . . ." and observed that "the statutory framework . . . requires consular officers and the [Secretary of Homeland Security] independently to address the same issues in different contexts." *See* 564 F.2d 417, 426-27 (D.C. Cir. 1977). Accordingly, consistent with that well-settled framework, the Supreme Court explicitly observed, "[b]efore issuing a visa, the consular officer must ensure the alien is not inadmissible under *any* provision of the INA." *See Kerry v. Din*, 576 U.S. 86, 89 (2015) (citing 8 U.S.C. § 1361) (emphasis added). And the Supreme Court's most recent discussion of Section 1182(f)—the *Hawaii* litigation—was premised on the use of a Section 1182(f) proclamation to preclude visa issuance for countries that provided inadequate cooperation with

security vetting needs that allowed the consular officer to safely adjudicate visa requests—a premise that would make no sense if visa issuance was required in spite of the Proclamation at issue there. *See generally Trump v. Hawaii*, 138 S. Ct. 2392 (2018). Thus, here, the State Department could not properly issue a visa to a DV2020 selectee because the consular officer would have known at the time of the visa adjudication that the applicant was subject to Proclamations 10014 and 10052 and thus inadmissible under Section 1182(f).

Congress's implementation of the Automated Visa Lookout System bolsters this interpretation of the statutory scheme. Briefly, under the Automated Visa Lookout System provisions of the Foreign Relations Authorization Act, Congress enacted legislation requiring consular officers to confirm that a noncitizen is not "excludable" from the United States prior to visa issuance. *See* Foreign Relations Authorization Act, Years 1994 and 1995, Pub. L. No. 103-236, § 140(c)(1)(B) (8 U.S.C. § 1182 note). Not only did Congress require that consular officers confirm that a noncitizen is not "excludable," it provided for professional consequences for consular officers who fail to do so. *See* Pub. L. No. 103-236, § 140(c)(1)(B) ("the consular officer's failure shall be made a matter of record and shall be considered a serious negative factor in the officer's annual performance evaluation."). The term "excludable" — the statutory forerunner to inadmissible, *see Judulang v. Holder*, 565 U.S. 42, 46 (2011) — includes those who cannot enter under a Proclamation. *See Hawaii*, 138 S. Ct. at 2414 n.4 ("The concepts of entry and admission . . . are used interchangeably in the INA."). This provision, therefore, reflects Congress's expectation that consular officers must not issue visas to those who cannot be admitted, such as those barred from entry under a Presidential Proclamation and Section 1182(f). This Court did not squarely address this provision or the fact that it shows Congress expected visas to be denied to those subject to an 1182(f) entry bar, and incorrectly focused on whether this provision was

discussed in the administrative record. *See Gomez III*, 2021 WL 3663535 at *12, 16. The fact that this provision was not mentioned in the administrative record is unremarkable because that simply reflects State following the decades-old statute. This Court also dismissed the provisions by stating that the statute requires only a check of the Automated Visa Lookout System, not denial of a visa to a person subject to it, but that overlooks the clear import by Congress that consular officers should not issue visas to persons who they know to be excludable.

Similarly, this Court's interpretation of State's responsibilities under Sections 1182(f) and 1201(g) conflicts with 8 U.S.C. §§ 1182e and 1182f. Those sections contain explicit statutory language dictating that "denial of entry" of noncitizens specifically precludes the issuance of visas. While Defendants fully briefed that argument, ECF No. 189-1 at 22 and ECF No. 224 at 20-21, this Court did not attempt to reconcile the conflict.[3]

Additionally, 6 U.S.C. § 236 further supports State's interpretation. Specifically, the provision says, "Nothing in this section shall be construed to affect any delegation of authority to the Secretary of State by the President pursuant to any proclamation issued under *** 8 U.S.C. 1182(f)." 6 U.S.C. 236(d)(2); *see also* 6 U.S.C. 236(c)(2)(H) ("the authorities of the Secretary of State under *** 8 U.S.C. 1182(f))"). In these proclamations, the President expressly directed the State Department to implement the proclamation through visa adjudication. *See, e.g.*, 85 Fed. Reg. at 23443. Given that State is primarily responsible for managing the adjudication of visas, whereas DHS primarily manages the arrival of aliens at the port of entry, it follows that Congress believed that State would implement 1182(f) proclamations by denying visas, consistent with State's

---

[3] Although this Court did not address Section 1182e on summary judgment, it acknowledged the provision's existence in its September 4 order. *See Gomez I*, 485 F. Supp. 3d. at 191 n.19 ("Other subsections of § 1182, including § [1182e], provide additional limitations on eligibility for visas, but Defendants do not contend these subsections have any bearing on the question of whether a person suspended from entry under § 1182(f) is ineligible for a visa under § 1201(g)").

historical practice. Thus, the resulting tension in those authorities must be reviewed and reconciled by the D.C. Circuit.

