# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOMINGO ARREGUIN GOMEZ, et al.,<br>                              Plaintiffs,<br><br>                    v.<br><br>JOSEPH R. BIDEN JR., et al.,<br>                              Defendants. | Civil Action No. 1:20-cv-01419 |
| MOHAMMED ABDULAZIZ ABDUL<br>MOHAMMED, et al.,<br>                              Plaintiffs,<br><br>                    v.<br><br>ANTHONY J. BLINKEN, et al.,<br>                              Defendants. | Civil Action No. 1:20-cv-01856 |
| AFSIN AKER, et al.,<br>                              Plaintiffs,<br><br>                    v.<br><br>JOSEPH R. BIDEN JR., et al.,<br>                              Defendants. | Civil Action No. 1:20-cv-01926 |
| CLAUDINE NGUM FONJONG, et al.,<br>                              Plaintiffs,<br><br>                    v.<br><br>JOSEPH R. BIDEN JR., et al.,<br>                              Defendants. | Civil Action No. 1:20-cv-02128 |
| MORAA ASNATH KENNEDY, et al.,<br>                              Plaintiffs,<br><br>                    v.<br><br>JOSEPH R. BIDEN JR., et al.,<br>                              Defendants. | Civil Action No. 1:20-cv-02639 |

## *GOMEZ* PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STAY

Jesse M. Bless (D.D.C. Bar No. MA0020)
Wasden Banias, LLC
38 Romney Street, Ste. 201
Charleston, SC 29403
(781) 704-3897
jbless@wasdenbanias.com

Karen C. Tumlin (D.D.C. Bar No. CA00129)
Esther H. Sung (D.D.C. Bar No. CA00132)
Jane P. Bentrott (D.D.C. Bar No. 1029861)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
jane.bentrott@justiceactioncenter.org

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
Justice Action Center Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
laboni@hoqlaw.com

Andrew J. Pincus (D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Stephen Manning (D.D.C. Bar No. OR0024)
Tess Hellgren (D.D.C. Bar No. OR0023)
Jordan Cunnings (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
tess@innovationlawlab.org
jordan@innovationlawlab.org

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 1

LEGAL STANDARD......................................................................................................... 3

ARGUMENT ..................................................................................................................... 3

I.      DEFENDANTS ARE NOT LIKELY TO PREVAIL ON APPEAL.................................. 3

      A.      The Court Properly Concluded that Defendants' No-Visa Policy Violated the APA......................................................................................................... 4

      B.      The Court Correctly Concluded that the Exclusion of DV-2020 Visa Applications from Mission-Critical Processing Constituted Reviewable and Irrational Final Agency Action that Violated the APA................................... 6

      C.      The Court Correctly Concluded that Defendants Unreasonably Delayed and Unlawfully Withheld Adjudication of the DV-2020 Plaintiffs' and Class Members' Visa Applications...................................................................... 10

      D.      The Court Properly Exercised its Equitable Authority Prior to the End of the Fiscal Year and Reserved Diversity Visas to Remedy the Harm to Class Members.................................................................................................. 15

II.      DEFENDANTS WILL NOT SUFFER IRREPARABLE HARM ABSENT A STAY ................................................................................................................... 18

III.      CLASS MEMBERS WILL CONTINUE TO SUFFER IRREPARABLE HARM IF A STAY IS ISSUED ........................................................................................... 20

IV.      A STAY PENDING APPEAL WOULD NOT SERVE THE PUBLIC INTEREST...... 23

CONCLUSION................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almaqrami v. Pompeo,*
   933 F.3d 774 (D.C. Cir. 2019) ......................................................................15, 16

*AstraZeneca Pharms. LP v. Burwell,*
   197 F. Supp. 3d 53 (D.D.C. 2016) .........................................................................17

*Bloche v. Dep't of Defense,*
   414 F. Supp. 3d 6 (D.D.C. 2019) .............................................................................5

*City of Houston v. HUD,*
   24 F.3d 1421 (D.C. Cir. 1994) ...............................................................................17

*Comm. on the Judiciary v. McGahn,*
   407 F. Supp. 3d 35 (D.D.C. 2019) ...........................................................................3

*Cuomo v. U.S. Nuclear Regulatory Comm'n,*
   772 F.2d 972 (D.C. Cir. 1985) ...........................................................................3, 18

*Defy Ventures, Inc. v. SBA,*
   469 F. Supp. 3d 459 (D. Md. 2020) .......................................................................17

*Dep't of Homeland Security v. Regents of Cal.,*
   140 S. Ct. 1891 (2020) ........................................................................................7, 9

*Dickson v. Sec'y of Def.,*
   68 F.3d 1396 (D.C. Cir. 1995) ............................................................................8, 9

*E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.,*
   2020 WL 7264048 (D.D.C. Dec. 10, 2020) ...........................................................15

*Gomez v. Trump,*
   485 F. Supp. 3d 145 (D.D.C. 2020) (*Gomez I*) ............................................. *passim*

*Gomez v. Trump,*
   490 F. Supp. 3d 276 (D.D.C. 2020) (*Gomez II*)........................................15, 16, 17

*Gomez v. Biden,*
   2021 WL 3663535 (D.D.C. Aug. 17, 2021) (*Gomez III*)................................ *passim*

*Hilton v. Braunskill,*
   481 U.S. 770 (1987)..................................................................................................3

*Jackson v. Dist. of Columbia*,
   692 F. Supp. 2d 5 (D.D.C. 2010) ................................................................20

*Johnson v. Panetta*,
   953 F. Supp. 2d 244 (D.D.C. 2013) .............................................................5

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*,
   230 F. Supp. 2d 12 (D.D.C. 2002) ..............................................................18

*Kelleher v. Dream Catcher, L.L.C.*,
   263 F. Supp. 3d 253 (D.D.C. 2017) .............................................................15

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .........................................................................23

*Milligan v. Pompeo*,
   502 F. Supp. 3d 302 (D.D.C. 2020) .............................................................4

*Mohamed v. Pompeo*,
   2019 WL 4734927 (E.D. Cal. Sept. 27, 2019) ...........................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
   *State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ........................................................................................9

*Nat. Res. Defense Council, Inc. v. FDA*,
   884 F. Supp. 2d 108 (S.D.N.Y. 2012) .........................................................20

*Nat'l Cable Television Ass'n v. Columbia Pictures Indus., Inc.*,
   1986 WL 32734 (D.D.C. Aug. 20, 1986) ....................................................18

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................................3

*Ohio Valley Env't Coalition, Inc. v. Pruitt*,
   2017 WL 1712527 (S.D. W.Va. May 2, 2017) .......................................18, 20

*P.K. v. Tillerson*,
   302 F. Supp. 3d 1 (D.D.C. 2017) ...........................................................21, 23