There are similarly strong arguments in Defendants' favor that because of the ambiguity stemming from these overlapping provisions, this Court should have deferred to State's longstanding interpretation, of which Congress has been aware of, and which the Department has consistently applied, for decades. This longstanding interpretation was implicit throughout the administrative record and explicit in various provisions of the FAM. In sum, Defendants are likely to succeed on their Section 1182 arguments on appeal.

> **B. The Court Erred in Holding that State's Mission-Critical Guidance was Arbitrary and Capricious Because the Determinations Underlying the Guidance is Committed to Agency Discretion and Unreviewable Under the APA, and Even if the Guidance Were Reviewable, it was Reasonable in Light of the Pandemic.**

Defendants are likely to prevail on their appeal of the Court's holding that State's mission-critical guidance was arbitrary and capricious.

At the threshold, because Congress has afforded the Secretary of State the broad authority to "administer, coordinate, and direct the Foreign Service," *see* 22 U.S.C. § 2651a, the Department's determination of how it allocates its limited resources, and what services it renders on an emergency basis at consular posts worldwide during the pandemic, is a matter of agency discretion and therefore not subject to APA review under 5 U.S.C. § 701(a)(2). While this Court reached the opposite conclusion, Chief Judge Howell agreed with the State Department in an identical issue in *Tate v. Pompeo*, 513 F. Supp. 3d 132, 148 n.8 (D.D.C. 2021). Defendants highlighted Chief Judge Howell's decision in *Tate* in its merits briefing. *See*, *e.g.*, ECF No. 189-1 at 46.

In *Tate*, the plaintiffs asserted that State's "decisions to exclude O-visa applicants from the list of 'mission critical' functions and deny O-visa applicants a categori[c]al national interest exception were arbitrary and capricious and should be set aside." *Tate*, 513 F. Supp. 3d at 148 n.8. Chief Judge Howell, however, observed that the plaintiffs "suggest no standard to employ in reviewing and forcing the State Department to give them priority or even how to evaluate internal and purely discretionary State Department actions ordering its priorities and allocating scarce resources in [a] pandemic." *Id.* Accordingly, Chief Judge Howell concluded that "the determination and prioritization of 'mission critical' functions during a time of crisis and administrative triage lies squarely within the discretion of the Secretary of State, under 22 U.S.C. § 2651a, and is not subject to judicial review." *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) and 5 U.S.C. § 701(a)(2)). Here, in the context of the DV2020 plaintiffs, who raised the same claim as the O-visa applicants in *Tate*, this Court did not provide any reason for its departure from, or disagreement with, Chief Judge Howell's determination that the State Department's mission-critical guidance was unreviewable under the APA.

Moreover, since this Court's order, another district court has also recognized that the Secretary of State's discretionary determinations regarding the ordering of its priorities and allocating scarce consular resources are not subject to APA review, particularly in light of the pandemic. *See Sunny v. Biden*, — F. Supp. 3d —, 2021 WL 5294879 at *8 (E.D.N.Y. Nov. 12, 2021). In *Sunny*, the plaintiffs, consisting of lawful permanent residents and their spouses and minor children, challenged State's prioritization scheme of its resumption of visa services, alleging that it violated the INA and the APA. The spouses and minor children were eligible for "Family: Second Preference (A)" visas, also known as F2As. The plaintiffs sought to enjoin State's prioritization plan because it designated "F2As as a third-tier priority," which was second-to-last

out of four tiers, and it prioritized and directed more resources to the adjudication of Immediate

Relative visas over F2As. *Id.* at *1, 3-4. Judge Cogan highlighted the "crippling" effects, *id.* at

*8, of the pandemic in creating the unprecedented backlog of visa cases:

> In this instance, the COVID-19 pandemic caused an unprecedented backlog in visa
> adjudications because the State Department prioritized the health and safety of its
> officers over maintaining its usual visa schedule. Now, the Department has only
> tough choices and no silver bullets. The data demonstrates that the government will
> very likely fail to meet multiple required INA quotas. At this juncture, the question
> is not whether all the INA's visa floors will be met, but rather which quotas will be
> unfilled.

*Id.* at *4. Judge Cogan further noted, "[i]n these circumstances, courts have observed that 'the

agency is in a unique– and authoritative – position to ... allocate its resources in the optimal way."