*Parcharne v. Dep't of Homeland Sec.*,
   --- F.Supp.3d ----, 2021 WL 4497481 (N.D. Miss. Sept. 30, 2021) ...........17

*Paunescu v. INS*,
   76 F. Supp. 2d 896 (N.D. Ill. 1999) ...........................................................16

*Physicians for Soc. Resp. v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020) .....................................................................7

*Przhebelskaya v. USCIS*,
    338 F. Supp. 2d 399 (E.D.N.Y. 2004) ....................................................................16

*Shays v. Fed. Election Comm'n*,
    340 F. Supp. 2d 39 (D.D.C. 2004) ...................................................................18, 19

*Sunny v. Biden*,
    --- F.3d ---, 2021 WL 5294879 (E.D.N.Y. Nov. 15, 2021) ...................7, 8, 11, 13

*Tate v. Pompeo*,
    513 F. Supp. 3d 132 (D.D.C. 2021) ...........................................................4, 7, 8, 11

*Telecomms. Research & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ..............................................................................11

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ..........................................................................................4

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ............................................................................................17

*Wagner v. Taylor*,
    836 F.2d 566 (D.C. Cir. 1987) ............................................................................17

*Wisc. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...................................................................18, 20, 23

*Xiaobing Liu v. Blinken*,
    544 F. Supp. 3d 1 (D.D.C. 2021) ........................................................................11

*Young v. Trump*,
    506 F. Supp. 3d 921 (N.D. Cal. 2020) ..................................................................4

**Statutes and Rules**

5 U.S.C. § 555(b) ...................................................................................................11

6 U.S.C. § 236 .....................................................................................................5, 6

6 U.S.C. § 236(b) .................................................................................................5, 6

6 U.S.C. § 236(c)(2)(H) ........................................................................................5, 6

6 U.S.C. § 236(d)(2) ................................................................................................5

8 U.S.C. § 1101(a)(15)(O) ........................................................................................8

8 U.S.C. § 1104(a) ...................................................................................................5

iv

8 U.S.C. § 1151(a)(2)(A)(i) ...........................................................................................12

8 U.S.C. § 1151(b)(2)(A)(i) ...........................................................................................13

8 U.S.C. § 1151(c) ........................................................................................................13

8 U.S.C. § 1152(a)(1)(A) ..............................................................................................14

8 U.S.C. § 1154(a)(1)(I)(ii)(II) ...........................................................................9, 11, 14

8 U.S.C. § 1182(f) ................................................................................................4, 5, 6

8 U.S.C. § 1201(g) ..........................................................................................................6

8 U.S.C. § 1202(b) ........................................................................................................11

22 U.S.C. § 2651a ...........................................................................................................9

28 U.S.C. § 1651(a) ......................................................................................................17

Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. 107–228,
    § 233(a), 116 Stat. 1350 (2002) ..........................................................................12

**Executive Actions**

Presidential Proclamation 10014, Suspension of Entry of Immigrants Who
    Represent Risk to the U.S. Labor Market During the Economic Recovery
    Following the 2019 Novel Coronavirus Outbreak,
    85 Fed. Reg. 23,441 (Apr. 22, 2020) .....................................................................5

**Other Authorities**

136 Cong. Rec. H-8529-02 (1990) ..........................................................................14, 23

H.R. Rep. No. 101-723 (1990)..........................................................................................23

U.S. Dep't of State, Immigrant and Nonimmigrant Visas Issued at Foreign
    Service Posts Fiscal Years 2016-2020, https://bit.ly/3sz4a5d ...................12, 14, 23

U.S. Dep't of State, Monthly Immigrant Visa Issuance Statistics,
    https://bit.ly/3gNXMBS ..........................................................................................14

## INTRODUCTION

Defendants' belated request for a stay of this Court's October 13, 2021 order is without merit and should be denied. As the Court recognized, Defendants have "waited nearly the full 60 days to file their notices of appeal, and then waited two more months to file their motion for stay." Minute Order, February 8, 2022. During that time, they took affirmative steps to comply with the Order, including expending presumably unrecoverable staff time and other resources to do so.

Defendants now claim that they will be irreparably harmed by continuing to do what they have been doing for the past four months: complying with this Court's order. But that is not how a stay pending appeal—an extraordinary remedy—works. Defendants' continuation of their efforts to comply with a court order is not an irreparable harm as a matter of law: the fact that they have been undertaking compliance, and in their report to the Court explained their plans to continue to do so, shows that compliance is not inflicting irreparable injury. Moreover, Defendants' claimed harms pale in comparison to Plaintiffs' lived harms that are compounding and escalating every day. While Defendants complain that they will not get to order their priorities as they please because of this Court's intervention, DV-2020 class members have been waiting for years, often in dangerous and uncertain conditions, for Defendants to finally comply with the law.

Defendants' reprised arguments in their motion for a stay fall far short of demonstrating a likelihood of success on appeal, their alleged claims of irreparable harm are belied by the record and reflect a callous disregard of the genuine harm imposed on class members from Defendants' actions, and a stay is not in the public interest. Defendants' request for a stay should be denied.

## BACKGROUND

Nearly six months ago, on August 17, 2021, this Court determined that the State Department's "No-Visa Policy"—under which the State Department "suspend[ed] all processing and issuance of visas in categories covered by" Presidential Proclamations 10014, 10052, 10131—

1

was both unsupported by any "applicable statutory authority" and arbitrary and capricious. *Gomez v. Biden*, 2021 WL 3663535, at \*11, \*15-16 (D.D.C. Aug. 17, 2021) (*Gomez III*). The Court further held that the State Department's COVID-19 Guidance—under which the State Department excluded DV-2020 selectees "from 'mission critical' visa services" and relegated them "to the lowest priority for visa processing at reopened consular posts"—was arbitrary and capricious, *id*. at \*16-17, and that the State Department had "unreasonably delayed and unlawfully withheld adjudication of" Plaintiffs' DV-2020 applications, *id*. at \*18-21. As the Court had previously reserved 9,095 diversity visas from the 2020 fiscal year, Mem. Op. and Am. Order at 26, ECF No. 151, the Court directed the State Department to process those 9,095 visas "in a random order until" all "have been granted," and sought additional input from the parties on whether they could agree on a deadline for completion of this task. *Gomez III*, 2021 WL 3663535, at \*24.