*Id.* (quoting *In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)).[4] Ultimately, Judge

Cogan held, "[n]one of the challenges plaintiffs raise are viable. Given the limited resources and

the defendants' inability to meet the visa floors set by the INA, Congress's guidance permits the

State Department to prioritize certain visas over others. As a result, the Department acted within

its lawful authority and properly allocated its resources, [and it] did not arbitrarily and capriciously

design its policy[.]" *See id.* at *8. Echoing Chief Judge Howell's conclusion in *Tate*, Judge Cogan

explained that "the prioritization of 'mission critical' functions lies squarely within the discretion

of the Secretary of State" and is, therefore, unreviewable. *See id.* (citing *Heckler*, 470 U.S. at 830

and 5 U.S.C. § 701(a)(2)).

Even if the D.C. Circuit were to agree with this Court that the mission-critical guidance is

reviewable under the APA, Defendants have strong arguments on appeal that the Department's

decision to exclude DVs from the guidance was not arbitrary and capricious. On the merits, this

---

[4] Defendants also relied upon *In re Barr Laboratories* in its merits brief. *See, e.g.*, ECF No. 189-
1 at 31, 37.

Court found no evidence in the record "showing that the agency gave any consideration to the September 30 deadline for issuance of diversity visas or the 'detrimental effects that will be wrought on the diversity visa selectees if they do not receive visas.'" *Gomez III*, 2021 WL 3663535 at *17. The Court then concluded that "[t]he State Department therefore failed to consider an important aspect of the problem in issuing the COVID-19 guidance." *Id*. But this is not true. The State Department, as the primary implementer of the DV program, is well aware of the statutory deadline on DV eligibility; the record simply reflects State's decision that during the initial days of the pandemic, and taking into account the safety of U.S. government employees, it was more important to allocate very limited consular resources to process visa applications for immediate family members of U.S. citizens, and applications for noncitizen healthcare workers. State lawfully maintained that position even if that meant that during this unprecedented global emergency, DV2020 selectees—all of whom were subject to entry suspension under the Presidential Proclamations and Section 1182(f)—may lose the opportunity to immigrate if processing of DV2020 applications occurred after the end of the fiscal year. Defendants thus have strong arguments on appeal that, in the context of the pandemic, this was a reasonable judgment by the Executive Branch that this Court should not have overridden.

In sum, the Court erred in finding that the State Department's mission-critical guidance was arbitrary and capricious. Defendants are likely to prevail on appeal that, consistent with the rulings that other courts that have issued in similar cases, State's mission-critical guidance is unreviewable under the APA because it involves determinations committed to agency discretion.

## C. The Court Erred in Holding that State Unreasonably Delayed and Unlawfully Withheld Adjudication of DVs.

Because Defendants are likely to succeed on the No-Visa Policy issue under Section 1182(f) and the mission-critical guidance addressed above, they are also likely to succeed on their

appeal of the Court's holding that the State Department unreasonably delayed and unlawfully withheld adjudication of DV2020 visa applications in the midst of the COVID-19 pandemic. This is because State's purported "delay" and decision to "withhold" DV2020 processing is both a natural consequence of exercising its lawful authority in accordance with the Presidential Proclamations and the entry suspension of DV2020 selectees under Section 1182(f), as well as its unreviewable discretionary authority to order its priorities and allocate its resources during a pandemic. In other words, in view of the Proclamations, Defendants (1) did not have a nondiscretionary duty to process Plaintiffs' visa applications, and (2) did not unreasonably delay or unlawfully withhold the processing of Plaintiffs' visa applications.

Moreover, the premise of the Court's holding was that State has a non-discretionary duty to adjudicate diversity visas, and to do so in a timely manner before the fiscal year ends. *See Gomez III*, 2021 WL 3663535 at *20 (concluding that 8 U.S.C. § 1202(b) "imposes a mandatory duty on consular officers to review and adjudicate visa applications."). This was wrong. Section 1202(b) is an important statutory mandate setting out certain procedural requirements for how a visa application must be made, including which U.S. official is authorized to adjudicate a visa application, providing that "immigrant visa applications shall be reviewed and adjudicated by a consular officer." Accordingly, a closer review of § 1202(b) shows that this sentence does not impose an affirmative duty on a consular officer to adjudicate a visa application in a certain time period, nor does it limit in any way the Secretary's exercise of his broad discretion under 22 U.S.C. § 2651a. *See Zarei v. Blinken*, No. 1:21-cv-2102-CJN, ECF No. 23 at *3 (D.D.C. Sept. 30, 2021) (finding that § 1202(b) did not create a nondiscretionary duty and that "[i]f this sentence did impose the duty suggested by Plaintiff, it would truly be the proverbial elephant in a mousehole") (*citing Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)). Moreover, the fact that

State annually overselects DV selectees militates against the Court's narrow reading of § 1202(b) to require State to provide interviews for selectees even after all DVs for a given fiscal year are allotted. For the 2020 DV program, State selected over 90,000 DV lottery applicants for the (roughly) 55,000 available DVs. Declaration of Brenda Grewe, ¶ 4 (attached hereto as Exhibit A). Each selectee won the opportunity to begin the DV application process—not the guarantee of an interview.