The parties, however, were unable to reach agreement on the deadline for the State Department to complete its visa processing under the Order. The Department insisted that it should not be required even to begin processing DV-2020 visas until fiscal year 2023, which begins on October 1, 2022. Am. Order at 3, ECF No. 244. Plaintiffs, meanwhile, asked for all diversity visas to be processed by no later than January 31, 2022—still sixteen months after those diversity visas should have been processed, had Defendants complied with their nondiscretionary duty to process diversity-visa applications in a timely fashion. *Id*. Ultimately, the Court ordered the State Department to commence processing the 9,095 diversity visas "as soon as is feasible" and to conclude such processing no later than September 30, 2022. *Id.*

Defendants did not immediately appeal that order. Instead, they waited until December 10, 2021 (almost the full 60 days allowed under the Rules) to file their notice of appeal. Defendants then waited another fifty-three days, until February 1, 2022, to file this stay motion seeking relief

similar to that which this Court already denied when it ruled that Defendants could not wait until October 2022 to start processing Plaintiffs' diversity-visa applications.

## LEGAL STANDARD

A stay pending appeal is an extraordinary remedy. *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). It is "an 'intrusion into the ordinary processes of administration and judicial review.'" *Comm. on the Judiciary v. McGahn*, 407 F. Supp. 3d 35, 38 (D.D.C. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). The party moving for a stay bears the "burden of showing that exercise of the court's extraordinary injunctive powers is warranted." *Cuomo,* 772 F.2d at 974. This stringent standard is governed by four factors: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken*, 556 U.S. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Cuomo,* 772 F.2d at 974.

## ARGUMENT

## I.   DEFENDANTS ARE NOT LIKELY TO PREVAIL ON APPEAL

This Court has considered and reconsidered the issues presented in this case and ruled against Defendants at each stage of the litigation, including in its August 17, 2021 decision granting Plaintiffs' motion for summary judgment. Now, six months later, Defendants ask this Court to stay its order to adjudicate the reserved 9,095 DV-2020 visas on or before October 1, 2022, while Defendants pursue an appeal. As explained below, Defendants have failed to meet the threshold showing that they are likely to prevail on any of the four issues presented for review.

A.      **The Court Properly Concluded that Defendants' No-Visa Policy Violated the APA**

The Court correctly rejected Defendants' argument that the refusal to process diversity visas during fiscal year 2020—its "No-Visa Policy"—was an automatic consequence of the President's exercise of authority under 8 U.S.C. § 1182(f) to temporarily suspend the entry of immigrants and nonimmigrants. This Court, and every court to have considered this assertion, have rejected Defendants' claim, and found that it rests on an erroneous interpretation of the Immigration and Nationality Act (INA). *Gomez III*, 2021 WL 3663535, at *12-15; *Gomez v. Trump*, 485 F. Supp. 3d 145, 190-94 (D.D.C. 2020) (*Gomez I*); *see also, e.g.*, *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143-46 (D.D.C. 2021) (finding that a § 1182(f) entry suspension did not justify the suspension of O-visa processing); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 316 (D.D.C. 2020) (relying on *Gomez I* to find that § 1182(f) does not justify the suspension of K-1 fiancé(e) visa issuance); *Young v. Trump*, 506 F. Supp. 3d 921, 944-45 (N.D. Cal. 2020) (same, as to immediate relative visas).

As this Court recognized, "none of the [Defendants'] arguments . . . can overcome the clear statutory text." *Gomez III*, 2021 WL 3663535, at *12. The INA does not authorize, much less require, the State Department to halt visa processing simply because the applicants are subject to a temporary suspension of *entry* under § 1182(f). Defendants' refusal to concede their misinterpretation, without more, does not establish that they are likely to prevail on appeal of the "No-Visa Policy" issue. Mem. in Support of Defs. Mot. for Stay 12, ECF No. 253-1 (Mem.).

Defendants' motion repeats the claims that this Court rejected twice before and goes so far as to refer to the Court's reasoning as "circular." Mem. 9. But this Court thoroughly addressed: (1) Defendants' statutory arguments (Mem. 8-9, 11-12); (2) Defendants' attempt to find support in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (Mem. 9); and (3) Defendants' reliance on the State

Department's prior understanding of the law (Mem. 10-11). *Gomez III*, 2021 WL 3663535, at *15.

Repeating these arguments does not demonstrate error—it reflects obstinance as Defendants are

"[s]till not willing to concede the issue." *Id.*

Defendants continue with a citation to 6 U.S.C. § 236, which states that "[n]othing in this

section shall be construed to affect any delegation of authority to the Secretary of State by the

President pursuant to any proclamation issued under" 8 U.S.C. § 1182(f).[1] Mem. 11 (citing

6 U.S.C. §§ 236(d)(2), 236(c)(2)(H)). Defendants waived any argument based on that provision

because they made no such argument in their opening brief for summary judgment, *see, e.g.*,

*Bloche v. Dep't of Defense*, 414 F. Supp. 3d 6, 23 n.5 (D.D.C. 2019), and never developed the

point, *see, e.g.*, *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013). In any event, the

---

[1] Section 236 of Title 6 of the United States Code is Titled "Visa Issuance." Section (b), upon which Defendants rely provides:

> Notwithstanding section 104(a) of the Immigration and Nationality Act (8 U.S.C. 1104(a)) [relating to the powers and duties of the Secretary of State] or any other provision of law, and except as provided in subsection (c) of this section, the Secretary--

> (1) shall be vested exclusively with all authorities to issue regulations with respect to, administer, and enforce the provisions of such Act and of all other immigration and nationality laws, relating to the functions of consular officers of the United States in connection with the granting or refusal of visas, and shall have the authority to refuse visas in accordance with law and to develop programs of homeland security training for consular officers (in addition to consular training provided by the Secretary of State), which authorities shall be exercised through the Secretary of State, except that the Secretary shall not have authority to alter or reverse the decision of a consular officer to refuse a visa to an alien; and

> (2) shall have authority to confer or impose upon any officer or employee of the United States, with the consent of the head of the executive agency under whose jurisdiction such officer or employee is serving, any of the functions specified in paragraph (1).

6 U.S.C. § 236(b)(1)-(2) (as edited in brackets).

Proclamation at issue here did not purport to delegate any authority with respect the issuance of visas. *See* Presidential Proclamation 10014, Suspension of Entry of Immigrants Who Represent Risk to the U.S. Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak, 85 Fed. Reg. 23,441 (Apr. 22, 2020) (suspending and limiting *entry* of certain noncitizens to the United States, without mention of visa issuance). And nothing in § 236(b) or § 236(c)(2)(H) alters the plain and unambiguous meaning of §§ 1182(f) and 1201(g); Section 236 does not suggest that "Congress believed that State would implement 1182(f) proclamations by ***denying visas*** . . . ." Mem. 11 (emphasis added). Even if it did, the statute fails to support Defendants' No-Visa Policy because Defendants did not seek to *deny* visas under the No-Visa Policy; instead, they stopped processing and adjudicating diversity visas at all.