In taking § 1202(b) out of context, the Court gave undue import to a narrow, albeit important, statutory provision that applies to the last stage of visa adjudication, when a noncitizen makes a visa application. *See* 8 U.S.C. § 1202(a) ("Every [noncitizen] applying for an immigrant visa and for [noncitizen] registration shall make application therefore in such form and manner and at such place as shall be by regulations prescribed."). Until a noncitizen completes certain steps, he or she cannot make a visa application before a consular officer. *See, e.g.*, 22 C.F.R. § 42.33 (discussing the steps for DV applicants). And, the execution of a visa application occurs only when an applicant "personally appears[s] before a consular officer and verif[ies] by oath or affirmation the statements contained on Form DS-230 or Form DS-260 and in all supporting documents, having previously submitted all forms and documents required in advance of the appearance and paid the visa application processing fee." *Id*. § 40.1(l)(2).

Further, Congress prescribed, "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer," because it is a consular officer, and not any other official of State, that is charged with the decision to issue or refuse a visa. *See* 8 U.S.C. § 1104(a) ("The Secretary of State shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties,

and functions conferred upon the consular officers relating to the granting or refusal of visas."); *see also* S. Rep. No. 81-1515, at 332 (1950) ("The subcommittee further considers that the initial administration and enforcement of our immigration laws at the actual source of aliens in foreign countries through the visa system, which was made a statutory responsibility of consular officers in the Foreign Service of the United States under the Immigration Act of 1924, should be continued."). It is not a timing provision or requirement. The INA provides State a great deal of discretion in how it manages its consular operations, including adjudication of DVs. The Secretary has broad discretionary authority to determine how to structure overseas operations and prioritize visa processing, particularly in the middle of a global pandemic and an unprecedented backlog of immigrant visa applicants seeking visa appointments. *See* 22 U.S.C. § 2651a; 8 U.S.C. § 1104.

Therefore, because the Court's analysis rests on statutory interpretation taken out of context, and because State is afforded discretion on how it processes DVs prior to the September 30, 2021 cut-off, Plaintiffs' unlawful withholding and unreasonably delay claims fail.

In considering Plaintiffs' unreasonable delay claim, the Court also analyzed the six factors outlined in *Telecomms. Research & Action Center ("TRAC") v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) and found that essentially all factors favored Plaintiffs. *Gomez III*, 2021 WL 3663535 at *18–21. This too was incorrect. The test favors Defendants. The first two factors ask whether the time the agency took to make decisions was governed by the "rule of reason" and whether Congress provided instructions. *See Ctr. for Sci. in the Pub. Interest v. United States FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014) (defining the rule of reason as whether an agency action is "governed by an identifiable rationale"). The Court found that these factors favored Plaintiffs. *Gomez III*, 2021 WL 3663535 at *19. The Court was wrong. Here, Defendants have provided an identifiable rationale—Defendants first suspended all routine nonimmigrant and immigrant visa

18

services due to the COVID-19 pandemic, as this Court acknowledged, in an effort to protect the health of consular officers and the public. *See id*. Other courts in this District have recognized that in similar challenges alleging unlawful delay, Defendants "outlined a rational and reasonable scheme to prioritize certain visa applicants as services resume," which "'relie[s] on clear direction from Congress that [State] must adopt a policy of prioritizing immediate relative visa applicants and K-1 fiancées of U.S. citizens, followed by family preference immigrant visa applicants.'" *Xiaobing Liu v. Blinken*, No. 21-629-TJK, 2021 WL 2514692 at *16 (D.D.C. June 18, 2021). Thus, the first two factors favor Defendants.