The delegation of authority to the State Department under § 236 is not a blank check to ignore or rewrite the plain language of the INA. "Defendants have [still] identified no applicable statutory authority permitting the State Department to suspend visa processing on the basis of the entry restrictions imposed by the Presidential Proclamations[.]" *Gomez III*, 2021 WL 3663535, at *15; *see also id.* at *12-16. Defendants' disagreement with this Court's determinations fails to show that they are likely to prevail on appeal in demonstrating that State's No-Visa Policy was required under the INA.

**B.    The Court Correctly Concluded that the Exclusion of DV-2020 Visa Applications from Mission-Critical Processing Constituted Reviewable and Irrational Final Agency Action that Violated the APA**

Defendants are not likely to prevail on appeal by recycling their arguments that the Court erred in finding that Defendants' decision to exclude DV-2020 visa applications from mission-critical processing violated the Administrative Procedure Act (APA). *Gomez III*, 2021 WL 3663535, at *16-18; Mem. 12-15. Because Defendants offer nothing new, this Court should "stand[] by its prior holding." *Gomez III*, 2021 WL 3663535, at *17. The label that the State

Department attaches to a final agency action, whether "mission critical," "national interest," or "priorities," does not determine whether it is reviewable final agency action under the APA. Defendants are not likely to prevail on their claim to the contrary on appeal. Mem. 12-15.

There remain only "two related, but distinct, barriers to judicial review" under the APA: one applies to a few "traditionally" unreviewable agency actions such as military policy; and the second applies outside those traditional categories, in "rare instances" where there exist "no meaningful standard against which to judge the agency's exercise of discretion" and "no legal norms pursuant to which to evaluate the challenged action." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (quotation marks and citations omitted). The Court correctly concluded that neither barrier applies here. *Gomez III*, 2021 WL 3663535, at *17.

Defendants, however, renew their prior argument (*see* Defs. Mem. in Support of Mot. for Partial Summ. Judgment 31-33, ECF 189-1) that the "Mission Critical" or "COVID-19 Guidance" fell within a "traditionally" unreviewable category of agency discretion. Mem. 12-15. As the Court correctly concluded, Defendants' assumption ignores the APA's "basic presumption of judicial review" over "final agency action" and Defendants point to nothing showing that this circumstance is one of the "rare" situations where neither a "meaningful standard" nor a "legal norm" constrains the State Department's discretion. *Dep't of Homeland Security v. Regents of Cal.*, 140 S. Ct. 1891, 1905 (2020); *Gomez III*, 2021 WL 3663535, at *17. Congress did not provide the Secretary of State a blank check to violate the APA.

Defendants attempt to rely on *Tate v. Pompeo*, 513 F. Supp. 3d 132, 148 n.8 (D.D.C. 2021), and *Sunny v. Biden*, --- F.3d ---, 2021 WL 5294879, at *8 (E.D.N.Y. Nov. 15, 2021), but the analogies are unpersuasive. Mem. 12-13. In a footnote, *Tate* rejected the plaintiffs' claims regarding the State Department's failure to prioritize the issuance of O-visas during the phased

resumption of visa services in July 2020. *Tate*, 513 F. Supp. 3d at 148 n.8. But in *Tate*, the record "[did] not make clear" whether the State Department's prioritization decisions were "affecting the adjudication of plaintiffs' visas independent of the implementation of the Proclamations." *Id.* Moreover, the O-visas in question did not have a statutory deadline for issuance, which distinguishes them from the DV-2020 visas at issue here. *See* 8 U.S.C. § 1101(a)(15)(O). *Gomez III*, in contrast, concerns well-pleaded and supported claims showing irrational failures to consider the relevant factors regarding time-sensitive diversity immigrant visas. Mem. 12-13. Chief Judge Howell's footnote in *Tate*, 513 F. Supp. 3d at 148 n.8, therefore, does not control.

Defendants' reliance on *Sunny* fares no better. The plaintiffs in *Sunny* "directly challenge[d] a [State] Department policy requiring consulates and embassies to prioritize [immediate relative] visa processing over F2As." 2021 WL 5294879, at *5. The Court in *Sunny* rejected the State Department's position that the Court could not conduct a meaningful review of its action and reviewed the merits of the plaintiffs' challenges under the APA. *Id.* at *6. The *Sunny* decision thus supports the Court's authority under the APA to review whether Defendants complied with the APA in promulgating its "Mission Critical" guidance for DV-2020 Selectees. *Id.* at *8-13.

Defendants are wrong to assert that Plaintiffs seek to intrude upon the Secretary's discretion to allocate resources, and their recycled arguments ignore the Court's correct conclusion that "while the State Department of course retained discretion to organize its priorities as necessary, it nonetheless remained obligated by Congress to carry out certain functions. And once it took action to reorganize its priorities, the agency was required to act in accordance with the APA." *Gomez III*, 2021 WL 3663535, at *17, *citing Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 n.12 (D.C. Cir. 1995) ("[T]he APA provides a default standard of judicial review—arbitrary and

capricious—precisely for situations . . . where a statute does not otherwise provide a standard of judicial review."). As this Court recognized, "[a]ll that plaintiffs ask[ed] the Court to do is determine whether the State Department considered the relevant factors in adjusting its visa adjudication protocols during the pandemic." *Gomez III*, 2021 WL 3663535, at *17. The Court's decision does not interfere with or rebuke the Secretary of State's authority to "administer, coordinate, and direct the Foreign Service." Mem. 12; 22 U.S.C. § 2651a.

Defendants' arguments suggest that the APA did not apply to the State Department's consular decision-making, and thus that the APA imposes no check on its decision-making to ensure that it considered the relevant factors and acted rationally. Mem. 12-15. That assertion is wrong, as ensuring that agencies consider all aspects of a problem is a broadly applicable requirement. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem"); *accord Dep't of Homeland Sec.*, 140 S. Ct. at 1910-15. The State Department's obligation to consider an important aspect of the problem in issuing its "Mission Critical" or "COVID-19" guidance fits squarely within the sorts of administrative decisions that are subject to APA review. *See Dickson*, 68 F.3d at 1404 n.12. Accordingly, Defendants are not likely to prevail on appeal by showing that the APA did not provide judicial review for Defendants' conduct.

Defendants also are not likely to prevail on appeal by showing that their "Mission Critical" and "COVID-19" guidance complied with the APA because they considered the relevant factors. Mem. 14-15. The Court did not err in concluding that Defendants could not use *post hoc* rationalizations to justify their prioritization decisions. Critical here is the reality that DV-2020 selectees would be deprived of eligibility for their visas if State failed to act within the fiscal year.

*See* 8 U.S.C. § 1154(a)(1)(I)(ii)(II). As the Court determined, "nothing in the record suggests that the State Department even considered this consequence as to DV-2020 selectees, and Defendants concede that no consideration was given to this loss of eligibility." *Gomez III*, 2021 WL 3663535 at *17. Indeed, Defendants previously conceded "that no consideration was given to this loss of eligibility." *Id.* (citing Hr'g Tr. at 151:20-152:2) ("Respondents' counsel stating that, 'in March,' the Secretary did not 'consider[] the fact of timing out and the loss of the opportunity to immigrate'").