Crucially, the fourth factor, the effect of expedited delayed action on agency activities of a higher or competing priority, also weighs in favor of Defendants. *TRAC*, 750 F.2d at 79–80. The Court found this factor neutral, *Gomez III*, 2021 WL 3663535 at *19, but where the fourth factor has weighed in an agency's favor, courts have "refused to grant relief, even though all the other factors considered in *TRAC* favored it." *See Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). Here, this Court recognized the "the impact of the COVID-19 pandemic on the State Department's consular and visa-processing operations." *Gomez III*, 2021 WL 3663535 at *19. Furthermore, advancing Plaintiffs' cases ahead of other immigrant visa cases who have also been waiting would simply benefit Plaintiffs to the detriment of other immigrant visa applicants, including family-based immigrant visa applicants, who may have experienced the same or worse impacts from the delays caused by the pandemic. *See In re Barr Labs., Inc.*, 930 F.2d at 75–76 (observing that "a judicial order putting [the petitioner] at the head of the queue [would] simply move[ ] all others back one space and produce[ ] no net gain[,]" and that agencies are in the best position to allocate their own resources); *Skalka v. Kelly*, 246 F. Supp. 3d 147, 154 (D.D.C. 2017) (noting that courts step outside of their "limited role" where they require "agencies

to invest the high degree of resources that would be necessary to accurately investigate plaintiffs' visa petitions," because such a requirement "would presumably delay other adjudications" and make others "suffer in response"). Indeed, expediting action in this case would direct resources away from the adjudications of other immigrant visa applicants who have been waiting longer. *See, e.g.*, U.S. Dep't of State Bureau of Consular Affairs, *Visa Bulletin for May 2020, State Dep't.*[5] (noting that, in May 2020, family preference applicants were finally eligible to apply for their immigrant visa, *e.g.*, an adult child of a U.S. citizen (F1) whose petition was filed before March 22, 2014 and a married child of a U.S. citizen (F3) whose petition was filed before March 15, 2008). Thus, the *TRAC* analysis weigh in favor of Defendants.

Thus, Defendants will likely succeed on their appeal of the Court's holding that the State Department unreasonably delayed and unlawfully withheld adjudication of DV2020 visa applications.

### D. The Court Erred In Holding That It Has The Equitable Authority To Order State To Adjudicate And Issue Reserved DVs Beyond The End Of The FY 2020.

Defendants are likely to prevail on appeal that this Court lacked the equitable authority to require the State Department to issue 9,095 FY 2020 diversity visas after the close of FY 2020 on September 30, 2020. The Court lacked this authority because the relief it granted to the DV2020 plaintiffs violates clear statutory language to the contrary. *See United States v. Oakland Cannabis Buyers' Co-Op*, 532 U.S. 483, 496 (2001) ("when district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise."); *INS v. Pangilinan*, 486 U.S. 875, 883-84 (1988) (stating that if Congress has set specific statutory limits on a naturalization

---

[5] Available at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2020/visa-bulletin-for-may-2020.html (last visited May 22, 2021).

provision, then "[n]either by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations").

The INA is explicit that noncitizens selected in the DV lottery "shall remain eligible to receive such visa *only* through *the end of the specific fiscal year for which they were selected*," 8 U.S.C. § 1154(a)(1)(I)(ii)(II) (emphasis added), and that DVs "shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State *for the fiscal year involved*," *id.* § 1153(e)(2) (emphasis added). For decades, the State Department has implemented these congressional mandates through unambiguous agency regulations that make clear that "[u]nder no circumstances may a consular officer issue a visa or other documentation to an alien *after the end of the fiscal year during which an alien possesses diversity visa eligibility*." 22 C.F.R. § 42.33(a)(1) (emphasis added). Under Congress's mandate, the State Department lacks authority to issue diversity visas to the DV2020 plaintiffs after the close of FY 2020 on September 30, 2020:

> [W]hen midnight strikes at the end of the fiscal year, those [diversity visa] applicants without visas are out of luck. Although this deadline may appear "unforgiving, this strict interpretation of the diversity visa statute has been adopted by every circuit court to have addressed the issue."

*Yung-Kai Lu v. Tillerson*, 292 F. Supp. 3d 276, 282-83 (D.D.C. 2018), *aff'd sub nom. Yung-Kai Lu v. Pompeo*, No. 18-5066, 2018 WL 5919254 (D.C. Cir. Oct. 19, 2018) (quoting *Mogu v. Chertoff*, 550 F. Supp. 2d 107, 109 (D.D.C. 2008)).