The motion for a stay cites to nothing in the record showing that this is untrue or that the Court should not credit Defendants' prior concession. Mem. 14-15. Indeed, the record shows that selectees were entirely excluded from consideration as "mission-critical" (Certified Administrative Record (CAR) 26, ECF No. 103-1), and assigned the lowest priority for processing, without exception. CAR 38, 257. Defendants admit the record contains no rational justification for that choice, and they are unlikely to show on appeal that the Court erred in holding that the State Department's "Mission Critical" guidance violated the APA.

### C. The Court Correctly Concluded that Defendants Unreasonably Delayed and Unlawfully Withheld Adjudication of the DV-2020 Plaintiffs' and Class Members' Visa Applications

Defendants are not likely to prevail on appeal in showing that the Court erred in concluding that the State Department unreasonably delayed or unlawfully withheld the adjudication of DV-2020 visas. Mem. 15-20. Defendants insist that the Court "was wrong" to conclude that the INA imposed any affirmative obligation to process diversity visas at any pace or to act in good faith. Mem. 16-18. This position is not supported by the law, and the Court correctly rejected it at each stage of this case. *Gomez I*, 485 F. Supp. 3d at 196; *Gomez III*, 2021 WL 3663535, at *18-21.

Defendants remain unwilling to acknowledge that Plaintiffs' claims rest on the unique statutory deadline for diversity visas, which the Court correctly concluded "provides a clear

'indication of the speed with which [Congress] expects the agency to proceed in' processing diversity lottery selectees' visa applications." *Gomez I*, 485 F. Supp. 3d at 196 (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984), and citing 8 U.S.C. § 1154(a)(1)(I)(ii)(II)); *Gomez III*, 2021 WL 3663535, at *18-21. It defies reason for Defendants to claim that the Court erred in reading 8 U.S.C. § 1202(b), which plainly mandates that "*[a]ll* immigrant visa applications *shall* be reviewed and adjudicated by a consular officer," 8 U.S.C. § 1202(b) (emphases added), within the context of the APA's requirement that "each agency shall proceed to conclude a matter presented to it" "within a reasonable time," 5 U.S.C. § 555(b). Defendants' position that there is no "timing or requirement" on how they process diversity-visa applications is "flatly contradicted" by these governing statutes, and Defendants' assertion that the State Department has complete discretion as to the pace of processing would displace APA review and the parameters that Congress has placed on such action. *See Gomez I*, 485 F. Supp. 3d at 198 n.23; *Gomez III*, 2021 WL 3663535, at *19-20.

On the unreasonable-delay claim, Defendants offer their disagreement with this Court's analysis and continue to press their arguments that they were not required to prioritize DV-2020 applications. Mem. 18-19. The cases cited by Defendant are inapposite because they did not involve the time-sensitive nature of diversity visas vis-à-vis other immigrant visas. Mem. 19 (citing *Xiaobing Liu v. Blinken*, 544 F. Supp. 3d 1, 11-12 (D.D.C. 2021) (finding that the State Department's delay in processing fifth preference employment-based immigrant visas, which do not have a statutorily imposed processing deadline, did not violate the APA)). [2]

---

[2] Neither *Tate* nor *Sunny* (cited in Mem. 20-21) involved a visa-issuance deadline, so neither case presented the congressionally mandated need for urgency that exists in this case. *See Tate*, 513 F. Supp. 3d at 148 ("plaintiffs do not argue that the *length* of the delay is necessarily unreasonable").

Defendants now propose a new *post hoc* rationalization for their unreasonable delay in processing diversity visas. They claim, without authority, that Congress *requires* them to prioritize immediate-relative immigrant visas, including fiancé visas, ahead of diversity-visa applicants.[3] Mem. 19-20; Decl. of Sara Craig, Managing Director, Visa Services, Bureau of Consular Affairs, Department of State (Craig Decl.) ¶¶ 4, 16, ECF No. 253-4. Not only have Defendants waived this argument by not raising it earlier, but the underlying policy they cite says no such thing. Congress originally set forth a policy for the State Department to adjudicate immediate-relative (IR) immigrant visas and K-1 fiancé visas within 30 days and other family-preference cases within 60 days. Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. 107–228, § 233(a), 116 Stat. 1350 (2002).[4] But it is wrong for Defendants to claim that this policy statement compels the State Department to prioritize certain immigrant visas ahead of diversity visas, especially when no visas covered by this policy statement disappear if not issued within a certain statutory timeframe. Indeed, diversity visas have historically accounted for only a fraction of immigrant visas issued annually, undercutting Defendants' argument that these visa categories are inherently in tension.[5]

---

[3] The "term 'immediate relatives' means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age." 8 U.S.C. § 1151(a)(2)(A)(i).

[4] Section 233(a) provides:

> It shall be the policy of the Department to process each visa application from an alien classified as an immediate relative or as a K–1 nonimmigrant within 30 days of the receipt of all necessary documents from the applicant and the Immigration and Naturalization Service. In the case of an immigrant visa application where the petitioner is a relative other than an immediate relative, it should be the policy of the Department to process such an application within 60 days of the receipt of all necessary documents from the applicant and the Immigration and Naturalization Service.

[5] *See* U.S. Dep't of State, Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts Fiscal Years 2016-2020, https://bit.ly/3sz4a5d (reporting that diversity visas consistently accounted for less than 10% of immigrant visas issued between FY2016 – FY2020).

Defendants' argument ignores the statutory provisions governing the diversity-visa program. As this Court has repeatedly recognized, the fiscal year deadline for diversity visas, which is unique to this category of immigrant visas, "'manifests Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline.'" *Gomez III*, 2021 WL 3663535, at *19 (quoting *Gomez I*, 485 F. Supp. 3d at 196).

Notably, the worldwide limit on the number of IR and family-sponsored preference immigrants is 480,000 and, unlike diversity visas, IR and family-sponsored visas do not expire at the end of the fiscal year. 8 U.S.C. § 1151(c). There is also no limit on the number of IR visas available for children, spouses, and parents of U.S. citizens. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *accord Sunny*, 2021 WL 5294879, at *2 (noting that 480,000 is a "permeable cap" on IR and family-sponsored preference visas because there is no limit on the number of IR visas that can be issued). Defendants' assertion that Congress mandates the State Department to prioritize immediate relatives ahead of diversity visas reflects a willful blindness to 1) the time-sensitive nature of the diversity-visa program; and 2) Congress' expectation that the State Department would have the capacity to process 55,000 diversity visas within each fiscal year at the same time that it processed other immigrant and nonimmigrant categories. 8 U.S.C. §§ 1151-1154.