Respectfully, this Court's explanation on why it has the equitable authority to order the issuance of DVs beyond the statutory deadline is flawed. Relying on an overbroad reading of *Almaqrami v. Pompeo*, 933 F.3d 774 (D.C. Cir. 2019), this Court concluded that it had the equitable power to "reserve" unused diversity visa numbers because it issued its order before the close of the FY. *Gomez III*, 2021 WL 3663535, at *23. But *Almaqrami* does not stand for this

proposition and it does not support the Court's conclusion. Rather, the D.C. Circuit remanded *Almaqrami* back to the district court on other grounds (namely, whether the plaintiff's claims were moot), and it did not resolve this issue. *See* 933 F.3d at 779-82. This Court's expansion of *Almaqrami* effectively eviscerates Congress's limitation on DVs each FY, and it ignores the INA's requirement that the State Department cease processing DVs at the close of the FY. *See Yung-Kai Lu*, 292 F. Supp. 3d at 282-83; 8 U.S.C. §§ 1153(e)(2), 1154(a)(1)(I)(II); 22 C.F.R. §§ 42.33(a)(1), (f). Indeed, another court in this jurisdiction has expressed skepticism about whether it can reserve DVs for FY2021 and order the State Department to issue them beyond the statutory deadline. *See Serakova v. Biden*, No. 1:21-cv-02066-TNM (D.D.C. September 24, 2021) Hr'g Tr. at 30:21–31:11 ("The Court would flout statutory guidelines if it reserved a visa for [Serakova] into the following year. This Court cannot take such an action contrary to the clear text of the statute."). Moreover, this Court's conclusion that "the reservation of visas is similar to 'reserving a congressionally afforded benefit past a statutory deadline in the appropriations context,'" *Gomez III*, 2021 WL 3663535 at *23, is incorrect because "visas are not currency and there is no INA equivalent to the Congressional Budget and Impoundment Control Act, 31 U.S.C. § 1301 *et seq.* Unlike money, which can be allocated and spent relatively quickly, each visa takes time to process." *Sunny*, 2021 WL 5294879 at *9.

And even if a court sitting in equity could reserve DVs, such relief was unwarranted in this case. At most, two nonbinding district court opinions have suggested that, if the government violated a court order to adjudicate DV applications before the FY deadline, that court could vindicate its order by directing the government to adjudicate the application after the deadline. *See Przhebelskaya v. USCIS*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004); *Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999). Here, this Court relied heavily on *Przhebelskaya* and *Paunescu*. But unlike

those two cases, no violation of the Court's order occurred here. This Court ordered the State Department to adjudicate the DV2020 applications in good faith before the deadline. The State Department complied and adjudicated 7,693 DV applications, issuing 6,972 DVs (including re-issuances), between September 4 and September 30, 2020 despite the pandemic. Ex. A, ¶ 3; *see also Gomez II*, 490 F. Supp. 3d at 282 (noting that as of September 24, 2020, the State Department had "adjudicated 5,093 diversity visa applications, issuing 3,208 diversity visas.").[6] Notably, this Court made no finding that the State Department violated its order and even "acknowledge[d] and appreciate[d] the hard work undertaken by many State Department employees to process the huge backlog of diversity visa applications." *See id.* at 287. But despite the State Department's diligent and good faith efforts, the Court decided that "unless additional relief is granted, approximately 72% of the available diversity visas for FY 2020 will go unissued . . ." *See id.* In other words, the Court made a policy judgment that the State Department issued an insufficient number of DVs for FY 2020, so it ordered that more visas be reserved until the final adjudication of the merits. *See id.* Rendering such a policy judgment oversteps a court's equitable authority and provides Defendants with a strong argument on appeal.

Thus, in light of the clear language of the applicable DV statutes and regulations, Defendants are likely to prevail on appeal that the Court lacked the equitable authority to reserve DVs for the DV2020 plaintiffs after the close of the FY.

\* \* \*

For these reasons, Defendants have strong arguments and are likely to succeed on their appeal to the D.C. Circuit.

## II.     Defendants Will Suffer Irreparable Harm Without A Stay

---

[6] In FY 2020, the State Department issued 18,288 FY 2020 DVs. Ex. A, ¶ 2.

Defendants will be irreparably injured without a stay of the Court's order and judgment pending appeal. Without a stay, while the Government pursues appeal, the State Department must undertake the likely irreversible action of processing and issuing FY 2020 diversity visas that will violate the INA, impose significant costs, subject it to overwhelming operational burdens, and require it to reorder its consular and administrative priorities during an ongoing pandemic to the detriment of other visa applicants. A stay pending appeal is thus warranted to prevent these irreparable injuries.