To suggest, as Defendants do, that immigrant processing is a "zero sum" game manifests a gross misunderstanding of the annual allocation of immigration visas that Congress authorized. Craig Decl. ¶ 19, ECF 253-4. There is no statutory support for the assertion that Congress intended the State Department to deprioritize diversity visas or considered immigrant-visa processing a zero-sum game. *See Gomez I*, 485 F. Supp. 3d at 196 (noting that "the INA provides a clear 'indication of the speed with which it expects the agency to proceed in' processing diversity lottery

13

selectees' visa applications"). For years, the State Department has consistently issued close to the total number of available diversity visas. Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts Fiscal Years 2016-2020, *supra* n.5 (reporting that the State Department issued 49,067 diversity visas in 2017, followed by 48,578 visas in 2018, and 44,882 visas in 2019). Indeed, the statutory deadline and the consequences for diversity-visa selectees, if anything, manifests Congress' intent to prioritize the issuance of diversity visas at a faster pace than other immigrant categories because of the year-end deadline.[6]

Moreover, the suggestion that diversity-visa winners' "only established connection to the United States is that they entered a free lottery and had their entry selected," Craig Decl. ¶ 19, ECF No. 253-4, reflects a misunderstanding of Congressional intent in allocating 55,000 visas that continue each year to "maintain an ongoing diverse flow of immigrants" to the United States. *See* 8 U.S.C. § 1154(a)(1)(I)(ii)(II); 136 Cong. Rec. H-8529-02 (1990). Defendants' warped, callous understanding of Congressional intent runs dangerously close to contravening the protection against discrimination "in the issuance of an immigrant visa because of a person's . . . nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). Nothing in the INA supports Defendants' view that certain immigrants must be prioritized ahead of diversity-visa applicants or provided preferential treatment based on a prior connection or relationship to the United States.

Beyond the untenable *post hoc* rationalization that Congress requires the State Department

---

[6] The State Department has routinely increased diversity-visa processing around August and September, as the end of the fiscal year approached. For instance, in FY2019, the State Department increased the number of diversity visas issued nearly eight-fold between January and September (approximately 836 versus approximately 6,939 diversity visas issued respectively). Similarly, in FY2018, the State Department issued approximately 3,556 diversity visas in January and subsequently increased that number to approximately 5,709 in September. *See* U.S. Dep't of State, Monthly Immigrant Visa Issuance Statistics, https://bit.ly/3gNXMBS.

to deprioritize DV-2020 selectees, Defendants offer nothing but a renewed disagreement with the Court's conclusion that they unreasonably withheld and unreasonably delayed adjudication of DV-2020 applications in violation of the APA. *Gomez III*, 2021 WL 3663535, at *18-21; Mem. 15-19. The Court did not err, and Defendants' motion for a stay only shows that Defendants are determined to preserve their actions from judicial oversight at all costs.

> ### D. The Court Properly Exercised its Equitable Authority Prior to the End of the Fiscal Year and Reserved Diversity Visas to Remedy the Harm to Class Members

As this Court recognized, Defendants "have identified no case that prevents the court from effectuating its previous order to grant Plaintiffs relief for Defendants' violations of law." *Gomez III*, 2021 WL 3663535, at *23. This Court had the authority to direct the State Department to adjudicate visa applications and to issue the 9,095 DV-2020 visas because it did so prior to the end of the fiscal-year deadline, *Gomez v. Trump*, 490 F. Supp. 3d 276, 294-95 (D.D.C. 2020) (*Gomez II*). Defendants' continued disregard of that order is wrong and contrary to binding circuit precedent.

This Court correctly concluded that it "plainly has" all the authority it needs, *Gomez II*, 490 F. Supp. 3d. at 286 (citing *Almaqrami v. Pompeo*, 933 F.3d 774, 782 (D.C. Cir. 2019)), and rejected Defendants' reprisal of their arguments in protest of the Court's reasoning, *Gomez III*, 2021 WL 3663535, at *23. Given the principle that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again," this Court need not revisit this question to deny Defendants' motion for a stay of the Court's order. *Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 253, 255 (D.D.C. 2017) (Mehta, J.) (citations omitted); *see, e.g.*, *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 2020 WL 7264048, at *3 (D.D.C. Dec. 10, 2020) (collecting cases; declining to revisit preliminary injunction order).

Notably, Defendants dropped their appeal of *Gomez II*, the first order that reserved visas, and have identified no clear error in that decision or the Court's subsequent decision in *Gomez III*. Mem. 21-23. The Court considered and entirely rejected Defendants' attempt to limit the D.C. Circuit's decision in *Almaqrami*, in which the court of appeals recognized that "where '[t]he plaintiff files suit and the court grants some relief—but not the visa—before October 1 . . . , the court might lawfully take steps to compel the government to process the plaintiff's application and issue her a diversity visa' even 'after the fiscal year has ended,'" in order to "'give effect to the district court's prior directive, entered before the end of the selection FY.'" *Gomez II*, 490 F. Supp. 3d at 284 (quoting *Almaqrami*, 933 F.3d at 781-82). This Court did not misread the D.C. Circuit's decision; nor did it misread *Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999), and *Przhebelskaya v. USCIS*, 338 F. Supp. 2d 399 (E.D.N.Y. 2004). The Court correctly read and applied these cases each time it has been called upon to do so. *Gomez II*, 490 F. Supp. 3d at 284; *Gomez III*, 2021 WL 3663535, at *23. It need not make a searching inquiry again to conclude that Defendants are not likely to prevail on appeal.

This Court's order in *Gomez I* expressly mandated that "Defendants shall undertake good-faith efforts . . . to expeditiously process and adjudicate DV-2020 diversity visa and derivative beneficiary applications and issue or reissue diversity and derivative beneficiary visas to eligible applicants by September 30, 2020," and further indicated that the Court would consider, "closer to the deadline," whether to "order Defendants to reserve unprocessed DV-2020 visas past the September 30 deadline." 485 F. Supp. 3d at 205. And in *Gomez II*—also issued *before* the end of the fiscal year—the Court determined that an additional 9,095 visas was a "reasonable estimate" of the number of additional DV-2020 visas that Defendants should have issued to remedy the effects of their past unlawful policies. 490 F. Supp. 3d at 290 & n.4. The Court's order to grant

summary judgment in *Gomez III* vindicated both the reservation order itself and the Court's injunction in *Gomez I*. That order falls squarely within the Court's authority where, as here, Plaintiffs filed suit, sought relief, and received an award of relief prior to the end of the fiscal year. *Gomez III*, 2021 WL 3663535, at *23;[7] *see also Parcharne v. Dep't of Homeland Sec.*, --- F. Supp. 3d ----, 2021 WL 4497481, at *12 (N.D. Miss. Sept. 30, 2021) (ordering U.S. Citizenship and Immigration Services to reserve five employment-based immigrant visas from the visa surplus from the 2021 fiscal year for issuance after the fiscal-year deadline).