### A. Resource-Intensive Systems Modifications

First, in order to begin issuing the 9,095 FY 2020 DVs (along with the substantial number of DVs for FY 2021), State needs to make significant modifications to its IT infrastructure, which are currently underway. State's systems are designed around the statutory expiration of DV eligibility at the end of each fiscal year. This means State's current IT infrastructure is only capable of operating the visa application processing and adjudication of one fiscal year diversity visa program at a time, and it is not capable of processing and adjudicating DVs for previous fiscal years. *See* Declaration of Sharon Westmark, ¶ 4 (attached hereto as Exhibit B). Thus, in order to adjudicate the DVs for FY 2020 in compliance with the Court's order, State is in the process of making significant and costly modifications to its IT infrastructure and how it processes DVs. *See id.,* ¶¶ 2, 9-11; *see also* Declaration of Sara Craig, ¶ 2 (attached hereto as Exhibit C). State began the process of modifying its IT infrastructure to process DV applications from prior fiscal years on the same day that the Court issued its Order of October 13, 2021, *see* ECF No. 243, Ex. B, ¶ 6, and this process remains ongoing. *See* Ex. B, ¶¶ 6-11. State estimates that it will require over 320 "working business days" for the software development team to make the necessary IT modifications and a further 82 "working business days" for work by the Independent Verification

and Validation team. Ex. B, ¶ 2. A "working business days" is a unit of measurement defined by the amount of work that can be done by one person in one day. *Id*. State also anticipates that the necessary IT modifications will cost approximately $500,000. *Id,*. ¶ 12. Thus far, State has determined that it must modify at least five of its DV processing systems, which will take at least until April 2022 to complete. *See id.*, ¶¶ 9, 12. If the D.C. Circuit finds in the Government's favor on appeal without a stay already in place, these significant and resource-intensive modifications will have been unnecessary and a waste of tax payer dollars.

Moreover, for State to implement the necessary modifications, State will need to divert resources from several high-priority IT projects it currently has scheduled, which will consequently delay those other projects. State's systems-related modifications and initiatives are necessary in order to comply with Presidential directives or requirements set by the Federal Chief Information Office and State's Chief Information Office. *See id.*, ¶¶ 13-14. For instance, State may need to divert resources from the deployment of the National Vetting Center, which is a direct result of the Presidential directive for enhanced vetting of visitors to the United States and affects border security and travel facilitation. *Id.*, ¶ 13. In addition, the IT modifications needed to process DV applications from prior fiscal years jeopardize State's ability to satisfy requirements that the Federal Chief Information Office and the Department's Chief Information Office have set, including security, critical update, and continuous integration, continuous deployment, and test automation requirements. *See id.*, ¶ 14.

These high-priority IT projects will be delayed by a minimum of four months should State be required to move forward with the modifications necessary to comply with the Court's order, *see id.*, ¶ 13, and such harm cannot be undone if the D.C. Circuit reverses the Court's order. Thus, without a stay, the Court's order will interfere with the Secretary of State's discretionary authority

25

to manage these competing IT-related obligations and prioritize them in accordance with his judgment.

### B. Reordering State Department Priorities

A lack of a stay will further harm State by requiring it to reorder its consular and administrative priorities while the pandemic is ongoing. *See* Ex. C, ¶ 2. First, without a stay, the State Department will suffer institutional harms. State is in the process of returning to the pre-pandemic balance between immigrant and nonimmigrant visa services and providing consular managers at U.S. embassies and consulates to determine how best to prioritize visa services based on local conditions and demands. *Id.*, ¶ 5. This Court's Order of October 13, 2021, ECF No. 243, together with this Court's orders in *Goh v. Biden.*, No. 21-cv-999 (APM), ECF Nos. 44 and 45 (D.D.C.), and orders by another court in this district in *Rai v. Biden*, No. 21-cv-863 (TSC), ECF Nos. 53, 54, 61, and 62 (D.D.C.), which similarly ordered the processing and adjudication of FY2021 DV applications by the end of FY2022, frustrate the Department's ability to make this pivot by requiring State to issue more than 10,000 additional diversity visas by September 30, 2022. *See* Ex. C, ¶ 5. Consequently, at certain posts, the State Department will have to forego implementing the Administration's immigration-related priorities, including addressing the backlog of family-based immigrant visa applications, which will be delayed for months while complying with the Court's order that could be overturned on appeal. *See id*. Moreover, the State Department needs flexibility to manage its overseas consular operations, and without a stay pending appeal, this Court's order limits the Department's ability to respond to crises around the world including ongoing developments in the global pandemic. *See id*., ¶¶ 3-6.