Finally, the D.C. Circuit has long recognized that a court's review of final agency action provides it with the "inherent equitable power to maintain the status quo" to facilitate such review and award appropriate relief. *Wagner v. Taylor*, 836 F.2d 566, 571 (D.C. Cir. 1987). Similarly, under the All Writs Act, 28 U.S.C. § 1651(a), this Court has authority to "issue those orders necessary to preserve the availability of meaningful judicial review," *AstraZeneca Pharms. LP v. Burwell*, 197 F. Supp. 3d 53, 56 (D.D.C. 2016), and to "effectuate and prevent the frustration of orders [the Court] has previously issued in its exercise of jurisdiction otherwise obtained," *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). This Court correctly concluded that it had the authority to reserve diversity visas for later processing. A stay of this Court's order is not warranted.

---

[7] Defendants also disregard the case law "recogniz[ing] in the analogous context of congressional appropriations that courts may suspend the operation of a statutory expiration date on an appropriation so long as the plaintiff requests relief before that date, thereby effectively reserving a congressionally afforded benefit past a statutory deadline." *Gomez II*, 490 F. Supp. 3d at 285 (collecting cases). In a case like this one, an order "giv[ing] the [class members] the chance to apply" for diversity visas "would further, rather than contravene, Congress's will." *Defy Ventures, Inc. v. SBA*, 469 F. Supp. 3d 459, 479 (D. Md. 2020); *see, e.g.*, *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994).

## II.    DEFENDANTS WILL NOT SUFFER IRREPARABLE HARM ABSENT A STAY

Defendants have failed to show that they will suffer an irreparable injury if they are required to continue the process they started nearly four months ago to comply with this Court's order.

A party seeking a stay has the burden to "demonstrate that the injury claimed is 'both certain and great.'" *Cuomo*, 772 F.2d at 976 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Any claimed injury is "tested for 'substantiality, likelihood of occurrence, and adequacy of proof.'" *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 230 F. Supp. 2d 12, 15 (D.D.C. 2002) (quoting *Cuomo*, 772 F.2d at 976, 977). And further, "[t]he Court must consider the significance of the change from the *status quo* which would arise in the absence of a stay, as well as likelihood of occurrence of the claimed injury, when determining whether defendants have truly met their burden of demonstrating irreparable harm justifying imposition of a stay." *Id.*

Defendants claim two irreparable harms: first, that the State Department will need to modify its IT infrastructure to process the reserved DV-2020 visas (Mem. 24-25), thus expending agency time and resources; and second, that complying with the Court's order will require the State Department to rearrange its own priorities (Mem. 25-27). Both fall far short of the irreparable injury Defendants must show to merit a stay.

This rule is clear: when seeking a stay, the "'key word . . . is *irreparable. Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay are not enough*.'" *Shays v. Fed. Election Comm'n*, 340 F. Supp. 2d 39, 48 (D.D.C. 2004) (quoting *Nat'l Cable Television Ass'n v. Columbia Pictures Indus., Inc.*, 1986 WL 32734, at *1 (D.D.C. Aug. 20, 1986)); *see also Wisc. Gas Co.*, 758 F.2d at 674 ("It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm."); *Ohio Valley Env't Coalition, Inc. v. Pruitt*, 2017 WL 1712527, at *9 (S.D. W.Va. May 2, 2017) ("Numerous courts

have held that compliance costs alone are not irreparable injuries, and for good reason," because "[i]f time and money spent complying with court orders are irreparable injuries, then every agency, or more broadly, every party, subject to an injunction would be able to demonstrate irreparable injury.").

The fact that this Court's October 13 "Order will force the [State Department] to expend its energy and resources to ensure that its [conduct] conform[s] with Congress' intent does not amount to 'irreparable injury.'" *Shays*, 340 F. Supp. 2d at 49. This is especially true because the State Department is in this position because of its own actions, which this Court found to violate the APA: It would not have to expend time and resources on DV-2020 visa applications now if it had only complied with the law when it should have.

The State Department's claim of irreparable harm is further belied by the fact that Defendants waited nearly four months to seek a stay, and—by their own admission—"State began the process of modifying its IT infrastructure to process DV applications from prior fiscal years *on the same day that the Court issued its Order of October 13, 2021*." Mem. 24 (emphasis added). State estimates that it will take until April 2022 to complete these IT changes, *id*. at 25, meaning that more than half of the time needed to complete the IT modifications has already passed. Presumably, if the State Department has been acting diligently, that also means that half the necessary funding has already been spent. The time and resources needed to comply with a court's order are not an irreparable injury as a matter of law, but even if they were, the claimed irreparable injury is especially dubious when the government agency purportedly harmed by these expenses waited until these expenses accrued for four months before even petitioning this Court for a stay. Indeed, if a stay is granted, the time and money Defendants have already spent preparing to implement the Court's order will be entirely wasted.

The State Department's other claimed injuries all boil down to the fact that the agency will not be able to arrange its priorities in the manner it prefers, whether by prioritizing other IT projects or by directing embassies and consulates to prioritize some visa services over others. Mem. 25-27. But this too is insufficient. The State Department's argument "is, at its base, an economic one: that the opportunity cost of compliance with the [October 13 Order] will irreparably harm" it. *Nat. Res. Defense Council, Inc. v. FDA*, 884 F. Supp. 2d 108, 125 (S.D.N.Y. 2012). But unless the State Department can show that this opportunity cost will "seriously threaten its mission or operations," it simply does not constitute an irreparable harm. *Id.*; *see also Ohio Valley*, 2017 WL 1712527, at *9. The State Department has fallen far short of that showing. It points, instead, to delaying IT projects for a handful of months (Mem. 25), and to the fact that other visa applicants will wait a bit longer, because State will be processing the applications of DV-2020 selectees—selectees who, of course, now have been waiting for their visas for more than sixteen months (Mem. 27). This is not "a showing that [the State Department's] core mission is substantially endangered," *Ohio Valley*, 2017 WL 1712527, at *9, and is not an irreparable injury.

## III.   CLASS MEMBERS WILL CONTINUE TO SUFFER IRREPARABLE HARM IF A STAY IS ISSUED

If a stay is issued, *Gomez* class members will continue to suffer irreparable harm. *See Jackson v. Dist. of Columbia*, 692 F. Supp. 2d 5, 7 (D.D.C. 2010) (defining irreparable harm as "imminent injury that is both great and likely, and for which legal remedies are inadequate") (citing *Wisc. Gas Co.*, 758 F.2d at 674). As this Court acknowledged, Plaintiffs "have provided a mountain of affidavits attesting to the severe emotional, economic, educational, and personal harms that they and their families will imminently experience" if they are unable to receive their visas. *Gomez I*, 485 F. Supp. 3d at 200. For that reason, this Court stated that it was a "smart

choice" for Defendants "not [to] contest that the DV-2020 Plaintiffs have met their burden of showing irreparable harm." *Id.*

Members of the DV-2020 class continue to be irreparably harmed by Defendants' refusal to adjudicate their diversity-visa applications. This irreparable harm has been repeatedly recognized by the courts. *See P.K. v. Tillerson*, 302 F. Supp. 3d 1, 10 (D.D.C. 2017) (finding that DV selectees' loss of opportunity to receive diversity visas constituted irreparable harm); *see also Mohamed v. Pompeo*, 2019 WL 4734927, at *4 (E.D. Cal. Sept. 27, 2019) (finding that if diversity visa selectees' applications were not adjudicated by the end of the fiscal year, the plaintiffs would "be harmed irreparably"). Many class members also have been harmed by the significant affirmative steps they have taken to prepare to immigrate to the United States—enduring family separation, selling assets, quitting their jobs, suspending their businesses and investments, and spending all savings to secure their visas. *See* Supplemental Declaration of Tess Hellgren (Hellgren Decl.) (submitted herewith).

*Gomez* class members continue to suffer myriad harms as they await adjudication of their diversity visas. In a recent survey by class counsel, half of *Gomez* class members who responded reported suffering economic harms from their delays in visa adjudication. *See* Hellgren Decl. ¶ 16 (noting that 48% of *Gomez* survey respondents reported disruption to employment and 53% reported suffering financial and economic harms due the delayed adjudication of DV-2020 visas); *see also id.* ¶ 16(c) (class member sold home to pay administrative fees for visa process). Delays have caused severe stress to family units and family separation: in the recent class survey, 40% of respondents reported that the delay of visa issuance disrupted their household stability, and 17% reported being separated from their families while awaiting resolution of this case. *See id.* ¶ 15 (citing class-member examples of parent-child separation and divorce caused by stress of visa

delays). Of the class-member-survey respondents, 16% also report medical or health ramifications from delayed adjudication of their diversity visas. *See, e.g., id.* ¶ 16(b) (class member's son with Crohn's disease is unable to access needed medication that is available in the United States but not in Iran).

Absent clarity about when, and to whom, visas will be issued, class members also suffer ongoing harm from their state of limbo. To preserve their eligibility for a visa, class members report postponing having children, remaining in unsafe locations, and losing or foregoing professional opportunities. *See* Hellgren Decl. ¶¶ 14-16; *see also id.* ¶ 16(a) (class member has delayed plans to have children due to fear of travelling while pregnant if she receives a visa). Many class members struggle with health conditions that have been caused by the uncertainty and anxiety of the visa process. *See id.* ¶ 16 (describing class members' struggles with depression, insomnia, a compulsive eating disorder, and other stress-related conditions). Having made great sacrifices only to potentially have lost their opportunity to immigrate to the United States, many class members continue to suffer from a waiting process that they experience as "mental torture." *See id.* ¶ 16(g).

Furthermore, as Defendants note, many class members remain in danger in their country of origin because of "global, regional, and local crises," ranging from political instability in Ethiopia to the Taliban takeover in Afghanistan. *See* Craig Decl. ¶ 6, ECF No. 253-4. While Defendants' "consular operations were affected" by these crises, *see id.*, so too are class members' lives, *see, e.g.,* Hellgren Decl. ¶ 14(c)-(d) (class members in Afghanistan living in fear of the Taliban), ¶ 14(e) (class member enduring danger of prolonged civil war in Ethiopia, where she is at risk due to her Tigrayan ethnicity). Class members are currently living in conflict zones ranging

from Yemen to Cameroon to Belarus, with many relying on the opportunity to receive this visa as their sole chance of finding safety. *See id.* ¶ 14.

For all of these reasons, class members' inability to have their diversity visas adjudicated is thus clearly a "certain," "great," and "imminen[t]" injury. *Wisc. Gas Co.*, 758 F.2d at 674; *see Tillerson*, 302 F. Supp. 3d at 9-10.

## IV.   A STAY PENDING APPEAL WOULD NOT SERVE THE PUBLIC INTEREST

Harm to the public interest weighs against a stay here. First, Congress has determined that diversity visas are in the public interest. *See, e.g.*, 136 Cong. Rec. H-8529-02 (1990) (reflecting the establishment of an annual "diversity visa" program to "maintain an ongoing diverse flow of immigrants" to the United States); H.R. Rep. No. 101-723, pt I (1990), as reprinted in 1990 U.S.C.C.A.N. 6710, 6715, 6728 (creating diversity-based immigrant visas "to promote diversity in our current immigration system"). While Defendants may not like that congressional choice, it is not theirs to ignore. *Accord League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").

Second, despite their protestations to the contrary, Defendants can continue processing family-based visas while complying with the Court's order. The truth is: 9,095 visas is a mere fraction of the visas that consulates process annually.[8] The public interest would be best served by finally allowing class members to receive the visas Congress intended them to receive years ago.

## CONCLUSION

For the reasons above, the Court should deny Defendants' motion for a stay pending appeal.

---

[8] *See, e.g.*, Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts Fiscal Years 2016-2020, *supra* n.5 (reflecting that in FY2020, the first year of the COVID-19 pandemic and the most recent year for which data is available, the State Department issued only 18,288 diversity visas out of 240,526 immigrant visas and separately issued 4,013,210 nonimmigrant visas).

Dated: February 15, 2022

Respectfully Submitted,

Jesse M. Bless (D.D.C. Bar No. MA0020)
Wasden Banias, LLC
38 Romney Street, Ste. 201
Charleston, SC 29403
(781) 704-3897
jbless@wasdenbanias.com

/s/ Andrew J. Pincus
Andrew J. Pincus (D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Karen C. Tumlin (D.D.C. Bar No. CA00129)
Esther H. Sung (D.D.C. Bar No. CA00132)
Jane P. Bentrott (D.D.C. Bar No. 1029861)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 316-0944
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
jane.bentrott@justiceactioncenter.org

Matthew D. Ingber (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com

Laboni A. Hoq (*pro hac vice*)
LAW OFFICE OF LABONI A. HOQ
Justice Action Center Cooperating Attorney
P.O. Box 753
South Pasadena, CA 91030
laboni@hoqlaw.com

Stephen Manning (D.D.C. Bar No. OR0024)
Tess Hellgren (D.D.C. Bar No. OR0023)
Jordan Cunnings (*pro hac vice*)
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: (503) 241-0035
stephen@innovationlawlab.org
tess@innovationlawlab.org
jordan@innovationlawlab.org