Second, specific consular posts will suffer harm and will need to divert substantial resources from competing priorities in order to process Plaintiffs' DV applications until consular

officers have issued all the reserved FY 2020 DVs. *See id.* ¶¶ 7-13. For instance, it would likely require the consular post in Abu Dhabi, United Arab Emirates, to divert its resources from assisting with the Afghanistan evacuation efforts, including processing of Special Immigrant Visas to Afghan nationals, to process the FY 2020 DV applications of Plaintiffs assigned to it. *See id.* ¶ 9. A lack of a stay pending appeal would also delay State's efforts to resume processing visa applications that were under consideration for waivers under the now rescinded travel ban, Presidential Proclamation 9645, which has resulted in years-long waits for visa processing for people impacted beginning in 2017. *See id.* ¶¶ 8–9. Additionally, the impact of this Court's order will not be evenly distributed among consular posts. *Id.* ¶¶ 5, 7. Generally, small-to-medium-sized posts, such as Kathmandu, Cairo, Kinshasa, Abu Dhabi, Johannesburg, and Kyiv, have extremely high DV workloads, while larger posts, like those in China, India, and Mexico, have comparatively low DV workloads. *Id.* ¶ 5. Thus, the burden of complying with this Court's order will fall more heavily on some posts than others. *Id.* Consequently, smaller posts will have to divert resources from other consular priorities to additional DV processing. *Id.* That will harm other visa applicants. Some posts also have unique issues that will limit their ability to comply with the Court's order. For instance, the consular post in Addis Ababa, Ethiopia, has one of the highest DV workloads in the world, but the deteriorating security situation led to a reduction in staff and limited visa services. *See id.* ¶ 10. Likewise, the consular post in Kyiv, Ukraine, is unable to resume normal visa operations at all due to the Ukrainian government's declared state of emergency and the uncertainty and reduction in staff that increased Russian military activity near Ukraine has precipitated. *See id.*, ¶ 13.

Accordingly, a stay pending appeal is warranted to prevent these irreparable injuries to the State Department.

**III.    Plaintiffs Will Not Be Harmed By A Stay Pending Appeal**

The DV2020 plaintiffs will not suffer irreparable harm if the Court grants a stay of its order pending the Government's appeal. Due to its IT infrastructure and the other resource limitations outlined above, the State Department has not yet been able to issue a "reserved" FY2020 DV to any plaintiff. A stay pending appeal, therefore, will not disrupt any immediate actions being taken by the plaintiffs. The only harm plaintiffs can allege is a delay in receiving a visa and that is a harm that is reparable—and comes at the expense of other visa applicants in any event. While Defendants acknowledge that plaintiffs understandably want to benefit immediately from this Court's order, certainty about the validity of the Court's order to issue the reserved DVs from previous FYs would benefit all parties.

**IV.    A Stay Pending Appeal Would Serve The Public Interest**

Beyond mitigating the substantial harms to State, a stay would also serve the public interest.[7] As Judge Lamberth recognized, "visa processing during the pandemic is a zero-sum game with [State]'s limited resources. Processing one category of immigrant visas necessarily results in diminished resources for processing another category of visas." *Gjoci v. Dep't of State*, — F. Supp. 3d —, 2021 WL 3912143 at *13 (D.D.C., Sept. 1, 2021). Accordingly, without a stay, U.S. citizen petitioners and other immigrant visa applicants, including FY 2022 selectees, would be relegated behind the DV plaintiffs. In order to schedule the visa appointments necessary to adjudicate the reserved DVs, State would have to de-prioritize these other immigrant visa

---

[7] Defendants, U.S. petitioners, and immigrant visa applicants would suffer the same irreparable harm from the Court's orders in *Goh v. Biden* and orders by another court in this district in *Rai v. Biden,* which, as noted, also ordered the processing and adjudication of FY2021 DV applications by the end of FY2022. *See Goh, et al. v. Biden, et al.*, No. 21-cv-999 (APM), ECF Nos. 44 and 45 (D.D.C.); *Rai, et al. v. Biden, et al.*, No. 21-cv-863 (TSC), ECF Nos. 53, 54, 61, and 62 (D.D.C.). Defendants have also appealed those order to the D.C. Circuit and have likewise sought to stay the enforcement of those orders pending appeal of those orders.

applicants. *See* Ex. C, ¶¶ 18–21. FY 2022 adjudications have already been adversely affected by the diversion of State's resources to the FY 2020 and FY 2021 DV programs and, consequently, as of January 30, 2022, only 1,542 FY 2022 DV applicants have made visa applications and had their applications adjudicated. *See id.* ¶ 21. If the D.C. Circuit finds in the Government's favor on appeal, such displacement of other immigrant visa applicants will have been unnecessary.

Thus, a stay pending the Government's appeal is in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should immediately stay its October 13, 2021 final order and judgment pending the Government's appeal.

Dated: February 1, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

WILLIAM C. PEACHEY
Director

GLENN M. GIRDHARRY
Assistant Director

JOSHUA S. PRESS
Senior Litigation Counsel

*/s/ JAMES J. WEN*
JAMES J. WEN
ERIC C. STEINHART
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
(202) 532-4142
James.J.Wen@usdoj.gov

*Counsels for Defendants*

29

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2022, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ James J. Wen
JAMES J. WEN
Trial Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS